Richard D. McCune, CA Bar No. 132124
rdm@mccunewright.com
Steven A. Haskins, CA Bar No. 238865
sah@mccunewright.com
Valerie L. Savran, CA Bar No. 334190
vls@mccunewright.com
Richard A. Nervig, CA Bar No. 226449
ran@mccunewright.com
**MCCUNE LAW GROUP, APC**
3281 E. Guasti Road, Suite 100
Ontario, California 91761
Telephone:  (909) 557-1250
Facsimile: (909) 557-1275

Emily J. Kirk, IL Bar No. 6275282*
ejk@mccunewright.com
**MCCUNE LAW GROUP, APC**
231 N. Main Street, Suite 20
Edwardsville, IL 62025
Telephone: (618) 307-6116
Facsimile: (618) 307-6161

* *Pro Hac Vice* application to be submitted

*Attorneys for Plaintiffs*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| ALEXANDRIA MOSELY, REJOYCE KEMP, BERENICE CISNEROS, BRUCE PARKER, individually, <br><br> Plaintiffs, <br><br> v. <br><br> WELLS FARGO & CO., WELLS FARGO BANK, N.A., and DOES 1 through 5, <br><br> Defendants. | Case No.: **'22CV1976 BEN AGS** <br><br> **COMPLAINT** <br><br> 1. Declaratory Judgment (Electronic Funds Transfer Act) <br> 2. Declaratory Judgment (Contract) <br> 3. Violation of Unfair Competition Act (Calif. Bus. & Prof. Code § 17200) |

# TABLE OF CONTENTS

*Page*

I     INTRODUCTION ................................................................3

II    PARTIES .......................................................................7

    A.    Plaintiffs ......................................................................7

    B.    Wells Fargo Defendants ...............................................9

    C.    Interested Party ..........................................................9

    D.    Doe Defendants ..........................................................9

III   JURISDICTION AND VENUE ........................................10

IV    FACTUAL ALLEGATIONS ............................................11

    A.    The Predatory History of Overdraft Fees......................11

    B.    Regulation E Introduces Rules to Protect Consumers from Predatory Overdraft Fees ........................................................15

    C.    Specific Regulation E Requirements ............................16

    D.    Wells Fargo's Violation of Regulation E Practices Prior to May 9, 2022...17

        1.    Use of Descriptive Language in the Opt-in Disclosure Applicable to Each Method of Opt-in ....................................17

        2.    Opt-in at Account Opening in the Branch .....................20

        3.    Opt-in Existing Customers at the Branch .....................21

        4.    Opt-in Through Online Customers .....................................22

        5.    Opt-in by Telephone Customers .......................................22

    E.    Wells Fargo's History of Charging Illegal Overdraft Fees.........................22

    F.    Wells Fargo Enrolled Plaintiffs into DCOS Through Unlawful Disclosures and Practices.........................................................22

        1.    Plaintiffs Submit Their Claims to AAA Expecting to Arbitrate Their Claims Per the Account Agreement................................23

        2.    Wells Fargo Prevents Plaintiffs from Serving Claims and Obtaining Hearings ................................................24

Complaint
Case No.

1

## TABLE OF CONTENTS, cont.

2

*Page*

3    V    CAUSES OF ACTION .................................................................................. 25

4         FIRST CAUSE OF ACTION ...................................................................... 25

5         SECOND CAUSE OF ACTION .................................................................. 27

6         THIRD CAUSE OF ACTION ...................................................................... 28

7    VI    PRAYER FOR RELIEF ............................................................................. 30

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Complaint
Case No.

## CLASS ACTION COMPLAINT

Plaintiffs Alexandria Mosely, Rejoyce Kemp, Berenice Cisneros, and Bruce Parker bring this action against Defendants Wells Fargo & Company and Wells Fargo Bank, N.A. (collectively, "Wells Fargo" or "Defendant") and Does 1 through 5, by and through their attorneys, and allege as follows:

### I    INTRODUCTION

1.    Plaintiffs Alexandria Mosely, Rejoyce Kemp, Berenice Cisneros, and Bruce Parker ("Plaintiffs") are a few out of over 3,000 Wells Fargo customers seeking relief through demands to the American Arbitration Association ("AAA")[1] against Wells Fargo & Company and Wells Fargo Bank, N.A., resulting from Wells Fargo's illegal collection of overdraft fees. These demands have been made pursuant to a provision in Wells Fargo's contracts with consumers (called the Deposit Account Agreement), which designated AAA as Wells Fargo's arbitration provider. But Wells Fargo did not just promise arbitration. It asserted:

> Arbitration is beneficial because it provides a legally binding decision in a more streamlined, cost-effective manner than a typical court case.[2]

2.    To reinforce its promises, Wells Fargo directed Plaintiffs to the AAA consumer arbitration rules, which promote arbitration as a faster and easier dispute resolution process than litigation.[3] Plaintiffs therefore agreed to arbitration by opening and maintaining their accounts.

---

[1] AAA is not mentioned as a Defendant in this Complaint; nevertheless, it states in its Consumer Arbitration Rules that it will abide by any court order issued as to the parties participating in the arbitration.  American Arbitration Ass'n, Consumer Arbitration Rules ("AAA Consumer Rules"), p. 6, 43, available at https://adr.org/sites/default/files/Consumer%20Rules.pdf. (last visited Dec. 12, 2022).

[2] Deposit Account Agreement, Ex. A, p. 35.

[3] The first paragraph of AAA's Consumer Arbitration Rules states that "Arbitration is usually faster and cheaper than going to court." AAA Consumer Rules, p. 6, available at https://adr.org/sites/default/files/Consumer%20Rules.pdf. (last visited Dec. 12, 2022). On its website, AAA declares that arbitration is "faster and more cost effective than litigation." AAA, What We Do, at https://www.adr.org/Arbitration (last visited December 12, 2022).

3.    But Wells Fargo misled consumers. In fact, as Wells Fargo feeds consumers through the arbitration meat-grinder, they soon experience Wells Fargo's intransigent opposition to any kind of efficient or cost-effective dispute resolution. In application, Wells Fargo "refuses to submit to arbitration," to put it mildly.

4.    Contrary to Wells Fargo's contractual promises, its version of "arbitration" entails absolute obstruction. By way of illustration, one Wells Fargo consumer disputing an overdraft claim on the same theory as Plaintiffs filed a class action complaint, but was instead ordered to submit to individual arbitration per the Account Agreement and Wells Fargo's promises. Though his claim was substantial to him, his overdraft fees and statutory penalties would have amounted to approximately $2,000, a mere pittance to Wells Fargo. Nonetheless, Wells Fargo (again, abetted by AAA) filed the following motions:

- Motion to dismiss pertaining to statute of limitations;
- Three different motions regarding the availability of public injunctive relief under the applicable contract and arbitration clause;
- Informal briefings regarding discovery disputes;
- A motion to exclude testimony and report of Claimant's expert witness; and
- A full dispositive motion on the merits of the claim.

5.    The pre-hearing briefing alone took months of calendar time, amounted to hundreds of written pages, and hundreds of hours of attorney time. As a result, this single claimant alone incurred what would have been over $500,000 in attorneys' fees had he paid attorneys' fees out of pocket. This example shows the extent to which Wells Fargo has deceived Plaintiffs and other consumers. And where Wells Fargo cannot directly block arbitrations, it instead employs the extraordinary litigation avalanche that renders individual arbitration, as a practical matter, nonsensical. And AAA actively facilitates Wells Fargo's conduct.

Complaint
Case No.

6.      What is more, because available AAA arbitrators are limited, they are on pace to complete these arbitrations in a time period measured not in years, but in ***decades***. This is true even here, in a situation where fewer than 1% of Wells Fargo consumers have submitted arbitration demands. Wells Fargo relies on AAA's inability to provide services on demand as part of its obstructive strategy. True to form, Plaintiffs submitted their claims up to a year ago, but arbitrators have not been appointed nor have Plaintiffs obtained an arbitration date.[4] Wells Fargo has also failed to pay the arbitration fees the arbitration agreements requires. These claims are the canary in the coal mine for thousands of current and future claimants, all of whom are being subjected to the same obstruction and denial of rights.

7.      Another significant impediment to quickly and efficiently resolving claims is that each individual claimant, including Plaintiffs, requires an individual hearing on whether Wells Fargo has violated the law, before addressing individual issues such as damages.  Wells Fargo intentionally precludes any coordination of individual claimants, even on common issues such as whether Wells Fargo's conduct—conduct that is uniform—violates the law.  This not only results in hundreds of arbitrators (many of whom are not judges) determining legal issues on the same set of facts, but decisions cannot even be shared among individual arbitrators. As such, each arbitrator must conduct an individual legal and factual inquiry about claims based on technical statutory language.  This needless repetition prevents quick and efficient resolution. And equally important, dozens of arbitrators will issue different rulings on the exact same conduct and legal issues, resulting in citizens obtaining inconsistent and inequitable relief and losing faith in the legal system.

8.      If that weren't enough, Wells Fargo uses the arbitration process to punish those who dare file claims before they are even accepted for arbitration. At Wells Fargo's

---

[4]  Of the thousands of existing Wells Fargo claimants awaiting resolution of their claims, AAA has assigned arbitrators to only two cases. Both these claimants served their demands in February 2022, ten months ago.

Complaint
Case No.

demand, AAA insists that Wells Fargo claimants submit evidentiary **proof** of their claims **before** AAA even begins to **process** them. Simultaneously, Wells Fargo refuses to produce the records necessary to decipher consumers' claims or any resulting damages, even upon the consumer's express request. Wells Fargo has also insisted that AAA impose pleading requirements **substantially higher** than those imposed by Rule 12 of the Federal Rules of Civil Procedure or California law. Incredibly, AAA has facilitated this request all while claiming that it intends to facilitate a quick and easy resolution of claims.  All this leaves consumers in a claims purgatory—right where Wells Fargo wants them.

9. For instance, "APSN" claims, a type of overdraft claim the CFPB recently specified as a practice inherently unfair to consumers,[5] are determinable only with data solely in Wells Fargo's possession. If arbitration proceeded as promised, Wells Fargo would be required to produce this information because doing so would timely resolve consumers' claims. But Wells Fargo stonewalls because it has never actually intended to encourage arbitration as a means of efficient dispute resolution. Wells Fargo simply finds it easier to shut AAA's door on consumers than the courthouse door.

10. In short, Wells Fargo's version of consumer arbitration is a fiction. In practice, its approach to arbitration **prevents** consumer claims by making arbitration arduous and impractical.[6] In this way, Wells Fargo elevates itself above the law.

11. To be clear, Plaintiffs do not attack the Federal Arbitration Act or the legality of the arbitration language on its face, and do not deny agreeing to arbitration. Plaintiffs submitted their claims to arbitration in the first place. But Wells Fargo won't let Plaintiffs' claims proceed with the meaningful arbitration Wells Fargo promised.

---

[5] https://files.consumerfinance.gov/f/documents/cfpb_unanticipated-overdraft-fee-assessment-practices_circular_2022-10.pdf (last visited Dec. 12, 2022).

[6] Wells Fargo has several reasons for avoiding arbitration, some unknown to Plaintiffs, but a significant known reason is expense. Consumer arbitration requires Wells Fargo to pay the costs of the arbitrator and the hearing; Wells Fargo does not want to pay these costs, despite having foisted the arbitration clause on consumers in the first place.

Complaint
Case No.

12.     The arbitration agreement provides that "Wells Fargo or you each can exercise any lawful rights or use other available remedies to . . . Obtain provisional or ancillary remedies such as injunctive relief …." Plaintiffs thus seek declaratory and injunctive relief from this Court.

13.     First, the Court should issue declaratory judgment on whether Wells Fargo violated Regulation E by unlawfully enrolling Plaintiffs in its overdraft program and subsequently assessing them overdraft fees without obtaining the lawful consent required by Regulation E. A declaratory ruling on this federal issue by a federal court would provide much-needed progress in providing guidance to the parties and the arbitrators to allow them to reach the quick and efficient resolution that Wells Fargo promised to Plaintiffs.

14.     Wells Fargo has also breached the arbitration agreement because it has not provided to Plaintiffs the promised method of quick, easy, and efficient dispute resolution. Thus, Plaintiffs also seek declaratory judgment that Wells Fargo has breached the arbitration agreement and must provide Plaintiffs (and others) who have submitted arbitration demands the streamlined and efficient resolution promised.

15.     Finally, Wells Fargo's actions amount to unfair and unlawful business practices actionable under California's Unfair Competition Law, California Business & Professions Code Section 17200. Systematic obstruction and denial of the contractual right to arbitrate is an unfair and unconscionable practice, and Plaintiffs seek public injunctive relief consistent with Wells Fargo's cessation of those policies.

## II     PARTIES

### A.    Plaintiffs

16.     Plaintiff Alexandria Mosely is a United States citizen and a resident of this judicial district. Her arbitration demand was filed with AAA on April 13, 2022. Based on information and belief, she was enrolled by Wells Fargo into its Regulation E Debit Card Overdraft Protection Services (hereinafter, "DCOS") program in or around June 2017 when she opened her account at the branch.  On November 9, 2021, she was charged a

$35.00 overdraft fee on an ATM transaction.  The fee has not been refunded. Plaintiff has been charged overdraft fees on other occasions.  Plaintiff has not had an arbitrator appointed, an arbitration scheduled, or been allowed to proceed with the arbitration Wells Fargo promised.

17.    Plaintiff Berenice Cisneros is a United States citizen and a resident of this judicial district. His arbitration demand was filed with AAA on August 16, 2022. Based on information and belief, he was enrolled by Wells Fargo into DCOS in or around November or December 2021 by telephone.  On February 9, 2022, he was charged a $35.00 overdraft fee on a one-time debit card transaction. The fee has not been refunded. Plaintiff has been charged overdraft fees on other occasions. Plaintiff has not had an arbitrator appointed, an arbitration scheduled, or been allowed to proceed with the arbitration Wells Fargo promised.

18.    Plaintiff Rejoyce Kemp is a United States citizen and a resident of this judicial district. Her arbitration demand was filed with AAA on July 19, 2022. Based on information and belief, she was enrolled online by Wells Fargo into DCOS in or around September 2020. On June 15, 2022, she was charged a $35.00 overdraft fee on a one-time debit card transaction. The fee has not been refunded. Plaintiff has been charged overdraft fees on other occasions.  Plaintiff has not had an arbitrator appointed, an arbitration scheduled, or been allowed to proceed with the arbitration Wells Fargo promised.

19.    Plaintiff Bruce Parker is a United States citizen and a resident of this judicial district. His arbitration demand was filed with AAA on April 13, 2022. Based on information and belief, he was enrolled by Wells Fargo into DCOS in or around December 2017 when he opened his account at a branch. On October 26, 2021, he was charged a $35.00 overdraft fee on a one-time debit card transaction.  The fee has not been refunded. Plaintiff has been charged overdraft fees on other occasions.  Plaintiff has not had an arbitrator appointed, an arbitration scheduled, or been allowed to proceed with the arbitration Wells Fargo promised.

Complaint
Case No.

**B.    Wells Fargo Defendants**

20.    Wells Fargo is a nationally chartered bank with over 4,700 banking locations nationwide, including more than 12,000 automatic teller machines (ATMs).  As of July 2022, Wells Fargo reports that it had over 64 million customers nationwide, with over 265,000 employees, $1.92 trillion in assets held on behalf of customers, and net income of $21.5 billion for the 2021 fiscal year. Between September 30, 2018 and September 30, 2022, Wells Fargo assessed its customers $5.821 *billion* in consumer overdraft-related charges.[7]

21.    Wells Fargo & Company maintains its corporate headquarters in San Francisco, California, and Wells Fargo Bank, N.A. maintains its principal place of business in Sioux Falls, South Dakota.

**C.    Interested Party**

22.    AAA is a non-profit organization with its headquarters in New York, New York.  It is the largest administrator of arbitration.  Its board and council members are largely made up of attorneys of the largest corporate law firms in the U.S. that defend Fortune 500 corporations in consumer class actions and arbitrations, including Sidley Austin; Skadden Arps Slater Meagher & Flom, LLP; Mayer Brown, LLP; Reed Smith LLP; Arnold & Porter Kaye Scholer, LLP; Gibson, Dunn & Crutcher; Wilmer Cutler Pickering Hale and Dorr, LLP;  Simpson Thatcher & Bartlett; Seyfarth Shaw LLP; White & Case LLP; Locke Lord, LLP;  King & Spalding LLP; Hogan Lovells US, LLP, and many other large corporate law firms.[8]

**D.    Doe Defendants**

23.    Without limitation, defendants DOES 1 through 5, include agents, partners, joint ventures, subsidiaries, and/or affiliates of Defendants and, upon information and

---

[7] https://cdr.ffiec.gov/public/ManageFacsimiles.aspx# (last visited Dec. 12, 2022).

[8] AAA_2021_Annual_Report_and_Financial_Statements.pdf (adr.org) (last visited Dec. 12, 2022).

-9-

Complaint
Case No.

belief, also own and/or operate Defendant's branch locations. As used herein, where appropriate, the term "Defendant" is also inclusive of Defendants DOES 1 through 5.

24.    Plaintiffs are unaware of the true names of Defendants DOES 1 through 5. Defendants DOES 1 through 5 are thus sued by fictitious names, and the pleadings will be amended as necessary to obtain relief against Defendants DOES 1 through 5 when the true names are ascertained, or as permitted by law or the Court.

25.    There exists, and has existed, a unity of interest and ownership between the Wells Fargo named defendants (including DOES) such that any corporate individuality and separateness between the named defendants has ceased, and that the named defendants are *alter egos* in that they effectively operate as a single enterprise or are mere instrumentalities of one another.

26.    At all material times herein, each Wells Fargo and DOE defendant was the agent, servant, co-conspirator, and/or employer of each of the remaining defendants; acted within the purpose, scope, and course of said agency, service, conspiracy, and/or employment and with the express and/or implied knowledge, permission, and consent of the remaining defendants; and ratified and approved the acts of the other defendants. However, each of these allegations are deemed alternative theories whenever not doing so would result in a contradiction with the other allegations.

27.    Whenever reference is made in this Complaint to any act, deed, or conduct of Defendants, the allegation means that Defendants engaged in the act, deed, or conduct by or through one or more of its officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of Defendants' ordinary business and affairs.

28.    As to the conduct alleged herein, each act was authorized, ratified, or directed by Defendants' officers, directors, or managing agents.

### III    JURISDICTION AND VENUE

29.    This Court has subject matter jurisdiction over this case under 28 U.S.C. § 1331, 15 U.S.C. § 1693m, 28 U.S.C. § 1367(a), and 28 U.S.C. § 2201.

Complaint
Case No.

30.     Venue is proper here because Wells Fargo transacts business, the parties entered into contracts, and Wells Fargo executed the unlawful policies and practices which are the subject of this action, in this District.

## IV     FACTUAL ALLEGATIONS

**A.     The Predatory History of Overdraft Fees**

31.     Overdraft services are not new, but historically generated relatively low revenues, particularly when payment methods were limited to cash, check, and credit card. But as debit card transactions rose in number, financial institutions recognized that overdraft fees could be a significant profit center. The new revenue came at a fortuitous time because revenue was falling due to lower average interest rates and competitive innovations like no-fee checking accounts. Institutions eagerly offer overdraft services because they generate revenue with little risk. On average, an overdraft is repaid in three days, meaning that the institution advances these small sums for no more than a day or two.

32.     When a financial institution advances its own funds to pay a transaction, it may charge a contracted and/or disclosed fee, if the fee is legally permissible. Wells Fargo, like most financial institutions, charges expensive fees amounting to expensive credit that harms the poorest customers and creates substantial profit. According to a 2014 Consumer Financial Protection Bureau ("CFPB") study:[9]

- Overdraft and non-sufficient funds (NSF) fees constitute the majority of the total checking account fees customers incur.

- The transactions resulting in overdrafts are often quite small.  In the case of debit card transactions, the median amount of a debit card transaction leads to a overdraft fee is $24.

---

[9] https://files.consumerfinance.gov/f/201407_cfpb_report_data-point_overdrafts.pdf (last visited Dec. 7, 2022).

Complaint
Case No.

- The average overdraft fee for bigger banks is $34 and $31 for smaller banks and credit unions.

33.    Accordingly, as highlighted in the CFPB Press Release related to this study:

- Put in lending terms, if a consumer borrowed $24 for three days and paid the median overdraft of $34, **such a loan would carry a _17,000_ percent annual percentage rate (APR)**. (emphasis added)[10]

34.    Wells Fargo's historical practices have followed these trends to the letter. Until recently, it has charged overdraft/NSF fees of $35.00 per transaction item, with a purported limit of three overdraft charges per day. But even if Wells Fargo was complying with Regulation E, the size of its overdraft fee bears no relation to the minute risk of loss or costs it incurs for administering its overdraft services. Meanwhile, those who pay the overdraft fee are in effect being charged an interest rate with an APR in the thousands. Accordingly, the overdraft fee is punitive in practice, which makes it even more unfair because most account overdrafts are accidental and involve small amounts of money—particularly in comparison to the size of the fee. A 2012 study found that more than 90% of customers assessed overdraft fees mistakenly overdrew their accounts.[11] In a 2014 study, more than 60% of transactions resulting in a large overdraft fee were less than $50.[12] More than 50% of those assessed overdraft fees do not recall opting into an overdraft program, (_id._ at p. 5), and more than two-thirds of customers would have

---

[10] CFPB, CFPB Finds Small Debit Purchases Lead to Expensive Overdraft Charges (7/31/2014) https://www.consumerfinance.gov/about-us/newsroom/cfpb-finds-small-debit-purchases-lead-to-expensive-overdraft-charges/ (last visited Dec. 7, 2022).

[11] Pew Charitable Trust Report, _Overdraft America: Confusion and Concerns about Bank Practices_, at p. 4 (May 2012), https://www.pewtrusts.org/-/media/legacy/uploadedfiles/pcs_assets/2012/sciboverdraft20america1pdf.pdf (last visited Dec. 7, 2022).

[12] Pew Charitable Trust Report, _Overdrawn_, at p. 8 (June 2014),https://www.pewtrusts.org/-/media/assets/2014/06/26/safe_checking_overdraft_survey_report.pdf (last visited Dec. 7, 2022). A more recent study finds that most purchases and transactions triggering a fee amount to less than $20. Smith, Peter et. al, "Overdraft Fees: Banks Must Stop Gouging Consumers During the COVID-19 Crisis." (2020), Center for Responsible Lending.

preferred that the financial institution decline their transaction rather than be charged a very large fee (*id*. at p. 10).

35.    The financial impact of these fees falls on the most vulnerable among the banking population, who have the least ability to absorb what can add up to significant costs. Younger, lower-income, and non-white accountholders are among those most likely to be assessed overdraft fees. *Id*. at p. 3. A 25-year-old is 133% more likely to pay an overdraft penalty fee than a 65-year-old. *Id*. More than 50% of the customers assessed overdraft fees earned under $40,000 per year, and 67% of those customers considered "heavy overdrafters" earn under $50,000 per year.[13] Black and Hispanic consumers identified as "heavy overdrafters" are also significantly over-represented as a proportion of the population—nearly 40% of overdrafters, but only 30% of the overall population.[14] Whereas white consumers pay an average of $5 per month on average in bank fees, Black consumers pay an average of $12 per month (a 140% increase) and Hispanic consumers pay an average of $16 per month (a 320% increase).[15]

36.    While younger, minority individuals are most likely to be caught up in the overdrafting cycle, they are being charged higher and higher interest rates on what constitute, in effect, short term loans. As one report explained it: Consider a $100 ATM withdrawal resulting in an overdraft fee of $35. If paid back in seven days, this 'cash loan' would carry an implicit interest rate of ***1,565 percent*** [emphasis added]."[16] And

---

[13] *Id*. at p. 4; *see also* Report: Overdraft Does Not Meet the Needs of Most Consumers." Pew Charitable Trusts (2017), available at https://www.pewtrusts.org/-/media/assets/2017/12/cb_overdraft_does_not_meet_the_needs_of_most_consumers.pdf.

[14] Heavy Overdrafters Chartbook, Figure 7 (2016).

[15] Survey: While Checking Fees Vary Wildly by Race and Age, Americans Stay Loyal to Their Banks." Bankrate (2020), available at https://www.bankrate.com/banking/best-banks-consumer-survey-2020/. (last visited Dec. 7, 2022).

[16] *Id*. One study found that Black consumers must spend an additional $200 annually more than white consumers, and Hispanics $260, to maintain their bank accounts.  Faber, J. and Terri Friedline. "The Racialized Costs of Banking." *New America* (2018), available at https://www.newamerica.org/family-centered-social-policy/reports/racialized-costs-banking/. (last visited Dec. 7, 2022).

Complaint
Case No.

while this category of consumer will likely have the most difficulty obtaining a credit or savings account, compounding overdraft fees often leads to the forced closure of checking accounts, followed by entry on to a blacklist of consumers unable to obtain accounts at any institution.[17] When turned away from traditional banks, these consumers are generally forced to extreme measures such as payday loans and pawnshops, further increasing the burdens being placed upon them.

37.    No rule requires financial institutions to cover overdraft transactions at all. An overdraft occurs only because the institution voluntarily chooses to advance its own funds to pay a customer's transaction. If the institution does not want to cover the transaction, it can decline the transaction and return it unpaid.

38.    But in most cases, financial institutions accept the miniscule risk that a consumer may not repay an overdraft because though small-dollar transactions, they trigger lucrative fees. Most often, consumers make a minor purchase with their debit cards—perhaps for groceries or even a $5 dollar cup of coffee—causing a small, brief negative account balance that is quickly repaid by the consumer while eliciting a fee for the bank.

39.    Before Regulation E's adoption, many financial institutions unilaterally adopted "overdraft payment" plans. Consumers would initiate transactions that financial institutions would identify as "overdrafts," then the institution would cover the overdraft as a matter of policy and charge a standard overdraft fee. Under such programs, consumers were charged a substantial fee and had no choice in the matter. At least if the transaction is declined, the consumer can choose another method of payment preventing a $5 coffee from becoming a $40 coffee. Regulation E was intended to curb these practices.

---

[17]  14% and 12% of Black and Hispanic consumers, respectively, do not  have access to banking services, whereas only 2.5% of white Americans are unable to access such services. *See* FDIC Survey on Household Use of Banking and Financial Services (2019) https://www.fdic.gov/analysis/household-survey/2019execsum.pdf (last visited Dec. 7, 2022).

**B.      Regulation E Introduces Rules to Protect Consumers from Predatory Overdraft Fees**

40.      The Federal Reserve, which has regulatory oversight over financial institutions, recognized that financial institutions had a strong incentive to adopt overdraft programs without giving consumers a choice, since overdraft fees are collected on a nearly risk-free basis. Historically, banks could not make a decision on overdrafts until after the transaction occurred. Because this entailed a certain amount of risk, financial institutions usually imposed a fee to process the transaction as an overdraft.  But as debit card and ATM use rose in popularity, both the number of transactions and the timing of their execution changed. There were more debit card transactions because debit card use was so convenient, and financial institutions now could either accept or reject transactions at the point of sale. As a result, banks could collect large amounts of fees on relatively miniscule overdrafts.

41.      And more, these overdraft programs were usually not disclosed to customers, or if so, they were hidden in the middle of a lengthy, boilerplate account agreement.  Unlike enrollment in other programs, the customer would be enrolled simply on the word of the banker (which, at Wells Fargo, involved additional questions outside the topic of overdraft fees because Wells Fargo incentivized sham account practices by its bankers for years).[18]

42.      To mitigate these incentives and to protect customers, the Federal Reserve Board amended Regulation E in 2009. Regulation E was designed to stop these practices. Customers were to get meaningful disclosures in understandable language that was segregated from all other information before they were enrolled in the overdraft program,

---

[18] U.S. Dept. of Justice, Wells Fargo Agrees to Pay $3 Billion to Resolve Criminal and Civil Investigations into Sales Practices Involving the Opening of Millions of Accounts without Customer Authorization, Feb. 21, 2020, https://www.justice.gov/opa/pr/wells-fargo-agrees-pay-3-billion-resolve-criminal-and-civil-investigations-sales-practices (last visited December 12, 2022); Jack Kelly, Wells Fargo Forced to Pay $3 Billion for the Bank's Fake Account Scandal, Forbes, https://www.forbes.com/sites/jackkelly/2020/02/24/wells-fargo-forced-to-pay-3-billion-for-the-banks-fake-account-scandal/?sh=6251c00542d2 (last visited December 12, 2022).

-15-

and then to be considered enrolled, customers were required to provide affirmative and verifiable agreement to the program. Only then was the financial institution allowed to assess overdraft fees on these customers.

**C.     Specific Regulation E Requirements**

43.     Because of the potential for financial institutions to skirt these requirements, Regulation E details specific prerequisites for enrolling in a financial institution's overdraft program. Prior to the customer making a decision to give consent, the financial institution must first provide customers with a disclosure (commonly referred to as an "opt-in" disclosure) describing the overdraft program. In addition to providing the disclosure to customers before opt-in, to qualify as a proper opt-in disclosure, that disclosure had to be accurate, and in a "clear and readily understandable way," disclose the terms of the overdraft services set forth in the Regulation. 12 C.F.R. § 1005.4(a)(1).

44.     To avoid burying the necessary disclosure language with other unrelated or unnecessary information and ensure all necessary information was provided, the opt-in disclosure needed to be substantially similar to the one-page Model A-9 Form included in Regulation E. 12 C.F.R. § 1005.17(d).

45.     A hidden or buried disclosure is the same as no disclosure at all. So Regulation E required that the opt-in disclosure be segregated from other disclosures and presented to customers as a stand-alone document. 12 C.F.R. § 1005.17(b)(1)(i).  The financial institution was also required to avoid encouraging and marketing customers into the overdraft program. *See* 12 CFR § 1005.1(b) (stating that "the primary objective of the act…is the protection of individual consumers engaging in electronic fund transfers and remittance transfers"); *see also* 12 CFR § 1005.1(b), cmt. 17(b)-4. Obtaining and verifying affirmative consent was similarly important.  The financial institution had to obtain affirmative consent separately from other acknowledgements, either by signature (as provided for in the model form), or through some other recordable means of assent (such as the customer checking an electronic box or consenting to a recording of verbal assent). 12 C.F.R. § 1005.17, cmt 17(b)-6.

46.    Once having obtained the consumer's affirmative consent after this process is completed, the financial institution is required to provide the customer with confirmation of their consent, including instructions on how later to opt out. 12 C.F.R. § 1005.17(b)(1)(iv).

47.    It was only after complying with each of these requirements that a financial institution could charge these customers overdrafts fees on one-time debit card and ATM fees. But even after that, financial institutions continued to have a responsibility to administer their overdraft programs in non-deceptive and fair manner.

**D.    Wells Fargo's Violation of Regulation E Practices Prior to May 9, 2022**

48.    At all relevant times, Wells Fargo enrolled customers into Regulation E through opt-in at the branch during account opening; at the branch for an existing customer at a time other than account opening; online; and by telephone.

### 1.    Use of Descriptive Language in the Opt-in Disclosure Applicable to Each Method of Opt-in

49.    In each way that customers can opt-in, Wells Fargo used an opt-in disclosure to describe an overdraft as existing when there was not enough money in the account to cover a transaction, but Wells Fargo paid it anyway. This description has been consistently found either ambiguous or misleading by the numerous courts that have examined this exact language.[19]

---

[19] *Tims v. LGE Cmty. Credit Union*, 935 F.3d 1228, 1239-40 (11th Cir. 2019); *Bettencourt v. Jeanne D'Arc Credit Union*, 370 F. Supp. 3d 258, 261-64 (D. Mass. 2019); *Pinkston-Poling v. Advia Credit Union*, 227 F. Supp. 3d 848, 854-56 (W.D. Mich. 2016); *Walbridge v. Northeast Credit Union*, 299 F. Supp. 3d 338, 343-46 (D.N.H. 2018) (holding that terms such as "enough money," "insufficient funds," "nonsufficient funds," "available funds," "insufficient available funds," and "account balance" were ambiguous); *Smith v. Bank of Hawaii*, No. 16-00513 JMS-RLP, 2017 WL 3597522, at *6–7 (D. Haw. Apr. 13, 2017) ("sporadic" use of terms such as "available" funds or balances insufficiently explained to consumer when overdraft fee could be charged); *Walker v. People's United Bank*, 305 F. Supp. 3d 365, 374–75 (D. Conn. 2018) (holding there was a "reasonable basis for a difference of opinion" regarding definition of "insufficient funds"); *Ramirez v. Baxter Credit Union*, No. 16-CV-03765-SI, 2017 WL 1064991, at *4-5 (N.D. Cal. Mar. 21, 2017); *Gunter v. United Fed. Credit Union*, No. 315CV00483MMDWGC, 2016 WL 3457009, at *3 (D. Nev. June 22, 2016); *Grenier v. Granite State Credit Union*, 570 F. Supp. 3d 18, 23 (D.N.H. 2021).

Complaint
Case No.

50.     The reason for these numerous court decisions is that like many other financial institutions, Wells Fargo calculates at least two different account balances for each customer's checking account. The "actual balance," "ledger balance," or "current balance" (herein referenced as "actual balance") are industry terms describing the full amount of money in a customer's account at any particular time. The "available balance" represents the actual balance but subtracted from it are any amounts for which the bank has placed "holds" on both debits and deposits. Funds subject to these holds, especially debit holds, may or may not ever actually be posted to the account.[20]  But one way or the other, all funds subject to a hold remain in the customer's account until actually transferred out to satisfy a transaction, which can take several days.

51.     Although Wells Fargo uses both these balances, the actual balance is the account's official balance. It is used when financial institutions report deposits to regulators, when they pay interest on an account, and when they issue monthly statements to customers. This is the balance used at time of actually paying transactions.

52.     However, Wells Fargo uses the "available balance" to assess overdraft fees because doing so increases its opportunities to charge fees. This is because the available balance is often lower (but never higher) than the actual balance, creating a lower threshold against which transactions can be deemed overdrafts. But no matter what calculation the financial institution uses, the account has ***exactly the same*** funds in it. A "hold" is an internal characterization defining a portion of the money in the account, and the placement of a "hold" removes ***no*** money from the account.

53.     The difference between these balances in the context of overdrafts is material to both the financial institution and accountholders. It is estimated that using the available balance increases the number of transactions assessed as overdrafts approximately 10-20%. In those transactions, sufficient funds exist in the account to pay

---

[20] Ayse Kelce, As Gas Prices Surge, Stations Now Hold Up to $175 of Your Money When You Swipe, WALL STREET JOURNAL, June 28, 2022, available at https://www.wsj.com/articles/as-gas-prices-surge-stations-now-hold-up-to-175-of-your-money-when-you-swipe-11656277411 (last visited Dec. 7, 2022).

Complaint
Case No.

the transaction and therefore the financial institution does not advance its own funds to cover the shortfall. Instead, the customer's own money pays for the transaction and then the customer is charged an overdraft fee anyway.

54.     Financial institutions have been put on notice by regulators, banking associations, their insurance companies and risk management departments, and from observing litigation and settlements that using the available balance to calculate overdrafts without disclosure likely violates the law. For instance, the FDIC stated in 2019:

> Institutions' processing systems utilize an "available balance" method or a "ledger balance" method to assess overdraft fees. The FDIC identified issues regarding certain overdraft programs that used an available balance method to determine when overdraft fees could be assessed. Specifically, FDIC examiners observed potentially unfair or deceptive practices when institutions using an available balance method assessed more overdraft fees than were appropriate based on the consumer's actual spending or when institutions did not adequately describe how the available balance method works in connection with overdrafts.[21]

55.     Institutions will process transactions using either the "available balance" method or the "ledger balance" method to assess overdraft fees. The FDIC identified issues regarding certain overdraft programs that used an available balance method to determine when overdraft fees could be assessed. Specifically, FDIC examiners observed potentially unfair or deceptive practices when institutions using an available balance method assessed more overdraft fees than were appropriate based on the consumer's actual spending or when institutions did not adequately describe how the available balance method works in connection with overdrafts.[22]

---

[21] https://www.fdic.gov/regulations/examinations/consumercomplsupervisoryhighlights.pdf (last visited Dec. 7, 2022).

[22] https://www.fdic.gov/regulations/examinations/consumercomplsupervisoryhighlights.pdf (last visited Dec. 7, 2022).

Complaint
Case No.

56.    And in its Winter 2015 Supervisory Highlights, the CFPB explained that:

> A ledger-balance method factors in only settled transactions in calculating an account's balance; an available-balance method calculates an account's balance based on electronic transactions that the institutions have authorized (and therefore are obligated to pay) but not yet settled, along with settled transactions. An available balance also reflects holds on deposits that have not yet cleared. Examiners observed that in some instances, transactions that would not have resulted in an overdraft (or an overdraft fee) under a ledger-balance method did result in an overdraft (and an overdraft fee) under an available-balance method. At one or more financial institutions, examiners noted that these changes to the balance calculation method used were not disclosed at all, or were not sufficiently disclosed, resulting in customers being misled as to the circumstances under which overdraft fees would be assessed. Because these misleading practices could be material to a reasonable consumer's decision making and actions, they were found to be deceptive.[23]

57.    Accordingly, describing an overdraft as "not having enough money in the account to cover a transaction, but we pay [the transaction] anyway" without defining the terms "money in the account" or "available balance" is at best ambiguous, likely deceptive, and either way violates Regulation E's requirement to provide a clear and understandable definition of the overdraft practice.

### 2.    Opt-in at Account Opening in the Branch

58.    Wells Fargo enrolled new customers when they opened their accounts by using an 8-page marketing overdraft brochure as its purported "opt-in" disclosure. (Ex. B.) One brochure page contained Regulation E disclosure language, but it was not segregated from other information, which was illegally targeted at convincing consumers to give consent in any event. The disclosure page stated that "an overdraft occurs when you do not have enough money in your account to cover a transaction but we pay it anyway," which was inaccurate.

59.    On top of the disclosure language being combined with other marketing information, the eight-page brochure itself was not provided to the customers as a standalone document.  Instead, it was placed in a new account folder containing piles of

---

[23] https://files.consumerfinance.gov/f/201503_cfpb_supervisory-highlights-winter-2015.pdf, p. 8 (last visited Dec. 7, 2022).

legal boilerplate, including the account agreement, privacy notice, fee schedule and other documents. These documents were not provided to a new customer until after a Wells Fargo employee elicited consent.

60.    The account representatives were allowed to sell the overdraft program without a script, and the same representative encouraged to enroll consumers into the overdraft program without obtaining the required signatures needed to demonstrate consent.

61.    These practices violated Regulation E because Wells Fargo failed to provide accurate, clear and understandable language when describing the overdraft program in its disclosure language.  It further violated Regulation E by failing to provide the disclosure in a segregated document. Wells Fargo also violated Regulation E when it waited to provide the necessary disclosures until after enrolling customers into the overdraft program.  Finally, Wells Fargo violated Regulation E by enrolling consumers into its overdraft program without obtaining a separate signature or using another independently objective way of obtaining affirmative consent.

62.    On May 9, 2022, in response to the first arbitration in which injunctive relief was sought, Wells Fargo changed its opt-in practice to conform with Regulation E (although these compliant practices apply only to new customers after May 18, 2022). Wells Fargo now uses a one-page segregated disclosure form that specifically discloses its use of the available balance to assess overdraft fees.  In addition, Wells Fargo began to require signatures before opt in. However, it has not applied the new procedure to customers enrolled prior to the change.

### 3.  Opt-in Existing Customers at the Branch

63.    Wells Fargo opted-in existing customers by disclosing that Wells Fargo used the "money in the account" to calculate overdrafts (Ex. B)

64.    This procedure violated Regulation E because Wells Fargo failed to use accurate, clear, and understandable language to describe the overdraft program. Wells Fargo further violated Regulation E by enrolling these customers without obtaining a

separate written agreement or some otherwise objective verification of affirmative consent.

### 4. Opt-in Through Online Customers

65.     Wells Fargo opted-in existing customers by disclosing that Wells Fargo used the "money in the account" to calculate overdrafts. (Ex. B.)

66.     The opt-in for online customers violated Regulation E because Wells Fargo failed to use accurate, clear and understandable language to describe its overdraft program.

### 5. Opt-in by Telephone Customers

67.     Wells Fargo opted-in telephone customers without providing those customers with either the written or verbal disclosure Regulation E required.

68.     The opt-in for telephone customers violated Regulation E for failure to use a disclosure as required by Regulation E to opt-in customers.

### E. Wells Fargo's History of Charging Illegal Overdraft Fees

69.     Wells Fargo has a history of utilizing unfair and deceptive practices with its overdraft practices. In 2010, the Northern District of California held that Wells Fargo had engaged in profiteering and gouging customers through its overdraft practice. It also misrepresented the manner in which it posted transactions and charged overdraft fees. *Gutierrez v. Wells Fargo Bank, N.A.*, 730 F. Supp. 2d 1080, 1097 (N.D. Cal. 2010.) The court entered an order permanently enjoining Wells Fargo from making false or misleading representations relating to the posting order of debit-card transactions. *Id.* at 1137.

### F. Wells Fargo Enrolled Plaintiffs into DCOS Through Unlawful Disclosures and Practices

70.     Wells Fargo enrolled Plaintiff Mosely into DCOS when she opened her account at her local Wells Fargo branch. Her experience with opting-in at time of the opening of the account was consistent with Wells Fargo's uniform practice of opting-in customers at time of opening an account within the branch.

Complaint
Case No.

71.     Wells Fargo enrolled Plaintiff Cisneros into DCOS over the phone with a Wells Fargo representative. His experience with opting-in by telephone was consistent with Wells Fargo's uniform practice of telephone opt-in. A bank employee gave him a rushed verbal explanation about overdraft fees. He was not provided with written confirmation of his opt-in choice, including the right to revoke consent.

72.     Plaintiff Kemp was opted into DCOS through Wells Fargo's online system. Her experience with opting-in online was consistent with Wells Fargo's uniform practice of opting-in customers online.

73.     Plaintiff Parker was opted into DCOS by a Wells Fargo representative when he opened his account at his local Wells Fargo branch. Her experience with opting-in at time of the opening of the account was consistent with Wells Fargo's uniform practice of opting-in customers at time of opening an account within the branch.

74.     At all relevant times, Wells Fargo knew it was using the available balance to assess overdraft fees, and knew or should have known that as a stand-alone document, its opt-in disclosure form failed to provide an accurate, clear and easily understandable definition of an overdraft.

75.     Although Wells Fargo changed its practices in May 2022, it did not re-opt existing customers, including Plaintiffs, using its new Regulation E process.  As a result, Wells Fargo has charged and continues to charge existing customers, including Plaintiffs, overdraft fees on one-time debit card and ATM transactions despite unlawfully enrolling them in DCOS.

**1. Plaintiffs Submit Their Claims to AAA Expecting to Arbitrate Their Claims Per the Account Agreement**

76.     After Plaintiffs determined the nature of their claims against Wells Fargo, each served AAA and Wells Fargo with an individual arbitration demand.

77.     The Account Agreement requires individual customers to waive all rights to participate in a class or act as a class representative. The AAA's Consumer Arbitration Rules and the Federal Arbitration Act govern the arbitral proceedings.

78.     Each Plaintiff has complied with the filing requirements described in the AAA's Consumer Arbitration Rules, specifically Rule 2, which requires that claimants "briefly explain the dispute, list the names and addresses of the consumer and the business, and, if known, the names of any representatives of the consumer and the business, specify the amount of money in dispute, if applicable, identify the requested location for the hearing if an in-person hearing is requested, and state what the claimant wants." Each Plaintiff provided the requisite information. Moreover, AAA accepted each Plaintiff's claim and confirmed with each, in writing, that they had satisfied AAA's filing requirements.

**2.  Wells Fargo Prevents Plaintiffs from Serving Claims and Obtaining Hearings**

79.     At this point, there should have been little left to do but assign arbitrators and proceed to a hearing. But that is inimical to Wells Fargo's strategy, which is to prevent arbitration hearings.  Wells Fargo thus demanded that AAA impose the additional filing requirements previously described, including the requirement that each individual claimant submit their demand with evidentiary proof of their claims already in hand.

80.     Wells Fargo also insisted that AAA impose California Code of Civil Procedure Section 128.7 standards on all claimants, though (1) the parties opted out of legal proceedings precisely to avoid the application of state procedural law and (2) there was no evidence that any consumer acted in bad faith. Wells Fargo is in no position to say whose claims should be heard, and whose shouldn't, particularly because it was the party that insisted on the arbitration process in the first place.

81.     What is more, Wells Fargo demanded (and AAA issued) an arbitrary stay of *all* individual arbitrations until *all* active claimants met arbitrary pleading requirements that apply only to Wells Fargo claimants. Put another way, no single arbitration can proceed until all claimants have satisfied these novel claims submission standards. In doing so, Wells Fargo gets to have it both ways. It demands individual arbitrations when

Complaint
Case No.

that suits its obstructive strategy and collective action when that suits its interests. Either way, Wells Fargo undertakes these actions in bad faith and to "significantly diminish the benefits of arbitration," as well as impede consumers' rights.

82.     Wells Fargo has never intended its arbitration provision to have bilateral effect or provide bilateral benefit. Any benefits Plaintiffs (and other consumers) obtain from Wells Fargo's arbitration language are wholly illusory; they exist only on paper, so courts will check the box and send Plaintiffs along their way. If consumer arbitration is in fact the future of dispute resolution, surely Plaintiffs can at least reasonably expect to obtain a resolution of their disputes from it. Wells Fargo affords them none.

# V     CAUSES OF ACTION

## FIRST CAUSE OF ACTION

## (Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202 – Contract)

83.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1 through 82 above and incorporates them herein by reference.

84.     This conflict constitutes an actual controversy concerning Plaintiffs' contractual duty to continue arbitrating its claims with Wells Fargo and is subject to a binding adjudication by this Court pursuant to 28 U.S.C. § 2201.

85.     The parties entered into an Account Agreement containing an arbitration clause governed by the Federal Arbitration Act, but the arbitration clause permits parties to seek provisional or ancillary remedies in court.

86.     Wells Fargo promised Plaintiffs they would have access to a quick and efficient means of resolving their claims. But in practice, Wells Fargo has demonstrated there will be no quick or efficient resolution. Instead, Wells Fargo ensures that consumers are not able to secure a hearing, much less obtain relief.  Once consumers submit arbitration claims, retain counsel, or take any other action in pursuit of a claim, Wells Fargo buries them under endless red tape, delay tactics, and burden. Wells Fargo promised a process to resolve Plaintiffs' claims, but none exists.

87.     Wells Fargo also demanded that all arbitrations be undertaken individually. Already, this procedure significantly burdens the arbitration process because AAA must be able to assign independent arbitrators to thousands of consumer claims. But Wells Fargo has since strategically sought and imposed collective arbitration procedures upon Plaintiffs in violation of the arbitration agreement. For instance, the requirement that all claimants must satisfy heightened pleading standards, or all current and future claimants will have their claims irrevocably frozen in AAA purgatory, is arbitrary and just plain wrong. All the while, Wells Fargo battles individual claimants' requests for information, even when the information is necessary to satisfy these heightened standards.  The deck could hardly be more stacked than it is here, where Wells Fargo refuses to produce information about the claimant's account until an arbitration commences, but it refuses to commence arbitration unless the claimant submits the evidence in advance that he can otherwise only obtain through discovery because the information is in Wells Fargo's ultimate possession and control.

88.     Though the arbitration agreement provides that Wells Fargo will pay the fees for an arbitrator, Wells Fargo has refused to pay those fees to facilitate arbitration for Plaintiffs and the vast majority of claimants awaiting resolution.  Instead of paying these fees and encouraging timely arbitration, Wells Fargo and AAA have prevented Wells Fargo from paying arbitration fees, even to facilitate arbitrations for those thousands of individuals whom AAA had confirmed proper service of their claims.

89.     By neglecting these obligations, Wells Fargo has breached the Account Agreement, and therefore, Plaintiffs are no longer bound by its terms.

90.     Accordingly, this Court should enter a declaratory judgment declaring that Wells Fargo has breached its arbitration agreement with Plaintiffs, and Plaintiffs thus are no longer bound by the agreement.  In the alternative, the Court should order Wells Fargo to provide Plaintiffs with the arbitration process promised in Plaintiffs' agreements.

91.     Consistent with these findings, the Court should issue appropriate injunctive relief staying or terminating the current arbitration proceedings.

Complaint
Case No.

## SECOND CAUSE OF ACTION

### (Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202 – Regulation E)

92.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

93.    This conflict constitutes an actual controversy concerning Wells Fargo's compliance with Regulation E when it enrolled Plaintiffs in DCOS, and subsequently when it charged overdraft fees to Plaintiffs having failed to obtain lawful consent.

94.    Through the foregoing alleged acts, Defendants violated Regulation E, 12 C.F.R. §§ 1005, *et seq.*, which has the "primary objective" to "protect[] individual consumers," 12 C.F.R. § 1005.1(b), and which "carries out the purposes of the Electronic Fund Transfer Act, 15 U.S.C. §§ 1693, *et seq.*, the 'EFTA,'" 12 C.F.R. § 1005.1(b)).

95.    Specifically, Wells Fargo violated Regulation E's "Opt In Rule." 12 C.F.R. § 1005.17. The Opt In Rule states: "a financial institution . . . *shall not assess a fee or charge* . . . pursuant to the institution's overdraft service, *unless* the institution:  (i) [p]rovides the consumer with a notice in writing [the opt-in notice] . . . *describing the institution's overdraft service*" and (ii) "[p]rovides a reasonable opportunity for the consumer to *affirmatively consent*" to enrollment in an overdraft program. *Id*. (emphasis added).

96.    The intent and purpose of the opt-in disclosure agreement is to "assist customers in understanding <u>how</u> overdraft services provided by their institutions <u>operate</u> . . . by <u>explaining</u> the institution's overdraft service . . . in a <u>clear and readily understandable way</u>"—as stated in the Official Staff Commentary, 74 Fed. Reg. 59033, 59035, 59037, 5940, 5948, which is "the CFPB's official interpretation of its own regulation," "warrants deference from the courts unless 'demonstrably irrational,'" and should therefore be treated as "a definitive interpretation" of Regulation E. *Strubel v. Capital One Bank (USA)*, 179 F. Supp. 3d 320, 324 (S.D.N.Y. 2016) (quoting *Chase Bank USA v. McCoy*, 562 U.S. 195, 211 (2011)) (so holding for the CFPB's Official Staff Commentary for the Truth In Lending Act's Regulation Z).

97.     Regulation E sets forth certain requirements for the notice.  It must be "clear and readily understandable." 12 C.F.R. § 1005.4(a)(1). It must also accurately reflect the terms of the bank's overdraft service, be segregated from all other disclosures, and the customer must sign or otherwise physically register their assent through a digital format. 12 C.F.R. § 1005.17(b).

98.     Wells Fargo's method of enrollment does not satisfy Regulation E because Plaintiffs received a document that inaccurately reflected DCOS's terms.

99.     Wells Fargo's procedural methods for opting consumers into DCOS violated Regulation E.  Plaintiffs were not provided a segregated document substantially similar to the Model A-9 Form, nor were they required to sign that form separate from all other disclosures.  Further, if they opted in over the phone, they were not provided written confirmation of their opt-in choice, or their right to revoke consent.

100.    And because Plaintiffs were not lawfully opted in to Wells Fargo's overdraft service, all overdraft fees Wells Fargo assessed to Plaintiffs on one-time debit card or ATM transactions were unlawful.

101.    Accordingly, Plaintiffs request this Court enter declaratory judgment that (1) Wells Fargo violated Regulation E by failing to obtain Plaintiffs' lawful consent before enrolling them in DCOS and (2), as a result, Wells Fargo unlawfully charged Plaintiffs overdraft fees on ATM and one-time debit card transactions.

102.    The Court should issue corresponding injunctive relief enjoining Wells Fargo from charging Plaintiffs any overdraft fees on one-time debit card or ATM transactions until such time as they have been re-enrolled in DCOS in a lawful manner.

## THIRD CAUSE OF ACTION

### (Violation of California Business & Professions Code Section 17200)

103.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

104.    Pursuant to California Business & Professions Code § 17200, "any unlawful, unfair…business act or practice" is prohibited in the State of California.  This statute

Complaint
Case No.

creates a private right of action based on any unlawful or unfair act committed in the course of business, particularly where it provides the unlawful actor with an unfair business advantage.  Local, state and/or federal law can serve as the basis for an "unlawful…business act or practice[.]"

105.    As alleged above, Wells Fargo violated Regulation E by, among other things, failing to properly obtain Plaintiffs' affirmative consent to opt in to DCOS.

106.    Specifically, Wells Fargo failed to provide Plaintiffs with a document that accurately reflected DCOS's terms in a "clear and readily understandable way." The statement that an overdraft occurs "when there is not enough money in the account to cover a transaction but we [Wells Fargo] pay it anyway," is inaccurate for the reasons previously explained.

107.    Moreover, Wells Fargo did not follow Regulation E when it opted Plaintiffs into DCOS.  It did not provide an opt-in disclosure form substantially similar to the Model A-9 form, did not segregate the opt-in disclosure from other disclosures, nor did it obtain consent signatures separate and distinct from any other consent.

108.    Because Plaintiffs were not lawfully opted in to DCOS, all overdraft fees Wells Fargo assessed on Plaintiffs' one-time debit card or ATM transactions were unlawful.

109.    Wells Fargo also engaged in "unfair" business practice through the alleged conduct. There is no utility inherent in misrepresenting DCOS's terms, while Plaintiffs suffer injury by being enrolled in DCOS without informed consent, as the lack of consent increases the risk that Plaintiffs (and others) will incur high overdraft fees without any commensurate benefit. Furthermore, Wells Fargo's enrollment policies undermine the expressed legislative purpose of Regulation E. Regulation E is a consumer-protection statute, applied liberally on consumers' behalf to protect them from predatory overdraft practices. But Wells Fargo used its enrollment methods to defeat Regulation E's purpose, adopting the model form language that did not accurately reflect Wells Fargo's practices.

Complaint
Case No.

110.    Because Plaintiffs have been harmed by Wells Fargo's unreasonable, unlawful, and unfair business practices of misrepresenting its overdraft practices, Plaintiffs request injunctive relief pursuant to California Business & Professions Code § 17203, including an order compelling Wells Fargo to cease all future unlawful and unfair business practices related to its overdraft practices.

111.    Wells Fargo's unfair, deceptive and misleading acts and practices have directly, foreseeably, and proximately caused injury to Plaintiffs. Thus, Plaintiffs ask the Court to award equitable relief pursuant to California Business & Professional Code 17203, in the form of  injunctive relief preventing Wells Fargo from (i) enforcing its arbitration agreement with Plaintiffs and other current customers unable to obtain arbitration hearings because of Wells Fargo's obstruction; (ii) offering the arbitration agreement to those who are not yet customers, but will open accounts in the future; and (iii) charging overdraft fees to Plaintiffs and other customers on Regulation E transactions until Wells Fargo has obtained affirmative consent through an overdraft disclosure and practices that are consistent with Regulation E.

## VI    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

1.    For declaratory judgment as to the matters alleged herein;

2.    For an order enjoining the continued wrongful conduct alleged herein;

3.    For costs;

4.    For attorneys' fees pursuant to applicable law; and

5.    For such other relief as the Court deems just and proper.

Dated: December 13, 2022              Respectfully Submitted,

**MCCUNE LAW GROUP, APC**

*/s/ Richard D. McCune*
Richard D. McCune, CA Bar No. 132124
rdm@mccunewright.com

-30-

Steven A. Haskins, CA State Bar No. 238865
sah@mccunewright.com
Valerie L. Savran, CA State Bar No. 334190
vls@mccunewright.com
Richard A. Nervig, CA State Bar No. 226449
ran@mccunewright.com
**MCCUNE LAW GROUP, APC**
3281 East Guasti Road, Suite 100
Ontario, CA 91761
Telephone: (909) 557-1250
Facsimile: (909) 557-1275

Emily J. Kirk, IL Bar No. 6275282*
ejk@mccunewright.com
**MCCUNE LAW GROUP, APC**
231 N. Main Street, Suite 20
Edwardsville, IL 62025
Telephone: (618) 307-6116
Facsimile: (618) 307-6161

Attorneys for Plaintiffs

*Pro Hac Vice* application to be submitted

-31-

Complaint
Case No.