# Exhibit B



<u>**American Arbitration Association**</u>
<u>**Consumer Arbitration Rules**</u>
<u>**Final Award**</u>

Case Number: 01-21-0016-4036

Mosanthony Wilson
v.
Wells Fargo & Co., Wells Fargo Bank, N.A

**FINAL AWARD WITH FINDINGS OF FACT & CONCLUSIONS OF LAW**

I, Arbitrator Janice L. Sperow, the undersigned, having been designated in accordance with the arbitration agreement entered into by the above-named parties, having been duly appointed and sworn, and having heard the proof and allegations of the Parties, Mosanthony Wilson (hereinafter claimant) having been represented by Richard McCune and Emily Kirk of the Law Offices of McCune Wright Arevalo LLP and Wells Fargo & Co., Wells Fargo Bank, N.A (hereinafter respondent) having been represented by Joshua Davey and Mary Grob of Troutman Pepper Hamilton Sanders LLP at an in-person hearing held on June 23, 2022, and having read the written evidentiary submissions in the matter do hereby AWARD as follows:

**THE PARTIES & CLAIMS**

Respondent is a national bank. Claimant is a banking customer with both checking and savings accounts with respondent. Claimant pled two causes of action: (1) violation of the Electronic Fund Transfer Act (ETFA), as implemented by Federal Reserve Regulation E (Reg. E), 12 C.F.R. § 1005.1, *et seq.*; and (2) violation of California's Unfair Competition Law (UCL), California Business & Professions Code § 17200, *et. seq*. <u>See</u> Comp. ¶¶ 86-92, 93-101. Claimant bases both claims on respondent's overdraft fees, practices, policies, and disclosures. <u>See</u> <u>id.</u>

**PROCEDURAL HISTORY**

**The Underlying Lawsuit**

Claimant initially filed this case as a lawsuit in the Southern District of California on November 25, 2020, alleging that respondent violated the UCL and the EFTA. Claimant sought class certification, disgorgement, injunctive relief, statutory damages, civil penalties, interest, costs, and attorneys' fees. <u>See</u> <u>id.</u> at VIII. Prayer for Relief.

**Arbitration Agreement**

As part of the account opening process, respondent issued claimant a copy of its terms and conditions for its services, called the Consumer Account Agreement (CAA). Claimant agreed to be bound by its provisions effective 2013 and thereafter as amended by respondent. The parties agree that the 2020 version of the CAA controls in this case, as it constitutes the effective CAA on

the date claimant first filed a claim against respondent. Joint Factual Stipulation, dated 6/22/22, at ¶ 4 (Stip.). The CAA governs the parties' relationship and requires arbitration of disputes between claimant and respondent:

> **Arbitration Agreement between you and Wells Fargo**
> If you have a dispute, we hope to resolve it as quickly and easily as possible. First, discuss your dispute with a banker. If your banker is unable to resolve your dispute, you agree that either Wells Fargo or you can initiate arbitration as described in this section.

CAA at 4 (original bold). The CAA broadly defines dispute as:

> Any unresolved disagreement between Wells Fargo and you. A dispute may also include a disagreement about this Arbitration Agreement's meaning, application, or enforcement.

Id. The CAA excluded small claims court, but no other, matters:

> **Wells Fargo and you each agrees to waive the right to a jury trial or a trial in front of a judge in a public court.** This Arbitration Agreement has only one exception: Either Wells Fargo or you may still take any dispute to small claims court.

Id. (original bold).

**Motion to Compel Arbitration**

Based upon this provision, respondent moved to dismiss the litigation and to compel arbitration. The court granted the motion and stayed the litigation pending arbitration. The court referred the gateway issues of McGill's application, arbitrability of the claims, and interpretation of the parties' agreement to the arbitrator. See Order Granting Defendants' Motion to Compel Arbitration, dated 5/8/21.

**The Arbitration**

Incorporating his complaint, claimant filed a demand and initiated this arbitration on September 3, 2021 before the American Arbitration Association (AAA), the forum identified in the parties' agreement. See Demand, undated. Respondent answered on November 21, 2021, denying the allegations and asserting several threshold legal issues. See Answer, dated 11/21/21. The AAA assigned the case to the undersigned Arbitrator pursuant to the parties' arbitration agreement.

Pursuant to Rule 21 of the AAA's Consumer Arbitration Rules, the Arbitrator held a Preliminary Hearing and Initial Arbitration Case Management Conference (CMC) via telephone conference on January 10, 2022. At the CMC, the parties disputed several gateway issues on which they requested briefing and early adjudication. The Arbitrator granted their requests and set a briefing schedule. See Order, dated 1/11/22. After the CMC, the parties submitted their briefs, met and conferred on several issues, agreed on some, and continued to dispute others. The parties and the Arbitrator therefore held a second CMC (CMC2) on February 1, 2022 to identify the remaining disputed issues and to set a briefing schedule. See CMC2 Order, dated 2/1/22. The parties thereafter agreed to bifurcate claimant's request for attorneys' fees from the claims' merits. See CMC3 Order, dated 3/16/22.

2

**The Pre-Hearing Motions**

After CMC2, the parties agreed upon the arbitrability of claimant's claims, the enforceability of their arbitration agreement, and the individualized nature of this arbitration. Id. They continued to disagree on the timeliness of claimant's claims under the applicable statutes of limitations (SOL) and the tolling of same, if any; and the Arbitrator's authority to issue public injunctive relief (PIR). Id. Accordingly, the Arbitrator permitted full briefing on both issues.

**Motion to Dismiss Claims**

Respondent moved to dismiss on SOL grounds on February 18, 2022. Claimant opposed the motion on March 8, 2022, to which respondent replied on March 15, 2022. The Arbitrator and the parties held a hearing on the motion on March 16, 2022. The parties presented their arguments and responded to the Arbitrator's questions, after which they submitted the matter. The Arbitrator held that claimant's filing of his federal complaint on November 25, 2020 tolled the SOL pursuant to California Code of Civil Procedure § 1281.12 from November 25, 2020 until 30 days after the court's May 8, 2021 grant of respondent's motion to compel arbitration, namely June 8, 2021. Conversely, the Arbitrator found claimant's EFTA claim and derivative UCL claim untimely to the extent they rely upon fees charged more than one year before November 25, 2020, namely November 25, 2019. See SOL Order, dated 3/21/22.

Consequently, the Arbitrator dismissed with prejudice all EFTA claims based upon alleged violations or fees pre-dating November 25, 2019, dismissed with prejudice all UCL claims based upon alleged violations or fees pre-dating November 25, 2016, and dismissed without prejudice all UCL claims based upon alleged violations or fees between November 26, 2016 and November 25, 2019. Id. The Arbitrator further found all EFTA and UCL claims based upon alleged violations or fees on or after November 25, 2019 timely. Id.

**Motion to Dismiss PIR Request**

Claimant sought injunctive relief in this arbitration. The parties disputed whether claimant sought private or public injunctive relief, or both, and whether their arbitration agreement authorizes the Arbitrator to issue PIR. At the parties' request, the Arbitrator permitted briefing on the following issues: (1) does claimant seek PIR; (2) if so, in what forum or fora does the arbitration agreement authorize PIR as a remedy; (3) if only a court may issue PIR, does the Arbitrator have authority to issue findings on the appropriateness of such relief in this case or must the court issue such findings; (4) does McGill apply here and if so, to what extent; and (5) any other legal issues raised by the parties with respect to the issuance of PIR. See Order, dated 2/1/22.

The parties filed opening briefs on these issues on February 18, 2022, opposition briefs on March 8, 2022, and reply briefs on March 15, 2022. The parties and the Arbitrator held a hearing on the issues on March 16, 2022. See CMC3 Order, dated 3/16/22. The Arbitrator held that the parties' arbitration agreement empowers her to consider, rule upon, and award, if appropriately proven, public injunctive relief in this arbitration. See PIR Order, dated 3/24/22.

**Rule 33 Dispositive Motion**

On May 2, 2022, respondent requested leave to file a dispositive motion on the legal questions governing this case. The Arbitrator found that respondent satisfied its Rule 33 burden and that the

3

motion would likely narrow the issues for hearing and therefore granted the request. Respondent filed a dispositive motion on May 16, 2022, which claimant opposed on May 31, 2022. Respondent submitted a reply brief on June 13, 2022. Both parties submitted supporting exhibits. The Arbitrator held a hearing on the motion on June 16, 2022, at which both parties argued their positions and responded to the Arbitrator's questions. See DM Order, dated 6/18/22.

Respondent moved to dispose of the claims under the safe harbor provision and as Reg. E compliant. It also sought to bar claimant's derivative UCL claim, to limit claimant's damages to $420.00, and to dismiss claimant's PIR request as moot. The Arbitrator denied in part and granted in part respondent's motion. The Arbitrator held that claimant may not recover damages, if any, incurred as a result of overdraft fees imposed after November 25, 2020 and that he must establish detrimental reliance to sustain Reg. E damages beyond disgorgement or restitution of incurred fees. The Arbitrator reserved judgment on the availability of consequential damages and denied the remainder of the motion.

**Motion to Exclude Expert Opinion**

On June 13, 2022, respondent moved to exclude the testimony and report of claimant's expert Arthur Olsen. Specifically, respondent objected to Expert Olsen's opinions in three areas: (1) a summation of the total number of Reg.-E specific overdrafts incurred by claimant during the statute of limitations period; (2) a calculation of the amount of non-Reg. E overdrafts incurred by claimant under a "cascading damages" theory; and (3) the balance respondent used to assess overdrafts. See Expert Order, dated 6/14/22. Claimant countered that respondent's objections should be addressed at hearing. See id. The Arbitrator denied respondent's motion as to the first and second opinions and granted the motion as to the third opinion subject to its use as impeachment or rebuttal. Id.

**Discovery Motions**

In addition to the above motions, the Arbitrator entered a stipulated protective order and ruled on motions to compel information exchange, to request a hearing subpoena, and to compel inspection. See CMC4 Order, dated 5/2/22; CMC 5 Order 5/5/22, and Customer Kit Order, dated 6/14/22. The Arbitrator granted claimant's motion for the issuance of a hearing subpoena for Jose Garcia, the former respondent banker who assisted claimant in opening his account. See CMC5 Order, dated 5/5/22. The Arbitrator granted several requests for the production of documents, a verified statement, and depositions. See CMC4 Order, dated 5/2/22; CMC5 Order, dated 5/5/22. The Arbitrator also granted claimant's motion for inspection of respondent's 2013 new account kit subject to respondent's right to maintain custody. See Customer Kit Order, dated 6/14/22.

**THE HEARING**

The Arbitrator held the Final Pre-Hearing Conference (FPHC) via teleconference on June 21, 2022. At the FPHC, the Arbitrator ordered the parties to submit a notice of damages and a notice of defenses. See FPHC Order, dated 6/21/22. The parties filed their respective notices on June 21, 2022. The Arbitrator also granted claimant's request for leave to amend his demand to conform to the evidence and respondent's request for leave to file an answer to the amended claim. Id. Claimant filed his amended claim on June 21, 2022 (First Am. Comp.), and respondent filed its answer on June 22, 2022. (Ans.) In preparation for the arbitration hearing, the parties also submitted witness lists, exhibit lists, CACI, core exhibits, deposition testimony, key authorities,

4

chronology, list of issues to be adjudicated, list of defenses, damages summary, exhibits, and pre-hearing briefs on June 21-22, 2022.

On June 22, 2022, respondent filed an objection to claimant's amended claim as untimely and prejudicial and a conditional answer subject to its objection. Respondent also objected to several of claimant's exhibits, specifically documents related to a prior litigation in which respondent was a party (Gutierrez), consent orders in cases in which respondent was a party, C31 containing case summaries, and one consent decree in which respondent apparently was not a party (TD). The Arbitrator overruled the objection as to C31 as merely a demonstrative of selected cases but granted respondent's motion to accept respondent's counter demonstrative. As to the other objections, the Arbitrator reserved decision.

At hearing, the Arbitrator admitted all exhibits proffered by claimant (C1- C43) and by respondent (R1- R34) into evidence subject to the Arbitrator's right to accord them the appropriate weight and probative value, if any, given their materiality and reliability. The Arbitrator also admitted by joint stipulation the 2020 CAA as C44 and the new customer account kit coversheet as R35 into evidence.

The parties and the Arbitrator held the in-person hearing June 23, 2022. Richard McCune and Emily Kirk of the Law Offices of McCune Wright Arevalo LLP represented claimant, and Joshua Davey and Mary Grob of Troutman Pepper Hamilton Sanders LLP represented respondent. Respondent representative Katie Krajeck and summer associate, Brandon Keshish, from claimant's counsel, also attended the hearing. Court reporter, Dalia Smith of Esquire, transcribed the proceedings.

Claimant called claimant, expert witness Arthur Olsen, and respondent's person most knowledgeable (PMK) witness Nelson by deposition as his witnesses; respondent called business execution consultant Wendy Hernandez and claimant by deposition as its witnesses. All witnesses testified upon oath under penalty of perjury; the Arbitrator afforded both parties a full opportunity to examine, cross-examine, redirect, and recross each witness as well as to ask additional questions after the Arbitrator asked questions. Both parties presented opening and closing statements. The Arbitrator received copies of the power point presentations used by the parties during the opening and closing statements as demonstratives. The Arbitrator did not request post-hearing briefing. After the hearing, the Arbitrator read and considered each exhibit, deposition admission, pre-hearing submission, and the complete testimony of each witness, in rendering this award.

## Arbitrator Authority & Jurisdiction

In resolving the parties' dispute, the Arbitrator must implement their agreement unless legally unenforceable. In addition to any inherent powers available by law or conferred by the AAA Consumer Arbitration Rules, the parties' arbitration agreement explicitly authorizes the Arbitrator to:

- Hear the parties' disputes, including disagreements about the arbitration agreement's meaning, application, or enforcement;
- Provide a final and enforceable decision;
- Determine the agreement's enforceability if the parties dispute the agreement;
- Decide disputes based upon applicable law, including any statutes of limitation; and

5

- Award to either party "any award or relief provided for by law."

CAA at 4; see also AAA Consumer Rules 14(a)-(b), 23, 37 & 44.

The parties confirmed jurisdiction before the Arbitrator and the AAA in the initial CMC. See Order, dated 1/11/22; see also CMC2 Order, dated 2/1/22. The Arbitrator further finds that she has jurisdiction over this dispute pursuant to the parties' arbitration agreement which encompasses all disputes. See CAA at 4. By agreement, the parties requested findings of fact and conclusions of law as the form of award. See CMC4 Order, dated 5/2/22. Accordingly, the Arbitrator herein adjudicates all issues raised by the parties in the form of detailed findings of fact and conclusions of law. This Final Award will satisfy this requirement.

## FACTUAL BACKGROUND, CHRONOLOGY, & FINDINGS OF FACT

### Respondent's Overdraft Services

Respondent offers checking accounts with debit cards as one of its services. R26 at ¶ 2. Customers deposit funds into checking accounts which they spend by writing checks, authorizing a money transfer, withdrawing money at an automatic teller machine (ATM), authorizing recurring transactions, and by purchasing a one-time transaction by debit card. Id. at ¶ 3. Some transactions, like an ATM withdrawal, present for payment at essentially the same time a customer uses his debit card; others, like a paper check, present for payment sometime after the customer initiates the transaction. Id. Respondent determines if it will pay the transaction by examining the customer's "available balance." Id. at ¶ 4; R1 at 24, 28-29; Hernandez Testimony (T); accord Olsen T.

Respondent defines available balance as the most current record of funds available for withdrawal from the customer's account. R26 at ¶ 4; Hernandez T; R1 at 2 (words with special meanings), 24 (determining your account's available balance). To calculate available balance, respondent adjusts for all posted transactions, all holds, and for all unposted pending transactions, but does not include pending checks, Automated Clearing House (ACH) transfers, and recurring debit card transactions. R26 at ¶ 4; Hernandez T; R1 at 2, 24. Respondent pays the transaction if the customer's available balance sufficiently covers the amount when presented for payment. R26 at ¶ 5. If the available balance will not cover the transaction, respondent then decides whether to decline the transaction or pay the transaction by overdraft. Id.

Respondent determines whether to decline or pay based partially upon the type of overdraft services the customer has associated with his checking account. Id. at ¶ 6. Respondent offers several different overdraft-related services. Id. Respondent automatically provides all checking accounts with its standard overdraft practices, which permit it to optionally pay checks, ACH, or automatic recurring payment transactions that exceed the customer's available balance. Id. at ¶ 7; Hernandez T.  The standard overdraft service does not apply to ATM or one-time debit card transactions. R26 at ¶ 7.

Customers may also choose to enroll in respondent's "Overdraft Protection" service, which allows them to link a savings or credit account to their checking account and authorize respondent to transfer funds from those accounts into their checking account to cover an otherwise overdraft transaction. Id. at ¶ 8. Respondent also offers its Debit Card Overdraft Services (DCOS), which, unlike the standard overdraft service, specifically covers ATM and one-time debit card

6

transactions. Id. at ¶ 9; Hernandez T. Customers may select or cancel DCOS participation at any time. Hernandez T; R26 at ¶ 9. Respondent charges a $35 overdraft fee as part of both its standard plan and DCOS. R26 at ¶ 10.

**Claimant's Account**

Claimant opened a Wells Fargo checking account on May 17, 2013 by applying in person in a branch office. Stip. at ¶¶ 1-2; Wilson T; R2; R26 at ¶ 11. As part of the account opening process, respondent issued claimant a copy of its CAA. R2 (acknowledging receipt of the CAA); Stip. at ¶ 2 (authentic claimant signature); Hernandez T. Claimant agreed to be bound by its provisions effective 2013 and thereafter as amended by respondent. R2; Stip. at ¶ 4. The CAA governs the parties' relationship. Stip. at ¶ 4; R1. The parties agree that the 2020 version of the CAA controls in this case, as it constitutes the effective CAA on the date claimant first filed a claim against respondent. Stip. at ¶ 4; C44. At the time he opened his checking account, claimant also became enrolled in respondent's optional DCOS effective May 21, 2013. Hernandez T; R5; R26 at ¶ 14.

Since then, respondent assessed claimant several overdraft fees on debit card and ATM transactions. Hernandez T; see R7-21; accord Olsen T. On some of those occasions, respondent assessed claimant an overdraft fee based upon its available balance metric, which it would not have assessed if respondent used a different metric, such as the ledger or daily ending balance. Olsen T; C38-39. On some of those occasions, respondent also assessed claimant a subsequent overdraft fee because respondent's prior overdraft fee caused claimant's available balance to become negative. Olsen T (cascading effect); C38-39. Between November 25, 2019 and November 25, 2020, respondent charged claimant fourteen (14) overdraft fees on ATM and nonrecurring debit card transactions for a total of $385 in fees after reversals. Olsen T; Stip. at ¶ 11. Claimant opted out of DCOS on April 5, 2022. Wilson T; R26 at ¶ 16; R34.

**Respondent's 2013 Opt In Process**

The parties could not present definitive evidence based upon personal knowledge of exactly how claimant became enrolled in DCOS because only two individuals actively participated in the process: claimant and the banker who assisted him on May 17, 2013 (claimant's special needs son was present but did not actively participate). Wilson T. Claimant does not remember most of the events that day nine years ago, and the banker no longer works for respondent. Wilson T; Hernandez T. However, claimant did credibly testify to the few events he remembered, and respondent's reliable business records demonstrated the process the bank followed in 2013 when claimant opened his account.

Respondent's Disclosure

In 2013 when claimant opened his account, respondent used a trifold pamphlet, entitled "*Customer Overdraft Services* Choices to help you manage your checking account" as its disclosure to comply with Reg. E. Hernandez T; Nelson Dep. at 53-54, 61; R26 at ¶ 12; R3 (original italics). Respondent provided new customers the disclosure as part of a customer new account kit containing multiple required banking disclosures and documents. Hernandez T; see R35. Respondent brought a hard copy of the applicable 2013 customer new account kit, including the 2012 DCOS disclosure brochure, to the hearing for inspection.

Upon inspection, the Arbitrator finds that the 2013 kit consisted of a two-pocket folder with

7

documents contained under the flap of each side. Arbitrator inspection; <u>accord</u> Hernandez T. Respondent numbered each unique type of document contained in the kit. Arbitrator inspection; <u>see</u> R35. The 2012 disclosure brochure was the first document under the left flap and consisted of eight pages (CNS8058). Arbitrator inspection; <u>accord</u> Hernandez T. The left side also contained a required privacy notice, a quick start guide, and a guide to common checking account fees. Arbitrator inspection; <u>accord</u> Hernandez T. Under the right flap, the kit contained a welcome letter, the applicable CAA in booklet form, a direct deposit advance service agreement and product guide in booklet form, and a customer account fee and information schedule booklet. Arbitrator inspection; <u>accord</u> Hernandez T; <u>see generally</u> Nelson Dep. at 37.

A third-party vendor pre-assembled all customer new account disclosure kits offsite, placed a bright lime green banker's instruction sheet on the top of the folder, shrink-wrapped the folder with the instruction sheet on top, and delivered the packets to respondent's marketing department. Hernandez T. The marketing department then distributed the packets unopened to each branch for use with customers. <u>Id.</u> The branches maintained the kits in their original wrapping in the vault until ready to use. <u>Id.</u> The banker would open the shrink-wrapped packet at the time he assisted the customer in opening a new account and follow the instructions. <u>Id.</u> Each kit had a unique serial number. Arbitrator inspection; <u>accord</u> Hernandez T. Respondent provided the kit and its contents only to individuals desiring to open a checking account with the bank. Hernandez T. The general public could not obtain the kit upon request but could obtain the information contained in the kit in branch brochures available to anyone walking into the bank. <u>Id.</u> The Arbitrator finds that the hard copy 2013 customer new account kit and the included 2012 brochure inspected during the hearing authentically represents respondent's new customer account disclosure kit and Reg. E DCOS disclosure in effect and in use by respondent in 2013.

The 2012 DCOS brochure consisted of a cover and title "*Consumer Overdraft Services* Choices to help you manage your checking account" with a picture of a customer working over her checking account with a computer and calculator. C3; R3 (original italics). The first page of the brochure is virtually identical to the Reg. E Model Form A-9:

<span style="color:red">Important things you should know</span>

**What you need to know about Overdrafts and Overdraft Fees**

An overdraft occurs when you do not have enough money in your account to cover a transaction but we pay it anyway. We can cover your overdrafts in two different ways:

1. We have <u>standard overdraft practices</u> that come with your account.
2. We also offer overdraft protection plans, such as a link to an eligible savings account, eligible line of credit or eligible credit card, which may be less expensive than our standard overdraft practices. To learn more, ask us about these plans.

This notice explains our standard overdraft practices.

**What are the standard overdraft practices that come with my account**?

We <u>do</u> authorize and pay overdrafts for the following types of transactions:

8

• Checks and other transactions made using your checking account number
• Automatic bill payments (such as recurring debit card and ACH payments)

We will not authorize and pay overdrafts for the following types of transactions unless you ask us to (see below):
• ATM transactions
• Everyday debit card transactions (such as one-time debit card and ATM card purchases)

We pay overdrafts at our discretion, which means we do not guarantee that we will always authorize and pay any type of transaction. If we do not authorize and pay an overdraft, your transaction will be declined.

**What fees will the bank charge if it pays my overdraft**?

Under our <u>standard overdraft practices</u>:

• We will charge you a fee of up to $**35** each time we pay an overdraft item to your account
• There is a limit of **four** overdraft and returned item fees per day

**What if I want Wells Fargo to authorize and pay overdrafts on my ATM and everyday debit card transactions**?

If you want us to authorize and pay overdrafts on ATM and everyday debit card transactions, please contact us at 1-877-804-4883, 24 hours a day, 7 days a week or speak to a banker at any Wells Fargo location. Or sign on to Wells Fargo Online® Banking and click the "Overdraft Services" link on the Account Activity page.

C3; R3 (original coloration and bold). The brochure continued:

Control of your accounts is in your hands

Managing your checking account is the foundation of good money management skills. Wells Fargo offers tools and services that meet your personal financial style — with ways to keep track of your account balance and choices on how to manage your account.

What is an overdraft?

Overdrafts occur when you spend more money than you have in your checking account and the bank pays your transaction.

How to avoid overdrafts

• **Don't spend more than you have**
Know your available balance,[1] the amount of money you can actually use.
• **Keep track of your spending**
Record every deposit and withdrawal including checks, recurring payments, debit

9

Exhibit C, Page 79

card purchases, and cash withdrawals.
• **Don't forget outstanding transactions**
The current available balance provided by the bank may not include all transactions, such as checks or upcoming automatic payments.
• **Keep a cushion in your account**
By keeping a little extra in your checking account, you can cover any outstanding expenses that don't yet appear in your available balance, and avoid overdrafts.

You've got options

Optional services that may offer protection to avoid overdrafts

**Overdraft Protection**

Protect yourself from the inconvenience of declined transactions or returned ("bounced") checks. When you link one of your eligible Wells Fargo savings or credit accounts to your checking account, the bank will use available funds in your linked accounts to authorize your transactions if you don't have enough money in your checking account.

• There is no fee to sign up for this service
• If your account balance goes negative and the bank transfers money to bring your balance current, a single Overdraft Protection Transfer fee[2] will be assessed regardless of how many transactions are presented for payment that day

**Debit Card Overdraft Service**[3]

You can choose how Wells Fargo handles your ATM and everyday debit card transactions.

If you add optional Debit Card Overdraft Service to your checking account, the bank may approve (at our discretion) ATM and everyday debit card *transactions if you don't have enough money in your checking account* or linked overdraft protection accounts at the time of the transaction.

• There is no fee to sign up for this service
• If your account is negative, our standard overdraft fee of up to $35 per item[6] will apply if a covering[4] deposit or transfer is not made before the posted cutoff time the same business day

If you do not add this service, your ATM and everyday debit card transactions will be declined at the time of the transaction if you don't have enough money in your account; you will not be charged an overdraft fee if these types of transactions cause an overdraft. The service does not apply to debit card transactions you have established for recurring payments (such as utilities or club memberships). These may continue to be authorized and paid into overdraft, at our discretion, even if you do not add Debit Card Overdraft Service and our overdraft fees[6] and policies will apply.

10

Please see back panel of brochure for additional details.  Lift to open

C3; R3 (original colors and emphasis). The pamphlet also included charts comparing the overdraft protection plan and the DCOS. C3; R3. It illustrated the different outcomes when a customer charges a $125 to a $100 account balance depending on if the customer has enrolled in no overdraft service, the overdraft protection plan, the DCOS, or the overdraft protection plan plus DCOS. Id. The pamphlet identified some tools for customers to use to monitor their account:

### Free tools to help you manage your account

Wells Fargo makes it easy for you to monitor your spending, to check account activity, and to make transfers to cover your transactions.

#### Online and mobile: You decide how to manage and track your spending

Sign up for convenient services and start managing your account via internet or mobile phone.

#### Services to help avoid overdrafts

•Text Banking[5] — Check your available balance[1] before you make a purchase. You can quickly request and receive information via text message.
• Mobile Banking[5] — Bank on the go, check balances and transfer funds between your Wells Fargo accounts using your phone's web browser
•Account Alerts — Stay informed. Set up a low balance alert to your email or wireless device[5]
• My Money Map — Take control of your finances with an online tool that helps you view your spending, budgeting and savings with one click

C3; R3 (original coloration). The brochure also included a portrayal of a customer using a Wells Fargo ATM machine. C3; R3. The back page explained the footnotes and fine print in smaller lettering. It also identified the version by date and internal document number.

### How can we help?

If you have questions or want more Information about our overdraft services:

[contact information in English, Spanish, and for the hearing impaired]

1 This balance may not reflect all of your transactions, such as checks you have written or debit card transactions that have been approved but not yet submitted for payment by the merchant.
2 You can link an eligible Wells Fargo savings and a credit card account to your checking account. One overdraft protection transfer or advance fee will be charged each day an overdraft protection transfer/ advance occurs. The fee for overdraft protection transfers from a savings account is $12.50. For more information about overdraft protection in connection with your credit card account, please see your account terms and conditions.
3 Not available for certain accounts such as Teen Checking, SM Opportunity

11

Checking,® and Savings.
4 Subject to the bank's funds availability policy.
5 Your mobile carrier's message and data rates may apply.
6 **About Overdrafts and Overdraft Fees**
• Our overdraft fee, whether the overdraft is by check, ATM withdrawal, debit card transaction or other electronic means, is $35 except for accounts that are maintained in the states below:
– For AK customers: $25 per item on the first day you are overdrawn in the preceding 12-month period. Otherwise, our overdraft fee is $31 per item.
– For CA customers: $25 per item on the first day you are overdrawn in the preceding 12-month period. Otherwise, our overdraft fee is $35 per item.

•You will be charged no more than 4 overdraft and returned item fees per day. You must immediately bring your account to a positive balance

• The payment of transactions into overdraft is discretionary and the bank reserves the right not to pay. For example, the bank typically does not pay overdrafts if your account is not in good standing or you have had excessive overdrafts

• Debit card transactions that you have established for recurring payment (such as utilities or club memberships) may continue to be authorized at our discretion, even if you do not sign up for Debit Card Overdraft Service

The information contained in this brochure is subject to change. Certain products not available in all states. Please see the applicable account agreements for the current terms and conditions.
© 2012 Wells Fargo Bank, N. A. All rights reserved. Member FDIC. CNS8058 (09/12)

C3; R3 (original emphasis, deemphasis, and coloring).

<u>The In Branch Opt In Process</u>

In 2013, a customer entering a branch office to open a checking account with respondent would work with a banker to complete an account application. See C1; R2; Hernandez T; <u>accord</u> Claimant T. The banker would typically write down the customer's verbal information on the application form and then submit it to the customer for signature. Nelson Dep. at 35; Hernandez T; <u>accord</u> Claimant T. The customer's signature acknowledges that he received the CAA, privacy policy, and the direct deposit guide, among other things, but does not mention overdrafts or available balance. Hernandez T; Nelson Dep. at 40-44; C1; R2. The banker would list his own name, employee number, the date, branch number, and internal branch mailing address. Nelson Dep. at 35-36; C1; R2. The banker then would scan the application into the archival system as well as enter the data into respondent's database. Nelson Dep. at 38-40. The banker could optionally work directly in the database as he worked with the new customer. Nelson Dep. at 40.

Pursuant to respondent's 2013 protocols, the banker would also open the shrink-wrapped new consumer account disclosure kit, remove the banker instruction sheet, and then follow the instructions. Hernandez T; R35. Before giving the kit to the customer, the banker recorded the specific serial number of that kit on the customer's application form so respondent could track

12

which customer received which kit. Hernandez T; C1; R2; Nelson Dep. at 36-37. During the account opening process, the banker would offer the new client other services offered by respondent, including the DCOS. Nelson Dep. at 44; Hernandez T. Unlike the checking account, the DCOS did not have a written application. Instead, according to respondent's protocol, the banker would proceed through various steps to obtain consumer consent. Hernandez T; see R35.

The banker's instruction sheet provided the steps:

**Effective 10/13**
**ENGLISH**
Pre-assembled
**Consumer New Account Disclosure Kit** (NAK)



**ACTION ITEMS**:

| | |
|---|---|
| 1. **Remove** this Banker Instruction Sheet | |
| + | |
| 2. **Enter** the Consumer Disclosure NAK serial number on SVP | |
| + | |
| 3. **Review/Provide** the Consumer New Account Disclosure Kit and applicable addenda from Forms Online … | |
| + | |
| 4. **Review** Debit Card Overdraft Services Brochure (CNS8058) with your customer. Record customers preferences in SVP. | |
| + | |
| 5. **Provide** Deposit Rate Sheet (if applicable) | |

R35 (original bold, coloration, and shading; extra details omitted). The instructions also listed the new account kit's contents on the bottom of the sheet. Id.

Respondent's written procedures in effect in 2013 also required the banker to give the customer the kit including "the required DCOS disclosures" and review it with the customer before enrolling in DCOS. Hernandez T; R35; R26 at ¶ 13; R4. The procedures specifically directed the banker to use the brochure. R4. Respondent's computer system also included a verification field, which asked the banker to verify by selecting "yes" that he had provided the "Overdraft Services brochure" to the customer. Hernandez T; R4; R26 at ¶ 13. If the banker selected no, the computer would generate an error message reminding the banker to give the brochure to the customer. Hernandez T; R4. The computer system would not allow the banker to proceed with the online process unless he verified that he had given the disclosure brochure to the new customer.

13

Hernandez T; R4.

The written protocols also advised the banker to "keep in mind" that the brochure contained the required DCOS disclosures and needed to be given to the customer before enrolling in the program. Hernandez T; R4. The banker would ask if the customer wished to enroll into DCOS and recorded the customer's verbal response as "yes" or "no" directly into the database. Hernandez T; R4. The customer did not have to personally verify his response in writing; instead, the banker logged the customer's selections for him. Hernandez T; R4. If the customer enrolled in DCOS, respondent instructed the banker to give the customer the immediate written confirmation of DCOS enrollment, which printed out automatically in the branch. R4; Hernandez T. The computer program would prevent the banker from proceeding to the next screen until he printed out the confirmation letter. Hernandez T; Nelson Dep. at 48-49, 55; see, e.g., C13; R6. The confirmation letter advised the customer of his right to opt out of the service at any time. Hernandez T; see, e.g., C13; R6.

The customer's bank statements would thereafter reflect DCOS enrollment with a checkmark in the overdraft services row under the applicable account options, unless and until the customer revoked the service. Hernandez T; Nelson Dep. at 62-64; see, e.g., R7-R20. Each monthly statement would also list a summary of overdraft fees assessed during that period as well as a year-to-date total. Hernandez T; R7-20. The statements also contain a section on how to avoid fees, respondent's website address for frequently asked questions about service fees, and a detailed three paragraph policy on how to report inaccuracies, errors, questions, or complaints. See R7-R20. The policy also advises customers that respondent will investigate complaints and promptly correct any errors. Id. Respondent also notified customers that it would refund any fees, even if correctly assessed, if its investigation lasted more than 10 business days so that customers had access to the disputed funds pending investigation. Id.

**Respondent's Current Opt In Process**

Respondent currently follows much the same process with some significant differences. Hernandez T. First, respondent implemented a new Reg. E disclosure form on May 9, 2022. See C12; R25; Hernandez T.  Second, respondent no longer uses the full trifold DCOS brochure. Hernandez T. Third, respondent requires customers who choose to enroll in DCOS to acknowledge their verbal consent in writing. Id.; see, e.g., R34.

Similarities

For customers opening new accounts in the branch, a banker still meets with the customer to personally discuss their options and desired services. Hernandez T. The banker still opens and then hands the customer a shrink-wrapped new account kit with several documents inside a folder. Id. The DCOS disclosure remains the first document in the folder under the left flap. Id. The banker continues to implement respondent's new account opening protocols, review the DCOS disclosure with the customer, and to log the customer's information and responses into respondent's SVP system. Id. The banker also continues to obtain the customer's verbal consent to DCOS enrollment. The banker still hands the customer a confirmation letter in the branch at the time of account opening and DCOS enrollment. Id. The monthly statements continue to show overdraft fee totals and how to question, dispute, or complain about respondent's fees. Id.

The New Disclosure

14

Before enrollment, however, the banker hands the customer a new Reg. E disclosure, which became effective May 9, 2022. Hernandez T; C12; R25. Respondent's 2022 disclosure consists of a single page which parallels both the Model Form A-9 and the left inside flap of its 2012 disclosure brochure except in these material respects: (1) it modified the definition of overdraft; (2) it added a definition of available balance; and (3) it is a single page standalone disclosure, no longer contained in an 8-page brochure. Compare R3 with R25; accord Hernandez T; Arbitrator Inspection. Respondent discontinued the use of a brochure as its Reg. E disclosure, opting instead to use a single page modelled on Reg. E's Model Consent Form A-9 but customized to explicitly reflect its use and definition of available balance. Hernandez T; R25.  The new 2022 disclosure defines an overdraft as:

> When you do not have enough available money in your account to cover a transaction (based on your account's available balance)[1] but we pay it anyway."

R25. The 2012 disclosure defined an overdraft as:

> When you do not have enough money in your account to cover a transaction but we pay it anyway

R3. Comparing the two definitions, the Arbitrator finds that respondent added two references to the customer's available balance as shown in red:

> When you do not have enough *available* money in your account to cover a transaction (*based on your account's available balance*)[1] but we pay it anyway.

Compare R3 with R25 (colored emphasis added). Respondent also added a definition of available balance in footnote 1 to explain how it uses the term:

> Available balance is the most current record we have about the funds that are available for your use or withdrawal. It includes all deposits and withdrawals that have been posted to your account, then adjusts for any holds on recent deposits and any pending transactions that are known to the Bank. This balance may not reflect all of your transactions, such as checks you have written or debit card transactions that have been approved but not yet submitted for payment by the merchant. For more information on how we calculate your available balance, please refer to the Deposit Account Agreement.

R25; accord Hernandez T.

This definition is new to the 2022 disclosure; the 2012 disclosure did not include this definition. Compare R3 with R25; accord Hernandez T.  The 2013 CAA included the first sentence of this 2022 definition in its definition of available balance under the section on terms with special meaning, and the CAA section entitled "Determining your *available balance*" included a complete breakdown of how respondent calculated available balance. R1 at 2, 24. Likewise, the governing 2020 CAA includes the first sentence of the 2022 definition under the section defining terms with special meaning and a complete breakdown of the available balance calculation under the section entitled "How do we determine your account's available balance?" C44 at 1, 26.

15

Respondent also changed the 2012 sentence "we <u>do</u> authorize and pay overdrafts for the following types of transactions" to the 2022 version "we <u>may</u> authorize and pay overdrafts for the following types of transactions." <u>Compare</u> C11 <u>with</u> C12. Respondent now underlines and adds these words in the 2022 version:

> which means we <u>do not guarantee</u> that we will authorize and pay any type of transaction. If we do <u>not</u> authorize and pay an overdraft, your transaction will be declined <span style="color:red">or returned unpaid</span>

<u>Compare</u> C11 <u>with</u> C12. Respondent also reduced its daily cap on overdraft fees from four to three. <u>Compare</u> C11 <u>with</u> C12.

<u>Written Consent</u>

After the banker reviews the new 2022 disclosure with the customer, he still obtains the customer's verbal consent or declination to enroll in the DCOS program. Hernandez T.  Now, however, if the customer chooses to enroll, the banker also requires the customer to sign a customized summary computerized form acknowledging affirmative consent to enroll in DCOS. <u>See, e.g.</u>, R34. After explaining how to add DCOS if desired, the 2022 version now adds this sentence: "You can remove the service at any time." <u>Compare</u> C11 <u>with</u> C12.

## LEGAL ANALYSIS, FACTUAL FINDINGS, & LEGAL CONCLUSIONS

The parties present compelling, yet markedly different, versions of the events underlying this case. Claimant presents a typical customer confused about, if not misled by, respondent's unfair and illegal overdraft practices and fees, which no one explained, about which he received no documents, to which he did not consent, and about which he complained. Conversely, respondent projects a bank offering customers transparent lawful services, clearly described in its compliant model disclosures, which its business records confirm claimant received as part of his new account kit and in which respondent voluntarily enrolled and used for many years without complaint, objection, or revocation until this arbitration.

### Claimant's Causes of Action

### <u>EFTA</u>

In his first cause of action, claimant alleges that respondent violated Reg. E, 12 C.F.R. § 1005.17, when it charged claimant overdraft fees on ATM and one time debit card transactions without first complying with Reg. E's mandatory customer opt in protections. <u>See</u> First Am. Comp. at ¶¶ 15-19. Specifically, claimant seeks the adjudication of the following issues with respect to his EFTA claim:

- Did Wells Fargo's 2012 Overdraft Brochure satisfy Regulation E's opt-in requirements?
- Was Claimant's signature on his application sufficient to demonstrate his assent to join the DCOS overdraft service?
- Did Wells Fargo satisfy Regulation E by giving Claimant a confirmation letter of being opted into the DCOS service, including a notice of his right to exit the service at any time?
- Did Claimant give affirmative consent in a manner satisfying Regulation E?
- Did Wells Fargo opt Claimant into its overdraft program using undue coercion?

16

- Did the fact that a Wells Fargo employee opted Claimant into the program satisfy Regulation E?
- Did Wells Fargo explain its overdraft program in a clear, unambiguous, stand-alone document as Regulation E requires?
- Did the 2012 Overdraft Brochure contain information not permitted under Regulation E?
- Did the 2012 Overdraft Brochure accurately disclose Wells Fargo's policy for charging overdrafts on one-time debit card and ATM transactions in a stand-alone document?
- Is Claimant entitled to damages for Wells Fargo's violations of federal law?
- Is Wilson entitled to obtain injunctive relief for Wells Fargo's violations?

Issues to be Adjudicated from Claimant, dated 6/24/22. In addition to its defenses, respondent identifies the following issues to be adjudicated with respect to this claim:

- Whether Wilson has proven that Wells Fargo violated Regulation E's disclosure requirement.
- Whether Wilson has proven that Wells Fargo violated Regulation E's reasonable opportunity requirement.
- If Wilson prevails on his claims, whether Wilson is entitled to "cascading damages."
- Whether Wilson has demonstrated that he is entitled to public injunctive relief and, if so, what relief.

Respondent's Issues to be Adjudicated, dated 6/22/22. The Arbitrator will analyze each of these issues.

## The Reg. E Framework

Congress enacted EFTA as part of the Consumer Credit Protection Act along with other consumer-protection statutes like the Truth in Lending Act (TILA). Pub. L. No. 95-630 § 2001, 92 Stat. 3641 (1978). Under the EFTA, Congress charged the Federal Reserve Board (FRB), and later the Consumer Financial Protection Bureau (CFPB), with promulgating regulations to carry out EFTA's purposes. 15 U.S.C. § 1693b(a)(1); see also id. § 1693a(4). The EFTA requires financial institutions to disclose the terms and conditions of electronic fund transfers involving consumer accounts "in accordance with the regulations of the" FRB and now CFPB. Id. § 1693c(a). The FRB adopted Reg. E to implement this congressional mandate.

Before the development of electronic fund transfer (EFT) systems, banks generally provided overdraft coverage for check transactions only. See Electronic Fund Transfers, 74 Fed. Reg. 59,033, 59,033 (Nov. 17, 2009). When a bank customer overdrew her account by writing a check in an amount that exceeded the amount of funds in the account, her financial institution applied its discretion in deciding whether to honor the customer's draft, in effect extending a small line of credit to its customer and imposing a small fee for the convenience. Id. Online banking transformed how financial institutions handled overdrafts and overdraft fees. New EFT systems provided customers with more ways to make payments from their accounts, including ATM withdrawals, debit card transactions, online purchases, and transfers to other accounts. Id. Most financial institutions chose to extend their overdraft coverage to all EFT transactions. Some further decided to cover automatically all overdrafts their customers might generate from their EFTs. Id. These changes reduced costs from manually reviewing individual transactions and furthered "consistent treatment of consumers." Id. at 59,033-34. But they sometimes created an unexpected cost to consumers: financial institutions generally assessed a flat fee each time an overdraft occurred,

17

sometimes charging additional fees—for each day an account remained overdrawn, for example, or incrementally higher fees as the number of overdrafts increased. Id. at 59,033.

In 2009, the FRB amended Reg. E to prohibit overdraft fees for ATM and nonrecurring, one-time debit card transactions, unless the consumer opts in and affirmatively consents to the bank's overdraft services after a full, clear, accurate, and readily understandable disclosure of the bank's specific program in a standalone document. See 12 C.F.R. § 1005.17(b); Elec. Fund Transfers, Final Rule, 74 Fed. Reg. 59,033-36 (November 17, 2009). Reg. E permits a civil damages action for failure to comply with its requirements. See 15 U.S.C. § 1693m(a). Reg. E contains a safe harbor provision, however, which precludes liability for "any failure to make disclosure in proper form" if the bank "utilized an appropriate model clause issued by the Bureau or the Board." Id. at § 1693m(d)(2).

## Account Balance Definition

Financial institutions use different types of accounting methods to determine a checking account's balance at any given moment, including for example, ending daily balance, collected balance, available balance, statement balance, and ledger balance. See generally Olsen T; Hernandez T; Nelson Dep. at 23-28. The collected balance includes funds received from other banks, such as wire transfers and deposited checks, but excludes pending transactions. Nelson Dep. at 27-28. The ending daily balance, ledger, or statement balance represents the checking account balance at the end of the day's processing period. Id. at 23; Hernandez T; Olsen T.

Banks typically use the ledger or available balance to determine overdrafts. See, e.g., R5 (reflecting claimant's ledger and available balance on his SVP profile); FDIC 2019 Statement (banks generally use ledger or available balance to assess overdraft fees); Tims v. LGE Cmty. Credit Union, 935 F.3d 1228, 1235 (11th Cir. 2019); Chambers v. NASA Fed. Credit Union, 222 F. Supp. 3d 1, 6 (D.D.C. 2016). The ledger balance represents the nominal amount of money in the account without reflecting any pending transactions or holds; it factors in only the settled transactions in determining the account balance. Nelson Dep. at 24; CFPB, Winter 2015 Supervisory Highlights 8. The available balance represents the funds immediately available for use; it calculates the account balance by including both settled and authorized, but unsettled, transactions, pending debits, and deposit holds. CFPB, Winter 2015 Supervisory Highlights 8; Salls v. Digital Federal Credit Union, 349 F. Supp. 3d 81, 85 (D. Mass. 2018). Put another way, the ledger balance includes only settled transactions, whereas the available balance includes authorized but unsettled transactions. See CFPB, Supervisory Highlights 8 (Winter 2015). The two balances may sometimes be the same, see, e.g., R5, but often they are not. When they differ, the available balance is usually lower than the ledger balance. Olsen T; Hernandez T; Salls, 349 F. Supp. 3d at 85.

For instance, when an accountholder deposits a check, banks generally make only a portion of that check available immediately, with the remainder held for a certain time period while the funds clear. See R1 (funds availability and deposit holds sections). The account's ledger balance might reflect the full amount of the deposit right away, but the available balance would include only the immediately available portion of the check. Or, as another example, when an accountholder uses his or her debit card to make a purchase in a store or online, a point-of-sale transaction, the merchant might place a "credit hold" on those funds, with the actual debit against the account occurring one or two days later when the transaction settles. Hernandez T. The account's ledger balance would not reflect the transaction until it actualizes or settles, but the available balance

18

would reflect the transaction "credit hold" immediately. See, e.g., R7-20 (reflecting different transaction authorization and settlement dates).

An "overdraft" is a banking term describing a deficit in a bank account caused by drawing more money than the account holds. See Electronic Fund Transfers, 74 Fed. Reg. 59,033, 59,033 (Nov. 17, 2009); Tims, 935 F.3d at 1234. Section 1005.17(a) defines "overdraft service" as a service under which a financial institution assesses a fee or charge on a consumer's account for paying a transaction when the consumer has "insufficient or unavailable" funds in the account. 12 C.F.R. § 1005.17(a). Banking laws do not dictate how a bank calculates an overdraft fee. Thus, banks can choose to impose overdraft fees after someone withdraws more than their ledger balance or their available balance. Or they can elect not to charge overdraft fees at all. Problems arise when a customer uses her account based upon her ledger balance but the bank calculates overdrafts based upon available balance. Thus, a customer may use funds from her checking account believing she has sufficient funds based upon the ledger balance but nevertheless incurs an overdraft fee because she did not have sufficient funds using the available balance. Problems also arise when a customer did not realize that he could incur an overdraft fee on ATM and debit card transactions at all.

To address this problem of customer-perceived "surprise" or unexpected fees, the Legislature amended Reg. E in 2009 to impose strict disclosure and consent rules intended to "assist consumers in understanding how overdraft services provided by their institutions operate and to ensure that consumers have the opportunity to limit the overdraft costs associated with ATM and one-time debit card transactions." See 74 Fed. Reg. at 59,035-36. While the amendments cured many problems, they did not end all customer confusion.

Many banks followed the required procedures and issued the required forms but did not fully explain which method they used to calculate overdraft fees, thereby still leaving customers unaware or confused. Other banks adopted Reg. E's model forms in order to describe their overdraft policies, but customers still could not understand if "enough money" in their account meant ledger or available balance in the absence of further explanation. As a result, some customers felt deceived or misled when they incurred overdraft fees because they believed they had sufficient funds in their accounts. See Chambers, 222 F. Supp. 3d at 6 (customers can be misled or deceived when banks do not disclose the metric they use). In response, customers have filed lawsuits and arbitrations throughout the country challenging many financial institutions' Reg. E compliance. See id. at 5-6 (describing Reg. E history and citing early Reg. E disclosure lawsuits). Claimant bases his claims on this issue.

**Regulation E Allegations**

Claimant alleges respondent violated Reg. E by failing to (1) include the required Reg. E notice; (2) substantially track Model Consent Form A-9; (3) provide the notice to claimant; (4) segregate the notice; (5) provide a reasonable consent opportunity; (6) remove impermissible extraneous information from the disclosure; (7) obtain claimant's affirmative consent; (8) document enrollment with claimant's signature; (9) use a scripted explanation of respondent's services; and by failing to (10) disclose its policies accurately, clearly, and in readily understandable language. See First Am. Comp. at ¶¶ 4-8, 15-19. Respondent argues that claimant creates nonexistent Reg. E requirements and that it satisfied Reg. E's actual requirements in every respect. But first it procedurally objects to claimant's standing to object to a disclosure he neither received nor read and to his "eve of trial" amended complaint as prejudicial, untimely, and contrary to his original

19

complaint.

Amendment

Respondent objected to and moved to prohibit claimant's amended claim dated June 22, 2022. Respondent stressed the unfairness of permitting claimant to amend his claim on the eve of hearing. Respondent also avers that claimant learned no new facts but instead had all the information he needed at the outset of this arbitration to amend his claim.

Claimant filed this arbitration on September 3, 2021. Respondent filed its answer on November 24, 2021. Respondent attached to its answer as exhibit C a copy of the actual 2012 disclosure it used during the relevant timeframe. Hence, as of that date, claimant knew he had attached the wrong document to his complaint. Claimant could have and should have sought leave to amend his claim at that time, seven months ago.

Claimant, however, proffers that he did not know the import of the attachment or that respondent would rely on that brochure to the exclusion of the single page document attached to his complaint until respondent submitted its first draft stipulation on March 4, 2022. Claimant thereafter sought a PMK deposition to verify the use of the brochure as the only 2012 disclosure, which claimant took on May 19, 2022 after a discovery order. After the deposition, the parties briefed respondent's dispositive motion based solely on the 2012 brochure's Reg. E compliance. Claimant notified respondent at the hearing on that motion of his intent to amend his claim after the decision on respondent's motion.

The Arbitrator finds that claimant did learn new information during the course of the case's information exchange warranting amendment. For example, claimant learned that (1) respondent provided the 2012 disclosure as part of a new account kit containing other documents, (2) respondent obtained customer consent verbally, and that (3) the banker checked the consent confirmation for the customer, among others. While the Arbitrator believes that claimant could and should have sought leave to amend his claim as soon as he learned this new information, courts generally permit parties to move to amend to conform to proof even during or after trial. See, e.g., Fed. R. Civ. Pro. 15(b).

The Arbitrator further finds that respondent did not suffer prejudice from the amendment because it alleged no new facts unknown to respondent, only new legal arguments based upon information respondent knew all along. As to the inconsistencies between claimant's original and amended complaints, the Arbitrator refers to FRCP 8(d)(3), which entitles parties to plead inconsistent facts in support of inconsistent theories of recovery, so long as they legitimately are uncertain what the evidence will show. See Chambers, 222 F. Supp. 3d at 16. Finally, the Arbitrator finds that the amendment serves the adjudication of the dispute's merits because it refocused the parties and the evidence on the correct disclosure, opt in procedure, and documentation process actually used in 2013 when claimant opened his account. Accordingly, the Arbitrator overrules respondent's objection to claimant's amended claim as untimely, prejudicial, and inconsistent.

Standing

To satisfy Article III's standing requirements, claimant must show that he suffered a concrete, particularized, actual, and not hypothetical injury in fact, fairly traceable to respondent's challenged action which a favorable decision could redress. Friends of the Earth, Inc. v. Laidlaw Env't Servs.

20

(TOC), Inc., 528 U.S. 167, 180–81 (2000). Respondent's standing challenge centers on the injury and traceability requirements because it avers the 2012 disclosure could not have harmed claimant when, by his own admission, he never received it.

The Arbitrator finds this standing challenge misconceives claimant's alleged injury. The regulators designed Reg. E to provide consumers with sufficient clarity about their banks' overdraft programs to make an informed choice about whether to join. See 12 C.F.R. § 1005.4(a)(1). The essence of claimant's claim is that the bank violated Reg. E because it did not afford him that choice, either by explaining the program to him, giving him the required notice, or using clear descriptions. In claimant's view, the language respondent used to describe its program – whether verbally or in the disclosure – did not match the reality of its available balance use and that, had someone clearly explained it to him, he could have declined enrollment and avoided costly overdraft fees. See Fludd v. South State Bank, No. 2:20-CV-1959-BHH, 2021 WL 4691587, at *4 (D.S.C. Oct. 7, 2021). The Arbitrator concludes that claimant has met his burden to establish a traceable concrete injury sufficient to confer standing and therefore overrules respondent's objection.

Regulation E Requirements

Reg. E implements the EFTA, which protects individual consumer rights by providing "a basic framework establishing the rights, liabilities, and responsibilities of participants in electronic fund … transfer systems." 15 U.S.C. § 1693(b) (2015). Reg. E governs how financial institutions obtain an accountholder's consent to charge overdraft fees on ATM and nonrecurring debit card transactions. 12 C.F.R. § 1005.17. Specifically, Reg. E provides:

> (1) General. Except as provided under paragraph (c) of this section, a financial institution holding a consumer's account shall not assess a fee or charge on a consumer's account for paying an ATM or one-time debit card transaction pursuant to the institution's overdraft service, unless the institution:
>
> (i) Provides the consumer with a notice in writing, or if the consumer agrees, electronically, segregated from all other information, describing the institution's overdraft service;
>
> (ii) Provides a reasonable opportunity for the consumer to affirmatively consent, or opt in, to the service for ATM and one-time debit card transactions;
>
> (iii) Obtains the consumer's affirmative consent, or opt-in, to the institution's payment of ATM or one-time debit card transactions; and
>
> (iv) Provides the consumer with confirmation of the consumer's consent in writing, or if the consumer agrees, electronically, which includes a statement informing the consumer of the right to revoke such consent.

12 C.F.R. §1005.17(b)(1).

Reg. E further provides guidance for the content and form of the mandatory opt-in notice. All disclosures must be "clear and readily understandable." 12 C.F.R. § 1005.4(a)(1); see also 15 U.S.C. § 1693c (requiring financial institutions to make disclosures "in accordance with the regulations of the" CFPB "in readily understandable language"). Opt-in notices must be

21

"substantially similar to" the A-9 Model Consent Form and include the following information:

> (1) Overdraft service.
>
> A brief description of the financial institution's overdraft service and the types of transactions for which a fee or charge for paying an overdraft may be imposed, including ATM and one-time debit card transactions.
>
> (2) Fees imposed.
>
> The dollar amount of any fees or charges assessed by the financial institution for paying an ATM or one-time debit card transaction pursuant to the institution's overdraft service, including any daily or other overdraft fees. If the amount of the fee is determined on the basis of the number of times the consumer has overdrawn the account, the amount of the overdraft, or other factors, the institution must disclose the maximum fee that may be imposed.
>
> (3) Limits on fees charged.
>
> The maximum number of overdraft fees or charges that may be assessed per day, or, if applicable, that there is no limit.
>
> (4) Disclosure of opt-in right.
>
> An explanation of the consumer's right to affirmatively consent to the financial institution's payment of overdrafts for ATM and one-time debit card transactions pursuant to the institution's overdraft service, including the methods by which the consumer may consent to the service; and
>
> (5) Alternative plans for covering overdrafts.
>
> If the institution offers a line of credit subject to Regulation Z (12 CFR part 1026) or a service that transfers funds from another account of the consumer held at the institution to cover overdrafts, the institution must state that fact. An institution may, but is not required to, list additional alternatives for the payment of overdrafts.

12 C.F.R. § 1005.17(d). Doing away with the practice of automatic customer enrollment in overdraft services, Reg. E thus requires financial institutions to secure consumers' "affirmative consent" to overdraft services through an opt-in notice, "substantially similar" to Model Consent Form A-9, which describes the institution's overdraft services in clear and readily understandable terms in a separate standalone disclosure. 12 C.F.R. § 1005.17.

A financial institution may not charge an overdraft fee on ATM and nonrecurring debit transactions unless it complies with each of these Reg. E requirements. 12 C.F.R. §1005.17(b)(1). Further, the Arbitrator must interpret Reg. E broadly and liberally "in favor of the consumer" to effectuate its remedial purpose. Clemmer v. Key Bank Nat'l Ass'n, 539 F.3d 349, 350 (6th Cir. 2008); Fludd, 2021 WL 4691587, at *14; Gunter v. United Fed. Credit Union, Case No. 3:15-cv-00483-MMD-WGC, 2017 WL 4274196, at *3 (D. Nev. Sept. 25, 2017); Bultemeyer v.

22

Fitness All., LLC, No. CV-12-2619-PHX-LOA, 2014 WL 667585, at *3 (D. Ariz. Feb. 20, 2014). The Arbitrator examines respondent's compliance with each of these requirements.

**Required Notice Content**

The Arbitrator finds that respondent's 2012 disclosure contained the Reg. E required content.

Brief Description

The disclosure included a "brief description of the financial institution's overdraft service" because it explained the three different types of overdraft protection the bank offered in 2013: the standard overdraft services, which automatically applied to all checking accounts; the overdraft services plan, which allowed a customer to prevent an overdraft by linking a related savings or credit account; and the DCOS, which permitted a customer to cover overdrafts on ATM and one-time debit card transactions. See R3; Hernandez T. It also illustrated its description and some of the differences in those plans through an example using the same $125 transaction drawn on a $100 available balance under each of the different plans. See R3.

Fees

The Arbitrator finds that the 2012 disclosure also described the types of transactions for which the bank would charge an overdraft fee and the dollar value of that fee, which in the case of the standard and DCOS overdrafts was $35. R3. The brochure explained that the DCOS applied to ATM and one-time debit card transactions and not recurring transactions; the standard protection covered "bounced" checks, ACH, and recurring transactions. Id. It informed the customer that the bank would charge an overdraft fee each time it covered a transaction up to four overdraft fees per day maximum. Id. The comparison chart clearly described the costs involved for each overdraft service offered by respondent. Id.

Opt in Right

The 2012 pamphlet also explained the customer's right to elect to opt in to DCOS or not and explained multiple ways to add the service if desired along with the required telephone number, online website link, and in person options. Id. The brochure explicitly explained that the customer must "want" respondent to authorize overdrafts on ATM and one time debit transactions and choose to opt in, unlike the standard protection in which the bank automatically enrolls each new customer. Id. The comparison chart also advised that customers do not have to enroll in both or either of the protection plans. Id.

Alternative Plans

The 2012 disclosure also informed customers of alternative plans for covering overdrafts, such as linking another account, permitting a declination of the transaction, or depositing a covering amount before the end of the day posting. Id. As another alternative, the brochure also offered customers tips on how to completely avoid overdraft fees, including free monitoring tools, such as online banking, text banking, and low balance alerts.

In sum, the Arbitrator denies claimant's assertion that the disclosure did not include the required notice and concludes that respondent's 2012 disclosure included all the mandatory components

23

required by 12 C.F.R. § 1005.17(d): (1) the service description; (2) the fees imposed; (3) fee limits; (4) the opt-in right; and (5) alternative plans for covering overdrafts. See R3.

## Substantially Similar

Section 1005.17(b)(1)(i) requires respondent to use a notice format "substantially similar" to Model Consent Form A-9. 12 C.F.R. § 1005.17(d). Claimant challenges the 2012 disclosure as dissimilar to Model Consent Form A-9 because respondent's disclosure consists of an eight-page brochure rather than a single page notice as drafted by the FRB after several rounds of consumer testing. Id. § 1005.17(d); 74 Fed. Reg. at 59,036. The Arbitrator disagrees.

Model Consent Form A-9 does not address which account balance calculation method a financial institution should use to determine whether a transaction results in an overdraft. See 12 C.F.R. pt. 1005, app. A; Tims, 935 F.3d at 1235; Chambers, 222 F. Supp. 3d at 6. Accordingly, the regulators expected banks to customize the notice to accurately describe their services as long as they also included the required content. Indeed, not customizing the form to reflect the bank's actual services could subject it to liability. See Tims, 935 F.3d at 1245. Consequently, the courts have allowed banks to include additional explanation, when necessary for accuracy, because Reg. E only demands substantial similarity, not exact duplication. See, e.g., Walbridge v. Northeast Credit Union, 299 F. Supp. 3d 338, 348 (D. N.H. 2018); Gunter, 2017 WL 4274196, at *3; Smith v. Bank of Haw., 2017 WL 3597522, *1, *8 (D. Haw. April 13, 2017); Ramirez v. Baxter Credit Union, 2017 WL 118859, *1, *7-8 (N.D. Cal. January 12, 2017); Pinkston-Poling v. Advia Credit Union, 2017 WL 5153218, *1, *3 (W.D. Mich. April 20, 2017).

Here, respondent virtually copied the single page model form as the first page of its disclosure. Compare R3 with Model Consent Form A-9. The rest of the brochure then describes its different overdraft services, how they work, how they compare, and how to avoid overdrafts completely. While perhaps more illustrative than other disclosures, the brochure specifically describes and explains respondent's overdraft services. The Arbitrator agrees with the majority of courts permitting banks to include additional explanation in an effort to accurately portray the customers' overdraft options and therefore finds respondent's 2012 disclosure "substantially similar" to Model Consent Form A-9.

## Disclosure Receipt

Claimant argues that he never received the 2012 disclosure at all. He specifically looked for all documents related to respondent in his four-drawer dresser where he keeps all his important documents and did not find anything. Wilson T. The Arbitrator agrees that, if respondent never gave claimant the 2012 disclosure but enrolled him in DCOS anyway, it would have violated Reg. E. See Chambers, 222 F. Supp. 3d at 16.

The Arbitrator finds claimant credible and believes that he looked for the documents but could not locate them. Nevertheless, even fully crediting claimant's testimony, the Arbitrator finds that claimant did not sustain his burden to prove by a preponderance of the evidence that respondent did not disclose its overdraft practices to him as Reg. E requires. The only individuals who definitively know what transpired when claimant opened his account are claimant, his son, and the banker who assisted him. Claimant does not remember the legally significant events of that day, his special needs son understandably did not testify, and the banker no longer works for respondent. Wilson T; Hernandez T. With no direct evidence based upon personal knowledge,

24

the Arbitrator must examine and weigh the circumstantial evidence. Here, the weight of the circumstantial evidence shows more likely than not that respondent delivered the required notice to claimant.

Respondent explained that the 2012 disclosures inside the 2013 brochures arrived at the branches from the marketing department via a third-party vendor who placed them inside a pre-assembled and shrink-wrapped folder containing the entire new customer account kit. Hernandez T. The branches then stored the sealed kits in the vault until needed for a customer. Id. The banker would not open the shrink-wrapped packet until the time he assisted the customer in opening a new account and then followed the instructions listed on the lime green cover sheet. Id.; R35.

Claimant specifically remembers physically walking into a branch office to open a checking account for the purpose of automatically depositing his monthly government check. Wilson T. While he does not recall the banker's name, he remembers meeting with a banker who helped him open the account that day. Id. Claimant agreed that he verbally provided information to the banker, although he does not recall the details. Id. He agrees that he signed the new account application. Id.; see also R2.

The account application corroborates claimant's memory as it displays claimant's personal information entered in someone else's handwriting but the acknowledgement signed by claimant. Wilson T; R2. The account application hence replicates respondent's 2013 opt in process for walk in new customers. See Hernandez T. In 2013, the banker would typically write down a walk-in customer's verbal information on the application form and then submit it to the customer for signature. Nelson Dep. at 35; Hernandez T. The customer's signature would acknowledge that he received the CAA, privacy policy, and the direct deposit guide, among other things. Hernandez T; Nelson Dep. at 40-44; C1; R2.

Pursuant to respondent's 2013 protocols, the banker would also open the shrink-wrapped new consumer account disclosure kit, remove the banker instruction sheet, and then follow the instructions. Hernandez T; R35. Before giving the kit to the customer, the banker recorded the specific serial number of that kit on the customer's application form so respondent could track which customer received which kit. Hernandez T; C1; R2; Nelson Dep. at 36-37. Again, the application in this case mirrors this practice: it shows the unique serial number of a new customer account kit and claimant's signature acknowledging his receipt of the CAA, privacy notice, and direct deposit guide, all of which the Arbitrator's physical inspection of the hard copy 2013 kit confirmed as included as part of the kit. It seems unlikely that claimant would have received only parts of the kit and not others.

While claimant correctly points out that his signature did not acknowledge receipt of the 2012 disclosure, the evidence credibly establishes that the disclosure was part of the kit. The banker instructions specifically list the disclosure as one of its contents. See R35. Respondent credibly testified that the kits all included the disclosure at the time. Hernandez T. Further, respondent did not prepare the kits itself; instead, it used an outside vendor whose job consisted of assembling and sealing the kits for uniformity. See id.

The instruction sheet also delineated mandatory steps for the banker to follow, including to review the DCOS disclosure with the new customer, which would be difficult to accomplish if the kit did not include the disclosure. Specifically, the instruction sheet required the banker to:

25

| 6. **Remove** this Banker Instruction Sheet |
|---|
| + |
| 7. **Enter** the Consumer Disclosure NAK serial number on SVP |
| + |
| 8. **Review/Provide** the Consumer New Account Disclosure Kit and applicable addenda from Forms Online … |
| + |
| 9. **Review** Debit Card Overdraft Services Brochure (CNS8058) with your customer. Record customers preferences in SVP. |

R35 (original bold and shading; extra details omitted).

Respondent's credible contemporaneous business records show definitively that the banker completed step 7 – he entered the serial number of claimant's kit. See R2; R35. They also show that the banker completed the part of step 9 that required him to record customer preference in respondent's computer system. See R4-R5. The credible evidence thus circumstantially proves that the banker also more likely than not completed step 8 and the first part of step 9 if he definitely completed step 7 and the rest of step 9.

Further, the written instructions to the banker explicitly differentiate between the kit and the disclosure within the kit. In step 8, the instructions require the banker to review and provide the kit; whereas, step 9 requires the banker to review, but not provide, the DCOS disclosure because the customer already received it in the kit. See R35. But step 9 still separately required the banker to review the disclosure with the customer. Id.; see also Hernandez T; R35; R26 at ¶ 13; R4.

Respondent's internal practices and policies in effect in 2013 reinforce these conclusions as they also specifically directed the banker to use the brochure. R4; Hernandez T. Respondent's computer system then functioned as safeguard to make sure bankers did not forget this critical step. It included a verification field, which required the banker to verify by selecting "yes" that he had provided the "Overdraft Services brochure" to the customer. Hernandez T; R4; R26 at ¶ 13. If the banker selected no, the computer would generate an error message reminding the banker to give the brochure to the customer. Hernandez T; R4. The computer system would not allow the banker to proceed with the online process unless he verified that he had given the disclosure brochure to the new customer. Hernandez T; R4. The written protocols also stressed the legal significance of this step; it advised the banker to "keep in mind" that the brochure contained the required DCOS disclosures and needed to be given to the customer before enrolling in the program. Hernandez T; R4.

Claimant implies that the banker could have falsified compliance with all these steps and requirements because claimant does not have the kit or the disclosure. Yet documents, even important ones, can get lost or misplaced over the course of nine years, particularly when claimant moved homes in the meantime, received documents at his mother's home, and rightfully focused his attention and time on his son's welfare. See Wilson T. Moreover, respondent specifically investigated the banker's personnel file to check for reprimands, discipline, or improper conduct but found nothing other than a banker who left on his own accord to pursue other career opportunities. Hernandez T. Examining the record as a whole, the Arbitrator finds that the totality of the evidence more likely than not proves that the banker performed his duty as respondent and Reg. E required.

26

**Segregated Disclosure**

Reg. E sets out procedures for how financial institutions must present their disclosures; it requires financial institutions to disclose their overdraft policies in a written notice "segregated from all other information." 12 C.F.R. §1005.17(b)(1)(i); see Tims, 935 F.3d at 1245. Claimant maintains that respondent failed to segregate the 2012 disclosure in two respects: (1) respondent included seven pages in the same document with the single page notice Reg. E requires; and (2) respondent provided the 2012 disclosure as part of a new account kit, which consisted of several separate documents.

Reg. E requires segregation to avoid financial institutions from burying overdraft fee disclosures in lengthy agreements and disclosures replete with legalese. Regulators wanted customers to be able to read a separate document just about the bank's overdraft fees and practices in order for them to make informed choices about enrollment in overdraft programs and to avoid "surprise" fees. Generally, segregate means to isolate; aggregate means to add, collect, join or group like with like, whereas segregate disassociates like from dislike. In this context, segregate means that the bank must separate its overdraft disclosures from other unrelated information, such as information about safety deposit boxes, savings accounts, wire transfers, and other bank functions and services.

The requirement does not mean that the bank cannot disclose overdraft fees with other overdraft information. On the contrary, Model Consent Form A-9 aggregates different overdraft services in one disclosure, and Reg. E requires respondent to describe its overdraft programs and alternative plans for handling overdrafts in one disclosure. Accordingly, the Arbitrator concludes that Reg. E's segregation requirement obligated respondent to provide a standalone, single document that describes its overdraft practices and policies.

Further, respondent complied when it created a standalone single document overdraft disclosure. While the model form consists of one page – and respondent's 2022 disclosure also consists of one page – nothing in Reg. E prohibits respondent from using more than a single page if necessary to describe its overdraft program. Thus, while its current shorter version looks more like the model, its former 8-page version did not violate Reg. E's segregation requirement because all the information in these eight pages contained information either required by Reg. E or used to describe respondent's overdraft practice. Finally, while Reg. E does not squarely address the issue, the Arbitrator finds no regulation, interpretation, or official comment barring respondent from containing the standalone disclosure in a folder of other required disclosures as long as the bank draws specific attention to the disclosure, permits the customer to consider it before enrollment, and obtains consent separately from other consents, as respondent's protocols required here. The Arbitrator therefore concludes that respondent complied with Reg. E's segregation requirement because it did not bury the information in other agreements and disclosures but prominently displayed the information in its own document, an eight-page brochure about overdraft fees and protections.

**Reasonable Opportunity**

Reg. E also requires respondent to have provided claimant with a "reasonable opportunity" to affirmatively consent to respondent's overdraft services. 12 C.F.R. §1005.17(b)(1)(ii). Claimant asserts that respondent failed to provide him a reasonable opportunity to review DCOS information

27

before opting in. Under Reg. E, a consumer has a reasonable opportunity to provide affirmative consent when, among other things, "it provides reasonable methods by which the consumer may affirmatively consent." 12 C.F.R. § 1005.17, cmt.17(b)-4. The comment then lists examples of a reasonable consent opportunity: (1) a mail in form; (2) a dedicated telephone line; (3) a hand in form; and (4) electronically. Id.

Respondent explained that it provided claimant with the required reasonable opportunity because its business records show that the banker followed its 2013 procedures to review the Reg. E disclosure and overdraft services with the customer and then record the customer's verbal assent or declination. Hernandez T; Nelson Dep. at 48-49. Claimant argues that this process did not afford him a reasonable opportunity to consider his options because respondent did not first provide claimant the disclosure, second have him take the disclosure away to consider, and only then come back to deliver his decision.

The Arbitrator finds this argument inconsistent with Reg. E's official comments, which specifically permit a financial institution to provide the required notice "prior to *or at* account-opening." Comment 17(b)-1.iv (italics added). Reg. E thus contemplates that a bank can provide a reasonable opportunity to consent during the account opening process, rather than only during a separate process, as claimant suggests. See id. Indeed, Reg. E comments explicitly allow respondent to require its customers, like claimant, to choose whether or not to enroll in DCOS as part of its account opening process:

> A financial institution may require a consumer, as a necessary step to opening an account, to choose whether or not to opt into the payment of ATM or one-time debit card transactions pursuant to the institution's overdraft service.

Id. Accordingly, the Arbitrator concludes both that Reg. E permitted respondent to afford claimant a reasonable opportunity to consent as part of the account opening process and that respondent's business records establish that it did so here. See Hernandez T; R2-5.

## Extraneous Information

Claimant challenges respondent's 2012 disclosure as containing impermissible extraneous information in violation of Reg. E; respondent countered that its disclosure contained only permitted information. The Arbitrator agrees that the Legislature preferred a shorter rather than longer disclosure but disagrees that respondent included impermissible information.

Reg. E discourages financial institutions from liberally adding language to opt-in agreements based on the model form. The regulation itself prohibits the inclusion of "information not specified or otherwise permitted by" the regulation's terms. 12 C.F.R. § 1005.17(d); see also id. at § 1005.17(d)(6) ("Permitted modifications and additional content"). In promulgating this section of Reg. E, the FRB plainly wanted opt-in agreements to be short and clear. See Final Rule, 74 Fed. Reg. at 59,047 (noting that the model form was edited to make it "shorter and clearer"); id. at 59,048 (describing efforts to "eliminate unnecessary language"); id. at 59,048–49 (expressing concern that additional language might "make the form lengthy," "confuse customers," or "diminish" understanding). Presumably, in part for this reason, respondent's current 2022 disclosure consists of a single page, much like the model form. See R25.

However, the disclosure's length does not determine its legality as Reg. E does not require a

28

specific page limit for disclosures. To examine its legality, the Arbitrator must examine its contents as compared to Reg. E's permissible inclusions. As noted above, section 1005.17(d)(1)-(5) describes the required content:

> **(1) Overdraft service.** A brief description of the financial institution's overdraft service and the types of transactions for which a fee or charge for paying an overdraft may be imposed, including ATM and one-time debit card transactions.
> **(2) Fees imposed.** The dollar amount of any fees or charges assessed by the financial institution for paying an ATM or one-time debit card transaction pursuant to the institution's overdraft service, including any daily or other overdraft fees. If the amount of the fee is determined on the basis of the number of times the consumer has overdrawn the account, the amount of the overdraft, or other factors, the institution must disclose the maximum fee that may be imposed.
> **(3) Limits on fees charged.** The maximum number of overdraft fees or charges that may be assessed per day, or, if applicable, that there is no limit.
> **(4) Disclosure of opt-in right.** An explanation of the consumer's right to affirmatively consent to the financial institution's payment of overdrafts for ATM and one-time debit card transactions pursuant to the institution's overdraft service, including the methods by which the consumer may consent to the service; and
> **(5) Alternative plans for covering overdrafts.** If the institution offers a line of credit subject to Regulation Z (12 CFR part 1026) or a service that transfers funds from another account of the consumer held at the institution to cover overdrafts, the institution must state that fact. An institution may, but is not required to, list additional alternatives for the payment of overdrafts.

12 C.F.R. § 1005.17(d)(1)-(5) (original bold). Reg. E's official interpretation elaborates on these descriptions:

> 17(d) Content and Format
> 1. **Overdraft service.** The description of the institution's overdraft service should indicate that the consumer has the right to affirmatively consent, or opt into payment of overdrafts for ATM and one-time debit card transactions. The description should also disclose the institution's policies regarding the payment of overdrafts for other transactions, including checks, ACH transactions, and automatic bill payments, provided that this content is not more prominent than the description of the consumer's right to opt into payment of overdrafts for ATM and one-time debit card transactions. As applicable, the institution also should indicate that it pays overdrafts at its discretion, and should briefly explain that if the institution does not authorize and pay an overdraft, it may decline the transaction.
> 2. **Maximum fee.** If the amount of a fee may vary from transaction to transaction, the financial institution may indicate that the consumer may be assessed a fee "up to" the maximum fee. The financial institution must disclose all applicable overdraft fees, including but not limited to:
> i. Per item or per transaction fees;
> ii. Daily overdraft fees;
> iii. Sustained overdraft fees, where fees are assessed when the consumer has not repaid the amount of the overdraft after some period of time (for example, if an account remains overdrawn for five or more business days); or
> iv. Negative balance fees.

29

3. **Opt-in methods.** The opt-in notice must include the methods by which the consumer may consent to the overdraft service for ATM and one-time debit card transactions. Institutions may tailor Model Form A-9 to the methods offered to consumers for affirmatively consenting to the service. For example, an institution need not provide the tear-off portion of Model Form A-9 if it is only permitting consumers to opt-in telephonically or electronically. Institutions may, but are not required, to provide a signature line or check box where the consumer can indicate that he or she declines to opt in.

4. **Identification of consumer's account.** An institution may use any reasonable method to identify the account for which the consumer submits the opt-in notice. For example, the institution may include a line for a printed name and an account number, as shown in Model Form A-9. Or, the institution may print a bar code or use other tracking information. *See also* comment 17(b)-6, which describes how an institution obtains a consumer's affirmative consent.

5. **Alternative plans for covering overdrafts.** If the institution offers both a line of credit subject to Regulation Z (12 CFR part 1026) and a service that transfers funds from another account of the consumer held at the institution to cover overdrafts, the institution must state in its opt-in notice that both alternative plans are offered. For example, the notice might state "We also offer *overdraft protection plans,* such as a link to a savings account or to an overdraft line of credit, which may be less expensive than our standard overdraft practices." If the institution offers one, but not the other, it must state in its opt-in notice the alternative plan that it offers. If the institution does not offer either plan, it should omit the reference to the alternative plans.

(original bold). Section 1005.17(d)(6) identifies additional permissible modifications and inclusions:

> **(6) Permitted modifications and additional content.** If applicable, the institution may modify the content required by § 1005.17(d) to indicate that the consumer has the right to opt into, or opt out of, the payment of overdrafts under the institution's overdraft service for other types of transactions, such as checks, ACH transactions, or automatic bill payments; to provide a means for the consumer to exercise this choice; and to disclose the associated returned item fee and that additional merchant fees may apply. The institution may also disclose the consumer's right to revoke consent. For notices provided to consumers who have opened accounts prior to July 1, 2010, the financial institution may describe the institution's overdraft service with respect to ATM and one-time debit card transactions with a statement such as "After August 15, 2010, we will not authorize and pay overdrafts for the following types of transactions unless you ask us to (see below)."

12 C.F.R. § 1005.17(d)(6); (original bold).

The Arbitrator analyzed the 2013 DCOS brochure in depth and in comparison, with the regulations, interpretations, and comments and, on that basis, concludes that it contains information required and permitted by Reg. E. The first page contained all information required by Reg. E and included in the Model Consent Form A-9, and the last page explained the disclosure's terms and how to reach respondent with any questions:

30

<span style="color:red">Important things you should know</span>

**What you need to know about Overdrafts and Overdraft Fees**

An overdraft occurs when you do not have enough money in your account to cover a transaction but we pay it anyway. We can cover your overdrafts in two different ways:

1. We have <u>standard overdraft practices</u> that come with your account.
2. We also offer overdraft protection plans, such as a link to an eligible savings account, eligible line of credit or eligible credit card, which may be less expensive than our standard overdraft practices. To learn more, ask us about these plans.

This notice explains our standard overdraft practices.

**What are the standard overdraft practices that come with my account**?

We <u>do</u> authorize and pay overdrafts for the following types of transactions:
• Checks and other transactions made using your checking account number
• Automatic bill payments (such as recurring debit card and ACH payments)

We will not authorize and pay overdrafts for the following types of transactions unless you ask us to (see below):
• ATM transactions
• Everyday debit card transactions (such as one-time debit card and ATM card purchases)

We pay overdrafts at our discretion, which means we do not guarantee that we will always authorize and pay any type of transaction. If we do not authorize and pay an overdraft, your transaction will be declined.

**What fees will the bank charge if it pays my overdraft**?

Under our <u>standard overdraft practices</u>:

• We will charge you a fee of up to $**35** each time we pay an overdraft item to your account
• There is a limit of **four** overdraft and returned item fees per day

**What if I want Wells Fargo to authorize and pay overdrafts on my ATM and everyday debit card transactions**?

If you want us to authorize and pay overdrafts on ATM and everyday debit card transactions, please contact us at 1-877-804-4883, 24 hours a day, 7 days a week or speak to a banker at any Wells Fargo location. Or sign on to Wells Fargo Online® Banking and click the "Overdraft Services" link on the Account Activity page.

<u>See</u> R3 (original emphasis and coloration). Reg. E requires all of this content, which the model

31

Exhibit C, Page 101

form also includes. <u>Compare</u> Model Consent Form A-9 <u>with</u> R3.

The next page of the 2012 disclosure describes respondent's alternative overdraft plans and programs, also specifically required by Reg. E:

<span style="color:red">You've got options</span>

<span style="color:blue">Optional services that may offer protection to avoid overdrafts</span>

**Overdraft Protection**

Protect yourself from the inconvenience of declined transactions or returned ("bounced") checks. When you link one of your eligible Wells Fargo savings or credit accounts to your checking account, the bank will use available funds in your linked accounts to authorize your transactions if you don't have enough money in your checking account.

• There is no fee to sign up for this service
• If your account balance goes negative and the bank transfers money to bring your balance current, a single Overdraft Protection Transfer fee[2] will be assessed regardless of how many transactions are presented for payment that day

**Debit Card Overdraft Service[3]**

You can choose how Wells Fargo handles your ATM and everyday debit card transactions.

If you add optional Debit Card Overdraft Service to your checking account, the bank may approve (at our discretion) ATM and everyday debit card *transactions if you don't have enough money in your checking account* or linked overdraft protection accounts at the time of the transaction.

• There is no fee to sign up for this service
• If your account is negative, our standard overdraft fee of up to $35 per item[6] will apply if a covering[4] deposit or transfer is not made before the posted cutoff time the same business day

If you do not add this service, your ATM and everyday debit card transactions will be declined at the time of the transaction if you don't have enough money in your account; you will not be charged an overdraft fee if these types of transactions cause an overdraft. The service does not apply to debit card transactions you have established for recurring payments (such as utilities or club memberships). These may continue to be authorized and paid into overdraft, at our discretion, even if you do not add Debit Card Overdraft Service and our overdraft fees[6] and policies will apply.

Please see back panel of brochure for additional details.  Lift to open

<u>See</u> R3 (original coloration and emphasis). The Arbitrator finds that Reg. E specifically requires all

32

of this information because it mandates that respondent explain any alternative overdraft practices it uses in addition to its standard overdraft program.

Respondent next included explanatory comparison charts and tips to avoid overdrafts:

### Control of your accounts is in your hands

Managing your checking account is the foundation of good money management skills. Wells Fargo offers tools and services that meet your personal financial style — with ways to keep track of your account balance and choices on how to manage your account.

### What is an overdraft?

Overdrafts occur when you spend more money than you have in your checking account and the bank pays your transaction.

### How to avoid overdrafts

• **Don't spend more than you have**
Know your available balance,[1] the amount of money you can actually use.
• **Keep track of your spending**
Record every deposit and withdrawal including checks, recurring payments, debit card purchases, and cash withdrawals.
• **Don't forget outstanding transactions**
The current available balance provided by the bank may not include all transactions, such as checks or upcoming automatic payments.
• **Keep a cushion in your account**
By keeping a little extra in your checking account, you can cover any outstanding expenses that don't yet appear in your available balance, and avoid overdrafts.

### Online and mobile: You decide how to manage and track your spending

Sign up for convenient services and start managing your account via internet or mobile phone.

### Services to help avoid overdrafts

•Text Banking[5] — Check your available balance1 before you make a purchase. You can quickly request and receive information via text message.
• Mobile Banking[5] — Bank on the go, check balances and transfer funds between your Wells Fargo accounts using your phone's web browser
•Account Alerts — Stay informed. Set up a low balance alert to your email or wireless device[5]
• My Money Map — Take control of your finances with an online tool that helps you view your spending, budgeting and savings with one click

<u>See</u> R3 (original coloration and emphasis). While not required by Reg. E, the Arbitrator finds such tips permissible. The charts qualify as illustrative descriptions of respondent's overdraft programs

33

and how they work separately or combined. They also highlight the differences between the options, also a helpful description of its overdraft services.

The Arbitrator further finds that the tips qualify as a permissible alternative plan. Respondent essentially advises consumers how to avoid overdrafts completely – a smart alternative plan to any of its products. Indeed, rather than finding a Reg. E violation, the <u>Chambers</u> court approved of similar examples and tips as *saving* the bank from violating Reg. E with an ambiguous overdraft description:

> opt-in agreement adopts the model form's definition of an overdraft, explaining that an "overdraft occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway." … The parties spill much ink disputing whether this language, viewed in isolation, refers to the actual or available balance. … But the Court need not settle that dispute, because the opt-in agreement does not use this language in isolation. In an introductory paragraph not contained in the model form, the opt-in agreement provides examples of situations that might result in an overdraft. These examples—"when you inadvertently calculate your available balance" or "when funds from a recent deposit are not available"— explicitly make overdrafts a function of the customer's available balance.

222 F. Supp. 3d at 15-16. The Arbitrator agrees with <u>Chambers</u>' analysis. Reg. E not only permits respondent's examples and tips; but, like the illustrations in <u>Chambers</u>, they help rescue the 2012 disclosure from impermissible ambiguity. <u>See id.</u> In sum, while the Arbitrator agrees that respondent's disclosure could have been shorter and more concise, it did not violate Reg. E by including permissible, descriptive information about its overdraft programs.

## Unscripted Discussion

Claimant avers that respondent violated Reg. E when it allowed its banker to engage in an unscripted dialogue with claimant about DCOS because it permitted the banker to unduly influence and mislead him. The Arbitrator concludes that claimant failed to sustain his burden of proof on this issue. Had claimant introduced credible evidence that the banker persuaded, misled, or tricked him into DCOS enrollment, then the Arbitrator would agree that respondent violated Reg. E. Yet claimant introduced no such evidence. Claimant testified quite forthrightly and never mentioned any efforts to influence, push, force, or cajole him into enrolling in respondent's DCOS program. Wilson T.

Further, the Arbitrator finds no regulatory provision requiring respondent to use a script or standard explanation when meeting with new checking account customers. Nor has the Arbitrator found any provision prohibiting discussions between customers and bankers about overdraft options. Indeed, claimant's position would arguably prohibit bankers from even answering customer questions unless scripted, which would run afoul of Reg. E's purpose of helping customers reach informed banking decisions. In sum, the Arbitrator concludes that respondent did not violate Reg. E by failing to follow a script because Reg. E imposes no such requirement.

## Clear and Readily Understandable

Reg. E mandates that respondent describe its overdraft program in "clear and readily understandable" language. 12 C.F.R. § 1005.4(a)(1); <u>see also</u> 15 U.S.C. § 1693c. Claimant argues

34

that respondent's disclosure lacks clarity in several respects: (1) it does not properly disclose respondent's use of available balance to calculate overdraft fees; (2) the phrase "enough money in your account" reflects ledger, not available, balance, contrary to respondent's actual practice; and (3) the use of the phrase "we pay it anyway" falsely implies that respondent uses its own money to cover an overdraft.

In short, claimant argues that respondent's 2012 disclosure misleads customers because it invites them to believe that the bank uses the ledger balance method, rather than the available balance metric it really uses. Or, at a minimum claimant argues, the disclosure is ambiguous because it does not clearly identify the methodology respondent uses to calculate an overdraft. And claimant continues, if ambiguous, the 2012 disclosure cannot satisfy Reg. E's "clear and readily understandable" mandate. See 12 C.F.R. § 205.4(a)(1).

A term is ambiguous when the parties can reasonably understand it in more than one way. Black's Law Dictionary (11th ed. 2019). In other words, the disclosure is ambiguous if it has more than one reasonable interpretation; although, importantly, it is not ambiguous simply because the parties disagree about its meaning. Chambers, 222 F. Supp. 3d at 9; see also Diamond Point Plaza Ltd. v. Wells Fargo, NA, 400 Md. 718, 929 A.2d 932, 951-52 (2007). Conversely, a contract is unambiguous when, after examining the contract as a whole and affording its words their plain meaning, the contract is capable of only one reasonable interpretation. Claimant explains that respondent's overdraft definition – When you do not have enough money in your account to cover a transaction but we pay it anyway – lacks clarity because it could ambiguously refer to either ledger or available balance.

In the motion to dismiss context, several courts have agreed with claimant and denied motions to dismiss based upon virtually identical allegations about identical disclosure language. See, e.g., Tims, 935 F.3d at 1235 (denying motion to dismiss based upon same definition of overdraft); Grenier v. Granite State Credit Union, Civil No. 21-cv-00534-LM, 2021 DNH 172 P., *1, *4 (D. New Hamp. November 8, 2021) (same); Fludd, 2021 WL 4691587, at *15 (same); Adams v. Liberty Bank, 2021 WL 3726007, *1 (D. Conn. August 23, 2021) (same); Wellington v. Empower Federal Credit Union, 533 F. Supp. 3d 64, 70-71 (N.D.N.Y. 2021) (same); Richard v. Glens Falls Nat'l Bank, 2021 WL 810218, *1, * 9 (N.D.N.Y. Mar. 3, 2021); Roy v. ESL Fed. Credit Union, 2020 WL 5849297, *1, *7 (W.D.N.Y. Sept. 30, 2020); Lussoro v. Ocean Fin. Fed. Credit Union, 456 F. Supp. 3d 474, 495-96 (E.D.N.Y. 2020); Kelly v. Cmty. Bank, N.A., Case No. 19-cv-919 MAD- CFH2020 WL 777463, at *9 (N.D.N.Y February 18, 2020) (same); Bettencourt v. Jeanne D'Arc Credit Union, 370 F. Supp. 3d 258, 262 (D. Mass. 2019) (same); Salls, 349 F. Supp. 3d at 87 (same); Walbridge, 299 F. Supp. 3d at 343 (same); Pinkston, 227 F. Supp. 3d at 856 (same); Ramirez, 2017 WL 118859, at *7 (same); Smith, 2017 WL 3597522, at *5; Gunter, 2016 WL 3457009, at *4 (same); Wodja v. Wash. State Emps. Credit Union, 2016 WL 3218832, at *2–3 (W.D. Wa. June 9, 2016) (same); In re: TD Bank, N.A., 150 F. Supp. 3d 593, 621–24 (D.S.C. 2015) (MDL); see also Roberts v. Capital One, N.A., 719 Fed. Appx. 33, 35–37, 2017 WL 5952720, at *2–*3 (2d Cir. Dec. 1, 2017) (finding term overdraft ambiguous in the absence of a clear explanation of when an overdraft occurs). Agreeing with these courts, the Arbitrator likewise denied respondent's motion to dismiss because claimant sufficiently pled a cause of action based upon the disclosure's ambiguity. See DM Order, dated 6/20/22.

Indeed, even now after the evidentiary hearing, if respondent's 2012 disclosure consisted of no further explanation than this single definition, the Arbitrator would agree with claimant that the phrase "enough money" does not adequately and unambiguously provide a "clear and readily

35

understandable" explanation of "the institution's overdraft service." 12 C.F.R. §§ 1005.4(1)(1), 1005.17(b)(1)(i); see, e.g., Tims, 935 F.3d at 1238, 1243-44 (ambiguous because could describe either the available or ledger balance calculation method which plausibly does not describe the overdraft service in a "clear and readily understandable" way); Wellington, 2021 WL 1377789, at *5; Bettencourt, 370 F. Supp. 3d at 262, 265; Walbridge, 299 F. Supp. 3d at 343; Salls, 349 F. Supp. 3d at 90; Pinkston, 227 F. Supp. 3d at 857; Walker v. People's United Bank, 305 F. Supp. 3d 365, 376 (D. Conn. 2018).

As Tims so aptly explained, when the opt in agreement "sheds no light" on what enough money in the account means, it simply raises the question of how the bank determines enough money – is it enough money to cover only settled transactions or to cover authorized but not yet settled transactions as well. 935 F.3d at 1238. In that case, the court found the use of the phrase ambiguous because neither the opt in nor account agreement articulated which method would trigger an overdraft. Id. at 1239-40.

The court then distinguished the agreements before it from those in Chambers:

> Importantly, in Chambers, the Opt-In Agreement used the phrase "available balance." In addition, the Account Agreement in Chambers contained a subsection addressing "Available Balances to Make Transactions," which linked the concept of available balance to the mechanics of when and how the bank would assess overdrafts. Finally, the Opt-In Agreement in Chambers provided examples illustrating when an account would not have "enough money" and thus be subject to an overdraft.

> None of those factors is present in this case. The agreements here did not use the phrase "available balance"; the Account Agreement nowhere explained the mechanics of how and when [the bank] would assess overdrafts, nor linked the concept of an "available balance" to those mechanics; and the Opt-In Agreement provided no examples illustrating when a consumer would not have "enough money" to cover a transaction and thereby trigger an overdraft. Because of these three distinctions, we cannot say the Opt-In and Account Agreements in this case clearly demonstrated the parties' intent that [the bank] would use the available balance calculation method when assessing overdraft fees.

Id. at 1242; see also Lussoro, 456 F. Supp. 3d at 485-86 (distinguishing Chambers because disclosure's lack of examples permitted ambiguity); Smith, 2019 WL 404423, at *12 (if only the bank had "provided the same example in the Account Agreement, this ambiguity might have been avoided entirely"); Ramirez, 2017 WL 1064991, at *n1 (distinguishing Chambers because, unlike the disclosure before it, the Chambers opt in "conspicuously described" and illustrated when a customer might not have "enough money" to cover a transaction); Walbridge, 299 F. Supp. 3d at 345-46 (concluding based on the same three factors that the financial institution did not clearly communicate an intent to use the available balance in charging overdraft fees).

The Arbitrator finds respondent's 2012 disclosure most analogous to the opt in agreement analyzed in Chambers. In Chambers, the bank used the same language respondent did, which it pulled directly from Model Consent Form A-9 complete with the same underline:

36

an <u>overdraft</u> occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway.

222 F. Supp. 3d at 10 (original underline). As here, the parties in <u>Chambers</u> hotly disputed the meaning of the definition, the customer interpreting it as the ledger balance and the bank interpreting it as the available balance. <u>Id.</u> The court examined the opt in agreement as a whole and noted that the bank had used examples in the disclosure to explain different overdraft scenarios:

> [the opt in agreement] provides examples of when a customer might find herself without "enough money in [her] account to cover a transaction"— such as when she "inadvertently miscalculate[s] [her] available balance," or "when funds from a recent deposit are not available."

<u>Id.</u> The bank also pointed out that the opt in agreement did not refer to ledger balance at all. <u>Id.</u> at 12. The court agreed, emphasizing that, unlike the term ledger balance, the agreement used the term available balance "in critical provisions dealing specifically with overdrafts and debit transactions—the subject matter of this case." <u>Id.</u> The court therefore concluded as a matter of law that

> By specifically invoking the phrase "available balance," the opt-in agreement makes clear that balance will be used in calculating overdrafts and imposing fees. There is no competing reference to an actual or ledger balance. Under the terms of the opt-in agreement, then, overdrafts are a function of the available balance … the relevant agreements unambiguously convey that the [the financial institution] will impose overdraft fees on debit transactions that overdraw the available balance. … The relevant agreements unambiguously disclose that overdraft fees would be imposed on debit transactions that overdrew her available balance. … The agreements at issue here unambiguously reveal the Credit Union's intention to impose overdraft fees when Chambers' debit transactions overdrew her available balance.

<u>Id.</u> at 10, 12-15, 17. The court bolstered its conclusion by citing to the customer account agreement, which also linked overdrafts to available balance even though it did not define the term. <u>Id.</u> at 10-11.

Here, as in <u>Chambers</u>, respondent took its overdraft definition directly from Model Consent Form A-9 right down to the same underline:

> An <u>overdraft</u> occurs when you do not have enough money in your account to cover a transaction but we pay it anyway

R3. Also as in <u>Chambers</u>, respondent cross-referenced the account agreement and the bank's funds availability policy and, more importantly, specifically used the term available balance in its disclosure. <u>Id.</u> More so than the <u>Chambers</u> bank, which used the term "available balance" once in its opt in agreement, respondent used the term five times in its 2012 disclosure, when it (1) explained how to avoid overdrafts by using text banking to determine the "available balance" before making a purchase; (2) compared the overdraft protection options by using a column expressly labeled "checking available balance;" (3) advised customers to "know your available balance" to avoid overdrafts; (4) reminded customers that the "available balance" may not include

37

all transactions; and when it (5) suggested customers keep a cushion in their accounts to cover any expenses not yet appearing in the "available balance." R3. "Available" is defined as "capable of use for the accomplishment of a purpose: immediately utilizable." Available, Webster's Third New International Dictionary 150 (2002). Thus, even the word's definition links the concepts of enough money and immediately usable.

Like the Chambers bank, respondent also used examples to illustrate its overdraft services. See R3. The examples themselves show that respondent used the available balance as its overdraft metric. See id. Finally, in lockstep with the Chambers' disclosure, respondent's 2012 disclosure never mentions ledger balance. See id. Given these similarities, Chambers provides an excellent lens through which to analyze the 2012 disclosure's clarity.

Claimant argues that even though respondent used the word "available," it did so without definition or clarity and therefore only confused the consumer further. The Arbitrator finds, however, that respondent did include a simple, layperson definition of available balance. Respondent explicitly advised customers to avoid overdrafts by knowing their available balance:

> Know your available balance,[1] the amount of money you can actually use

R3. In this clause, respondent explained that available balance is the amount of money you can actually use. Had the disclosure contained only the model form's definition of overdraft without reference to the type of balance used to determine "enough money," the Arbitrator would agree with claimant and the legion of cases finding non-customized disclosures misleading at worst and ambiguous at best. But, here, even more so than the financial institution in Chambers, respondent referred its customers not once but five times to the available balance in the same 2012 disclosure as its overdraft measure, and never once mentioned ledger balance. Under these circumstances, reviewing the 2012 disclosure as a whole, without reference to the 2013 or 2020 CAA, the Arbitrator concludes as a matter of law that respondent's 2012 disclosure complied with its Reg. E duty to explain its overdraft services in "clear and readily understandable" language.

Claimant emphasizes that the 2022 disclosure, unlike the 2012 disclosure, explicitly defines available balance and specifically references available balance in its overdraft definition. Thus, claimant suggests, the 2012 cannot be clear and readily understandable given the 2022 changes. The Arbitrator agrees that the 2022 disclosure provides more precision and greater clarity than the 2012 version. Compare R3 with R25. But it does not follow that the 2012 version was unclear simply because respondent was able to later clarify it further. On the contrary, financial institutions should strive to achieve best practices, not minimum compliance. Accordingly, the Arbitrator applauds the improvements and respondent's decision to transform a clear and readily understandable disclosure into a clearer, simpler disclosure, even easier to understand. Finally, as a matter of public policy and equity, the Arbitrator will not use respondent's compliance improvements to impose liability against it based upon its earlier compliant, *albeit* less precise, version.

## Affirmative Consent

Reg E. requires respondent to obtain the customer's "affirmative consent" to its overdraft services. See 12 C.F.R. § 1005.17(b)(1)(ii). Affirmative consent requires "plain and clear consent ... before certain acts or events, such as changes in policies that could impair an individual's rights or interests." Affirmative-Consent Requirement, Black's Law Dictionary (11th ed. 2019). Thus, if

38

respondent's disclosure did not adequately convey the circumstances under which it would charge overdraft fees, then it would violate Reg. E based upon lack of affirmative consent. See Tims, 935 F.3d at 1243-44; Salls, 349 F. Supp. 3d at 90.

The official comments elaborate on the opt in methods and affirmative consent requirement:

> 3. **Opt-in methods.** The opt-in notice must include the methods by which the consumer may consent to the overdraft service for ATM and one-time debit card transactions. Institutions may tailor Model Form A-9 to the methods offered to consumers for affirmatively consenting to the service. For example, an institution need not provide the tear-off portion of Model Form A-9 if it is only permitting consumers to opt-in telephonically or electronically. Institutions may, but are not required, to provide a signature line or check box where the consumer can indicate that he or she declines to opt in.
>
> 6. **Affirmative consent required.** A consumer's affirmative consent, or opt-in, to a financial institution's overdraft service must be obtained separately from other consents or acknowledgements obtained by the institution, including a consent to receive disclosures electronically. An institution may obtain a consumer's affirmative consent by providing a blank signature line or check box that the consumer could sign or select to affirmatively consent, provided that the signature line or check box is used solely for purposes of evidencing the consumer's choice whether or not to opt into the overdraft service and not for other purposes. An institution does not obtain a consumer's affirmative consent by including preprinted language about the overdraft service in an account disclosure provided with a signature card or contract that the consumer must sign to open the account and that acknowledges the consumer's acceptance of the account terms. Nor does an institution obtain a consumer's affirmative consent by providing a signature card that contains a pre-selected check box indicating that the consumer is requesting the service.

(original bold). Further, the official comments specifically address the process for obtaining affirmative consent to opt in overdraft services at the time of account opening:

> 5. **Implementing opt-in at account-opening.** A financial institution may provide notice regarding the institution's overdraft service prior to or at account-opening. A financial institution may require a consumer, as a necessary step to opening an account, to choose whether or not to opt into the payment of ATM or one-time debit card transactions pursuant to the institution's overdraft service. For example, the institution could require the consumer, at account opening, to sign a signature line or check a box on a form (consistent with comment 17(b)-6) indicating whether or not the consumer affirmatively consents at account opening. If the consumer does not check any box or provide a signature, the institution must assume that the consumer does not opt in. Or, the institution could require the consumer to choose between an account that does not permit the payment of ATM or one-time debit card transactions pursuant to the institution's overdraft service and an account that permits the payment of such overdrafts, provided that the accounts comply with § 1005.17(b)(2) and § 1005.17(b)(3).

(original bold).

39

Here, claimant emphasizes that respondent omitted the signature portion of Model Consent Form A-9 in its disclosure and thus did not obtain claimant's affirmative consent. He also maintains that verbal consent, if he even consented, does not satisfy Reg. E. For the reasons analyzed above, the Arbitrator concludes that Reg. E permits, but does not require, affirmative consent to be written. See generally 12 C.F.R. § 1005.17, cmt.17(b)-4 (permitting verbal telephonic consent).

Additionally, while respondent has no written record directly from claimant acknowledging his consent, its contemporaneous business records memorialize that claimant consented to DCOS enrollment. See R5; accord Hernandez T. Each monthly account statement also acknowledged with a check mark that claimant had signed up for DCOS. See R7-R20. Claimant's monthly statements contain a section on the right top identifying the account options claimant selected, such as online banking, direct deposit, or my spending report, among others. See id. One of the checkable options is "Overdraft Service." See id. Each and every one of claimant's statements, before he disenrolled in DCOS in 2022, had the overdraft service box checked, showing that he was enrolled in DCOS. See id. Each statement also showed the overdraft fees imposed that month as well as the year-to-date total. See id. Claimant could have removed or added any of the optional account services at any time. Hernandez T. In fact, he did just that for other services. Compare R7 with R12 (adding services with new checked boxes).

Likewise, claimant could have questioned the checked overdraft service box or the fees imposed if he had not consented. See also R7-R20 (explaining how to contact banker or report an error). Claimant testified that he did question the fees on a few different occasions in person at respondent's branches but remembered no specifics or details. Wilson T. His memory, by his own admission, was vague on when, where, and in what manner he voiced his concerns. Id. Respondent, on the other hand, maintains a written record of all customer complaints, which it specifically checked. Hernandez T. Respondent found no complaints logged from claimant at any time, even though it annually trains its bankers on the need and protocol to lodge customer complaints. Id. Accordingly, the Arbitrator concludes that respondent obtained claimant's affirmative consent, which he never revoked until 2022 when he disenrolled in DCOS.

The Chambers court agreed that a disclosure, like respondent's, effectively secures affirmative consent:

> These examples—"when you inadvertently calculate your available balance" or "when funds from a recent deposit are not available"— explicitly make overdrafts a function of the customer's available balance. If the [bank's] aim was to secure Chambers' affirmative consent for an overdraft program based on her available balance, then the opt in agreement was effective.

222 F. Supp. 3d at 15-16.

## Signature Acknowledgement

Claimant asserts that respondent violated Reg. E because it did not obtain claimant's signature to acknowledge his DCOS enrollment. Claimant points out that respondent obtained his signature on the account application form which acknowledged his receipt of the CAA, privacy notice, and other items, but failed to include any reference to the DCOS disclosure. See R2. Respondent admits that, in 2013, it only obtained verbal consent directly from the customer, which the banker then formally acknowledged by logging the consumer's consent into the SVP computer system.

40

Hernandez T; R4; R5.

The Arbitrator agrees that Reg. E permits banks to require a signature and that a signature would have been more prudent for both respondent and claimant. Presumably, in part for this reason, respondent now requires its customers to acknowledge their consent with an electronic signature. See R34. Nevertheless, the Arbitrator found nothing in the regulation, interpretations, or comments that require a customer's signature, only comments that permit a signature. See, e.g., Comment 5 (bank *could* require the consumer to sign at account opening). Moreover, Reg. E expressly permits telephonic consent, which by definition, would not result in a signature. See also Comment 6 (An institution *may* obtain a consumer's affirmative consent by providing a blank signature line). Further, while respondent could have required – and now does require – a separate consent signature, respondent could not have included a written, signed consent to the DCOS disclosure as part of the account application's signature because Reg. E requires it to obtain the customer's consent "separately from other consents or acknowledgements obtained by the institution." See Comment 6; see also id. (not affirmative consent if included in contract consumer must sign to open the account). Finally, Reg. E's separate requirement to furnish the customer with a written confirmation of enrollment suggests that consent and written confirmation represent two different requirements with two different processes. As to the latter, the regulators specifically obliged banks to provide its enrolled customers with a *written* confirmation. In contrast, as to the first, the regulators required affirmative consent but did not specify written consent, as they had in the confirmation context. Compare 12 C.F.R. § 1005.17(b)(1)(iv) with 12 C.F.R. § 1005.17(b)(1). Accordingly, the Arbitrator concludes that respondent did not violate Reg. E by failing to obtain claimant's signature acknowledging his DCOS enrollment because Reg. E does not require the customer's signature.

## Confirmation

Section 1005.17 also requires a financial institution to confirm the customer's consent in writing. 12 C.F.R. § 1005.17(b)(1)(iv). Alternatively, the financial institution can confirm consent electronically with the customer's approval. Id. Under either method, the confirmation must specify the customer's right to revoke consent. Id. Claimant argued that respondent never confirmed his enrollment in writing and that, if it did, the confirmation did not include the requisite right to revoke notice.

To satisfy the confirmation requirement,

> 7. **Confirmation.** A financial institution may comply with the requirement in § 1005.17(b)(1)(iv) to provide confirmation of the consumer's affirmative consent by mailing or delivering to the consumer a copy of the consumer's completed opt-in notice, or by mailing or delivering a letter or notice to the consumer acknowledging that the consumer has elected to opt into the institution's service. The confirmation, which must be provided in writing, or electronically if the consumer agrees, must include a statement informing the consumer of the right to revoke the opt-in at any time. *See* § 1005.17(d)(6), which permits institutions to include the revocation statement on the initial opt-in notice. An institution complies with the confirmation requirement if it has adopted reasonable procedures designed to ensure that overdraft fees are assessed only in connection with transactions paid after the confirmation has been mailed or delivered to the consumer.

41

Comment 7 (original bold).

Respondent's contemporaneous business records show a template of the confirmation form letter used in 2013 but not a copy of claimant's actual letter. R6; Hernandez T. Respondent explained that its retention policy only lasts 7 years and therefore it no longer maintains a copy of the actual letter handed to claimant. Hernandez T. Still, as respondent demonstrated, its 2013 protocols required the banker to hand a customer who enrolled in DCOS in person, like claimant, a hard copy of the confirmation letter that printed out immediately and automatically from its computer system once the banker verified the customer's desire to enroll in DCOS. Id.; see R4-R5. Indeed, the computer system blocked the banker from proceeding with the account opening until it printed out the confirmation letter. Hernandez T. Given these contemporaneous records, the Arbitrator finds that claimant failed to sustain his burden to show respondent violated Reg. E by failing to confirm his enrollment in writing. The Arbitrator also concludes that the plain language of the confirmation letter explicitly includes the required notice of claimant's right to revoke consent at any time. See R6; accord Hernandez T.

## CONCLUSION

Based upon the totality of the evidence, the Arbitrator rules that claimant did not prove his First Cause of Action for violation of the Electronic Fund Transfer Act (ETFA), as implemented by Federal Reserve Regulation E (Reg. E), 12 C.F.R. § 1005.1, et seq. because he failed to establish respondent's noncompliance with Reg. E. Specifically, the Arbitrator adjudicates the parties' submitted issues as follows:

- Did Wells Fargo's 2012 Overdraft Brochure satisfy Regulation E's opt-in requirements? *Yes.*
- Was Claimant's signature on his application sufficient to demonstrate his assent to join the DCOS overdraft service? *No but not determinative.*
- Did Wells Fargo satisfy Regulation E by giving Claimant a confirmation letter of being opted into the DCOS service, including a notice of his right to exit the service at any time? *Yes.*
- Did Claimant give affirmative consent in a manner satisfying Regulation E? *Yes.*
- Did Wells Fargo opt Claimant into its overdraft program using undue coercion? *No.*
- Did the fact that a Wells Fargo employee opted Claimant into the program satisfy Regulation E? *Inapplicable. The Arbitrator finds claimant opted in to DCOS, and the bank employee checked yes in respondent's system to capture claimant's verbal consent.*
- Did Wells Fargo explain its overdraft program in a clear, unambiguous, stand-alone document as Regulation E requires? *Yes.*
- Did the 2012 Overdraft Brochure contain information not permitted under Regulation E? *No.*
- Did the 2012 Overdraft Brochure accurately disclose Wells Fargo's policy for charging overdrafts on one-time debit card and ATM transactions in a stand-alone document? *Yes.*
- Is Claimant entitled to damages for Wells Fargo's violations of federal law? *No.*
- Is Wilson entitled to obtain injunctive relief for Wells Fargo's violations? *No.*
- Whether Wilson has proven that Wells Fargo violated Regulation E's disclosure requirement. *No.*
- Whether Wilson has proven that Wells Fargo violated Regulation E's reasonable opportunity requirement. *No.*
- If Wilson prevails on his claims, whether Wilson is entitled to "cascading damages." *Inapplicable.*

42

- Whether Wilson has demonstrated that he is entitled to public injunctive relief and, if so, what relief. *No.*

Issues to be Adjudicated from Claimant, dated 6/24/22; Respondent's Issues to be Adjudicated, dated 6/22/22.

## UCL

In his Second Cause of Action, claimant alleges that respondent's overdraft policies violated both the unlawful and unfair prongs of California's Unfair Competition Law California Business & Professions Code § 17200, *et. seq.* Specifically, claimant seeks adjudication of the following issues:
- Did Wells Fargo's overdraft practices violate the unlawful prong of the UCL?
- Did Wells Fargo's overdraft practices violate the unfair prong of the UCL?
- Is Claimant entitled to damages for Wells Fargo's violations of state law?
- Is Wilson entitled to obtain injunctive relief for Wells Fargo's violations?

Issues to be Adjudicated from Claimant, dated 6/24/22. Similarly, in addition to its defenses, respondent identifies the following issues to be adjudicated with respect to this cause of action:

- Whether Wilson has proven that Wells Fargo committed an unfair practice in violation of California's UCL.
- If Wilson prevails on his claims, whether Wilson is entitled to "cascading damages."
- Whether Wilson has demonstrated that he is entitled to public injunctive relief and, if so, what relief.

Respondent's Issues to be Adjudicated, dated 6/22/22.

The UCL prohibits illegal business practices, which it defines, *inter alia*, as any unlawful, unfair, or fraudulent business practice. Cal. Bus. & Prof. Code § 17200. The UCL imposes strict liability, but adjudicators may use their equitable powers to dismiss a UCL claim or deny equitable relief. Cortez v. Purolator Air Filtration Prod. Co., 23 Cal. 4th 163, 179 (2000); South Bay Chevrolet v. General Motors Acceptance Corp., 72 Cal. App. 4th 861, 877 (1999).

## Economic Injury

Individual consumers have standing to sue for illegal business practices if they suffered financial loss as a result. Cal. Bus. & Prof. Code § 17204. Consumers, like claimant, must prove that the illegal practice caused them an economic injury. Kwikset Corp. v. Superior Court, 51 Cal. 4th 310, 322-23 (2011); see Mosley v. Wells Fargo Bank NA, No. 17-CV-05064- JSC, 2017 WL 5478628, at *7 (N.D. Cal. Nov. 15, 2017) (violation of Homeowner's Bill of Rights insufficient to confer UCL standing when loss of money or property not alleged).

## Causation

Claimant must also prove causation – the casual link between the illegal practice and his harm – but cannot do so if he would have suffered the same injury whether or not respondent complied with the law. Troyk v. Farmers Grp. Inc., 171 Cal. App. 4th 1305, 1349 (2009); see Townsend v. Wells Fargo Bank, N.A., No. 18-cv-07382-NC, 2019 WL 4145464, at *4 (N.D. Cal. Aug. 30, 2019)

43

(no UCL standing where plaintiffs did not establish a causal connection between bank's reporting to credit bureaus and their diminished credit rating), aff'd, No. 19-16919 (9th Cir. Dec. 16, 2020).

## Remedies

If claimant proves a violation, the statute authorizes injunctive and other equitable relief to prevent the illegal or unfair practice; and these remedies are cumulative with other remedies. Cal. Bus. & Prof. Code §§ 17203, 17205; DiCarlo v. MoneyLion, Inc., 977 F.3d 1148, 1156 (9th Cir. 2021). Claimant may not recover damages, however, as the UCL disgorges the particular property or money taken by an unfair or illegal business practice, rather than confer compensation damages. Korea Supply Co. v. Lockheed Martin Corp., 29 Cal. 4th 1134, 1144 (2003); Inline, Inc. v. Apace Moving Sys. Inc., 125 Cal. App. 4th 895, 905 (2005). Claimant may not obtain disgorgement (a full refund) if he received a benefit from the product or service. See In re Tobacco Cases II, 240 Cal. App. 4th 779, 800 (2015), review denied, No. S23046 (Cal. Dec. 9, 2015). Instead, the UCL provides for injunctive relief, restitution, and civil penalties for government enforcement. Cal. Bus. & Prof. Code §§ 17203, 17206.  As with the UCL's substantive provisions, the courts liberally construe its remedial provisions to fashion creative awards of injunctive or restitutionary relief. Fletcher v. Sec. Pac. Nat'l Bank, 23 Cal. 3d 442, 449 (1979).

In Cortez, the California Supreme Court held that, given UCL's equitable nature, adjudicators must weigh the equities and may take into account equitable defenses and "considerations," including laches, good faith, waiver and estoppel. 23 Cal. 4th at 180. ("A court cannot properly exercise an equitable power without consideration of the equities on both sides of a dispute."); see e.g., Pac. Coin Mgmt. v. BR Telephony Partners, No. B165217, 2006 WL 290569, at *18 (Cal. Ct. App. Feb. 8, 2006) (laches valid equitable defense to deny UCL restitution claim).

## Unlawful

A business practice is unlawful if it violates a law other than the UCL.
A UCL "unlawful" claim thus rises or falls with the underlying claim, here the EFTA. See Asencio v. Miller Brewing Co., 283 Fed. App'x 559, 561-62 (9th Cir. 2008); Ruberson v. Gerdau Reinforcing Steel, Case No. 5:19-cv-01553, 2020 WL 3891679, at *4 (C.D. Cal. Apr. 10, 2020); Sanchez v. Russell Sigler, Inc., Case No. CV 15-01350-AP (PLAx), 2016 WL 11760184, at *4 (C.D. Cal. May 31, 2016); Daugherty v. Am. Honda Motor Co., 144 Cal. App. 4th 824, 837 (2006); Bothwell v. Abbot Laboratories, Inc., 134 Cal. App. 4th 438 (2005). Here, claimant based his UCL unlawful claim on respondent's alleged Reg. E violations. Accordingly, for all the reasons analyzed above, the Arbitrator concludes as a matter of law that claimant did not prove his UCL unlawful claim because he failed to prove a violation of the underlying Reg. E claim.

## Unfair

Neither the UCL nor courts have specifically defined "unfair" for UCL purposes. Generally, courts use the "unfair" prong to redress improper business practices. See Candelore v. Tinder, Inc., 19 Cal. App. 5th 1138, 1155 (2018); see, e.g., Smith v. Chase Mortg. Credit Grp., 653 F. Supp. 2d 1035, 1045-46 (E.D. Cal. 2009) (concluding that defendant's alleged violation of internal policy provides basis for unfairness claim). The California Supreme Court, however, criticized UCL's unfairness ground as unfair to businesses who need to know with reasonable certainty what the law prohibits and permits. See Cel-Tech Comms., Inc. v. L.A. Cellular Tel. Co., 20 Cal. 4th 163, (1999) (establishing test in competitor cases).

44

Since the Cel-Tech decision, the courts have applied different tests of unfairness in consumer UCL cases, including: the "tethered test," public harm test, unconscionability test, "the balancing test," the FTC test, and Cel-Tech's competitor test. See Lozano v. AT&T Wireless Servs., Inc., 504 F.3d 718, 735, 736 (9th Cir. 2007); In re Qualcomm Litig., No. 17-cv-00108-GPC-MDD, 2017 WL 5985598, at *6-11 (S.D. Cal. Nov. 8, 2017) (recognizing unsettled test and analyzing claim under all three "primary consumer tests"); Moran v. Prime Healthcare, 3 Cal. App. 5th 1131, 1147-48 (2016).

The tethered test requires claimants to tether their UCL unfairness claim to public policy evidenced in specific constitutional, statutory, or regulatory provisions. See, e.g., Gregory v. Albertson's, Inc., 104 Cal. App. 4th 845, 854 (2002). The public harm test requires claimants to establish a causal link between the unfair practice and public harm. See, e.g., In re Firearms Cases, 126 Cal. App. 4th 959, 981 (2005). Under the unconscionability test, claimant must identify a practice that "offends an established public policy" or is otherwise "immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." Cappello v. Walmart Inc., 394 F. Supp. 3d 1015, 1024 (N.D. Cal. 2019).

Under the balancing test, the adjudicator weighs "the utility" of respondent's conduct against the "gravity of the harm." Davis v. HSBV Bank Nevada, N.A., 691 F.3d 1152, 1169 (9th Cir. 2012). In Camacho v. Automobile Club of So. Cal., the court applied the balancing test and required a substantial, unavoidable consumer injury, not outweighed by countervailing benefits. 142 Cal. App. 4th 1394, 1403 (2006).

**Claimant's Unfairness Claim**

Claimant stresses that respondent's 2012 disclosure satisfies UCL's unfairness test because it: (1) was misleading; (2) encouraged customers to enroll in DCOS; and (3) required reliance on the banker's unscripted verbal explanation of the program. Respondent objects to this claim as untimely filed on the eve of hearing and meritless in any event.

Timeliness

For the reasons analyzed above, the Arbitrator overrules respondent's procedural objections.

Substantive Claim

On the merits, the Arbitrator finds claimant failed to state an unfairness claim under UCL for several independent grounds: (1) claimant cannot sustain an unfairness claim based upon lawful practices; (2) claimant's unfairness claim mimics his unlawful claim; (3) respondent's practices did not rise to the level of unfairness; (4) claimant could have avoided the consequences; (5) federal law preempts claimant's UCL claim; and (6) the Arbitrator exercises her discretion to abstain.

   1. Lawful

Regardless of the test used, lawful practices cannot support a UCL unfairness claim. See Cel-Tech, 20 Cal. 4th at 183; see, e.g., Hauk v. JP Morgan Chase Bank USA, 552 F.3d 1114, 1122 (9th Cir. 2009) (safe harbor applied when bank complied with the TILA disclosure provisions); Suzuki v. Hitachi Glob. Storage Techs., Inc., No. C 06-07289 MHP, 2007 WL

45

2070263, at *3 (N.D. Cal. July 17, 2007) (same). For the reasons analyzed above, the Arbitrator concluded that respondent engaged in lawful practices. Accordingly, claimant cannot as a matter of law base his UCL unfair prong claim upon those practices.

   2.   Mimicry

"Where the unfair business practices alleged under the unfair prong of the UCL overlap entirely with the business practices addressed in the fraudulent and unlawful prongs of the UCL, the unfair prong of the UCL cannot survive if the claims under the other two prongs of the UCL do not survive."  NorthBay Healthcare Grp. – Hosp. Div. v. Blue Shield of Cal. Life & Health Ins., 342 F. Supp. 3d 980, 988-89 (N.D. Cal. 2018). The Arbitrator finds that claimant's UCL claim based upon the unfair prong mirrors his unlawful prong claim and therefore cannot survive.

   3.   Fair

The Arbitrator concludes that respondent's practices do not rise to the level of unfair business practices. In Bickoff v. Wells Fargo Bank N.A., the court held it was not unfair for a bank to foreclose on an overdue construction loan where it had never guaranteed permanent financing. No. 14CV1065 BEN (WVG), 2016 WL 3280439, at *15-16 (S.D. Cal. June 14, 2016), aff'd, 705 F. App'x 616 (9th Cir. 2017). In Harris v. Wells Fargo Bank N.A., it was not unfair for a bank to record a notice of default against secured real property at the same time as the borrower was preparing, but had not completed, a borrower's loan modification application. No. 516CV00645CASKKx, 2016 WL 3410161, at *4 (C.D. Cal. June 15, 2016), vacated on other grounds, No. EDCV 16-645 JGB (KKx), 2016 WL 11486587 (C.D. Cal. July 14, 2016) (vacating prior opinion following recusal of prior assigned judge under 28 U.S.C. § 455). In both those banking cases, the courts rejected the unfairness claims even though plaintiffs presented sympathetic arguments. Applying these and other precedent in this case, the Arbitrator finds that respondent's overdraft practices do not trigger UCL's unfair prong.

   4.   Avoidable

Under the most commonly applied balancing test, courts refuse to find a UCL unfair claim where the claimant could have avoided the consequences of respondent's conduct. Here, the Arbitrator finds that claimant could have avoided the imposition of overdraft fees. Claimant's bank statements reflected DCOS enrollment with a checkmark in the overdraft services row under the applicable account options. Hernandez T; Nelson Dep. at 62-64; see, e.g., R7-R20. Each monthly statement also listed a summary of overdraft fees assessed during that period as well as year-to-date. Hernandez T; R7-20. The statements also contained a section on how to avoid fees, respondent's website address for frequently asked questions about service fees, and a detailed three paragraph policy on how to report inaccuracies, errors, questions, or complaints. See R7-R20. The policy also advised customers that respondent will investigate complaints and promptly correct any errors. Id. Respondent also notified customers that it would refund any fees, even if correctly assessed, if its investigation lasted more than 10 business days so that customers had access to the disputed funds pending investigation. Id.  The Arbitrator finds that claimant could have avoided many, if not all, of the overdraft fees at issue if he had examined his statements and contacted respondent to ascertain how best to avoid overdraft fees each month. Therefore, the Arbitrator concludes as a matter of law that claimant cannot sustain a UCL claim under the unfair prong.

46

5. Preemption

Claimant may not base an unfair prong UCL claim on matters preempted by federal law. <u>See, e.g.</u>, <u>Robinson v. Bank of Am., NA</u>, 525 F. App'x 580 (9th Cir. 2013) (NBA preempted account holder's nondisclosure claims); <u>Gutierrez v. Wells Fargo Bank, NA</u>, 704 F.3d 712, 723-25 (9th Cir. 2012) (NBA preempted unfair but not fraudulent UCL claim to the extent "unfair" prong prohibited bank's "high-to-low" posting practices); <u>Chae v. SLM Corp.</u>, 593 F.3d 936, 938, 943 (9th Cir. 2010) (Higher Education Act preempted UCL and CLRA claims alleging improper interest charges); <u>Winebarger v. Pa. Higher Educ. Assistance Agency</u>, 411 F. Supp. 3d 1070, 1089 (C.D. Cal. 2019) (20 U.S.C. § 1098g preempted UCL and CLRA claims based on failure to accurate disclosure); <u>Newbeck v. Wash. Mut. Bank</u>, No. C 09-1599 CW, 2010 WL 291821, at *4 (N.D. Cal. Jan. 19, 2010) (HOLA preempted UCL failure to disclose claim); <u>Grant v. Aurora Loan Servs.</u>, 736 F. Supp. 2d 1257, 1275 (C.D. Cal. 2010) (HOLA and OTS regs preempted UCL claim relating to mortgages); <u>Martinez v. Wells Fargo Bank, N.A.</u>, No. C-06-40-03327 RMW, 2007 WL 963965, at *6-8 (N.D. Cal. Mar. 30, 2007) (NBA preempted UCL as to fees for mortgage loan settlement services). Applying this precedent, the Arbitrator separately concludes as a matter of law that the national banking laws preempt California's UCL to the extent they conflict.

6. Abstention

Courts also proceed with caution in adjudicating unfairness claims under UCL and may apply judicial abstention in economic matters when the challenged business practice arises in a regulated industry and has not been prohibited. Basically, courts decline to do what the legislature has chosen to leave undone. <u>See, e.g., Beasley v. Wells Fargo Bank</u>, 235 Cal. App. 3d 1383, 1391 (1991). The Arbitrator exercises her discretion to exercise judicial abstention in this case. Claimant essentially objects to banks using the available balance method of determining overdraft fees. Regardless of the fairness or unfairness of that method, Congress has not prohibited it even though federal law heavily regulates the banking industry. Accordingly, the Arbitrator declines to tread where the legislative has chosen not to.

## CONCLUSION

Based on each of these independent grounds, the Arbitrator rules that claimant did not prove his second cause of action for violation of UCL. Specifically, the Arbitrator adjudicates the parties' submitted issues as follows:

- Did Wells Fargo's overdraft practices violate the unlawful prong of the UCL? *No.*
- Did Wells Fargo's overdraft practices violate the unfair prong of the UCL? *No.*
- Is Claimant entitled to damages for Wells Fargo's violations of state law? *No.*
- Is Wilson entitled to obtain injunctive relief for Wells Fargo's violations? *No.*
- Whether Wilson has proven that Wells Fargo committed an unfair practice in violation of California's UCL. *No.*
- If Wilson prevails on his claims, whether Wilson is entitled to "cascading damages." *Inapplicable.*
- Whether Wilson has demonstrated that he is entitled to public injunctive relief and, if so, what relief. *No.*

Issues to be Adjudicated from Claimant, dated 6/24/22; Respondent's Issues to be Adjudicated, dated 6/22/22.

47

## RESPONDENT'S DEFENSES

Respondent defended itself on the grounds of (1) lack of standing; (2) Reg. E compliance; (3) safe harbor protection; (4) industry practices; (5) estoppel; (6) laches; (7) UCL safe harbor; (8) statute of limitations; (9) failure to mitigate; and (10) UCL circumvention of safe harbor protection.

### Standing

For the reasons analyzed above, the Arbitrator rules that claimant has standing to assert his claims.

### Reg. E Compliance

For the reasons analyzed above, the Arbitrator concludes that respondent complied with Reg. E.

### SOL

The Arbitrator hereby incorporates her ruling on the statute of limitations defense as set forth in the SOL Order, dated 3/22/22.

### Failure to Mitigate

The Arbitrator hereby incorporates her ruling on the duty to mitigate as set forth in the Dispositive Motion Order, dated 6/18/22.

### Safe Harbor Protection

The Arbitrator hereby incorporates her ruling on the safe harbor's applicability as set forth in the Dispositive Motion Order, dated 6/18/22.

### UCL Safe Harbor

The Arbitrator declines to adjudicate this defense as moot.

### Industry Practices

The Arbitrator concludes that respondent did not sustain its burden of proof on this defense as it did not submit evidence of industry-wide practices.

### Estoppel

The Arbitrator declines to adjudicate this defense as moot.

### Laches

The Arbitrator declines to adjudicate this defense as moot.

### UCL Circumvention

48

The Arbitrator declines to adjudicate this defense as moot.

## REQUESTED REMEDIES

Claimant requested disgorgement with interest, injunctive relief barring enrollment in its overdraft program without informed consent through an accurate opt-in and proper procedures, damages, civil penalties, order enjoining continuing wrongful conduct, costs, pre- and post-judgment interest, costs, and attorneys' fees. Respondent argued that, even if it violated Reg. E and or the UCL, claimant has limited available remedies.

The Arbitrator finds that respondent's current 2022 disclosure effective May 9, 2022 complies with its Reg. E duties. Accordingly, the Arbitrator declines to issue any form of public injunctive relief in this matter. The Arbitrator finds for respondent on all remaining requested remedies.

## <u>FINAL AWARD</u>

I, Janice L. Sperow, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement entered into between the above-named parties, and having been duly sworn, and having duly heard the proofs and allegations of the parties, do hereby AWARD as follows in this matter:

1. For respondent on the First Cause of Action;
2. For respondent on the Second Cause of Action;
3. For claimant on the issue of standing;
4. For claimant on the Regulation E safe harbor defense;
5. For respondent on the defense of failure to mitigate;
6. For respondent in part and claimant in part on the statute of limitations defense;
7. For claimant on the defense of industry practices;
8. The Arbitrator dismisses the defense of estoppel as moot;
9. The Arbitrator dismisses the defense of laches as moot;
10. The Arbitrator dismisses the defense of UCL safe harbor as moot;
11. The Arbitrator dismisses the defense of UCL circumvention of safe harbor protection as moot;
12. The Arbitrator declines to adjudicate all other defenses as moot;
13. For respondent on all requests for damages, statutory and non-statutory, economic and noneconomic;
14. For respondent on the request for declaratory judgment;
15. For respondent on the request for public injunctive relief;
16. For respondent on the request for private injunctive relief;
17. For respondent on the request for punitive damages;
18. For respondent on claimant's request for attorneys' fees and costs;
19. The Arbitrator denies the request for interest as moot; and
20. The Arbitrator denies the request for expert costs as moot;

The administrative fees and expenses of the American Arbitration Association totaling $3,150.00 and the compensation and expenses of the Arbitrator totaling $33,500.00 shall be borne as incurred.

49

Respondent is the prevailing party in this matter. All claims not expressly granted herein are hereby denied. This is a final award in this arbitration. This award resolves all issues between the parties and represents the final adjudication of all claims and defenses between the parties.

July 14, 2022
*/s/ Janice L. Sperow*
Janice L. Sperow, Arbitrator

50