# Exhibit Q

**AMERICAN ARBITRATION ASSOCIATION**

| | |
|---|---|
| **INDIVIDUAL CONSUMERS V. WELLS FARGO & CO., WELLS FARGO BANK, N.A.** | **WELLS FARGO BANK, N.A.'S MEMORANDUM IN SUPPORT OF REQUEST FOR CLAIMANTS TO PROVIDE BASIC INFORMATION ABOUT EACH DISPUTE PRIOR TO THE DEMAND PROCEEDING THROUGH THE ARBITRATION PROCESS** |

Pursuant to Process Arbitrator Hon. Anita Rae Shapiro's ("Process Arbitrator") request for briefing regarding filing requirements for Claimants' demands made during the August 24, 2022 initial conference call, Wells Fargo Bank, N.A. ("Wells Fargo") submits this Memorandum in Support of Request for Claimants to Provide Basic Information About Each Dispute Prior to the Demand Proceeding Through the Arbitration Process.

## I.   <u>INTRODUCTION</u>

As of today, Claimants' counsel has filed more than 2200 essentially identical demands for arbitration against Wells Fargo. Hundreds of these demands (the exact number is unknown as investigation into these Claims is ongoing) have been filed on behalf of individuals that have no legitimate or lawful claims against Wells Fargo, either because they have no account with Wells Fargo, were not enrolled in the Wells Fargo overdraft program at issue, or were assessed no overdraft fees during an actionable limitations period. These unlawful and non-compliant demands appear to be the result of counsel's false advertising and failure to conduct basic required investigations of the claims asserted. The consequence of this filing method is that Wells Fargo has paid hundreds of thousands of dollars in nonrefundable filing fees for claimants whose demands fail to provide the type of basic information required by AAA's Consumer Rules.

To protect the integrity of this Multiple Case Filing dispute, it is imperative that Claimants' counsel provide the basic information required by the AAA Consumer Rules. This information is necessary to put Wells Fargo on proper notice of the individual facts and state and statutory laws at issue in each demand so Wells Fargo can properly investigate the claims and prepare a defense. This request is consistent with counsel's obligation under Rules of Professional Responsibility to conduct a sufficient and diligent investigation before bringing a viable claim. Specifically, and as set forth further below, Wells Fargo requests that the Process Arbitrator enter an order requiring Claimants' counsel to amend its previously filed arbitration demands to include (a) the Claimant's Wells Fargo checking account number for the account issue, (b) sufficiently pled facts establishing that the Claimant was enrolled in the overdraft service at issue, (c) sufficiently pled facts establishing that the Claimant incurred overdraft fees in connection with transactions covered by Regulation E, (d) identification of the specific state law(s) under which Claimants assert claims (statutory or common law), and (e) specify the amount of money in dispute.  Wells Fargo also requests that the Process Arbitrator order that any future demands filed by Claimants' counsel provide that same basic information and that the AAA's invoicing of fees and arbitrator compensation related to the demands or arbitrations shall be stayed until the underlying demands meet such requirements.

The Process Arbitrator has the authority to enter the requested order. Indeed, the AAA created the Supplementary Rules for Multiple Case Filings—and the Process Arbitrator role contained therein—to ensure that Multiple Case Filing disputes are completed as efficiently and economically as possible by providing the Process Arbitrator the express authority to make these exact types of determinations.

## II.   FACTUAL & PROCEDURAL BACKGROUND

**A.**   **McCune Wright Arevalo, LLP files suit against Wells Fargo on a class basis in federal court.**

On November 25, 2020, McCune Wright Arevalo, LLP ("McCune") filed a class action complaint on behalf of Mosanthony Wilson ("Wilson") and all others similarly situated, alleging that Wells Fargo violated the requirements of the Federal Electronic Funds Act ("EFTA"), its implementing regulation at 12 C.F.R. ¶ 1005.1, *et seq.* ("Regulation E") and California's Unfair Competition Law California Business & Professions Code § 17200, *et seq.* ("California UCL"). *See Wilson v. Wells Fargo & Co.*, No. 3:20-cv-02307-DMS-WVG, (S.D. Cal. filed Nov. 25, 2020), at ECF No. 1 ("Wilson Complaint").

When opening his account at Wells Fargo, however, Wilson agreed to resolve any dispute with Wells Fargo in arbitration with the American Arbitration Association ("AAA") (the "Arbitration Agreement"). *See id.* at ECF No. 21, Exh. C. The Arbitration Agreement further provided that Wilson and Wells Fargo would "not be entitled to join or consolidate disputes by or against others as a presentative or member of a class." *Id.* Accordingly, Wells Fargo moved to dismiss the Wilson Complaint and compel individual arbitration. *See id.* at ECF No. 21. On May 8, 2021, the Court granted Wells Fargo's motion to compel individual arbitration, ordering that the litigation be stayed to permit an arbitrator to decide the questions of arbitrability and then, if permissible, to arbitrate the substantive claims. *See id.* at ECF No. 25.

On September 3, 2021, Wilson filed a demand for arbitration with the AAA according to the terms of the Arbitration Agreement. Notably, on July 14, 2022, after a hearing on the merits of Wilson's claims, Arbitrator Janice L. Sperow issued a Final Award with Findings of Fact & Conclusions of Law ("Wilson Final Award"), wherein she found that Wilson did not prove his claims for violation of Regulation E and violation of the California UCL and held that Wells Fargo

was the prevailing party in the matter. A true and correct copy of the Wilson Final Award is attached hereto as **Exhibit A.**

**B.      McCune begins filing identical individual arbitration demands against Wells Fargo. AAA determines the demands are subject to its Supplementary Rules for Multiple Case Filings.**

Shortly before and immediately after Wells Fargo filed its motion to compel in Wilson, McCune filed arbitration demands against Wells Fargo on behalf of 13 individual claimants. These 13 demands contained no specifics concerning the allegations, and instead simply repeated the following boilerplate sentence: "Claimant seeks statutory damages and return of overdraft fees collected in violations of Regulation E of the federal Electronic Funds Transfer Act, and for violations of [state consumer fraud statutes]."[1]

What does seem clear is that the allegations in the arbitration demands concern requirements for overdraft programs imposed by Regulation E. Specifically, Regulation E precludes financial institutions like Wells Fargo from assessing overdraft fees on certain debit card transactions that overdraw their checking accounts unless the bank provides the customer a disclosure that complies with the Requirements of Regulation E and gives the customer a "reasonable opportunity for the consumer to affirmatively consent" to be enrolled in an overdraft program. EFTA claims are subject to a one-year statute of limitations. 15 U.S.C. § 1693m(g). State law claims may have longer statutes of limitation.

Thus, in order to assert a viable Regulation E claim against Wells Fargo, a claimant must, at a minimum, have signed up for a checking account with Wells Fargo, agreed to participate in Wells Fargo's Debit Card Overdraft Service ("DCOS"), and been assessed an overdraft fee during an actionable limitations period.

---

[1] Some, but not all, of the 13 demands identified a particular state, but none identified a specific law.

On April 13, 2022, McCune filed 497 additional arbitration demands against Wells Fargo. The additional demands were virtually identical, and included the following, identical statement when required to "[s]pecify the amount of money in dispute": "Statutory damages of $1,000, return of all improperly collected overdrafts plus statutory attorneys' fees and costs. The amount of overdraft fees improperly collected is in the possession of the Business."[2] Additionally, when required to briefly explain the dispute, McCune has provided the following, identical statement for every demand filed thus far: "Claimant seeks statutory damages and return of overdraft fees collected in violations of Regulation E of the federal Electronic Funds Transfer Act, and for violation of state consumer fraud laws that have also been violated as a result of Respondent's violations of Regulation E. Please see attached and incorporated herein Exhibits: A) Statement of Claims; B) Opt-in Disclosure Agreement; and C) Deposit Account Agreement (arbitration provision commencing at page 35 thereto)."[3] Notably, in the identical "Statement of Claims" filed with each demand, McCune does not specify which state consumer fraud law or statutory section applies to the Claimant's arbitration, but simply states that the "Claimant seeks actual damages, statutory damages, restitution, and all appropriate injunctive relief provided for by applicable state laws."[4]

On April 22, 2022, the AAA informed McCune and counsel for Wells Fargo via letter (the "April 22nd AAA Letter")[5] that the additional demands (which had grown to 501 demands by the date of the letter) would be subject to the AAA's Supplementary Rules for Multiple Case Filings ("Supplementary Rules").[6] On April 25, 2022, McCune sent a letter to the AAA requesting that

---

[2] As examples, Wells Fargo has attached true and correct copies of the demands of ███████ (the "███ Demand") and ███████ (the "███ Demand") as **Exhibits B and C**.
[3] *Compare* **Exhibit B** (███ Demand) *with* **Exhibit C** (███ Demand).
[4] *Compare* **Exhibit B** (███ Demand) at Exhibit A, ¶ 4 *with* **Exhibit C** (███ Demand), at Exhibit A, ¶ 4.
[5] A true and correct copy of the April 22nd AAA Letter is attached hereto as **Exhibit D**.
[6] A true and correct copy of the Supplementary Rules is attached hereto as **Exhibit E**.

the initial 13 arbitration demands filed against Wells Fargo be consolidated and otherwise subject to the Supplementary Rules (the "April 25th McCune Letter").[7]

On June 29, 2022, the AAA sent a letter to McCune and counsel for Wells Fargo confirming the prior day's Administrative Conference Call and requesting that the parties agree on one of seven AAA panelists to serve as Process Arbitrator or for the parties to provide a rank and strike list of the panelists (the "June 29th AAA Letter").[8] On July 12, 2022, the AAA informed the parties via letter that the AAA's Consumer Rules ("Consumer Rules") and Supplementary Rules apply to the arbitration demands filed by McCune (the "July 12th AAA Letter").[9]

On July 29, 2022, the AAA confirmed via letter the appointment of the Honorable Anita Rae Shapiro to serve as Process Arbitrator for this dispute (the "July 29th AAA Letter").[10]

## C.    The Consumer Rules require demands to include basic information allowing the respondent to fully understand and investigate the dispute. The Supplementary Rules provide the Process Arbitrator authority to enforce the Consumer Rules to ensure economic and efficient adjudication of Multiple Case Filings.

In response to a wave of Supreme Court decisions affirming the enforceability of class action waivers in arbitration agreements, *e.g., Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612 (2018), plaintiffs' firms implemented a new strategy to circumvent representative action waivers in arbitration agreements entitled "mass arbitration." The term mass arbitration refers to a plaintiff's firm's use of the AAA's consumer or employment rules and filing fee procedures to file (or threaten to file after reaching out to discuss potential settlement) thousands of individual arbitration demands against the same entity. The consequence to the Company who created and administered the arbitration program at issue is to pay millions of dollars in initial administrative filing fees

---

[7] A true and correct copy of the April 25th McCune Letter is attached hereto as **Exhibit F**.
[8] A true and correct copy of the June 29th AAA Letter is attached hereto as **Exhibit G**.
[9] A true and correct copy of the July 12th AAA Letter is attached hereto as **Exhibit H**.
[10] A true and correct copy of the July 29th AAA Letter is attached hereto as **Exhibit I**.

before any ruling on the merits of the dispute had been litigated, much less resolved. This mass arbitration strategy has resulted in extensive litigation (including litigation between the AAA and entities that had contracted with its consumers and/or employers to use AAA as its arbitration provider),[11] as well as newly formed arbitration providers that would potentially become competition for the AAA.[12]

In response to mass arbitration, the AAA created the Supplementary Rules, which became effective on August 1, 2021. The Supplementary Rules were developed to "streamline the administration of large volume filings involving the same [or related] party, parties, and party representatives" for disputes where the AAA's employment or consumer fee schedules apply, and "are intended to provide parties and their representatives with an ***efficient and economical*** path toward the resolution of multiple individual disputes." *See* Supplementary Rules at Introduction (emphasis added). The AAA may apply the Supplementary Rules to any group of cases it deems "Multiple Case Filings," which is defined as "twenty-five or more similar Demands for Arbitrations filed against or on behalf of the same party or related parties, where representation of the parties is consistent or coordinated across the cases." *See id.* at MC-1(a), (b). The Supplementary Rules supplement any other AAA rules applicable to the disputes, and where inconsistencies exist among the Supplementary Rules and other AAA rules, the Supplementary Rules govern. *Id.* at MC-1(a).

---

[11] *See Family Dollar, Inc. v. Am. Arbitration Ass'n, Inc.*, No. 2:20-cv-00248-AWA-RJK, (E.D. Va. filed May 15, 2020) (Family Dollar filed suit against the AAA after it attempted to invoice Family Dollar for $2.5 million in administrative fees after one law firm sought to initiate 2,000 arbitrations with the AAA); *see also Uber Techs., Inc. v. Am. Arbitration Ass'n, Inc.*, No. 655549/21, (N.Y. filed Sept. 20, 2021) (Uber filed suit against the AAA after it sought to charge Uber nearly $100 million in non-refundable case management fees related to 31,573 consumer arbitration demands filed by one law firm against Uber).

[12] For example, New Era ADR ("New Era") "stepped in to fill the void" left by arbitration providers that did "not have <u>any</u> rules or procedures in place for mass individual arbitrations" by offering comprehensive rules and procedures to adjudicate mass arbitration campaigns "to conclusion, on the merits." *See Heckman v. Live Nation Entertainment, Inc.*, No. 2:22-cv-0047-GW-GJS (C.D. Cal. filed Jan. 4, 2022) at ECF No. 30-1, 8-9 (emphasis in original).

The Consumer Rules, thus, still govern these disputes to the extent there are not inconsistencies between them and the Supplementary Rules. The Consumer Rules provide that, to start an arbitration, a party shall file a demand for arbitration that must, among other things, "[b]riefly explain the dispute" and "[s]pecify the amount of money in dispute." *See* Consumer Rules at R-2(a)(1). Under the Consumer Rules, "demand" is defined as the "written document created by the claimant that informs respondent that it wishes to arbitrate a dispute" that "provides basic information about the dispute, the parties involved, and what the claimant wants as a result of the arbitration." *See id.* at Glossary of Terms. The Consumer Rules further provide that "[w]hen sending a Demand or an answer, the consumer and the business are encouraged to provide enough details to make the dispute clear to the arbitrator." Consumer Rules at R-2(f). Thus, in order to have a lawful demand under the Consumer Rules, the demand must provide "basic information about the dispute," including, at a minimum, a description of the dispute and the specific laws or statutory sections at issue sufficient to make the individual factual and legal issues clear to Wells Fargo and the arbitrator, and the specific amount of money in dispute.[13]

To ensure that the Multiple Case Filings do not run afoul of the Consumer Rules, and to ensure that any other administrative issues related to Multiple Case Filings are handled consistently, the Supplementary Rules provide for the appointment of a Process Arbitrator to make determinations on "administrative issues for all of the cases included in the Multiple Case Filing affected by such administrative issues." Supplementary Rules at MC-6(b). Specifically, the Supplementary Rules provide the Process Arbitrator the exclusive authority to make determinations related to "AAA filing requirements" and the "allocation of payment advances on

---

[13] The Arbitration Agreement Claimants entered with Wells Fargo includes a similar requirement, stating that arbitration will commence only after the submission of a "lawful demand" to the AAA. *See* **Exhibit B** (███████ Demand) at Ex. C, 35.

administrative fees, arbitrator compensation, and/or expenses." The Supplementary Rules also provide the Process Arbitrator the authority to resolve "any other administrative issue arising out of the nature of the Multiple Case Filings" at her discretion. *See* Supplementary Rules at MC-6(d)(v); MC-6(f) ("The Process Arbitrator shall have the power to rule on the Process Arbitrator's own jurisdiction and shall resolve any disputes over the applicability of this Section MC-6."). Thus, because the Consumer Rules provide that an arbitration cannot commence until a demand meeting the requirements under the Consumer Rules is filed, the Process Arbitrator's authority to make decisions on the "AAA's filing requirements" specifically covers the issue of what must be included in Claimants' demands before an arbitration commences.

**D.  While the parties and AAA work through the Supplementary Rules process, McCune continues to file arbitration demands on behalf of claimants gained through dubious advertisements, and without basic information necessary for Wells Fargo to properly investigate and defend against the claims.**

While the parties and the AAA worked through the processes required by the Supplementary Rules, McCune continued to file hundreds of arbitration demands on behalf of claimants who are allegedly customers of Wells Fargo.[14] As of September 6, 2022, there were 2,277 individual demands filed by McCune against Wells Fargo, with that number increasing on an almost daily basis. McCune has also submitted an "authorization" form for many claimants for whom it has filed a demand which purports to request the release of certain account documents.[15] The authorizations submitted provide the date that the individual retained McCune to represent them in arbitration against Wells Fargo, along with the claimant's name, address, email, and (on

---

[14] On May 6, 2022, the AAA sent a letter to the parties acknowledging receipt of an additional 85 demands filed by McCune. The AAA informed the parties via letter on four other occasions of its receipt of additional demands: May 18, 2022 (96 demands), June 23, 2022 (621 demands), July 18, 2022 (401 demands), and August 12, 2022 (142 demands).

[15] As examples, Wells Fargo has attached true and correct copies of the authorizations for ▮▮▮▮▮▮▮ (the "▮▮▮ Authorization") and ▮▮▮▮▮▮▮ (the "▮▮▮ Authorization") as **Exhibits J and K**.

Page **9** of 22

occasion) Wells Fargo account number.[16]

It appears that many Claimants found their way to McCune through advertising on McCune's website (and/or other forums with links to visit McCune's website). McCune's advertising has evolved over time, but at one point claimed the following:

- "National law firm successfully secured more than $1,000 per client in Wells Fargo overdraft arbitrations."
- "[McCune] has won in hundreds of arbitrations against Wells Fargo over unfair overdraft fees."
- "Each successful arbitration secured the return of the client's fees as well as $1,000.00 in penalties."
- "Any Wells Fargo customer who received an overdraft fee within the past 12 months can qualify."
- "In June 2022, [McCune] – representing hundreds of clients who have been charged unfair overdraft fees in arbitrations against Wells Fargo – secured the return of all overdraft fees charged within the past year plus a $1000.00 penalty for every client."

These statements were made on McCune's website discussing "Wells Fargo New Arbitrations" (https://mccunewright.com/wells-fargo-new-arbitrations/), which Wells Fargo captured on June 30th, 2022 (the "June 30th McCune Advertisement Capture").[17]

***Each of these statements is demonstratively false***. McCune has never "successfully secured" any monetary judgment, won any arbitration (let alone "hundreds of" them), or "secured the return of all overdraft fees charged . . . plus a $1000.00 penalty" for any client in a "Wells Fargo overdraft arbitration" or otherwise. In fact, the only overdraft arbitration brought by McCune against Wells Fargo that has been fully adjudicated found that Wells Fargo was the "prevailing party" and provided no monetary award whatsoever for McCune's client.[18] Moreover, McCune's statement that "[a]ny Wells Fargo customer who received an overdraft fee within the past 12 months can qualify" is misleading, as Regulation E only applies to specific overdraft charges

---

[16] *See* **Exhibit J** (███ Authorization); **Exhibit K** (███ Authorization).
[17] A true and correct copy of the June 30th McCune Advertisement Capture is attached hereto as **Exhibit L**.
[18] *See* **Exhibit A** (Wilson Final Award).

related to ATM and one-time debit card transactions—i.e., it does not cover overdrafts on checks or recurring withdrawals such as a mortgage or auto payment.

Additionally, McCune explains to its potential clients that each arbitration it files on a claimant's behalf forces Wells Fargo to pay "a whopping $4,000.00, not including their attorneys' fees!"[19] Thus, McCune explains, "bringing hundreds of thousands of arbitrations, each resulting in thousands paid by Wells Fargo, means consumers can finally hit one of the world's largest corporations where it hurts."[20] This statement is clearly intended to induce potential clients to sign up to file an arbitration against Wells Fargo for the sole purpose of harming the bank, regardless of whether or not the individual has a legitimate claim.

**E.    Wells Fargo has paid initial administrative filing fees of $437,325 for 1,845 arbitration demands filed thus far and will be required to pay over $6 million more in non-refundable case management fees and arbitrator compensation for arbitrations that likely have no merit.**

After the AAA determined that this dispute would be governed by the Supplementary Rules, it began invoicing Wells Fargo for the initial administrative filing fees associated with the demands filed by McCune. Thus far, the AAA has invoiced Wells Fargo on six separate occasions (April 22, 2022, May 6, 2022, May 18, 2022, June 23, 2022, July 18, 2022, and August 12, 2022) for a total amount of $437,325.00 in initial administrative filing fees for 1,846 arbitration demands. Wells Fargo has timely paid each invoice.

If McCune is not required to provide the basic information for these Claimant Demands as required by the AAA Rules (and, as a result, conduct an investigation into its clients' claims), Wells Fargo will be required to pay $1,400 in case management fees and at least $1,500 in arbitrator compensation for each individual arbitration. As currently alleged in the Demands, there

---

[19] *See* **Exhibit L** (June 30th McCune Advertisement Capture).
[20] *Id.*

is no way for Wells Fargo—or McCune—to know which and how many of its clients banked with Wells Fargo and opted into the Wells Fargo DCOS. Thus, Wells Fargo is set to be invoiced for approximately $6,600,000 in nonrefundable fees for arbitrations that may not have any merit. As shown by Wells Fargo's timely payments thus far, it intends to pay all fees associated with each individual arbitration in this Multiple Case Filing Dispute. However, as discussed in detail below, McCune should be required to investigate its clients' claims to insure their integrity and provide the basic information necessary for Wells Fargo to investigate and defend against the arbitrations prior to Wells Fargo incurring such costs.

**F.    Wells Fargo requests that McCune amend previous demands to provide specificity and McCune asks to brief the issue.**

On August 24, 2022, the Process Arbitrator held an initial conference call with McCune and counsel for Wells Fargo. During the call, Wells Fargo pointed out that Claimants' counsel's method of procuring clients and filing demands has likely resulted, thus far, in hundreds of demands being filed on behalf of individuals that have no legitimate or lawful claims against Wells Fargo. This has led Wells Fargo to pay hundreds of thousands of dollars in nonrefundable filing fees for claimants who filed demands. Wells Fargo maintains that if the filing requirements of AAA regarding the required content of "Demands" were properly satisfied prior to initiation of fees, such fees should not have been incurred for claimants who never banked with Wells Fargo, or who were never enrolled in the overdraft program at issue, or who were not assessed an overdraft fee during an actionable limitations period.

As a result, Wells Fargo raised the sufficiency of information provided in the Demands (both already filed and future filings) to the Process Arbitrator in the parties' initial call on August 24, 2022. The Process Arbitrator recognized that certain basic information regarding each claimants' individual disputes with Wells Fargo could be helpful to the efficient and economical

administration of all claims and opined that Claimants' current demands could be amended to meet a more specified filing requirement that includes information establishing legitimate claims. The Process Arbitrator further opined that she could Order future demands filed by Claimants' counsel to meet certain specificity requirements. Claimants' counsel requested briefing on the issue, arguing that the Process Arbitrator lacked the jurisdiction and authority to rule on filing requirements.

## III.   ARGUMENT & AUTHORITIES

**A.   Attorneys have the obligation to conduct a reasonable investigation before asserting a claim.**

Federal courts, the American Bar Association ("ABA"), and the AAA have all recognized the necessity for attorneys to perform a reasonable investigation into the facts at issue prior to asserting a claim. The central purpose of these rules is to deter baseless filings and streamline administration and procedures of courts and arbitration tribunals. *See, e.g., Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393 (1990).

For example, Rule 11(b) of the Federal Rules of Civil Procedure provides that, by filing a pleading to a court, an attorney certifies "to the best of [the attorney's] knowledge, information, and belief, ***formed after an inquiry reasonable under the circumstances***:" (1) the pleading is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) the claims, defenses, and other legal contentions are warranted by existing law; and (3) the factual contentions have evidentiary support. *See* Fed. R. Civ. P. 11(b). *Goldman v. Barrett*, 825 F. App'x 35, 37 (2d Cir. 2020) (holding that pursuant to Rule 11, "every attorney owes a duty to conduct a pre-litigation inquiry into the viability of a pleading that is objectively reasonable under the circumstances"). The Rule also provides that a court may impose sanctions on an attorney in violation of Rule 11(b). *See* Fed. R. Civ. P. 11(c)(1);

*see also Glaser v. City of San Diego*, 163 F.3d 606 (9th Cir. 1998) ("Sanctions are appropriate under Rule 11(b)(2) when a pleading which has been filed is objectively 'frivolous, legally unreasonable, or without factual foundation, even though the paper was not filed in subjective bad faith.'"); *Collins v. Cheney*, No. 07-CV-0725S, 2007 WL 4300025, at *3 (W.D.N.Y. Dec. 3, 2007) ("In the face of the plaintiff's continuing propensity for filing frivolous and obviously baseless actions in this Court, it becomes necessary for the Court to impose appropriate sanctions pursuant to Rule 11 and the Court's inherent authority to fashion an appropriate sanction for conduct which abuses the judicial process.") (internal quotations omitted).

Similarly, ABA Model Rule of Professional Conduct 3.1, which has been adopted in some form by all 50 states, forbids a lawyer from bringing or asserting an issue "unless there is a basis in law and fact for doing so that is not frivolous." Model Rules of Prof'l Conduct R. 3.1 (Am. Bar Ass'n). Comments to the ABA's Model Rule 3.1 further provide that lawyers are required to "inform themselves about the facts of their clients' cases and the applicable law and determine that they can make good faith arguments in support of their clients' positions" and that an action is frivolous "if the lawyer is unable either to make a good faith argument on the merits of the action taken or to support the action taken by a good faith argument for an extension, modification or reversal of existing law." *See id.* at cmt. 2.

The AAA Consumer Rules contain a rule against frivolous filings similar to Rule 11 and in step with ABA Model Rule 3.1. Specifically, Rule 44(c) permits the arbitrator to allocate compensation, expenses, costs of arbitration, and administrative fees (which expressly include filing and hearing fees), to any party upon the arbitrator's determination that the party's claim was filed for purposes of harassment or is patently frivolous. *See* Consumer Rules at 44(c). Courts have held that the AAA's mechanism for reallocating fees is similar to the sanctions imposed by Rule

11(c). *See West v. Brookdale Senior Living Communities Inc.*, No. 3:13-CV-1567-HU, 2014 WL 2829751, at *12 (D. Or. June 20, 2014) ("[Reallocation of fees] under the AAA rules bears some resemblance to the grounds for imposing a Rule 11 sanction in federal district court."). Wells Fargo does not wish to get to the point of sanctions briefing but instead asks the Process Arbitrator to remedy the issue at hand by enforcing the AAA rules governing the required substance of demands.

Requiring counsel for Claimants to satisfy the requirements for filing a Demand under the AAA Consumer Arbitration and corresponding Supplementary Rules will assist in the efficient and economic administration of these Multiple Case Filings. Wells Fargo is not asking for any additional requirements under AAA rules. Wells Fargo is merely asking the Process Arbitrator to uphold the requirements for filing a Demand under applicable AAA rules to ensure (a) the required amount of due diligence is performed by Claimant's counsel before bringing a claim; and (b) the Respondent is on proper notice of the individual facts and state statutory laws at issue so that it can properly investigate those claims and prepare a defense.

**B.    To protect the integrity of the Multiple Case Filing process, it is imperative McCune provides the basic information required under AAA's Consumer Rules for each Claimant Demand.**

McCune's false and misleading advertising has, unsurprisingly, resulted in individuals authorizing McCune to file frivolous arbitrations on their behalf. It is imperative that the AAA perform its proper gate-keeping role to ensure such frivolous claims do not proceed at the outset of each claim. The Multiple Case Filing Demands filed against Wells Fargo fail to provide any basic information to support Claimants' individual disputes with the Company. The proper administration of Consumer Rules R-2 (a)(1) and R-2(f) and a fair reading of the definition of "Demand" set forth in the Consumer Rules can remedy this issue. Requiring McCune to satisfy the filing requirements of a Demand under AAA Rules is imperative to protect the integrity of the

Multiple Case Filing process so that the process is used for its intended purposes—and not as a strategy to harass and leverage settlement.

Indeed, there are "authorization" forms submitted by McCune that demonstrate the claimant has no Wells Fargo account and therefore has no claim, or at a minimum that McCune failed to conduct basic due diligence before submitting the demands to arbitration in an effort to force Wells Fargo to incur fees. For example, ███████ provided an authorization to McCune expressly stating that she does not have an account with Wells Fargo, and ███████ provided an authorization to McCune stating that she did not know her account number:





These exemplar authorizations, at a minimum, required McCune to further investigate whether these individuals have a legitimate, non-frivolous claim against Wells Fargo. Instead, McCune moved forward with filing demands on behalf of ███████ and ███████ despite the clear

---

[21] *See* **Exhibit K** (███████ Authorization); **Exhibit J** (███████ Authorization).

issues surrounding their authorizations.[22] These are just two examples—Wells Fargo's review has identified dozens of similar problems, as well as instances in which the authorization form contains a purported "account number" that Wells Fargo has been unable to match to any existing checking account.

McCune has not provided the basic information required for Wells Fargo and the merits arbitrator to fully understand and investigate the dispute. Again, that basic information would include: (a) the Claimant's Wells Fargo checking account number for the account issue; (b) sufficiently pled facts establishing that the Claimant was enrolled in DCOS; (c) sufficiently pled facts establishing that the Claimant was assessed an overdraft fee during an actionable limitations period;[23] (d) identification of the specific state law(s) under which Claimants assert claims (statutory and common law); and (e) specify the amount of money in dispute.

Instead of including this basic information, McCune has filed more than 2,277 identical demands which do not specify the amount in dispute, do not identify any overdraft fees which were allegedly incurred unlawfully, and which implicate the voluminous consumer fraud laws of many different states without identifying the specific state law at issue and which shows nothing changed but the Claimants' names and contact information. And McCune has affirmatively stated that more filings are forthcoming.

These frivolous, harassing demands are not an accident. In one of the few factual statements contained in McCune's advertising, McCune explained to its potential clients that each arbitration it files on a claimant's behalf forces Wells Fargo to pay "a whopping $4,000.00, not

---

[22] *See* **Exhibit C** (▮▮▮ Demand); **Exhibit B** (▮▮▮ Demand).
[23] *See* 15 U.S.C. § 1693m(g) ("Without regard to the amount in controversy, any action under this section may be brought in any United States district court, or in any other court of competent jurisdiction, within one year from the date of the occurrence of the violation.").

including their attorneys' fees!"[24] Thus, McCune explains, "bringing hundreds of thousands of arbitrations, each resulting in thousands paid by Wells Fargo, means consumers can finally hit one of the world's largest corporations where it hurts."[25]

> Here's how MWA is attaining justice out of Wells Fargo's injustice beyond securing overdraft fees for our clients. Arbitrations brought by the consumer costs only $50.00 paid by the attorney while Wells Fargo pays a whopping $4,000.00, not including their attorneys' fees! In short, bringing hundreds of thousands of arbitrations, each resulting in thousands paid by Wells Fargo, means consumers can finally hit one of the world's largest corporations where it hurts. Each of these thousands of arbitrations matters in holding Wells Fargo accountable.

In other words, **_McCune's expressed intent with these Multiple Case Filings is to harm Wells Fargo_**. This clearly stated goal, along with McCune's misleading statement that "[a]ny Wells Fargo customer who received an overdraft fee within the past 12 months can qualify" as a claimant,[26] rather than stating the proper standard that only individuals who enrolled in Well Fargo's DCOS can qualify, inevitably have led to the filing of claims that contain sparse factual and legal information that is insufficient to satisfy the filing requirements of AAA Rules.

Indeed, a preliminary review of the demands filed by McCune (which is ongoing) show that a number of claimants have never opened a Wells Fargo consumer checking account. Additionally, of the claimants that have opened a consumer checking account with Wells Fargo, many never agreed to participate in the Wells Fargo DCOS at issue. Importantly, whether a claimant has opted into Wells Fargo's DCOS can be answered by a cursory review of a claimant's bank statement, which specifies if the claimant is enrolled in the service.[27]

---

[24] *See* **Exhibit L** (June 30th McCune Advertisement Capture).
[25] *Id.*
[26] *See id.*
[27] As an example, Wells Fargo has attached a true and correct copy of a redacted bank statement as **Exhibit M**.

The bank statements further itemize every transaction, including identification of transactions covered by Regulation E (i.e., one-time debit card and ATM transactions) which resulted in an overdraft fee, and the dates of when such fees were incurred. *See id.* Moreover, McCune's current advertising specifically requests that individuals seeking to qualify as claimants for arbitration against Wells Fargo submit a Wells Fargo bank statement to McCune for review.[28] In other words, McCune can gather the information requested in this Memorandum by conducting basic due diligence into its clients' claims.[29] But McCune has not done so thus far, and it is already making this Multiple Case Filing dispute less efficient and less economical. To remedy this issue, McCune should not be permitted to continue filing demands for individuals without providing the basic information required for each Demand.

---

[28] *See Overdraft Fee Claims Against Wells Fargo*, https://mccunewright.com/overdraft-fee-claims-against-wells-fargo/ (last visited September 4, 2022) ("If you are a Wells Fargo customer who has been victimized by unfair overdraft fees, contact our team to see if you qualify to recover your money. To qualify quickly, submit your most current Wells Fargo bank statement to our team.").

[29] Notably, with the information currently being provided by McCune, Wells Fargo is forced to chase down the basic information it requests in this memorandum through multiple searches that cost inordinate amounts of time and money. Moreover, the results of those searches cannot provide Wells Fargo the information with any level of confidence as to its accuracy.

**C.  The Process Arbitrator has express authority to make determinations to address administrative issues to ensure the efficient and economic resolution of these disputes, and these Multiple Case Filings require such a determination.**

As discussed in detail above, the purpose of the Supplementary Rules is to provide an efficient and economical path toward the resolution of multiple individual disputes. To further that end, the Supplementary Rules provide the Process Arbitrator the unequivocal right to make determinations on any "administrative issue arising out of the nature of the Multiple Case Filing" including, specifically, AAA filing requirements and fee payments. *See* Supplementary Rules at MC-6(d)(i), (ii), (v). Thus, there is no question that the Process Arbitrator has authority to make determinations related to Claimants' filing requirements and Wells Fargo's fee payments.

Indeed, the issue at hand illustrates the importance of the Process Arbitrator's role in addressing administrative issues to ensure that Multiple Case Filings move toward an economical and efficient resolution. Specifically, Wells Fargo has paid hundreds of thousands of dollars in non-refundable administrative initial filing fees for demands related to the instant Multiple Case Filings—a cost that Wells Fargo acknowledges it has contractually obligated itself to pay by agreeing to administer its program under the AAA Consumer Rules and corresponding fee schedule.[30] But that obligation also requires AAA to perform its gate-keeping function and require Claimant to meet the basic information threshold of filing a Demand as defined by those same AAA rules so that Claimants without any basis to bring a claim are not improperly leveraged in a mass arbitration situation.

**D.  The Process Arbitrator should require McCune to provide basic information in future demands and to amend the current demands to meet the same requirements, and should stay further invoicing of AAA fees until the information required under AAA rules for Demands has been met.**

Pursuant to the Process Arbitrator's express authority to make determinations on AAA

---

[30] As made clear by Wells Fargo's timely payments of all AAA fees invoiced thus far.

filing requirements and any other administrative issue arising out of the Multiple Case Filings, Wells Fargo requests that the Process Arbitrator enter an order requiring McCune to, by a certain specified date, amend the demands currently filed with the AAA to include, and ensure that any future demands include, the additional following information: (a) the Claimant's Wells Fargo checking account number for the account at issue, (b) sufficiently pled facts establishing that the Claimant was enrolled in DCOS, (c) sufficiently pled facts establishing that the Claimant incurred overdraft fees in connection with transactions covered by Regulation E, (d) identification of the specific state law(s) under which Claimants assert claims (statutory and common law), and (e) specify the amount of money in dispute.[31]

Additionally, Wells Fargo requests that, pursuant to her authority to make determinations related to the "allocation of payment advances on administrative fees, arbitrator compensation, and/or expenses," enter an order staying the AAA's invoicing of any fees or arbitration compensation related to the demands or arbitrations until the underlying demands (both currently filed and filed in the future) meet these specificity requirements.

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, Wells Fargo respectfully requests that the Process Arbitrator enter an order: (i) requiring McCune to amend its previously filed arbitration demands to provide the basic information outlined above; (ii) requiring that all future demands filed by McCune provide the basic information outlined above; and (iii) staying the AAA's invoicing of fees and arbitrator compensation related to the demands or arbitrations until the underlying demands meet these specificity requirements (applicable to both current and future filings).

---

[31] During the August 24, 2022 initial conference call, the Process Arbitrator opined that requiring McCune to file a declaration from each claimant under the penalty of perjury which set forth this basic information would lead to a more efficient arbitration process. Wells Fargo agrees.

*/s/ Alicia A. Baiardo*

Alicia A. Baiardo
MCGUIREWOODS LLP
Two Embarcadero Center
Suite 1300
San Francisco, CA 94111
Tel: 415.844.1973
abaiardo@mcguirewoods.com

Amy M. Turk
MCGUIREWOODS LLP
World Trade Center
101 West Main Street
Suite 9000
Norfolk, VA 23510
Tel: 757.640.3711
aturk@mcguirewoods.com

Joel S. Allen
MCGUIREWOODS LLP
2000 McKinney Avenue
Suite 1400
Dallas, TX 75201
Tel: 214.932.6464
jallen@mcguirewoods.com

Joshua D. Davey
William C. Mayberry
Jason D. Evans
Michael C. Peretz
Mary K. Grob
Jacob R. Franchek
TROUTMAN PEPPER HAMILTON SANDERS LLP
301 S. College St., Ste. 3400
Charlotte, NC 28202
Tel: 704.916.1503
joshua.davey@troutman.com
bill.mayberry@troutman.com
Jason.Evans@troutman.com
michael.peretz@troutman.com
mary.grob@troutman.com
jacob.franchek@troutman.com

*Counsel for Defendant Wells Fargo Bank, N.A.*

# Exhibit A

AMERICAN ARBITRATION ASSOCIATION® | INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION®

**American Arbitration Association**
**Consumer Arbitration Rules**
**Final Award**

Case Number: 01-21-0016-4036

Mosanthony Wilson
v.
Wells Fargo & Co., Wells Fargo Bank, N.A

**FINAL AWARD WITH FINDINGS OF FACT & CONCLUSIONS OF LAW**

I, Arbitrator Janice L. Sperow, the undersigned, having been designated in accordance with the arbitration agreement entered into by the above-named parties, having been duly appointed and sworn, and having heard the proof and allegations of the Parties, Mosanthony Wilson (hereinafter claimant) having been represented by Richard McCune and Emily Kirk of the Law Offices of McCune Wright Arevalo LLP and Wells Fargo & Co., Wells Fargo Bank, N.A (hereinafter respondent) having been represented by Joshua Davey and Mary Grob of Troutman Pepper Hamilton Sanders LLP at an in-person hearing held on June 23, 2022, and having read the written evidentiary submissions in the matter do hereby AWARD as follows:

**THE PARTIES & CLAIMS**

Respondent is a national bank. Claimant is a banking customer with both checking and savings accounts with respondent. Claimant pled two causes of action: (1) violation of the Electronic Fund Transfer Act (ETFA), as implemented by Federal Reserve Regulation E (Reg. E), 12 C.F.R. § 1005.1, *et seq.*; and (2) violation of California's Unfair Competition Law (UCL), California Business & Professions Code § 17200, *et. seq*. See Comp. ¶¶ 86-92, 93-101. Claimant bases both claims on respondent's overdraft fees, practices, policies, and disclosures. See id.

**PROCEDURAL HISTORY**

**The Underlying Lawsuit**

Claimant initially filed this case as a lawsuit in the Southern District of California on November 25, 2020, alleging that respondent violated the UCL and the EFTA. Claimant sought class certification, disgorgement, injunctive relief, statutory damages, civil penalties, interest, costs, and attorneys' fees. See id. at VIII. Prayer for Relief.

**Arbitration Agreement**

As part of the account opening process, respondent issued claimant a copy of its terms and conditions for its services, called the Consumer Account Agreement (CAA). Claimant agreed to be bound by its provisions effective 2013 and thereafter as amended by respondent. The parties agree that the 2020 version of the CAA controls in this case, as it constitutes the effective CAA on

the date claimant first filed a claim against respondent. Joint Factual Stipulation, dated 6/22/22, at ¶ 4 (Stip.). The CAA governs the parties' relationship and requires arbitration of disputes between claimant and respondent:

> **Arbitration Agreement between you and Wells Fargo**
> If you have a dispute, we hope to resolve it as quickly and easily as possible. First, discuss your dispute with a banker. If your banker is unable to resolve your dispute, you agree that either Wells Fargo or you can initiate arbitration as described in this section.

CAA at 4 (original bold). The CAA broadly defines dispute as:

> Any unresolved disagreement between Wells Fargo and you. A dispute may also include a disagreement about this Arbitration Agreement's meaning, application, or enforcement.

Id. The CAA excluded small claims court, but no other, matters:

> **Wells Fargo and you each agrees to waive the right to a jury trial or a trial in front of a judge in a public court.** This Arbitration Agreement has only one exception: Either Wells Fargo or you may still take any dispute to small claims court.

Id. (original bold).

**Motion to Compel Arbitration**

Based upon this provision, respondent moved to dismiss the litigation and to compel arbitration. The court granted the motion and stayed the litigation pending arbitration. The court referred the gateway issues of McGill's application, arbitrability of the claims, and interpretation of the parties' agreement to the arbitrator. See Order Granting Defendants' Motion to Compel Arbitration, dated 5/8/21.

**The Arbitration**

Incorporating his complaint, claimant filed a demand and initiated this arbitration on September 3, 2021 before the American Arbitration Association (AAA), the forum identified in the parties' agreement. See Demand, undated. Respondent answered on November 21, 2021, denying the allegations and asserting several threshold legal issues. See Answer, dated 11/21/21. The AAA assigned the case to the undersigned Arbitrator pursuant to the parties' arbitration agreement.

Pursuant to Rule 21 of the AAA's Consumer Arbitration Rules, the Arbitrator held a Preliminary Hearing and Initial Arbitration Case Management Conference (CMC) via telephone conference on January 10, 2022. At the CMC, the parties disputed several gateway issues on which they requested briefing and early adjudication. The Arbitrator granted their requests and set a briefing schedule. See Order, dated 1/11/22. After the CMC, the parties submitted their briefs, met and conferred on several issues, agreed on some, and continued to dispute others. The parties and the Arbitrator therefore held a second CMC (CMC2) on February 1, 2022 to identify the remaining disputed issues and to set a briefing schedule. See CMC2 Order, dated 2/1/22. The parties thereafter agreed to bifurcate claimant's request for attorneys' fees from the claims' merits. See CMC3 Order, dated 3/16/22.

2

**The Pre-Hearing Motions**

After CMC2, the parties agreed upon the arbitrability of claimant's claims, the enforceability of their arbitration agreement, and the individualized nature of this arbitration. Id. They continued to disagree on the timeliness of claimant's claims under the applicable statutes of limitations (SOL) and the tolling of same, if any; and the Arbitrator's authority to issue public injunctive relief (PIR). Id.  Accordingly, the Arbitrator permitted full briefing on both issues.

**Motion to Dismiss Claims**

Respondent moved to dismiss on SOL grounds on February 18, 2022. Claimant opposed the motion on March 8, 2022, to which respondent replied on March 15, 2022. The Arbitrator and the parties held a hearing on the motion on March 16, 2022. The parties presented their arguments and responded to the Arbitrator's questions, after which they submitted the matter. The Arbitrator held that claimant's filing of his federal complaint on November 25, 2020 tolled the SOL pursuant to California Code of Civil Procedure § 1281.12 from November 25, 2020 until 30 days after the court's May 8, 2021 grant of respondent's motion to compel arbitration, namely June 8, 2021. Conversely, the Arbitrator found claimant's EFTA claim and derivative UCL claim untimely to the extent they rely upon fees charged more than one year before November 25, 2020, namely November 25, 2019.  See SOL Order, dated 3/21/22.

Consequently, the Arbitrator dismissed with prejudice all EFTA claims based upon alleged violations or fees pre-dating November 25, 2019, dismissed with prejudice all UCL claims based upon alleged violations or fees pre-dating November 25, 2016, and dismissed without prejudice all UCL claims based upon alleged violations or fees between November 26, 2016 and November 25, 2019. Id. The Arbitrator further found all EFTA and UCL claims based upon alleged violations or fees on or after November 25, 2019 timely. Id.

**Motion to Dismiss PIR Request**

Claimant sought injunctive relief in this arbitration. The parties disputed whether claimant sought private or public injunctive relief, or both, and whether their arbitration agreement authorizes the Arbitrator to issue PIR. At the parties' request, the Arbitrator permitted briefing on the following issues: (1) does claimant seek PIR; (2) if so, in what forum or fora does the arbitration agreement authorize PIR as a remedy; (3) if only a court may issue PIR, does the Arbitrator have authority to issue findings on the appropriateness of such relief in this case or must the court issue such findings; (4) does McGill apply here and if so, to what extent; and (5) any other legal issues raised by the parties with respect to the issuance of PIR. See Order, dated 2/1/22.

The parties filed opening briefs on these issues on February 18, 2022, opposition briefs on March 8, 2022, and reply briefs on March 15, 2022. The parties and the Arbitrator held a hearing on the issues on March 16, 2022. See CMC3 Order, dated 3/16/22. The Arbitrator held that the parties' arbitration agreement empowers her to consider, rule upon, and award, if appropriately proven, public injunctive relief in this arbitration. See PIR Order, dated 3/24/22.

**Rule 33 Dispositive Motion**

On May 2, 2022, respondent requested leave to file a dispositive motion on the legal questions governing this case. The Arbitrator found that respondent satisfied its Rule 33 burden and that the

3

motion would likely narrow the issues for hearing and therefore granted the request. Respondent filed a dispositive motion on May 16, 2022, which claimant opposed on May 31, 2022. Respondent submitted a reply brief on June 13, 2022. Both parties submitted supporting exhibits. The Arbitrator held a hearing on the motion on June 16, 2022, at which both parties argued their positions and responded to the Arbitrator's questions. See DM Order, dated 6/18/22.

Respondent moved to dispose of the claims under the safe harbor provision and as Reg. E compliant. It also sought to bar claimant's derivative UCL claim, to limit claimant's damages to $420.00, and to dismiss claimant's PIR request as moot. The Arbitrator denied in part and granted in part respondent's motion. The Arbitrator held that claimant may not recover damages, if any, incurred as a result of overdraft fees imposed after November 25, 2020 and that he must establish detrimental reliance to sustain Reg. E damages beyond disgorgement or restitution of incurred fees. The Arbitrator reserved judgment on the availability of consequential damages and denied the remainder of the motion.

### Motion to Exclude Expert Opinion

On June 13, 2022, respondent moved to exclude the testimony and report of claimant's expert Arthur Olsen. Specifically, respondent objected to Expert Olsen's opinions in three areas: (1) a summation of the total number of Reg.-E specific overdrafts incurred by claimant during the statute of limitations period; (2) a calculation of the amount of non-Reg. E overdrafts incurred by claimant under a "cascading damages" theory; and (3) the balance respondent used to assess overdrafts. See Expert Order, dated 6/14/22. Claimant countered that respondent's objections should be addressed at hearing. See id. The Arbitrator denied respondent's motion as to the first and second opinions and granted the motion as to the third opinion subject to its use as impeachment or rebuttal. Id.

### Discovery Motions

In addition to the above motions, the Arbitrator entered a stipulated protective order and ruled on motions to compel information exchange, to request a hearing subpoena, and to compel inspection. See CMC4 Order, dated 5/2/22; CMC 5 Order 5/5/22, and Customer Kit Order, dated 6/14/22. The Arbitrator granted claimant's motion for the issuance of a hearing subpoena for Jose Garcia, the former respondent banker who assisted claimant in opening his account. See CMC5 Order, dated 5/5/22. The Arbitrator granted several requests for the production of documents, a verified statement, and depositions. See CMC4 Order, dated 5/2/22; CMC5 Order, dated 5/5/22. The Arbitrator also granted claimant's motion for inspection of respondent's 2013 new account kit subject to respondent's right to maintain custody. See Customer Kit Order, dated 6/14/22.

### THE HEARING

The Arbitrator held the Final Pre-Hearing Conference (FPHC) via teleconference on June 21, 2022. At the FPHC, the Arbitrator ordered the parties to submit a notice of damages and a notice of defenses. See FPHC Order, dated 6/21/22. The parties filed their respective notices on June 21, 2022. The Arbitrator also granted claimant's request for leave to amend his demand to conform to the evidence and respondent's request for leave to file an answer to the amended claim. Id. Claimant filed his amended claim on June 21, 2022 (First Am. Comp.), and respondent filed its answer on June 22, 2022. (Ans.) In preparation for the arbitration hearing, the parties also submitted witness lists, exhibit lists, CACI, core exhibits, deposition testimony, key authorities,

chronology, list of issues to be adjudicated, list of defenses, damages summary, exhibits, and pre-hearing briefs on June 21-22, 2022.

On June 22, 2022, respondent filed an objection to claimant's amended claim as untimely and prejudicial and a conditional answer subject to its objection. Respondent also objected to several of claimant's exhibits, specifically documents related to a prior litigation in which respondent was a party (Gutierrez), consent orders in cases in which respondent was a party, C31 containing case summaries, and one consent decree in which respondent apparently was not a party (TD). The Arbitrator overruled the objection as to C31 as merely a demonstrative of selected cases but granted respondent's motion to accept respondent's counter demonstrative. As to the other objections, the Arbitrator reserved decision.

At hearing, the Arbitrator admitted all exhibits proffered by claimant (C1- C43) and by respondent (R1- R34) into evidence subject to the Arbitrator's right to accord them the appropriate weight and probative value, if any, given their materiality and reliability. The Arbitrator also admitted by joint stipulation the 2020 CAA as C44 and the new customer account kit coversheet as R35 into evidence.

The parties and the Arbitrator held the in-person hearing June 23, 2022. Richard McCune and Emily Kirk of the Law Offices of McCune Wright Arevalo LLP represented claimant, and Joshua Davey and Mary Grob of Troutman Pepper Hamilton Sanders LLP represented respondent. Respondent representative Katie Krajeck and summer associate, Brandon Keshish, from claimant's counsel, also attended the hearing. Court reporter, Dalia Smith of Esquire, transcribed the proceedings.

Claimant called claimant, expert witness Arthur Olsen, and respondent's person most knowledgeable (PMK) witness Nelson by deposition as his witnesses; respondent called business execution consultant Wendy Hernandez and claimant by deposition as its witnesses. All witnesses testified upon oath under penalty of perjury; the Arbitrator afforded both parties a full opportunity to examine, cross-examine, redirect, and recross each witness as well as to ask additional questions after the Arbitrator asked questions. Both parties presented opening and closing statements. The Arbitrator received copies of the power point presentations used by the parties during the opening and closing statements as demonstratives. The Arbitrator did not request post-hearing briefing. After the hearing, the Arbitrator read and considered each exhibit, deposition admission, pre-hearing submission, and the complete testimony of each witness, in rendering this award.

## Arbitrator Authority & Jurisdiction

In resolving the parties' dispute, the Arbitrator must implement their agreement unless legally unenforceable. In addition to any inherent powers available by law or conferred by the AAA Consumer Arbitration Rules, the parties' arbitration agreement explicitly authorizes the Arbitrator to:

- Hear the parties' disputes, including disagreements about the arbitration agreement's meaning, application, or enforcement;
- Provide a final and enforceable decision;
- Determine the agreement's enforceability if the parties dispute the agreement;
- Decide disputes based upon applicable law, including any statutes of limitation; and

5

- Award to either party "any award or relief provided for by law."

CAA at 4; see also AAA Consumer Rules 14(a)-(b), 23, 37 & 44.

The parties confirmed jurisdiction before the Arbitrator and the AAA in the initial CMC. See Order, dated 1/11/22; see also CMC2 Order, dated 2/1/22. The Arbitrator further finds that she has jurisdiction over this dispute pursuant to the parties' arbitration agreement which encompasses all disputes. See CAA at 4. By agreement, the parties requested findings of fact and conclusions of law as the form of award. See CMC4 Order, dated 5/2/22. Accordingly, the Arbitrator herein adjudicates all issues raised by the parties in the form of detailed findings of fact and conclusions of law. This Final Award will satisfy this requirement.

## FACTUAL BACKGROUND, CHRONOLOGY, & FINDINGS OF FACT

### Respondent's Overdraft Services

Respondent offers checking accounts with debit cards as one of its services. R26 at ¶ 2. Customers deposit funds into checking accounts which they spend by writing checks, authorizing a money transfer, withdrawing money at an automatic teller machine (ATM), authorizing recurring transactions, and by purchasing a one-time transaction by debit card. Id. at ¶ 3. Some transactions, like an ATM withdrawal, present for payment at essentially the same time a customer uses his debit card; others, like a paper check, present for payment sometime after the customer initiates the transaction. Id. Respondent determines if it will pay the transaction by examining the customer's "available balance." Id. at ¶ 4; R1 at 24, 28-29; Hernandez Testimony (T); accord Olsen T.

Respondent defines available balance as the most current record of funds available for withdrawal from the customer's account. R26 at ¶ 4; Hernandez T; R1 at 2 (words with special meanings), 24 (determining your account's available balance). To calculate available balance, respondent adjusts for all posted transactions, all holds, and for all unposted pending transactions, but does not include pending checks, Automated Clearing House (ACH) transfers, and recurring debit card transactions. R26 at ¶ 4; Hernandez T; R1 at 2, 24. Respondent pays the transaction if the customer's available balance sufficiently covers the amount when presented for payment. R26 at ¶ 5. If the available balance will not cover the transaction, respondent then decides whether to decline the transaction or pay the transaction by overdraft. Id.

Respondent determines whether to decline or pay based partially upon the type of overdraft services the customer has associated with his checking account. Id. at ¶ 6. Respondent offers several different overdraft-related services. Id. Respondent automatically provides all checking accounts with its standard overdraft practices, which permit it to optionally pay checks, ACH, or automatic recurring payment transactions that exceed the customer's available balance. Id. at ¶ 7; Hernandez T.  The standard overdraft service does not apply to ATM or one-time debit card transactions. R26 at ¶ 7.

Customers may also choose to enroll in respondent's "Overdraft Protection" service, which allows them to link a savings or credit account to their checking account and authorize respondent to transfer funds from those accounts into their checking account to cover an otherwise overdraft transaction. Id. at ¶ 8. Respondent also offers its Debit Card Overdraft Services (DCOS), which, unlike the standard overdraft service, specifically covers ATM and one-time debit card

transactions. Id. at ¶ 9; Hernandez T. Customers may select or cancel DCOS participation at any time. Hernandez T; R26 at ¶ 9. Respondent charges a $35 overdraft fee as part of both its standard plan and DCOS. R26 at ¶ 10.

**Claimant's Account**

Claimant opened a Wells Fargo checking account on May 17, 2013 by applying in person in a branch office. Stip. at ¶¶ 1-2; Wilson T; R2; R26 at ¶ 11. As part of the account opening process, respondent issued claimant a copy of its CAA. R2 (acknowledging receipt of the CAA); Stip. at ¶ 2 (authentic claimant signature); Hernandez T. Claimant agreed to be bound by its provisions effective 2013 and thereafter as amended by respondent. R2; Stip. at ¶ 4. The CAA governs the parties' relationship. Stip. at ¶ 4; R1.  The parties agree that the 2020 version of the CAA controls in this case, as it constitutes the effective CAA on the date claimant first filed a claim against respondent. Stip. at ¶ 4; C44. At the time he opened his checking account, claimant also became enrolled in respondent's optional DCOS effective May 21, 2013. Hernandez T; R5; R26 at ¶ 14.

Since then, respondent assessed claimant several overdraft fees on debit card and ATM transactions. Hernandez T; see R7-21; accord Olsen T. On some of those occasions, respondent assessed claimant an overdraft fee based upon its available balance metric, which it would not have assessed if respondent used a different metric, such as the ledger or daily ending balance. Olsen T; C38-39. On some of those occasions, respondent also assessed claimant a subsequent overdraft fee because respondent's prior overdraft fee caused claimant's available balance to become negative. Olsen T (cascading effect); C38-39. Between November 25, 2019 and November 25, 2020, respondent charged claimant fourteen (14) overdraft fees on ATM and nonrecurring debit card transactions for a total of $385 in fees after reversals. Olsen T; Stip. at ¶ 11. Claimant opted out of DCOS on April 5, 2022. Wilson T; R26 at ¶ 16; R34.

**Respondent's 2013 Opt In Process**

The parties could not present definitive evidence based upon personal knowledge of exactly how claimant became enrolled in DCOS because only two individuals actively participated in the process: claimant and the banker who assisted him on May 17, 2013 (claimant's special needs son was present but did not actively participate). Wilson T. Claimant does not remember most of the events that day nine years ago, and the banker no longer works for respondent. Wilson T; Hernandez T. However, claimant did credibly testify to the few events he remembered, and respondent's reliable business records demonstrated the process the bank followed in 2013 when claimant opened his account.

Respondent's Disclosure

In 2013 when claimant opened his account, respondent used a trifold pamphlet, entitled "*Customer Overdraft Services* Choices to help you manage your checking account" as its disclosure to comply with Reg. E. Hernandez T; Nelson Dep. at 53-54, 61; R26 at ¶ 12; R3 (original italics). Respondent provided new customers the disclosure as part of a customer new account kit containing multiple required banking disclosures and documents. Hernandez T; see R35. Respondent brought a hard copy of the applicable 2013 customer new account kit, including the 2012 DCOS disclosure brochure, to the hearing for inspection.

Upon inspection, the Arbitrator finds that the 2013 kit consisted of a two-pocket folder with

documents contained under the flap of each side. Arbitrator inspection; <u>accord</u> Hernandez T. Respondent numbered each unique type of document contained in the kit. Arbitrator inspection; <u>see</u> R35. The 2012 disclosure brochure was the first document under the left flap and consisted of eight pages (CNS8058). Arbitrator inspection; <u>accord</u> Hernandez T. The left side also contained a required privacy notice, a quick start guide, and a guide to common checking account fees. Arbitrator inspection; <u>accord</u> Hernandez T. Under the right flap, the kit contained a welcome letter, the applicable CAA in booklet form, a direct deposit advance service agreement and product guide in booklet form, and a customer account fee and information schedule booklet. Arbitrator inspection; <u>accord</u> Hernandez T; <u>see generally</u> Nelson Dep. at 37.

A third-party vendor pre-assembled all customer new account disclosure kits offsite, placed a bright lime green banker's instruction sheet on the top of the folder, shrink-wrapped the folder with the instruction sheet on top, and delivered the packets to respondent's marketing department. Hernandez T. The marketing department then distributed the packets unopened to each branch for use with customers. <u>Id.</u> The branches maintained the kits in their original wrapping in the vault until ready to use. <u>Id.</u> The banker would open the shrink-wrapped packet at the time he assisted the customer in opening a new account and follow the instructions. <u>Id.</u> Each kit had a unique serial number. Arbitrator inspection; <u>accord</u> Hernandez T. Respondent provided the kit and its contents only to individuals desiring to open a checking account with the bank. Hernandez T. The general public could not obtain the kit upon request but could obtain the information contained in the kit in branch brochures available to anyone walking into the bank. <u>Id.</u>  The Arbitrator finds that the hard copy 2013 customer new account kit and the included 2012 brochure inspected during the hearing authentically represents respondent's new customer account disclosure kit and Reg. E DCOS disclosure in effect and in use by respondent in 2013.

The 2012 DCOS brochure consisted of a cover and title "*Consumer Overdraft Services* Choices to help you manage your checking account" with a picture of a customer working over her checking account with a computer and calculator. C3; R3 (original italics).  The first page of the brochure is virtually identical to the Reg. E Model Form A-9:

<span style="color:red">Important things you should know</span>

**What you need to know about Overdrafts and Overdraft Fees**

An overdraft occurs when you do not have enough money in your account to cover a transaction but we pay it anyway. We can cover your overdrafts in two different ways:

1.  We have <u>standard overdraft practices</u> that come with your account.
2.  We also offer overdraft protection plans, such as a link to an eligible savings account, eligible line of credit or eligible credit card, which may be less expensive than our standard overdraft practices. To learn more, ask us about these plans.

This notice explains our standard overdraft practices.

**What are the standard overdraft practices that come with my account**?

We <u>do</u> authorize and pay overdrafts for the following types of transactions:

8

• Checks and other transactions made using your checking account number
• Automatic bill payments (such as recurring debit card and ACH payments)

We will not authorize and pay overdrafts for the following types of transactions unless you ask us to (see below):
• ATM transactions
• Everyday debit card transactions (such as one-time debit card and ATM card purchases)

We pay overdrafts at our discretion, which means we do not guarantee that we will always authorize and pay any type of transaction. If we do not authorize and pay an overdraft, your transaction will be declined.

**What fees will the bank charge if it pays my overdraft**?

Under our standard overdraft practices:

• We will charge you a fee of up to $**35** each time we pay an overdraft item to your account
• There is a limit of **four** overdraft and returned item fees per day

**What if I want Wells Fargo to authorize and pay overdrafts on my ATM and everyday debit card transactions**?

If you want us to authorize and pay overdrafts on ATM and everyday debit card transactions, please contact us at 1-877-804-4883, 24 hours a day, 7 days a week or speak to a banker at any Wells Fargo location. Or sign on to Wells Fargo Online® Banking and click the "Overdraft Services" link on the Account Activity page.

C3; R3 (original coloration and bold). The brochure continued:

<span style="color:red">Control of your accounts is in your hands</span>

Managing your checking account is the foundation of good money management skills. Wells Fargo offers tools and services that meet your personal financial style — with ways to keep track of your account balance and choices on how to manage your account.

<span style="color:blue">What is an overdraft</span>?

Overdrafts occur when you spend more money than you have in your checking account and the bank pays your transaction.

<span style="color:blue">How to avoid overdrafts</span>

• **Don't spend more than you have**
Know your available balance,[1] the amount of money you can actually use.
• **Keep track of your spending**
Record every deposit and withdrawal including checks, recurring payments, debit

9

card purchases, and cash withdrawals.
• **Don't forget outstanding transactions**
The current available balance provided by the bank may not include all transactions, such as checks or upcoming automatic payments.
• **Keep a cushion in your account**
By keeping a little extra in your checking account, you can cover any outstanding expenses that don't yet appear in your available balance, and avoid overdrafts.

You've got options

*Optional services that may offer protection to avoid overdrafts*

**Overdraft Protection**

Protect yourself from the inconvenience of declined transactions or returned ("bounced") checks. When you link one of your eligible Wells Fargo savings or credit accounts to your checking account, the bank will use available funds in your linked accounts to authorize your transactions if you don't have enough money in your checking account.

• There is no fee to sign up for this service
• If your account balance goes negative and the bank transfers money to bring your balance current, a single Overdraft Protection Transfer fee[2] will be assessed regardless of how many transactions are presented for payment that day

**Debit Card Overdraft Service**[3]

You can choose how Wells Fargo handles your ATM and everyday debit card transactions.

If you add optional Debit Card Overdraft Service to your checking account, the bank may approve (at our discretion) ATM and everyday debit card *transactions if you don't have enough money in your checking account* or linked overdraft protection accounts at the time of the transaction.

• There is no fee to sign up for this service
• If your account is negative, our standard overdraft fee of up to $35 per item[6] will apply if a covering[4] deposit or transfer is not made before the posted cutoff time the same business day

If you do not add this service, your ATM and everyday debit card transactions will be declined at the time of the transaction if you don't have enough money in your account; you will not be charged an overdraft fee if these types of transactions cause an overdraft. The service does not apply to debit card transactions you have established for recurring payments (such as utilities or club memberships). These may continue to be authorized and paid into overdraft, at our discretion, even if you do not add Debit Card Overdraft Service and our overdraft fees[6] and policies will apply.

Please see back panel of brochure for additional details.  Lift to open

C3; R3 (original colors and emphasis). The pamphlet also included charts comparing the overdraft protection plan and the DCOS. C3; R3. It illustrated the different outcomes when a customer charges a $125 to a $100 account balance depending on if the customer has enrolled in no overdraft service, the overdraft protection plan, the DCOS, or the overdraft protection plan plus DCOS. Id. The pamphlet identified some tools for customers to use to monitor their account:

### Free tools to help you manage your account

Wells Fargo makes it easy for you to monitor your spending, to check account activity, and to make transfers to cover your transactions.

### Online and mobile: You decide how to manage and track your spending

Sign up for convenient services and start managing your account via internet or mobile phone.

### Services to help avoid overdrafts

•Text Banking[5] — Check your available balance[1] before you make a purchase. You can quickly request and receive information via text message.
• Mobile Banking[5] — Bank on the go, check balances and transfer funds between your Wells Fargo accounts using your phone's web browser
•Account Alerts — Stay informed. Set up a low balance alert to your email or wireless device[5]
• My Money Map — Take control of your finances with an online tool that helps you view your spending, budgeting and savings with one click

C3; R3 (original coloration). The brochure also included a portrayal of a customer using a Wells Fargo ATM machine. C3; R3. The back page explained the footnotes and fine print in smaller lettering. It also identified the version by date and internal document number.

### How can we help?

If you have questions or want more Information about our overdraft services:

[contact information in English, Spanish, and for the hearing impaired]

1 This balance may not reflect all of your transactions, such as checks you have written or debit card transactions that have been approved but not yet submitted for payment by the merchant.
2 You can link an eligible Wells Fargo savings and a credit card account to your checking account. One overdraft protection transfer or advance fee will be charged each day an overdraft protection transfer/ advance occurs. The fee for overdraft protection transfers from a savings account is $12.50. For more information about overdraft protection in connection with your credit card account, please see your account terms and conditions.
3 Not available for certain accounts such as Teen Checking, SM Opportunity

Checking,® and Savings.
4 Subject to the bank's funds availability policy.
5 Your mobile carrier's message and data rates may apply.
6 **About Overdrafts and Overdraft Fees**
• Our overdraft fee, whether the overdraft is by check, ATM withdrawal, debit card transaction or other electronic means, is $35 except for accounts that are maintained in the states below:
– <u>For AK customers</u>: $25 per item on the first day you are overdrawn in the preceding 12-month period. Otherwise, our overdraft fee is $31 per item.
– <u>For CA customers</u>: $25 per item on the first day you are overdrawn in the preceding 12-month period. Otherwise, our overdraft fee is $35 per item.

•You will be charged no more than 4 overdraft and returned item fees per day. You must immediately bring your account to a positive balance

• The payment of transactions into overdraft is discretionary and the bank reserves the right not to pay. For example, the bank typically does not pay overdrafts if your account is not in good standing or you have had excessive overdrafts

• Debit card transactions that you have established for recurring payment (such as utilities or club memberships) may continue to be authorized at our discretion, even if you do not sign up for Debit Card Overdraft Service

The information contained in this brochure is subject to change. Certain products not available in all states. Please see the applicable account agreements for the current terms and conditions.
© 2012 Wells Fargo Bank, N. A. All rights reserved. Member FDIC. CNS8058 (09/12)

C3; R3 (original emphasis, deemphasis, and coloring).

<u>The In Branch Opt In Process</u>

In 2013, a customer entering a branch office to open a checking account with respondent would work with a banker to complete an account application. <u>See</u> C1; R2; Hernandez T; <u>accord</u> Claimant T. The banker would typically write down the customer's verbal information on the application form and then submit it to the customer for signature. Nelson Dep. at 35; Hernandez T; <u>accord</u> Claimant T. The customer's signature acknowledges that he received the CAA, privacy policy, and the direct deposit guide, among other things, but does not mention overdrafts or available balance. Hernandez T; Nelson Dep. at 40-44; C1; R2. The banker would list his own name, employee number, the date, branch number, and internal branch mailing address. Nelson Dep. at 35-36; C1; R2. The banker then would scan the application into the archival system as well as enter the data into respondent's database. Nelson Dep. at 38-40. The banker could optionally work directly in the database as he worked with the new customer. Nelson Dep. at 40.

Pursuant to respondent's 2013 protocols, the banker would also open the shrink-wrapped new consumer account disclosure kit, remove the banker instruction sheet, and then follow the instructions. Hernandez T; R35. Before giving the kit to the customer, the banker recorded the specific serial number of that kit on the customer's application form so respondent could track

12

which customer received which kit. Hernandez T; C1; R2; Nelson Dep. at 36-37. During the account opening process, the banker would offer the new client other services offered by respondent, including the DCOS. Nelson Dep. at 44; Hernandez T. Unlike the checking account, the DCOS did not have a written application. Instead, according to respondent's protocol, the banker would proceed through various steps to obtain consumer consent. Hernandez T; see R35.

The banker's instruction sheet provided the steps:

**Effective 10/13**
**ENGLISH**
Pre-assembled
**Consumer New Account Disclosure Kit** (NAK)



**ACTION ITEMS**:

| | |
|---|---|
| 1. **Remove** this Banker Instruction Sheet | |
| + | |
| 2. **Enter** the Consumer Disclosure NAK serial number on SVP | |
| + | |
| 3. **Review/Provide** the Consumer New Account Disclosure Kit and applicable addenda from Forms Online … | |
| + | |
| 4. **Review** Debit Card Overdraft Services Brochure (CNS8058) with your customer. Record customers preferences in SVP. | |
| + | |
| 5. **Provide** Deposit Rate Sheet (if applicable) | |

R35 (original bold, coloration, and shading; extra details omitted). The instructions also listed the new account kit's contents on the bottom of the sheet. Id.

Respondent's written procedures in effect in 2013 also required the banker to give the customer the kit including "the required DCOS disclosures" and review it with the customer before enrolling in DCOS. Hernandez T; R35; R26 at ¶ 13; R4. The procedures specifically directed the banker to use the brochure. R4. Respondent's computer system also included a verification field, which asked the banker to verify by selecting "yes" that he had provided the "Overdraft Services brochure" to the customer. Hernandez T; R4; R26 at ¶ 13. If the banker selected no, the computer would generate an error message reminding the banker to give the brochure to the customer. Hernandez T; R4. The computer system would not allow the banker to proceed with the online process unless he verified that he had given the disclosure brochure to the new customer.

13

Hernandez T; R4.

The written protocols also advised the banker to "keep in mind" that the brochure contained the required DCOS disclosures and needed to be given to the customer before enrolling in the program. Hernandez T; R4. The banker would ask if the customer wished to enroll into DCOS and recorded the customer's verbal response as "yes" or "no" directly into the database. Hernandez T; R4. The customer did not have to personally verify his response in writing; instead, the banker logged the customer's selections for him. Hernandez T; R4. If the customer enrolled in DCOS, respondent instructed the banker to give the customer the immediate written confirmation of DCOS enrollment, which printed out automatically in the branch. R4; Hernandez T. The computer program would prevent the banker from proceeding to the next screen until he printed out the confirmation letter. Hernandez T; Nelson Dep. at 48-49, 55; see, e.g., C13; R6. The confirmation letter advised the customer of his right to opt out of the service at any time. Hernandez T; see, e.g., C13; R6.

The customer's bank statements would thereafter reflect DCOS enrollment with a checkmark in the overdraft services row under the applicable account options, unless and until the customer revoked the service. Hernandez T; Nelson Dep. at 62-64; see, e.g., R7-R20. Each monthly statement would also list a summary of overdraft fees assessed during that period as well as a year-to-date total. Hernandez T; R7-20. The statements also contain a section on how to avoid fees, respondent's website address for frequently asked questions about service fees, and a detailed three paragraph policy on how to report inaccuracies, errors, questions, or complaints. See R7-R20. The policy also advises customers that respondent will investigate complaints and promptly correct any errors. Id. Respondent also notified customers that it would refund any fees, even if correctly assessed, if its investigation lasted more than 10 business days so that customers had access to the disputed funds pending investigation. Id.

**Respondent's Current Opt In Process**

Respondent currently follows much the same process with some significant differences. Hernandez T. First, respondent implemented a new Reg. E disclosure form on May 9, 2022. See C12; R25; Hernandez T.  Second, respondent no longer uses the full trifold DCOS brochure. Hernandez T. Third, respondent requires customers who choose to enroll in DCOS to acknowledge their verbal consent in writing. Id.; see, e.g., R34.

<u>Similarities</u>

For customers opening new accounts in the branch, a banker still meets with the customer to personally discuss their options and desired services. Hernandez T. The banker still opens and then hands the customer a shrink-wrapped new account kit with several documents inside a folder. Id. The DCOS disclosure remains the first document in the folder under the left flap. Id. The banker continues to implement respondent's new account opening protocols, review the DCOS disclosure with the customer, and to log the customer's information and responses into respondent's SVP system. Id. The banker also continues to obtain the customer's verbal consent to DCOS enrollment. The banker still hands the customer a confirmation letter in the branch at the time of account opening and DCOS enrollment. Id. The monthly statements continue to show overdraft fee totals and how to question, dispute, or complain about respondent's fees. Id.

<u>The New Disclosure</u>

14

Before enrollment, however, the banker hands the customer a new Reg. E disclosure, which became effective May 9, 2022. Hernandez T; C12; R25. Respondent's 2022 disclosure consists of a single page which parallels both the Model Form A-9 and the left inside flap of its 2012 disclosure brochure except in these material respects: (1) it modified the definition of overdraft; (2) it added a definition of available balance; and (3) it is a single page standalone disclosure, no longer contained in an 8-page brochure. Compare R3 with R25; accord Hernandez T; Arbitrator Inspection. Respondent discontinued the use of a brochure as its Reg. E disclosure, opting instead to use a single page modelled on Reg. E's Model Consent Form A-9 but customized to explicitly reflect its use and definition of available balance. Hernandez T; R25.  The new 2022 disclosure defines an overdraft as:

> When you do not have enough available money in your account to cover a transaction (based on your account's available balance)[1] but we pay it anyway."

R25. The 2012 disclosure defined an overdraft as:

> When you do not have enough money in your account to cover a transaction but we pay it anyway

R3. Comparing the two definitions, the Arbitrator finds that respondent added two references to the customer's available balance as shown in red:

> When you do not have enough *available* money in your account to cover a transaction (*based on your account's available balance*)[1] but we pay it anyway.

Compare R3 with R25 (colored emphasis added). Respondent also added a definition of available balance in footnote 1 to explain how it uses the term:

> Available balance is the most current record we have about the funds that are available for your use or withdrawal. It includes all deposits and withdrawals that have been posted to your account, then adjusts for any holds on recent deposits and any pending transactions that are known to the Bank. This balance may not reflect all of your transactions, such as checks you have written or debit card transactions that have been approved but not yet submitted for payment by the merchant. For more information on how we calculate your available balance, please refer to the Deposit Account Agreement.

R25; accord Hernandez T.

This definition is new to the 2022 disclosure; the 2012 disclosure did not include this definition. Compare R3 with R25; accord Hernandez T.  The 2013 CAA included the first sentence of this 2022 definition in its definition of available balance under the section on terms with special meaning, and the CAA section entitled "Determining your *available balance*" included a complete breakdown of how respondent calculated available balance. R1 at 2, 24. Likewise, the governing 2020 CAA includes the first sentence of the 2022 definition under the section defining terms with special meaning and a complete breakdown of the available balance calculation under the section entitled "How do we determine your account's available balance?" C44 at 1, 26.

15

Respondent also changed the 2012 sentence "we <u>do</u> authorize and pay overdrafts for the following types of transactions" to the 2022 version "we <u>may</u> authorize and pay overdrafts for the following types of transactions." <u>Compare</u> C11 <u>with</u> C12. Respondent now underlines and adds these words in the 2022 version:

> which means we <u>do not guarantee</u> that we will authorize and pay any type of transaction. If we do <u>not</u> authorize and pay an overdraft, your transaction will be declined or returned unpaid

<u>Compare</u> C11 <u>with</u> C12. Respondent also reduced its daily cap on overdraft fees from four to three. <u>Compare</u> C11 <u>with</u> C12.

<u>Written Consent</u>

After the banker reviews the new 2022 disclosure with the customer, he still obtains the customer's verbal consent or declination to enroll in the DCOS program. Hernandez T.  Now, however, if the customer chooses to enroll, the banker also requires the customer to sign a customized summary computerized form acknowledging affirmative consent to enroll in DCOS. <u>See, e.g.</u>, R34. After explaining how to add DCOS if desired, the 2022 version now adds this sentence: "You can remove the service at any time." <u>Compare</u> C11 <u>with</u> C12.

## LEGAL ANALYSIS, FACTUAL FINDINGS, & LEGAL CONCLUSIONS

The parties present compelling, yet markedly different, versions of the events underlying this case. Claimant presents a typical customer confused about, if not misled by, respondent's unfair and illegal overdraft practices and fees, which no one explained, about which he received no documents, to which he did not consent, and about which he complained. Conversely, respondent projects a bank offering customers transparent lawful services, clearly described in its compliant model disclosures, which its business records confirm claimant received as part of his new account kit and in which respondent voluntarily enrolled and used for many years without complaint, objection, or revocation until this arbitration.

**Claimant's Causes of Action**

<u>**EFTA**</u>

In his first cause of action, claimant alleges that respondent violated Reg. E, 12 C.F.R. § 1005.17, when it charged claimant overdraft fees on ATM and one time debit card transactions without first complying with Reg. E's mandatory customer opt in protections. <u>See</u> First Am. Comp. at ¶¶ 15-19. Specifically, claimant seeks the adjudication of the following issues with respect to his EFTA claim:

- Did Wells Fargo's 2012 Overdraft Brochure satisfy Regulation E's opt-in requirements?
- Was Claimant's signature on his application sufficient to demonstrate his assent to join the DCOS overdraft service?
- Did Wells Fargo satisfy Regulation E by giving Claimant a confirmation letter of being opted into the DCOS service, including a notice of his right to exit the service at any time?
- Did Claimant give affirmative consent in a manner satisfying Regulation E?
- Did Wells Fargo opt Claimant into its overdraft program using undue coercion?

16

- Did the fact that a Wells Fargo employee opted Claimant into the program satisfy Regulation E?
- Did Wells Fargo explain its overdraft program in a clear, unambiguous, stand-alone document as Regulation E requires?
- Did the 2012 Overdraft Brochure contain information not permitted under Regulation E?
- Did the 2012 Overdraft Brochure accurately disclose Wells Fargo's policy for charging overdrafts on one-time debit card and ATM transactions in a stand-alone document?
- Is Claimant entitled to damages for Wells Fargo's violations of federal law?
- Is Wilson entitled to obtain injunctive relief for Wells Fargo's violations?

Issues to be Adjudicated from Claimant, dated 6/24/22. In addition to its defenses, respondent identifies the following issues to be adjudicated with respect to this claim:

- Whether Wilson has proven that Wells Fargo violated Regulation E's disclosure requirement.
- Whether Wilson has proven that Wells Fargo violated Regulation E's reasonable opportunity requirement.
- If Wilson prevails on his claims, whether Wilson is entitled to "cascading damages."
- Whether Wilson has demonstrated that he is entitled to public injunctive relief and, if so, what relief.

Respondent's Issues to be Adjudicated, dated 6/22/22. The Arbitrator will analyze each of these issues.

**The Reg. E Framework**

Congress enacted EFTA as part of the Consumer Credit Protection Act along with other consumer-protection statutes like the Truth in Lending Act (TILA). Pub. L. No. 95-630 § 2001, 92 Stat. 3641 (1978). Under the EFTA, Congress charged the Federal Reserve Board (FRB), and later the Consumer Financial Protection Bureau (CFPB), with promulgating regulations to carry out EFTA's purposes. 15 U.S.C. § 1693b(a)(1); see also id. § 1693a(4). The EFTA requires financial institutions to disclose the terms and conditions of electronic fund transfers involving consumer accounts "in accordance with the regulations of the" FRB and now CFPB. Id. § 1693c(a). The FRB adopted Reg. E to implement this congressional mandate.

Before the development of electronic fund transfer (EFT) systems, banks generally provided overdraft coverage for check transactions only. See Electronic Fund Transfers, 74 Fed. Reg. 59,033, 59,033 (Nov. 17, 2009). When a bank customer overdrew her account by writing a check in an amount that exceeded the amount of funds in the account, her financial institution applied its discretion in deciding whether to honor the customer's draft, in effect extending a small line of credit to its customer and imposing a small fee for the convenience. Id. Online banking transformed how financial institutions handled overdrafts and overdraft fees. New EFT systems provided customers with more ways to make payments from their accounts, including ATM withdrawals, debit card transactions, online purchases, and transfers to other accounts. Id. Most financial institutions chose to extend their overdraft coverage to all EFT transactions. Some further decided to cover automatically all overdrafts their customers might generate from their EFTs. Id. These changes reduced costs from manually reviewing individual transactions and furthered "consistent treatment of consumers." Id. at 59,033-34. But they sometimes created an unexpected cost to consumers: financial institutions generally assessed a flat fee each time an overdraft occurred,

17

sometimes charging additional fees—for each day an account remained overdrawn, for example, or incrementally higher fees as the number of overdrafts increased. Id. at 59,033.

In 2009, the FRB amended Reg. E to prohibit overdraft fees for ATM and nonrecurring, one-time debit card transactions, unless the consumer opts in and affirmatively consents to the bank's overdraft services after a full, clear, accurate, and readily understandable disclosure of the bank's specific program in a standalone document. See 12 C.F.R. § 1005.17(b); Elec. Fund Transfers, Final Rule, 74 Fed. Reg. 59,033-36 (November 17, 2009). Reg. E permits a civil damages action for failure to comply with its requirements. See 15 U.S.C. § 1693m(a). Reg. E contains a safe harbor provision, however, which precludes liability for "any failure to make disclosure in proper form" if the bank "utilized an appropriate model clause issued by the Bureau or the Board." Id. at § 1693m(d)(2).

**Account Balance Definition**

Financial institutions use different types of accounting methods to determine a checking account's balance at any given moment, including for example, ending daily balance, collected balance, available balance, statement balance, and ledger balance. See generally Olsen T; Hernandez T; Nelson Dep. at 23-28. The collected balance includes funds received from other banks, such as wire transfers and deposited checks, but excludes pending transactions. Nelson Dep. at 27-28. The ending daily balance, ledger, or statement balance represents the checking account balance at the end of the day's processing period. Id. at 23; Hernandez T; Olsen T.

Banks typically use the ledger or available balance to determine overdrafts. See, e.g., R5 (reflecting claimant's ledger and available balance on his SVP profile); FDIC 2019 Statement (banks generally use ledger or available balance to assess overdraft fees); Tims v. LGE Cmty. Credit Union, 935 F.3d 1228, 1235 (11th Cir. 2019); Chambers v. NASA Fed. Credit Union, 222 F. Supp. 3d 1, 6 (D.D.C. 2016). The ledger balance represents the nominal amount of money in the account without reflecting any pending transactions or holds; it factors in only the settled transactions in determining the account balance. Nelson Dep. at 24; CFPB, Winter 2015 Supervisory Highlights 8. The available balance represents the funds immediately available for use; it calculates the account balance by including both settled and authorized, but unsettled, transactions, pending debits, and deposit holds. CFPB, Winter 2015 Supervisory Highlights 8; Salls v. Digital Federal Credit Union, 349 F. Supp. 3d 81, 85 (D. Mass. 2018). Put another way, the ledger balance includes only settled transactions, whereas the available balance includes authorized but unsettled transactions. See CFPB, Supervisory Highlights 8 (Winter 2015). The two balances may sometimes be the same, see, e.g., R5, but often they are not. When they differ, the available balance is usually lower than the ledger balance. Olsen T; Hernandez T; Salls, 349 F. Supp. 3d at 85.

For instance, when an accountholder deposits a check, banks generally make only a portion of that check available immediately, with the remainder held for a certain time period while the funds clear. See R1 (funds availability and deposit holds sections). The account's ledger balance might reflect the full amount of the deposit right away, but the available balance would include only the immediately available portion of the check. Or, as another example, when an accountholder uses his or her debit card to make a purchase in a store or online, a point-of-sale transaction, the merchant might place a "credit hold" on those funds, with the actual debit against the account occurring one or two days later when the transaction settles. Hernandez T. The account's ledger balance would not reflect the transaction until it actualizes or settles, but the available balance

18

would reflect the transaction "credit hold" immediately. <u>See, e.g.</u>, R7-20 (reflecting different transaction authorization and settlement dates).

An "overdraft" is a banking term describing a deficit in a bank account caused by drawing more money than the account holds. <u>See</u> Electronic Fund Transfers, 74 Fed. Reg. 59,033, 59,033 (Nov. 17, 2009); <u>Tims</u>, 935 F.3d at 1234. Section 1005.17(a) defines "overdraft service" as a service under which a financial institution assesses a fee or charge on a consumer's account for paying a transaction when the consumer has "insufficient or unavailable" funds in the account. 12 C.F.R. § 1005.17(a). Banking laws do not dictate how a bank calculates an overdraft fee. Thus, banks can choose to impose overdraft fees after someone withdraws more than their ledger balance or their available balance. Or they can elect not to charge overdraft fees at all. Problems arise when a customer uses her account based upon her ledger balance but the bank calculates overdrafts based upon available balance. Thus, a customer may use funds from her checking account believing she has sufficient funds based upon the ledger balance but nevertheless incurs an overdraft fee because she did not have sufficient funds using the available balance. Problems also arise when a customer did not realize that he could incur an overdraft fee on ATM and debit card transactions at all.

To address this problem of customer-perceived "surprise" or unexpected fees, the Legislature amended Reg. E in 2009 to impose strict disclosure and consent rules intended to "assist consumers in understanding how overdraft services provided by their institutions operate and to ensure that consumers have the opportunity to limit the overdraft costs associated with ATM and one-time debit card transactions." <u>See</u> 74 Fed. Reg. at 59,035-36. While the amendments cured many problems, they did not end all customer confusion.

Many banks followed the required procedures and issued the required forms but did not fully explain which method they used to calculate overdraft fees, thereby still leaving customers unaware or confused. Other banks adopted Reg. E's model forms in order to describe their overdraft policies, but customers still could not understand if "enough money" in their account meant ledger or available balance in the absence of further explanation. As a result, some customers felt deceived or misled when they incurred overdraft fees because they believed they had sufficient funds in their accounts. <u>See</u> <u>Chambers</u>, 222 F. Supp. 3d at 6 (customers can be misled or deceived when banks do not disclose the metric they use). In response, customers have filed lawsuits and arbitrations throughout the country challenging many financial institutions' Reg. E compliance. <u>See</u> <u>id.</u> at 5-6 (describing Reg. E history and citing early Reg. E disclosure lawsuits). Claimant bases his claims on this issue.

### Regulation E Allegations

Claimant alleges respondent violated Reg. E by failing to (1) include the required Reg. E notice; (2) substantially track Model Consent Form A-9; (3) provide the notice to claimant; (4) segregate the notice; (5) provide a reasonable consent opportunity; (6) remove impermissible extraneous information from the disclosure; (7) obtain claimant's affirmative consent; (8) document enrollment with claimant's signature; (9) use a scripted explanation of respondent's services; and by failing to (10) disclose its policies accurately, clearly, and in readily understandable language. <u>See</u> First Am. Comp. at ¶¶ 4-8, 15-19. Respondent argues that claimant creates nonexistent Reg. E requirements and that it satisfied Reg. E's actual requirements in every respect. But first it procedurally objects to claimant's standing to object to a disclosure he neither received nor read and to his "eve of trial" amended complaint as prejudicial, untimely, and contrary to his original

complaint.

Amendment

Respondent objected to and moved to prohibit claimant's amended claim dated June 22, 2022. Respondent stressed the unfairness of permitting claimant to amend his claim on the eve of hearing. Respondent also avers that claimant learned no new facts but instead had all the information he needed at the outset of this arbitration to amend his claim.

Claimant filed this arbitration on September 3, 2021. Respondent filed its answer on November 24, 2021. Respondent attached to its answer as exhibit C a copy of the actual 2012 disclosure it used during the relevant timeframe. Hence, as of that date, claimant knew he had attached the wrong document to his complaint. Claimant could have and should have sought leave to amend his claim at that time, seven months ago.

Claimant, however, proffers that he did not know the import of the attachment or that respondent would rely on that brochure to the exclusion of the single page document attached to his complaint until respondent submitted its first draft stipulation on March 4, 2022. Claimant thereafter sought a PMK deposition to verify the use of the brochure as the only 2012 disclosure, which claimant took on May 19, 2022 after a discovery order. After the deposition, the parties briefed respondent's dispositive motion based solely on the 2012 brochure's Reg. E compliance. Claimant notified respondent at the hearing on that motion of his intent to amend his claim after the decision on respondent's motion.

The Arbitrator finds that claimant did learn new information during the course of the case's information exchange warranting amendment. For example, claimant learned that (1) respondent provided the 2012 disclosure as part of a new account kit containing other documents, (2) respondent obtained customer consent verbally, and that (3) the banker checked the consent confirmation for the customer, among others. While the Arbitrator believes that claimant could and should have sought leave to amend his claim as soon as he learned this new information, courts generally permit parties to move to amend to conform to proof even during or after trial. See, e.g., Fed. R. Civ. Pro. 15(b).

The Arbitrator further finds that respondent did not suffer prejudice from the amendment because it alleged no new facts unknown to respondent, only new legal arguments based upon information respondent knew all along. As to the inconsistencies between claimant's original and amended complaints, the Arbitrator refers to FRCP 8(d)(3), which entitles parties to plead inconsistent facts in support of inconsistent theories of recovery, so long as they legitimately are uncertain what the evidence will show. See Chambers, 222 F. Supp. 3d at 16. Finally, the Arbitrator finds that the amendment serves the adjudication of the dispute's merits because it refocused the parties and the evidence on the correct disclosure, opt in procedure, and documentation process actually used in 2013 when claimant opened his account. Accordingly, the Arbitrator overrules respondent's objection to claimant's amended claim as untimely, prejudicial, and inconsistent.

Standing

To satisfy Article III's standing requirements, claimant must show that he suffered a concrete, particularized, actual, and not hypothetical injury in fact, fairly traceable to respondent's challenged action which a favorable decision could redress. Friends of the Earth, Inc. v. Laidlaw Env't Servs.

20

(TOC), Inc., 528 U.S. 167, 180–81 (2000). Respondent's standing challenge centers on the injury and traceability requirements because it avers the 2012 disclosure could not have harmed claimant when, by his own admission, he never received it.

The Arbitrator finds this standing challenge misconceives claimant's alleged injury. The regulators designed Reg. E to provide consumers with sufficient clarity about their banks' overdraft programs to make an informed choice about whether to join. See 12 C.F.R. § 1005.4(a)(1). The essence of claimant's claim is that the bank violated Reg. E because it did not afford him that choice, either by explaining the program to him, giving him the required notice, or using clear descriptions. In claimant's view, the language respondent used to describe its program – whether verbally or in the disclosure – did not match the reality of its available balance use and that, had someone clearly explained it to him, he could have declined enrollment and avoided costly overdraft fees. See Fludd v. South State Bank, No. 2:20-CV-1959-BHH, 2021 WL 4691587, at *4 (D.S.C. Oct. 7, 2021). The Arbitrator concludes that claimant has met his burden to establish a traceable concrete injury sufficient to confer standing and therefore overrules respondent's objection.

Regulation E Requirements

Reg. E implements the EFTA, which protects individual consumer rights by providing "a basic framework establishing the rights, liabilities, and responsibilities of participants in electronic fund … transfer systems." 15 U.S.C. § 1693(b) (2015). Reg. E governs how financial institutions obtain an accountholder's consent to charge overdraft fees on ATM and nonrecurring debit card transactions. 12 C.F.R. § 1005.17. Specifically, Reg. E provides:

> (1) General. Except as provided under paragraph (c) of this section, a financial institution holding a consumer's account shall not assess a fee or charge on a consumer's account for paying an ATM or one-time debit card transaction pursuant to the institution's overdraft service, unless the institution:
>
> (i) Provides the consumer with a notice in writing, or if the consumer agrees, electronically, segregated from all other information, describing the institution's overdraft service;
>
> (ii) Provides a reasonable opportunity for the consumer to affirmatively consent, or opt in, to the service for ATM and one-time debit card transactions;
>
> (iii) Obtains the consumer's affirmative consent, or opt-in, to the institution's payment of ATM or one-time debit card transactions; and
>
> (iv) Provides the consumer with confirmation of the consumer's consent in writing, or if the consumer agrees, electronically, which includes a statement informing the consumer of the right to revoke such consent.

12 C.F.R. §1005.17(b)(1).

Reg. E further provides guidance for the content and form of the mandatory opt-in notice. All disclosures must be "clear and readily understandable." 12 C.F.R. § 1005.4(a)(1); see also 15 U.S.C. § 1693c (requiring financial institutions to make disclosures "in accordance with the regulations of the" CFPB "in readily understandable language"). Opt-in notices must be

21

"substantially similar to" the A-9 Model Consent Form and include the following information:

(1) Overdraft service.

A brief description of the financial institution's overdraft service and the types of transactions for which a fee or charge for paying an overdraft may be imposed, including ATM and one-time debit card transactions.

(2) Fees imposed.

The dollar amount of any fees or charges assessed by the financial institution for paying an ATM or one-time debit card transaction pursuant to the institution's overdraft service, including any daily or other overdraft fees. If the amount of the fee is determined on the basis of the number of times the consumer has overdrawn the account, the amount of the overdraft, or other factors, the institution must disclose the maximum fee that may be imposed.

(3) Limits on fees charged.

The maximum number of overdraft fees or charges that may be assessed per day, or, if applicable, that there is no limit.

(4) Disclosure of opt-in right.

An explanation of the consumer's right to affirmatively consent to the financial institution's payment of overdrafts for ATM and one-time debit card transactions pursuant to the institution's overdraft service, including the methods by which the consumer may consent to the service; and

(5) Alternative plans for covering overdrafts.

If the institution offers a line of credit subject to Regulation Z (12 CFR part 1026) or a service that transfers funds from another account of the consumer held at the institution to cover overdrafts, the institution must state that fact. An institution may, but is not required to, list additional alternatives for the payment of overdrafts.

12 C.F.R. § 1005.17(d). Doing away with the practice of automatic customer enrollment in overdraft services, Reg. E thus requires financial institutions to secure consumers' "affirmative consent" to overdraft services through an opt-in notice, "substantially similar" to Model Consent Form A-9, which describes the institution's overdraft services in clear and readily understandable terms in a separate standalone disclosure. 12 C.F.R. § 1005.17.

A financial institution may not charge an overdraft fee on ATM and nonrecurring debit transactions unless it complies with each of these Reg. E requirements. 12 C.F.R. §1005.17(b)(1). Further, the Arbitrator must interpret Reg. E broadly and liberally "in favor of the consumer" to effectuate its remedial purpose. Clemmer v. Key Bank Nat'l Ass'n, 539 F.3d 349, 350 (6th Cir. 2008); Fludd, 2021 WL 4691587, at *14; Gunter v. United Fed. Credit Union, Case No. 3:15-cv-00483-MMD-WGC, 2017 WL 4274196, at *3 (D. Nev. Sept. 25, 2017); Bultemeyer v.

<u>Fitness All</u>., LLC, No. CV-12-2619-PHX-LOA, 2014 WL 667585, at *3 (D. Ariz. Feb. 20, 2014). The Arbitrator examines respondent's compliance with each of these requirements.

**Required Notice Content**

The Arbitrator finds that respondent's 2012 disclosure contained the Reg. E required content.

<u>Brief Description</u>

The disclosure included a "brief description of the financial institution's overdraft service" because it explained the three different types of overdraft protection the bank offered in 2013: the standard overdraft services, which automatically applied to all checking accounts; the overdraft services plan, which allowed a customer to prevent an overdraft by linking a related savings or credit account; and the DCOS, which permitted a customer to cover overdrafts on ATM and one-time debit card transactions. <u>See</u> R3; Hernandez T. It also illustrated its description and some of the differences in those plans through an example using the same $125 transaction drawn on a $100 available balance under each of the different plans. <u>See</u> R3.

<u>Fees</u>

The Arbitrator finds that the 2012 disclosure also described the types of transactions for which the bank would charge an overdraft fee and the dollar value of that fee, which in the case of the standard and DCOS overdrafts was $35. R3. The brochure explained that the DCOS applied to ATM and one-time debit card transactions and not recurring transactions; the standard protection covered "bounced" checks, ACH, and recurring transactions. <u>Id</u>. It informed the customer that the bank would charge an overdraft fee each time it covered a transaction up to four overdraft fees per day maximum. <u>Id</u>. The comparison chart clearly described the costs involved for each overdraft service offered by respondent. <u>Id</u>.

<u>Opt in Right</u>

The 2012 pamphlet also explained the customer's right to elect to opt in to DCOS or not and explained multiple ways to add the service if desired along with the required telephone number, online website link, and in person options. <u>Id</u>. The brochure explicitly explained that the customer must "want" respondent to authorize overdrafts on ATM and one time debit transactions and choose to opt in, unlike the standard protection in which the bank automatically enrolls each new customer. <u>Id</u>. The comparison chart also advised that customers do not have to enroll in both or either of the protection plans. <u>Id</u>.

<u>Alternative Plans</u>

The 2012 disclosure also informed customers of alternative plans for covering overdrafts, such as linking another account, permitting a declination of the transaction, or depositing a covering amount before the end of the day posting. <u>Id</u>. As another alternative, the brochure also offered customers tips on how to completely avoid overdraft fees, including free monitoring tools, such as online banking, text banking, and low balance alerts.

In sum, the Arbitrator denies claimant's assertion that the disclosure did not include the required notice and concludes that respondent's 2012 disclosure included all the mandatory components

23

required by 12 C.F.R. § 1005.17(d): (1) the service description; (2) the fees imposed; (3) fee limits; (4) the opt-in right; and (5) alternative plans for covering overdrafts. See R3.

## Substantially Similar

Section 1005.17(b)(1)(i) requires respondent to use a notice format "substantially similar" to Model Consent Form A-9. 12 C.F.R. § 1005.17(d). Claimant challenges the 2012 disclosure as dissimilar to Model Consent Form A-9 because respondent's disclosure consists of an eight-page brochure rather than a single page notice as drafted by the FRB after several rounds of consumer testing. Id. § 1005.17(d); 74 Fed. Reg. at 59,036. The Arbitrator disagrees.

Model Consent Form A-9 does not address which account balance calculation method a financial institution should use to determine whether a transaction results in an overdraft. See 12 C.F.R. pt. 1005, app. A; Tims, 935 F.3d at 1235; Chambers, 222 F. Supp. 3d at 6. Accordingly, the regulators expected banks to customize the notice to accurately describe their services as long as they also included the required content. Indeed, not customizing the form to reflect the bank's actual services could subject it to liability. See Tims, 935 F.3d at 1245. Consequently, the courts have allowed banks to include additional explanation, when necessary for accuracy, because Reg. E only demands substantial similarity, not exact duplication. See, e.g., Walbridge v. Northeast Credit Union, 299 F. Supp. 3d 338, 348 (D. N.H. 2018); Gunter, 2017 WL 4274196, at *3; Smith v. Bank of Haw., 2017 WL 3597522, *1, *8 (D. Haw. April 13, 2017); Ramirez v. Baxter Credit Union, 2017 WL 118859, *1, *7-8 (N.D. Cal. January 12, 2017); Pinkston-Poling v. Advia Credit Union, 2017 WL 5153218, *1, *3 (W.D. Mich. April 20, 2017).

Here, respondent virtually copied the single page model form as the first page of its disclosure. Compare R3 with Model Consent Form A-9. The rest of the brochure then describes its different overdraft services, how they work, how they compare, and how to avoid overdrafts completely. While perhaps more illustrative than other disclosures, the brochure specifically describes and explains respondent's overdraft services. The Arbitrator agrees with the majority of courts permitting banks to include additional explanation in an effort to accurately portray the customers' overdraft options and therefore finds respondent's 2012 disclosure "substantially similar" to Model Consent Form A-9.

## Disclosure Receipt

Claimant argues that he never received the 2012 disclosure at all. He specifically looked for all documents related to respondent in his four-drawer dresser where he keeps all his important documents and did not find anything. Wilson T. The Arbitrator agrees that, if respondent never gave claimant the 2012 disclosure but enrolled him in DCOS anyway, it would have violated Reg. E. See Chambers, 222 F. Supp. 3d at 16.

The Arbitrator finds claimant credible and believes that he looked for the documents but could not locate them. Nevertheless, even fully crediting claimant's testimony, the Arbitrator finds that claimant did not sustain his burden to prove by a preponderance of the evidence that respondent did not disclose its overdraft practices to him as Reg. E requires. The only individuals who definitively know what transpired when claimant opened his account are claimant, his son, and the banker who assisted him. Claimant does not remember the legally significant events of that day, his special needs son understandably did not testify, and the banker no longer works for respondent. Wilson T; Hernandez T. With no direct evidence based upon personal knowledge,

the Arbitrator must examine and weigh the circumstantial evidence. Here, the weight of the circumstantial evidence shows more likely than not that respondent delivered the required notice to claimant.

Respondent explained that the 2012 disclosures inside the 2013 brochures arrived at the branches from the marketing department via a third-party vendor who placed them inside a pre-assembled and shrink-wrapped folder containing the entire new customer account kit. Hernandez T. The branches then stored the sealed kits in the vault until needed for a customer. Id. The banker would not open the shrink-wrapped packet until the time he assisted the customer in opening a new account and then followed the instructions listed on the lime green cover sheet. Id.; R35.

Claimant specifically remembers physically walking into a branch office to open a checking account for the purpose of automatically depositing his monthly government check. Wilson T. While he does not recall the banker's name, he remembers meeting with a banker who helped him open the account that day. Id. Claimant agreed that he verbally provided information to the banker, although he does not recall the details. Id. He agrees that he signed the new account application. Id.; see also R2.

The account application corroborates claimant's memory as it displays claimant's personal information entered in someone else's handwriting but the acknowledgement signed by claimant. Wilson T; R2. The account application hence replicates respondent's 2013 opt in process for walk in new customers. See Hernandez T. In 2013, the banker would typically write down a walk-in customer's verbal information on the application form and then submit it to the customer for signature. Nelson Dep. at 35; Hernandez T. The customer's signature would acknowledge that he received the CAA, privacy policy, and the direct deposit guide, among other things. Hernandez T; Nelson Dep. at 40-44; C1; R2.

Pursuant to respondent's 2013 protocols, the banker would also open the shrink-wrapped new consumer account disclosure kit, remove the banker instruction sheet, and then follow the instructions. Hernandez T; R35. Before giving the kit to the customer, the banker recorded the specific serial number of that kit on the customer's application form so respondent could track which customer received which kit. Hernandez T; C1; R2; Nelson Dep. at 36-37. Again, the application in this case mirrors this practice: it shows the unique serial number of a new customer account kit and claimant's signature acknowledging his receipt of the CAA, privacy notice, and direct deposit guide, all of which the Arbitrator's physical inspection of the hard copy 2013 kit confirmed as included as part of the kit. It seems unlikely that claimant would have received only parts of the kit and not others.

While claimant correctly points out that his signature did not acknowledge receipt of the 2012 disclosure, the evidence credibly establishes that the disclosure was part of the kit. The banker instructions specifically list the disclosure as one of its contents. See R35. Respondent credibly testified that the kits all included the disclosure at the time. Hernandez T. Further, respondent did not prepare the kits itself; instead, it used an outside vendor whose job consisted of assembling and sealing the kits for uniformity. See id.

The instruction sheet also delineated mandatory steps for the banker to follow, including to review the DCOS disclosure with the new customer, which would be difficult to accomplish if the kit did not include the disclosure. Specifically, the instruction sheet required the banker to:

25

| 6. **Remove** this Banker Instruction Sheet |
| --- |
| + |
| 7. **Enter** the Consumer Disclosure NAK serial number on SVP |
| + |
| 8. **Review/Provide** the Consumer New Account Disclosure Kit and applicable addenda from Forms Online … |
| + |
| 9. **Review** Debit Card Overdraft Services Brochure (CNS8058) with your customer. Record customers preferences in SVP. |

R35 (original bold and shading; extra details omitted).

Respondent's credible contemporaneous business records show definitively that the banker completed step 7 – he entered the serial number of claimant's kit. See R2; R35. They also show that the banker completed the part of step 9 that required him to record customer preference in respondent's computer system. See R4-R5. The credible evidence thus circumstantially proves that the banker also more likely than not completed step 8 and the first part of step 9 if he definitely completed step 7 and the rest of step 9.

Further, the written instructions to the banker explicitly differentiate between the kit and the disclosure within the kit. In step 8, the instructions require the banker to review and provide the kit; whereas, step 9 requires the banker to review, but not provide, the DCOS disclosure because the customer already received it in the kit. See R35. But step 9 still separately required the banker to review the disclosure with the customer. Id.; see also Hernandez T; R35; R26 at ¶ 13; R4.

Respondent's internal practices and policies in effect in 2013 reinforce these conclusions as they also specifically directed the banker to use the brochure. R4; Hernandez T. Respondent's computer system then functioned as safeguard to make sure bankers did not forget this critical step. It included a verification field, which required the banker to verify by selecting "yes" that he had provided the "Overdraft Services brochure" to the customer. Hernandez T; R4; R26 at ¶ 13. If the banker selected no, the computer would generate an error message reminding the banker to give the brochure to the customer. Hernandez T; R4. The computer system would not allow the banker to proceed with the online process unless he verified that he had given the disclosure brochure to the new customer. Hernandez T; R4. The written protocols also stressed the legal significance of this step; it advised the banker to "keep in mind" that the brochure contained the required DCOS disclosures and needed to be given to the customer before enrolling in the program. Hernandez T; R4.

Claimant implies that the banker could have falsified compliance with all these steps and requirements because claimant does not have the kit or the disclosure. Yet documents, even important ones, can get lost or misplaced over the course of nine years, particularly when claimant moved homes in the meantime, received documents at his mother's home, and rightfully focused his attention and time on his son's welfare. See Wilson T. Moreover, respondent specifically investigated the banker's personnel file to check for reprimands, discipline, or improper conduct but found nothing other than a banker who left on his own accord to pursue other career opportunities. Hernandez T. Examining the record as a whole, the Arbitrator finds that the totality of the evidence more likely than not proves that the banker performed his duty as respondent and Reg. E required.

26

**Segregated Disclosure**

Reg. E sets out procedures for how financial institutions must present their disclosures; it requires financial institutions to disclose their overdraft policies in a written notice "segregated from all other information." 12 C.F.R. §1005.17(b)(1)(i); see Tims, 935 F.3d at 1245. Claimant maintains that respondent failed to segregate the 2012 disclosure in two respects: (1) respondent included seven pages in the same document with the single page notice Reg. E requires; and (2) respondent provided the 2012 disclosure as part of a new account kit, which consisted of several separate documents.

Reg. E requires segregation to avoid financial institutions from burying overdraft fee disclosures in lengthy agreements and disclosures replete with legalese. Regulators wanted customers to be able to read a separate document just about the bank's overdraft fees and practices in order for them to make informed choices about enrollment in overdraft programs and to avoid "surprise" fees. Generally, segregate means to isolate; aggregate means to add, collect, join or group like with like, whereas segregate disassociates like from dislike. In this context, segregate means that the bank must separate its overdraft disclosures from other unrelated information, such as information about safety deposit boxes, savings accounts, wire transfers, and other bank functions and services.

The requirement does not mean that the bank cannot disclose overdraft fees with other overdraft information. On the contrary, Model Consent Form A-9 aggregates different overdraft services in one disclosure, and Reg. E requires respondent to describe its overdraft programs and alternative plans for handling overdrafts in one disclosure. Accordingly, the Arbitrator concludes that Reg. E's segregation requirement obligated respondent to provide a standalone, single document that describes its overdraft practices and policies.

Further, respondent complied when it created a standalone single document overdraft disclosure. While the model form consists of one page – and respondent's 2022 disclosure also consists of one page – nothing in Reg. E prohibits respondent from using more than a single page if necessary to describe its overdraft program. Thus, while its current shorter version looks more like the model, its former 8-page version did not violate Reg. E's segregation requirement because all the information in these eight pages contained information either required by Reg. E or used to describe respondent's overdraft practice. Finally, while Reg. E does not squarely address the issue, the Arbitrator finds no regulation, interpretation, or official comment barring respondent from containing the standalone disclosure in a folder of other required disclosures as long as the bank draws specific attention to the disclosure, permits the customer to consider it before enrollment, and obtains consent separately from other consents, as respondent's protocols required here. The Arbitrator therefore concludes that respondent complied with Reg. E's segregation requirement because it did not bury the information in other agreements and disclosures but prominently displayed the information in its own document, an eight-page brochure about overdraft fees and protections.

**Reasonable Opportunity**

Reg. E also requires respondent to have provided claimant with a "reasonable opportunity" to affirmatively consent to respondent's overdraft services. 12 C.F.R. §1005.17(b)(1)(ii). Claimant asserts that respondent failed to provide him a reasonable opportunity to review DCOS information

27

before opting in. Under Reg. E, a consumer has a reasonable opportunity to provide affirmative consent when, among other things, "it provides reasonable methods by which the consumer may affirmatively consent." 12 C.F.R. § 1005.17, cmt.17(b)-4. The comment then lists examples of a reasonable consent opportunity: (1) a mail in form; (2) a dedicated telephone line; (3) a hand in form; and (4) electronically. Id.

Respondent explained that it provided claimant with the required reasonable opportunity because its business records show that the banker followed its 2013 procedures to review the Reg. E disclosure and overdraft services with the customer and then record the customer's verbal assent or declination. Hernandez T; Nelson Dep. at 48-49. Claimant argues that this process did not afford him a reasonable opportunity to consider his options because respondent did not first provide claimant the disclosure, second have him take the disclosure away to consider, and only then come back to deliver his decision.

The Arbitrator finds this argument inconsistent with Reg. E's official comments, which specifically permit a financial institution to provide the required notice "prior to *or at* account-opening." Comment 17(b)-1.iv (italics added). Reg. E thus contemplates that a bank can provide a reasonable opportunity to consent during the account opening process, rather than only during a separate process, as claimant suggests. See id. Indeed, Reg. E comments explicitly allow respondent to require its customers, like claimant, to choose whether or not to enroll in DCOS as part of its account opening process:

> A financial institution may require a consumer, as a necessary step to opening an account, to choose whether or not to opt into the payment of ATM or one-time debit card transactions pursuant to the institution's overdraft service.

Id. Accordingly, the Arbitrator concludes both that Reg. E permitted respondent to afford claimant a reasonable opportunity to consent as part of the account opening process and that respondent's business records establish that it did so here. See Hernandez T; R2-5.

## Extraneous Information

Claimant challenges respondent's 2012 disclosure as containing impermissible extraneous information in violation of Reg. E; respondent countered that its disclosure contained only permitted information. The Arbitrator agrees that the Legislature preferred a shorter rather than longer disclosure but disagrees that respondent included impermissible information.

Reg. E discourages financial institutions from liberally adding language to opt-in agreements based on the model form. The regulation itself prohibits the inclusion of "information not specified or otherwise permitted by" the regulation's terms. 12 C.F.R. § 1005.17(d); see also id. at § 1005.17(d)(6) ("Permitted modifications and additional content"). In promulgating this section of Reg. E, the FRB plainly wanted opt-in agreements to be short and clear. See Final Rule, 74 Fed. Reg. at 59,047 (noting that the model form was edited to make it "shorter and clearer"); id. at 59,048 (describing efforts to "eliminate unnecessary language"); id. at 59,048–49 (expressing concern that additional language might "make the form lengthy," "confuse customers," or "diminish" understanding). Presumably, in part for this reason, respondent's current 2022 disclosure consists of a single page, much like the model form. See R25.

However, the disclosure's length does not determine its legality as Reg. E does not require a

28

specific page limit for disclosures. To examine its legality, the Arbitrator must examine its contents as compared to Reg. E's permissible inclusions. As noted above, section 1005.17(d)(1)-(5) describes the required content:

> **(1) Overdraft service.** A brief description of the financial institution's overdraft service and the types of transactions for which a fee or charge for paying an overdraft may be imposed, including ATM and one-time debit card transactions.
> **(2) Fees imposed.** The dollar amount of any fees or charges assessed by the financial institution for paying an ATM or one-time debit card transaction pursuant to the institution's overdraft service, including any daily or other overdraft fees. If the amount of the fee is determined on the basis of the number of times the consumer has overdrawn the account, the amount of the overdraft, or other factors, the institution must disclose the maximum fee that may be imposed.
> **(3) Limits on fees charged.** The maximum number of overdraft fees or charges that may be assessed per day, or, if applicable, that there is no limit.
> **(4) Disclosure of opt-in right.** An explanation of the consumer's right to affirmatively consent to the financial institution's payment of overdrafts for ATM and one-time debit card transactions pursuant to the institution's overdraft service, including the methods by which the consumer may consent to the service; and
> **(5) Alternative plans for covering overdrafts.** If the institution offers a line of credit subject to Regulation Z (12 CFR part 1026) or a service that transfers funds from another account of the consumer held at the institution to cover overdrafts, the institution must state that fact. An institution may, but is not required to, list additional alternatives for the payment of overdrafts.

12 C.F.R. § 1005.17(d)(1)-(5) (original bold). Reg. E's official interpretation elaborates on these descriptions:

> 17(d) Content and Format
> 1. **Overdraft service.** The description of the institution's overdraft service should indicate that the consumer has the right to affirmatively consent, or opt into payment of overdrafts for ATM and one-time debit card transactions. The description should also disclose the institution's policies regarding the payment of overdrafts for other transactions, including checks, ACH transactions, and automatic bill payments, provided that this content is not more prominent than the description of the consumer's right to opt into payment of overdrafts for ATM and one-time debit card transactions. As applicable, the institution also should indicate that it pays overdrafts at its discretion, and should briefly explain that if the institution does not authorize and pay an overdraft, it may decline the transaction.
> 2. **Maximum fee.** If the amount of a fee may vary from transaction to transaction, the financial institution may indicate that the consumer may be assessed a fee "up to" the maximum fee. The financial institution must disclose all applicable overdraft fees, including but not limited to:
> i. Per item or per transaction fees;
> ii. Daily overdraft fees;
> iii. Sustained overdraft fees, where fees are assessed when the consumer has not repaid the amount of the overdraft after some period of time (for example, if an account remains overdrawn for five or more business days); or
> iv. Negative balance fees.

3. **Opt-in methods.** The opt-in notice must include the methods by which the consumer may consent to the overdraft service for ATM and one-time debit card transactions. Institutions may tailor Model Form A-9 to the methods offered to consumers for affirmatively consenting to the service. For example, an institution need not provide the tear-off portion of Model Form A-9 if it is only permitting consumers to opt-in telephonically or electronically. Institutions may, but are not required, to provide a signature line or check box where the consumer can indicate that he or she declines to opt in.

4. **Identification of consumer's account.** An institution may use any reasonable method to identify the account for which the consumer submits the opt-in notice. For example, the institution may include a line for a printed name and an account number, as shown in Model Form A-9. Or, the institution may print a bar code or use other tracking information. *See also* comment 17(b)-6, which describes how an institution obtains a consumer's affirmative consent.

5. **Alternative plans for covering overdrafts.** If the institution offers both a line of credit subject to Regulation Z (12 CFR part 1026) and a service that transfers funds from another account of the consumer held at the institution to cover overdrafts, the institution must state in its opt-in notice that both alternative plans are offered. For example, the notice might state "We also offer *overdraft protection plans,* such as a link to a savings account or to an overdraft line of credit, which may be less expensive than our standard overdraft practices." If the institution offers one, but not the other, it must state in its opt-in notice the alternative plan that it offers. If the institution does not offer either plan, it should omit the reference to the alternative plans.

(original bold). Section 1005.17(d)(6) identifies additional permissible modifications and inclusions:

**(6) Permitted modifications and additional content.** If applicable, the institution may modify the content required by § 1005.17(d) to indicate that the consumer has the right to opt into, or opt out of, the payment of overdrafts under the institution's overdraft service for other types of transactions, such as checks, ACH transactions, or automatic bill payments; to provide a means for the consumer to exercise this choice; and to disclose the associated returned item fee and that additional merchant fees may apply. The institution may also disclose the consumer's right to revoke consent. For notices provided to consumers who have opened accounts prior to July 1, 2010, the financial institution may describe the institution's overdraft service with respect to ATM and one-time debit card transactions with a statement such as "After August 15, 2010, we will not authorize and pay overdrafts for the following types of transactions unless you ask us to (see below)."

12 C.F.R. § 1005.17(d)(6); (original bold).

The Arbitrator analyzed the 2013 DCOS brochure in depth and in comparison, with the regulations, interpretations, and comments and, on that basis, concludes that it contains information required and permitted by Reg. E. The first page contained all information required by Reg. E and included in the Model Consent Form A-9, and the last page explained the disclosure's terms and how to reach respondent with any questions:

Important things you should know

**What you need to know about Overdrafts and Overdraft Fees**

An overdraft occurs when you do not have enough money in your account to cover a transaction but we pay it anyway. We can cover your overdrafts in two different ways:

1. We have <u>standard overdraft practices</u> that come with your account.
2. We also offer overdraft protection plans, such as a link to an eligible savings account, eligible line of credit or eligible credit card, which may be less expensive than our standard overdraft practices. To learn more, ask us about these plans.

This notice explains our standard overdraft practices.

**What are the standard overdraft practices that come with my account**?

We <u>do</u> authorize and pay overdrafts for the following types of transactions:
• Checks and other transactions made using your checking account number
• Automatic bill payments (such as recurring debit card and ACH payments)

We will not authorize and pay overdrafts for the following types of transactions unless you ask us to (see below):
• ATM transactions
• Everyday debit card transactions (such as one-time debit card and ATM card purchases)

We pay overdrafts at our discretion, which means we do not guarantee that we will always authorize and pay any type of transaction. If we do not authorize and pay an overdraft, your transaction will be declined.

**What fees will the bank charge if it pays my overdraft**?

Under our <u>standard overdraft practices</u>:

• We will charge you a fee of up to $**35** each time we pay an overdraft item to your account
• There is a limit of **four** overdraft and returned item fees per day

**What if I want Wells Fargo to authorize and pay overdrafts on my ATM and everyday debit card transactions**?

If you want us to authorize and pay overdrafts on ATM and everyday debit card transactions, please contact us at 1-877-804-4883, 24 hours a day, 7 days a week or speak to a banker at any Wells Fargo location. Or sign on to Wells Fargo Online® Banking and click the "Overdraft Services" link on the Account Activity page.

<u>See</u> R3 (original emphasis and coloration). Reg. E requires all of this content, which the model

31

form also includes. <u>Compare</u> Model Consent Form A-9 <u>with</u> R3.

The next page of the 2012 disclosure describes respondent's alternative overdraft plans and programs, also specifically required by Reg. E:

<span style="color:red">You've got options</span>

<span style="color:blue">Optional services that may offer protection to avoid overdrafts</span>

**Overdraft Protection**

Protect yourself from the inconvenience of declined transactions or returned ("bounced") checks. When you link one of your eligible Wells Fargo savings or credit accounts to your checking account, the bank will use available funds in your linked accounts to authorize your transactions if you don't have enough money in your checking account.

• There is no fee to sign up for this service
• If your account balance goes negative and the bank transfers money to bring your balance current, a single Overdraft Protection Transfer fee[2] will be assessed regardless of how many transactions are presented for payment that day

**Debit Card Overdraft Service**[3]

You can choose how Wells Fargo handles your ATM and everyday debit card transactions.

If you add optional Debit Card Overdraft Service to your checking account, the bank may approve (at our discretion) ATM and everyday debit card *transactions if you don't have enough money in your checking account* or linked overdraft protection accounts at the time of the transaction.

• There is no fee to sign up for this service
• If your account is negative, our standard overdraft fee of up to $35 per item[6] will apply if a covering[4] deposit or transfer is not made before the posted cutoff time the same business day

If you do not add this service, your ATM and everyday debit card transactions will be declined at the time of the transaction if you don't have enough money in your account; you will not be charged an overdraft fee if these types of transactions cause an overdraft. The service does not apply to debit card transactions you have established for recurring payments (such as utilities or club memberships). These may continue to be authorized and paid into overdraft, at our discretion, even if you do not add Debit Card Overdraft Service and our overdraft fees[6] and policies will apply.

Please see back panel of brochure for additional details.  Lift to open

<u>See</u> R3 (original coloration and emphasis). The Arbitrator finds that Reg. E specifically requires all

32

of this information because it mandates that respondent explain any alternative overdraft practices it uses in addition to its standard overdraft program.

Respondent next included explanatory comparison charts and tips to avoid overdrafts:

### Control of your accounts is in your hands

Managing your checking account is the foundation of good money management skills. Wells Fargo offers tools and services that meet your personal financial style — with ways to keep track of your account balance and choices on how to manage your account.

### What is an overdraft?

Overdrafts occur when you spend more money than you have in your checking account and the bank pays your transaction.

### How to avoid overdrafts

• **Don't spend more than you have**
Know your available balance,[1] the amount of money you can actually use.
• **Keep track of your spending**
Record every deposit and withdrawal including checks, recurring payments, debit card purchases, and cash withdrawals.
• **Don't forget outstanding transactions**
The current available balance provided by the bank may not include all transactions, such as checks or upcoming automatic payments.
• **Keep a cushion in your account**
By keeping a little extra in your checking account, you can cover any outstanding expenses that don't yet appear in your available balance, and avoid overdrafts.

### Online and mobile: You decide how to manage and track your spending

Sign up for convenient services and start managing your account via internet or mobile phone.

### Services to help avoid overdrafts

•Text Banking[5] — Check your available balance1 before you make a purchase. You can quickly request and receive information via text message.
• Mobile Banking[5] — Bank on the go, check balances and transfer funds between your Wells Fargo accounts using your phone's web browser
•Account Alerts — Stay informed. Set up a low balance alert to your email or wireless device[5]
• My Money Map — Take control of your finances with an online tool that helps you view your spending, budgeting and savings with one click

<u>See</u> R3 (original coloration and emphasis). While not required by Reg. E, the Arbitrator finds such tips permissible. The charts qualify as illustrative descriptions of respondent's overdraft programs

33

and how they work separately or combined. They also highlight the differences between the options, also a helpful description of its overdraft services.

The Arbitrator further finds that the tips qualify as a permissible alternative plan. Respondent essentially advises consumers how to avoid overdrafts completely – a smart alternative plan to any of its products. Indeed, rather than finding a Reg. E violation, the Chambers court approved of similar examples and tips as *saving* the bank from violating Reg. E with an ambiguous overdraft description:

> opt-in agreement adopts the model form's definition of an overdraft, explaining that an "overdraft occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway." … The parties spill much ink disputing whether this language, viewed in isolation, refers to the actual or available balance. … But the Court need not settle that dispute, because the opt-in agreement does not use this language in isolation. In an introductory paragraph not contained in the model form, the opt-in agreement provides examples of situations that might result in an overdraft. These examples—"when you inadvertently calculate your available balance" or "when funds from a recent deposit are not available"— explicitly make overdrafts a function of the customer's available balance.

222 F. Supp. 3d at 15-16. The Arbitrator agrees with Chambers' analysis. Reg. E not only permits respondent's examples and tips; but, like the illustrations in Chambers, they help rescue the 2012 disclosure from impermissible ambiguity. See id. In sum, while the Arbitrator agrees that respondent's disclosure could have been shorter and more concise, it did not violate Reg. E by including permissible, descriptive information about its overdraft programs.

## Unscripted Discussion

Claimant avers that respondent violated Reg. E when it allowed its banker to engage in an unscripted dialogue with claimant about DCOS because it permitted the banker to unduly influence and mislead him. The Arbitrator concludes that claimant failed to sustain his burden of proof on this issue. Had claimant introduced credible evidence that the banker persuaded, misled, or tricked him into DCOS enrollment, then the Arbitrator would agree that respondent violated Reg. E. Yet claimant introduced no such evidence. Claimant testified quite forthrightly and never mentioned any efforts to influence, push, force, or cajole him into enrolling in respondent's DCOS program. Wilson T.

Further, the Arbitrator finds no regulatory provision requiring respondent to use a script or standard explanation when meeting with new checking account customers. Nor has the Arbitrator found any provision prohibiting discussions between customers and bankers about overdraft options. Indeed, claimant's position would arguably prohibit bankers from even answering customer questions unless scripted, which would run afoul of Reg. E's purpose of helping customers reach informed banking decisions. In sum, the Arbitrator concludes that respondent did not violate Reg. E by failing to follow a script because Reg. E imposes no such requirement.

## Clear and Readily Understandable

Reg. E mandates that respondent describe its overdraft program in "clear and readily understandable" language. 12 C.F.R. § 1005.4(a)(1); see also 15 U.S.C. § 1693c. Claimant argues

that respondent's disclosure lacks clarity in several respects: (1) it does not properly disclose respondent's use of available balance to calculate overdraft fees; (2) the phrase "enough money in your account" reflects ledger, not available, balance, contrary to respondent's actual practice; and (3) the use of the phrase "we pay it anyway" falsely implies that respondent uses its own money to cover an overdraft.

In short, claimant argues that respondent's 2012 disclosure misleads customers because it invites them to believe that the bank uses the ledger balance method, rather than the available balance metric it really uses. Or, at a minimum claimant argues, the disclosure is ambiguous because it does not clearly identify the methodology respondent uses to calculate an overdraft. And claimant continues, if ambiguous, the 2012 disclosure cannot satisfy Reg. E's "clear and readily understandable" mandate. See 12 C.F.R. § 205.4(a)(1).

A term is ambiguous when the parties can reasonably understand it in more than one way. Black's Law Dictionary (11th ed. 2019). In other words, the disclosure is ambiguous if it has more than one reasonable interpretation; although, importantly, it is not ambiguous simply because the parties disagree about its meaning. Chambers, 222 F. Supp. 3d at 9; see also Diamond Point Plaza Ltd. v. Wells Fargo, NA, 400 Md. 718, 929 A.2d 932, 951-52 (2007). Conversely, a contract is unambiguous when, after examining the contract as a whole and affording its words their plain meaning, the contract is capable of only one reasonable interpretation. Claimant explains that respondent's overdraft definition – When you do not have enough money in your account to cover a transaction but we pay it anyway – lacks clarity because it could ambiguously refer to either ledger or available balance.

In the motion to dismiss context, several courts have agreed with claimant and denied motions to dismiss based upon virtually identical allegations about identical disclosure language. See, e.g., Tims, 935 F.3d at 1235 (denying motion to dismiss based upon same definition of overdraft); Grenier v. Granite State Credit Union, Civil No. 21-cv-00534-LM, 2021 DNH 172 P., *1, *4 (D. New Hamp. November 8, 2021) (same); Fludd, 2021 WL 4691587, at *15 (same); Adams v. Liberty Bank, 2021 WL 3726007, *1 (D. Conn. August 23, 2021) (same); Wellington v. Empower Federal Credit Union, 533 F. Supp. 3d 64, 70-71 (N.D.N.Y. 2021) (same); Richard v. Glens Falls Nat'l Bank, 2021 WL 810218, *1, * 9 (N.D.N.Y. Mar. 3, 2021); Roy v. ESL Fed. Credit Union, 2020 WL 5849297, *1, *7 (W.D.N.Y. Sept. 30, 2020); Lussoro v. Ocean Fin. Fed. Credit Union, 456 F. Supp. 3d 474, 495-96 (E.D.N.Y. 2020); Kelly v. Cmty. Bank, N.A., Case No. 19-cv-919 MAD- CFH2020 WL 777463, at *9 (N.D.N.Y February 18, 2020) (same); Bettencourt v. Jeanne D'Arc Credit Union, 370 F. Supp. 3d 258, 262 (D. Mass. 2019) (same); Salls, 349 F. Supp. 3d at 87 (same); Walbridge, 299 F. Supp. 3d at 343 (same); Pinkston, 227 F. Supp. 3d at 856 (same); Ramirez, 2017 WL 118859, at *7 (same); Smith, 2017 WL 3597522, at *5; Gunter, 2016 WL 3457009, at *4 (same); Wodja v. Wash. State Emps. Credit Union, 2016 WL 3218832, at *2–3 (W.D. Wa. June 9, 2016) (same); In re: TD Bank, N.A., 150 F. Supp. 3d 593, 621–24 (D.S.C. 2015) (MDL); see also Roberts v. Capital One, N.A., 719 Fed. Appx. 33, 35–37, 2017 WL 5952720, at *2–*3 (2d Cir. Dec. 1, 2017) (finding term overdraft ambiguous in the absence of a clear explanation of when an overdraft occurs). Agreeing with these courts, the Arbitrator likewise denied respondent's motion to dismiss because claimant sufficiently pled a cause of action based upon the disclosure's ambiguity. See DM Order, dated 6/20/22.

Indeed, even now after the evidentiary hearing, if respondent's 2012 disclosure consisted of no further explanation than this single definition, the Arbitrator would agree with claimant that the phrase "enough money" does not adequately and unambiguously provide a "clear and readily

understandable" explanation of "the institution's overdraft service." 12 C.F.R. §§ 1005.4(1)(1), 1005.17(b)(1)(i); see, e.g., Tims, 935 F.3d at 1238, 1243-44 (ambiguous because could describe either the available or ledger balance calculation method which plausibly does not describe the overdraft service in a "clear and readily understandable" way); Wellington, 2021 WL 1377789, at *5; Bettencourt, 370 F. Supp. 3d at 262, 265; Walbridge, 299 F. Supp. 3d at 343; Salls, 349 F. Supp. 3d at 90; Pinkston, 227 F. Supp. 3d at 857; Walker v. People's United Bank, 305 F. Supp. 3d 365, 376 (D. Conn. 2018).

As Tims so aptly explained, when the opt in agreement "sheds no light" on what enough money in the account means, it simply raises the question of how the bank determines enough money – is it enough money to cover only settled transactions or to cover authorized but not yet settled transactions as well. 935 F.3d at 1238. In that case, the court found the use of the phrase ambiguous because neither the opt in nor account agreement articulated which method would trigger an overdraft. Id. at 1239-40.

The court then distinguished the agreements before it from those in Chambers:

> Importantly, in Chambers, the Opt-In Agreement used the phrase "available balance." In addition, the Account Agreement in Chambers contained a subsection addressing "Available Balances to Make Transactions," which linked the concept of available balance to the mechanics of when and how the bank would assess overdrafts. Finally, the Opt-In Agreement in Chambers provided examples illustrating when an account would not have "enough money" and thus be subject to an overdraft.

> None of those factors is present in this case. The agreements here did not use the phrase "available balance"; the Account Agreement nowhere explained the mechanics of how and when [the bank] would assess overdrafts, nor linked the concept of an "available balance" to those mechanics; and the Opt-In Agreement provided no examples illustrating when a consumer would not have "enough money" to cover a transaction and thereby trigger an overdraft. Because of these three distinctions, we cannot say the Opt-In and Account Agreements in this case clearly demonstrated the parties' intent that [the bank] would use the available balance calculation method when assessing overdraft fees.

Id. at 1242; see also Lussoro, 456 F. Supp. 3d at 485-86 (distinguishing Chambers because disclosure's lack of examples permitted ambiguity); Smith, 2019 WL 404423, at *12 (if only the bank had "provided the same example in the Account Agreement, this ambiguity might have been avoided entirely"); Ramirez, 2017 WL 1064991, at *n1 (distinguishing Chambers because, unlike the disclosure before it, the Chambers opt "conspicuously described" and illustrated when a customer might not have "enough money" to cover a transaction); Walbridge, 299 F. Supp. 3d at 345-46 (concluding based on the same three factors that the financial institution did not clearly communicate an intent to use the available balance in charging overdraft fees).

The Arbitrator finds respondent's 2012 disclosure most analogous to the opt in agreement analyzed in Chambers. In Chambers, the bank used the same language respondent did, which it pulled directly from Model Consent Form A-9 complete with the same underline:

36

> an <u>overdraft</u> occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway.

222 F. Supp. 3d at 10 (original underline). As here, the parties in <u>Chambers</u> hotly disputed the meaning of the definition, the customer interpreting it as the ledger balance and the bank interpreting it as the available balance. <u>Id.</u> The court examined the opt in agreement as a whole and noted that the bank had used examples in the disclosure to explain different overdraft scenarios:

> [the opt in agreement] provides examples of when a customer might find herself without "enough money in [her] account to cover a transaction"— such as when she "inadvertently miscalculate[s] [her] available balance," or "when funds from a recent deposit are not available."

<u>Id.</u> The bank also pointed out that the opt in agreement did not refer to ledger balance at all. <u>Id.</u> at 12. The court agreed, emphasizing that, unlike the term ledger balance, the agreement used the term available balance "in critical provisions dealing specifically with overdrafts and debit transactions—the subject matter of this case." <u>Id.</u> The court therefore concluded as a matter of law that

> By specifically invoking the phrase "available balance," the opt-in agreement makes clear that balance will be used in calculating overdrafts and imposing fees. There is no competing reference to an actual or ledger balance. Under the terms of the opt-in agreement, then, overdrafts are a function of the available balance … the relevant agreements unambiguously convey that the [the financial institution] will impose overdraft fees on debit transactions that overdraw the available balance. … The relevant agreements unambiguously disclose that overdraft fees would be imposed on debit transactions that overdrew her available balance. … The agreements at issue here unambiguously reveal the Credit Union's intention to impose overdraft fees when Chambers' debit transactions overdrew her available balance.

<u>Id.</u> at 10, 12-15, 17. The court bolstered its conclusion by citing to the customer account agreement, which also linked overdrafts to available balance even though it did not define the term. <u>Id.</u> at 10-11.

Here, as in <u>Chambers</u>, respondent took its overdraft definition directly from Model Consent Form A-9 right down to the same underline:

> An <u>overdraft</u> occurs when you do not have enough money in your account to cover a transaction but we pay it anyway

R3. Also as in <u>Chambers</u>, respondent cross-referenced the account agreement and the bank's funds availability policy and, more importantly, specifically used the term available balance in its disclosure. <u>Id.</u> More so than the <u>Chambers</u> bank, which used the term "available balance" once in its opt in agreement, respondent used the term five times in its 2012 disclosure, when it (1) explained how to avoid overdrafts by using text banking to determine the "available balance" before making a purchase; (2) compared the overdraft protection options by using a column expressly labeled "checking available balance;" (3) advised customers to "know your available balance" to avoid overdrafts; (4) reminded customers that the "available balance" may not include

37

all transactions; and when it (5) suggested customers keep a cushion in their accounts to cover any expenses not yet appearing in the "available balance." R3. "Available" is defined as "capable of use for the accomplishment of a purpose: immediately utilizable." Available, Webster's Third New International Dictionary 150 (2002). Thus, even the word's definition links the concepts of enough money and immediately usable.

Like the Chambers bank, respondent also used examples to illustrate its overdraft services. See R3. The examples themselves show that respondent used the available balance as its overdraft metric. See id. Finally, in lockstep with the Chambers' disclosure, respondent's 2012 disclosure never mentions ledger balance. See id. Given these similarities, Chambers provides an excellent lens through which to analyze the 2012 disclosure's clarity.

Claimant argues that even though respondent used the word "available," it did so without definition or clarity and therefore only confused the consumer further. The Arbitrator finds, however, that respondent did include a simple, layperson definition of available balance. Respondent explicitly advised customers to avoid overdrafts by knowing their available balance:

> Know your available balance,[1] the amount of money you can actually use

R3. In this clause, respondent explained that available balance is the amount of money you can actually use. Had the disclosure contained only the model form's definition of overdraft without reference to the type of balance used to determine "enough money," the Arbitrator would agree with claimant and the legion of cases finding non-customized disclosures misleading at worst and ambiguous at best. But, here, even more so than the financial institution in Chambers, respondent referred its customers not once but five times to the available balance in the same 2012 disclosure as its overdraft measure, and never once mentioned ledger balance. Under these circumstances, reviewing the 2012 disclosure as a whole, without reference to the 2013 or 2020 CAA, the Arbitrator concludes as a matter of law that respondent's 2012 disclosure complied with its Reg. E duty to explain its overdraft services in "clear and readily understandable" language.

Claimant emphasizes that the 2022 disclosure, unlike the 2012 disclosure, explicitly defines available balance and specifically references available balance in its overdraft definition. Thus, claimant suggests, the 2012 cannot be clear and readily understandable given the 2022 changes. The Arbitrator agrees that the 2022 disclosure provides more precision and greater clarity than the 2012 version. Compare R3 with R25. But it does not follow that the 2012 version was unclear simply because respondent was able to later clarify it further. On the contrary, financial institutions should strive to achieve best practices, not minimum compliance. Accordingly, the Arbitrator applauds the improvements and respondent's decision to transform a clear and readily understandable disclosure into a clearer, simpler disclosure, even easier to understand. Finally, as a matter of public policy and equity, the Arbitrator will not use respondent's compliance improvements to impose liability against it based upon its earlier compliant, *albeit* less precise, version.

## Affirmative Consent

Reg E. requires respondent to obtain the customer's "affirmative consent" to its overdraft services. See 12 C.F.R. § 1005.17(b)(1)(ii). Affirmative consent requires "plain and clear consent ... before certain acts or events, such as changes in policies that could impair an individual's rights or interests." Affirmative-Consent Requirement, Black's Law Dictionary (11th ed. 2019). Thus, if

respondent's disclosure did not adequately convey the circumstances under which it would charge overdraft fees, then it would violate Reg. E based upon lack of affirmative consent. See Tims, 935 F.3d at 1243-44; Salls, 349 F. Supp. 3d at 90.

The official comments elaborate on the opt in methods and affirmative consent requirement:

> 3. **Opt-in methods.** The opt-in notice must include the methods by which the consumer may consent to the overdraft service for ATM and one-time debit card transactions. Institutions may tailor Model Form A-9 to the methods offered to consumers for affirmatively consenting to the service. For example, an institution need not provide the tear-off portion of Model Form A-9 if it is only permitting consumers to opt-in telephonically or electronically. Institutions may, but are not required, to provide a signature line or check box where the consumer can indicate that he or she declines to opt in.
>
> 6. **Affirmative consent required.** A consumer's affirmative consent, or opt-in, to a financial institution's overdraft service must be obtained separately from other consents or acknowledgements obtained by the institution, including a consent to receive disclosures electronically. An institution may obtain a consumer's affirmative consent by providing a blank signature line or check box that the consumer could sign or select to affirmatively consent, provided that the signature line or check box is used solely for purposes of evidencing the consumer's choice whether or not to opt into the overdraft service and not for other purposes. An institution does not obtain a consumer's affirmative consent by including preprinted language about the overdraft service in an account disclosure provided with a signature card or contract that the consumer must sign to open the account and that acknowledges the consumer's acceptance of the account terms. Nor does an institution obtain a consumer's affirmative consent by providing a signature card that contains a pre-selected check box indicating that the consumer is requesting the service.

(original bold). Further, the official comments specifically address the process for obtaining affirmative consent to opt in overdraft services at the time of account opening:

> 5. **Implementing opt-in at account-opening.** A financial institution may provide notice regarding the institution's overdraft service prior to or at account-opening. A financial institution may require a consumer, as a necessary step to opening an account, to choose whether or not to opt into the payment of ATM or one-time debit card transactions pursuant to the institution's overdraft service. For example, the institution could require the consumer, at account opening, to sign a signature line or check a box on a form (consistent with comment 17(b)-6) indicating whether or not the consumer affirmatively consents at account opening. If the consumer does not check any box or provide a signature, the institution must assume that the consumer does not opt in. Or, the institution could require the consumer to choose between an account that does not permit the payment of ATM or one-time debit card transactions pursuant to the institution's overdraft service and an account that permits the payment of such overdrafts, provided that the accounts comply with § 1005.17(b)(2) and § 1005.17(b)(3).

(original bold).

39

Here, claimant emphasizes that respondent omitted the signature portion of Model Consent Form A-9 in its disclosure and thus did not obtain claimant's affirmative consent. He also maintains that verbal consent, if he even consented, does not satisfy Reg. E. For the reasons analyzed above, the Arbitrator concludes that Reg. E permits, but does not require, affirmative consent to be written. See generally 12 C.F.R. § 1005.17, cmt.17(b)-4 (permitting verbal telephonic consent).

Additionally, while respondent has no written record directly from claimant acknowledging his consent, its contemporaneous business records memorialize that claimant consented to DCOS enrollment. See R5; accord Hernandez T. Each monthly account statement also acknowledged with a check mark that claimant had signed up for DCOS. See R7-R20. Claimant's monthly statements contain a section on the right top identifying the account options claimant selected, such as online banking, direct deposit, or my spending report, among others. See id. One of the checkable options is "Overdraft Service." See id. Each and every one of claimant's statements, before he disenrolled in DCOS in 2022, had the overdraft service box checked, showing that he was enrolled in DCOS. See id. Each statement also showed the overdraft fees imposed that month as well as the year-to-date total. See id. Claimant could have removed or added any of the optional account services at any time. Hernandez T. In fact, he did just that for other services. Compare R7 with R12 (adding services with new checked boxes).

Likewise, claimant could have questioned the checked overdraft service box or the fees imposed if he had not consented. See also R7-R20 (explaining how to contact banker or report an error). Claimant testified that he did question the fees on a few different occasions in person at respondent's branches but remembered no specifics or details. Wilson T. His memory, by his own admission, was vague on when, where, and in what manner he voiced his concerns. Id. Respondent, on the other hand, maintains a written record of all customer complaints, which it specifically checked. Hernandez T. Respondent found no complaints logged from claimant at any time, even though it annually trains its bankers on the need and protocol to lodge customer complaints. Id. Accordingly, the Arbitrator concludes that respondent obtained claimant's affirmative consent, which he never revoked until 2022 when he disenrolled in DCOS.

The Chambers court agreed that a disclosure, like respondent's, effectively secures affirmative consent:

> These examples—"when you inadvertently calculate your available balance" or "when funds from a recent deposit are not available"— explicitly make overdrafts a function of the customer's available balance. If the [bank's] aim was to secure Chambers' affirmative consent for an overdraft program based on her available balance, then the opt in agreement was effective.

222 F. Supp. 3d at 15-16.

## Signature Acknowledgement

Claimant asserts that respondent violated Reg. E because it did not obtain claimant's signature to acknowledge his DCOS enrollment. Claimant points out that respondent obtained his signature on the account application form which acknowledged his receipt of the CAA, privacy notice, and other items, but failed to include any reference to the DCOS disclosure. See R2. Respondent admits that, in 2013, it only obtained verbal consent directly from the customer, which the banker then formally acknowledged by logging the consumer's consent into the SVP computer system.

40

Hernandez T; R4; R5.

The Arbitrator agrees that Reg. E permits banks to require a signature and that a signature would have been more prudent for both respondent and claimant. Presumably, in part for this reason, respondent now requires its customers to acknowledge their consent with an electronic signature. See R34. Nevertheless, the Arbitrator found nothing in the regulation, interpretations, or comments that require a customer's signature, only comments that permit a signature. See, e.g., Comment 5 (bank *could* require the consumer to sign at account opening). Moreover, Reg. E expressly permits telephonic consent, which by definition, would not result in a signature. See also Comment 6 (An institution *may* obtain a consumer's affirmative consent by providing a blank signature line). Further, while respondent could have required – and now does require – a separate consent signature, respondent could not have included a written, signed consent to the DCOS disclosure as part of the account application's signature because Reg. E requires it to obtain the customer's consent "separately from other consents or acknowledgements obtained by the institution." See Comment 6; see also id. (not affirmative consent if included in contract consumer must sign to open the account). Finally, Reg. E's separate requirement to furnish the customer with a written confirmation of enrollment suggests that consent and written confirmation represent two different requirements with two different processes. As to the latter, the regulators specifically obliged banks to provide its enrolled customers with a *written* confirmation. In contrast, as to the first, the regulators required affirmative consent but did not specify written consent, as they had in the confirmation context. Compare 12 C.F.R. § 1005.17(b)(1)(iv) with 12 C.F.R. § 1005.17(b)(1). Accordingly, the Arbitrator concludes that respondent did not violate Reg. E by failing to obtain claimant's signature acknowledging his DCOS enrollment because Reg. E does not require the customer's signature.

## Confirmation

Section 1005.17 also requires a financial institution to confirm the customer's consent in writing. 12 C.F.R. § 1005.17(b)(1)(iv). Alternatively, the financial institution can confirm consent electronically with the customer's approval. Id. Under either method, the confirmation must specify the customer's right to revoke consent. Id. Claimant argued that respondent never confirmed his enrollment in writing and that, if it did, the confirmation did not include the requisite right to revoke notice.

To satisfy the confirmation requirement,

> 7. **Confirmation.** A financial institution may comply with the requirement in § 1005.17(b)(1)(iv) to provide confirmation of the consumer's affirmative consent by mailing or delivering to the consumer a copy of the consumer's completed opt-in notice, or by mailing or delivering a letter or notice to the consumer acknowledging that the consumer has elected to opt into the institution's service. The confirmation, which must be provided in writing, or electronically if the consumer agrees, must include a statement informing the consumer of the right to revoke the opt-in at any time. *See* § 1005.17(d)(6), which permits institutions to include the revocation statement on the initial opt-in notice. An institution complies with the confirmation requirement if it has adopted reasonable procedures designed to ensure that overdraft fees are assessed only in connection with transactions paid after the confirmation has been mailed or delivered to the consumer.

41

Comment 7 (original bold).

Respondent's contemporaneous business records show a template of the confirmation form letter used in 2013 but not a copy of claimant's actual letter. R6; Hernandez T. Respondent explained that its retention policy only lasts 7 years and therefore it no longer maintains a copy of the actual letter handed to claimant. Hernandez T. Still, as respondent demonstrated, its 2013 protocols required the banker to hand a customer who enrolled in DCOS in person, like claimant, a hard copy of the confirmation letter that printed out immediately and automatically from its computer system once the banker verified the customer's desire to enroll in DCOS. Id.; see R4-R5. Indeed, the computer system blocked the banker from proceeding with the account opening until it printed out the confirmation letter. Hernandez T. Given these contemporaneous records, the Arbitrator finds that claimant failed to sustain his burden to show respondent violated Reg. E by failing to confirm his enrollment in writing. The Arbitrator also concludes that the plain language of the confirmation letter explicitly includes the required notice of claimant's right to revoke consent at any time. See R6; accord Hernandez T.

## CONCLUSION

Based upon the totality of the evidence, the Arbitrator rules that claimant did not prove his First Cause of Action for violation of the Electronic Fund Transfer Act (ETFA), as implemented by Federal Reserve Regulation E (Reg. E), 12 C.F.R. § 1005.1, *et seq.* because he failed to establish respondent's noncompliance with Reg. E. Specifically, the Arbitrator adjudicates the parties' submitted issues as follows:

- Did Wells Fargo's 2012 Overdraft Brochure satisfy Regulation E's opt-in requirements? *Yes*.
- Was Claimant's signature on his application sufficient to demonstrate his assent to join the DCOS overdraft service? *No but not determinative.*
- Did Wells Fargo satisfy Regulation E by giving Claimant a confirmation letter of being opted into the DCOS service, including a notice of his right to exit the service at any time? *Yes*.
- Did Claimant give affirmative consent in a manner satisfying Regulation E? *Yes*.
- Did Wells Fargo opt Claimant into its overdraft program using undue coercion? *No*.
- Did the fact that a Wells Fargo employee opted Claimant into the program satisfy Regulation E? *Inapplicable. The Arbitrator finds claimant opted in to DCOS, and the bank employee checked yes in respondent's system to capture claimant's verbal consent*.
- Did Wells Fargo explain its overdraft program in a clear, unambiguous, stand-alone document as Regulation E requires? *Yes*.
- Did the 2012 Overdraft Brochure contain information not permitted under Regulation E? *No*.
- Did the 2012 Overdraft Brochure accurately disclose Wells Fargo's policy for charging overdrafts on one-time debit card and ATM transactions in a stand-alone document? *Yes*.
- Is Claimant entitled to damages for Wells Fargo's violations of federal law? *No*.
- Is Wilson entitled to obtain injunctive relief for Wells Fargo's violations? *No*.
- Whether Wilson has proven that Wells Fargo violated Regulation E's disclosure requirement. *No*.
- Whether Wilson has proven that Wells Fargo violated Regulation E's reasonable opportunity requirement. *No*.
- If Wilson prevails on his claims, whether Wilson is entitled to "cascading damages." *Inapplicable*.

42

- Whether Wilson has demonstrated that he is entitled to public injunctive relief and, if so, what relief. *No*.

Issues to be Adjudicated from Claimant, dated 6/24/22; Respondent's Issues to be Adjudicated, dated 6/22/22.

## UCL

In his Second Cause of Action, claimant alleges that respondent's overdraft policies violated both the unlawful and unfair prongs of California's Unfair Competition Law California Business & Professions Code § 17200, *et. seq*. Specifically, claimant seeks adjudication of the following issues:

- Did Wells Fargo's overdraft practices violate the unlawful prong of the UCL?
- Did Wells Fargo's overdraft practices violate the unfair prong of the UCL?
- Is Claimant entitled to damages for Wells Fargo's violations of state law?
- Is Wilson entitled to obtain injunctive relief for Wells Fargo's violations?

Issues to be Adjudicated from Claimant, dated 6/24/22. Similarly, in addition to its defenses, respondent identifies the following issues to be adjudicated with respect to this cause of action:

- Whether Wilson has proven that Wells Fargo committed an unfair practice in violation of California's UCL.
- If Wilson prevails on his claims, whether Wilson is entitled to "cascading damages."
- Whether Wilson has demonstrated that he is entitled to public injunctive relief and, if so, what relief.

Respondent's Issues to be Adjudicated, dated 6/22/22.

The UCL prohibits illegal business practices, which it defines, *inter alia*, as any unlawful, unfair, or fraudulent business practice. Cal. Bus. & Prof. Code § 17200. The UCL imposes strict liability, but adjudicators may use their equitable powers to dismiss a UCL claim or deny equitable relief. Cortez v. Purolator Air Filtration Prod. Co., 23 Cal. 4th 163, 179 (2000); South Bay Chevrolet v. General Motors Acceptance Corp., 72 Cal. App. 4th 861, 877 (1999).

## Economic Injury

Individual consumers have standing to sue for illegal business practices if they suffered financial loss as a result. Cal. Bus. & Prof. Code § 17204. Consumers, like claimant, must prove that the illegal practice caused them an economic injury. Kwikset Corp. v. Superior Court, 51 Cal. 4th 310, 322-23 (2011); see Mosley v. Wells Fargo Bank NA, No. 17-CV-05064- JSC, 2017 WL 5478628, at *7 (N.D. Cal. Nov. 15, 2017) (violation of Homeowner's Bill of Rights insufficient to confer UCL standing when loss of money or property not alleged).

## Causation

Claimant must also prove causation – the casual link between the illegal practice and his harm – but cannot do so if he would have suffered the same injury whether or not respondent complied with the law. Troyk v. Farmers Grp. Inc., 171 Cal. App. 4th 1305, 1349 (2009); see Townsend v. Wells Fargo Bank, N.A., No. 18-cv-07382-NC, 2019 WL 4145464, at *4 (N.D. Cal. Aug. 30, 2019)

43

(no UCL standing where plaintiffs did not establish a causal connection between bank's reporting to credit bureaus and their diminished credit rating), aff'd, No. 19-16919 (9th Cir. Dec. 16, 2020).

## Remedies

If claimant proves a violation, the statute authorizes injunctive and other equitable relief to prevent the illegal or unfair practice; and these remedies are cumulative with other remedies. Cal. Bus. & Prof. Code §§ 17203, 17205; DiCarlo v. MoneyLion, Inc., 977 F.3d 1148, 1156 (9th Cir. 2021). Claimant may not recover damages, however, as the UCL disgorges the particular property or money taken by an unfair or illegal business practice, rather than confer compensation damages. Korea Supply Co. v. Lockheed Martin Corp., 29 Cal. 4th 1134, 1144 (2003); Inline, Inc. v. Apace Moving Sys. Inc., 125 Cal. App. 4th 895, 905 (2005). Claimant may not obtain disgorgement (a full refund) if he received a benefit from the product or service. See In re Tobacco Cases II, 240 Cal. App. 4th 779, 800 (2015), review denied, No. S23046 (Cal. Dec. 9, 2015). Instead, the UCL provides for injunctive relief, restitution, and civil penalties for government enforcement. Cal. Bus. & Prof. Code §§ 17203, 17206.  As with the UCL's substantive provisions, the courts liberally construe its remedial provisions to fashion creative awards of injunctive or restitutionary relief. Fletcher v. Sec. Pac. Nat'l Bank, 23 Cal. 3d 442, 449 (1979).

In Cortez, the California Supreme Court held that, given UCL's equitable nature, adjudicators must weigh the equities and may take into account equitable defenses and "considerations," including laches, good faith, waiver and estoppel. 23 Cal. 4th at 180. ("A court cannot properly exercise an equitable power without consideration of the equities on both sides of a dispute."); see e.g., Pac. Coin Mgmt. v. BR Telephony Partners, No. B165217, 2006 WL 290569, at *18 (Cal. Ct. App. Feb. 8, 2006) (laches valid equitable defense to deny UCL restitution claim).

## Unlawful

A business practice is unlawful if it violates a law other than the UCL.
A UCL "unlawful" claim thus rises or falls with the underlying claim, here the EFTA. See Asencio v. Miller Brewing Co., 283 Fed. app'x 559, 561-62 (9th Cir. 2008); Ruberson v. Gerdau Reinforcing Steel, Case No. 5:19-cv-01553, 2020 WL 3891679, at *4 (C.D. Cal. Apr. 10, 2020); Sanchez v. Russell Sigler, Inc., Case No. CV 15-01350-AP (PLAx), 2016 WL 11760184, at *4 (C.D. Cal. May 31, 2016); Daugherty v. Am. Honda Motor Co., 144 Cal. App. 4th 824, 837 (2006); Bothwell v. Abbot Laboratories, Inc., 134 Cal. App. 4th 438 (2005). Here, claimant based his UCL unlawful claim on respondent's alleged Reg. E violations. Accordingly, for all the reasons analyzed above, the Arbitrator concludes as a matter of law that claimant did not prove his UCL unlawful claim because he failed to prove a violation of the underlying Reg. E claim.

## Unfair

Neither the UCL nor courts have specifically defined "unfair" for UCL purposes. Generally, courts use the "unfair" prong to redress improper business practices. See Candelore v. Tinder, Inc., 19 Cal. App. 5th 1138, 1155 (2018); see, e.g., Smith v. Chase Mortg. Credit Grp., 653 F. Supp. 2d 1035, 1045-46 (E.D. Cal. 2009) (concluding that defendant's alleged violation of internal policy provides basis for unfairness claim). The California Supreme Court, however, criticized UCL's unfairness ground as unfair to businesses who need to know with reasonable certainty what the law prohibits and permits. See Cel-Tech Comms., Inc. v. L.A. Cellular Tel. Co., 20 Cal. 4th 163, (1999) (establishing test in competitor cases).

Since the Cel-Tech decision, the courts have applied different tests of unfairness in consumer UCL cases, including: the "tethered test," public harm test, unconscionability test, "the balancing test," the FTC test, and Cel-Tech's competitor test. See Lozano v. AT&T Wireless Servs. Inc., 504 F.3d 718, 735, 736 (9th Cir. 2007); In re Qualcomm Litig., No. 17-cv-00108-GPC-MDD, 2017 WL 5985598, at *6-11 (S.D. Cal. Nov. 8, 2017) (recognizing unsettled test and analyzing claim under all three "primary consumer tests"); Moran v. Prime Healthcare, 3 Cal. App. 5th 1131, 1147-48 (2016).

The tethered test requires claimants to tether their UCL unfairness claim to public policy evidenced in specific constitutional, statutory, or regulatory provisions. See, e.g., Gregory v. Albertson's, Inc., 104 Cal. App. 4th 845, 854 (2002). The public harm test requires claimants to establish a causal link between the unfair practice and public harm. See, e.g., In re Firearms Cases, 126 Cal. App. 4th 959, 981 (2005). Under the unconscionability test, claimant must identify a practice that "offends an established public policy" or is otherwise "immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." Cappello v. Walmart Inc., 394 F. Supp. 3d 1015, 1024 (N.D. Cal. 2019).

Under the balancing test, the adjudicator weighs "the utility" of respondent's conduct against the "gravity of the harm." Davis v. HSBV Bank Nevada, N.A., 691 F.3d 1152, 1169 (9th Cir. 2012). In Camacho v. Automobile Club of So. Cal., the court applied the balancing test and required a substantial, unavoidable consumer injury, not outweighed by countervailing benefits. 142 Cal. App. 4th 1394, 1403 (2006).

**Claimant's Unfairness Claim**

Claimant stresses that respondent's 2012 disclosure satisfies UCL's unfairness test because it: (1) was misleading; (2) encouraged customers to enroll in DCOS; and (3) required reliance on the banker's unscripted verbal explanation of the program. Respondent objects to this claim as untimely filed on the eve of hearing and meritless in any event.

Timeliness

For the reasons analyzed above, the Arbitrator overrules respondent's procedural objections.

Substantive Claim

On the merits, the Arbitrator finds claimant failed to state an unfairness claim under UCL for several independent grounds: (1) claimant cannot sustain an unfairness claim based upon lawful practices; (2) claimant's unfairness claim mimics his unlawful claim; (3) respondent's practices did not rise to the level of unfairness; (4) claimant could have avoided the consequences; (5) federal law preempts claimant's UCL claim; and (6) the Arbitrator exercises her discretion to abstain.

1. Lawful

Regardless of the test used, lawful practices cannot support a UCL unfairness claim. See Cel-Tech, 20 Cal. 4th at 183; see, e.g., Hauk v. JP Morgan Chase Bank USA, 552 F.3d 1114, 1122 (9th Cir. 2009) (safe harbor applied when bank complied with the TILA disclosure provisions); Suzuki v. Hitachi Glob. Storage Techs., Inc., No. C 06-07289 MHP, 2007 WL

45

2070263, at *3 (N.D. Cal. July 17, 2007) (same). For the reasons analyzed above, the Arbitrator concluded that respondent engaged in lawful practices. Accordingly, claimant cannot as a matter of law base his UCL unfair prong claim upon those practices.

    2.   Mimicry

"Where the unfair business practices alleged under the unfair prong of the UCL overlap entirely with the business practices addressed in the fraudulent and unlawful prongs of the UCL, the unfair prong of the UCL cannot survive if the claims under the other two prongs of the UCL do not survive." NorthBay Healthcare Grp. – Hosp. Div. v. Blue Shield of Cal. Life & Health Ins., 342 F. Supp. 3d 980, 988-89 (N.D. Cal. 2018). The Arbitrator finds that claimant's UCL claim based upon the unfair prong mirrors his unlawful prong claim and therefore cannot survive.

    3.   Fair

The Arbitrator concludes that respondent's practices do not rise to the level of unfair business practices. In Bickoff v. Wells Fargo Bank N.A., the court held it was not unfair for a bank to foreclose on an overdue construction loan where it had never guaranteed permanent financing. No. 14CV1065 BEN (WVG), 2016 WL 3280439, at *15-16 (S.D. Cal. June 14, 2016), aff'd, 705 F. App'x 616 (9th Cir. 2017). In Harris v. Wells Fargo Bank N.A., it was not unfair for a bank to record a notice of default against secured real property at the same time as the borrower was preparing, but had not completed, a borrower's loan modification application. No. 516CV00645CASKKx, 2016 WL 3410161, at *4 (C.D. Cal. June 15, 2016), vacated on other grounds, No. EDCV 16-645 JGB (KKx), 2016 WL 11486587 (C.D. Cal. July 14, 2016) (vacating prior opinion following recusal of prior assigned judge under 28 U.S.C. § 455). In both those banking cases, the courts rejected the unfairness claims even though plaintiffs presented sympathetic arguments. Applying these and other precedent in this case, the Arbitrator finds that respondent's overdraft practices do not trigger UCL's unfair prong.

    4.   Avoidable

Under the most commonly applied balancing test, courts refuse to find a UCL unfair claim where the claimant could have avoided the consequences of respondent's conduct. Here, the Arbitrator finds that claimant could have avoided the imposition of overdraft fees. Claimant's bank statements reflected DCOS enrollment with a checkmark in the overdraft services row under the applicable account options. Hernandez T; Nelson Dep. at 62-64; see, e.g., R7-R20. Each monthly statement also listed a summary of overdraft fees assessed during that period as well as year-to-date. Hernandez T; R7-20. The statements also contained a section on how to avoid fees, respondent's website address for frequently asked questions about service fees, and a detailed three paragraph policy on how to report inaccuracies, errors, questions, or complaints. See R7-R20. The policy also advised customers that respondent will investigate complaints and promptly correct any errors. Id. Respondent also notified customers that it would refund any fees, even if correctly assessed, if its investigation lasted more than 10 business days so that customers had access to the disputed funds pending investigation. Id. The Arbitrator finds that claimant could have avoided many, if not all, of the overdraft fees at issue if he had examined his statements and contacted respondent to ascertain how best to avoid overdraft fees each month. Therefore, the Arbitrator concludes as a matter of law that claimant cannot sustain a UCL claim under the unfair prong.

5. Preemption

Claimant may not base an unfair prong UCL claim on matters preempted by federal law. See, e.g., Robinson v. Bank of Am., NA, 525 F. App'x 580 (9th Cir. 2013) (NBA preempted account holder's nondisclosure claims); Gutierrez v. Wells Fargo Bank, NA, 704 F.3d 712, 723-25 (9th Cir. 2012) (NBA preempted unfair but not fraudulent UCL claim to the extent "unfair" prong prohibited bank's "high-to-low" posting practices); Chae v. SLM Corp., 593 F.3d 936, 938, 943 (9th Cir. 2010) (Higher Education Act preempted UCL and CLRA claims alleging improper interest charges); Winebarger v. Pa. Higher Educ. Assistance Agency, 411 F. Supp. 3d 1070, 1089 (C.D. Cal. 2019) (20 U.S.C. § 1098g preempted UCL and CLRA claims based on failure to accurate disclosure); Newbeck v. Wash. Mut. Bank, No. C 09-1599 CW, 2010 WL 291821, at *4 (N.D. Cal. Jan. 19, 2010) (HOLA preempted UCL failure to disclose claim); Grant v. Aurora Loan Servs., 736 F. Supp. 2d 1257, 1275 (C.D. Cal. 2010) (HOLA and OTS regs preempted UCL claim relating to mortgages); Martinez v. Wells Fargo Bank, N.A., No. C-06-40-03327 RMW, 2007 WL 963965, at *6-8 (N.D. Cal. Mar. 30, 2007) (NBA preempted UCL as to fees for mortgage loan settlement services). Applying this precedent, the Arbitrator separately concludes as a matter of law that the national banking laws preempt California's UCL to the extent they conflict.

6. Abstention

Courts also proceed with caution in adjudicating unfairness claims under UCL and may apply judicial abstention in economic matters when the challenged business practice arises in a regulated industry and has not been prohibited. Basically, courts decline to do what the legislature has chosen to leave undone. See, e.g., Beasley v. Wells Fargo Bank, 235 Cal. App. 3d 1383, 1391 (1991). The Arbitrator exercises her discretion to exercise judicial abstention in this case. Claimant essentially objects to banks using the available balance method of determining overdraft fees. Regardless of the fairness or unfairness of that method, Congress has not prohibited it even though federal law heavily regulates the banking industry. Accordingly, the Arbitrator declines to tread where the legislative has chosen not to.

## CONCLUSION

Based on each of these independent grounds, the Arbitrator rules that claimant did not prove his second cause of action for violation of UCL. Specifically, the Arbitrator adjudicates the parties' submitted issues as follows:

- Did Wells Fargo's overdraft practices violate the unlawful prong of the UCL? *No*.
- Did Wells Fargo's overdraft practices violate the unfair prong of the UCL? *No*.
- Is Claimant entitled to damages for Wells Fargo's violations of state law? *No*.
- Is Wilson entitled to obtain injunctive relief for Wells Fargo's violations? *No*.
- Whether Wilson has proven that Wells Fargo committed an unfair practice in violation of California's UCL. *No*.
- If Wilson prevails on his claims, whether Wilson is entitled to "cascading damages." *Inapplicable*.
- Whether Wilson has demonstrated that he is entitled to public injunctive relief and, if so, what relief. *No*.

Issues to be Adjudicated from Claimant, dated 6/24/22; Respondent's Issues to be Adjudicated, dated 6/22/22.

**RESPONDENT'S DEFENSES**

Respondent defended itself on the grounds of (1) lack of standing; (2) Reg. E compliance; (3) safe harbor protection; (4) industry practices; (5) estoppel; (6) laches; (7) UCL safe harbor; (8) statute of limitations; (9) failure to mitigate; and (10) UCL circumvention of safe harbor protection.

**Standing**

For the reasons analyzed above, the Arbitrator rules that claimant has standing to assert his claims.

**Reg. E Compliance**

For the reasons analyzed above, the Arbitrator concludes that respondent complied with Reg. E.

**SOL**

The Arbitrator hereby incorporates her ruling on the statute of limitations defense as set forth in the SOL Order, dated 3/22/22.

**Failure to Mitigate**

The Arbitrator hereby incorporates her ruling on the duty to mitigate as set forth in the Dispositive Motion Order, dated 6/18/22.

**Safe Harbor Protection**

The Arbitrator hereby incorporates her ruling on the safe harbor's applicability as set forth in the Dispositive Motion Order, dated 6/18/22.

**UCL Safe Harbor**

The Arbitrator declines to adjudicate this defense as moot.

**Industry Practices**

The Arbitrator concludes that respondent did not sustain its burden of proof on this defense as it did not submit evidence of industry-wide practices.

**Estoppel**

The Arbitrator declines to adjudicate this defense as moot.

**Laches**

The Arbitrator declines to adjudicate this defense as moot.

**UCL Circumvention**

48

The Arbitrator declines to adjudicate this defense as moot.

**REQUESTED REMEDIES**

Claimant requested disgorgement with interest, injunctive relief barring enrollment in its overdraft program without informed consent through an accurate opt-in and proper procedures, damages, civil penalties, order enjoining continuing wrongful conduct, costs, pre- and post-judgment interest, costs, and attorneys' fees. Respondent argued that, even if it violated Reg. E and or the UCL, claimant has limited available remedies.

The Arbitrator finds that respondent's current 2022 disclosure effective May 9, 2022 complies with its Reg. E duties. Accordingly, the Arbitrator declines to issue any form of public injunctive relief in this matter. The Arbitrator finds for respondent on all remaining requested remedies.

**<u>FINAL AWARD</u>**

I, Janice L. Sperow, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement entered into between the above-named parties, and having been duly sworn, and having duly heard the proofs and allegations of the parties, do hereby AWARD as follows in this matter:

1. For respondent on the First Cause of Action;
2. For respondent on the Second Cause of Action;
3. For claimant on the issue of standing;
4. For claimant on the Regulation E safe harbor defense;
5. For respondent on the defense of failure to mitigate;
6. For respondent in part and claimant in part on the statute of limitations defense;
7. For claimant on the defense of industry practices;
8. The Arbitrator dismisses the defense of estoppel as moot;
9. The Arbitrator dismisses the defense of laches as moot;
10. The Arbitrator dismisses the defense of UCL safe harbor as moot;
11. The Arbitrator dismisses the defense of UCL circumvention of safe harbor protection as moot;
12. The Arbitrator declines to adjudicate all other defenses as moot;
13. For respondent on all requests for damages, statutory and non-statutory, economic and noneconomic;
14. For respondent on the request for declaratory judgment;
15. For respondent on the request for public injunctive relief;
16. For respondent on the request for private injunctive relief;
17. For respondent on the request for punitive damages;
18. For respondent on claimant's request for attorneys' fees and costs;
19. The Arbitrator denies the request for interest as moot; and
20. The Arbitrator denies the request for expert costs as moot;

The administrative fees and expenses of the American Arbitration Association totaling $3,150.00 and the compensation and expenses of the Arbitrator totaling $33,500.00 shall be borne as incurred.

49

Respondent is the prevailing party in this matter. All claims not expressly granted herein are hereby denied. This is a final award in this arbitration. This award resolves all issues between the parties and represents the final adjudication of all claims and defenses between the parties.

July 14, 2022
*/s/ Janice L. Sperow*
Janice L. Sperow, Arbitrator

50

# Exhibit B

# AMERICAN ARBITRATION ASSOCIATION®

**DEMAND FOR ARBITRATION**
**CONSUMER ARBITRATION RULES**

Complete this form to start arbitration under an arbitration agreement in a contract.

| |
|---|
| 1. Which party is sending in the filing documents? *(check one)*  ☑ Consumer  ☐ Business |
| 2. Briefly explain the dispute: Claimant seeks statutory damages and return of overdraft fees collected in violations of Regulation E of the federal Electronic Funds Transfer Act, and for violation of state consumer fraud laws that have also been violated as a result of Respondent's violations of Regulation E. Please see attached and incorporated herein Exhibits: A) Statement of Claims; B) Opt-in Disclosure Agreement; and C) Deposit Account Agreement (arbitration provision commencing at page 35 thereto).

Related to Wilson v. Wells Fargo Bank (Case No. 01-21-0016-4036) |
| 3. Specify the amount of money in dispute, if any: $  Statutory damages of $1,000, return of all improperly collected overdrafts plus statutory attorneys' fees and costs.  The amount of overdraft fees improperly collected is in the possession of the Business. |
| 4. State any other relief you are seeking:

☑ Attorney Fees  ☑ Interest  ☑ Arbitration Costs  ☑ Other; explain:  Public injunctive relief order to discontinue opting in customers into overdraft coverage using a form and procedures that do not conform with Regulation E. |
| 5. Identify the requested city and state for the hearing if an in-person hearing is held:

City: Cinnaminson                                    State: NJ |
| 6. Please provide contact information for both the Consumer and the Business. Attach additional sheets or forms as needed. |

**Consumer:**

| | |
|---|---|
| Name: ███████ | Consumer Account No.: xxxxxx |

| |
|---|
| Address: ███████ |

| | | |
|---|---|---|
| City: ███████ | State: ██ | Zip Code: ███████ |
| Telephone: ███████ | Fax: N/A | |

| |
|---|
| Email Address: ███████ |

**Consumer's Representative (if known):**

| |
|---|
| Name:  Richard A. Nervig and Kyle D. Lawheed |
| Firm:  McCune Wright Arevalo, LLP |
| Address:  3281 East Guasti Road, Suite 100 |

| | | |
|---|---|---|
| City:  Ontario | State:  California | Zip Code:  91761 |
| Telephone:  (909) 557-1250 | Fax:  (909) 557-1275 | |

| |
|---|
| Email Address:  ran@mccunewright.com; kl@mccunewright.com |

**Business:**

| |
|---|
| Name:  Wells Fargo Bank, N.A. |
| Address:  101 North Phillips Avenue |

| | | |
|---|---|---|
| City:  Sioux Falls | State: South Dakota | Zip Code:  57104 |
| Telephone:  (606) 575-6900 | Fax: | |

| |
|---|
| Email Address: |

AMERICAN ARBITRATION ASSOCIATION®

**DEMAND FOR ARBITRATION
CONSUMER ARBITRATION RULES**

| Business' Representative (if known): | | |
|---|---|---|
| Name: | | |
| Firm: | | |
| Address: | | |
| City: | State: | Zip Code: |
| Telephone: | Fax: | |
| Email Address: | | |
| Date:  July 27, 2022 | | |

**7. Send a copy of this completed form to the AAA together with:**

- A clear, legible copy of the contract containing the parties' agreement to arbitrate disputes;

- The proper filing fee (filing fee information can be found in the Costs of Arbitration section of the Consumer Arbitration Rules); and

- A copy of the court order, if arbitration is court-ordered.

**8. Send a copy of the completed form and any attachments to all parties and retain a copy of the form for your records.**

To file by mail, send the initial filing documents and the filing fee to: AAA Case Filing Services, 1101 Laurel Oak Road, Suite 100, Voorhees, NJ 08043.

To file online, visit **www.adr.org** and click on **File or Access Your Case** and follow directions. To avoid the creation of duplicate filings, the AAA requests that the filing documents and payment be submitted together. When filing electronically, no hard copies are required.

Pursuant to Section 1284.3 of the California Code of Civil Procedure, consumers with a gross monthly income of less than 300% of the federal poverty guidelines are entitled to a waiver of arbitration fees and costs, exclusive of arbitrator fees. This law applies to all consumer agreements subject to the California Arbitration Act, and to all consumer arbitrations conducted in California. If you believe that you meet these requirements, you must submit a completed Affidavit for Waiver of Fees, available on our website.

Pursuant to New Jersey Statutes § 2A:23B-1 et seq, consumers with a gross monthly income of less than 300% of the federal poverty guidelines are entitled to a waiver of arbitration fees and costs, exclusive of arbitrator fees. This law applies to all consumer agreements subject to the New Jersey Arbitration Act, and to all consumer arbitrations conducted in New Jersey. If you believe that you meet these requirements, you must submit a completed Affidavit for Waiver of Fees, available on our website.

# EXHIBIT A

(to Demand for Arbitration)

## AMERICAN ARBITRATION ASSOCIATION

██████████████████,

Claimant,

v.

WELLS FARGO BANK, N.A.,

Respondent.

AAA CASE NO.

**CLAIMANT'S STATEMENT OF CLAIMS**

**[Relates to Wilson v. Wells Fargo Bank (Case No. 01-21-0016-4036)]**

## STATEMENT OF CLAIMS

1.　　　Claimant, ████ █████, seeks relief because Respondent, Wells Fargo Bank, N.A., has been wrongfully charged overdraft fees in violation of federal and state law. Federal Reserve Regulation E, 12 C.F.R. § 1005.1, *et seq.*, ("Regulation E"), requires that before Respondent can charge any overdraft fees on one-time debit card and ATM transactions, it must (1) provide a complete, accurate, clear, and easily understandable disclosure of its overdraft services (opt-in disclosure agreement); (2) provide the disclosure as a stand-alone document not intertwined with other disclosures; (3) obtain verifiable affirmative consent of Claimant's agreement to opt into the financial institution's overdraft program; and (4) provide a recorded confirmation of Claimant's consent, including the right to later opt-out of the program. Regulation E also prevents financial institutions from tying other benefits to an opt-in decision or using pre-checked boxes for the "opt-in" option on the agreement. Finally, Regulation E prohibits financial institutions from aggressively marketing the benefits of Regulation E overdraft coverage. 15 U.S.C. §1693m gives Claimant a statutory private right of action to pursue claims for violating Regulation E. In doing so, Claimant may recover all actual damages sustained, statutory penalties of no less than $100 and no more than $1,000, and reasonable attorneys' fees and costs.

2.　　　Respondent provides its customers, including Claimant, with a Regulation E opt-in disclosure agreement purportedly describing its overdraft services, attached hereto as Exhibit B. But the disclosure agreement inaccurately describes the circumstances in which Respondent charges overdraft fees. Specifically, it describes a process of calculating overdrafts that uses the

account's actual balance (all money in the account at the time), but Respondent actually uses an internal bookkeeping account balance (*i.e.*, "available balance") that artificially decreases the balance and makes it more likely that an overdraft fee will be assessed. Respondent's use of the available balance to assess overdraft fees significantly increases the likelihood that its customers will incur overdraft fees, and its use is relevant and material to understanding Respondent's overdraft services.

3.      A financial institution must provide customers its opt-in disclosure agreement as a stand-alone document.[1] Information about overdrafts given in other documents does not discharge the obligations imposed by Regulation E. A financial institution that discloses that "An overdraft occurs when there is not enough money in your account to cover a transaction, but we pay it anyway" is disclosing a use of the actual balance to calculate overdrafts.[2] But Respondent's practice is to calculate overdrafts, and charge fees, based on the available balance.

4.      Respondent's actions as described above also constitute unfair and deceptive practices under the laws of the state of Claimant's residence. Claimant seeks actual damages, statutory damages, restitution, and all appropriate injunctive relief provided for by applicable state laws.

5.      Claimant has been harmed by Respondent's actions. Claimant opted into Respondent's Regulation E overdraft program after receiving the inaccurate Regulation E opt-in disclosure agreement. And because Respondent did not satisfy Regulation E's requirements in its disclosure agreement, Respondent has wrongly assessed overdraft fees to Claimant on Regulation E transactions.

6.      At all relevant times, Respondent charged Claimant overdraft fees on one-time debit card and ATM transactions though Respondent obtained Claimant's consent by using an inaccurate disclosure not compliant with Regulation E. Claimant has held an account with Respondent at all times relevant to the allegations and is believed to have opted into its Regulation E overdraft program for one-time debit card and ATM transactions. Respondent has been assessed improper fees on one-time debit card and ATM transactions within the past year.

---

[1] *See Grenier v. Granite Credit Union*, No. 1:21-cv-00534, 2021 WL 5177709 (D.N.H. Nov. 8, 2021).
[2] *See Fludd, et al. v. S.* No. 2:20-CV-1959-BHH, 2021 WL 4691587 (D.S.C. Oct. 7, 2021);
*Smith v. Bank of Hawaii*, 2017 WL 3597522 (D. Haw. Apr. 13, 2017).

7.      Despite these facts, Respondent continues to market its Regulation E overdraft program and to "opt-in" customers like Claimant using the same (or a similar) non-compliant Regulation E disclosure agreement. Claimant seeks injunctive relief requiring Respondent to (1) withhold charging of additional overdraft or NSF fees until Plaintiff and others give consent after Respondent provides them with an accurate disclosure agreement and (2) provide an accurate disclosure agreement to future customers not yet enrolled in Respondent's Regulation E overdraft program.

WHEREFORE, Claimant requests an award for the following:

A.      For an order requiring Wells Fargo Bank, N.A. to disgorge, restore, and return all monies wrongfully obtained together with interest calculated at the maximum legal rate;

B.      For injunctive relief barring Wells Fargo Bank, N.A. from enrolling individuals in its overdraft program without obtaining informed consent through an accurate Regulation E opt-in disclosure agreement;

C.      For monetary and/or actual damages;

D.      For statutory damages;

E.      For civil penalties;

F.      For an order enjoining the continued wrongful conduct alleged herein;

G.      For costs;

H.      For pre-judgment and post-judgment interest as provided by law; and

I.      For such other relief as the Arbitrator deems just and proper.


Dated: July 27, 2022                          /s/ Richard A. Nervig
                                              Richard A. Nervig
                                              Kyle D. Lawheed
                                              MCCUNE WRIGHT AREVALO, LLP
                                              3281 E. Guasti Road, Suite 100
                                              Ontario, CA 91761
                                              Tel. (909) 557-1250
                                              Email: ran@mccunewright.com
                                              kl@mccunewright.com
                                              *Attorneys for Claimant* ▮▮▮▮▮▮

# EXHIBIT B

(to Demand for Arbitration)

*What You Need to Know About Overdrafts and Overdraft Fees*

# Important information about overdrafts

An <u>overdraft</u> occurs when you do not have enough money in your account to cover a transaction but we pay it anyway. We can cover your overdrafts in two different ways:

1. We have <u>standard overdraft coverage</u> that comes with your account.[1]

2. We also offer <u>overdraft protection plans</u>, such as a link to an eligible savings account, eligible line of credit or eligible credit card, which may be less expensive than our standard overdraft coverage. To learn more, ask us about these plans.

This notice explains our standard overdraft coverage.

**What is the standard overdraft coverage that comes with my account?**

We <u>may</u> authorize and pay overdrafts for the following types of transactions:

- Checks and other transactions made using your checking account number
- Automatic bill payments (such as recurring debit card and ACH payments)

We <u>will not</u> authorize and pay overdrafts for the following types of transactions unless you ask us to (see below):

- ATM transactions
- Everyday debit card transactions (such as one-time debit card and ATM card purchases)

We pay overdrafts at our discretion which means we <u>do not guarantee</u> that we will always authorize and pay any type of transaction. If we do <u>not</u> authorize and pay an overdraft, your transaction will be declined.

If you'd like more information about available options related to standard overdraft coverage, please speak with a Wells Fargo banker.

**What fees will the bank charge if it pays my overdraft?[2]**

Under our <u>standard overdraft coverage:</u>

- We will charge you a fee of $35 each time we pay an overdraft item to your account
- There is a limit of three overdraft and/or returned item fees per day

**What if I want Wells Fargo to authorize and pay overdrafts on my ATM and everyday debit card transactions?**

You can add Debit Card Overdraft Service[3] anytime by calling us at 1-800-TO-WELLS (1-800-869-3557), signing on to *Wells Fargo Online®* Banking from a computer or tablet (search Overdraft Services), visiting a Wells Fargo ATM (select More Choices), or speaking to a banker at any Wells Fargo branch. You can remove the service at any time.

1. Our standard overdraft coverage does not apply to Clear Access Banking[SM] accounts. Optional overdraft services, such as Overdraft Protection and Debit Card Overdraft Service, are not available for Clear Access Banking accounts. For more information about the overdraft features for Clear Access Banking accounts, please refer to your Consumer Account Fee and Information Schedule and Deposit Account Agreement.

2. The overdraft and/or non-sufficient funds (NSF) fee for Wells Fargo Teen Checking[SM] accounts is $15 per item and we will charge no more than two (2) overdraft and/or returned item fees per business day. Overdraft and/or non-sufficient funds (NSF) fees are not applicable to Clear Access Banking[SM] accounts.

3. Not available for certain accounts, such as Clear Access Banking[SM] accounts, Teen Checking[SM] accounts, Opportunity Checking® accounts, Greenhouse[SM] by Wells Fargo deposit accounts (Greenhouse Set Aside and Greenhouse Spending accounts), or savings accounts. Debit Card Overdraft Service is a discretionary service that may be removed by the bank for a variety of reasons including excessive overdrafts or returned items, as determined by the Bank.

**For Consumer Deposit Accounts Only**
© 2020 Wells Fargo Bank, N. A. All rights reserved. Member FDIC.
CNS9795 (Rev 02 – 07/20)

# EXHIBIT C

(to Demand for Arbitration)



Effective October 15, 2021

# Deposit Account Agreement

Important legal information and disclosures

# Thank you for doing business with us

This Deposit Account Agreement applies to new and existing consumer and business accounts and, together with the following documents, is your contract with Wells Fargo and constitutes the "Agreement" that governs your account with Wells Fargo:

- The Consumer Account Fee and Information Schedule ("Consumer Schedule") or the Business Account Fee and Information Schedule ("Business Schedule"),
- Our interest rate sheet for interest-bearing accounts,
- Our privacy notice, and
- Any additional disclosures, amendments, or addenda we provide to you.

In this Agreement, when we say "Wells Fargo," "Bank," "we," "us," and "our," we are talking about Wells Fargo Bank, N.A. "You" and "your" means each account owner, authorized signer, and any other person authorized to operate your account. When we say "We may" or "Wells Fargo may" do something, that means you authorize us and agree to such action.

**This Agreement is applicable to new and existing accounts and replaces all prior agreements regarding your account,** including any verbal or written statements or representations. When you sign an account application or use your account, including any account service, you and anyone else identified as an owner or authorized signer on your account consent to the terms of this Agreement. We regularly update this Agreement. You are responsible for ensuring that any authorized signer is familiar with this Agreement. If you keep your account open after we change this Agreement or end a fee waiver, you agree to the changes.

We recommend you keep a copy of this Agreement — and any changes we provide to this Agreement — for as long as your Wells Fargo accounts are open. You can get a copy of the current Agreement at wellsfargo.com, or by visiting your local branch, or by phone at the numbers below.

This document contains various defined terms with specific meanings. Some defined terms are defined within the section in which they are used. More frequently used defined terms are defined in the Glossary at the end of the document. As you review this Agreement, be sure to check the Glossary for those definitions.

# Questions? We're here for you

| Online | Visit **wellsfargo.com** or **wellsfargo.com/biz** | |
|---|---|---|
| Phone | **Consumer Banking**<br>**1-800-869-3557** | **Business Banking**<br>**1-800-225-5935** |
| Deaf or hard of hearing customers | We accept all relay calls, including 711. | |
| Mail | Wells Fargo, Customer Correspondence<br>P.O. Box 6995<br>Portland, OR 97228-6995 | |

# Table of Contents

Opening Accounts ........................................................................................................4

Depositing Funds ........................................................................................................5

Availability of Funds Policy ........................................................................................7

Available Balance, Posting Transactions, and Overdraft ...........................................9

    Available balance ....................................................................................................9

    How we process and post transactions to your account .........................................9

    Standard overdraft coverage...................................................................................10

    Debit Card Overdraft Service..................................................................................11

    Overdraft Protection ...............................................................................................11

    Overdraft Rewind[®] Feature ...................................................................................11

Debit Cards and ATM Cards .......................................................................................12

Funds Transfer Services .............................................................................................18

Electronic Fund Transfer Services (Consumer accounts only)...................................20

Electronic Fund Transfer Disclosures (Consumer accounts only) ..............................21

Other Account Services and Restrictions ..................................................................23

Time Accounts (CDs) ..................................................................................................25

Protecting Your Account and Your Information .........................................................26

Statements, Interest, and Other Account Information ..............................................28

Closing Accounts ........................................................................................................33

Resolving Disputes Through Arbitration.....................................................................35

    Consumer Accounts Only: Resolving Disputes Through Arbitration.......................35

    Business Accounts Only: Resolving Disputes Through Arbitration..........................36

Additional Terms and Services ...................................................................................38

Glossary ......................................................................................................................40

# Opening Accounts

This section applies to consumer accounts only unless otherwise noted.

**Forms of account ownership**

You can open an account that you own alone, or with more than one person. If the account is owned with more than one person, it's considered a joint account.

**Different types of joint account ownership**

**For joint accounts,** we treat all owners, who are referred to in this Agreement as "co-owners," as joint tenants with right of survivorship (described below), unless:

- Applicable state laws require other treatment, or
- We agree with you in writing that the account is owned in some other way.

Regardless of how your account is owned, we don't keep a separate record of each co-owner's interest in the account. We act on instructions from any co-owner (or a co-owner's authorized representative) without obtaining other co-owner's consent, including withdrawing or transferring funds, making payments, or closing the account.

Each co-owner has complete control over all of the funds in the account. We may pay out money from the account upon the request or direction of any co-owner (or a co-owner's authorized representative), regardless of their contributions to the account, and whether any other co-owner is incapacitated or deceased, or whether the account includes a right of survivorship.

**Joint tenants with right of survivorship:** When you hold an account as joint tenants with right of survivorship and one person dies, the account is owned by and payable to the surviving co-owners; this is subject to our rights under this Agreement.

**Tenants-in-common:** When you hold an account as tenants-in-common and one owner dies, the account is payable in whole or in part to any surviving co-owner or the deceased owner's authorized representative, heirs, or successors. This is subject to our rights under this Agreement.

**Community property:** An account is held as community property under state law when spouses have equal and undivided interests in the account during their lifetimes. When one spouse dies, ownership does not automatically pass to the survivor; rather, the deceased spouse can pass his or her interest through a will. Community property does not exist in every state.

**Joint owners and responsibility for liabilities on your account**

Each joint owner is individually and jointly responsible for any overdraft on your account, regardless of who caused or benefited from the overdraft. If there's a setoff, an enforcement of our security interest in your account, or legal action (such as a third party garnishment, seizure, forfeiture, or tax levy) affecting any co-owner, we may treat all funds in the account as belonging to the customer against whom the setoff, enforcement of the security interest, or other legal action is directed. If your account is closed for unsatisfactory handling, we may report all joint owners to the consumer reporting agencies.

**Pay On Death (POD) account**

A POD account is payable to the surviving beneficiaries you designated on your account when we receive proof of your death or the death of the last surviving co-owner. An account titled "in trust for (ITF)," "transfer on death (TOD)," or similar language is treated as a POD account.

You and any co-owner may change beneficiaries anytime by notifying us in writing. Generally, the beneficiary(ies) must survive all owners in order to receive funds.

**Accounts established for minors**

**Uniform Transfers/Gifts to Minors Act account.** An account established under a state's Uniform Transfers/Gifts to Minors Act that is controlled by a custodian (an adult who holds the minor's funds in the account for safekeeping). We may disclose account information to the minor or their authorized representative. When the minor reaches the age established by the UTMA/UGMA laws in your state, we may pay the funds in the account to the minor without waiting for instructions from the custodian.

**Minor by account.** One or more adults may open an account, as custodian (an adult who holds the minor's funds in the account for safekeeping) in the name of a minor. The minor owns the funds in the account. The adult, as the custodian, has exclusive control of the account and the minor cannot make deposits, withdrawals or transact on the account. If there's more than one adult as the custodian on the account, each may act independently. We're not obligated to inquire about the use of the funds. When the minor reaches the age of majority, they still will not be able to make deposits, withdrawals or transact on the account except to close the account. If the adult as the custodian (or the last of the adults as the custodian to survive) dies before the minor reaches the age of majority, we may transfer the funds to a successor custodian according to the applicable Uniform Transfers/Gifts to Minors Act.

**Transfer of account ownership**

If you want to transfer account ownership to another person, we must consent and note it in our records before the transfer is valid and binding on us; however, we're not responsible for determining whether such transfer is legally valid. Assignment of your account is subject to our setoff rights (see Setoff and security interest in the "Additional Terms and Services" section). This Agreement is binding on your personal representatives, executors, administrators, and successors, as well as our successors and assigns.

**When an owner does not sign account documentation**

**Applies to both Consumer and Business Accounts:** If a customer identified in our records as an owner or a co-owner of an account does not sign any account-related documentation (including the account application), we still may treat them as an owner or a co-owner of that account, in our sole discretion; we're not liable to anyone as a result.

**Death or legal incompetence of an authorized signer or account owner**

Please notify us promptly if you learn or suspect an account owner or signer has been declared incompetent by a court or other legal authority, or has died. When we receive proper notice, we may:

- Freeze the account until we receive documents verifying the incapacity or death and instructions regarding the funds remaining in the account,
- Pay (without inquiring) any item authorized by the account owner before being declared legally incompetent or deceased,
- Return or reverse deposits, and
- Apply funds in the account to any debt the account owner owes us before recognizing the rights of a surviving joint owner or other person to any remaining funds.

If we release funds after the account owner's death and have to pay tax or reclamation claims to a government agency as a result, the account owner's estate is responsible for reimbursing us.

**Consumers and Sole Proprietors Only:** If an account owner dies or is declared legally incompetent, we may comply with court orders and legal documents, and take direction from affiants, court-appointed representatives, guardians, or conservators from your state of residence, even if different than where the account was opened except as otherwise required by applicable law or court order. We may require additional documentation be provided to us before complying with the directives. We may require U.S. court documents for customers residing outside of the U.S. at the time of incompetence or death.

**For Business Account Owners:** Businesses must provide us documentation of any change in ownership or control of a business upon the death or legal incompetence of a business owner.

# Depositing Funds

**There are many ways for you to deposit funds into your account: at branches, ATMs, via Bank by Mail, and through the Wells Fargo Mobile® app. You should be aware of your responsibilities when you make deposits.** We exercise ordinary care when collecting a deposited item but are not responsible for any other bank's treatment or loss of the item. If a deposited item is lost or destroyed during processing or collection, you agree to provide all reasonable assistance to help us reconstruct the item.

**Deposit accuracy**

**It's your responsibility, not ours, to confirm the accuracy of the amount you deposit.** If we determine a discrepancy exists between the declared and the actual amount, we may debit or credit your account and we may notify you if any adjustments are made. We can also use the declared amount as the correct amount to be deposited and not adjust a discrepancy if it's less than our standard adjustment amount. We may vary our standard adjustment amount from time to time without notice and use different amounts depending on account type.

**Analyzed business accounts:** You may request that the Bank adjust deposit discrepancies identified during any verification regardless of the standard adjustment amount.

**Notify us of a discrepancy.** You must notify us within the applicable timeframe below or we may consider the deposit correct.

| Consumer accounts | within 1 year after we have made your account statement available to you |
|---|---|
| Business accounts | within 30 days after we have made your account statement available to you |

**If you fail to notify us in a timely manner:** If the actual deposit is less than the amount on the statement, the difference is your property; if the actual deposit is more, the difference is the Bank's property.

## Verifying transactions

We don't verify all transactions but have the right to verify any, including those for which we have provided a receipt. We may reverse or adjust, at any time without prior notice to you, any debit or credit we believe we have made to your account by mistake.

## Sending an item for collection

We may, upon notice to you, send an item for collection instead of treating it as a deposit. This means we send it to the issuer's bank for payment, and your account won't be credited for the item until we receive payment. Our availability of funds policy does not apply to an item we accept for collection.

## Our right to decline deposits

**We may decline all or part of a deposit, including cash.** This could happen if a payee isn't a co-owner, authorized signer, or authorized representative on your account, we can't verify an endorsement, the check was issued from a credit account, the check looks suspicious, or it's a non-U.S. item. If we decline a deposit that you mailed to us, we may return it to you at your cost (including charging you for postage and handling to return foreign currency coin or paper), or retain any invalid checks or other documents included in the deposit without crediting your account, at our discretion.

If we cannot verify an endorsement, we can also decline to pay, cash, or send the item for collection. We can require that all endorsers be present and that you deposit the item instead of cashing it.

Non-account owners are not allowed to deposit cash into consumer accounts. For business accounts, any person wanting to make a cash deposit must provide an acceptable form of identification before we accept a cash deposit.

## Requirements for correct endorsement

An endorsement is a signature, stamp, or other mark on the back of a check to transfer, restrict payment, or make the signer responsible for the check. If you have not endorsed a check that you deposited to your account, we may endorse it for you. Any endorsement must be in the 1-1/2 inch area that starts on the top of the back of the check. Do not sign or write anywhere else on the back of the check.

## Restrictions on checks are not binding

We are not obligated to follow restrictions or notations written on a check such as, "void after six months," "void over $50," or "payment in full." You're responsible for any resulting loss or expense we incur.

## Substitute checks

A substitute check is created from an original check; under federal law, it's legally equivalent to the original check and can even be used as proof of payment. A substitute check contains an accurate copy of the front and back of the original and bears the legend: "This is a legal copy of your check. You can use it the same way you would use an original check." Any check may be returned to you in the form of a substitute check. You agree that you won't transfer a substitute check to us, by deposit or otherwise, if we would be the first financial institution to take the substitute check, unless we have expressly agreed in writing to take it.

## Our handling of non-U.S. items

A non-U.S. item is an item:
- Payable in a currency other than U.S. dollars,
- Drawn on a financial institution that isn't organized under U.S. law, or
- That is an incoming funds transfer remitted in a currency other than U.S. dollars.

We're not required to accept a non-U.S. item for deposit or collection, but we may accept it on a collection basis without your specific instruction to do so. We can reverse any amount we have credited to your account and send the non-U.S. item on a collection basis even if we have taken physical possession of the item.

If we accept a non-U.S. item, the U.S. dollar amount you receive for it will be determined by the applicable exchange rate that is in effect at the time of deposit or our receipt of final payment (less any associated fees) of the non-U.S. item. If the deposited non-U.S. item is returned for any reason, **we'll charge the amount against your account (or any other account you maintain with us)** at the applicable exchange rate in effect at the time of the return. For information on the applicable exchange rate, see "Applicable exchange rate" in the "Statements, Interest, and Other Account Information" section of this Agreement. Our availability of funds policy does not apply to a non-U.S. item.

## Items returned unpaid

If an item you deposited or cashed is returned to us unpaid, **we can deduct the amount from any account you have with us.** We can do this when we're notified that the item will be returned and don't need to receive the actual item. We can do this even if the balance in your account isn't sufficient to cover the amount we hold or deduct, causing an overdraft. In addition, we'll charge you all applicable fees and reverse all interest accrued on the item.

**We may place a hold on or charge your account for a deposit if a claim is made or we otherwise have reason to believe the deposited item was altered, forged, unauthorized, missing a signature or has a forged endorsement, or should not have been paid for any other reason.** When the claim is finally resolved, we'll either release the hold or deduct the amount of the item from your account. We're not responsible if we take, or fail to take, any action to recover payment of a returned deposited item.

**Breach of a warranty associated with an item**

If you breach any warranty you make to us under the laws governing your account with respect to any item, you won't be released or discharged from any liability for the breach so long as we notify you of the breach within 120 days after we learn of the breach. If we fail to notify you within this 120 day period, you'll be released from liability and discharged only to the extent our failure to notify you within this time period caused a loss to you.

**Reversal of an electronic payment**

If an electronic payment credited to your account, such as a direct deposit, is reversed, **we can deduct the amount from any account you have with us,** at any time, without notifying you. You agree to promptly repay any resulting overdrafts.

**Bank By Mail**

You can make deposits to your account(s) by mail, although we cannot accept cash or foreign checks. Call us to request a Bank By Mail deposit kit.

If you need to send deposits before your kit arrives, write on the back of the check "for deposit only, Wells Fargo" and include the account number to which the check should be deposited, and mail to:

Wells Fargo
P.O. Box 77200
Minneapolis, MN 55480-7720

For accounts located in **Alaska**, send deposits to:

Wells Fargo
P.O. Box 77040
Minneapolis, MN 55480-7740

# Availability of Funds Policy

**Your ability to withdraw funds**

Our policy is to make funds from your check deposits to your checking or savings account (in this policy, each account) available to you on the first business day after the day we receive your deposits. Incoming wire transfers, electronic direct deposits, cash deposited at a teller window and at a Wells Fargo ATM, and the first $400 of a day's check deposits at a teller window and at a Wells Fargo ATM will be available on the day we receive the deposits. Certain electronic credit transfers, such as those through card networks or funds transfer systems, will be available on the day we receive the transfer. Once they are available, you can withdraw the funds in cash and we will use the funds to pay checks and other items presented for payment and applicable fees that you have incurred.

**Determining the day your deposit is received by the Bank**

**For determining the day your deposit is received by the Bank**, every day is a business day, except Saturday, Sunday, and federal holidays. If you make a deposit before our established cutoff time on a business day that we are open, we will consider that day to be the day your deposit is received by the Bank. However, if you make a deposit after our cutoff time or on a day we are not open, we will consider the day your deposit is received by the Bank to be the next business day we are open.

Our deposit cutoff times are as follows:

| Type of Deposit | Cutoff time |
|---|---|
| In branch | when the branch closes for business; varies by location |
| At Wells Fargo ATM | 9 p.m. local time (Alaska 8 p.m.) |
| Checks deposited with the Wells Fargo Mobile app | 9 p.m. Pacific Time |
| Electronic credits (such as direct deposits) | 8 p.m. Pacific Time |

**Longer delays may apply**

In some cases, we will not make the first $400 of a business day's check deposits available to you on the day we receive the deposits. Further, in some cases, we will not make all the funds that you deposit by check available to you on the first business day after the day of your deposit.

Depending on the type of check that you deposit, funds may not be available until the second business day after the day of your deposit. The first $225 of your deposit, however, may be available on the first business day after the day of your deposit.

Except as otherwise explained in this paragraph, if we are not going to make all funds from your deposit available on the business day of deposit or the first business day after the day of deposit, we will notify you at the time you make your deposit. We will also tell you when the funds will be available. If your deposit is not made directly to a Wells Fargo employee, or if we decide to take this action after you have left the premises, we will mail you the notice by the first business day after we receive your deposit.

If you need the funds from a deposit right away, you should ask us when the funds will be available.

Funds you deposit by check may be delayed for a longer period under the following circumstances:
• We believe a check you deposit will not be paid
• You deposit checks totaling more than $5,525 on any one day
• You redeposit a check that has been returned unpaid
• You have overdrawn your account repeatedly in the last six months
• There is an emergency, such as failure of computer or communications equipment

We will notify you if we delay your ability to withdraw funds for any of these reasons, and we will tell you when the funds will be available. The funds will generally be available no later than the seventh business day after the day of your deposit.

**Special rules for new accounts**

**If you are a new customer, the following special rules apply during the first 30 days your account is open.** Incoming wire transfers, electronic direct deposits, and cash deposited at a teller window and at a Wells Fargo ATM will be available on the day we receive the deposit. Funds from your check deposits will be available on the business day after the day we receive the deposits; no funds from a business day's check deposits are available on the day we receive the deposits.

If we delay the availability of your deposit the following special rules may apply:
• **The first $5,525** of a day's total deposits of cashier's, certified, teller's, traveler's, and federal, state, and local government checks, and U.S. Postal Service money orders made payable to you will be available on the first business day after the day of your deposit.
• **The excess over $5,525** and funds from all other check deposits will be available no later than the seventh business day after the day of your deposit. The first $225 of a day's total deposit of funds from all other check deposits, however, may be available on the first business day after the day of your deposit.

We will notify you if we delay your ability to withdraw funds and we will tell you when the funds will be available.

**Holds on other funds**

**If we cash a check for you that is drawn on another bank**, we may withhold the availability of a corresponding amount of funds that are already in your account. Those funds will be available at the time funds from the check we cash would have been available if you had deposited it.

**If we accept a check for deposit that is drawn on another bank**, we may make funds from the deposit available for withdrawal immediately but delay your ability to withdraw a corresponding amount of funds that you have on deposit in another account with us. The funds in the other account would then not be available until the time periods that are described in this policy.

# Available Balance, Posting Transactions, and Overdraft

## Available balance

Your account's available balance is our most current record of the amount of money in your account available for your use or withdrawal. We use the available balance to authorize your transactions during the day (for example, debit card purchases and ATM withdrawals). We also use the available balance to pay your transactions during our nightly processing. Your available balance is calculated as follows:

| | |
|---|---|
| **Ending Daily Balance** | Ending daily balance from prior business day's nightly processing |
| **−  Holds** | Subtract funds that have been placed on hold |
| **+  Deposits** | Add pending deposits that are immediately available (see "Availability of Funds Policy" in previous section) |
| **−  Withdrawals** | Subtract pending withdrawals that we have either authorized or we know about but have not yet processed |

## = Available Balance

**The available balance may not include every transaction you have initiated or that we previously authorized.** For example, your available balance may not include the following:

- Outstanding checks and authorized withdrawals we have not received for payment (such as recurring debit card transactions and ACH transactions);
- The final amount of a debit card purchase. For example, we may authorize a purchase amount prior to a tip that you add;
- Debit card transactions that have been previously authorized but not sent to us for payment. In most cases, a transaction authorization hold must be released after three business days even though the transaction may be sent to us for payment from your account at a later date, which we must honor. The authorization hold may be up to 30 business days for certain transactions, including car rental, cash, and international transactions.

## How we process and post transactions to your account

We process transactions each business day (not Saturdays, Sundays, or federal holidays) during a late night process that includes **three key steps**. We call this nightly processing. Once the transactions are processed, the results are posted to your account.

Step 1: **We calculate the available balance in your account that can be used to pay your transactions as described above.**

**Certain pending transactions can impact your available balance for purposes of determining whether we will pay other transactions during our nightly processing, including:**

- Cash deposits or transfers from another Wells Fargo account made AFTER the applicable cutoff time will be added to your available balance only if they are made before we start our nightly processing; and
- Pending withdrawals that reduce your available balance, such as debit card transactions we have authorized.

Step 2: **We sort your transactions into categories.**

- **+  We credit deposits** received before the cutoff time.
- **−  We subtract withdrawals and payments we have previously authorized that we cannot return unpaid** such as debit card purchases, ATM withdrawals, account transfers, Bill Pay transactions, and teller-cashed checks. Transactions are generally sorted by date and time the transaction was conducted or, for some transactions, the day we receive it for payment or the time assigned by our system. If date and time are the same, we post from lowest to highest dollar amount.
- **−  We pay your checks and preauthorized automatic ACH payments** such as recurring bills you have authorized a company to withdraw. Transactions are sorted by date and time received by the bank, and if date and time are the same, we post from lowest to highest dollar amount.

**Determining Date and Time**

- Cutoff time is based on the location where the deposit or transfer was made.
- If a merchant does not seek authorization at the time of a debit card transaction or we receive it for payment more than 10 business days later, we'll use the date the transaction is received for payment.
- For some transactions, such as Bill Pay or teller-cashed checks, a different time may be assigned by our systems.

Step 3: If the available balance is **not enough to pay all of your transactions**, we:

- **Use Overdraft Protection** (if you have it) by transferring and/or advancing available funds from a linked savings and/or credit account. An overdraft protection transfer/advance fee will be charged as applicable.
- **Then, decide whether to pay your transactions presented to us for payment into overdraft, or return them unpaid.** Paying an item into overdraft means that we pay an item even though your available balance is not sufficient to cover that item, resulting in your account having a negative balance. At our discretion, we may pay a check or automatic bill payment into overdraft, rather than return it unpaid. This is our **standard overdraft coverage (see more information below)**. Debit card transactions presented to us for payment (whether previously authorized by us or not) **will be paid into overdraft and won't be returned unpaid**, even if you don't have sufficient funds in your account. Any applicable overdraft or returned item fees are deducted from your account the morning of the next business day.

**Pending transactions can result in overdrafts.** If your available balance during the nightly processing is insufficient, the Bank may assess overdraft and/or non-sufficient funds (NSF) fees on transaction(s) we pay or return. Even if a pending transaction has been dropped from your account, we must pay it when we receive it for payment. Sometimes, previously authorized transactions are sent to us for payment. In those cases, you may be charged an overdraft fee if the transaction is paid into overdraft.

**To minimize the number of overdraft fees you may be assessed**, we track transactions that reduced your available balance while pending and caused overdraft fees on other transactions. If the pending transactions are then presented for payment within 10 business days after they first appeared as pending, **we'll waive any overdraft fees on those transactions**. In rare circumstances, the merchant presents transactions for payment with a different identification code than was used when originally sent for authorization and we're unable to match them. In those cases, you may be charged an overdraft fee if the transaction is paid into overdraft.

## Standard overdraft coverage

The bank typically does not pay overdrafts if your account is overdrawn or you have had excessive overdrafts.

Except for Clear Access Banking$^{SM}$, all checking accounts come with **standard overdraft coverage**. Under standard overdraft coverage:

- We **may** authorize checks, other transactions using your checking account number, and automatic bill payments (such as recurring debit card and ACH transactions) into overdraft and charge a fee.
- We **will not** authorize ATM and everyday (one-time) debit card transactions into overdraft, unless your account is enrolled in Debit Card Overdraft Service as described below.

Whether we pay transactions into overdraft is at our discretion and we reserve the right not to pay into overdraft.

You can remove standard overdraft coverage from your account at any time. If you remove it, the following will happen if you don't have enough money in your checking account or in accounts linked for Overdraft Protection to cover a transaction when it is presented to us for payment or authorization:

- We **will** return your checks and other returnable items, such as ACH payments, as unpaid and charge a returned item fee (non-sufficient funds/NSF).
- We **will not** authorize certain transactions such as cashed checks, recurring debit card transactions, or Bill Pay transactions into overdraft. **Important:** If these transactions are authorized when your account has enough money but are later presented for payment when your account does not have enough money, we'll pay the transaction into overdraft and charge an overdraft fee.
- We **will not** authorize ATM and everyday (one-time) debit card transactions (such as one-time debit card and ATM card purchases) into overdraft. If your account is enrolled in Debit Card Overdraft Service, the service will also be removed.

You understand that the classification of a debit card transaction (except ATM transactions) as recurring or non-recurring (i.e., one-time) is determined by merchants, other institutions, or other third parties before the transaction is presented to us for authorization or payment. We will treat and process such debit card transactions in the manner they are presented to us, which may result in a one-time debit card transaction presented as recurring preauthorized transactions and vice versa.

**Important:** Overdraft and returned item (non-sufficient funds/NSF) fees don't apply to Clear Access Banking accounts, and standard overdraft coverage isn't available. For more information about Clear Access Banking, refer to your Consumer Schedule.

## Debit Card Overdraft Service

Consumer account customers may choose to enroll in this service; business accounts are automatically enrolled at account opening.

**Your enrollment preference for Debit Card Overdraft Service determines how the Bank handles your ATM and everyday (one-time) debit card transactions** on eligible accounts. You can add or remove the service on eligible accounts at any time. It's important to understand that this service is unique from other optional services that may be less costly for you, such as our optional Overdraft Protection plan described in the next section.

When you don't have enough money in your checking account or accounts you have linked for Overdraft Protection at the time of an ATM or everyday (one-time) debit card transaction:

- **If you're enrolled in Debit Card Overdraft Service,** the transaction may be authorized into overdraft at the Bank's discretion but **an overdraft fee applies.** If you cover the shortage by the posted cutoff time on the same business day as the transaction, no overdraft fee is assessed.
- **If you aren't enrolled in Debit Card Overdraft Service,** the transaction will be declined and no fees apply. If a previously authorized transaction creates a negative balance when it posts, you won't be assessed an overdraft fee.

Debit Card Overdraft Service **does not apply** to checks and other recurring transactions (such as Bill Pay or ACH transfers, or recurring debit card transactions such as utilities or health club memberships). With or without Debit Card Overdraft Service, the Bank may continue to pay these other transaction types into overdraft, at our discretion, and our standard overdraft fees and policies will apply.

Debit Card Overdraft Service **isn't available for certain accounts**, such as Clear Access Banking accounts, Teen Checking℠ accounts, Opportunity Checking® accounts, IOLTA/RETA accounts, accounts for government entities, or savings accounts. Debit Card Overdraft Service is a discretionary service that may be removed by the Bank for a variety of reasons including excessive overdrafts or returned items.

## Overdraft Protection

This is an optional service you can add to your checking account by **linking up to two eligible Wells Fargo accounts (one savings, one credit) to authorize or pay your transactions if you don't have enough money in your checking account**. Overdraft Protection transfers/advances may occur to cover pending transactions, even if these transactions are not subsequently presented for payment. When an Overdraft Protection transfer occurs from a linked savings account to cover a transaction, the available balance in that savings account will be reduced by the amount of money to be transferred. That amount of money will be unavailable for other use, and it will be applied to the checking account the next business day. You can avoid the Overdraft Protection transfer/advance fee by making a covering deposit or transfer before the cut-off time to cover the amount of the transaction on the same business day. A single Overdraft Protection transfer or advance fee will be charged any day a transfer/advance is made regardless of the number of transactions covered or whether funds are transferred/advanced from multiple accounts. Also, we won't charge a fee unless the transfer/advance covered at least one pending item, or helped you avoid at least one overdraft or returned item. If you link two accounts, you may tell us which account to use first to transfer/advance funds. If you don't specify an order, we'll first transfer funds from your linked savings account. Overdraft Protection isn't available for all accounts. Refer to the Consumer Schedule or the Business Schedule to determine account eligibility.

## Overdraft Rewind® Feature

(Consumer accounts only)

Wells Fargo provides an automatic account feature called Overdraft Rewind. If an electronic direct deposit is received by 9 am where your account is located, as noted in your account statement, we'll calculate a new account balance that includes the pending direct deposit, minus any pending debits. If this newly calculated balance covers transactions that resulted in overdraft or non-sufficient funds (NSF) fees, or Overdraft Protection transfer or advance fees, during the prior business day's nightly processing, we'll waive or refund those fees. We may also reverse returned item (non-sufficient funds/NSF) decisions. Only electronic direct deposits through Automated Clearing House (ACH) qualify. Overdraft Rewind does not reverse the transfer or advance of funds from a linked Overdraft Protection account.

## Returning your account to a positive balance

**If your account has an overdraft, you must promptly add money to return your account to a positive balance.** If you don't return your account to a positive balance or you have too many overdrafts, we may close your account. Also, we may report you to consumer reporting agencies and initiate collection efforts. You agree to reimburse us for the costs and expenses (including attorney's fees and expenses) we incur to do so.

# Debit Cards and ATM Cards

We offer a number of account services at a variety of locations that involve using a card. Some services may not be available at all locations. When you get a debit or ATM card from us, you'll receive, and be required to agree to, additional terms and conditions applicable to the card. In the event of a conflict between the terms and conditions and this Agreement, the terms and conditions will control. Additional disclosures applicable to these services are provided in the Consumer Schedule or Business Schedule, as applicable.

## Issuance of a card and Personal Identification Number (PIN)

We may issue a card to each account owner to access your accounts. If you don't select a PIN when you request your card, we'll send a randomly selected PIN. If you don't request a card but would like a PIN for authentication purposes, we can provide a PIN for only that purpose (a "cardless PIN"). A cardless PIN cannot be used for purchases or ATM access (see "Telephone banking services" section for more details).

You should securely protect your card and PIN from loss or theft. Each cardholder must have his or her own unique PIN and is responsible for keeping the PIN confidential. If the card or PIN is given to another person, the account owner will, to the extent allowed by applicable law, be responsible for all transactions made by that person or anyone else to whom that person gives the card or PIN.

## Using a card to access linked asset accounts

Non-Wells Fargo ATM operators may not support display of all linked accounts, and may not support all functions.

Linking lets you add asset accounts you own (for example, checking or savings) to a debit or ATM card, giving you the ability to perform transactions on multiple accounts with one card at Wells Fargo ATMs. The money for purchases and payments made with your card is deducted from the primary linked account. Using a card at a participating non-Wells Fargo ATM for cash withdrawals, transfers, and balance inquiries is generally available for the primary linked checking and savings accounts. We can restrict the number and type of asset accounts you can link to your card.

Some Wells Fargo ATMs in branches can operate in "Assisted-Service mode" during branch hours. When in Assisted-Service mode, the ATM screen's main menu will display an "I need assistance" option. When using a Wells Fargo ATM in Assisted-Service mode, you may be able to use your consumer card to access and perform transactions on your consumer accounts that are not linked to your card.

**If you link more than one asset account to the card, you may designate a primary linked account.** If you don't designate a primary linked account, the first account linked to your card is considered the primary linked account. The primary linked account for a consumer debit card must be an eligible consumer checking account. The primary linked account for a business debit card must be an eligible business checking account.

If a primary linked account is closed or delinked for any reason, we'll generally designate a linked secondary account of the same account type, if you have one, as the new primary account. If you have a debit card and none of your other linked accounts are checking accounts, or you have no other linked accounts, your debit card will be closed and you can request an ATM card. You may link a new primary account of a different type (consumer, business, individual brokerage, or commercial brokerage) than the previous primary linked account. Depending on the new primary linked account, you may be issued a new card type. (Note: for Wells Fargo campus debit and ATM cards with school access, your banking access will be closed but your card can still be used for school access).

When you use your card to access any asset account, the agreements and disclosures applicable to that asset account will apply to that card transaction. Additionally, the consumer protections described in the "Electronic Fund Transfer Disclosures" section of this Agreement don't apply to transactions on business or commercial brokerage accounts.

## Using a card to access linked credit card and line of credit accounts at ATMs

If you link your Wells Fargo credit card account or eligible line of credit account (linked credit account) to your debit or ATM card, you may use the card to access the linked credit account at any Wells Fargo ATM. You can use the card to obtain cash or transfer funds from the linked credit account, as long as the linked credit account is in good standing and has available credit. Cash withdrawals and transfers of funds from your linked credit account are treated as cash advances. Each of these transactions is subject to the applicable credit card account agreement or line of credit account agreement, including daily limits and cash advance fees.

## Using your card

There are many ways to use your debit and ATM[1] cards—using the physical cards or via mobile devices. See the following descriptions.

**You can use your debit and ATM cards:**

- At merchants who accept payments through a network in which we participate
- To request cash back when making a physical card purchase with your PIN at merchants who offer this service
- To choose whether and how you receive a receipt when you use your card at a merchant terminal

**In addition, with your debit card, you can also:**

- Pay for purchases, or pay bills directly with your card, or through a mobile device at participating merchants (see "Using your card through a mobile device" for more details)

**At any ATM with your debit or ATM card you can:**

- View account balances, withdraw cash, and transfer funds between your accounts (fees may apply on any of these actions at a non-Wells Fargo ATM)[2]

**At Wells Fargo ATMs ONLY you can:**

- Make deposits to your account[3]
- Transfer funds from your eligible Wells Fargo credit accounts to your checking or savings accounts[4]
- Make payments to your eligible Wells Fargo credit accounts
- Get a statement[5] of your account balances or the last 10 transactions
- Choose how you want to receive your ATM receipt: printed, emailed, or to your mobile phone

**In addition, with your debit card but not your ATM card,** you can also use your mobile device at Wells Fargo ATMs.

[1] Purchases using an ATM card are only available at merchants who accept payments through networks in which we participate and require a PIN to authorize the purchase.

[2] Non-Wells Fargo ATMs are part of ATM networks owned or operated by other financial institutions. You can use your card at non-Wells Fargo ATMs that display the Plus® logo to withdraw cash, check balances, and transfer funds between the accounts linked to your card as primary checking and primary savings. Note: 1) Some non-Wells Fargo ATMs may not give you the option of choosing which account to access or may only let you access one of these two accounts. 2) Some transactions may not be available at all ATMs, may be different from those available at Wells Fargo ATMs, or may be limited to any withdrawal limit(s) set by the non-Wells Fargo ATM.

[3] A business deposit card can be issued to an authorized signer on business accounts. It can also be issued to a non-authorized signer at the request of an authorized signer. At Wells Fargo ATMs, a business deposit card and associated PIN can only be used to make ATM deposits, and can only be linked to deposit accounts. When the card is used to make an ATM deposit, account balances are neither displayed on the ATM screen nor printed on the ATM receipt. The card PIN cannot be used for authentication for phone or online access.

[4] Cash advance and ATM advance fees may apply. Refer to the applicable credit card account agreement or line of credit account agreement for more details.

[5] Statements at Wells Fargo ATMs should not be used in place of the account statement for balancing or verifying the actual account balance.

## Actions via electronic credit transfers

You can receive transfers through card networks or funds transfer systems with your debit card.

The following limitations apply to Visa Original Credit Transactions ("OCT") and MasterCard MoneySend ("MoneySend") money transfers to your debit card:

| | Rolling 24 hours | Rolling 7-day | Rolling 30-day |
|---|---|---|---|
| **Visa**<br>Person-to-person OCT | 25 transactions or $10,000 | 100 transactions or $25,000 | 200 transactions or $50,000 |
| **Visa**<br>Business-to-person OCT | 40 transactions or $50,000 | 100 transactions or $125,000 | 200 transactions or $300,000 |
| **Visa**<br>Me-to-me OCT | 40 transactions or $50,000 | 100 transactions or $125,000 | 200 transactions or $300,000 |
| **Visa**<br>Me-to-me OCT, BAI code CD (cash deposit) | 15 transactions or $600 | 25 transactions or $1,000 | 75 transactions or $3,000 |
| Times listed are in Coordinated Universal Time (UTC), which is a standard used to set all time zones around the world and, for example, is 5 hours ahead of Eastern Time Zone (4 hours ahead during daylight savings time). | **Calendar Day**<br>(12 AM - 12 AM UTC) | **Calendar Week**<br>(Starting 12AM UTC each Monday) | **Calendar Month**<br>(Starting 12AM UTC the first day of each month) |
| **MasterCard**<br>MoneySend (all types) | 25 transactions or $10,000 | 100 transactions or $10,000 | 200 transactions or $10,000 |

## ATM and merchant terminal malfunctions

Generally, we're not responsible for damages resulting from an ATM or merchant terminal malfunction. However, for applicable accounts, see "In case of errors or questions about your electronic fund transfers" in the "Electronic Fund Transfer Disclosures" section of this Agreement.

## Fees for use of card

Other applicable fees for use of your card are described in the Consumer Schedule and Business Schedule.

**We charge a fee for each non-Wells Fargo ATM transaction. In addition, the non-Wells Fargo ATM owner/operator may charge a fee and set their own withdrawal limits.** We may waive our fee and/or reimburse the non-Wells Fargo ATM owner/operator fee, in whole or in part, if allowed by the terms of your account. Even if reimbursed, the non-Wells Fargo ATM owner/operator fee is included in the total transaction amount that is withdrawn from your account and will apply to your card's daily ATM withdrawal limit. Transactions will also be limited to any withdrawal limits set by the non-Wells Fargo ATM. We'll charge a fee if you make a teller-assisted cash disbursement at a non-Wells Fargo bank that accepts Visa-branded cards. Some merchants may assess a fee when you use your card for a purchase or for cash back. The merchant fee will be included in the total purchase amount.

## Daily limits

Unless otherwise specified, a "day" is defined as the 24-hour period from midnight to midnight, Pacific Time. Transactions made in other time zones will be based on when received in Pacific Time. You may use your card subject to your daily purchase limit, daily ATM withdrawal limit, and the available balance in your account. The following rules apply:

**Limits on dollar amounts:** Your card's daily purchase limit is the maximum U.S. dollar amount of purchases (including cash back, if any) that can be authorized each day from your primary linked account, less merchant fees, if any. Note: If you use your card or card number to fund a digital wallet, brokerage, or other type of account, these Account Funding Transactions (AFTs) will count against your card's daily purchase limit. AFTs may also be limited by the applicable card network. If your daily purchase limit is more than $99,999, you may ask that the merchant process multiple transactions to complete a purchase above this amount.

Your card's daily ATM withdrawal limit is the maximum amount of cash you can withdraw each day from any combination of accessible accounts using your card, less any non-Wells Fargo ATM owner/operator fees, if applicable. When you use a Wells Fargo ATM in Assisted-Service mode, your card's daily ATM withdrawal limit may not apply.

You can confirm your card's daily limits through online banking, our mobile app, or by calling us.

**Limits for your card:** We provide you your daily ATM withdrawal and purchase limits when you receive your card, unless otherwise stated in the Agreement. **Note:** For security reasons there may be additional limits on the amount, number, or type of transactions you can make using your card.

There's generally no limit on the number of times the card may be used each day as long as the applicable daily ATM withdrawal limit and daily purchase limit are not exceeded, and there's a sufficient available balance in accounts you access for the transactions. If an ATM transaction or purchase would create an overdraft on the account, we may, in our sole discretion, take any of the actions described in the "Available Balance, Posting Transactions, and Overdraft" section of this Agreement.

When we approve a transaction or purchase, we call that an authorization.

We may limit the number of authorizations we allow during a period of time (for example, if we notice out-of-pattern use of your card, or suspected fraudulent or unlawful activity). For security reasons, we cannot explain the details of the authorization system. If we don't authorize the payment, we may notify the person who attempted the payment that it has been refused. We won't be responsible for failing to give an authorization. In our discretion, we may allow or deny transactions or authorizations from merchants who are apparently engaged in or who are identified as engaged in the internet gambling business.

**Changes to your card limits:** We may, without telling you, increase your daily purchase or ATM withdrawal limit based on account history, activity, and other factors. If we decrease the limits of your card, we'll notify you in accordance with applicable law.

## Using your card through a mobile device

A mobile device means a smartphone, tablet, or any other hand-held or wearable communication device that allows you to electronically store or electronically present your debit card or debit card number (digital card number) to make debit card transactions.

When you use your debit card with your mobile device for transactions:

- Availability may be affected by your mobile carrier's coverage area, and your mobile carrier may charge you message and data rates, or other fees.
- Your debit card information is sent across wireless and computer networks.
- Information about your mobile device may be transmitted to us.
- You should secure the mobile device the same as you would cash, credit cards, and other valuable information. Password protect and lock it to help prevent unauthorized transactions and notify us promptly if it's lost or stolen.
- When you make a purchase or payment using your mobile device, the merchant won't provide an option for cash back.
- A physical card may be required for access to Wells Fargo ATMs within secure locations.
- You can access Wells Fargo ATMs by holding your mobile device close to the Contactless Symbol displayed on the ATM. The Contactless Symbol and Contactless Indicator are trademarks owned by and used with the permission of EMVCo, LLC.

- Each time you access a Wells Fargo ATM with your mobile device and card PIN, you can perform one monetary transaction (such as a cash withdrawal), or one non-monetary transaction (such as a balance inquiry) before your one monetary transaction.
- If you're accessing a Wells Fargo ATM in Assisted-Service mode using your mobile device, your card's daily ATM withdrawal limit will apply and you won't be able to access accounts that are not linked to your card.
- We may automatically provide digital wallet operators with updated Digital Card Number information, such as when your Card is replaced or reissued.

Third parties, such as merchants, card association networks, mobile carriers, digital wallet operators, mobile device manufacturers, and software application providers may 1) use and receive your digital card number, and 2) receive information about your mobile device. If you have enrolled in Overdraft Protection and/or Debit Card Overdraft Service, those terms will apply to debit card transactions made through a mobile device.

We may, at any time, partially or fully restrict your ability to make debit card transactions through a mobile device. If you want to remove your digital card number from your mobile device, contact us using the information listed in the "Questions? We're here for you" section at the beginning of this Agreement.

## Card on file with merchants

If you give your debit card number to a merchant with authorization to bill that card for recurring payments, or to keep it on file for future purchases or payments, the merchant may receive updated card information to process such payments. However, since not all merchants receive updated card information, we recommend you notify each merchant of your new debit card number and/or expiration date to ensure your payments continue uninterrupted. If you have a card on file with a merchant and want to cancel the payment arrangement, be sure to cancel it directly with the merchant.

## Authorization holds for card transactions

For all card purchase transactions, we may place a temporary hold on some or all of the funds in the account linked to your card when we obtain an authorization request. **We refer to this temporary hold as an authorization hold. The funds subject to the hold will be subtracted from your available balance.** We generally release the hold within 3 business days, but it can be up to 30 business days for certain types of debit card transactions, such as international car rental and hotel, from the time of authorization or until the transaction is paid from your account.

If the merchant does not submit the transaction for payment within the time allowed, we'll release the authorization hold. This means your available balance will increase until the transaction is submitted for payment by the merchant and posted to your account. If this happens, we must honor the prior authorization and will pay the transaction from your account. In some situations, the amount of the hold may differ from the actual transaction amount since the merchant may not know the total amount you'll spend. For example: A restaurant submits the authorization request for your meal before you add a tip.

**You might end up overdrawing your account even though the available balance appears to show there are sufficient funds to cover your transaction.** For example: A merchant does not submit a one-time debit card transaction for payment within three business days of authorization (or up to 30 business days); we must release the authorization hold even though we'll have to honor the transaction. When we receive it for payment, it's paid from the funds in the account and at that time it causes an overdraft.

You should record and track all of your transactions closely to confirm your available balance accurately reflects how you spend funds from the account linked to your card.

## Partial authorization for card transactions

If a debit card or ATM card purchase amount exceeds the current available balance in the primary linked account when you're making a purchase, you may be able to use your available balance to pay for a portion of the total purchase. The transaction will be subject to a partial authorization daily purchase limit set by the Bank and your card's daily purchase limit.

We'll first try to approve the full amount of the purchase with the available funds in your checking account, account(s) linked for Overdraft Protection, and, if enrolled, using Debit Card Overdraft Service. If we don't approve the full amount of the purchase, we may approve a portion of the purchase using the remaining available funds in your checking account. This is called a partial authorization. The remaining amount of the purchase total would need to be covered by another form of payment, such as cash or another card. If you're unable/unwilling to provide an additional form of payment, and the transaction does not occur, the partial authorization will be reversed by the merchant. Not all merchants are able to accept partial authorizations or process transactions using multiple forms of payment.

## Transactions outside the United States

If a card is used to make an ATM withdrawal or a purchase outside the United States, the network handling the transaction will convert the local currency amount of the transaction to U.S. dollars (or, in the case of a purchase only, the merchant handling the transaction may convert the currency). If the network converts the currency, it will use either a rate selected by the network from the range of rates available in wholesale currency markets for the applicable central processing date, which rate may vary from the rate the network itself receives, or the government-mandated rate in effect for the applicable central processing date. If the merchant handling the purchase converts the currency, the merchant will determine the currency conversion rate. For each purchase transaction completed outside the United States, we may also charge an international purchase transaction fee, which we base on the amount provided to us by the network (for example, Visa, MasterCard) in U.S. dollars.

## Ending your card use

Your card is our property.

We may cancel your card or card banking access at any time without notice to you. You may cancel your card or card banking access at any time by writing to us at the address provided in your account statement, calling the number on the back of your card, or visiting your nearest branch. If the account is closed or the card is cancelled, you will immediately destroy the card(s) and, upon request, tell us in writing that the card(s) has been destroyed. If requested, you must immediately return the card(s) to us. If your card or card banking access is cancelled, you must pay for any card transactions made before the card is cancelled. For the Wells Fargo Campus Card℠ program, school issued campus cards are the property of the school.

## Zero Liability protection

With Zero Liability protection, you'll have no liability for any card transactions that you did not make or authorize, so long as those transactions occurred before the end of the 60-day period described below.

If your account statement shows card transactions that you did not make or authorize, tell us at once. If you don't notify us within 60 days after the statement was mailed or was otherwise made available to you, you'll be liable for any additional unauthorized card transactions that occurred after the 60-day period and before you provided notice to us (if we could have stopped those card transactions had you promptly notified us). This will apply even to unauthorized card transactions that occur shortly before you notify us. If a good reason (such as a long trip or hospital stay) kept you from telling us, we'll extend the time period.

**For card transactions from consumer accounts:** Your card comes with Wells Fargo's Zero Liability protection, which provides you with more coverage than what Regulation E requires for cards accessing consumer accounts (see "Liability for unauthorized transactions according to Regulation E" in the "Electronic Fund Transfer Disclosures" section of this Agreement).

**For card transactions from business accounts:** Your card comes with Wells Fargo's Zero Liability protection.

## Additional information for Wells Fargo Campus Card Program customers

Wells Fargo campus cards are available two ways:
1) Wells Fargo issued cards
2) School issued cards

Campus debit and campus ATM cards are available for students, faculty, and staff of participating colleges and universities. Campus debit cards can be identified by the Visa® logo on the front of the card; campus ATM cards don't include a Visa logo.

**A Wells Fargo-issued card** is produced by Wells Fargo and delivered to currently enrolled students and currently employed faculty and staff by mail after we receive their request for a campus debit card. A card may be requested by bringing a valid school ID from a participating college or university to a Wells Fargo branch. The card must be linked to an eligible new or existing deposit account to be used for purchases and ATM transactions, and it expires five years from the date it was issued. After the card expires, we'll issue you a standard Wells Fargo Debit Card. You may visit a Wells Fargo branch to request another campus debit card if you remain eligible based on current enrollment or employment at a participating college or university.

**A school issued card** is produced by a participating college or university and issued to currently enrolled students and currently employed faculty and staff by the school. It can be linked to an eligible new or existing deposit account to be used for purchases and ATM transactions. School issued campus ATM cards can be linked to an eligible deposit account at any time for up to five years from the date it was issued, and it expires five years after it is linked to an eligible deposit account. After the card expires, you can contact Wells Fargo and request a standard Wells Fargo Debit or ATM Card to use for purchases and ATM transactions. Or, you can request another campus ATM card from the school if you remain eligible based on current enrollment or employment at a participating college or university, and then visit a Wells Fargo branch to link your campus ATM card to your eligible deposit account.

School issued campus ATM cards can be linked to an eligible deposit account at any time for up to five years from the date it was issued. The card expires five years after it is issued. You can contact Wells Fargo and request a standard Wells Fargo Debit or ATM Card to use for purchases and ATM transactions.

Both Wells Fargo and school issued campus cards are subject to daily dollar limits for purchases and ATM transactions. For a new campus debit card, we provide your daily ATM withdrawal and purchase limits when you receive your card. For a new campus ATM card, the limits below apply to your card, unless you request and are provided other limits at the time you link your campus ATM card to an eligible deposit account. Replacement campus debit or campus ATM cards will have the same limits as the card it replaced at the time the replacement card is issued. You can confirm your limits by calling us at the number listed in the "Questions? We're here for you" section at the beginning of this Agreement, or by viewing them in online banking.

| New campus ATM card daily limits | |
| --- | --- |
| ATM Withdrawals | $1,010 |
| Purchases | $500 |

To view the Campus Debit and ATM Card Terms and Conditions, visit wellsfargo.com/debitcardterms (English) or wellsfargo.com/spanishdebitcardterms (Spanish).

## Card and ATM safety tips

### Card safety

- Always protect your card and keep it in a safe place, just like you would cash, credit cards, or checks.
- Create a PIN that does not include any number or word that appears in your wallet (such as birth date, name, or address). Note: Most ATMs outside of the U.S require a four-digit numeric PIN.
- Memorize your PIN, never tell it to anyone, and never write it down.
- Change your PIN every six months. If you have forgotten your PIN or want a new one, visit your nearest Wells Fargo location.
- Shop with merchants you know and trust.
- Look at your account statements when you receive them to be sure you made the transactions listed. Contact us immediately if you identify anything suspicious.
- Make sure your internet transactions are secure. Look for secure transaction symbols.
- Log off from any site after you make a purchase. If you cannot log off, shut down your browser to keep someone from accessing your information.
- Avoid sending your card number through email because it isn't secure, and don't give the number over the phone unless you made the call.
- If your card is ever lost or stolen, immediately notify us at the number or P.O. Box listed in the "Questions? We're here for you" section at the beginning of this Agreement.
- Destroy your old card if you receive a replacement.
- Before using an attended or unattended merchant terminal, look at it for possible tampering or for the presence of any unauthorized attachment that could capture your card information or PIN.

### ATM safety

- Be aware of your surroundings and be cautious when you withdraw money.
- Watch for suspicious persons or activity around the ATM. If you notice anything out of the ordinary, come back later or use an ATM elsewhere. If you see someone suspicious or unusual circumstances, don't use the ATM at that time. If you're in the middle of a transaction, cancel the transaction, take your card and leave the area and come back at another time or use an ATM at another location.
- Before using the ATM, look at it for possible tampering or for presence of any unauthorized attachment that could capture your card information or PIN.
- Report all crimes immediately to the operator of the ATM or local law enforcement.
- Consider having someone accompany you when using an ATM after dark.
- Be sure no one sees you enter your PIN.
- Avoid showing your cash. Put it away as soon as your transaction is completed. Wait to count your cash until you're in the safety of a locked enclosure, such as a car or home.
- Keep safe or securely get rid of your ATM receipts.
- Keep your engine running when you use a drive-up ATM. Keep your doors locked and your passenger window up.

# Funds Transfer Services

The following provisions are in addition to, and not in place of, any other agreements you have with us regarding funds transfers to and from your account. The terms "funds transfer," "funds transfer system," "payment order," and "beneficiary" are used here as defined in Article 4A of the Uniform Commercial Code - Funds Transfers, as adopted by the state whose laws govern your account. As used in these provisions, a funds transfer does not include a transaction made using a Wells Fargo issued card. Examples of funds transfers covered by these provisions are a preauthorized automatic transaction via ACH (such as your car or mortgage payment), remittance transfers, and wire transfers (whether outgoing or incoming, foreign or domestic).

**Rules of funds transfer systems**

Funds transfers to or from your account will be governed by the rules of the funds transfer system(s) through which the transfers are made ("system rules"), including Fedwire, the National Automated Clearing House Association, the Electronic Check Clearing House Organization, any regional association (each an ACH), the Clearing House Interbank Payments System (CHIPS), the Society for Worldwide Interbank Financial Telecommunication ("SWIFT") and the RTP system ("RTP System"). We're under no obligation to honor, in whole or in part, any payment order or other instruction that could result in our contravention of applicable law, including, without limitation, requirements of the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC") and the Financial Crimes Enforcement Network ("FinCEN").

**Sending funds transfers/ Means of transmission**

When acting upon your transfer instructions, we may use any means of transmission, funds transfer system, clearing house, or intermediary bank that we reasonably select.

**Notice of funds transfers**

We'll notify you of funds electronically debited from or credited to your account through the account statement covering the period in which the transaction occurred. We're under no obligation to provide you with any additional notice or receipt.

**Reliance on identification numbers**

If an instruction or order to transfer funds describes the party to receive payment inconsistently by name and account number, we'll rely on the beneficiary account number even if the account number identifies a party different from the named recipient. If an instruction or order to transfer funds describes a participating financial institution inconsistently by name and identification number, the identification number may be relied on as the proper identification of the financial institution.

**Your duty to report unauthorized or erroneous funds transfers**

You'll exercise ordinary care to determine whether a funds transfer from your account was either not authorized or inaccurate. You must notify us if a funds transfer from your account wasn't authorized or is inaccurate. Notify us within 14 days after we notify you that the instruction or order was accepted or your account was debited or credited for the funds transfer, whichever is earlier, to be entitled to a refund from us. If you don't notify us within 14 days, we'll be entitled to retain payment for the funds transfer.

**Erroneous payment orders**

You could lose funds if you provide incomplete or inaccurate information in your payment orders. We have no obligation to detect errors you make in payment orders (for example, paying the wrong person or the wrong amount). Just because we detect an error once, we won't be obligated to detect future errors. We'll rely on the beneficiary account number and beneficiary bank identification number (e.g., IBAN, RTN, or SWIFT BIC) you provide with an instruction or order.

**ACH transactions**

These additional terms apply to payments to or from your account that you transmit through an ACH:

- Your rights as to payments to or from your account will be based on the laws governing your account.
- When we credit your account for an ACH payment, the payment is provisional until we receive final settlement through a Federal Reserve Bank or otherwise receive payment.
- If we don't receive final settlement or payment, we're entitled to a refund from you for the amount credited to your account.
- Any Originating Depository Financial Institution (ODFI) may initiate, pursuant to ACH Operating Rules, ACH debit entries to your account for presentment or re-presentment of items you write or authorize.

**Remittance transfers**

Remittance transfers are initiated by consumers primarily for personal, family, or household purposes, and are sent outside the United States and its territories. Each time you initiate a remittance transfer, you'll receive disclosures outlining additional rights provided by federal law. You also may obtain a copy of those rights on wellsfargo.com or in any branch.

**Incoming international wire transfers**

Incoming wire transfers received in a foreign currency for payment into your account will be converted into U.S. dollars using the applicable exchange rate without prior notice to you. For more information, see the "Applicable Exchange Rate" section of this account agreement.

**Reversal or return of ACH transactions**

**Consumer accounts only:** You have the right to reverse any unauthorized ACH payment that was debited from your account. If you give us written notice that you want to reverse a payment, we'll credit your account for the amount of the payment. You must notify us no later than 15 days after we send or otherwise make available to you the account statement that reflects the payment you want to reverse. This right of reversal is in addition to your right to stop payment.

**Business accounts only:** Under the ACH Rules, the Bank can return any non-consumer ACH debit entry as unauthorized until midnight of the business day following the business day the Bank posts the entry to your account. In order for the Bank to meet this deadline, you're required to notify us to return any non-consumer ACH debit entry as unauthorized by the cutoff time we separately disclose. The cutoff time is currently 3:00 p.m. Central Time. If you don't notify us in a timely manner of the unauthorized non-consumer ACH debit entry, we won't be able to return it without the cooperation and agreement of the originating bank and the originator of the debit entry. Any other effort to recover the funds must occur solely between you and the originator of the entry.

**Additional information on ACH debit entries**

If you provide information that is incorrect or subject to change (for example, if the sender changes its company identification number or individual identification number), it may result in payment of the ACH debit entry. You acknowledge this risk and agree that you're responsible for notifying the sender of the ACH debit entry that your authorization has been revoked. You agree to indemnify and hold us harmless from, and against any loss we incur, as a result of our paying an ACH debit entry, if any of the information relied on in the stop payment order is incorrect or incomplete (or as a result of our not paying an ACH debit entry for which a valid stop payment order is in effect).

**Liability for transactions not covered by Regulation E**

For purchases and other transactions in consumer accounts not governed by Regulation E, you're liable for all losses relating to unauthorized funds transfers that don't result solely from our negligence or intentional misconduct, unless the laws governing your account require lesser liability.

**Receiving RTP® Payments**

The following additional terms apply to any real-time payments we receive for credit to your account through the RTP System. The terms "sender," "receiver," and "sending participant" are used here as defined in the system rules governing RTP payments ("RTP Rules"). In addition to the RTP Rules, RTP payments will be governed by the laws of the state of New York, including New York's version of Article 4A of the Uniform Commercial Code, as applicable, without regard to its conflict of laws principles.

- The RTP System may be used only for eligible payments between a sender and receiver whose accounts are located in the United States. You may not send or receive payments on behalf of any person or entity not domiciled in the United States. RTP payments that are permitted under the RTP Rules and our requirements are considered eligible payments for purposes of this Agreement.
- RTP payments cannot be cancelled or amended by the sender. If we receive a message from a sending participant requesting return of an RTP payment received for credit to your account, we may notify you of that request. You're not obligated under the RTP Rules to comply with any such request for return of funds. Any dispute between you and the sender of an RTP payment should be resolved between you and the sender.
- If you don't wish to accept an RTP credit received to your account, you may request that we return such payment to the sender. We may, at our sole discretion, attempt to honor such request but will have no liability for our failure to do so.
- RTP payments are typically completed within thirty (30) seconds of transmission of the RTP payment by the sender, unless the RTP payment fails or is delayed due to a review by us or the sending participant, such as for fraud, regulatory, or compliance purposes. Transaction limits imposed by the RTP System or sending participant may also prevent RTP payments from being sent to your account.

We're under no obligation to honor, in whole or in part, any payment order or other instruction that could result in our contravention of applicable law, including, without limitation, requirements of the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC") and the Financial Crimes Enforcement Network ("FinCEN").

# Electronic Fund Transfer Services

**(Consumer accounts only)**

**General rules for electronic fund transfer services**

When you read this section, you'll see references to Regulation E which provides certain protections and responsibilities.

We offer a variety of electronic fund transfer services you can use to access funds in your account(s) and perform other transactions detailed in this section. We describe some of these services in this section and also provide certain disclosures that apply to the use of electronic fund transfer services with your consumer account. Some of these services are governed by separate agreements we give to you at the time your card is mailed or you sign up for the service (e.g., ATM and debit cards, online, and mobile banking).

When you read this section, you'll see references to Regulation E or Reg E. This regulation applies to transactions you can perform using your card to access your account, such as purchases and ATM transactions. Regulation E also applies to other types of electronic fund transfers you can make from or to your account, such as payments made using Bill Pay and the direct deposit of your paycheck into your account. Regulation E sets forth the basic rights, liabilities, and responsibilities of consumers who use electronic fund transfers and of the banks or other persons who offer these services. It includes the actions you need to take if you believe your card, your card number, or your Personal Identification Number (PIN) has been lost or stolen, or if you notice an error or unauthorized electronic fund transfer on your account and the rules regarding your potential liability for these transfers. Your responsibilities and protections under Regulation E are described in more detail in the "Electronic Fund Transfer Disclosures" section.

For unauthorized card transactions, in addition to the rights you have under Regulation E, Wells Fargo Zero Liability protection provides you with added protection from liability. For details, see "Zero Liability protection" in the "Debit Cards and ATM Cards" section of this Agreement.

The following table summarizes the types of transactions to which Regulation E applies and tells you if Zero Liability protection covers the transaction.

| Electronic fund transfer | Description | Transaction covered by Reg E | Zero Liability protection |
|---|---|:---:|:---:|
| **Card transactions** | | | |
| Debit and ATM cards | Use your Debit or ATM card to make purchases, withdrawals, payments, transfers, and other transactions as described above in the "Debit Cards and ATM Cards" section of this Agreement. | X | X |
| **Electronic transfers, payments, credits, and electronic check conversions** | | | |
| Transfers | Send or receive transfers between your accounts or to other recipients at Wells Fargo or other financial institutions | X | |
| Payments | One-time or recurring payments from your account that you initiate or preauthorize for withdrawal from your account | X | |
| Credits | Manual or automatic electronic deposits to your account, such as payroll or benefits payments | X | |
| Electronic check conversions | Electronic fund transfer using information from a check (e.g., the Bank's routing number and your account number) | X | |
| **Phone Bank transactions** | | | |
| Phone Bank transactions | **Not under a written agreement or plan:** A request to the Phone Bank to make a transaction to or from your account | | |
| | **Under a written agreement or plan:** The Phone Bank, under an agreement, can make transactions to and from your account | X | |

# Electronic Fund Transfer Disclosures

**(Consumer accounts only)**

The following provisions apply to electronic fund transfers to or from your consumer deposit account that are governed by Part A of Regulation E.

**Note:** These provisions don't apply to wire transfers. Refer to the "Funds Transfer Services" section of this Agreement.

**Liability for unauthorized transactions according to Regulation E**

**Tell us AT ONCE if you believe your card, card number, or PIN has been lost or stolen**, or if you believe that an electronic fund transfer has been made without your permission using information from your check. Telephoning is the best way of keeping your possible losses down. You could lose all the money in your account (plus funds in any line of credit, savings account, or credit card linked to your account or as part of an Overdraft Protection plan).

If you tell us within two business days after you learn of the loss or theft of your card, card number, or PIN, you can lose no more than $50 if someone used your credentials without your permission (however, see "Zero Liability protection" in the "Debit Cards and ATM Cards" section of this Agreement).

If you **do NOT** tell us within two business days after you learn of the loss or theft of your card, card number, or PIN, and we can prove we could have stopped someone from using your credentials without your permission if you had told us, you could lose up to $500 (however, see "Zero Liability protection" in the "Debit Cards and ATM Cards" section of this Agreement).

Also, if your account statement shows transfers that you did not make or authorize, including those made by your card, PIN, or other means, tell us at once. If you do not notify us within 60 days after the statement was mailed or was otherwise made available to you, you will be liable for any additional unauthorized transactions that occurred after the 60-day period and before you provided notice to us (if we can prove we could have stopped those transactions had you promptly notified us). This will apply even to unauthorized transactions that occur shortly before you notify us. If a good reason (such as a long trip or hospital stay) kept you from telling us, we will extend the time periods.

**Contact in the event of unauthorized transfer**

If you believe your card, card number, or PIN, has been lost or stolen, call us at 1-800-869-3557 or the number listed on your statement, or write to us at Wells Fargo, Customer Correspondence, P.O. Box 6995, Portland, OR, 97228-6995.

You should also call the number or write to the address listed above if you believe a transfer has been made using the information from your check without your permission.

**Preauthorized credits to your account**

If you have arranged to have direct deposits made to your account at least once every 60 days from the same person or company, you can check your online or mobile banking, enroll in account alerts, or call us at 1-800-869-3557 to find out whether or not the deposit has been made.

**Handling preauthorized payments**

**Right to stop payment:** If you have told us in advance to make regular (recurring) payments out of your account, you can stop any of these payments. Here's how: Call us at 1-800-869-3557, or write to us at Wells Fargo, Customer Correspondence, P.O. Box 6995, Portland, OR, 97228-6995, in time for us to receive your request three business days or more before the payment is scheduled to be made. If you call, we may also require you to put your request in writing and get it to us within 14 days after you call. There is no fee to stop a recurring preauthorized payment using the debit card.

**Notice of varying amounts:** If the amount of these regular (recurring) payments vary, the party you are going to pay should tell you, 10 days before each payment, when it will be made and how much it will be. (The party you are going to pay may allow you to choose to get this notice only when the payment would differ by more than a certain amount from the previous payment, or when the amount would fall outside certain limits that you set.)

**Liability for failure to stop payment:** If you order us to stop one of these payments three business days or more before the transfer is scheduled, and we do not do so, we will pay for your losses or damages.

**Note:** We cannot stop payment on a purchase transaction unless it is a preauthorized electronic fund transfer.

**Electronic check conversion**

You may authorize a merchant or other payee to make a one-time electronic payment from your account using information from your check to 1) pay for purchases, or 2) pay bills.

**Account inquiry**

You have the right to contact us to find out whether an electronic transfer has been credited or debited to your account. Call us at 1-800-869-3557, or write to us at Wells Fargo, Customer Correspondence, P.O. Box 6995, Portland, OR 97228-6995.

**Receipts**

You can get a receipt at the time you make any transfer to or from your account using one of our ATMs or when you use your card at a merchant terminal.

**Our liability for failure to make transfers**

If we do not complete a transfer to or from your account on time or in the correct amount according to our agreement with you, we will be liable for your losses or damages. However, there are some exceptions. For instance, we will not be liable if:

- Through no fault of ours, you do not have enough money in your account to make the transfer,
- The transfer would go over the credit limit on a credit account linked for Overdraft Protection,
- The ATM where you are making the transfer does not have enough cash,
- The terminal or system was not working properly and you knew about the breakdown when you started the transfer,
- Circumstances beyond our control (such as fire or flood) prevent the transfer, despite reasonable precautions we have taken, or
- There is some other exception stated in our Agreement with you.

**In case of errors or questions about your electronic fund transfers**

If you see an error or have questions about your electronic transfers, think your deposit statement or receipt is wrong, or you need more information about a transfer listed on an account statement or receipt, call us at 1-800-869-3557 or the number listed on your account statement, or write to us at Wells Fargo, Customer Correspondence, P.O. Box 6995, Portland, OR, 97228-6995 as soon as you can. We must hear from you no later than 60 days after we send the FIRST account statement on which the problem or error appeared, and you should take the following actions:

- Tell us your name and account number (if any) and the dollar amount of the suspected error.
- Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe it is an error, or why you need more information.

If you tell us in person or by phone, we may require that you send us your complaint or question in writing within 10 business days.

**Investigations**

We will determine whether an error occurred within 10 business days after we hear from you and will correct any error promptly. If we need more time, however, we may take up to 45 days to investigate your complaint or question. If we need more time, we will credit your account within 10 business days for the amount you think is in error, so that you will have the use of the money during the time it takes us to complete our investigation. If we ask you to put your complaint or question in writing and we do not receive it within 10 business days, we may not credit your account.

For errors involving new accounts, point-of-sale transactions, or foreign-initiated transactions, we may take up to 90 days to investigate your complaint or question. For new accounts, we may take up to 20 business days to credit your account for the amount you think is in error.

We will tell you the results within three business days after completing our investigation. If we decide that there was no error, we will send you a written explanation. You may ask for copies of the documents that we used in our investigation.

# Other Account Services and Restrictions

**Telephone banking services**

You may use our automated phone system to get account information, transfer funds between Wells Fargo accounts, or pay certain Wells Fargo credit bills. To access this service, you must have a valid PIN, either for your debit or ATM card, or a cardless PIN issued only for authentication purposes. If you don't have a valid PIN, we'll ask you for information to verify your identity. We may cancel your non-card PIN at any time without notice, including after six months of non-use. We may comply with any request of a caller using Wells Fargo's telephone banking services, provided we authenticate the caller in compliance with one of the identity verification procedures described in this paragraph.

**Large cash withdrawals or deposits**

We may place reasonable restrictions on large cash withdrawals. These restrictions may include requiring you to provide reasonable advance notice to ensure we have sufficient cash on hand. We don't have any obligation to provide security if you make a large cash withdrawal. If you want to deposit a large amount of cash, we may require you to provide adequate security or exercise other options to mitigate possible risks.

**Checks with multiple signatures**

We may act on the instructions of any one authorized signer on your account and not require multiple signatures. If you have indicated that more than one signature is required to transact on your account, you acknowledge and agree that such requirements are for your own control purposes only, and we won't be liable if a check or other transaction is processed without multiple signatures. We're not responsible for reviewing your checks or other transactions for multiple signatures.

**Checks with dates and special instructions**

We may pay the amount encoded on your check in U.S. dollars, even if you wrote the check in a foreign currency or made a notation on the check's face to pay it in a foreign currency. If we, in our sole discretion, pay a check or other item in a foreign currency, the applicable exchange rate may apply. For information on the applicable exchange rate, see "Applicable exchange rate" in the "Statements, Interest, and Other Account Information" section of this Agreement. The encoded amount is in the line along the bottom edge of the front of the check where the account number is printed.

We may, without inquiry or liability, pay a check even if it:

- Has special written instructions indicating we should refuse payment (e.g., "void after 30 days" or "void over $100"),
- Is stale-dated (i.e., the check's date is more than six months in the past), even if we're aware of the check's date,
- Is post-dated (i.e., the check's date is in the future), or
- Isn't dated.

**Use of a facsimile or mechanical signature**

If you use any device or machine to provide a faxed, electronic, computer generated or other mechanical signature (including a stamp on a check) it will be treated as if you had actually signed it.

**ACH debit entries**
(Business accounts make note)

Under the ACH operating rules, certain types of ACH debit entries may only be presented on a consumer account. We'll have no obligation to pay, and no liability for paying, any consumer ACH debit entry on a business account.

**Acceptable form for checks**

Your checks must meet our standards, including paper stock and dimensions; we may refuse checks that don't or that cannot be processed by our equipment. Checks must include our name and address as provided by us. Certain check features, such as security features, may impair the quality of a check image. We're not responsible for losses that result from your failure to follow our check standards.

**Checks presented by a non-customer**

For these transactions, we require acceptable identification, which may include a fingerprint from the person presenting your check. We may not honor the check if the person refuses to provide us with requested identification. We may charge a fee for non-customers to cash a check.

**Electronic check indemnifications**

An "electronic check" and an "electronic returned check" means an electronic image of a paper check or paper returned check or the electronic information derived from it.

When we transfer or present an electronic check or electronic returned check, we provide the following warranties:

- **Image Quality Warranty.** We guarantee that the electronic image accurately represents all of the information on the front of the check as of the time that the original check is truncated, and the electronic information includes an accurate record of all MICR line information required for a substitute check and the amount of a check.
- **No Double Debit Warranty.** We guarantee that the warrantee won't receive a presentment of or otherwise be charged for an electronic check, an electronic returned check, the original check, a substitute check, or a paper or electronic representation of a paper substitute check, in a way that the warrantee will be asked to pay a check that it has already paid.

When we transfer an electronic check for collection or payment, we make the image quality warranty and the no double debit warranty to the transferee bank, any subsequent collecting bank, the paying bank, and the drawer. When we transfer an electronic returned check for return, we make the image quality warranty and the no double debit warranty to the transferee returning bank, the depository bank, and the owner.

**Indemnities applicable to electronic checks and electronic returned checks.** You will indemnify, defend, and hold us harmless from all liabilities, obligations, demands, and costs (including fees of legal counsel and accountants) awarded against or incurred by us (collectively, "losses and liabilities"), related to the transfer or return of an electronic check or an electronic returned check on your behalf. If we suffer any losses or liabilities related to a breach of the image quality warranty or the no double debit warranty, you will reimburse us and not hold us responsible or liable.

**Indemnities applicable to remote deposit capture services (including Wells Fargo Mobile Deposit)**. If a depository bank accepts the original check from which an electronic check is created and suffers losses due to the check having already been paid, we're required to indemnify and reimburse that bank. If we suffer any losses or liabilities related to that type of depository bank indemnity obligation, you will indemnify and reimburse us and not hold us responsible or liable.

**Indemnities applicable to electronically created items.** If we transfer or present an "electronically created item" and receive settlement or other consideration for it, we're required to indemnify and reimburse each transferee bank, any subsequent collecting bank, the paying bank, and any subsequent returning bank against losses that result from the fact that:

- The electronic image or electronic information is not derived from a paper check,
- The person on whose account the electronically created item is drawn didn't authorize its issuance or the payee stated on the item, or
- A person receives a transfer, presentment, or return of, or otherwise is charged for an electronically created item in such a way that the person is asked to make payment based on an item it has paid.

If we suffer any losses or liabilities related to that type of electronically created item indemnity obligation, you will indemnify and reimburse us and not hold us responsible or liable.

## Stop payment

Applicable fees are described in the Consumer Schedule and Business Schedule.

**Requesting stop payment on a check**
You may request a stop payment on a check if you allow us a reasonable amount of time to act on it; the same is true if you ask us to cancel a stop payment order. You can request a stop payment through wellsfargo.com, by phone, or by visiting your local branch. We may verify that we have not already become obligated to pay the check from your account and can verify after we accept your stop payment order.

To issue a stop payment order on a check, we need the following information:

- Your bank account number
- The check number or range of numbers
- The check amount or amounts
- The payee(s) name(s)
- The date on the check

We are not responsible for stopping payment on a check if you provide incorrect or incomplete information about the check.

**Effective period for a stop payment order**
- **A stop payment order on a check is valid for six months.** We may pay a check once a stop payment order expires. You must request a new stop payment order if you don't want it to expire and we treat each renewal as a new order, and a new fee will apply.
- **Your responsibility after we accept a stop payment on a check.** Even if we return a check unpaid due to a stop payment order, you may still be liable to the holder of the check (e.g., a check cashing business).

**Stop payment orders on ACH debit entries**
You may request a stop payment order for an ACH debit entry that has not already been paid from your account. To be effective, a stop payment order must be received in a time and manner that gives the Bank a reasonable opportunity to act on the applicable ACH debit entry. If you provide verbal instructions, we may require confirmation in writing. If such written confirmation isn't received, we may remove the stop payment order after 14 days. An instruction to revoke a stop payment order must be received in a time and manner that gives us a reasonable opportunity to act on it.

To place a stop payment order on an ACH debit entry, you must provide the following information: (i) your account number, (ii) amount of the ACH debit entry, (iii) effective date, and (iv) payee name. We may request additional information and may, at our sole discretion, use only a portion of the required information in order to identify the ACH debit entry. We may be able to place a stop payment order based on the company identification number of the sender/payee, but this may stop all ACH entries received from this sender/payee.

**Stopping payment on a preauthorized electronic fund transfer**
If your account is a consumer account, you may stop payment on a preauthorized electronic fund transfer. See "Handling preauthorized payments" in the "Electronic Fund Transfer Services" section of this Agreement.

## Post-dated checks

A post-dated check is a check you issue with a date in the future. We're not responsible for waiting to honor the check unless you use a stop payment order for the check. You're responsible for notifying us to cancel the stop payment order when you're ready to have that check paid.

# Time Accounts (CDs)

CDs mature and are payable at the expiration of a specified term, which will be no less than seven calendar days after the date of deposit. The CD's maturity date is the last day of the term for the CD and is printed on your receipt.

We may refer to a Time Account as a CD or Certificate of Deposit, even though we don't issue a paper certificate when opening the account or require a paper certificate to close the account.

**You may withdraw funds from your CD on the maturity date without a penalty**. During the seven calendar days after the maturity date, which we refer to as grace period, you can change the term, generally make withdrawals and additional deposits, or close the CD. No additional deposits to the CD are allowed outside this grace period. You may be charged a penalty if you make a withdrawal at any other time. See "Early withdrawal penalty and Regulation D penalty" in this section.

**Unless you withdraw the funds, your CD will automatically renew at maturity:**

- Typically for the same term unless we inform you at the time of account opening or prior to maturity of a different renewal term, and
- At our standard interest rate in effect on the maturity date for a new CD of the same term and amount, unless we have notified you otherwise.

At renewal, in addition to the interest rate and renewal term, we may change any other CD provision, subject to providing you notice as required by law. We'll treat any interest that is deposited into your CD during the previous term as principal for your new term.

### IRA CDs and ESA CDs
You may have multiple accounts within your Individual Retirement Account (IRA) or Education Savings Account (ESA) plan. We no longer offer new IRAs or new ESAs. IRA CDs are only available for current IRA customers, and ESA CDs are only available for current ESA customers.

Your IRA/ESA plan balance on December 31 of each year represents the fair market value of your account. We report the fair market value, distributions from and contributions to your IRA/ESA, to the Internal Revenue Service (IRS). If applicable, the IRS may impose penalties. Please consult your tax advisor.

### Interest on your CD
The Annual Percentage Yield (APY) we disclose to you assumes the interest you earn will remain on deposit until your CD matures. If you withdraw your earned interest before maturity, your account will earn less interest over time and the actual APY will be less than the disclosed APY.

| Term | CD Interest payment options* | | | | |
|---|---|---|---|---|---|
| | Monthly | Quarterly | Semi-Annually | Annually | At maturity |
| Less than 12 months (365 days) | X | X | X | Not available | X |
| 12 months or more | X | X | X | X | Not available |

*Interest payments for IRA/ESA CDs redeposit monthly into your CD.

With the exception of IRA/ESA CDs, you may choose to have your interest payments re-deposited into your CD, transferred to a Wells Fargo checking or savings account, or paid by check if your CD has a minimum balance of $5,000.

**Early withdrawal penalty and Regulation D penalty**

**Early withdrawal penalty (Fixed Rate CDs and Fixed Rate IRA/ESA CDs):** Other than the Regulation D penalty described below, any money you withdraw from your CD before the end of its term will be subject to an early withdrawal penalty based on the length of the CD term.

| CD Term | Penalty |
|---|---|
| less than 90 days (or less than 3 months*) | 1 month's interest |
| 90 through 365 days (or 3-12 months*) | 3 months' interest |
| Over 12 months through 24 months | 6 months' interest |
| Over 24 months | 12 months' interest |

\* Some CD terms are based on days and others are based on months. Check your receipt for the term applicable to your CD.

We calculate the early withdrawal penalty using the amount of principal you withdraw at your CD's interest rate at the time of withdrawal. The penalty is calculated by multiplying the interest rate by the amount of principal withdrawn then dividing that total by 12 to arrive at one month's interest. We'll deduct your early withdrawal penalty from your earned interest. If the penalty is greater than your earned interest, then we'll deduct the difference from the principal amount of your CD.

**Regulation D Penalty**: The Regulation D penalty is seven days' simple interest on the amount withdrawn and applies to the following:

- Withdrawals made within seven days of account opening including the day the account was opened.
- Withdrawals made during the grace period, when additional deposits are made during the grace period and the withdrawal exceeds the amount of the matured CD balance.
- Withdrawals within seven days of any prior withdrawal where the Bank's early withdrawal penalty is not applied.

**Exceptions to the early withdrawal penalty and the Regulation D penalty (Fixed Rate CDs):**

- Death of the CD owner
- Death of the grantor of a revocable family/living trust
- Court determination that a CD owner is legally incompetent

**Exceptions to the early withdrawal penalty and the Regulation D penalty (Fixed Rate IRA/ESA CDs):**

- Death of the IRA CD or ESA CD owner
- Court determination that an IRA CD or ESA CD owner is legally incompetent
- IRA or ESA owner becomes disabled
- IRA owner is age 59 ½ or older
- IRA or ESA owner requests a revocation in writing within seven days of plan opening

# Protecting Your Account and Your Information

**Protection against unauthorized items**

You acknowledge that there's a growing risk of losses resulting from fraud, including unauthorized items. To help prevent fraud on your account, you agree to take reasonable steps to ensure the integrity of your account and items drawn on your account or deposited to it. We recommend you take the following preventive measures (not an exhaustive list):

- Reconcile your account statements when received and promptly notify us of any problem.
- Promptly notify us if you don't receive an expected statement.
- Don't provide your account and routing numbers to unknown persons. Fraudsters may use this information to initiate fraudulent transactions against your account.
- Only write checks to people and businesses whom you know. Fraudsters may try to trick you by pretending to be friends and family, indicating you have won the lottery or sweepstakes, through online dating sites, or impersonating law enforcement.
- Don't deposit checks from people whom you don't know. Fraudsters often request that you deposit a fake check into your account, then request that you return some of the funds. After you return the funds, the check bounces, but you are still responsible to us for the full amount of the check you deposited.
- Write your checks in a manner to prevent others from adding words, numbers or making other changes without your authorization.
- Protect your checks from unauthorized use and theft by securing your supply of checks at all times (for example, never leave checks in an unlocked vehicle, or out in a visible location unattended), using tamper resistant checks, destroying checks you don't intend to use, and  not signing blank checks. Check-related fraud is common. If you fail to take any of these preventive measures, we are not responsible for any losses that you may incur.

## Additional protections for business accounts

**Additional steps business customers should take to help reduce the risk of fraud on their accounts:**

- Assign responsibilities for your business account to multiple individuals and periodically reassign duties. Have different people reconcile statements and withdraw funds.
- Watch for checks cashed out of sequence or made out to cash as flags for embezzlement.
- Review activity for unexpected fluctuations such as the percentage of cash deposits to total deposit size. Most businesses will keep a constant average.
- Notify us immediately when an authorized signer's authority ends so that their name can be removed from account access.
- Obtain insurance coverage for bank account fraud risks.
- Watch out for imposters impersonating vendors or if an alleged vendor changes their payment instructions.
- Only send trusted employees to deliver checks or make deposits.

**Wells Fargo services to help prevent fraud on analyzed business accounts include:**

- Positive pay, positive pay with payee validation, or reverse positive pay
- ACH fraud filter, and
- Payment Authorization service.

In addition, we recommend you use certain industry best practices such as dual custody. With dual custody, when one user initiates an action like a payment or a change in the set-up of a service, the action does not take effect until a second user approves the action using a different computer or mobile device.

**Consequences if a business customer does not implement the fraud prevention services we recommend.** If we have expressly recommended that you use a fraud prevention service or industry best practice and you either (a) decide not to implement or use the recommended service or industry best practice or (b) fail to use it in accordance with the applicable service description or our other applicable documentation, then you are responsible for all losses that could have been prevented or mitigated by correct use of the recommended service or best practice.

## Verifying your identity with your mobile device and your wireless company

Wells Fargo may collect, use, and retain personal or other information about you or your mobile device to assist in verifying your identity. We may rely on such information provided to us by your wireless company, and you authorize them to disclose:

- Your mobile number, name, address, email;
- Network status, customer type, customer role, billing type, mobile device identifiers (IMSI and IMEI), and other subscriber and device details to Wells Fargo and our service providers for the duration of the account relationship.

Review our Privacy Notice for how we treat your data. You represent that you're the owner of the mobile phone number or have the delegated legal authority to act on behalf of the mobile subscriber to provide this consent.

# Statements, Interest, and Other Account Information

**Statements and notices**

We'll make available to you a statement of your account activity for each statement period, using the postal or email address associated with your account. We'll do the same with notices. If your delivery preference is electronic, we'll notify you by email that your statement or notice is available online. You must be at least 13 years old to receive online statements.

We'll send statements and notices to one owner of a jointly owned account, and you agree that owner is responsible for sharing copies of the information with all other owners. If you request that we send notices to an authorized signer, the authorized signer has the same responsibility. Online statements are available to each joint owner.

Your statement is considered received by you on the second business day after we mail it to you or, if your delivery preference is electronic, when it's available through online banking. You agree to this timing even if the postal or email address you provided us is invalid.

Checking accounts get a monthly account statement. Savings accounts generally get a quarterly account statement, but will get a monthly statement if you set up automatic transfers into your savings account, have electronic fund transfer activity in the account, or have a combined statement for your checking and savings accounts.

**Combined statements**

We may combine statements for accounts with at least one common owner, in which case we consider the first account listed on your statement as your primary account. We'll make available your account statement through the address listed for your primary account. Statements for accounts in a combined statement will be delivered according to the delivery preference of the primary account.

Any person with online access to the primary account will also have online viewing capability to all the information on the combined statement.

If you prefer that we not combine your statements, let us know and we'll keep them separate. This will apply to subsequent statements only, and this option isn't available for the Portfolio by Wells Fargo® program.

**Changing statement period and fee period for checking and non-IRA savings accounts**

We may change the statement period and fee period assigned to your account without advance notice. If your account is interest-bearing, these changes won't affect interest calculations, but they may affect the date we post interest to your account.

For all accounts except analyzed business accounts, if the first new fee period created by our change is fewer than 25 days, the Bank will automatically waive the monthly service fee for that period.

**Check safekeeping and check image service**

**We don't return your physical paid checks in your statements.** Instead, we make copies of your paid checks available online, by calling us, or at our branches.

**For an additional fee, you can enroll in our check image service.** With this service, you'll receive images of your paid checks on your paper statement. See the "Service Fees" section of the Consumer Schedule or Business Schedule for specific applicable fees and additional details. This service isn't available with online statements, savings accounts, or Clear Access Banking.

For checking accounts with paper statements, the fee for this service is posted to your account on the last day of the fee period, and it will only be assessed when check images are included in your statement. If you have a combined statement or Portfolio by Wells Fargo program, only the primary checking account is eligible for the monthly check image service.

When we provide a statement, we have made the check image available to you, even if we don't send originals or images with the statement. We'll destroy original checks after a reasonable period of time we determine. If for any reason we can't provide a copy of your check, we won't be liable for more than the face amount of the check. We cannot provide originals or images of checks that are sent to us as electronic transfers. Additionally, other banks may send us electronic images instead of original checks. In that case, we may provide a copy of the image, but not the original check.

## Account statements or notices returned or undeliverable

Your account statements or notices will be considered unclaimed or undeliverable if

- Two or more account statements or notices are returned to us through the mail because of an incorrect address; or
- We notify you electronically that your account statement is available for online viewing, and we receive email notifications that our message is undeliverable.

In either event, we may

- Discontinue sending account statements and notices, and
- Destroy account statements and notices returned to us as undeliverable.

We won't attempt to re-deliver account statements and notices to you until you provide us with a valid postal or electronic address.

## Change of address

You agree to promptly notify us of any change to your postal or email address. We'll change your postal or email address within a reasonable time after you request it. If you have a combined statement, any owner of the primary account can change the address of all accounts included in the combined statement. Unless you instruct otherwise, we may change the postal or electronic address only for the account(s) you specify or for all or some of your other account(s) with us.

We may update your address in our records without a request from you if (1) we identify a need to rely on another address you have provided us; or (2) we receive an address change notice from the U.S. Postal Service or information from another party in the business of providing correct address details that does not match the address in our records for your account or card.

## Your responsibility to review account statements and notices and notify us of errors

You are obligated to:

- Examine your account statement promptly and carefully.
- Notify us promptly of any errors.
- Notify us within 30 days after we have made your account statement available to you of any unauthorized transaction on your account. Note: If the same person has made two or more unauthorized transactions and you fail to notify us of the first one within this 30-day period, we won't be responsible for unauthorized transactions made by the same wrongdoer.
- Notify us within six months after we have made your account statement available to you if you identify any unauthorized, missing, or altered endorsements on your items.

For specific information on unauthorized card transactions, see "Zero Liability protection" in the "Debit Cards and ATM Cards" section of this Agreement.

**Consumer accounts only:** Electronic fund transfers are subject to different time periods for notification of errors, as described in the "Electronic Fund Transfer Services" section of this Agreement. Common examples of electronic fund transfers are ATM, debit card, and Bill Pay transactions.

## Responsibility to notify us of errors

If you fail to notify us of any unauthorized transaction, error, or claim for a credit or refund within the time frames specified above, your account statement will be considered correct and we won't be responsible for any unauthorized transaction, error, or claim for transactions included in the applicable statement.

## Unauthorized transactions

A transaction is an unauthorized transaction when it's

- Missing a required signature or other evidence showing you have authorized it, or
- Altered (for example, the amount of a check or the payee's name is changed).

You can notify us of errors on your account statements by promptly

- Calling the telephone number listed on your account statement or in a notice, or
- Submitting a written report (if instructed by us) as soon as possible, but in any event within the specified time frames.

**Actions we take when you report an unauthorized transaction:** We investigate any reports of unauthorized activity on your account. After you submit a claim, we may require you to:

- Complete and return the claim form and any other documents we require,
- Notify law enforcement, and
- Cooperate fully with us in our investigation.

We can reverse any credit made to your account resulting from a claim of unauthorized transaction or error if you don't cooperate fully with us in our investigation or recovery efforts, or we determine the transaction was authorized.

For specific information on unauthorized card transactions, see "Zero Liability protection" in the "Debit Cards and ATM Cards" section of this Agreement.

**Consumer accounts only:** For specific information on unauthorized electronic fund transfers, see the "Electronic Fund Transfer Services" section of this Agreement.

## Adverse claims against your account

An adverse claim occurs when

• Any person or entity makes a claim against your account or funds in your account,
• We believe a conflict exists between or among your account's owners, or
• We believe a dispute exists over who has account ownership or authority to withdraw funds from your account.

In these situations, we may take any of the following actions without any responsibility or liability to you:

• Continue to rely on the documents we have on file for your account.
• Honor the claim against your account funds if we're satisfied the claim is valid.
• Freeze all or a part of the funds in your account until we believe the dispute is resolved to our satisfaction.
• Close your account and send a check or other item for the available balance in your account payable to you or to you and each person or entity who claimed the funds.
• Pay the funds into an appropriate court and/or petition the court to resolve the dispute.

We also may charge any account you keep with us for our fees and expenses in taking these actions (including attorney's fees and expenses, and court costs).

## If you carry special insurance for employee fraud/embezzlement
(Business accounts only)

If you have special insurance for employee fraud/embezzlement, we may require you to file your claim with your insurance company before making any claim against us. In such event, we'll consider your claim only after we have reviewed your insurance company's decision, and our liability to you, if any, will be reduced by the amount your insurance company pays you.

## Restricting access to your account

If we suspect any suspicious, irregular, fraudulent, unauthorized or unlawful activities, we can prevent, delay or decline transactions, freeze all or some of the funds in any account with us that you keep or control, and otherwise restrict access to your account. We may take these actions in our sole discretion and without liability to you, but we are not obligated to take any such actions.

## Converting accounts

We can convert your account to another type of deposit account (by giving you any required notice) if:

• You use it inappropriately or fail to meet or maintain the account's requirements, including minimum balance requirements, or
• We determine an account is inappropriate for you based on your use, or
• We stop offering the type of account you have.

## Terminating or suspending services

We can terminate or suspend specific services (for example, wire transfers) without closing your account and without prior notice to you. You can discontinue using a service at any time.

## Obtaining credit reports or other reports about you

We can obtain a credit or other report about you and/or your co-owners and authorized signers to help us determine whether to open or keep an account. We can also obtain information from motor vehicle departments, other state agencies, and public records.

## Sharing information about your account with others

Generally, if we don't have your consent, we won't share information about your account. However, we may share information about your account in accordance with our separately provided Privacy Notice.

## Use of funds in customers' non-interest-bearing accounts

We may benefit from having the use of funds in customers' non-interest-bearing accounts. We may use these funds to reduce our borrowing from other sources, such as the Fed Funds market, or invest them in short-term investments, such as our Federal Reserve Account. Our use of funds as described in this paragraph has no effect or impact on your use of and access to funds in your account.

## Interest-bearing accounts

**Calculating the applicable interest rate:** When you open an interest-bearing account, we provide a rate sheet listing the current interest rate and Annual Percentage Yield (APY) for your account. Interest-bearing accounts earn interest at a variable rate, except CDs. The interest rate may be as low as 0.00%, and we may change the interest rate for variable-rate accounts at any time. The interest rate may vary depending on your daily balances (tiered-rate account). We may pay the same interest rate on more than one tier. The tiers and corresponding interest rates are disclosed in the rate sheet.

We calculate interest using the daily periodic balance method, applying a daily periodic rate to the collected balance in your account each day. Interest is calculated using a 365-day year, unless otherwise noted for business accounts in the Business Schedule. Interest compounds daily. For interest-bearing checking and savings accounts, it will be credited monthly.

Cash deposits begin accruing interest the same business day the deposit is credited to your account. If you deposit an item such as a check, interest begins accruing on the business day we receive credit for the item.

**Annual Percentage Yield (APY) and Annual Percentage Yield Earned (APYE):** The Annual Percentage Yield (APY) is a percentage rate reflecting the total amount of interest paid on an account based on the interest rate and the frequency of compounding for a 365-day period. The Annual Percentage Yield Earned (APYE) is an annualized rate that reflects the relationship between the amount of interest actually earned on your account during the statement period and the average daily balance in the account for the statement period.

We calculate both your APY and APYE according to formulas established by federal regulations. The APYE appears on your account statement.

**The right to require notice of withdrawal from your savings account:** We may require seven days written notice before you withdraw money from your savings account.

## Tax identification number certification requirements

U.S. Treasury regulations require us to determine the tax residency of all customers and payees who could receive income that is reportable to the IRS. We accomplish this by obtaining a Form W-9 from all U.S. taxpayers and a type of Form W-8 from all foreign customers.

- We use Form W-9 to document U.S. tax residency and obtain a Taxpayer Identification Number ("TIN") from the primary owner of each account. Until we have received the Form W-9 and TIN, we're required to apply backup withholding to any income earned.
- Foreign individuals (also referred to as nonresident aliens) and foreign entities document their tax residency outside the U.S. on the applicable type of Form W-8. That form also allows us to apply the correct withholding rate or exemption to your income earned in the U.S. If you don't provide a valid type of Form W-8, we're required to apply the 30% withholding rate, or in some cases, presume you're an uncertified U.S. taxpayer subject to backup withholding on all income and gross proceeds regardless of whether or not it's U.S. sourced.
- Accounts jointly owned by at least one foreign individual or entity must provide a Form W-8 or Form W-9, as applicable, for all of the joint owners.
- Foreign individuals provide a Form W-8BEN. Foreign entities that are the beneficial owner of the income provide a Form W-8BEN-E unless they can make a special withholding exemption claim and instead provide either a Form W-8EXP or Form W-8ECI.
- Entities that act as intermediaries or flow-through entities receiving income on behalf of someone else provide a Form W-8IMY. In some cases, that Form W-8IMY must also include a withholding statement that allocates the income to each of the beneficial owners and copies of the tax certification documentation for those underlying beneficial owners.

If you own your account as an individual or sole proprietor, upon your death, we must be provided with the estate's or successor's IRS Form W-9 or Form W-8. If these are not provided, we may either refuse to pay interest earned on your account from the date of your death or apply backup withholding on the income earned after the date of your death.

## Your tax responsibility

You're responsible for paying applicable state and local sales taxes on your account fees. These taxes vary by location. You also agree to pay an amount equal to any other applicable taxes, including backup withholding tax. We will charge you for all the foregoing taxes and amounts. You also agree to pay an amount equal to any other applicable taxes, including backup withholding tax.

**Applicable exchange rate**

In addition to any applicable fees, we make money when we convert one currency to another currency for you. The exchange rate used when we convert one currency to another is set at our sole discretion, and it includes a markup. The markup is designed to compensate us for several considerations including, without limitation, costs incurred, market risks, and our desired return. The applicable exchange rate does not include, and is separate from, any applicable fees. The exchange rate we provide to you may be different from exchange rates you see elsewhere. Different customers may receive different rates for transactions that are the same or similar, and the applicable exchange rate may be different for foreign currency cash, drafts, checks, or wire transfers. Foreign exchange markets are dynamic and rates fluctuate over time based on market conditions, liquidity, and risks. We're your arms-length counterparty on foreign exchange transactions. We may refuse to process any request for a foreign exchange transaction.

**Communications about your account**

**Contacting you for servicing and collection:** We may contact you by phone, text, email, or mail to service your account or collect amounts you owe us. You will provide us accurate and current contact information. We can contact you at any address, phone number, or email address you provide.

When you give us a phone number, you expressly consent that we (and any party acting on our behalf) may contact you by phone call or text message at that number. When we call you, you agree that we may leave prerecorded or artificial voice messages. You also agree that we may use automatic telephone dialing systems in connection with calls or text messages sent to any phone number you give us, even if the receiving number is a mobile phone or other service for which the party called may be charged.

**Monitoring communications:** We can monitor, record, and retain your communications with us at any time without further notice to anyone, unless the laws governing your account require further notice. Monitored and recorded communications include phone conversations, electronic messages and records, and other data transmissions.

**Communicating with authorized signers:** We may provide you or an authorized signer with information about your account. When we receive information from an authorized signer, we treat it as a communication from you. You agree to notify us promptly in writing if an authorized signer no longer has authority on your account.

# Closing Accounts

**If you close your account**

You can request to close your account at any time. To close, the account must be in good standing (for example, it does not have a negative balance, or restrictions such as holds on funds, legal order holds, or court blocks). At closing, we'll assist you in withdrawing or transferring any remaining funds, bringing your account balance to zero. All outstanding items need to be processed and posted to your account and all deposits collected and posted to your account before it closes or items will be returned unpaid afterwards. You must redirect or cancel all scheduled deposits to and payments from (recurring or one-time, in each case) your account; otherwise, they may be returned unpaid after the account closes. We won't be liable for any loss or damage that may result from not honoring items or recurring deposits or payments that are presented or received after your account is closed (such as additional fees charged by a merchant or payee for a returned item).

During the process of closing your account:

- Interest-bearing accounts will stop earning interest.
- Overdraft Protection will be removed.
- All cards and linked accounts will be delinked.
- This Agreement continues to apply.

**Closing a Portfolio by Wells Fargo linked account:** When you ask us to close the primary checking account linked to your Portfolio by Wells Fargo program, we may take up to three business days to process your request.

**When we can close your account**

We may close your account at any time. If we close your account, we may send the remaining balance on deposit in your account by mail or credit it to another account you keep with us.

**Electronic banking privileges end when account is closed**

All of your electronic banking privileges will be terminated if your account is closed, except that you can view account activity, download statements and tax documents, and perform limited maintenance functions for at least 90 days after closure. If you're enrolled in online banking, refer to the Online Access Agreement for specific terms governing online access to your account.

**Closing your account if the balance is zero**

**Accounts with a zero balance will continue to be charged applicable fees** (like the monthly service fee) until you request to close your account. We may close an account (except analyzed business accounts) with a zero balance on the fee period ending date or at month end without prior notification to you. Once an account is closed (either by you or us), no fees will be assessed on the account.

- To prevent closure by us, an account with a zero balance must have a qualifying transaction posted within the last two months of the most recent fee period ending date. IOLTA and RETA accounts require a qualifying transaction within ten months of the most recent fee period ending date.
- Examples of qualifying transactions are deposits and withdrawals made at a branch, ATM, online, mobile, or via telephone; one-time and recurring transfers made at a branch, ATM, online, mobile, or via telephone; automatic or electronic deposits, such as from payroll or government benefits; automatic or electronic payments, including Bill Pay; one time and recurring purchases or payments made using a card or mobile device; and checks paid from the account. IOLTA and RETA accounts are not eligible for ATM cards or debit cards.
- Bank-originated transactions, like monthly service or other fees, are not considered qualifying transactions that will prevent closure of an account with a zero balance.

## Dormant accounts

Generally, an account with a positive balance becomes dormant if you do not initiate an account-related activity (as determined by the laws governing your account) for a specified period of time.

**Checking accounts, savings accounts, and CDs**: To avoid dormancy, initiate an account-related activity like depositing or withdrawing funds at a branch or ATM, or writing a check from the account. One-time and recurring automatic transactions such as pre-authorized transfers, payments and electronic deposits (including direct deposits), do not prevent the account from becoming dormant, unless otherwise specified by state law.

| Generally, dormancy for: | | |
|---|---|---|
| Checking account | Savings account | CD |
| 12 months | 34 months | 34 months after first renewal |

**Portfolio accounts only**: If any linked account other than your primary checking account becomes dormant, that account will be delinked from your Portfolio by Wells Fargo program and any program benefits no longer apply (including any fee discounts or waivers or special interest rates).

**Individual Retirement Accounts (IRAs) and Education Savings Accounts (ESAs)**: Generally, your IRA and ESA (Savings or CD) will become dormant if you don't initiate an account-related activity as follows:

- Traditional IRA becomes dormant if you don't initiate an account-related activity for 34 months or more after you reach the age of 70 ½ (if you reached that age prior to January 1, 2020) or 72 (if you did not reach age 70 ½ prior to January 1, 2020)
- Roth IRA won't become dormant unless we receive notification of your death, unless otherwise specified by state law
- ESA becomes dormant after the beneficial owner reaches age 30, unless otherwise specified by state law.

**Safeguards for dormant accounts**: We put safeguards in place to protect a dormant account, which may include restricting the following transactions:

- Transfers between your Wells Fargo accounts using your ATM/debit card
- Transfers by phone using our automated banking service
- Transfers or payments through online, mobile, and text banking (including Bill Pay)
- Wire transfers (incoming and outgoing)
- Contributions or transfers to IRA or ESA savings through online and mobile banking.

Normal monthly service fees and other fees continue to apply throughout the dormancy period.

## When and how accounts escheat

If you do not contact us about your dormant account or initiate an account-related activity within the time period specified by applicable state unclaimed property laws (generally, three or five years), Wells Fargo will close your account and deliver your account funds to that state. This process is known as escheat. Account statements will no longer be accessible through online banking. To recover your account funds, you must file a claim with the state.

**Portfolio accounts only**: About two months before escheat of the primary checking account in your Portfolio by Wells Fargo program we'll close the Portfolio by Wells Fargo program. At the time of closure, we'll delink all accounts, and any Portfolio benefits will no longer apply. See the Consumer Schedule for the benefits impacted. To reinstate your Portfolio by Wells Fargo program and associated program benefits, you must contact us before the primary checking account escheats.

# Consumer Accounts Only:
# Resolving Disputes Through Arbitration

**Arbitration Agreement between you and Wells Fargo**

If you have a dispute with us, we hope to resolve it as quickly and easily as possible. First, discuss your dispute with a banker. If your banker or another Wells Fargo employee is unable to resolve your dispute, you agree that either Wells Fargo or you can initiate arbitration as described in this section.

**Definition:** Arbitration means an impartial third party will hear the dispute between Wells Fargo and you and provide a decision. Binding arbitration means the decision of the arbitrator is final and enforceable. A dispute is any unresolved disagreement between Wells Fargo and you. A dispute may also include a disagreement about this Arbitration Agreement's meaning, application, or enforcement.

**Wells Fargo and you each agree to waive the right to a jury trial or a trial in front of a judge in a public court.** This Arbitration Agreement has only one exception: Either Wells Fargo or you may still take any dispute to small claims court.

Arbitration is beneficial because it provides a legally binding decision in a more streamlined, cost-effective manner than a typical court case. But, the benefit of arbitration is diminished if either Wells Fargo or you refuse to submit to arbitration following a lawful demand. Thus, the party that does not agree to submit to arbitration after a lawful demand must pay all of the other party's costs and expenses for compelling arbitration.

**Neither Wells Fargo nor you will be entitled to join or consolidate disputes by or against others as a representative or member of a class, to act in any arbitration in the interests of the general public, or to act as a private attorney general.** If any provision related to a class action, class arbitration, private attorney general action, other representative action, joinder, or consolidation is found to be illegal or unenforceable, the entire Arbitration Agreement will be unenforceable.

**Applicable rules**

Wells Fargo and you each agree that:

• The American Arbitration Association (AAA) will administer each arbitration and the selection of arbitrators according to the AAA's Consumer Arbitration Rules (AAA Rules).

• If there are any differences between the AAA Rules and this Arbitration Agreement, this Arbitration Agreement applies. If this Arbitration Agreement is in dispute, the arbitrator will decide whether it is enforceable.

• Wells Fargo and you are participating in commercial transactions involving the movement of money or goods among states.

• The Federal Arbitration Act (Title 9 of the United States Code) governs this Arbitration Agreement and any arbitration between Wells Fargo and you. If the Act or any part of it is inapplicable, unenforceable or invalid, the state laws governing your relationship with Wells Fargo govern this Arbitration Agreement.

Either Wells Fargo or you may submit a dispute to binding arbitration at any time, regardless of whether a lawsuit or other proceeding has previously begun. For information on initiating arbitration, contact the AAA at 1-800-778-7879.

Each arbitrator must be a licensed attorney with expertise in the laws applicable to the dispute's subject matter. The arbitrator will make a decision regarding the dispute based on applicable law, including any statutes of limitations. The arbitrator may award to either Wells Fargo or you any award or relief provided for by law.

**Fees and expenses**

• **Setting the fees/expenses:** We will pay any costs that are required to be paid by us under the arbitration administrator's rules and procedures, and subject to applicable law. If the arbitrator rules in your favor on any claim presented, we will reimburse you for arbitration filing fees you have paid up to $700.00. Please check with the arbitration administrator to determine the fees applicable to any arbitration you file.

• **Applying state law:** The laws governing your account may limit the amount of fees and expenses you are required to pay in arbitration. Your arbitration fees and expenses will not exceed any applicable limits.

• **Paying for attorney/expert/witness fees:** Unless applicable laws state otherwise, each party will pay its own attorney, expert, and witness fees. This rule applies no matter which party wins arbitration.

| | |
|---|---|
| **Additional dispute resolution** | Wells Fargo or you each can exercise any lawful rights or use other available remedies to:<br><br>• Preserve or obtain possession of property,<br><br>• Exercise self-help remedies, including setoff rights, or<br><br>• Obtain provisional or ancillary remedies such as injunctive relief, attachment, garnishment, or appointment of a receiver by a court of competent jurisdiction. |
| **Arbitration location** | An arbitration will be held in the state whose laws govern your account. |

# Business Accounts Only:
# Resolving Disputes Through Arbitration

**Arbitration Agreement between you and Wells Fargo**

If you have a dispute with us, we hope to resolve it as quickly and easily as possible. First, discuss your dispute with a banker. If your banker or another Wells Fargo employee is unable to resolve your dispute, you agree that either Wells Fargo or you can initiate arbitration as described in this section.

**Definition:** Arbitration means an impartial third party will hear the dispute between Wells Fargo and you and provide a decision. Binding arbitration means the decision of the arbitrator is final and enforceable. A "dispute" is any unresolved disagreement between Wells Fargo and you. A "dispute" may also include a disagreement about this Arbitration Agreement's meaning, application, or enforcement.

Except as stated in "No waiver of self-help or provisional remedies" below, Wells Fargo and you agree, at Wells Fargo's or your request, to submit to binding arbitration all claims, disputes, and controversies between or among Wells Fargo and you (and their respective employees, officers, directors, attorneys, and other agents), whether in tort, contract or otherwise arising out of or relating in any way to your account(s) and/or service(s), and their negotiation, execution, administration, modification, substitution, formation, inducement, enforcement, default, or termination (each, a "dispute"). **DISPUTES SUBMITTED TO ARBITRATION ARE NOT RESOLVED IN COURT BY A JUDGE OR JURY. TO THE EXTENT ALLOWED BY APPLICABLE LAW, WELLS FARGO AND YOU EACH IRREVOCABLY AND VOLUNTARILY WAIVE THE RIGHT EACH MAY HAVE TO A TRIAL BY JURY FOR ANY DISPUTE ARBITRATED UNDER THIS AGREEMENT.**

Aside from self-help remedies, this Arbitration Agreement has only one exception: Either Wells Fargo or you may still take any dispute to small claims court. Arbitration is beneficial because it provides a legally binding decision in a more streamlined, cost-effective manner than a typical court case. But, the benefit of arbitration is diminished if either Wells Fargo or you refuse to submit to arbitration following a lawful demand. Thus, the party that does not agree to submit to arbitration after a lawful demand by the other party must pay all of the other party's costs and expenses for compelling arbitration.

**Class action or representative suit not permitted**

Wells Fargo and you agree that the resolution of any dispute arising pursuant to the terms of this Agreement will be resolved by a separate arbitration proceeding and will not be consolidated with other disputes or treated as a class. Neither Wells Fargo nor you will be entitled to join or consolidate disputes by or against others as a representative or member of a class, to act in any arbitration in the interests of the general public, or to act as a private attorney general. If any provision related to a class action, class arbitration, private attorney general action, other representative action, joinder, or consolidation is found to be illegal or unenforceable, the entire Arbitration Agreement will be unenforceable.

**Applicable rules**

Wells Fargo and you each agree that the arbitration will:

• Proceed in a location mutually agreeable to Wells Fargo and you, or if the parties cannot agree, in a location selected by the American Arbitration Association (AAA) in the state whose laws govern your account

• Be governed by the Federal Arbitration Act (Title 9 of the United States Code), notwithstanding any conflicting choice of law provision in any of the documents between Wells Fargo and you

• Be conducted by the AAA, or such other administrator as Wells Fargo and you will mutually agree upon, in accordance with the AAA's commercial dispute resolution procedures, unless the claim or counterclaim is at least $1,000,000 exclusive of claimed interest, arbitration fees and costs in which case the arbitration will be conducted in accordance with the AAA's optional procedures for large, complex commercial disputes (the commercial dispute resolution procedures or the optional procedures for large, complex commercial disputes to be referred to, as applicable, as the "rules").

If there is any inconsistency between the terms hereof and any such rules, the terms and procedures set forth herein will control. Any party who fails or refuses to submit to arbitration following a lawful demand by any other party will bear all costs and expenses incurred by such other party in compelling arbitration of any dispute. Nothing contained herein will be deemed to be a waiver by Wells Fargo of the protections afforded to it under 12 U.S.C. Section 91 or any similar applicable state law.

### No waiver of self-help or provisional remedies

This arbitration requirement does not limit the right of Wells Fargo or you to:

1. Exercise self-help remedies, including setoff or

2. Obtain provisional or ancillary remedies such as injunctive relief or attachment, before, during, or after the pendency of any arbitration proceeding. This exclusion does not constitute a waiver of the right or obligation of either party to submit any dispute to arbitration or reference hereunder, including those arising from the exercise of the actions detailed in (1) and (2) above.

### Arbitrator's qualifications and power

Any dispute in which the amount in controversy is $5,000,000 or less will be decided by a single arbitrator selected according to the rules, and who will not render an award of greater than $5,000,000. Any dispute in which the amount in controversy exceeds $5,000,000 will be decided by majority vote of a panel of three arbitrators; provided however, that all three arbitrators must actively participate in all hearings and deliberations. Each arbitrator will be a neutral attorney licensed in the state whose laws govern your account, or a neutral, retired judge in such state, in either case with a minimum of ten years' experience in the substantive law applicable to the subject matter of the dispute to be arbitrated. The arbitrator(s) will determine whether or not an issue is arbitratable and will give effect to the statutes of limitation in determining any claim.

In any arbitration proceeding the arbitrator(s) will decide (by documents only or with a hearing at the discretion of the arbitrator(s)) any pre-hearing motions which are similar to motions to dismiss for failure to state a claim or motions for summary adjudication. The arbitrator(s) will resolve all disputes in accordance with the substantive law of the state whose laws govern your account and may grant any remedy or relief that a court of such state could order or grant within the scope hereof and such ancillary relief as is necessary to make effective any award. The arbitrator(s) will also have the power to award recovery of all costs and fees, to impose sanctions, and to take such other action as deemed necessary to the same extent a judge could pursuant to the federal rules of civil procedure, the state rules of civil procedure for the state whose laws govern your account, or other applicable law. Judgment upon the award rendered by the arbitrator(s) may be entered in any court having jurisdiction. The institution and maintenance of an action for judicial relief or pursuit of a provisional or ancillary remedy will not constitute a waiver of the right of any party, including the plaintiff, to submit the controversy or claim to arbitration if any other party contests such action for judicial relief.

### Discovery

In any arbitration proceeding, discovery will be permitted in accordance with the rules. All discovery will be expressly limited to matters directly relevant to the dispute being arbitrated and must be completed no later than 20 days before the hearing date. Any requests for an extension of the discovery periods, or any discovery disputes, will be subject to final determination by the arbitrator upon a showing that the request for discovery is essential for the party's presentation and that no alternative means for obtaining information is available.

### Fees and expenses

The arbitrator will award all costs and expenses of the arbitration proceeding.

### Additional rules for an arbitration proceeding

To the maximum extent practicable, the AAA, the arbitrator(s), Wells Fargo and you will take all action required to conclude any arbitration proceeding within 180 days of the filing of the dispute with the AAA. The arbitrator(s), Wells Fargo or you may not disclose the existence, content, or results thereof, except for disclosures of information by Wells Fargo or you required in the ordinary course of business, by applicable law or regulation, or to the extent necessary to exercise any judicial review rights set forth herein. If more than one agreement for arbitration by or between Wells Fargo and you potentially applies to a dispute, the arbitration agreement most directly related to your account or the subject matter of the dispute will control. This arbitration agreement will survive the closing of your account or termination of any service or the relationship between Wells Fargo and you.

### The right to pursue claims in small claims court

Notwithstanding anything to the contrary, Wells Fargo and you each retains the right to pursue in small claims court a dispute within that court's jurisdiction. Further, this arbitration agreement will apply only to disputes in which either party seeks to recover an amount of money (excluding attorneys' fees and costs) that exceeds the jurisdictional limit of the small claims court.

# Additional Terms and Services

**Laws governing your account**

This Agreement, your accounts, services and any related disputes are governed by United States law and (when not superseded by United States law) the laws of the state where you opened your account (without regard to conflict of laws principles).

For consumer and business accounts (except analyzed business accounts), your account statement identifies which state's laws govern your account. If a different state law applies, we'll notify you.

Any funds transfer (including a wire transfer) that is a remittance transfer as defined in Regulation E, Subpart B, will be governed by the laws of the United States and, to the extent applicable, the laws of the state of New York, including New York's version of Article 4A of the Uniform Commercial Code, without regard to its conflict of laws principles.

**Controlling language**

English is the controlling language of our relationship with you, including the terms of this Agreement. Items you write such as checks or withdrawal slips must be written in English. For your convenience, we may, but are not obligated to (unless required by law), translate some forms, disclosures, and advertisements into another language, but if there's a discrepancy, the English version prevails over the translation.

**Order of precedence between agreements**

If a service we offer has a separate agreement, and there's a conflict between the terms of this Agreement and the separate agreement, the conflicting terms of the separate agreement will apply.

**Legal process**

Legal process includes any levy, garnishment or attachment, tax levy or withholding order, injunction, restraining order, subpoena, search warrant, government agency request for information, forfeiture or seizure, and other legal process relating to your account.

We may accept and act on any legal process we believe to be valid regardless of how and where it is served, including if process is served in locations, states, or jurisdictions other than where the account was opened or where the account, property, or records are located.

We may, but are not required to, provide notice of legal process relating to your accounts. We may comply with legal process even though it affects the interests of only one owner or authorized signer of a joint account.

Any fees, expenses (including attorney's fees and expenses), or losses we incur as a result of responding to legal process related to your account are your responsibility. We may charge these costs to any account you maintain with us.

**Legal dispute location**

Any lawsuit, claim, or other proceeding arising from or relating to your account or this Agreement, will take place exclusively in the state or federal courts in the state whose laws govern your account, without regard to conflict of laws principles. This includes enforcement of the Arbitration Agreement and entry of judgment on any arbitration award.

**Changes to this Agreement**

We may change the terms of this Agreement, including account fees and features, at any time by adding new terms or conditions, or by modifying or deleting existing ones. If we're required to notify you of a change to this Agreement, we'll describe the change and its effective date in a message within your account statement or by any other appropriate means. We may agree in writing to waive a term of this Agreement, including a fee, and we may revoke any waiver.

**Modification of invalid terms**

Any term of this Agreement that is inconsistent with the laws governing your account will be excluded to the extent of such invalidity. The invalid term will be considered modified by us and applied in a manner consistent with such laws. Such modification won't affect the enforceability or validity of the remaining terms of this Agreement.

**Timing of notices**

Any notice you send us is effective once we receive it and have a reasonable opportunity to act on it.

## Responsibilities and liabilities between Wells Fargo and you

We're responsible for exercising ordinary care and complying with this Agreement.

When we take an item for processing by automated means, ordinary care does not require us to examine the item. In all other cases, ordinary care requires only that we follow standards that don't vary unreasonably from the general standards followed by similarly situated banks.

Except to the extent we fail to exercise ordinary care or to comply with this Agreement, you agree to indemnify and hold us harmless from all claims, demands, losses, liabilities, judgments, and expenses (including attorney's fees and expenses) arising out of or in any way connected with our performance under this Agreement. This indemnification will survive termination of this Agreement.

We won't be liable for anything we do when following your instructions. In addition, we won't be liable if we don't follow your instructions if we reasonably believe that your instructions would expose us to potential loss or civil or criminal liability, or conflict with customary banking practices. In no event will either Wells Fargo or you be liable to the other for any special, consequential, indirect, or punitive damages. The limitation doesn't apply where the laws governing your account prohibit it. We won't have any liability to you if your account does not have sufficient available funds to pay your items due to actions we have taken in accordance with this Agreement.

Circumstances beyond your control or ours may arise and make it impossible for us to provide services to you or for you to perform your duties under this Agreement. If this happens, neither Wells Fargo nor you will be in breach of this Agreement. If we waive a right with respect to your account on one or more occasions, it does not mean we're obligated to waive the same right on any other occasion.

## Your obligation to pay our fees

We're permitted to either directly debit your account or bill you for our fees, expenses and taxes incurred in connection with your account and any service.  If the available funds in your account are not sufficient to cover the debit, we may create an overdraft on your account.

## Setoff and security interest

**Our setoff rights:** If you owe us any money, we have the right to apply funds in any of your accounts to pay your debt. This is known as setoff. When we exercise this right, we reduce the funds in your account(s) by the amount of the debt that is due or past due as allowed by the laws governing your account. We're not required to give you any prior notice to exercise our right of setoff.

A debt includes any amount you owe individually or together with someone else both now or in the future. It includes any overdrafts and our fees. If your account is a joint account, we may setoff funds in it to pay the debt of any joint owner.

If your account is an unmatured CD, then we may deduct an early withdrawal penalty. This may be due as a result of our having exercised our right of setoff. See "Early withdrawal penalty and Regulation D penalty" in the "Time Accounts (CDs)" section of this Agreement.

**Consumer accounts only:** Our right to setoff extends to any federal or state benefit payments (including Social Security benefits) deposited to your account, subject to applicable law. If we're obligated to return any federal or state benefits deposited to your accounts after you're no longer eligible to receive them, we may setoff against any of your accounts to recover the payments you were ineligible to receive. Our right of setoff won't apply if it would invalidate the tax-deferred status of any tax-deferred retirement account (e.g., a SEP or an IRA) you keep with us.

**Security interest:** To ensure you pay us all amounts you owe us under this Agreement (e.g., overdrafts and fees), you grant us a lien on and security interest in each account you keep with us. By opening and keeping each account with us, you consent to our asserting our security interest should the laws governing this Agreement require your consent. Our rights under this security interest are in addition to and apart from any other rights under any other security interest you may have granted to us.

You may not grant a security interest in, transfer, or assign your accounts to anyone other than us without our written agreement.

# Glossary

**ACH:** the Automated Clearing House Network.

**ACH debit entry:** an electronic instruction requesting the withdrawal of funds from your account through ACH.

**ACH transaction:** a deposit or payment transferred to or from your account through an ACH.

**Analyzed business account:** a checking account for which fees are billed through account analysis. Some analyzed accounts offer an earnings allowance to offset eligible fees. Examples of analyzed business accounts include the following: Optimize Business Checking$^{SM}$, Analyzed Business Checking, and Analyzed Interest on Lawyers Trust Account (IOLTA).

**Authorized signer:** a person who has actual or apparent authority to use your account even if they have not signed the account application.

**Available balance:** our most current record of the amount of money available for your use or withdrawal. For more information, see the "Available Balance, Posting Transactions, and Overdraft" section in this Agreement.

**Business account:** any deposit account, other than one of Wells Fargo's commercial deposit accounts, which isn't established and kept for personal, family, or household purposes. Common examples of ownership include an individual acting as a sole proprietor, a partnership, a limited partnership, a limited liability partnership, a limited liability company, a corporation, a joint venture, a nonprofit corporation, an employee benefit plan, or a governmental unit including an Indian tribal entity.

**Business day:** every day except Saturday, Sunday, and federal holidays.

**Card:** every type of debit card and ATM card we may issue, except any prepaid cards or the business deposit card.

**Collected balance:** the ending daily balance in your account after all credits and debits have posted, minus deposited items that have not yet been collected from the originating financial institution. The collected balance is the balance on which interest is calculated for all interest-bearing checking accounts and for all savings accounts.

**Consumer account:** any deposit account which is established and kept for personal, family, or household purposes and isn't intended for business use. A consumer account can be owned by one or more individuals.

**Direct deposit:** an automatic electronic deposit of your salary, pension, Social Security, or other regular income deposited through the ACH network to your Wells Fargo deposit account by your employer or an outside agency.

**Endorsement:** a signature, stamp, or other mark on the back of a check to transfer, restrict payment, or make the signer responsible for the check.

**Fee period:** see the "Overview and Key Terms" section of the Consumer Schedule or Business Schedule, as applicable.

**Item:** any order, instruction, or authorization to withdraw or pay funds or money from or to an account. Examples include a check, draft, money order, ACH, wire transfer, Bill Pay, other electronic transfer, ATM withdrawal, teller withdrawal, debit card purchase, and fee.

**Overdraft:** an available balance of less than $\$0.00$ in your account.

**Returned item / Non-sufficient funds (NSF):** a term used to indicate when an item presented for payment is returned unpaid because the available balance in your deposit account is less than the amount of the item when presented.

**Statement period:** The dates of your statement period are located on your account statement, which provides you a record of all transactions posted during that period. Statement periods can be of varying length, including monthly, quarterly, semi-annual, or annual.

This Deposit Account Agreement governs deposit accounts maintained at Wells Fargo Bank, N.A.

© 2021 Wells Fargo Bank, N.A. All rights reserved. Member FDIC.

CCB2018 (10/15/21)

# Exhibit C

**AMERICAN ARBITRATION ASSOCIATION®**

**DEMAND FOR ARBITRATION
CONSUMER ARBITRATION RULES**

Complete this form to start arbitration under an arbitration agreement in a contract.

| | |
|---|---|
| 1. Which party is sending in the filing documents? *(check one)* | ☑ Consumer   ☐ Business |

2. Briefly explain the dispute: Claimant seeks statutory damages and return of overdraft fees collected in violations of Regulation E of the federal Electronic Funds Transfer Act, and for violation of state consumer fraud laws that have also been violated as a result of Respondent's violations of Regulation E. Please see attached and incorporated herein Exhibits: A) Statement of Claims; B) Opt-in Disclosure Agreement; and C) Deposit Account Agreement (arbitration provision commencing at page 35 thereto).

Related to Wilson v. Wells Fargo Bank (Case No. 01-21-0016-4036)

3. Specify the amount of money in dispute, if any: $  Statutory damages of $1,000, return of all improperly collected overdrafts plus statutory attorneys' fees and costs.  The amount of overdraft fees improperly collected is in the possession of the Business.

4. State any other relief you are seeking:

☑ Attorney Fees  ☑ Interest  ☑ Arbitration Costs  ☑ Other; explain:  Public injunctive relief order to discontinue opting in customers into overdraft coverage using a form and procedures that do not conform with Regulation E.

5. Identify the requested city and state for the hearing if an in-person hearing is held:

City: Fort Washington                                    State: MD

6. Please provide contact information for both the Consumer and the Business. Attach additional sheets or forms as needed.

**Consumer:**

| Name: ███████ | | |
|---|---|---|
| Address: ███████ | | |
| City: ███████ | State: ██ | Zip Code: ███████ |
| Telephone: ███████ | Fax: N/A | |
| Email Address: ███████ | | |

**Consumer's Representative (if known):**

Name:  Richard A. Nervig and Kyle D. Lawheed

Firm:  McCune Wright Arevalo, LLP

Address:  3281 East Guasti Road, Suite 100

| City:  Ontario | State:  California | Zip Code:  91761 |
|---|---|---|
| Telephone:  (909) 557-1250 | Fax:  (909) 557-1275 | |

Email Address:  ran@mccunewright.com; kl@mccunewright.com

**Business:**

Name:  Wells Fargo Bank, N.A.

Address:  101 North Phillips Avenue

| City:  Sioux Falls | State: South Dakota | Zip Code:  57104 |
|---|---|---|
| Telephone:  (606) 575-6900 | Fax: | |

Email Address:

AMERICAN ARBITRATION ASSOCIATION®

**DEMAND FOR ARBITRATION
CONSUMER ARBITRATION RULES**

| Business' Representative (if known): | | |
|---|---|---|
| Name: | | |
| Firm: | | |
| Address: | | |
| City: | State: | Zip Code: |
| Telephone: | Fax: | |
| Email Address: | | |
| Date:  May 23, 2022 | | |

**7. Send a copy of this completed form to the AAA together with:**

- A clear, legible copy of the contract containing the parties' agreement to arbitrate disputes;

- The proper filing fee (filing fee information can be found in the Costs of Arbitration section of the Consumer Arbitration Rules); and

- A copy of the court order, if arbitration is court-ordered.

**8. Send a copy of the completed form and any attachments to all parties and retain a copy of the form for your records.**

To file by mail, send the initial filing documents and the filing fee to: AAA Case Filing Services, 1101 Laurel Oak Road, Suite 100, Voorhees, NJ 08043.

To file online, visit **www.adr.org** and click on **File or Access Your Case** and follow directions. To avoid the creation of duplicate filings, the AAA requests that the filing documents and payment be submitted together. When filing electronically, no hard copies are required.

Pursuant to Section 1284.3 of the California Code of Civil Procedure, consumers with a gross monthly income of less than 300% of the federal poverty guidelines are entitled to a waiver of arbitration fees and costs, exclusive of arbitrator fees. This law applies to all consumer agreements subject to the California Arbitration Act, and to all consumer arbitrations conducted in California. If you believe that you meet these requirements, you must submit a completed Affidavit for Waiver of Fees, available on our website.

Pursuant to New Jersey Statutes § 2A:23B-1 et seq, consumers with a gross monthly income of less than 300% of the federal poverty guidelines are entitled to a waiver of arbitration fees and costs, exclusive of arbitrator fees. This law applies to all consumer agreements subject to the New Jersey Arbitration Act, and to all consumer arbitrations conducted in New Jersey. If you believe that you meet these requirements, you must submit a completed Affidavit for Waiver of Fees, available on our website.

# EXHIBIT A

(to Demand for Arbitration)

**AMERICAN ARBITRATION ASSOCIATION**

███████████,

Claimant,

v.

WELLS FARGO BANK, N.A.,

Respondent.

**AAA CASE NO.**

**CLAIMANT'S STATEMENT OF CLAIMS**

**[Relates to Wilson v. Wells Fargo Bank (Case No. 01-21-0016-4036)]**

## STATEMENT OF CLAIMS

1.     Claimant, ███████, seeks relief because Respondent, Wells Fargo Bank, N.A., has been wrongfully charged overdraft fees in violation of federal and state law. Federal Reserve Regulation E, 12 C.F.R. § 1005.1, *et seq.*, ("Regulation E"), requires that before Respondent can charge any overdraft fees on one-time debit card and ATM transactions, it must (1) provide a complete, accurate, clear, and easily understandable disclosure of its overdraft services (opt-in disclosure agreement); (2) provide the disclosure as a stand-alone document not intertwined with other disclosures; (3) obtain verifiable affirmative consent of Claimant's agreement to opt into the financial institution's overdraft program; and (4) provide a recorded confirmation of Claimant's consent, including the right to later opt-out of the program. Regulation E also prevents financial institutions from tying other benefits to an opt-in decision or using pre-checked boxes for the "opt-in" option on the agreement. Finally, Regulation E prohibits financial institutions from aggressively marketing the benefits of Regulation E overdraft coverage. 15 U.S.C. §1693m gives Claimant a statutory private right of action to pursue claims for violating Regulation E. In doing so, Claimant may recover all actual damages sustained, statutory penalties of no less than $100 and no more than $1,000, and reasonable attorneys' fees and costs.

2.     Respondent provides its customers, including Claimant, with a Regulation E opt-in disclosure agreement purportedly describing its overdraft services, attached hereto as <u>Exhibit B</u>. But the disclosure agreement inaccurately describes the circumstances in which Respondent charges overdraft fees. Specifically, it describes a process of calculating overdrafts that uses the

account's actual balance (all money in the account at the time), but Respondent actually uses an internal bookkeeping account balance (*i.e.*, "available balance") that artificially decreases the balance and makes it more likely that an overdraft fee will be assessed. Respondent's use of the available balance to assess overdraft fees significantly increases the likelihood that its customers will incur overdraft fees, and its use is relevant and material to understanding Respondent's overdraft services.

3.      A financial institution must provide customers its opt-in disclosure agreement as a stand-alone document.[1] Information about overdrafts given in other documents does not discharge the obligations imposed by Regulation E. A financial institution that discloses that "An overdraft occurs when there is not enough money in your account to cover a transaction, but we pay it anyway" is disclosing a use of the actual balance to calculate overdrafts.[2] But Respondent's practice is to calculate overdrafts, and charge fees, based on the available balance.

4.      Respondent's actions as described above also constitute unfair and deceptive practices under the laws of the state of Claimant's residence. Claimant seeks actual damages, statutory damages, restitution, and all appropriate injunctive relief provided for by applicable state laws.

5.      Claimant has been harmed by Respondent's actions. Claimant opted into Respondent's Regulation E overdraft program after receiving the inaccurate Regulation E opt-in disclosure agreement. And because Respondent did not satisfy Regulation E's requirements in its disclosure agreement, Respondent has wrongly assessed overdraft fees to Claimant on Regulation E transactions.

6.      At all relevant times, Respondent charged Claimant overdraft fees on one-time debit card and ATM transactions though Respondent obtained Claimant's consent by using an inaccurate disclosure not compliant with Regulation E. Claimant has held an account with Respondent at all times relevant to the allegations and is believed to have opted into its Regulation E overdraft program for one-time debit card and ATM transactions. Respondent has been assessed improper fees on one-time debit card and ATM transactions within the past year.

---

[1] *See Grenier v. Granite Credit Union*, No. 1:21-cv-00534, 2021 WL 5177709 (D.N.H. Nov. 8, 2021).
[2] *See Fludd, et al. v. S.* No. 2:20-CV-1959-BHH, 2021 WL 4691587 (D.S.C. Oct. 7, 2021); *Smith v. Bank of Hawaii*, 2017 WL 3597522 (D. Haw. Apr. 13, 2017).

7.     Despite these facts, Respondent continues to market its Regulation E overdraft program and to "opt-in" customers like Claimant using the same (or a similar) non-compliant Regulation E disclosure agreement. Claimant seeks injunctive relief requiring Respondent to (1) withhold charging of additional overdraft or NSF fees until Plaintiff and others give consent after Respondent provides them with an accurate disclosure agreement and (2) provide an accurate disclosure agreement to future customers not yet enrolled in Respondent's Regulation E overdraft program.

WHEREFORE, Claimant requests an award for the following:

A.     For an order requiring Wells Fargo Bank, N.A. to disgorge, restore, and return all monies wrongfully obtained together with interest calculated at the maximum legal rate;

B.     For injunctive relief barring Wells Fargo Bank, N.A. from enrolling individuals in its overdraft program without obtaining informed consent through an accurate Regulation E opt-in disclosure agreement;

C.     For monetary and/or actual damages;

D.     For statutory damages;

E.     For civil penalties;

F.     For an order enjoining the continued wrongful conduct alleged herein;

G.     For costs;

H.     For pre-judgment and post-judgment interest as provided by law; and

I.     For such other relief as the Arbitrator deems just and proper.


Dated: May 23, 2022                          /s/ Richard A. Nervig
                                             Richard A. Nervig
                                             Kyle D. Lawheed
                                             MCCUNE WRIGHT AREVALO, LLP
                                             3281 E. Guasti Road, Suite 100
                                             Ontario, CA 91761
                                             Tel. (909) 557-1250
                                             Email: ran@mccunewright.com
                                             kl@mccunewright.com
                                             *Attorneys for Claimant* ███████

# EXHIBIT B

(to Demand for Arbitration)



*What You Need to Know About Overdrafts and Overdraft Fees*

# Important information about overdrafts

An <u>overdraft</u> occurs when you do not have enough money in your account to cover a transaction but we pay it anyway. We can cover your overdrafts in two different ways:

1. We have <u>standard overdraft coverage</u> that comes with your account.[1]

2. We also offer <u>overdraft protection plans</u>, such as a link to an eligible savings account, eligible line of credit or eligible credit card, which may be less expensive than our standard overdraft coverage. To learn more, ask us about these plans.

This notice explains our standard overdraft coverage.

**What is the standard overdraft coverage that comes with my account?**

We <u>may</u> authorize and pay overdrafts for the following types of transactions:

- Checks and other transactions made using your checking account number

- Automatic bill payments (such as recurring debit card and ACH payments)

We <u>will not</u> authorize and pay overdrafts for the following types of transactions unless you ask us to (see below):

- ATM transactions

- Everyday debit card transactions (such as one-time debit card and ATM card purchases)

We pay overdrafts at our discretion which means we <u>do not guarantee</u> that we will always authorize and pay any type of transaction. If we do <u>not</u> authorize and pay an overdraft, your transaction will be declined.

If you'd like more information about available options related to standard overdraft coverage, please speak with a Wells Fargo banker.

**What fees will the bank charge if it pays my overdraft?[2]**

Under our <u>standard overdraft coverage:</u>

- We will charge you a fee of $35 each time we pay an overdraft item to your account

- There is a limit of three overdraft and/or returned item fees per day

**What if I want Wells Fargo to authorize and pay overdrafts on my ATM and everyday debit card transactions?**

You can add Debit Card Overdraft Service[3] anytime by calling us at 1-800-TO-WELLS (1-800-869-3557), signing on to *Wells Fargo Online*® Banking from a computer or tablet (search Overdraft Services), visiting a Wells Fargo ATM (select More Choices), or speaking to a banker at any Wells Fargo branch. You can remove the service at any time.

1. Our standard overdraft coverage does not apply to Clear Access Banking[SM] accounts. Optional overdraft services, such as Overdraft Protection and Debit Card Overdraft Service, are not available for Clear Access Banking accounts. For more information about the overdraft features for Clear Access Banking accounts, please refer to your Consumer Account Fee and Information Schedule and Deposit Account Agreement.

2. The overdraft and/or non-sufficient funds (NSF) fee for Wells Fargo Teen Checking[SM] accounts is $15 per item and we will charge no more than two (2) overdraft and/or returned item fees per business day. Overdraft and/or non-sufficient funds (NSF) fees are not applicable to Clear Access Banking[SM] accounts.

3. Not available for certain accounts, such as Clear Access Banking[SM] accounts, Teen Checking[SM] accounts, Opportunity Checking® accounts, Greenhouse[SM] by Wells Fargo deposit accounts (Greenhouse Set Aside and Greenhouse Spending accounts), or savings accounts. Debit Card Overdraft Service is a discretionary service that may be removed by the bank for a variety of reasons including excessive overdrafts or returned items, as determined by the Bank.

**For Consumer Deposit Accounts Only**
© 2020 Wells Fargo Bank, N. A. All rights reserved. Member FDIC.

# EXHIBIT C

(to Demand for Arbitration)



Effective October 15, 2021

# Deposit Account Agreement

Important legal information and disclosures

# Thank you for doing business with us

This Deposit Account Agreement applies to new and existing consumer and business accounts and, together with the following documents, is your contract with Wells Fargo and constitutes the "Agreement" that governs your account with Wells Fargo:

- The Consumer Account Fee and Information Schedule ("Consumer Schedule") or the Business Account Fee and Information Schedule ("Business Schedule"),
- Our interest rate sheet for interest-bearing accounts,
- Our privacy notice, and
- Any additional disclosures, amendments, or addenda we provide to you.

In this Agreement, when we say "Wells Fargo," "Bank," "we," "us," and "our," we are talking about Wells Fargo Bank, N.A. "You" and "your" means each account owner, authorized signer, and any other person authorized to operate your account. When we say "We may" or "Wells Fargo may" do something, that means you authorize us and agree to such action.

**This Agreement is applicable to new and existing accounts and replaces all prior agreements regarding your account,** including any verbal or written statements or representations. When you sign an account application or use your account, including any account service, you and anyone else identified as an owner or authorized signer on your account consent to the terms of this Agreement. We regularly update this Agreement. You are responsible for ensuring that any authorized signer is familiar with this Agreement. If you keep your account open after we change this Agreement or end a fee waiver, you agree to the changes.

We recommend you keep a copy of this Agreement — and any changes we provide to this Agreement — for as long as your Wells Fargo accounts are open. You can get a copy of the current Agreement at wellsfargo.com, or by visiting your local branch, or by phone at the numbers below.

This document contains various defined terms with specific meanings. Some defined terms are defined within the section in which they are used. More frequently used defined terms are defined in the Glossary at the end of the document. As you review this Agreement, be sure to check the Glossary for those definitions.

# Questions? We're here for you

| Online | Visit **wellsfargo.com** or **wellsfargo.com/biz** | |
|---|---|---|
| Phone | **Consumer Banking**<br>**1-800-869-3557** | **Business Banking**<br>**1-800-225-5935** |
| Deaf or hard of hearing customers | We accept all relay calls, including 711. | |
| Mail | Wells Fargo, Customer Correspondence<br>P.O. Box 6995<br>Portland, OR 97228-6995 | |

# Table of Contents

Opening Accounts ........................................................................................................4

Depositing Funds ........................................................................................................5

Availability of Funds Policy ........................................................................................7

Available Balance, Posting Transactions, and Overdraft ..........................................9

    Available balance ..................................................................................................9

    How we process and post transactions to your account ......................................9

    Standard overdraft coverage ...............................................................................10

    Debit Card Overdraft Service ...............................................................................11

    Overdraft Protection ............................................................................................11

    Overdraft Rewind® Feature .................................................................................11

Debit Cards and ATM Cards .....................................................................................12

Funds Transfer Services ...........................................................................................18

Electronic Fund Transfer Services (Consumer accounts only) ................................20

Electronic Fund Transfer Disclosures (Consumer accounts only) ...........................21

Other Account Services and Restrictions ................................................................23

Time Accounts (CDs) ...............................................................................................25

Protecting Your Account and Your Information ........................................................26

Statements, Interest, and Other Account Information .............................................28

Closing Accounts .....................................................................................................33

Resolving Disputes Through Arbitration ..................................................................35

    Consumer Accounts Only: Resolving Disputes Through Arbitration ...................35

    Business Accounts Only: Resolving Disputes Through Arbitration .....................36

Additional Terms and Services ................................................................................38

Glossary ...................................................................................................................40

# Opening Accounts

This section applies to consumer accounts only unless otherwise noted.

**Forms of account ownership**

You can open an account that you own alone, or with more than one person. If the account is owned with more than one person, it's considered a joint account.

**Different types of joint account ownership**

**For joint accounts,** we treat all owners, who are referred to in this Agreement as "co-owners," as joint tenants with right of survivorship (described below), unless:

- Applicable state laws require other treatment, or
- We agree with you in writing that the account is owned in some other way.

Regardless of how your account is owned, we don't keep a separate record of each co-owner's interest in the account. We act on instructions from any co-owner (or a co-owner's authorized representative) without obtaining other co-owner's consent, including withdrawing or transferring funds, making payments, or closing the account.

Each co-owner has complete control over all of the funds in the account. We may pay out money from the account upon the request or direction of any co-owner (or a co-owner's authorized representative), regardless of their contributions to the account, and whether any other co-owner is incapacitated or deceased, or whether the account includes a right of survivorship.

**Joint tenants with right of survivorship:** When you hold an account as joint tenants with right of survivorship and one person dies, the account is owned by and payable to the surviving co-owners; this is subject to our rights under this Agreement.

**Tenants-in-common:** When you hold an account as tenants-in-common and one owner dies, the account is payable in whole or in part to any surviving co-owner or the deceased owner's authorized representative, heirs, or successors. This is subject to our rights under this Agreement.

**Community property:** An account is held as community property under state law when spouses have equal and undivided interests in the account during their lifetimes. When one spouse dies, ownership does not automatically pass to the survivor; rather, the deceased spouse can pass his or her interest through a will. Community property does not exist in every state.

**Joint owners and responsibility for liabilities on your account**

Each joint owner is individually and jointly responsible for any overdraft on your account, regardless of who caused or benefited from the overdraft. If there's a setoff, an enforcement of our security interest in your account, or legal action (such as a third party garnishment, seizure, forfeiture, or tax levy) affecting any co-owner, we may treat all funds in the account as belonging to the customer against whom the setoff, enforcement of the security interest, or other legal action is directed. If your account is closed for unsatisfactory handling, we may report all joint owners to the consumer reporting agencies.

**Pay On Death (POD) account**

A POD account is payable to the surviving beneficiaries you designated on your account when we receive proof of your death or the death of the last surviving co-owner. An account titled "in trust for (ITF)," "transfer on death (TOD)," or similar language is treated as a POD account.

You and any co-owner may change beneficiaries anytime by notifying us in writing. Generally, the beneficiary(ies) must survive all owners in order to receive funds.

**Accounts established for minors**

**Uniform Transfers/Gifts to Minors Act account.** An account established under a state's Uniform Transfers/Gifts to Minors Act that is controlled by a custodian (an adult who holds the minor's funds in the account for safekeeping). We may disclose account information to the minor or their authorized representative. When the minor reaches the age established by the UTMA/UGMA laws in your state, we may pay the funds in the account to the minor without waiting for instructions from the custodian.

**Minor by account.** One or more adults may open an account, as custodian (an adult who holds the minor's funds in the account for safekeeping) in the name of a minor. The minor owns the funds in the account. The adult, as the custodian, has exclusive control of the account and the minor cannot make deposits, withdrawals or transact on the account. If there's more than one adult as the custodian on the account, each may act independently. We're not obligated to inquire about the use of the funds. When the minor reaches the age of majority, they still will not be able to make deposits, withdrawals or transact on the account except to close the account. If the adult as the custodian (or the last of the adults as the custodian to survive) dies before the minor reaches the age of majority, we may transfer the funds to a successor custodian according to the applicable Uniform Transfers/Gifts to Minors Act.

**Transfer of account ownership**

If you want to transfer account ownership to another person, we must consent and note it in our records before the transfer is valid and binding on us; however, we're not responsible for determining whether such transfer is legally valid. Assignment of your account is subject to our setoff rights (see Setoff and security interest in the "Additional Terms and Services" section). This Agreement is binding on your personal representatives, executors, administrators, and successors, as well as our successors and assigns.

**When an owner does not sign account documentation**

**Applies to both Consumer and Business Accounts:** If a customer identified in our records as an owner or a co-owner of an account does not sign any account-related documentation (including the account application), we still may treat them as an owner or a co-owner of that account, in our sole discretion; we're not liable to anyone as a result.

**Death or legal incompetence of an authorized signer or account owner**

Please notify us promptly if you learn or suspect an account owner or signer has been declared incompetent by a court or other legal authority, or has died. When we receive proper notice, we may:

- Freeze the account until we receive documents verifying the incapacity or death and instructions regarding the funds remaining in the account,
- Pay (without inquiring) any item authorized by the account owner before being declared legally incompetent or deceased,
- Return or reverse deposits, and
- Apply funds in the account to any debt the account owner owes us before recognizing the rights of a surviving joint owner or other person to any remaining funds.

If we release funds after the account owner's death and have to pay tax or reclamation claims to a government agency as a result, the account owner's estate is responsible for reimbursing us.

**Consumers and Sole Proprietors Only:** If an account owner dies or is declared legally incompetent, we may comply with court orders and legal documents, and take direction from affiants, court-appointed representatives, guardians, or conservators from your state of residence, even if different than where the account was opened except as otherwise required by applicable law or court order. We may require additional documentation be provided to us before complying with the directives. We may require U.S. court documents for customers residing outside of the U.S. at the time of incompetence or death.

**For Business Account Owners:** Businesses must provide us documentation of any change in ownership or control of a business upon the death or legal incompetence of a business owner.

# Depositing Funds

**There are many ways for you to deposit funds into your account: at branches, ATMs, via Bank by Mail, and through the Wells Fargo Mobile® app. You should be aware of your responsibilities when you make deposits.** We exercise ordinary care when collecting a deposited item but are not responsible for any other bank's treatment or loss of the item. If a deposited item is lost or destroyed during processing or collection, you agree to provide all reasonable assistance to help us reconstruct the item.

**Deposit accuracy**

**It's your responsibility, not ours, to confirm the accuracy of the amount you deposit.** If we determine a discrepancy exists between the declared and the actual amount, we may debit or credit your account and we may notify you if any adjustments are made. We can also use the declared amount as the correct amount to be deposited and not adjust a discrepancy if it's less than our standard adjustment amount. We may vary our standard adjustment amount from time to time without notice and use different amounts depending on account type.

**Analyzed business accounts:** You may request that the Bank adjust deposit discrepancies identified during any verification regardless of the standard adjustment amount.

**Notify us of a discrepancy.** You must notify us within the applicable timeframe below or we may consider the deposit correct.

| Consumer accounts | within 1 year after we have made your account statement available to you |
|---|---|
| Business accounts | within 30 days after we have made your account statement available to you |

**If you fail to notify us in a timely manner:** If the actual deposit is less than the amount on the statement, the difference is your property; if the actual deposit is more, the difference is the Bank's property.

## Verifying transactions

We don't verify all transactions but have the right to verify any, including those for which we have provided a receipt. We may reverse or adjust, at any time without prior notice to you, any debit or credit we believe we have made to your account by mistake.

## Sending an item for collection

We may, upon notice to you, send an item for collection instead of treating it as a deposit. This means we send it to the issuer's bank for payment, and your account won't be credited for the item until we receive payment. Our availability of funds policy does not apply to an item we accept for collection.

## Our right to decline deposits

**We may decline all or part of a deposit, including cash.** This could happen if a payee isn't a co-owner, authorized signer, or authorized representative on your account, we can't verify an endorsement, the check was issued from a credit account, the check looks suspicious, or it's a non-U.S. item. If we decline a deposit that you mailed to us, we may return it to you at your cost (including charging you for postage and handling to return foreign currency coin or paper), or retain any invalid checks or other documents included in the deposit without crediting your account, at our discretion.

If we cannot verify an endorsement, we can also decline to pay, cash, or send the item for collection. We can require that all endorsers be present and that you deposit the item instead of cashing it.

Non-account owners are not allowed to deposit cash into consumer accounts. For business accounts, any person wanting to make a cash deposit must provide an acceptable form of identification before we accept a cash deposit.

## Requirements for correct endorsement

An endorsement is a signature, stamp, or other mark on the back of a check to transfer, restrict payment, or make the signer responsible for the check. If you have not endorsed a check that you deposited to your account, we may endorse it for you. Any endorsement must be in the 1-1/2 inch area that starts on the top of the back of the check. Do not sign or write anywhere else on the back of the check.

## Restrictions on checks are not binding

We are not obligated to follow restrictions or notations written on a check such as, "void after six months," "void over $50," or "payment in full." You're responsible for any resulting loss or expense we incur.

## Substitute checks

A substitute check is created from an original check; under federal law, it's legally equivalent to the original check and can even be used as proof of payment. A substitute check contains an accurate copy of the front and back of the original and bears the legend: "This is a legal copy of your check. You can use it the same way you would use an original check." Any check may be returned to you in the form of a substitute check. You agree that you won't transfer a substitute check to us, by deposit or otherwise, if we would be the first financial institution to take the substitute check, unless we have expressly agreed in writing to take it.

## Our handling of non-U.S. items

A non-U.S. item is an item:

- Payable in a currency other than U.S. dollars,
- Drawn on a financial institution that isn't organized under U.S. law, or
- That is an incoming funds transfer remitted in a currency other than U.S. dollars.

We're not required to accept a non-U.S. item for deposit or collection, but we may accept it on a collection basis without your specific instruction to do so. We can reverse any amount we have credited to your account and send the non-U.S. item on a collection basis even if we have taken physical possession of the item.

If we accept a non-U.S. item, the U.S. dollar amount you receive for it will be determined by the applicable exchange rate that is in effect at the time of deposit or our receipt of final payment (less any associated fees) of the non-U.S. item. If the deposited non-U.S. item is returned for any reason, **we'll charge the amount against your account (or any other account you maintain with us)** at the applicable exchange rate in effect at the time of the return. For information on the applicable exchange rate, see "Applicable exchange rate" in the "Statements, Interest, and Other Account Information" section of this Agreement. Our availability of funds policy does not apply to a non-U.S. item.

## Items returned unpaid

If an item you deposited or cashed is returned to us unpaid, **we can deduct the amount from any account you have with us.** We can do this when we're notified that the item will be returned and don't need to receive the actual item. We can do this even if the balance in your account isn't sufficient to cover the amount we hold or deduct, causing an overdraft. In addition, we'll charge you all applicable fees and reverse all interest accrued on the item.

**We may place a hold on or charge your account for a deposit if a claim is made or we otherwise have reason to believe the deposited item was altered, forged, unauthorized, missing a signature or has a forged endorsement, or should not have been paid for any other reason.** When the claim is finally resolved, we'll either release the hold or deduct the amount of the item from your account. We're not responsible if we take, or fail to take, any action to recover payment of a returned deposited item.

## Breach of a warranty associated with an item

If you breach any warranty you make to us under the laws governing your account with respect to any item, you won't be released or discharged from any liability for the breach so long as we notify you of the breach within 120 days after we learn of the breach. If we fail to notify you within this 120 day period, you'll be released from liability and discharged only to the extent our failure to notify you within this time period caused a loss to you.

## Reversal of an electronic payment

If an electronic payment credited to your account, such as a direct deposit, is reversed, **we can deduct the amount from any account you have with us**, at any time, without notifying you. You agree to promptly repay any resulting overdrafts.

## Bank By Mail

You can make deposits to your account(s) by mail, although we cannot accept cash or foreign checks. Call us to request a Bank By Mail deposit kit.

If you need to send deposits before your kit arrives, write on the back of the check "for deposit only, Wells Fargo" and include the account number to which the check should be deposited, and mail to:

Wells Fargo
P.O. Box 77200
Minneapolis, MN 55480-7720

For accounts located in **Alaska**, send deposits to:

Wells Fargo
P.O. Box 77040
Minneapolis, MN 55480-7740

# Availability of Funds Policy

## Your ability to withdraw funds

Our policy is to make funds from your check deposits to your checking or savings account (in this policy, each account) available to you on the first business day after the day we receive your deposits. Incoming wire transfers, electronic direct deposits, cash deposited at a teller window and at a Wells Fargo ATM, and the first $400 of a day's check deposits at a teller window and at a Wells Fargo ATM will be available on the day we receive the deposits. Certain electronic credit transfers, such as those through card networks or funds transfer systems, will be available on the day we receive the transfer. Once they are available, you can withdraw the funds in cash and we will use the funds to pay checks and other items presented for payment and applicable fees that you have incurred.

## Determining the day your deposit is received by the Bank

**For determining the day your deposit is received by the Bank**, every day is a business day, except Saturday, Sunday, and federal holidays. If you make a deposit before our established cutoff time on a business day that we are open, we will consider that day to be the day your deposit is received by the Bank. However, if you make a deposit after our cutoff time or on a day we are not open, we will consider the day your deposit is received by the Bank to be the next business day we are open.

Our deposit cutoff times are as follows:

| Type of Deposit | Cutoff time |
| --- | --- |
| In branch | when the branch closes for business; varies by location |
| At Wells Fargo ATM | 9 p.m. local time (Alaska 8 p.m.) |
| Checks deposited with the Wells Fargo Mobile app | 9 p.m. Pacific Time |
| Electronic credits (such as direct deposits) | 8 p.m. Pacific Time |

**Longer delays may apply**

In some cases, we will not make the first $400 of a business day's check deposits available to you on the day we receive the deposits. Further, in some cases, we will not make all the funds that you deposit by check available to you on the first business day after the day of your deposit.

Depending on the type of check that you deposit, funds may not be available until the second business day after the day of your deposit. The first $225 of your deposit, however, may be available on the first business day after the day of your deposit.

Except as otherwise explained in this paragraph, if we are not going to make all funds from your deposit available on the business day of deposit or the first business day after the day of deposit, we will notify you at the time you make your deposit. We will also tell you when the funds will be available. If your deposit is not made directly to a Wells Fargo employee, or if we decide to take this action after you have left the premises, we will mail you the notice by the first business day after we receive your deposit.

If you need the funds from a deposit right away, you should ask us when the funds will be available.

Funds you deposit by check may be delayed for a longer period under the following circumstances:
• We believe a check you deposit will not be paid
• You deposit checks totaling more than $5,525 on any one day
• You redeposit a check that has been returned unpaid
• You have overdrawn your account repeatedly in the last six months
• There is an emergency, such as failure of computer or communications equipment

We will notify you if we delay your ability to withdraw funds for any of these reasons, and we will tell you when the funds will be available. The funds will generally be available no later than the seventh business day after the day of your deposit.

**Special rules for new accounts**

**If you are a new customer, the following special rules apply during the first 30 days your account is open.** Incoming wire transfers, electronic direct deposits, and cash deposited at a teller window and at a Wells Fargo ATM will be available on the day we receive the deposit. Funds from your check deposits will be available on the business day after the day we receive the deposits; no funds from a business day's check deposits are available on the day we receive the deposits.

If we delay the availability of your deposit the following special rules may apply:
• **The first $5,525** of a day's total deposits of cashier's, certified, teller's, traveler's, and federal, state, and local government checks, and U.S. Postal Service money orders made payable to you will be available on the first business day after the day of your deposit.
• **The excess over $5,525** and funds from all other check deposits will be available no later than the seventh business day after the day of your deposit. The first $225 of a day's total deposit of funds from all other check deposits, however, may be available on the first business day after the day of your deposit.

We will notify you if we delay your ability to withdraw funds and we will tell you when the funds will be available.

**Holds on other funds**

**If we cash a check for you that is drawn on another bank**, we may withhold the availability of a corresponding amount of funds that are already in your account. Those funds will be available at the time funds from the check we cash would have been available if you had deposited it.

**If we accept a check for deposit that is drawn on another bank**, we may make funds from the deposit available for withdrawal immediately but delay your ability to withdraw a corresponding amount of funds that you have on deposit in another account with us. The funds in the other account would then not be available until the time periods that are described in this policy.

# Available Balance, Posting Transactions, and Overdraft

**Available balance**

Your account's available balance is our most current record of the amount of money in your account available for your use or withdrawal. We use the available balance to authorize your transactions during the day (for example, debit card purchases and ATM withdrawals). We also use the available balance to pay your transactions during our nightly processing. Your available balance is calculated as follows:

| | |
|---|---|
| **Ending Daily Balance** | Ending daily balance from prior business day's nightly processing |
| **– Holds** | Subtract funds that have been placed on hold |
| **+ Deposits** | Add pending deposits that are immediately available (see "Availability of Funds Policy" in previous section) |
| **– Withdrawals** | Subtract pending withdrawals that we have either authorized or we know about but have not yet processed |

## = Available Balance

**The available balance may not include every transaction you have initiated or that we previously authorized.** For example, your available balance may not include the following:

- Outstanding checks and authorized withdrawals we have not received for payment (such as recurring debit card transactions and ACH transactions);
- The final amount of a debit card purchase. For example, we may authorize a purchase amount prior to a tip that you add;
- Debit card transactions that have been previously authorized but not sent to us for payment. In most cases, a transaction authorization hold must be released after three business days even though the transaction may be sent to us for payment from your account at a later date, which we must honor. The authorization hold may be up to 30 business days for certain transactions, including car rental, cash, and international transactions.

**How we process and post transactions to your account**

We process transactions each business day (not Saturdays, Sundays, or federal holidays) during a late night process that includes **three key steps**. We call this nightly processing. Once the transactions are processed, the results are posted to your account.

## Step 1: **We calculate the available balance in your account that can be used to pay your transactions as described above.**

**Certain pending transactions can impact your available balance for purposes of determining whether we will pay other transactions during our nightly processing, including**:

- Cash deposits or transfers from another Wells Fargo account made AFTER the applicable cutoff time will be added to your available balance only if they are made before we start our nightly processing; and
- Pending withdrawals that reduce your available balance, such as debit card transactions we have authorized.

## Step 2: **We sort your transactions into categories.**

- **+ We credit deposits** received before the cutoff time.
- **– We subtract withdrawals and payments we have previously authorized that we cannot return unpaid** such as debit card purchases, ATM withdrawals, account transfers, Bill Pay transactions, and teller-cashed checks. Transactions are generally sorted by date and time the transaction was conducted or, for some transactions, the day we receive it for payment or the time assigned by our system. If date and time are the same, we post from lowest to highest dollar amount.
- **– We pay your checks and preauthorized automatic ACH payments** such as recurring bills you have authorized a company to withdraw. Transactions are sorted by date and time received by the bank, and if date and time are the same, we post from lowest to highest dollar amount.

**Determining Date and Time**

- Cutoff time is based on the location where the deposit or transfer was made.
- If a merchant does not seek authorization at the time of a debit card transaction or we receive it for payment more than 10 business days later, we'll use the date the transaction is received for payment.
- For some transactions, such as Bill Pay or teller-cashed checks, a different time may be assigned by our systems.

**Step 3**: If the available balance is **not enough to pay all of your transactions,** we:

- **Use Overdraft Protection** (if you have it) by transferring and/or advancing available funds from a linked savings and/or credit account. An overdraft protection transfer/advance fee will be charged as applicable.
- **Then, decide whether to pay your transactions presented to us for payment into overdraft, or return them unpaid.** Paying an item into overdraft means that we pay an item even though your available balance is not sufficient to cover that item, resulting in your account having a negative balance. At our discretion, we may pay a check or automatic bill payment into overdraft, rather than return it unpaid. This is our **standard overdraft coverage (see more information below)**. Debit card transactions presented to us for payment (whether previously authorized by us or not) **will be paid into overdraft and won't be returned unpaid**, even if you don't have sufficient funds in your account. Any applicable overdraft or returned item fees are deducted from your account the morning of the next business day.

**Pending transactions can result in overdrafts.** If your available balance during the nightly processing is insufficient, the Bank may assess overdraft and/or non-sufficient funds (NSF) fees on transaction(s) we pay or return. Even if a pending transaction has been dropped from your account, we must pay it when we receive it for payment. Sometimes, previously authorized transactions are sent to us for payment. In those cases, you may be charged an overdraft fee if the transaction is paid into overdraft.

**To minimize the number of overdraft fees you may be assessed**, we track transactions that reduced your available balance while pending and caused overdraft fees on other transactions. If the pending transactions are then presented for payment within 10 business days after they first appeared as pending, **we'll waive any overdraft fees on those transactions**. In rare circumstances, the merchant presents transactions for payment with a different identification code than was used when originally sent for authorization and we're unable to match them. In those cases, you may be charged an overdraft fee if the transaction is paid into overdraft.

## Standard overdraft coverage

The bank typically does not pay overdrafts if your account is overdrawn or you have had excessive overdrafts.

Except for Clear Access Banking[SM], all checking accounts come with **standard overdraft coverage**. Under standard overdraft coverage:

- We **may** authorize checks, other transactions using your checking account number, and automatic bill payments (such as recurring debit card and ACH transactions) into overdraft and charge a fee.
- We **will not** authorize ATM and everyday (one-time) debit card transactions into overdraft, unless your account is enrolled in Debit Card Overdraft Service as described below.

Whether we pay transactions into overdraft is at our discretion and we reserve the right not to pay into overdraft.

You can remove standard overdraft coverage from your account at any time. If you remove it, the following will happen if you don't have enough money in your checking account or in accounts linked for Overdraft Protection to cover a transaction when it is presented to us for payment or authorization:

- We **will** return your checks and other returnable items, such as ACH payments, as unpaid and charge a returned item fee (non-sufficient funds/NSF).
- We **will not** authorize certain transactions such as cashed checks, recurring debit card transactions, or Bill Pay transactions into overdraft. **Important:** If these transactions are authorized when your account has enough money but are later presented for payment when your account does not have enough money, we'll pay the transaction into overdraft and charge an overdraft fee.
- We **will not** authorize ATM and everyday (one-time) debit card transactions (such as one-time debit card and ATM card purchases) into overdraft. If your account is enrolled in Debit Card Overdraft Service, the service will also be removed.

You understand that the classification of a debit card transaction (except ATM transactions) as recurring or non-recurring (i.e., one-time) is determined by merchants, other institutions, or other third parties before the transaction is presented to us for authorization or payment. We will treat and process such debit card transactions in the manner they are presented to us, which may result in a one-time debit card transaction presented as recurring preauthorized transactions and vice versa.

**Important:** Overdraft and returned item (non-sufficient funds/NSF) fees don't apply to Clear Access Banking accounts, and standard overdraft coverage isn't available. For more information about Clear Access Banking, refer to your Consumer Schedule.

## Debit Card Overdraft Service

Consumer account customers may choose to enroll in this service; business accounts are automatically enrolled at account opening.

**Your enrollment preference for Debit Card Overdraft Service determines how the Bank handles your ATM and everyday (one-time) debit card transactions** on eligible accounts. You can add or remove the service on eligible accounts at any time. It's important to understand that this service is unique from other optional services that may be less costly for you, such as our optional Overdraft Protection plan described in the next section.

When you don't have enough money in your checking account or accounts you have linked for Overdraft Protection at the time of an ATM or everyday (one-time) debit card transaction:

- **If you're enrolled in Debit Card Overdraft Service**, the transaction may be authorized into overdraft at the Bank's discretion but **an overdraft fee applies.** If you cover the shortage by the posted cutoff time on the same business day as the transaction, no overdraft fee is assessed.
- **If you aren't enrolled in Debit Card Overdraft Service**, the transaction will be declined and no fees apply. If a previously authorized transaction creates a negative balance when it posts, you won't be assessed an overdraft fee.

Debit Card Overdraft Service **does not apply** to checks and other recurring transactions (such as Bill Pay or ACH transfers, or recurring debit card transactions such as utilities or health club memberships). With or without Debit Card Overdraft Service, the Bank may continue to pay these other transaction types into overdraft, at our discretion, and our standard overdraft fees and policies will apply.

Debit Card Overdraft Service **isn't available for certain accounts**, such as Clear Access Banking accounts, Teen Checking℠ accounts, Opportunity Checking® accounts, IOLTA/RETA accounts, accounts for government entities, or savings accounts. Debit Card Overdraft Service is a discretionary service that may be removed by the Bank for a variety of reasons including excessive overdrafts or returned items.

## Overdraft Protection

This is an optional service you can add to your checking account by **linking up to two eligible Wells Fargo accounts (one savings, one credit) to authorize or pay your transactions if you don't have enough money in your checking account**. Overdraft Protection transfers/advances may occur to cover pending transactions, even if these transactions are not subsequently presented for payment. When an Overdraft Protection transfer occurs from a linked savings account to cover a transaction, the available balance in that savings account will be reduced by the amount of money to be transferred. That amount of money will be unavailable for other use, and it will be applied to the checking account the next business day. You can avoid the Overdraft Protection transfer/advance fee by making a covering deposit or transfer before the cut-off time to cover the amount of the transaction on the same business day. A single Overdraft Protection transfer or advance fee will be charged any day a transfer/advance is made regardless of the number of transactions covered or whether funds are transferred/advanced from multiple accounts. Also, we won't charge a fee unless the transfer/advance covered at least one pending item, or helped you avoid at least one overdraft or returned item. If you link two accounts, you may tell us which account to use first to transfer/advance funds. If you don't specify an order, we'll first transfer funds from your linked savings account. Overdraft Protection isn't available for all accounts. Refer to the Consumer Schedule or the Business Schedule to determine account eligibility.

## Overdraft Rewind® Feature

(Consumer accounts only)

Wells Fargo provides an automatic account feature called Overdraft Rewind. If an electronic direct deposit is received by 9 am where your account is located, as noted in your account statement, we'll calculate a new account balance that includes the pending direct deposit, minus any pending debits. If this newly calculated balance covers transactions that resulted in overdraft or non-sufficient funds (NSF) fees, or Overdraft Protection transfer or advance fees, during the prior business day's nightly processing, we'll waive or refund those fees. We may also reverse returned item (non-sufficient funds/NSF) decisions. Only electronic direct deposits through Automated Clearing House (ACH) qualify. Overdraft Rewind does not reverse the transfer or advance of funds from a linked Overdraft Protection account.

## Returning your account to a positive balance

**If your account has an overdraft, you must promptly add money to return your account to a positive balance.** If you don't return your account to a positive balance or you have too many overdrafts, we may close your account. Also, we may report you to consumer reporting agencies and initiate collection efforts. You agree to reimburse us for the costs and expenses (including attorney's fees and expenses) we incur to do so.

# Debit Cards and ATM Cards

We offer a number of account services at a variety of locations that involve using a card. Some services may not be available at all locations. When you get a debit or ATM card from us, you'll receive, and be required to agree to, additional terms and conditions applicable to the card. In the event of a conflict between the terms and conditions and this Agreement, the terms and conditions will control. Additional disclosures applicable to these services are provided in the Consumer Schedule or Business Schedule, as applicable.

### Issuance of a card and Personal Identification Number (PIN)

We may issue a card to each account owner to access your accounts. If you don't select a PIN when you request your card, we'll send a randomly selected PIN. If you don't request a card but would like a PIN for authentication purposes, we can provide a PIN for only that purpose (a "cardless PIN"). A cardless PIN cannot be used for purchases or ATM access (see "Telephone banking services" section for more details).

You should securely protect your card and PIN from loss or theft. Each cardholder must have his or her own unique PIN and is responsible for keeping the PIN confidential.  If the card or PIN is given to another person, the account owner will, to the extent allowed by applicable law, be responsible for all transactions made by that person or anyone else to whom that person gives the card or PIN.

### Using a card to access linked asset accounts

Non-Wells Fargo ATM operators may not support display of all linked accounts, and may not support all functions.

Linking lets you add asset accounts you own (for example, checking or savings) to a debit or ATM card, giving you the ability to perform transactions on multiple accounts with one card at Wells Fargo ATMs. The money for purchases and payments made with your card is deducted from the primary linked account. Using a card at a participating non-Wells Fargo ATM for cash withdrawals, transfers, and balance inquiries is generally available for the primary linked checking and savings accounts. We can restrict the number and type of asset accounts you can link to your card.

Some Wells Fargo ATMs in branches can operate in "Assisted-Service mode" during branch hours. When in Assisted-Service mode, the ATM screen's main menu will display an "I need assistance" option. When using a Wells Fargo ATM in Assisted-Service mode, you may be able to use your consumer card to access and perform transactions on your consumer accounts that are not linked to your card.

**If you link more than one asset account to the card, you may designate a primary linked account.** If you don't designate a primary linked account, the first account linked to your card is considered the primary linked account. The primary linked account for a consumer debit card must be an eligible consumer checking account. The primary linked account for a business debit card must be an eligible business checking account.

If a primary linked account is closed or delinked for any reason, we'll generally designate a linked secondary account of the same account type, if you have one, as the new primary account. If you have a debit card and none of your other linked accounts are checking accounts, or you have no other linked accounts, your debit card will be closed and you can request an ATM card. You may link a new primary account of a different type (consumer, business, individual brokerage, or commercial brokerage) than the previous primary linked account. Depending on the new primary linked account, you may be issued a new card type. (Note: for Wells Fargo campus debit and ATM cards with school access, your banking access will be closed but your card can still be used for school access).

When you use your card to access any asset account, the agreements and disclosures applicable to that asset account will apply to that card transaction. Additionally, the consumer protections described in the "Electronic Fund Transfer Disclosures" section of this Agreement don't apply to transactions on business or commercial brokerage accounts.

### Using a card to access linked credit card and line of credit accounts at ATMs

If you link your Wells Fargo credit card account or eligible line of credit account (linked credit account) to your debit or ATM card, you may use the card to access the linked credit account at any Wells Fargo ATM. You can use the card to obtain cash or transfer funds from the linked credit account, as long as the linked credit account is in good standing and has available credit. Cash withdrawals and transfers of funds from your linked credit account are treated as cash advances. Each of these transactions is subject to the applicable credit card account agreement or line of credit account agreement, including daily limits and cash advance fees.

### Using your card

There are many ways to use your debit and ATM[1] cards—using the physical cards or via mobile devices. See the following descriptions.

**You can use your debit and ATM cards:**

- At merchants who accept payments through a network in which we participate
- To request cash back when making a physical card purchase with your PIN at merchants who offer this service
- To choose whether and how you receive a receipt when you use your card at a merchant terminal

In addition, with your debit card, you can also:

- Pay for purchases, or pay bills directly with your card, or through a mobile device at participating merchants (see "Using your card through a mobile device" for more details)

**At any ATM with your debit or ATM card you can:**

- View account balances, withdraw cash, and transfer funds between your accounts (fees may apply on any of these actions at a non-Wells Fargo ATM)[2]

**At Wells Fargo ATMs ONLY you can:**

- Make deposits to your account[3]
- Transfer funds from your eligible Wells Fargo credit accounts to your checking or savings accounts[4]
- Make payments to your eligible Wells Fargo credit accounts
- Get a statement[5] of your account balances or the last 10 transactions
- Choose how you want to receive your ATM receipt: printed, emailed, or to your mobile phone

**In addition, with your debit card but not your ATM card,** you can also use your mobile device at Wells Fargo ATMs.

[1] Purchases using an ATM card are only available at merchants who accept payments through networks in which we participate and require a PIN to authorize the purchase.

[2] Non-Wells Fargo ATMs are part of ATM networks owned or operated by other financial institutions. You can use your card at non-Wells Fargo ATMs that display the Plus® logo to withdraw cash, check balances, and transfer funds between the accounts linked to your card as primary checking and primary savings. Note: 1) Some non-Wells Fargo ATMs may not give you the option of choosing which account to access or may only let you access one of these two accounts. 2) Some transactions may not be available at all ATMs, may be different from those available at Wells Fargo ATMs, or may be limited to any withdrawal limit(s) set by the non-Wells Fargo ATM.

[3] A business deposit card can be issued to an authorized signer on business accounts. It can also be issued to a non-authorized signer at the request of an authorized signer. At Wells Fargo ATMs, a business deposit card and associated PIN can only be used to make ATM deposits, and can only be linked to deposit accounts. When the card is used to make an ATM deposit, account balances are neither displayed on the ATM screen nor printed on the ATM receipt. The card PIN cannot be used for authentication for phone or online access.

[4] Cash advance and ATM advance fees may apply. Refer to the applicable credit card account agreement or line of credit account agreement for more details.

[5] Statements at Wells Fargo ATMs should not be used in place of the account statement for balancing or verifying the actual account balance.

## Actions via electronic credit transfers

You can receive transfers through card networks or funds transfer systems with your debit card.

The following limitations apply to Visa Original Credit Transactions ("OCT") and MasterCard MoneySend ("MoneySend") money transfers to your debit card:

| | Rolling 24 hours | Rolling 7-day | Rolling 30-day |
|---|---|---|---|
| **Visa** Person-to-person OCT | 25 transactions or $10,000 | 100 transactions or $25,000 | 200 transactions or $50,000 |
| **Visa** Business-to-person OCT | 40 transactions or $50,000 | 100 transactions or $125,000 | 200 transactions or $300,000 |
| **Visa** Me-to-me OCT | 40 transactions or $50,000 | 100 transactions or $125,000 | 200 transactions or $300,000 |
| **Visa** Me-to-me OCT, BAI code CD (cash deposit) | 15 transactions or $600 | 25 transactions or $1,000 | 75 transactions or $3,000 |
| Times listed are in Coordinated Universal Time (UTC), which is a standard used to set all time zones around the world and, for example, is 5 hours ahead of Eastern Time Zone (4 hours ahead during daylight savings time). | **Calendar Day** (12 AM - 12 AM UTC) | **Calendar Week** (Starting 12AM UTC each Monday) | **Calendar Month** (Starting 12AM UTC the first day of each month) |
| **MasterCard** MoneySend (all types) | 25 transactions or $10,000 | 100 transactions or $10,000 | 200 transactions or $10,000 |

## ATM and merchant terminal malfunctions

Generally, we're not responsible for damages resulting from an ATM or merchant terminal malfunction. However, for applicable accounts, see "In case of errors or questions about your electronic fund transfers" in the "Electronic Fund Transfer Disclosures" section of this Agreement.

## Fees for use of card

Other applicable fees for use of your card are described in the Consumer Schedule and Business Schedule.

**We charge a fee for each non-Wells Fargo ATM transaction. In addition, the non-Wells Fargo ATM owner/operator may charge a fee and set their own withdrawal limits.** We may waive our fee and/or reimburse the non-Wells Fargo ATM owner/operator fee, in whole or in part, if allowed by the terms of your account. Even if reimbursed, the non-Wells Fargo ATM owner/operator fee is included in the total transaction amount that is withdrawn from your account and will apply to your card's daily ATM withdrawal limit. Transactions will also be limited to any withdrawal limits set by the non-Wells Fargo ATM. We'll charge a fee if you make a teller-assisted cash disbursement at a non-Wells Fargo bank that accepts Visa-branded cards. Some merchants may assess a fee when you use your card for a purchase or for cash back. The merchant fee will be included in the total purchase amount.

## Daily limits

Unless otherwise specified, a "day" is defined as the 24-hour period from midnight to midnight, Pacific Time. Transactions made in other time zones will be based on when received in Pacific Time. You may use your card subject to your daily purchase limit, daily ATM withdrawal limit, and the available balance in your account. The following rules apply:

**Limits on dollar amounts:** Your card's daily purchase limit is the maximum U.S. dollar amount of purchases (including cash back, if any) that can be authorized each day from your primary linked account, less merchant fees, if any. Note: If you use your card or card number to fund a digital wallet, brokerage, or other type of account, these Account Funding Transactions (AFTs) will count against your card's daily purchase limit. AFTs may also be limited by the applicable card network. If your daily purchase limit is more than $99,999, you may ask that the merchant process multiple transactions to complete a purchase above this amount.

Your card's daily ATM withdrawal limit is the maximum amount of cash you can withdraw each day from any combination of accessible accounts using your card, less any non-Wells Fargo ATM owner/operator fees, if applicable. When you use a Wells Fargo ATM in Assisted-Service mode, your card's daily ATM withdrawal limit may not apply.

You can confirm your card's daily limits through online banking, our mobile app, or by calling us.

**Limits for your card:** We provide you your daily ATM withdrawal and purchase limits when you receive your card, unless otherwise stated in the Agreement. **Note:** For security reasons there may be additional limits on the amount, number, or type of transactions you can make using your card.

There's generally no limit on the number of times the card may be used each day as long as the applicable daily ATM withdrawal limit and daily purchase limit are not exceeded, and there's a sufficient available balance in accounts you access for the transactions. If an ATM transaction or purchase would create an overdraft on the account, we may, in our sole discretion, take any of the actions described in the "Available Balance, Posting Transactions, and Overdraft" section of this Agreement.

When we approve a transaction or purchase, we call that an authorization.

We may limit the number of authorizations we allow during a period of time (for example, if we notice out-of-pattern use of your card, or suspected fraudulent or unlawful activity). For security reasons, we cannot explain the details of the authorization system. If we don't authorize the payment, we may notify the person who attempted the payment that it has been refused. We won't be responsible for failing to give an authorization. In our discretion, we may allow or deny transactions or authorizations from merchants who are apparently engaged in or who are identified as engaged in the internet gambling business.

**Changes to your card limits:** We may, without telling you, increase your daily purchase or ATM withdrawal limit based on account history, activity, and other factors. If we decrease the limits of your card, we'll notify you in accordance with applicable law.

## Using your card through a mobile device

A mobile device means a smartphone, tablet, or any other hand-held or wearable communication device that allows you to electronically store or electronically present your debit card or debit card number (digital card number) to make debit card transactions.

When you use your debit card with your mobile device for transactions:

- Availability may be affected by your mobile carrier's coverage area, and your mobile carrier may charge you message and data rates, or other fees.
- Your debit card information is sent across wireless and computer networks.
- Information about your mobile device may be transmitted to us.
- You should secure the mobile device the same as you would cash, credit cards, and other valuable information. Password protect and lock it to help prevent unauthorized transactions and notify us promptly if it's lost or stolen.
- When you make a purchase or payment using your mobile device, the merchant won't provide an option for cash back.
- A physical card may be required for access to Wells Fargo ATMs within secure locations.
- You can access Wells Fargo ATMs by holding your mobile device close to the Contactless Symbol displayed on the ATM. The Contactless Symbol and Contactless Indicator are trademarks owned by and used with the permission of EMVCo, LLC.

- Each time you access a Wells Fargo ATM with your mobile device and card PIN, you can perform one monetary transaction (such as a cash withdrawal), or one non-monetary transaction (such as a balance inquiry) before your one monetary transaction.
- If you're accessing a Wells Fargo ATM in Assisted-Service mode using your mobile device, your card's daily ATM withdrawal limit will apply and you won't be able to access accounts that are not linked to your card.
- We may automatically provide digital wallet operators with updated Digital Card Number information, such as when your Card is replaced or reissued.

Third parties, such as merchants, card association networks, mobile carriers, digital wallet operators, mobile device manufacturers, and software application providers may 1) use and receive your digital card number, and 2) receive information about your mobile device. If you have enrolled in Overdraft Protection and/or Debit Card Overdraft Service, those terms will apply to debit card transactions made through a mobile device.

We may, at any time, partially or fully restrict your ability to make debit card transactions through a mobile device. If you want to remove your digital card number from your mobile device, contact us using the information listed in the "Questions? We're here for you" section at the beginning of this Agreement.

### Card on file with merchants

If you give your debit card number to a merchant with authorization to bill that card for recurring payments, or to keep it on file for future purchases or payments, the merchant may receive updated card information to process such payments. However, since not all merchants receive updated card information, we recommend you notify each merchant of your new debit card number and/or expiration date to ensure your payments continue uninterrupted. If you have a card on file with a merchant and want to cancel the payment arrangement, be sure to cancel it directly with the merchant.

### Authorization holds for card transactions

For all card purchase transactions, we may place a temporary hold on some or all of the funds in the account linked to your card when we obtain an authorization request. **We refer to this temporary hold as an authorization hold. The funds subject to the hold will be subtracted from your available balance.** We generally release the hold within 3 business days, but it can be up to 30 business days for certain types of debit card transactions, such as international car rental and hotel, from the time of authorization or until the transaction is paid from your account.

If the merchant does not submit the transaction for payment within the time allowed, we'll release the authorization hold. This means your available balance will increase until the transaction is submitted for payment by the merchant and posted to your account. If this happens, we must honor the prior authorization and will pay the transaction from your account. In some situations, the amount of the hold may differ from the actual transaction amount since the merchant may not know the total amount you'll spend. For example: A restaurant submits the authorization request for your meal before you add a tip.

**You might end up overdrawing your account even though the available balance appears to show there are sufficient funds to cover your transaction.** For example: A merchant does not submit a one-time debit card transaction for payment within three business days of authorization (or up to 30 business days); we must release the authorization hold even though we'll have to honor the transaction. When we receive it for payment, it's paid from the funds in the account and at that time it causes an overdraft.

You should record and track all of your transactions closely to confirm your available balance accurately reflects how you spend funds from the account linked to your card.

### Partial authorization for card transactions

If a debit card or ATM card purchase amount exceeds the current available balance in the primary linked account when you're making a purchase, you may be able to use your available balance to pay for a portion of the total purchase. The transaction will be subject to a partial authorization daily purchase limit set by the Bank and your card's daily purchase limit.

We'll first try to approve the full amount of the purchase with the available funds in your checking account, account(s) linked for Overdraft Protection, and, if enrolled, using Debit Card Overdraft Service. If we don't approve the full amount of the purchase, we may approve a portion of the purchase using the remaining available funds in your checking account. This is called a partial authorization. The remaining amount of the purchase total would need to be covered by another form of payment, such as cash or another card. If you're unable/unwilling to provide an additional form of payment, and the transaction does not occur, the partial authorization will be reversed by the merchant. Not all merchants are able to accept partial authorizations or process transactions using multiple forms of payment.

## Transactions outside the United States

If a card is used to make an ATM withdrawal or a purchase outside the United States, the network handling the transaction will convert the local currency amount of the transaction to U.S. dollars (or, in the case of a purchase only, the merchant handling the transaction may convert the currency). If the network converts the currency, it will use either a rate selected by the network from the range of rates available in wholesale currency markets for the applicable central processing date, which rate may vary from the rate the network itself receives, or the government-mandated rate in effect for the applicable central processing date. If the merchant handling the purchase converts the currency, the merchant will determine the currency conversion rate. For each purchase transaction completed outside the United States, we may also charge an international purchase transaction fee, which we base on the amount provided to us by the network (for example, Visa, MasterCard) in U.S. dollars.

## Ending your card use

Your card is our property.

We may cancel your card or card banking access at any time without notice to you. You may cancel your card or card banking access at any time by writing to us at the address provided in your account statement, calling the number on the back of your card, or visiting your nearest branch. If the account is closed or the card is cancelled, you will immediately destroy the card(s) and, upon request, tell us in writing that the card(s) has been destroyed. If requested, you must immediately return the card(s) to us. If your card or card banking access is cancelled, you must pay for any card transactions made before the card is cancelled. For the Wells Fargo Campus Card℠ program, school issued campus cards are the property of the school.

## Zero Liability protection

With Zero Liability protection, you'll have no liability for any card transactions that you did not make or authorize, so long as those transactions occurred before the end of the 60-day period described below.

If your account statement shows card transactions that you did not make or authorize, tell us at once. If you don't notify us within 60 days after the statement was mailed or was otherwise made available to you, you'll be liable for any additional unauthorized card transactions that occurred after the 60-day period and before you provided notice to us (if we could have stopped those card transactions had you promptly notified us). This will apply even to unauthorized card transactions that occur shortly before you notify us. If a good reason (such as a long trip or hospital stay) kept you from telling us, we'll extend the time period.

**For card transactions from consumer accounts:** Your card comes with Wells Fargo's Zero Liability protection, which provides you with more coverage than what Regulation E requires for cards accessing consumer accounts (see "Liability for unauthorized transactions according to Regulation E" in the "Electronic Fund Transfer Disclosures" section of this Agreement).

**For card transactions from business accounts:** Your card comes with Wells Fargo's Zero Liability protection.

## Additional information for Wells Fargo Campus Card Program customers

Wells Fargo campus cards are available two ways:
1) Wells Fargo issued cards
2) School issued cards

Campus debit and campus ATM cards are available for students, faculty, and staff of participating colleges and universities. Campus debit cards can be identified by the Visa® logo on the front of the card; campus ATM cards don't include a Visa logo.

**A Wells Fargo-issued card** is produced by Wells Fargo and delivered to currently enrolled students and currently employed faculty and staff by mail after we receive their request for a campus debit card. A card may be requested by bringing a valid school ID from a participating college or university to a Wells Fargo branch. The card must be linked to an eligible new or existing deposit account to be used for purchases and ATM transactions, and it expires five years from the date it was issued. After the card expires, we'll issue you a standard Wells Fargo Debit Card. You may visit a Wells Fargo branch to request another campus debit card if you remain eligible based on current enrollment or employment at a participating college or university.

**A school issued card** is produced by a participating college or university and issued to currently enrolled students and currently employed faculty and staff by the school. It can be linked to an eligible new or existing deposit account to be used for purchases and ATM transactions. School issued campus ATM cards can be linked to an eligible deposit account at any time for up to five years from the date it was issued, and it expires five years after it is linked to an eligible deposit account. After the card expires, you can contact Wells Fargo and request a standard Wells Fargo Debit or ATM Card to use for purchases and ATM transactions. Or, you can request another campus ATM card from the school if you remain eligible based on current enrollment or employment at a participating college or university, and then visit a Wells Fargo branch to link your campus ATM card to your eligible deposit account.

School issued campus ATM cards can be linked to an eligible deposit account at any time for up to five years from the date it was issued. The card expires five years after it is issued. You can contact Wells Fargo and request a standard Wells Fargo Debit or ATM Card to use for purchases and ATM transactions.

Both Wells Fargo and school issued campus cards are subject to daily dollar limits for purchases and ATM transactions. For a new campus debit card, we provide your daily ATM withdrawal and purchase limits when you receive your card. For a new campus ATM card, the limits below apply to your card, unless you request and are provided other limits at the time you link your campus ATM card to an eligible deposit account. Replacement campus debit or campus ATM cards will have the same limits as the card it replaced at the time the replacement card is issued. You can confirm your limits by calling us at the number listed in the "Questions? We're here for you" section at the beginning of this Agreement, or by viewing them in online banking.

| New campus ATM card daily limits | |
| --- | --- |
| ATM Withdrawals | $1,010 |
| Purchases | $500 |

To view the Campus Debit and ATM Card Terms and Conditions, visit wellsfargo.com/debitcardterms (English) or wellsfargo.com/spanishdebitcardterms (Spanish).

**Card and ATM safety tips**

**Card safety**

- Always protect your card and keep it in a safe place, just like you would cash, credit cards, or checks.
- Create a PIN that does not include any number or word that appears in your wallet (such as birth date, name, or address). Note: Most ATMs outside of the U.S require a four-digit numeric PIN.
- Memorize your PIN, never tell it to anyone, and never write it down.
- Change your PIN every six months. If you have forgotten your PIN or want a new one, visit your nearest Wells Fargo location.
- Shop with merchants you know and trust.
- Look at your account statements when you receive them to be sure you made the transactions listed. Contact us immediately if you identify anything suspicious.
- Make sure your internet transactions are secure. Look for secure transaction symbols.
- Log off from any site after you make a purchase. If you cannot log off, shut down your browser to keep someone from accessing your information.
- Avoid sending your card number through email because it isn't secure, and don't give the number over the phone unless you made the call.
- If your card is ever lost or stolen, immediately notify us at the number or P.O. Box listed in the "Questions? We're here for you" section at the beginning of this Agreement.
- Destroy your old card if you receive a replacement.
- Before using an attended or unattended merchant terminal, look at it for possible tampering or for the presence of any unauthorized attachment that could capture your card information or PIN.

**ATM safety**

- Be aware of your surroundings and be cautious when you withdraw money.
- Watch for suspicious persons or activity around the ATM. If you notice anything out of the ordinary, come back later or use an ATM elsewhere. If you see someone suspicious or unusual circumstances, don't use the ATM at that time. If you're in the middle of a transaction, cancel the transaction, take your card and leave the area and come back at another time or use an ATM at another location.
- Before using the ATM, look at it for possible tampering or for presence of any unauthorized attachment that could capture your card information or PIN.
- Report all crimes immediately to the operator of the ATM or local law enforcement.
- Consider having someone accompany you when using an ATM after dark.
- Be sure no one sees you enter your PIN.
- Avoid showing your cash. Put it away as soon as your transaction is completed. Wait to count your cash until you're in the safety of a locked enclosure, such as a car or home.
- Keep safe or securely get rid of your ATM receipts.
- Keep your engine running when you use a drive-up ATM. Keep your doors locked and your passenger window up.

# Funds Transfer Services

The following provisions are in addition to, and not in place of, any other agreements you have with us regarding funds transfers to and from your account. The terms "funds transfer," "funds transfer system," "payment order," and "beneficiary" are used here as defined in Article 4A of the Uniform Commercial Code - Funds Transfers, as adopted by the state whose laws govern your account. As used in these provisions, a funds transfer does not include a transaction made using a Wells Fargo issued card. Examples of funds transfers covered by these provisions are a preauthorized automatic transaction via ACH (such as your car or mortgage payment), remittance transfers, and wire transfers (whether outgoing or incoming, foreign or domestic).

**Rules of funds transfer systems**

Funds transfers to or from your account will be governed by the rules of the funds transfer system(s) through which the transfers are made ("system rules"), including Fedwire, the National Automated Clearing House Association, the Electronic Check Clearing House Organization, any regional association (each an ACH), the Clearing House Interbank Payments System (CHIPS), the Society for Worldwide Interbank Financial Telecommunication ("SWIFT") and the RTP system ("RTP System"). We're under no obligation to honor, in whole or in part, any payment order or other instruction that could result in our contravention of applicable law, including, without limitation, requirements of the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC") and the Financial Crimes Enforcement Network ("FinCEN").

**Sending funds transfers/ Means of transmission**

When acting upon your transfer instructions, we may use any means of transmission, funds transfer system, clearing house, or intermediary bank that we reasonably select.

**Notice of funds transfers**

We'll notify you of funds electronically debited from or credited to your account through the account statement covering the period in which the transaction occurred. We're under no obligation to provide you with any additional notice or receipt.

**Reliance on identification numbers**

If an instruction or order to transfer funds describes the party to receive payment inconsistently by name and account number, we'll rely on the beneficiary account number even if the account number identifies a party different from the named recipient. If an instruction or order to transfer funds describes a participating financial institution inconsistently by name and identification number, the identification number may be relied on as the proper identification of the financial institution.

**Your duty to report unauthorized or erroneous funds transfers**

You'll exercise ordinary care to determine whether a funds transfer from your account was either not authorized or inaccurate. You must notify us if a funds transfer from your account wasn't authorized or is inaccurate. Notify us within 14 days after we notify you that the instruction or order was accepted or your account was debited or credited for the funds transfer, whichever is earlier, to be entitled to a refund from us. If you don't notify us within 14 days, we'll be entitled to retain payment for the funds transfer.

**Erroneous payment orders**

You could lose funds if you provide incomplete or inaccurate information in your payment orders. We have no obligation to detect errors you make in payment orders (for example, paying the wrong person or the wrong amount). Just because we detect an error once, we won't be obligated to detect future errors. We'll rely on the beneficiary account number and beneficiary bank identification number (e.g., IBAN, RTN, or SWIFT BIC) you provide with an instruction or order.

**ACH transactions**

These additional terms apply to payments to or from your account that you transmit through an ACH:

- Your rights as to payments to or from your account will be based on the laws governing your account.
- When we credit your account for an ACH payment, the payment is provisional until we receive final settlement through a Federal Reserve Bank or otherwise receive payment.
- If we don't receive final settlement or payment, we're entitled to a refund from you for the amount credited to your account.
- Any Originating Depository Financial Institution (ODFI) may initiate, pursuant to ACH Operating Rules, ACH debit entries to your account for presentment or re-presentment of items you write or authorize.

**Remittance transfers**

Remittance transfers are initiated by consumers primarily for personal, family, or household purposes, and are sent outside the United States and its territories. Each time you initiate a remittance transfer, you'll receive disclosures outlining additional rights provided by federal law. You also may obtain a copy of those rights on wellsfargo.com or in any branch.

| | |
|---|---|
| **Incoming international wire transfers** | Incoming wire transfers received in a foreign currency for payment into your account will be converted into U.S. dollars using the applicable exchange rate without prior notice to you. For more information, see the "Applicable Exchange Rate" section of this account agreement. |
| **Reversal or return of ACH transactions** | **Consumer accounts only:** You have the right to reverse any unauthorized ACH payment that was debited from your account. If you give us written notice that you want to reverse a payment, we'll credit your account for the amount of the payment. You must notify us no later than 15 days after we send or otherwise make available to you the account statement that reflects the payment you want to reverse. This right of reversal is in addition to your right to stop payment. |
| | **Business accounts only:** Under the ACH Rules, the Bank can return any non-consumer ACH debit entry as unauthorized until midnight of the business day following the business day the Bank posts the entry to your account. In order for the Bank to meet this deadline, you're required to notify us to return any non-consumer ACH debit entry as unauthorized by the cutoff time we separately disclose. The cutoff time is currently 3:00 p.m. Central Time. If you don't notify us in a timely manner of the unauthorized non-consumer ACH debit entry, we won't be able to return it without the cooperation and agreement of the originating bank and the originator of the debit entry. Any other effort to recover the funds must occur solely between you and the originator of the entry. |
| **Additional information on ACH debit entries** | If you provide information that is incorrect or subject to change (for example, if the sender changes its company identification number or individual identification number), it may result in payment of the ACH debit entry. You acknowledge this risk and agree that you're responsible for notifying the sender of the ACH debit entry that your authorization has been revoked. You agree to indemnify and hold us harmless from, and against any loss we incur, as a result of our paying an ACH debit entry, if any of the information relied on in the stop payment order is incorrect or incomplete (or as a result of our not paying an ACH debit entry for which a valid stop payment order is in effect). |
| **Liability for transactions not covered by Regulation E** | For purchases and other transactions in consumer accounts not governed by Regulation E, you're liable for all losses relating to unauthorized funds transfers that don't result solely from our negligence or intentional misconduct, unless the laws governing your account require lesser liability. |
| **Receiving RTP® Payments** | The following additional terms apply to any real-time payments we receive for credit to your account through the RTP System. The terms "sender," "receiver," and "sending participant" are used here as defined in the system rules governing RTP payments ("RTP Rules"). In addition to the RTP Rules, RTP payments will be governed by the laws of the state of New York, including New York's version of Article 4A of the Uniform Commercial Code, as applicable, without regard to its conflict of laws principles.<br><br>• The RTP System may be used only for eligible payments between a sender and receiver whose accounts are located in the United States. You may not send or receive payments on behalf of any person or entity not domiciled in the United States. RTP payments that are permitted under the RTP Rules and our requirements are considered eligible payments for purposes of this Agreement.<br><br>• RTP payments cannot be cancelled or amended by the sender. If we receive a message from a sending participant requesting return of an RTP payment received for credit to your account, we may notify you of that request. You're not obligated under the RTP Rules to comply with any such request for return of funds. Any dispute between you and the sender of an RTP payment should be resolved between you and the sender.<br><br>• If you don't wish to accept an RTP credit received to your account, you may request that we return such payment to the sender. We may, at our sole discretion, attempt to honor such request but will have no liability for our failure to do so.<br><br>• RTP payments are typically completed within thirty (30) seconds of transmission of the RTP payment by the sender, unless the RTP payment fails or is delayed due to a review by us or the sending participant, such as for fraud, regulatory, or compliance purposes. Transaction limits imposed by the RTP System or sending participant may also prevent RTP payments from being sent to your account.<br><br>We're under no obligation to honor, in whole or in part, any payment order or other instruction that could result in our contravention of applicable law, including, without limitation, requirements of the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC") and the Financial Crimes Enforcement Network ("FinCEN"). |

# Electronic Fund Transfer Services

**(Consumer accounts only)**

**General rules for electronic fund transfer services**

When you read this section, you'll see references to Regulation E which provides certain protections and responsibilities.

We offer a variety of electronic fund transfer services you can use to access funds in your account(s) and perform other transactions detailed in this section. We describe some of these services in this section and also provide certain disclosures that apply to the use of electronic fund transfer services with your consumer account. Some of these services are governed by separate agreements we give to you at the time your card is mailed or you sign up for the service (e.g., ATM and debit cards, online, and mobile banking).

When you read this section, you'll see references to Regulation E or Reg E. This regulation applies to transactions you can perform using your card to access your account, such as purchases and ATM transactions. Regulation E also applies to other types of electronic fund transfers you can make from or to your account, such as payments made using Bill Pay and the direct deposit of your paycheck into your account. Regulation E sets forth the basic rights, liabilities, and responsibilities of consumers who use electronic fund transfers and of the banks or other persons who offer these services. It includes the actions you need to take if you believe your card, your card number, or your Personal Identification Number (PIN) has been lost or stolen, or if you notice an error or unauthorized electronic fund transfer on your account and the rules regarding your potential liability for these transfers. Your responsibilities and protections under Regulation E are described in more detail in the "Electronic Fund Transfer Disclosures" section.

For unauthorized card transactions, in addition to the rights you have under Regulation E, Wells Fargo Zero Liability protection provides you with added protection from liability. For details, see "Zero Liability protection" in the "Debit Cards and ATM Cards" section of this Agreement.

The following table summarizes the types of transactions to which Regulation E applies and tells you if Zero Liability protection covers the transaction.

| Electronic fund transfer | Description | Transaction covered by Reg E | Zero Liability protection |
|---|---|---|---|
| **Card transactions** | | | |
| Debit and ATM cards | Use your Debit or ATM card to make purchases, withdrawals, payments, transfers, and other transactions as described above in the "Debit Cards and ATM Cards" section of this Agreement. | X | X |
| **Electronic transfers, payments, credits, and electronic check conversions** | | | |
| Transfers | Send or receive transfers between your accounts or to other recipients at Wells Fargo or other financial institutions | X | |
| Payments | One-time or recurring payments from your account that you initiate or preauthorize for withdrawal from your account | X | |
| Credits | Manual or automatic electronic deposits to your account, such as payroll or benefits payments | X | |
| Electronic check conversions | Electronic fund transfer using information from a check (e.g., the Bank's routing number and your account number) | X | |
| **Phone Bank transactions** | | | |
| Phone Bank transactions | **Not under a written agreement or plan:** A request to the Phone Bank to make a transaction to or from your account | | |
| | **Under a written agreement or plan:** The Phone Bank, under an agreement, can make transactions to and from your account | X | |

# Electronic Fund Transfer Disclosures

**(Consumer accounts only)**

The following provisions apply to electronic fund transfers to or from your consumer deposit account that are governed by Part A of Regulation E.

**Note:** These provisions don't apply to wire transfers. Refer to the "Funds Transfer Services" section of this Agreement.

**Liability for unauthorized transactions according to Regulation E**

**Tell us AT ONCE if you believe your card, card number, or PIN has been lost or stolen**, or if you believe that an electronic fund transfer has been made without your permission using information from your check. Telephoning is the best way of keeping your possible losses down. You could lose all the money in your account (plus funds in any line of credit, savings account, or credit card linked to your account or as part of an Overdraft Protection plan).

If you tell us within two business days after you learn of the loss or theft of your card, card number, or PIN, you can lose no more than $50 if someone used your credentials without your permission (however, see "Zero Liability protection" in the "Debit Cards and ATM Cards" section of this Agreement).

If you **do NOT** tell us within two business days after you learn of the loss or theft of your card, card number, or PIN, and we can prove we could have stopped someone from using your credentials without your permission if you had told us, you could lose up to $500 (however, see "Zero Liability protection" in the "Debit Cards and ATM Cards" section of this Agreement).

Also, if your account statement shows transfers that you did not make or authorize, including those made by your card, PIN, or other means, tell us at once. If you do not notify us within 60 days after the statement was mailed or was otherwise made available to you, you will be liable for any additional unauthorized transactions that occurred after the 60-day period and before you provided notice to us (if we can prove we could have stopped those transactions had you promptly notified us). This will apply even to unauthorized transactions that occur shortly before you notify us. If a good reason (such as a long trip or hospital stay) kept you from telling us, we will extend the time periods.

**Contact in the event of unauthorized transfer**

If you believe your card, card number, or PIN, has been lost or stolen, call us at 1-800-869-3557 or the number listed on your statement, or write to us at Wells Fargo, Customer Correspondence, P.O. Box 6995, Portland, OR, 97228-6995.

You should also call the number or write to the address listed above if you believe a transfer has been made using the information from your check without your permission.

**Preauthorized credits to your account**

If you have arranged to have direct deposits made to your account at least once every 60 days from the same person or company, you can check your online or mobile banking, enroll in account alerts, or call us at 1-800-869-3557 to find out whether or not the deposit has been made.

**Handling preauthorized payments**

**Right to stop payment:** If you have told us in advance to make regular (recurring) payments out of your account, you can stop any of these payments. Here's how: Call us at 1-800-869-3557, or write to us at Wells Fargo, Customer Correspondence, P.O. Box 6995, Portland, OR, 97228-6995, in time for us to receive your request three business days or more before the payment is scheduled to be made. If you call, we may also require you to put your request in writing and get it to us within 14 days after you call. There is no fee to stop a recurring preauthorized payment using the debit card.

**Notice of varying amounts:** If the amount of these regular (recurring) payments vary, the party you are going to pay should tell you, 10 days before each payment, when it will be made and how much it will be. (The party you are going to pay may allow you to choose to get this notice only when the payment would differ by more than a certain amount from the previous payment, or when the amount would fall outside certain limits that you set.)

**Liability for failure to stop payment:** If you order us to stop one of these payments three business days or more before the transfer is scheduled, and we do not do so, we will pay for your losses or damages.

**Note:** We cannot stop payment on a purchase transaction unless it is a preauthorized electronic fund transfer.

| | |
|---|---|
| **Electronic check conversion** | You may authorize a merchant or other payee to make a one-time electronic payment from your account using information from your check to 1) pay for purchases, or 2) pay bills. |
| **Account inquiry** | You have the right to contact us to find out whether an electronic transfer has been credited or debited to your account. Call us at 1-800-869-3557, or write to us at Wells Fargo, Customer Correspondence, P.O. Box 6995, Portland, OR 97228-6995. |
| **Receipts** | You can get a receipt at the time you make any transfer to or from your account using one of our ATMs or when you use your card at a merchant terminal. |

**Our liability for failure to make transfers**

If we do not complete a transfer to or from your account on time or in the correct amount according to our agreement with you, we will be liable for your losses or damages. However, there are some exceptions. For instance, we will not be liable if:

- Through no fault of ours, you do not have enough money in your account to make the transfer,
- The transfer would go over the credit limit on a credit account linked for Overdraft Protection,
- The ATM where you are making the transfer does not have enough cash,
- The terminal or system was not working properly and you knew about the breakdown when you started the transfer,
- Circumstances beyond our control (such as fire or flood) prevent the transfer, despite reasonable precautions we have taken, or
- There is some other exception stated in our Agreement with you.

**In case of errors or questions about your electronic fund transfers**

If you see an error or have questions about your electronic transfers, think your deposit statement or receipt is wrong, or you need more information about a transfer listed on an account statement or receipt, call us at 1-800-869-3557 or the number listed on your account statement, or write to us at Wells Fargo, Customer Correspondence, P.O. Box 6995, Portland, OR, 97228-6995 as soon as you can. We must hear from you no later than 60 days after we send the FIRST account statement on which the problem or error appeared, and you should take the following actions:

- Tell us your name and account number (if any) and the dollar amount of the suspected error.
- Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe it is an error, or why you need more information.

If you tell us in person or by phone, we may require that you send us your complaint or question in writing within 10 business days.

**Investigations**

We will determine whether an error occurred within 10 business days after we hear from you and will correct any error promptly. If we need more time, however, we may take up to 45 days to investigate your complaint or question. If we need more time, we will credit your account within 10 business days for the amount you think is in error, so that you will have the use of the money during the time it takes us to complete our investigation. If we ask you to put your complaint or question in writing and we do not receive it within 10 business days, we may not credit your account.

For errors involving new accounts, point-of-sale transactions, or foreign-initiated transactions, we may take up to 90 days to investigate your complaint or question. For new accounts, we may take up to 20 business days to credit your account for the amount you think is in error.

We will tell you the results within three business days after completing our investigation. If we decide that there was no error, we will send you a written explanation. You may ask for copies of the documents that we used in our investigation.

# Other Account Services and Restrictions

**Telephone banking services**

You may use our automated phone system to get account information, transfer funds between Wells Fargo accounts, or pay certain Wells Fargo credit bills. To access this service, you must have a valid PIN, either for your debit or ATM card, or a cardless PIN issued only for authentication purposes. If you don't have a valid PIN, we'll ask you for information to verify your identity. We may cancel your non-card PIN at any time without notice, including after six months of non-use. We may comply with any request of a caller using Wells Fargo's telephone banking services, provided we authenticate the caller in compliance with one of the identity verification procedures described in this paragraph.

**Large cash withdrawals or deposits**

We may place reasonable restrictions on large cash withdrawals. These restrictions may include requiring you to provide reasonable advance notice to ensure we have sufficient cash on hand. We don't have any obligation to provide security if you make a large cash withdrawal. If you want to deposit a large amount of cash, we may require you to provide adequate security or exercise other options to mitigate possible risks.

**Checks with multiple signatures**

We may act on the instructions of any one authorized signer on your account and not require multiple signatures. If you have indicated that more than one signature is required to transact on your account, you acknowledge and agree that such requirements are for your own control purposes only, and we won't be liable if a check or other transaction is processed without multiple signatures. We're not responsible for reviewing your checks or other transactions for multiple signatures.

**Checks with dates and special instructions**

We may pay the amount encoded on your check in U.S. dollars, even if you wrote the check in a foreign currency or made a notation on the check's face to pay it in a foreign currency. If we, in our sole discretion, pay a check or other item in a foreign currency, the applicable exchange rate may apply. For information on the applicable exchange rate, see "Applicable exchange rate" in the "Statements, Interest, and Other Account Information" section of this Agreement. The encoded amount is in the line along the bottom edge of the front of the check where the account number is printed.

We may, without inquiry or liability, pay a check even if it:

- Has special written instructions indicating we should refuse payment (e.g., "void after 30 days" or "void over $100"),
- Is stale-dated (i.e., the check's date is more than six months in the past), even if we're aware of the check's date,
- Is post-dated (i.e., the check's date is in the future), or
- Isn't dated.

**Use of a facsimile or mechanical signature**

If you use any device or machine to provide a faxed, electronic, computer generated or other mechanical signature (including a stamp on a check) it will be treated as if you had actually signed it.

**ACH debit entries**
(Business accounts make note)

Under the ACH operating rules, certain types of ACH debit entries may only be presented on a consumer account. We'll have no obligation to pay, and no liability for paying, any consumer ACH debit entry on a business account.

**Acceptable form for checks**

Your checks must meet our standards, including paper stock and dimensions; we may refuse checks that don't or that cannot be processed by our equipment. Checks must include our name and address as provided by us. Certain check features, such as security features, may impair the quality of a check image. We're not responsible for losses that result from your failure to follow our check standards.

**Checks presented by a non-customer**

For these transactions, we require acceptable identification, which may include a fingerprint from the person presenting your check. We may not honor the check if the person refuses to provide us with requested identification. We may charge a fee for non-customers to cash a check.

**Electronic check indemnifications**

An "electronic check" and an "electronic returned check" means an electronic image of a paper check or paper returned check or the electronic information derived from it.

When we transfer or present an electronic check or electronic returned check, we provide the following warranties:

- **Image Quality Warranty.** We guarantee that the electronic image accurately represents all of the information on the front of the check as of the time that the original check is truncated, and the electronic information includes an accurate record of all MICR line information required for a substitute check and the amount of a check.
- **No Double Debit Warranty.** We guarantee that the warrantee won't receive a presentment of or otherwise be charged for an electronic check, an electronic returned check, the original check, a substitute check, or a paper or electronic representation of a paper substitute check, in a way that the warrantee will be asked to pay a check that it has already paid.

When we transfer an electronic check for collection or payment, we make the image quality warranty and the no double debit warranty to the transferee bank, any subsequent collecting bank, the paying bank, and the drawer. When we transfer an electronic returned check for return, we make the image quality warranty and the no double debit warranty to the transferee returning bank, the depository bank, and the owner.

**Indemnities applicable to electronic checks and electronic returned checks.** You will indemnify, defend, and hold us harmless from all liabilities, obligations, demands, and costs (including fees of legal counsel and accountants) awarded against or incurred by us (collectively, "losses and liabilities"), related to the transfer or return of an electronic check or an electronic returned check on your behalf. If we suffer any losses or liabilities related to a breach of the image quality warranty or the no double debit warranty, you will reimburse us and not hold us responsible or liable.

**Indemnities applicable to remote deposit capture services (including Wells Fargo Mobile Deposit)**. If a depository bank accepts the original check from which an electronic check is created and suffers losses due to the check having already been paid, we're required to indemnify and reimburse that bank. If we suffer any losses or liabilities related to that type of depository bank indemnity obligation, you will indemnify and reimburse us and not hold us responsible or liable.

**Indemnities applicable to electronically created items.** If we transfer or present an "electronically created item" and receive settlement or other consideration for it, we're required to indemnify and reimburse each transferee bank, any subsequent collecting bank, the paying bank, and any subsequent returning bank against losses that result from the fact that:

- The electronic image or electronic information is not derived from a paper check,
- The person on whose account the electronically created item is drawn didn't authorize its issuance or the payee stated on the item, or
- A person receives a transfer, presentment, or return of, or otherwise is charged for an electronically created item in such a way that the person is asked to make payment based on an item it has paid.

If we suffer any losses or liabilities related to that type of electronically created item indemnity obligation, you will indemnify and reimburse us and not hold us responsible or liable.

## Stop payment

Applicable fees are described in the Consumer Schedule and Business Schedule.

**Requesting stop payment on a check**
You may request a stop payment on a check if you allow us a reasonable amount of time to act on it; the same is true if you ask us to cancel a stop payment order. You can request a stop payment through wellsfargo.com, by phone, or by visiting your local branch. We may verify that we have not already become obligated to pay the check from your account and can verify after we accept your stop payment order.

To issue a stop payment order on a check, we need the following information:

- Your bank account number
- The check number or range of numbers
- The check amount or amounts
- The payee(s) name(s)
- The date on the check

We are not responsible for stopping payment on a check if you provide incorrect or incomplete information about the check.

**Effective period for a stop payment order**
- **A stop payment order on a check is valid for six months.** We may pay a check once a stop payment order expires. You must request a new stop payment order if you don't want it to expire and we treat each renewal as a new order, and a new fee will apply.
- **Your responsibility after we accept a stop payment on a check.** Even if we return a check unpaid due to a stop payment order, you may still be liable to the holder of the check (e.g., a check cashing business).

**Stop payment orders on ACH debit entries**
You may request a stop payment order for an ACH debit entry that has not already been paid from your account. To be effective, a stop payment order must be received in a time and manner that gives the Bank a reasonable opportunity to act on the applicable ACH debit entry. If you provide verbal instructions, we may require confirmation in writing. If such written confirmation isn't received, we may remove the stop payment order after 14 days. An instruction to revoke a stop payment order must be received in a time and manner that gives us a reasonable opportunity to act on it.

To place a stop payment order on an ACH debit entry, you must provide the following information: (i) your account number, (ii) amount of the ACH debit entry, (iii) effective date, and (iv) payee name. We may request additional information and may, at our sole discretion, use only a portion of the required information in order to identify the ACH debit entry. We may be able to place a stop payment order based on the company identification number of the sender/payee, but this may stop all ACH entries received from this sender/payee.

**Stopping payment on a preauthorized electronic fund transfer**
If your account is a consumer account, you may stop payment on a preauthorized electronic fund transfer. See "Handling preauthorized payments" in the "Electronic Fund Transfer Services" section of this Agreement.

## Post-dated checks

A post-dated check is a check you issue with a date in the future. We're not responsible for waiting to honor the check unless you use a stop payment order for the check. You're responsible for notifying us to cancel the stop payment order when you're ready to have that check paid.

# Time Accounts (CDs)

CDs mature and are payable at the expiration of a specified term, which will be no less than seven calendar days after the date of deposit. The CD's maturity date is the last day of the term for the CD and is printed on your receipt.

We may refer to a Time Account as a CD or Certificate of Deposit, even though we don't issue a paper certificate when opening the account or require a paper certificate to close the account.

**You may withdraw funds from your CD on the maturity date without a penalty**. During the seven calendar days after the maturity date, which we refer to as grace period, you can change the term, generally make withdrawals and additional deposits, or close the CD. No additional deposits to the CD are allowed outside this grace period. You may be charged a penalty if you make a withdrawal at any other time. See "Early withdrawal penalty and Regulation D penalty" in this section.

**Unless you withdraw the funds, your CD will automatically renew at maturity:**

- Typically for the same term unless we inform you at the time of account opening or prior to maturity of a different renewal term, and
- At our standard interest rate in effect on the maturity date for a new CD of the same term and amount, unless we have notified you otherwise.

At renewal, in addition to the interest rate and renewal term, we may change any other CD provision, subject to providing you notice as required by law. We'll treat any interest that is deposited into your CD during the previous term as principal for your new term.

**IRA CDs and ESA CDs**
You may have multiple accounts within your Individual Retirement Account (IRA) or Education Savings Account (ESA) plan. We no longer offer new IRAs or new ESAs. IRA CDs are only available for current IRA customers, and ESA CDs are only available for current ESA customers.

Your IRA/ESA plan balance on December 31 of each year represents the fair market value of your account. We report the fair market value, distributions from and contributions to your IRA/ESA, to the Internal Revenue Service (IRS). If applicable, the IRS may impose penalties. Please consult your tax advisor.

**Interest on your CD**
The Annual Percentage Yield (APY) we disclose to you assumes the interest you earn will remain on deposit until your CD matures. If you withdraw your earned interest before maturity, your account will earn less interest over time and the actual APY will be less than the disclosed APY.

| Term | CD Interest payment options* | | | | |
|---|---|---|---|---|---|
| | Monthly | Quarterly | Semi-Annually | Annually | At maturity |
| Less than 12 months (365 days) | X | X | X | Not available | X |
| 12 months or more | X | X | X | X | Not available |

*Interest payments for IRA/ESA CDs redeposit monthly into your CD.

With the exception of IRA/ESA CDs, you may choose to have your interest payments re-deposited into your CD, transferred to a Wells Fargo checking or savings account, or paid by check if your CD has a minimum balance of $5,000.

**Early withdrawal penalty and Regulation D penalty**

**Early withdrawal penalty (Fixed Rate CDs and Fixed Rate IRA/ESA CDs):** Other than the Regulation D penalty described below, any money you withdraw from your CD before the end of its term will be subject to an early withdrawal penalty based on the length of the CD term.

| CD Term | Penalty |
|---------|---------|
| less than 90 days (or less than 3 months*) | 1 month's interest |
| 90 through 365 days (or 3-12 months*) | 3 months' interest |
| Over 12 months through 24 months | 6 months' interest |
| Over 24 months | 12 months' interest |

\* Some CD terms are based on days and others are based on months. Check your receipt for the term applicable to your CD.

We calculate the early withdrawal penalty using the amount of principal you withdraw at your CD's interest rate at the time of withdrawal. The penalty is calculated by multiplying the interest rate by the amount of principal withdrawn then dividing that total by 12 to arrive at one month's interest. We'll deduct your early withdrawal penalty from your earned interest. If the penalty is greater than your earned interest, then we'll deduct the difference from the principal amount of your CD.

**Regulation D Penalty:** The Regulation D penalty is seven days' simple interest on the amount withdrawn and applies to the following:

• Withdrawals made within seven days of account opening including the day the account was opened.
• Withdrawals made during the grace period, when additional deposits are made during the grace period and the withdrawal exceeds the amount of the matured CD balance.
• Withdrawals within seven days of any prior withdrawal where the Bank's early withdrawal penalty is not applied.

**Exceptions to the early withdrawal penalty and the Regulation D penalty (Fixed Rate CDs):**

• Death of the CD owner
• Death of the grantor of a revocable family/living trust
• Court determination that a CD owner is legally incompetent

**Exceptions to the early withdrawal penalty and the Regulation D penalty (Fixed Rate IRA/ESA CDs):**

• Death of the IRA CD or ESA CD owner
• Court determination that an IRA CD or ESA CD owner is legally incompetent
• IRA or ESA owner becomes disabled
• IRA owner is age 59 ½ or older
• IRA or ESA owner requests a revocation in writing within seven days of plan opening

# Protecting Your Account and Your Information

**Protection against unauthorized items**

You acknowledge that there's a growing risk of losses resulting from fraud, including unauthorized items. To help prevent fraud on your account, you agree to take reasonable steps to ensure the integrity of your account and items drawn on your account or deposited to it. We recommend you take the following preventive measures (not an exhaustive list):

• Reconcile your account statements when received and promptly notify us of any problem.
• Promptly notify us if you don't receive an expected statement.
• Don't provide your account and routing numbers to unknown persons. Fraudsters may use this information to initiate fraudulent transactions against your account.
• Only write checks to people and businesses whom you know. Fraudsters may try to trick you by pretending to be friends and family, indicating you have won the lottery or sweepstakes, through online dating sites, or impersonating law enforcement.
• Don't deposit checks from people whom you don't know. Fraudsters often request that you deposit a fake check into your account, then request that you return some of the funds. After you return the funds, the check bounces, but you are still responsible to us for the full amount of the check you deposited.
• Write your checks in a manner to prevent others from adding words, numbers or making other changes without your authorization.
• Protect your checks from unauthorized use and theft by securing your supply of checks at all times (for example, never leave checks in an unlocked vehicle, or out in a visible location unattended), using tamper resistant checks, destroying checks you don't intend to use, and  not signing blank checks. Check-related fraud is common. If you fail to take any of these preventive measures, we are not responsible for any losses that you may incur.

## Additional protections for business accounts

**Additional steps business customers should take to help reduce the risk of fraud on their accounts:**

- Assign responsibilities for your business account to multiple individuals and periodically reassign duties. Have different people reconcile statements and withdraw funds.
- Watch for checks cashed out of sequence or made out to cash as flags for embezzlement.
- Review activity for unexpected fluctuations such as the percentage of cash deposits to total deposit size. Most businesses will keep a constant average.
- Notify us immediately when an authorized signer's authority ends so that their name can be removed from account access.
- Obtain insurance coverage for bank account fraud risks.
- Watch out for imposters impersonating vendors or if an alleged vendor changes their payment instructions.
- Only send trusted employees to deliver checks or make deposits.

**Wells Fargo services to help prevent fraud on analyzed business accounts include:**

- Positive pay, positive pay with payee validation, or reverse positive pay
- ACH fraud filter, and
- Payment Authorization service.

In addition, we recommend you use certain industry best practices such as dual custody. With dual custody, when one user initiates an action like a payment or a change in the set-up of a service, the action does not take effect until a second user approves the action using a different computer or mobile device.

**Consequences if a business customer does not implement the fraud prevention services we recommend.** If we have expressly recommended that you use a fraud prevention service or industry best practice and you either (a) decide not to implement or use the recommended service or industry best practice or (b) fail to use it in accordance with the applicable service description or our other applicable documentation, then you are responsible for all losses that could have been prevented or mitigated by correct use of the recommended service or best practice.

## Verifying your identity with your mobile device and your wireless company

Wells Fargo may collect, use, and retain personal or other information about you or your mobile device to assist in verifying your identity. We may rely on such information provided to us by your wireless company, and you authorize them to disclose:

- Your mobile number, name, address, email;
- Network status, customer type, customer role, billing type, mobile device identifiers (IMSI and IMEI), and other subscriber and device details to Wells Fargo and our service providers for the duration of the account relationship.

Review our Privacy Notice for how we treat your data. You represent that you're the owner of the mobile phone number or have the delegated legal authority to act on behalf of the mobile subscriber to provide this consent.

# Statements, Interest, and Other Account Information

**Statements and notices**

We'll make available to you a statement of your account activity for each statement period, using the postal or email address associated with your account. We'll do the same with notices. If your delivery preference is electronic, we'll notify you by email that your statement or notice is available online.  You must be at least 13 years old to receive online statements.

We'll send statements and notices to one owner of a jointly owned account, and you agree that owner is responsible for sharing copies of the information with all other owners. If you request that we send notices to an authorized signer, the authorized signer has the same responsibility. Online statements are available to each joint owner.

Your statement is considered received by you on the second business day after we mail it to you or, if your delivery preference is electronic, when it's available through online banking. You agree to this timing even if the postal or email address you provided us is invalid.

Checking accounts get a monthly account statement. Savings accounts generally get a quarterly account statement, but will get a monthly statement if you set up automatic transfers into your savings account, have electronic fund transfer activity in the account, or have a combined statement for your checking and savings accounts.

**Combined statements**

We may combine statements for accounts with at least one common owner, in which case we consider the first account listed on your statement as your primary account. We'll make available your account statement through the address listed for your primary account. Statements for accounts in a combined statement will be delivered according to the delivery preference of the primary account.

Any person with online access to the primary account will also have online viewing capability to all the information on the combined statement.

If you prefer that we not combine your statements, let us know and we'll keep them separate. This will apply to subsequent statements only, and this option isn't available for the Portfolio by Wells Fargo® program.

**Changing statement period and fee period for checking and non-IRA savings accounts**

We may change the statement period and fee period assigned to your account without advance notice. If your account is interest-bearing, these changes won't affect interest calculations, but they may affect the date we post interest to your account.

For all accounts except analyzed business accounts, if the first new fee period created by our change is fewer than 25 days, the Bank will automatically waive the monthly service fee for that period.

**Check safekeeping and check image service**

**We don't return your physical paid checks in your statements.** Instead, we make copies of your paid checks available online, by calling us, or at our branches.

**For an additional fee, you can enroll in our check image service.** With this service, you'll receive images of your paid checks on your paper statement. See the "Service Fees" section of the Consumer Schedule or Business Schedule for specific applicable fees and additional details. This service isn't available with online statements, savings accounts, or Clear Access Banking.

For checking accounts with paper statements, the fee for this service is posted to your account on the last day of the fee period, and it will only be assessed when check images are included in your statement. If you have a combined statement or Portfolio by Wells Fargo program, only the primary checking account is eligible for the monthly check image service.

When we provide a statement, we have made the check image available to you, even if we don't send originals or images with the statement. We'll destroy original checks after a reasonable period of time we determine. If for any reason we can't provide a copy of your check, we won't be liable for more than the face amount of the check. We cannot provide originals or images of checks that are sent to us as electronic transfers. Additionally, other banks may send us electronic images instead of original checks. In that case, we may provide a copy of the image, but not the original check.

## Account statements or notices returned or undeliverable

Your account statements or notices will be considered unclaimed or undeliverable if

- Two or more account statements or notices are returned to us through the mail because of an incorrect address; or
- We notify you electronically that your account statement is available for online viewing, and we receive email notifications that our message is undeliverable.

In either event, we may

- Discontinue sending account statements and notices, and
- Destroy account statements and notices returned to us as undeliverable.

We won't attempt to re-deliver account statements and notices to you until you provide us with a valid postal or electronic address.

## Change of address

You agree to promptly notify us of any change to your postal or email address. We'll change your postal or email address within a reasonable time after you request it. If you have a combined statement, any owner of the primary account can change the address of all accounts included in the combined statement. Unless you instruct otherwise, we may change the postal or electronic address only for the account(s) you specify or for all or some of your other account(s) with us.

We may update your address in our records without a request from you if (1) we identify a need to rely on another address you have provided us; or (2) we receive an address change notice from the U.S. Postal Service or information from another party in the business of providing correct address details that does not match the address in our records for your account or card.

## Your responsibility to review account statements and notices and notify us of errors

You are obligated to:

- Examine your account statement promptly and carefully.
- Notify us promptly of any errors.
- Notify us within 30 days after we have made your account statement available to you of any unauthorized transaction on your account. Note: If the same person has made two or more unauthorized transactions and you fail to notify us of the first one within this 30-day period, we won't be responsible for unauthorized transactions made by the same wrongdoer.
- Notify us within six months after we have made your account statement available to you if you identify any unauthorized, missing, or altered endorsements on your items.

For specific information on unauthorized card transactions, see "Zero Liability protection" in the "Debit Cards and ATM Cards" section of this Agreement.

**Consumer accounts only:** Electronic fund transfers are subject to different time periods for notification of errors, as described in the "Electronic Fund Transfer Services" section of this Agreement. Common examples of electronic fund transfers are ATM, debit card, and Bill Pay transactions.

## Responsibility to notify us of errors

If you fail to notify us of any unauthorized transaction, error, or claim for a credit or refund within the time frames specified above, your account statement will be considered correct and we won't be responsible for any unauthorized transaction, error, or claim for transactions included in the applicable statement.

## Unauthorized transactions

A transaction is an unauthorized transaction when it's

- Missing a required signature or other evidence showing you have authorized it, or
- Altered (for example, the amount of a check or the payee's name is changed).

You can notify us of errors on your account statements by promptly

- Calling the telephone number listed on your account statement or in a notice, or
- Submitting a written report (if instructed by us) as soon as possible, but in any event within the specified time frames.

**Actions we take when you report an unauthorized transaction:** We investigate any reports of unauthorized activity on your account. After you submit a claim, we may require you to:

- Complete and return the claim form and any other documents we require,
- Notify law enforcement, and
- Cooperate fully with us in our investigation.

We can reverse any credit made to your account resulting from a claim of unauthorized transaction or error if you don't cooperate fully with us in our investigation or recovery efforts, or we determine the transaction was authorized.

For specific information on unauthorized card transactions, see "Zero Liability protection" in the "Debit Cards and ATM Cards" section of this Agreement.

**Consumer accounts only:** For specific information on unauthorized electronic fund transfers, see the "Electronic Fund Transfer Services" section of this Agreement.

## Adverse claims against your account

An adverse claim occurs when

- Any person or entity makes a claim against your account or funds in your account,
- We believe a conflict exists between or among your account's owners, or
- We believe a dispute exists over who has account ownership or authority to withdraw funds from your account.

In these situations, we may take any of the following actions without any responsibility or liability to you:

- Continue to rely on the documents we have on file for your account.
- Honor the claim against your account funds if we're satisfied the claim is valid.
- Freeze all or a part of the funds in your account until we believe the dispute is resolved to our satisfaction.
- Close your account and send a check or other item for the available balance in your account payable to you or to you and each person or entity who claimed the funds.
- Pay the funds into an appropriate court and/or petition the court to resolve the dispute.

We also may charge any account you keep with us for our fees and expenses in taking these actions (including attorney's fees and expenses, and court costs).

## If you carry special insurance for employee fraud/embezzlement
(Business accounts only)

If you have special insurance for employee fraud/embezzlement, we may require you to file your claim with your insurance company before making any claim against us. In such event, we'll consider your claim only after we have reviewed your insurance company's decision, and our liability to you, if any, will be reduced by the amount your insurance company pays you.

## Restricting access to your account

If we suspect any suspicious, irregular, fraudulent, unauthorized or unlawful activities, we can prevent, delay or decline transactions, freeze all or some of the funds in any account with us that you keep or control, and otherwise restrict access to your account. We may take these actions in our sole discretion and without liability to you, but we are not obligated to take any such actions.

## Converting accounts

We can convert your account to another type of deposit account (by giving you any required notice) if:

- You use it inappropriately or fail to meet or maintain the account's requirements, including minimum balance requirements, or
- We determine an account is inappropriate for you based on your use, or
- We stop offering the type of account you have.

## Terminating or suspending services

We can terminate or suspend specific services (for example, wire transfers) without closing your account and without prior notice to you. You can discontinue using a service at any time.

## Obtaining credit reports or other reports about you

We can obtain a credit or other report about you and/or your co-owners and authorized signers to help us determine whether to open or keep an account. We can also obtain information from motor vehicle departments, other state agencies, and public records.

## Sharing information about your account with others

Generally, if we don't have your consent, we won't share information about your account. However, we may share information about your account in accordance with our separately provided Privacy Notice.

## Use of funds in customers' non-interest-bearing accounts

We may benefit from having the use of funds in customers' non-interest-bearing accounts. We may use these funds to reduce our borrowing from other sources, such as the Fed Funds market, or invest them in short-term investments, such as our Federal Reserve Account. Our use of funds as described in this paragraph has no effect or impact on your use of and access to funds in your account.

## Interest-bearing accounts

**Calculating the applicable interest rate:** When you open an interest-bearing account, we provide a rate sheet listing the current interest rate and Annual Percentage Yield (APY) for your account. Interest-bearing accounts earn interest at a variable rate, except CDs. The interest rate may be as low as 0.00%, and we may change the interest rate for variable-rate accounts at any time. The interest rate may vary depending on your daily balances (tiered-rate account). We may pay the same interest rate on more than one tier. The tiers and corresponding interest rates are disclosed in the rate sheet.

We calculate interest using the daily periodic balance method, applying a daily periodic rate to the collected balance in your account each day. Interest is calculated using a 365-day year, unless otherwise noted for business accounts in the Business Schedule. Interest compounds daily. For interest-bearing checking and savings accounts, it will be credited monthly.

Cash deposits begin accruing interest the same business day the deposit is credited to your account. If you deposit an item such as a check, interest begins accruing on the business day we receive credit for the item.

**Annual Percentage Yield (APY) and Annual Percentage Yield Earned (APYE):** The Annual Percentage Yield (APY) is a percentage rate reflecting the total amount of interest paid on an account based on the interest rate and the frequency of compounding for a 365-day period. The Annual Percentage Yield Earned (APYE) is an annualized rate that reflects the relationship between the amount of interest actually earned on your account during the statement period and the average daily balance in the account for the statement period.

We calculate both your APY and APYE according to formulas established by federal regulations. The APYE appears on your account statement.

**The right to require notice of withdrawal from your savings account:** We may require seven days written notice before you withdraw money from your savings account.

## Tax identification number certification requirements

U.S. Treasury regulations require us to determine the tax residency of all customers and payees who could receive income that is reportable to the IRS. We accomplish this by obtaining a Form W-9 from all U.S. taxpayers and a type of Form W-8 from all foreign customers.

- We use Form W-9 to document U.S. tax residency and obtain a Taxpayer Identification Number ("TIN") from the primary owner of each account. Until we have received the Form W-9 and TIN, we're required to apply backup withholding to any income earned.

- Foreign individuals (also referred to as nonresident aliens) and foreign entities document their tax residency outside the U.S. on the applicable type of Form W-8. That form also allows us to apply the correct withholding rate or exemption to your income earned in the U.S. If you don't provide a valid type of Form W-8, we're required to apply the 30% withholding rate, or in some cases, presume you're an uncertified U.S. taxpayer subject to backup withholding on all income and gross proceeds regardless of whether or not it's U.S. sourced.

- Accounts jointly owned by at least one foreign individual or entity must provide a Form W-8 or Form W-9, as applicable, for all of the joint owners.

- Foreign individuals provide a Form W-8BEN. Foreign entities that are the beneficial owner of the income provide a Form W-8BEN-E unless they can make a special withholding exemption claim and instead provide either a Form W-8EXP or Form W-8ECI.

- Entities that act as intermediaries or flow-through entities receiving income on behalf of someone else provide a Form W-8IMY. In some cases, that Form W-8IMY must also include a withholding statement that allocates the income to each of the beneficial owners and copies of the tax certification documentation for those underlying beneficial owners.

If you own your account as an individual or sole proprietor, upon your death, we must be provided with the estate's or successor's IRS Form W-9 or Form W-8. If these are not provided, we may either refuse to pay interest earned on your account from the date of your death or apply backup withholding on the income earned after the date of your death.

## Your tax responsibility

You're responsible for paying applicable state and local sales taxes on your account fees. These taxes vary by location. You also agree to pay an amount equal to any other applicable taxes, including backup withholding tax. We will charge you for all the foregoing taxes and amounts. You also agree to pay an amount equal to any other applicable taxes, including backup withholding tax.

## Applicable exchange rate

In addition to any applicable fees, we make money when we convert one currency to another currency for you. The exchange rate used when we convert one currency to another is set at our sole discretion, and it includes a markup. The markup is designed to compensate us for several considerations including, without limitation, costs incurred, market risks, and our desired return. The applicable exchange rate does not include, and is separate from, any applicable fees. The exchange rate we provide to you may be different from exchange rates you see elsewhere. Different customers may receive different rates for transactions that are the same or similar, and the applicable exchange rate may be different for foreign currency cash, drafts, checks, or wire transfers. Foreign exchange markets are dynamic and rates fluctuate over time based on market conditions, liquidity, and risks. We're your arms-length counterparty on foreign exchange transactions. We may refuse to process any request for a foreign exchange transaction.

## Communications about your account

**Contacting you for servicing and collection:** We may contact you by phone, text, email, or mail to service your account or collect amounts you owe us. You will provide us accurate and current contact information. We can contact you at any address, phone number, or email address you provide.

When you give us a phone number, you expressly consent that we (and any party acting on our behalf) may contact you by phone call or text message at that number. When we call you, you agree that we may leave prerecorded or artificial voice messages. You also agree that we may use automatic telephone dialing systems in connection with calls or text messages sent to any phone number you give us, even if the receiving number is a mobile phone or other service for which the party called may be charged.

**Monitoring communications:** We can monitor, record, and retain your communications with us at any time without further notice to anyone, unless the laws governing your account require further notice. Monitored and recorded communications include phone conversations, electronic messages and records, and other data transmissions.

**Communicating with authorized signers:** We may provide you or an authorized signer with information about your account. When we receive information from an authorized signer, we treat it as a communication from you. You agree to notify us promptly in writing if an authorized signer no longer has authority on your account.

# Closing Accounts

**If you close your account**

You can request to close your account at any time. To close, the account must be in good standing (for example, it does not have a negative balance, or restrictions such as holds on funds, legal order holds, or court blocks). At closing, we'll assist you in withdrawing or transferring any remaining funds, bringing your account balance to zero. All outstanding items need to be processed and posted to your account and all deposits collected and posted to your account before it closes or items will be returned unpaid afterwards. You must redirect or cancel all scheduled deposits to and payments from (recurring or one-time, in each case) your account; otherwise, they may be returned unpaid after the account closes. We won't be liable for any loss or damage that may result from not honoring items or recurring deposits or payments that are presented or received after your account is closed (such as additional fees charged by a merchant or payee for a returned item).

During the process of closing your account:

- Interest-bearing accounts will stop earning interest.
- Overdraft Protection will be removed.
- All cards and linked accounts will be delinked.
- This Agreement continues to apply.

**Closing a Portfolio by Wells Fargo linked account:** When you ask us to close the primary checking account linked to your Portfolio by Wells Fargo program, we may take up to three business days to process your request.

**When we can close your account**

We may close your account at any time. If we close your account, we may send the remaining balance on deposit in your account by mail or credit it to another account you keep with us.

**Electronic banking privileges end when account is closed**

All of your electronic banking privileges will be terminated if your account is closed, except that you can view account activity, download statements and tax documents, and perform limited maintenance functions for at least 90 days after closure. If you're enrolled in online banking, refer to the Online Access Agreement for specific terms governing online access to your account.

**Closing your account if the balance is zero**

**Accounts with a zero balance will continue to be charged applicable fees** (like the monthly service fee) until you request to close your account. We may close an account (except analyzed business accounts) with a zero balance on the fee period ending date or at month end without prior notification to you. Once an account is closed (either by you or us), no fees will be assessed on the account.

- To prevent closure by us, an account with a zero balance must have a qualifying transaction posted within the last two months of the most recent fee period ending date. IOLTA and RETA accounts require a qualifying transaction within ten months of the most recent fee period ending date.
- Examples of qualifying transactions are deposits and withdrawals made at a branch, ATM, online, mobile, or via telephone; one-time and recurring transfers made at a branch, ATM, online, mobile, or via telephone; automatic or electronic deposits, such as from payroll or government benefits; automatic or electronic payments, including Bill Pay; one time and recurring purchases or payments made using a card or mobile device; and checks paid from the account. IOLTA and RETA accounts are not eligible for ATM cards or debit cards.
- Bank-originated transactions, like monthly service or other fees, are not considered qualifying transactions that will prevent closure of an account with a zero balance.

## Dormant accounts

Generally, an account with a positive balance becomes dormant if you do not initiate an account-related activity (as determined by the laws governing your account) for a specified period of time.

**Checking accounts, savings accounts, and CDs**: To avoid dormancy, initiate an account-related activity like depositing or withdrawing funds at a branch or ATM, or writing a check from the account. One-time and recurring automatic transactions such as pre-authorized transfers, payments and electronic deposits (including direct deposits), do not prevent the account from becoming dormant, unless otherwise specified by state law.

| Generally, dormancy for: | | |
|---|---|---|
| Checking account | Savings account | CD |
| 12 months | 34 months | 34 months after first renewal |

**Portfolio accounts only**: If any linked account other than your primary checking account becomes dormant, that account will be delinked from your Portfolio by Wells Fargo program and any program benefits no longer apply (including any fee discounts or waivers or special interest rates).

**Individual Retirement Accounts (IRAs) and Education Savings Accounts (ESAs)**: Generally, your IRA and ESA (Savings or CD) will become dormant if you don't initiate an account-related activity as follows:

- Traditional IRA becomes dormant if you don't initiate an account-related activity for 34 months or more after you reach the age of 70 ½ (if you reached that age prior to January 1, 2020) or 72 (if you did not reach age 70 ½ prior to January 1, 2020)
- Roth IRA won't become dormant unless we receive notification of your death, unless otherwise specified by state law
- ESA becomes dormant after the beneficial owner reaches age 30, unless otherwise specified by state law.

**Safeguards for dormant accounts**: We put safeguards in place to protect a dormant account, which may include restricting the following transactions:

- Transfers between your Wells Fargo accounts using your ATM/debit card
- Transfers by phone using our automated banking service
- Transfers or payments through online, mobile, and text banking (including Bill Pay)
- Wire transfers (incoming and outgoing)
- Contributions or transfers to IRA or ESA savings through online and mobile banking.

Normal monthly service fees and other fees continue to apply throughout the dormancy period.

## When and how accounts escheat

If you do not contact us about your dormant account or initiate an account-related activity within the time period specified by applicable state unclaimed property laws (generally, three or five years), Wells Fargo will close your account and deliver your account funds to that state. This process is known as escheat. Account statements will no longer be accessible through online banking. To recover your account funds, you must file a claim with the state.

**Portfolio accounts only**: About two months before escheat of the primary checking account in your Portfolio by Wells Fargo program we'll close the Portfolio by Wells Fargo program. At the time of closure, we'll delink all accounts, and any Portfolio benefits will no longer apply. See the Consumer Schedule for the benefits impacted. To reinstate your Portfolio by Wells Fargo program and associated program benefits, you must contact us before the primary checking account escheats.

# Consumer Accounts Only:
# Resolving Disputes Through Arbitration

**Arbitration Agreement between you and Wells Fargo**

If you have a dispute with us, we hope to resolve it as quickly and easily as possible. First, discuss your dispute with a banker. If your banker or another Wells Fargo employee is unable to resolve your dispute, you agree that either Wells Fargo or you can initiate arbitration as described in this section.

**Definition:** Arbitration means an impartial third party will hear the dispute between Wells Fargo and you and provide a decision. Binding arbitration means the decision of the arbitrator is final and enforceable. A dispute is any unresolved disagreement between Wells Fargo and you. A dispute may also include a disagreement about this Arbitration Agreement's meaning, application, or enforcement.

**Wells Fargo and you each agree to waive the right to a jury trial or a trial in front of a judge in a public court.** This Arbitration Agreement has only one exception: Either Wells Fargo or you may still take any dispute to small claims court.

Arbitration is beneficial because it provides a legally binding decision in a more streamlined, cost-effective manner than a typical court case. But, the benefit of arbitration is diminished if either Wells Fargo or you refuse to submit to arbitration following a lawful demand. Thus, the party that does not agree to submit to arbitration after a lawful demand must pay all of the other party's costs and expenses for compelling arbitration.

**Neither Wells Fargo nor you will be entitled to join or consolidate disputes by or against others as a representative or member of a class, to act in any arbitration in the interests of the general public, or to act as a private attorney general.** If any provision related to a class action, class arbitration, private attorney general action, other representative action, joinder, or consolidation is found to be illegal or unenforceable, the entire Arbitration Agreement will be unenforceable.

**Applicable rules**

Wells Fargo and you each agree that:

• The American Arbitration Association (AAA) will administer each arbitration and the selection of arbitrators according to the AAA's Consumer Arbitration Rules (AAA Rules).

• If there are any differences between the AAA Rules and this Arbitration Agreement, this Arbitration Agreement applies. If this Arbitration Agreement is in dispute, the arbitrator will decide whether it is enforceable.

• Wells Fargo and you are participating in commercial transactions involving the movement of money or goods among states.

• The Federal Arbitration Act (Title 9 of the United States Code) governs this Arbitration Agreement and any arbitration between Wells Fargo and you. If the Act or any part of it is inapplicable, unenforceable or invalid, the state laws governing your relationship with Wells Fargo govern this Arbitration Agreement.

Either Wells Fargo or you may submit a dispute to binding arbitration at any time, regardless of whether a lawsuit or other proceeding has previously begun. For information on initiating arbitration, contact the AAA at 1-800-778-7879.

Each arbitrator must be a licensed attorney with expertise in the laws applicable to the dispute's subject matter. The arbitrator will make a decision regarding the dispute based on applicable law, including any statutes of limitations. The arbitrator may award to either Wells Fargo or you any award or relief provided for by law.

**Fees and expenses**

• **Setting the fees/expenses:** We will pay any costs that are required to be paid by us under the arbitration administrator's  rules and procedures, and subject to applicable law. If the arbitrator rules in your favor on any claim presented, we will reimburse you for arbitration filing fees you have paid up to $700.00. Please check with the arbitration administrator to determine the fees applicable to any arbitration you file.

• **Applying state law:** The laws governing your account may limit the amount of fees and expenses you are required to pay in arbitration. Your arbitration fees and expenses will not exceed any applicable limits.

• **Paying for attorney/expert/witness fees:** Unless applicable laws state otherwise, each party will pay its own attorney, expert, and witness fees. This rule applies no matter which party wins arbitration.

| | |
|---|---|
| **Additional dispute resolution** | Wells Fargo or you each can exercise any lawful rights or use other available remedies to:<br><br>• Preserve or obtain possession of property,<br><br>• Exercise self-help remedies, including setoff rights, or<br><br>• Obtain provisional or ancillary remedies such as injunctive relief, attachment, garnishment, or appointment of a receiver by a court of competent jurisdiction. |
| **Arbitration location** | An arbitration will be held in the state whose laws govern your account. |

# Business Accounts Only:
# Resolving Disputes Through Arbitration

| | |
|---|---|
| **Arbitration Agreement between you and Wells Fargo** | If you have a dispute with us, we hope to resolve it as quickly and easily as possible. First, discuss your dispute with a banker. If your banker or another Wells Fargo employee is unable to resolve your dispute, you agree that either Wells Fargo or you can initiate arbitration as described in this section.<br><br>**Definition:** Arbitration means an impartial third party will hear the dispute between Wells Fargo and you and provide a decision. Binding arbitration means the decision of the arbitrator is final and enforceable. A "dispute" is any unresolved disagreement between Wells Fargo and you. A "dispute" may also include a disagreement about this Arbitration Agreement's meaning, application, or enforcement.<br><br>Except as stated in "No waiver of self-help or provisional remedies" below, Wells Fargo and you agree, at Wells Fargo's or your request, to submit to binding arbitration all claims, disputes, and controversies between or among Wells Fargo and you (and their respective employees, officers, directors, attorneys, and other agents), whether in tort, contract or otherwise arising out of or relating in any way to your account(s) and/or service(s), and their negotiation, execution, administration, modification, substitution, formation, inducement, enforcement, default, or termination (each, a "dispute"). **DISPUTES SUBMITTED TO ARBITRATION ARE NOT RESOLVED IN COURT BY A JUDGE OR JURY. TO THE EXTENT ALLOWED BY APPLICABLE LAW, WELLS FARGO AND YOU EACH IRREVOCABLY AND VOLUNTARILY WAIVE THE RIGHT EACH MAY HAVE TO A TRIAL BY JURY FOR ANY DISPUTE ARBITRATED UNDER THIS AGREEMENT.**<br><br>Aside from self-help remedies, this Arbitration Agreement has only one exception: Either Wells Fargo or you may still take any dispute to small claims court. Arbitration is beneficial because it provides a legally binding decision in a more streamlined, cost-effective manner than a typical court case. But, the benefit of arbitration is diminished if either Wells Fargo or you refuse to submit to arbitration following a lawful demand. Thus, the party that does not agree to submit to arbitration after a lawful demand by the other party must pay all of the other party's costs and expenses for compelling arbitration. |
| **Class action or representative suit not permitted** | Wells Fargo and you agree that the resolution of any dispute arising pursuant to the terms of this Agreement will be resolved by a separate arbitration proceeding and will not be consolidated with other disputes or treated as a class. Neither Wells Fargo nor you will be entitled to join or consolidate disputes by or against others as a representative or member of a class, to act in any arbitration in the interests of the general public, or to act as a private attorney general. If any provision related to a class action, class arbitration, private attorney general action, other representative action, joinder, or consolidation is found to be illegal or unenforceable, the entire Arbitration Agreement will be unenforceable. |
| **Applicable rules** | Wells Fargo and you each agree that the arbitration will:<br><br>• Proceed in a location mutually agreeable to Wells Fargo and you, or if the parties cannot agree, in a location selected by the American Arbitration Association (AAA) in the state whose laws govern your account<br><br>• Be governed by the Federal Arbitration Act (Title 9 of the United States Code), notwithstanding any conflicting choice of law provision in any of the documents between Wells Fargo and you<br><br>• Be conducted by the AAA, or such other administrator as Wells Fargo and you will mutually agree upon, in accordance with the AAA's commercial dispute resolution procedures, unless the claim or counterclaim is at least $1,000,000 exclusive of claimed interest, arbitration fees and costs in which case the arbitration will be conducted in accordance with the AAA's optional procedures for large, complex commercial disputes (the commercial dispute resolution procedures or the optional procedures for large, complex commercial disputes to be referred to, as applicable, as the "rules"). |

If there is any inconsistency between the terms hereof and any such rules, the terms and procedures set forth herein will control. Any party who fails or refuses to submit to arbitration following a lawful demand by any other party will bear all costs and expenses incurred by such other party in compelling arbitration of any dispute. Nothing contained herein will be deemed to be a waiver by Wells Fargo of the protections afforded to it under 12 U.S.C. Section 91 or any similar applicable state law.

## No waiver of self-help or provisional remedies

This arbitration requirement does not limit the right of Wells Fargo or you to:

1. Exercise self-help remedies, including setoff or

2. Obtain provisional or ancillary remedies such as injunctive relief or attachment, before, during, or after the pendency of any arbitration proceeding. This exclusion does not constitute a waiver of the right or obligation of either party to submit any dispute to arbitration or reference hereunder, including those arising from the exercise of the actions detailed in (1) and (2) above.

## Arbitrator's qualifications and power

Any dispute in which the amount in controversy is $5,000,000 or less will be decided by a single arbitrator selected according to the rules, and who will not render an award of greater than $5,000,000. Any dispute in which the amount in controversy exceeds $5,000,000 will be decided by majority vote of a panel of three arbitrators; provided however, that all three arbitrators must actively participate in all hearings and deliberations. Each arbitrator will be a neutral attorney licensed in the state whose laws govern your account, or a neutral, retired judge in such state, in either case with a minimum of ten years' experience in the substantive law applicable to the subject matter of the dispute to be arbitrated. The arbitrator(s) will determine whether or not an issue is arbitratable and will give effect to the statutes of limitation in determining any claim.

In any arbitration proceeding the arbitrator(s) will decide (by documents only or with a hearing at the discretion of the arbitrator(s)) any pre-hearing motions which are similar to motions to dismiss for failure to state a claim or motions for summary adjudication. The arbitrator(s) will resolve all disputes in accordance with the substantive law of the state whose laws govern your account and may grant any remedy or relief that a court of such state could order or grant within the scope hereof and such ancillary relief as is necessary to make effective any award. The arbitrator(s) will also have the power to award recovery of all costs and fees, to impose sanctions, and to take such other action as deemed necessary to the same extent a judge could pursuant to the federal rules of civil procedure, the state rules of civil procedure for the state whose laws govern your account, or other applicable law. Judgment upon the award rendered by the arbitrator(s) may be entered in any court having jurisdiction. The institution and maintenance of an action for judicial relief or pursuit of a provisional or ancillary remedy will not constitute a waiver of the right of any party, including the plaintiff, to submit the controversy or claim to arbitration if any other party contests such action for judicial relief.

## Discovery

In any arbitration proceeding, discovery will be permitted in accordance with the rules. All discovery will be expressly limited to matters directly relevant to the dispute being arbitrated and must be completed no later than 20 days before the hearing date. Any requests for an extension of the discovery periods, or any discovery disputes, will be subject to final determination by the arbitrator upon a showing that the request for discovery is essential for the party's presentation and that no alternative means for obtaining information is available.

## Fees and expenses

The arbitrator will award all costs and expenses of the arbitration proceeding.

## Additional rules for an arbitration proceeding

To the maximum extent practicable, the AAA, the arbitrator(s), Wells Fargo and you will take all action required to conclude any arbitration proceeding within 180 days of the filing of the dispute with the AAA. The arbitrator(s), Wells Fargo or you may not disclose the existence, content, or results thereof, except for disclosures of information by Wells Fargo or you required in the ordinary course of business, by applicable law or regulation, or to the extent necessary to exercise any judicial review rights set forth herein. If more than one agreement for arbitration by or between Wells Fargo and you potentially applies to a dispute, the arbitration agreement most directly related to your account or the subject matter of the dispute will control. This arbitration agreement will survive the closing of your account or termination of any service or the relationship between Wells Fargo and you.

## The right to pursue claims in small claims court

Notwithstanding anything to the contrary, Wells Fargo and you each retains the right to pursue in small claims court a dispute within that court's jurisdiction. Further, this arbitration agreement will apply only to disputes in which either party seeks to recover an amount of money (excluding attorneys' fees and costs) that exceeds the jurisdictional limit of the small claims court.

# Additional Terms and Services

**Laws governing your account**

This Agreement, your accounts, services and any related disputes are governed by United States law and (when not superseded by United States law) the laws of the state where you opened your account (without regard to conflict of laws principles).

For consumer and business accounts (except analyzed business accounts), your account statement identifies which state's laws govern your account. If a different state law applies, we'll notify you.

Any funds transfer (including a wire transfer) that is a remittance transfer as defined in Regulation E, Subpart B, will be governed by the laws of the United States and, to the extent applicable, the laws of the state of New York, including New York's version of Article 4A of the Uniform Commercial Code, without regard to its conflict of laws principles.

**Controlling language**

English is the controlling language of our relationship with you, including the terms of this Agreement. Items you write such as checks or withdrawal slips must be written in English. For your convenience, we may, but are not obligated to (unless required by law), translate some forms, disclosures, and advertisements into another language, but if there's a discrepancy, the English version prevails over the translation.

**Order of precedence between agreements**

If a service we offer has a separate agreement, and there's a conflict between the terms of this Agreement and the separate agreement, the conflicting terms of the separate agreement will apply.

**Legal process**

Legal process includes any levy, garnishment or attachment, tax levy or withholding order, injunction, restraining order, subpoena, search warrant, government agency request for information, forfeiture or seizure, and other legal process relating to your account.

We may accept and act on any legal process we believe to be valid regardless of how and where it is served, including if process is served in locations, states, or jurisdictions other than where the account was opened or where the account, property, or records are located.

We may, but are not required to, provide notice of legal process relating to your accounts. We may comply with legal process even though it affects the interests of only one owner or authorized signer of a joint account.

Any fees, expenses (including attorney's fees and expenses), or losses we incur as a result of responding to legal process related to your account are your responsibility. We may charge these costs to any account you maintain with us.

**Legal dispute location**

Any lawsuit, claim, or other proceeding arising from or relating to your account or this Agreement, will take place exclusively in the state or federal courts in the state whose laws govern your account, without regard to conflict of laws principles. This includes enforcement of the Arbitration Agreement and entry of judgment on any arbitration award.

**Changes to this Agreement**

We may change the terms of this Agreement, including account fees and features, at any time by adding new terms or conditions, or by modifying or deleting existing ones. If we're required to notify you of a change to this Agreement, we'll describe the change and its effective date in a message within your account statement or by any other appropriate means. We may agree in writing to waive a term of this Agreement, including a fee, and we may revoke any waiver.

**Modification of invalid terms**

Any term of this Agreement that is inconsistent with the laws governing your account will be excluded to the extent of such invalidity. The invalid term will be considered modified by us and applied in a manner consistent with such laws. Such modification won't affect the enforceability or validity of the remaining terms of this Agreement.

**Timing of notices**

Any notice you send us is effective once we receive it and have a reasonable opportunity to act on it.

**Responsibilities and liabilities between Wells Fargo and you**

We're responsible for exercising ordinary care and complying with this Agreement.

When we take an item for processing by automated means, ordinary care does not require us to examine the item. In all other cases, ordinary care requires only that we follow standards that don't vary unreasonably from the general standards followed by similarly situated banks.

Except to the extent we fail to exercise ordinary care or to comply with this Agreement, you agree to indemnify and hold us harmless from all claims, demands, losses, liabilities, judgments, and expenses (including attorney's fees and expenses) arising out of or in any way connected with our performance under this Agreement. This indemnification will survive termination of this Agreement.

We won't be liable for anything we do when following your instructions. In addition, we won't be liable if we don't follow your instructions if we reasonably believe that your instructions would expose us to potential loss or civil or criminal liability, or conflict with customary banking practices. In no event will either Wells Fargo or you be liable to the other for any special, consequential, indirect, or punitive damages. The limitation doesn't apply where the laws governing your account prohibit it. We won't have any liability to you if your account does not have sufficient available funds to pay your items due to actions we have taken in accordance with this Agreement.

Circumstances beyond your control or ours may arise and make it impossible for us to provide services to you or for you to perform your duties under this Agreement. If this happens, neither Wells Fargo nor you will be in breach of this Agreement. If we waive a right with respect to your account on one or more occasions, it does not mean we're obligated to waive the same right on any other occasion.

**Your obligation to pay our fees**

We're permitted to either directly debit your account or bill you for our fees, expenses and taxes incurred in connection with your account and any service.  If the available funds in your account are not sufficient to cover the debit, we may create an overdraft on your account.

**Setoff and security interest**

**Our setoff rights:** If you owe us any money, we have the right to apply funds in any of your accounts to pay your debt. This is known as setoff. When we exercise this right, we reduce the funds in your account(s) by the amount of the debt that is due or past due as allowed by the laws governing your account. We're not required to give you any prior notice to exercise our right of setoff.

A debt includes any amount you owe individually or together with someone else both now or in the future. It includes any overdrafts and our fees. If your account is a joint account, we may setoff funds in it to pay the debt of any joint owner.

If your account is an unmatured CD, then we may deduct an early withdrawal penalty. This may be due as a result of our having exercised our right of setoff. See "Early withdrawal penalty and Regulation D penalty" in the "Time Accounts (CDs)" section of this Agreement.

**Consumer accounts only:** Our right to setoff extends to any federal or state benefit payments (including Social Security benefits) deposited to your account, subject to applicable law. If we're obligated to return any federal or state benefits deposited to your accounts after you're no longer eligible to receive them, we may setoff against any of your accounts to recover the payments you were ineligible to receive. Our right of setoff won't apply if it would invalidate the tax-deferred status of any tax-deferred retirement account (e.g., a SEP or an IRA) you keep with us.

**Security interest:** To ensure you pay us all amounts you owe us under this Agreement (e.g., overdrafts and fees), you grant us a lien on and security interest in each account you keep with us. By opening and keeping each account with us, you consent to our asserting our security interest should the laws governing this Agreement require your consent. Our rights under this security interest are in addition to and apart from any other rights under any other security interest you may have granted to us.

You may not grant a security interest in, transfer, or assign your accounts to anyone other than us without our written agreement.

# Glossary

**ACH:** the Automated Clearing House Network.

**ACH debit entry:** an electronic instruction requesting the withdrawal of funds from your account through ACH.

**ACH transaction:** a deposit or payment transferred to or from your account through an ACH.

**Analyzed business account:** a checking account for which fees are billed through account analysis. Some analyzed accounts offer an earnings allowance to offset eligible fees. Examples of analyzed business accounts include the following: Optimize Business Checking$^{SM}$, Analyzed Business Checking, and Analyzed Interest on Lawyers Trust Account (IOLTA).

**Authorized signer:** a person who has actual or apparent authority to use your account even if they have not signed the account application.

**Available balance:** our most current record of the amount of money available for your use or withdrawal. For more information, see the "Available Balance, Posting Transactions, and Overdraft" section in this Agreement.

**Business account:** any deposit account, other than one of Wells Fargo's commercial deposit accounts, which isn't established and kept for personal, family, or household purposes. Common examples of ownership include an individual acting as a sole proprietor, a partnership, a limited partnership, a limited liability partnership, a limited liability company, a corporation, a joint venture, a nonprofit corporation, an employee benefit plan, or a governmental unit including an Indian tribal entity.

**Business day:** every day except Saturday, Sunday, and federal holidays.

**Card:** every type of debit card and ATM card we may issue, except any prepaid cards or the business deposit card.

**Collected balance:** the ending daily balance in your account after all credits and debits have posted, minus deposited items that have not yet been collected from the originating financial institution. The collected balance is the balance on which interest is calculated for all interest-bearing checking accounts and for all savings accounts.

**Consumer account:** any deposit account which is established and kept for personal, family, or household purposes and isn't intended for business use. A consumer account can be owned by one or more individuals.

**Direct deposit:** an automatic electronic deposit of your salary, pension, Social Security, or other regular income deposited through the ACH network to your Wells Fargo deposit account by your employer or an outside agency.

**Endorsement:** a signature, stamp, or other mark on the back of a check to transfer, restrict payment, or make the signer responsible for the check.

**Fee period:** see the "Overview and Key Terms" section of the Consumer Schedule or Business Schedule, as applicable.

**Item:** any order, instruction, or authorization to withdraw or pay funds or money from or to an account. Examples include a check, draft, money order, ACH, wire transfer, Bill Pay, other electronic transfer, ATM withdrawal, teller withdrawal, debit card purchase, and fee.

**Overdraft:** an available balance of less than $^{\$}0.00$ in your account.

**Returned item / Non-sufficient funds (NSF):** a term used to indicate when an item presented for payment is returned unpaid because the available balance in your deposit account is less than the amount of the item when presented.

**Statement period:** The dates of your statement period are located on your account statement, which provides you a record of all transactions posted during that period. Statement periods can be of varying length, including monthly, quarterly, semi-annual, or annual.

This Deposit Account Agreement governs deposit accounts maintained at Wells Fargo Bank, N.A.

© 2021 Wells Fargo Bank, N.A. All rights reserved. Member FDIC.

CCB2018 (10/15/21)

# Exhibit D



Neil Currie
Vice President
2355 Highway 36 W.
Suite 400
Roseville, MN 55113
Telephone: (612)332-6545
Fax: (612)342-2334

April 22, 2022

Richard A. Nervig, Esq.
McCune, Wright & Arevalo, LLP
3281 East Guasti Road
Suite 100
Ontario, CA
Ontario, CA 91761
Via Email to: ran@mccunewright.com

Joshua D. Davey, Esq.
Troutman Pepper Hamilton Sanders LLP
301 South College Street
Suite 3400
Charlotte, NC 28202
Via Email to: joshua.davey@troutman.com

501 Individual Consumers
-vs-
Wells Fargo & Co., Wells Fargo Bank, N.A.

Dear Parties:

The American Arbitration Association (AAA) acknowledges receipt of a total of 501 individual consumer demands for arbitration filed against Wells Fargo & Co., Wells Fargo Bank N.A. "Wells Fargo." The consumers have now met the administrative filing requirements on each of the 501 cases filed. A list of these cases are enclosed.

Wells Fargo is now responsible for payment of the initial administrative filing fees totaling $150,225. This letter shall serve as the invoice pursuant to California Code of Civil Procedure Sections 1281.97 and 1281.98. An invoice is enclosed to facilitate payment by the Business. This is provided to all parties pursuant to CA CCP. Payment from the Business is due upon receipt.  As these arbitrations are subject to California Code of Civil Procedure sections 1281.97 and 1281.98, payment from the Business must be received by **May 23**, **2022** or the AAA may close these cases. Pursuant to California Code of Civil Procedure 1281.97 the AAA cannot grant any extensions to this payment deadline.

Payment may be submitted by credit card or electronic check. Please confirm the email address to which the AAA will send a secured paylink and the instructions for payment via either method. If paying by check, please make it payable to the American Arbitration Association (AAA) and send it to the AAA at 13727 Noel Road, Suite 700, Dallas, TX 75240.

As the filing requirements were met after August 1, 2021, the Supplementary Rules for Multiple Case Filings will apply to these 501 individual cases. The parties may find additional information at: AAA Consumer Multiple Case Filing.

Lastly, we ask that parties please provide an updated service list to the AAA no later than **May 8, 2022**. Please

contact me directly should you have any questions. If either party requests an administrative conference call, I will schedule one.

Thank you for your attention to this matter. I look forward to working with you.

Sincerely,
/s/
Victoria Chandler
Director of ADR Operations
Direct Dial: (612)278-5124
Email: VictoriaChandler@adr.org
Fax: (612)342-2334

cc:     Michael Peretz, Esq.
        David C. Wright, Esq.
        Emily J. Kirk, Esq.
        Jacob Franchek
        Richard D. McCune, Esq.

# Exhibit E



# Supplementary Rules for Multiple Case Filings



AMERICAN ARBITRATION ASSOCIATION®

Rules Effective August 1, 2021

Available online at **adr.org**

# Table of Contents

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

MC-1. Applicability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   4

MC-2. Filing Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   5

MC-3. Serving of Documents, Notices, and Communications  . . . . . . . . . . . . . . . . . . . . . . .   5

MC-4. Answers, Counterclaims, and Amended Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   5

MC-5. Fixing of Locale . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6

MC-6. Challenges to Initial Administrative Determinations . . . . . . . . . . . . . . . . . . . . . . . . . . .   6

MC-7. Appointment of Merits Arbitrator(s) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   7

MC-8. Scheduling . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8

MC-9. Mediation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8

MC-10. Administrative Fees and Compensation and Expenses of the Arbitrator(s) . . . .   9



# Supplementary Rules for Multiple Case Filings

## Introduction

The American Arbitration Association® (AAA®) developed these *Supplementary Rules for Multiple Case Filings* (Supplementary Rules) to streamline the administration of large volume filings involving the same party, parties, and party representative(s), or related party, parties and party representative(s) for disputes where the *Employment/Workplace Fee Schedule* or the *Consumer Fee Schedule* apply. Parties to other types of arbitration may also opt into these Supplementary Rules. These Supplementary Rules, including Section MC-1(g), are intended to provide parties and their representatives with an efficient and economical path toward the resolution of multiple individual disputes.

Parties are encouraged to agree to additional processes that make the resolution of Multiple Case Filings more efficient, such as:

- An agreed-upon Scheduling Order setting forth deadlines across multiple cases, including those for submission of documents and witness lists, completion of discovery, and filing of motions.
  - Where the parties can agree on the Scheduling Order, they should consult with the arbitrator as to whether a Preliminary Management Conference between the parties and the arbitrator is necessary.
  - Eliminating the need for a separate Preliminary Management Conference in each case can significantly impact time to resolution of the case.
- An agreement to appoint a special master to oversee procedural issues common to the cases, such as discovery, choice of law, and statute of limitations.
- An agreement that cases be heard on the documents, rather than by in-person, telephone, or videoconference hearings.
- An agreement to assign multiple cases to a single arbitrator, making the scheduling of conferences and hearings more efficient. Each case will still be heard and decided individually by the arbitrator.
- An agreement on the form of award.

- An agreement limiting briefs, motions, and discovery requests.

- An agreement allowing testimony via affidavit or recorded deposition, rather than requiring live witness testimony.

## MC-1. Applicability

**(a)** The AAA may apply these Supplementary Rules to any group of cases defined as Multiple Case Filings in Section MC-1(b) below for disputes where the *Employment/Workplace Fee Schedule* or the *Consumer Fee Schedule* apply. The AAA's determination to apply these Supplementary Rules shall be final, unless a party seeks review of that determination by a Process Arbitrator, as provided for in Section MC-6. These Supplementary Rules supplement any other AAA rules applicable to the disputes. Where inconsistencies exist among these Supplementary Rules and other AAA rules, these Supplementary Rules shall govern.

**(b)** For the purpose of these Supplementary Rules, Multiple Case Filings are defined as:

 **i.** twenty-five or more similar Demands for Arbitration (Demand(s)) filed against or on behalf of the same party or related parties,

 **ii.** where representation of the parties is consistent or coordinated across the cases.

**(c)** These Supplementary Rules apply whenever 25 or more similar Demands for Arbitration are filed, whether or not such cases are filed simultaneously.

**(d)** The Supplementary Rules are to be applied as described in Sections MC-1 through MC-10. Where inconsistencies exist between these Supplementary Rules and other AAA rules that apply to the dispute, these Supplementary Rules will govern.

**(e)** Parties to Multiple Case Filings are encouraged to agree to processes for the efficient resolution of those cases. Any such agreement must be in writing and should address the matters set forth in Sections MC-1 through MC-9 of these Supplementary Rules. In the absence of a post-dispute agreement as to any issue covered by these Supplementary Rules, the Supplementary Rules shall apply.

**(f)** If, within 30 calendar days after the AAA's commencement of administration, a party seeks judicial intervention with respect to cases to which these Supplementary Rules apply and provides the AAA with documentation that judicial intervention has been sought, the AAA will suspend administration of such cases for 60 calendar days to permit the party to obtain a stay of arbitration from the court.

**(g)** In its sole discretion, the AAA has the authority to interpret and apply these Supplementary Rules. The AAA will make initial determinations with respect to administrative issues where necessary in order to apply these Supplementary Rules.

## MC-2. Filing Requirements

A separate Demand for Arbitration must be filed in each individual case. The filing party shall adhere to the filing requirements set forth in the applicable rules. Each Demand must include complete contact information for all parties and representatives. When the AAA determines that the filing requirements have been met, it shall notify the parties.

As part of the filing requirements, the filing party shall submit a fully completed *Multiple Case Filings Intake Data Spreadsheet* (Spreadsheet), which is available at www.adr.org, at the time a Multiple Case Filing reaches the 25-case threshold, and shall update such Spreadsheet as additional cases are filed. This Spreadsheet must also be provided to opposing parties at the same time it is provided to the AAA. The AAA may also require the filing party to submit the Demands for Arbitration, and any other documents submitted with the Demands, in an electronic format. The AAA will advise the filing party when and in what manner those materials shall be submitted.

## MC-3. Serving of Documents, Notices, and Communications

**(a)** For all purposes in accordance with these Supplementary Rules, the parties shall accept documents, notices, and communications pertaining to each Multiple Case Filing via single, combined, electronic communication from the AAA. The AAA will determine when separate documents, notices, and communications are required.

**(b)** Service of documents, notices, and communications pertaining to Multiple Case Filings will be effected via electronic means, such as a file transfer protocol administered by the AAA or the AAA WebFile® platform. Parties providing service of documents, notices, and communications must simultaneously notify opposing parties in writing that the documents, notices, or communications have been submitted.

## MC-4. Answers, Counterclaims, and Amended Claims

**(a)** A respondent may file an Answer and/or Counterclaim as set forth in the applicable rules; however, the deadline for filing an Answer shall be 45 calendar days from the date the AAA confirms the filing requirements have been met.

**(b)** With the exception of the initial filings required under Section MC-2, where party submissions are substantially similar across a Multiple Case Filing, the submission may be filed in a single document and need not be filed separately in each individual case.

    **i.** Any party submission filed in this manner shall also include correspondence advising, by case number, to which cases the submission relates.

    ii.   Any dispute over whether a party's submission is substantially similar will initially be determined by the AAA, subject to a final determination by a Process Arbitrator, as provided for in Section MC-6.

## MC-5. Fixing of Locale

Where in-person hearings are required, and in the absence of party agreement, the AAA will identify one or more locales where hearings may take place. In any such determination, the AAA will consider the positions of the parties; relative ability of the parties to travel; and factors such as the location of performance of the agreement, the location of witnesses and documents, relative costs, and the location of any prior court proceedings, among other factors presented by the parties.

## MC-6. Challenges to Initial Administrative Determinations

**(a)** After all filing requirements have been met, including payment of the AAA's initial administrative fees, and prior to the appointment of arbitrators to determine the merits (the Merits Arbitrator(s)), any party may notify the AAA and opposing parties in writing that the party disagrees with the AAA's initial determination as to any administrative issue(s).

**(b)** Upon receipt of a party's written notice of disagreement with an administrative determination made by the AAA with respect to a particular Multiple Case Filing, and if the parties do not agree to mediate such issue(s), or if such mediation is unsuccessful, the AAA in its sole discretion may decide whether or not to appoint an arbitrator (the Process Arbitrator) to hear and determine the administrative issue(s) for all of the cases included in the Multiple Case Filing affected by such administrative issue(s).

**(c)** There shall be one Process Arbitrator. If the parties have not appointed a Process Arbitrator and have not agreed to a process for appointing the Process Arbitrator, the Process Arbitrator shall be administratively appointed by the AAA, unless the AAA, in its sole discretion, elects to simultaneously send to each party an identical list of names from which to select a single arbitrator by the process described in Section MC-7(a) below.

**(d)** Only administrative issues may be submitted to the Process Arbitrator for determination. Administrative issues include:

    **i.**   AAA filing requirements;

    **ii.**  allocation of payment advances on administrative fees, arbitrator compensation, and/or expenses;

    **iii.** determining the applicable AAA rules that will govern the individual disputes;

    **iv.** any other issue the parties wish to submit by agreement; and

    **v.**  any other administrative issue arising out of the nature of the Multiple Case Filings.

**(e)** The Process Arbitrator is subject to requirements in the applicable rules pertaining to disclosure and disqualification.

**(f)** The Process Arbitrator shall have the power to rule on the Process Arbitrator's own jurisdiction and shall resolve any disputes over the applicability of this Section MC-6.

**(g)** The Process Arbitrator shall make rulings on the basis of written submissions unless the Process Arbitrator determines that a telephone or videoconference hearing is necessary.

**(h)** The ruling of the Process Arbitrator shall contain the reasons for such ruling and shall be rendered no later than 30 calendar days from the date the Process Arbitrator set for receipt of the final document submissions, or, if the Process Arbitrator set a hearing, no later than 30 calendar days from the close of the hearing. The AAA may extend the time limit for the rendering of the Process Arbitrator's ruling only in unusual and extreme circumstances.

**(i)** The Process Arbitrator's authority shall cease upon the rendering of the Process Arbitrator's ruling, except that after the Process Arbitrator has rendered a ruling, if new and different administrative issues arise upon which the parties disagree, the AAA may re-appoint the same Process Arbitrator to rule on such new and different administrative issues.

**(j)** Rulings by the Process Arbitrator will be final and binding upon the parties and Merits Arbitrator(s) where the Merits Arbitrator(s) is appointed after the appointment of the Process Arbitrator. Administrative issues arising in individual cases after a Merits Arbitrator(s) has been appointed may be decided by the Merits Arbitrator(s).

**(k)** Rulings by the Process Arbitrator will be final and binding upon the parties and Merits Arbitrator(s) with respect to subsequently filed cases that the AAA determines to be part of the same Multiple Case Filing.

**(l)** Absent agreement of all parties, the Process Arbitrator shall not be appointed as the Merits Arbitrator for any of the cases in the same Multiple Case Filing.

## MC-7. Appointment of Merits Arbitrator(s)

The parties may mutually agree upon a process for selection of the arbitrator(s) to determine the merits (the Merits Arbitrator(s)), and the AAA will facilitate any such selection process. The arbitrator selection process may include the use of the AAA arbitrator search platform when the AAA deems it practical to provide and permits its use. Parties are encouraged to consider assigning multiple proceedings to a single, mutually agreeable Merits Arbitrator. Absent a contractual process or party agreement, the AAA shall have the authority to apply the following process:

**(a)** The AAA shall compile a roster of arbitrators for the purpose of identifying arbitrators who may be appointed to cases or groups of cases in Multiple Case

Filings. The AAA may submit a list of proposed arbitrators to the parties to any Multiple Case Filing. The parties are encouraged to agree to arbitrators from this list and to advise the AAA of their agreement. If the parties are unable to agree upon arbitrators, each party shall have 14 calendar days from the list transmittal date in which to strike names objected to, number the remaining names in order of preference, and return the list to the AAA. To ensure an appropriate number of arbitrators remain available for appointment, the AAA may limit the number of strikes.

**(b)** If for any reason appointments cannot be made from the submitted lists or if the AAA determines the number of cases is too numerous for use of lists, the AAA shall have the authority to administratively appoint Merits Arbitrator(s).

**(c)** To facilitate arbitrator selection, to satisfy the parties' desired arbitrator qualifications, if the number of individual cases exceeds the number of qualified arbitrators in the locale, or in any other circumstance determined by the AAA to warrant such action, the AAA may assign multiple cases to a single Merits Arbitrator, who will decide each case on its own merits.

**(d)** Arbitrators appointed pursuant to Section MC-7 are subject to the disclosure and disqualification procedures set forth in the applicable AAA rules.

## MC-8. Scheduling

Preliminary Management Conferences and hearings will be scheduled in a manner consistent with the expeditious nature of arbitration. The parties are encouraged to agree on a streamlined procedure for scheduling conferences and hearings. Absent such agreement of the parties, conferences and hearings may be scheduled in any fashion deemed appropriate by the AAA or the arbitrator(s). The AAA or the arbitrator(s) may schedule the Preliminary Management Conference without first consulting with the parties, although either party may request that it be rescheduled. To avoid delay in the administration of the cases, the AAA may require that representatives provide availability via an automated or another electronic scheduling method and that they be available for blocks of hours or days at a time.

## MC-9. Mediation

Within 120 calendar days from the established due date for the Answer, the parties shall initiate a global mediation of the Multiple Case Filings pursuant to the applicable AAA mediation procedures or as otherwise agreed to by the parties. The mediator shall be administratively appointed by the AAA unless the parties agree on a mediator. The mediation shall take place concurrently with the arbitrations and shall not act as a stay of the arbitration proceedings, unless agreed to by the parties. Any party may unilaterally opt out of mediation upon

written notification to the AAA and the other parties to the arbitration. Unless agreed by all parties and the mediator, the mediator shall not be appointed as an arbitrator for any of the cases in the same Multiple Case Filing.

## MC-10. Administrative Fees and Compensation and Expenses of the Arbitrator(s)

**(a)** Administrative fees will be billed according to the applicable Multiple Case Filings Administrative Fee Schedule. Administrative fees, as well as arbitrator compensation and expense deposits, are due on or before the deadline established by the AAA. Neither settlement nor withdrawal of any individual claim or group of multiple cases shall result in extension of payment due dates or waiver of administrative fees. Administrative fees, as well as arbitrator compensation and expenses, for each Multiple Case Filing will be billed and must be paid prior to the AAA completing the applicable administrative procedures.

**(b)** Invoices provided by the AAA to the parties for payment of fees and arbitrator compensation and expenses may be in consolidated format for each Multiple Case Filing.

**(c)** Compensation of the Process Arbitrator will be at the rate set forth on the Process Arbitrator's resume. Merits Arbitrator(s) shall be compensated pursuant to the rules and fee schedules applicable to the individual cases.

**(d)** If administrative fees, arbitrator compensation, and/or expenses have not been paid in full, the AAA may notify the parties in order that one party may advance the required payment within the time specified by the AAA.

**(e)** If payments due are not made by the date specified in such notice to the parties, the arbitrator may order the suspension or termination of the proceedings. If no arbitrator has yet been appointed, the AAA may suspend or terminate those proceedings. The AAA may also decline to administer future arbitrations with the parties involved.

© 2021 American Arbitration Association, Inc. All rights reserved. These Rules are the copyrighted property of the
American Arbitration Association (AAA) and are intended to be used in conjunction with the AAA's administrative services.
Any unauthorized use or modification of these Rules may violate copyright laws and other applicable laws.
Please contact 800.778.7879 or websitemail@adr.org for additional information.

# Exhibit F

McCUNE · WRIGHT · AREVALO
**ATTORNEYS AT LAW**

April 25, 2022

*Delivery Type: Email*
SophiaParra@adr.org

Richard A. Nervig

ran@mccunewright.com
Phone: 909-557-1250

American Arbitration Association
*Attn: Sophia Parra*
45 E River Park Place West, Suite 308
Fresno, CA 93720

> **Re:** **Arbitration Against Wells Fargo Bank, N.A.**
>
> **Related Case:** *Wilson v. Wells Fargo Bank, N.A.,*
> **AAA Case No. 01-21-0016-4036**

Dear Ms. Parra:

As you know, our firm represents the following Claimants in arbitration cases against Wells Fargo Bank, NA.:

- *(Case No. 01-22-0000-4726)*
- *(Case No. 01-22-0000-6147)*
- *(Case No. 01-22-0000-9017)*
- *(Case No. 01-22-0000-9849)*
- *(Case No. 01-22-0001-1831)*
- *(Case No. 01-22-0001-1851)*
- *(Case No. 01-22-0001-2073)*

- *(Case No. 01-22-0000-5138)*
- *(Case No. 01-22-0000-6470)*
- *(Case No. 01-22-0000-9034)*
- *(Case no. 01-22-0000-9868)*
- *(Case No. 01-22-0001-1836)*
- *(Case No. 01-22-0001-1944)*

**ORANGE COUNTY**
Irvine, CA

**INLAND EMPIRE - EAST**
San Bernardino, CA

**MIDWEST**
Edwardsville, IL

**EAST COAST**
Newark, NJ

Page 2 of 2
April 25, 2022

     Although not filed simultaneously with our recent multi case filing, we request that all of these cases be consolidated and otherwise subject to AAA's Supplementary Rules for Multiple Case Filings pursuant to Rule MC-1(c) thereto.
     .

                        Very truly yours,
                        MCCUNE WRIGHT AREVALO, LLP

                        /s/ *Richard A. Nervig*
                        Richard A. Nervig

RAN/mt
cc:   Victoria Chandler *(VictoriaChandler@adr.org)*;
Joshua D. Davey, Esq. *(joshua.davey@troutman.com);*
Jacob Franchek, Esq. *(jacob.franchek@troutman.com)*;
Michael Peretz, Esq. *(michael.peretz@troutman.com)*

# Exhibit G



Western Case Management Center
Neil Currie
Vice President
45 E River Park Place West
Suite 308
Fresno, CA
Telephone: (877) 528-0880
Fax: (855) 433-3046

June 29, 2022

Richard A. Nervig, Esq.
McCune Wright Arevalo, LLP
18565 Jamboree Road
Suite 550
Irvine, CA 92612
Via Email to: ran@mccunewright.com

Joshua D. Davey, Esq.
Troutman Pepper Hamilton Sanders LLP
301 South College Street
Suite 3400
Charlotte, NC 28202
Via Email to: joshua.davey@troutman.com

Individual Consumers
-vs-
Wells Fargo & Co., Wells Fargo Bank, N.A.

Dear Parties:

This will confirm an Administrative Conference Call was held on June 28, 2022. This letter will summarize our discussion.

I, along with my team, will be administering these matters under the Consumer Group Team email. My direct dial is (559) 475-6265. Please provide all correspondence regarding the below referenced cases to consumergroupteam@adr.org. If there are any additional filings, please direct those filings to MultiCaseFiling@adr.org.

We have included a copy of the service list (Exhibit A) for your review. Please confirm we have the appropriate representatives listed by July 8, 2022.

To date, Claimants have filed 1760 cases against Wells Fargo & Co., Wells Fargo Bank, N.A., which includes the withdrawn cases and the thirteen (13) cases that were previously assigned to Sophia Parra. We ask you to review the enclosed case list and advise of any duplicates by July 8, 2022. Once the AAA receives the revised case list, an initiation letter will be sent separately. The AAA will send closing letters for the withdrawn cases.

On June 23, 2022, the American Arbitration Association (AAA) invoiced Claimants $19,600 for the Initial Administrative Fees on 401 newly filed cases. We also billed Respondent initial administrative fees on 621 cases totaling $139,725.

As a Process Arbitrator has been requested, below is a list of seven (7) panelists from the American Arbitration Association's (AAA) National Roster from which one panelist shall be appointed to serve as the Process Arbitrator. You are encouraged to agree on an arbitrator.

- Hon. Anita Rae Shapiro
- Hon. Bruce E. Meyerson
- Laura Bottaro
- John R. Holsinger
- Hon. Patrick Walsh
- Summer L. Nastich
- Hon. Nancy A. Thomas

If you are unable to agree on an appointment from this list, we will ask that you proceed with a strike/rank process. Parties shall limit their strikes to no more than two (2), ranking the remaining five (5) in order of your preference, with number one (1) being your first preference. Please advise me of any agreement between you, or alternatively submit your ranked list on or before July 8, 2022.

Additionally, we ask that you provide a brief summation of the agreed upon issues they wish to have the Process Arbitrator determine. This should also be submitted to the AAA no later than July 8, 2022.

This confirms you have discussed mediation; however, mediation is premature at this time.

As a reminder, the AAA will provide communications in the manner outlined in Rule MC-3 of the Supplementary Rules for Multiple Case Filings.

The AAA appreciates the opportunity to assist you with your dispute resolution needs.

Sincerely,
/s/
Christina Negrete
Manager of ADR Services
Consumer Group Team
Direct Dial: (559) 475-6265
Email: consumergroupteam@adr.org

Supervisor Information: *Donna Martinez, Director of ADR Operations, (559) 490-1881, DonnaMartinez@adr.org*

Enclosures

cc:     Ashley Hawthorne
        Alicia A. Baiardo, Esq.
        Michael Peretz, Esq.
        David C. Wright, Esq.
        Brandon Keshish
        Kyle Lawheed
        Kristina J. Catapang
        Joel S. Allen
        Emily J. Kirk, Esq.
        Jacob Franchek
        Richard D. McCune, Esq.
        Mary Katherine Grob, Esq.
        Chloe Lee
        Michelle Truong

# Exhibit A

**SERVICE LIST**

---

Individual Consumers
-vs-
Wells Fargo & Co., Wells Fargo Bank, N.A.

---

**<u>Parties</u>**

**Individual Consumers**

Richard Alan Nervig
McCune Wright Arevalo, LLP
18565 Jamboree Road
Suite 550
Irvine, CA 92612
Phone: (760) 451-2300
ran@mccunewright.com
*Via Email*


Chloe Lee
McCune Wright Arevalo, LLP
3281 East Guasti Road
Suite 100
Ontario, CA 91761
Phone: (909) 495-1038
Fax: (909) 557-1275
cl@mccunewright.com
*Via Email*


Michelle Truong
McCune Wright Arevalo, LLP
3281 East Guasti Road
Suite 100
Ontario, CA 91761
Phone: (909) 206-0674
Fax: (909) 557-1275
Mt@mccunewright.com
*Via Email*


Brandon Keshish
McCune Wright Arevalo, LLP
3281 East Guasti Road
Suite 100
Ontario, CA 90957

Phone: (909) 557-1250
Fax: (909) 557-1275
bk@mccunewright.com
*Via Email*


Richard D. McCune
McCune Wright Arevalo, LLP
3281 East Guasti Road
Suite 100
Ontario, CA 91761
Phone: (909) 557-1250
Fax: (909) 557-1275
rdm@mccunewright.com
*Via Email*


Emily J. Kirk
McCune Wright Avervalo, LLP
231 North Main Street
Suite 20
Edwardsville, IL 62025
Phone: (618) 307-6116
Fax: (618) 307-6161
ejk@mccunewright.com
*Via Email*


David C. Wright
McCune Wright Avervalo, LLP
3281 East Guasti Road
Suite 100
Ontario, CA 91761
Phone: (909) 557-1250
Fax: (909) 557-1275
dcw@mccunewright.com
*Via Email*


Kristina J Catapang
McCune Wright Arevalo, LLP
3281 E. Guasti Rd
Suite 100
Ontario, CA 91761
Phone: (909) 206-0727
kjc@mccunewright.com
*Via Email*


Kyle Lawheed
McCune Wright Arevalo, LLP
3281 East Guasti Road, Suite 100
Ontario, CA 91761
Phone: (909) 557-1250

Fax: (909) 557-1275
kl@mccunewright.com
*Via Email*


Ashley Hawthorne
McCune Wright Arevalo, LLP
3281 East Guasti Road, Suite 100
Ontario, CA 91761
Phone: (909) 557-1250
Fax: (909) 557-1275
ah@mccunewright.com
*Via Email*

**Wells Fargo & Co., Wells Fargo Bank, N.A.**

Michael Peretz
Troutman Pepper Hamilton Sanders LLP
301 South College Street
Suite 3400
Charlotte, NC 28202
Phone: (704) 916-1511
michael.peretz@troutman.com
*Via Email*


Joshua D Davey
Troutman Pepper Hamilton Sanders LLP
301 South College Street
Suite 3400
Charlotte, NC 28202
Phone: (704) 916-1503
joshua.davey@troutman.com
*Via Email*


Mary Katherine Grob
Troutman Pepper Hamilton Sanders LLP
301 South College Street
34th Floor
Charlotte, NC 28202
Phone: (704) 916-1507
Fax: (704) 998-4051
mary.grob@troutman.com
*Via Email*


Jacob Franchek
Troutman Pepper LLP
301 S. College St.
Ste. 34
Charlotte, NC 28202
Phone: (704) 519-5981
jacob.franchek@troutman.com

*Via Email*


Alicia A. Baiardo
McGuireWoods LLP
Two Embarcadero Center
Suite 1300
San Francisco, CA 94111
Phone: (415) 844-1976
Fax: (415) 844-1919
abaiardo@mcguirewoods.com
*Via Email*


Joel S Allen
McGuireWoods LLP
2000 McKinney Avenue
Suite 1400
Dallas, TX 75201
Phone: (214) 932-6464
Fax: (214) 932-6499
jallen@mcguirewoods.com
*Via Email*

# Exhibit H



Western Case Management Center<br>
Neil Currie<br>
Vice President<br>
45 E River Park Place West<br>
Suite 308<br>
Fresno, CA<br>
Telephone: (877) 528-0880<br>
Fax: (855) 433-3046

July 12, 2022

Richard A. Nervig, Esq.
McCune Wright Arevalo, LLP
18565 Jamboree Road
Suite 550
Irvine, CA 92612
Via Email to: ran@mccunewright.com

Joshua D. Davey, Esq.
Troutman Pepper Hamilton Sanders LLP
301 South College Street
Suite 3400
Charlotte, NC 28202
Via Email to: joshua.davey@troutman.com

Individual Consumers
-vs-
Wells Fargo & Co., Wells Fargo Bank, N.A.

Dear Parties:

This acknowledges receipt of Demands for Arbitration for the matters in the enclosed case list and arbitration agreements providing for administration by the American Arbitration Association (AAA). These cases are now assigned to me for administration as the Consumers have met the filing requirements.

The **Consumer Arbitration Rules** and **Supplementary Rules for Multiple Case Filings** apply to these matters.

**<u>Answer</u>**

- This acknowledges receipt of Wells Fargo's Answer dated July 6, 2022. The Answer pertains to the cases outlined in the case list.
- Please reference the Rules if filing a counterclaim.

**<u>Initial List of People Form</u>**

- Please complete and return the enclosed Initial List of People Form by August 2, 2022. Instructions are provided on the Initial List form and on the enclosed reference sheet.

**Hearing Type and Locale of In-Person Hearing**

- We note the parties' arbitration agreement provides that:
  *"An arbitration will be held in the state whose laws govern your account."*
- If no disclosed claim or counterclaim exceeds $25,000, the matter shall be resolved by the Procedures for the Resolution of Disputes through Document Submission contained in the Consumer Arbitration Rules, unless a party asks for a hearing or the arbitrator decides that a hearing is necessary.

**CA CCP §1282.4**

- Your attention is directed to California Code of Civil Procedure Section 1282.4 regarding representation by an attorney not licensed to practice in the State of California. Please refer to the State Bar of California website if you need a certification form as described in the statute. Admissions requirements, Out of State Attorney Arbitration Counsel FAQ, and other information may be found at: The State Bar of California.

**The Costs of Arbitration effective November 1, 2020**

- Pursuant to section 1284.3 of the California Code of Civil Procedure, consumers with a gross monthly income of less than 300% of the federal poverty guidelines are entitled to a waiver of arbitration fees and costs, exclusive of arbitrator fees. This law applies to all consumer agreements subject to the California Arbitration Act, and to all consumer arbitrations conducted in California. If you believe that you meet these requirements, you must submit to the AAA a declaration under oath regarding your monthly income and the number of persons in your household. Please contact the undersigned if you have any questions regarding the waiver of administrative fees.
- The costs for this case are detailed in the Consumer Rules Costs of Arbitration effective November 1, 2020, available on our website at www.adr.org.

**Amounts Paid or Due**

- This confirms the Filing Fees have been paid.

**Cybersecurity and Privacy**

- Please review the enclosed *AAA-ICDR® Best Practices Guide for Maintaining Cybersecurity and Privacy,* and *AAA-ICDR® Cybersecurity Checklist.*

**Small Claims Court Option**

- We draw your attention to R-9 of the Consumer Arbitration Rules. If a party's claim is within the jurisdiction of a small claims court, either party may choose to exercise the small claims option. If either party would like this matter decided by a small claims court, please send your written request to the case administrator and copy all other parties. If the parties disagree over whether the claim is within the jurisdiction of a small claims court, the case will proceed in arbitration and the arbitrator may make a final determination on whether the claim may proceed to small claims court.

**Next Administrative Step**

- This will acknowledge receipt of the parties' proposed issues for the Process Arbitrator. A Process Arbitrator will be appointed from the parties' submitted strike and rank lists.
- We will proceed with administration of the cases previously assigned to Sophia Parra.

Please review the enclosed Consumer Arbitration Reference Sheet for more information or view our website at www.adr.org/consumer.

The AAA appreciates the opportunity to assist you with your dispute resolution needs.

Sincerely,
/s/
Christina Negrete
Manager of ADR Services
Consumer Group Team
Direct Dial: (559) 475-6265
Email: consumergroupteam@adr.org


Supervisor Information: *Donna Martinez, Director of ADR Operations,(559)490-1881, DonnaMartinez@adr.org*

Enclosures

cc:    Ashley Hawthorne
       Alicia A. Baiardo, Esq.
       Michael Peretz, Esq.
       David C. Wright, Esq.
       Brandon Keshish
       Kyle Lawheed
       Kristina J. Catapang
       Joel S. Allen
       Emily J. Kirk, Esq.
       Jacob Franchek
       Richard D. McCune, Esq.
       Mary Katherine Grob, Esq.
       Chloe Lee
       Michelle Truong
       Bill Mayberry
       Jason Evans
       Amy Morrissey Turk
       Krystal Gollogly

# Exhibit I

AMERICAN ARBITRATION ASSOCIATION® | INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION®

Western Case Management Center
Neil Currie
Vice President
45 E River Park Place West
Suite 308
Fresno, CA 93720
Telephone: (877)528-0880
Fax: (855)433-3046

July 29, 2022

Richard A. Nervig, Esq.
McCune Wright Arevalo, LLP
18565 Jamboree Road, Suite 550
Irvine, CA 92612
Via Email to: ran@mccunewright.com

Joshua D. Davey, Esq.
Troutman Pepper Hamilton Sanders LLP
301 South College Street, Suite 3400
Charlotte, NC 28202
Via Email to: joshua.davey@troutman.com

Individual Consumers
-vs-
Wells Fargo & Co., Wells Fargo Bank, N.A.

Dear Parties:

This will confirm the appointment of Hon. Anita Rae Shapiro as the Process Arbitrator for the above-referenced matters.

As requested by the arbitrator, if either party or their counsel knows of any contact or conflict that may be relevant, they are to communicate this information to the American Arbitration Association (AAA) immediately.

Pursuant to the Supplementary Rules for Multiple Case filings, Rule MC-10(c), "Compensation of the Process Arbitrator will be at the rate set forth on the Process Arbitrator's Resume." Upon receipt of Hon. Shapiro's requested compensation deposit, an invoice will be provided to the business.

An Initial Conference Call will be held with the parties and Hon. Shapiro to discuss next steps and administrative issues. We ask that the parties review Rule MC-6 of the Supplementary Rules for Multiple Case Filings with regard to the Process Arbitrator. A copy of the Rules is attached for your convenience.

Hon. Shapiro is available to conduct the conference call on the following dates and times:

- August 8, 2022 - (9:00AM – 5:00PM)
- August 9, 2022 - (9:00AM – 5:00PM)
- August 10, 2022 - (9:00AM-10:30AM)
- August 12, 2022 - (9:00AM-12:00PM)
- August 22, 2022 - (9:00AM-12:00PM)
- August 23, 2022 - (9:00AM-11:00AM)
- August 24-26, 2022 - (9:00AM – 5:00PM)

All times presented are for Pacific Time.

Please provide your availability within the next two business days or by August 2, 2022.  If we do not receive a response, we will presume all options are acceptable and this hearing will be set.

A copy of this correspondence is being provided to Hon. Shapiro.


Sincerely,
/s/
Christina Negrete
Manager of ADR Services
Consumer Group Team
Direct Dial: (559) 475-6265
Email: consumergroupteam@adr.org
Fax: (855)433-3046

Supervisor Information: *Donna Martinez, Director of ADR Operations, (559) 490-1881,* *DonnaMartinez@adr.org*

Enclosure

cc:     Ashley Hawthorne
        Alicia A. Baiardo, Esq.
        Michael Peretz, Esq.
        David C. Wright, Esq.
        Brandon Keshish
        Kyle Lawheed
        Kristina J. Catapang
        Joel S. Allen
        Emily J. Kirk, Esq.
        Jacob Franchek
        Bill Mayberry
        Richard D. McCune, Esq.
        Mary Katherine Grob, Esq.
        Krystal Gollogly
        Chloe Lee
        Michelle Truong
        Amy Morrissey Turk, Esq.
        Jason Evans

# Exhibit J



## AUTHORIZATION

I have retained the law firm of McCune Wright Arevalo, LLP to represent me in an arbitration against Wells Fargo Bank, N.A. for improperly assessed overdraft fees. You are hereby authorized and directed to produce *electronic copies* of my monthly account statements for the last three years, all opening account documents including without limitation all overdraft opt in agreements and documents to **McCune Wright Arevalo, LLP at** **odstatements@mccunewright.com.**

**Dated:** 06/06/2022

**Client:**

**Account Number:**        Idk

**Address:**

**Email:**

# Exhibit K



## McCUNE · WRIGHT · AREVALO
### ATTORNEYS AT LAW

## **AUTHORIZATION**

I have retained the law firm of McCune Wright Arevalo, LLP to represent me in an arbitration against Wells Fargo Bank, N.A. for improperly assessed overdraft fees.  You are hereby authorized and directed to produce *electronic copies* of my monthly account statements for the last three years to **McCune Wright Arevalo**, **LLP at** **odstatements@mccunewright.com**.

Dated: __04/14/2022__

Client: ███████████████

Account Number: ___ i dont have one___

Address: ████████████████

Email: ████████████████

3281 E. Guasti Road, Suite 100, Ontario, CA 91761   ■   Phone: 909.557.1250   Fax: 909.557.1275   ■   McCuneWright.com

ORANGE COUNTY
Irvine, CA

INLAND EMPIRE - EAST
San Bernardino, CA

MIDWEST
Edwardsville, IL

EAST COAST
Newark, NJ

# Exhibit L

PageVault

| | |
|---|---|
| Document title: | Wells Fargo New Arbitrations \| McCune Wright Arevalo, LLP |
| Capture URL: | https://mccunewright.com/wells-fargo-new-arbitrations/ |
| Page loaded at (UTC): | Thu, 30 Jun 2022 20:12:25 GMT |
| Capture timestamp (UTC): | Thu, 30 Jun 2022 20:12:54 GMT |
| Capture tool: | v7.14.1 |
| Collection server IP: | 34.198.15.100 |
| Browser engine: | Chrome/96.0.4664.93 |
| Operating system: | Microsoft Windows NT 10.0.17763.0 (10.0.17763.0) |
| PDF length: | 7 |
| Capture ID: | 96e5a8af-a9e0-4e3f-aabb-2e109d809602 |
| User: | mcguirewoods |

McCUNE · WRIGHT · AREVALO
ATTORNEYS AT LAW

Call For a **Free Consultation**
**(602) 926-7797**

PRACTICE AREAS          RESULTS          CONTACT US          MORE

## MWA Accepting 100,000 New Arbitrations Against Wells Fargo

## National law firm successfully secured more than $1,000 per client in Wells Fargo overdraft arbitrations

Wells Fargo thinks they can avoid legal ramifications for abusive overdraft practices by forcing arbitrations. McCune Wright Arevalo, LLP, is here to show them they're dead wrong. MWA has won in hundreds of arbitrations against Wells Fargo over unfair overdraft fees. Each successful arbitration secured the return of the client's fees as well as $1,000.00 in penalties. None of these awards went to attorneys' fees. Now, MWA is ready for more, taking on 100,000 new arbitrations against Wells Fargo. Any Wells Fargo customer who received an overdraft fee within the past 12 months can qualify. Ready to join MWA in the fight against financial injustice? Complete to form today become one of the 100,000 arbitrations bringing the fight to Wells Fargo.

### Are you ready to bring arbitrations against Wells Fargo for unfair

Document title: Wells Fargo New Arbitrations | McCune Wright Arevalo, LLP
Capture URL: https://mccunewright.com/wells-fargo-new-arbitrations/
Capture timestamp (UTC): Thu, 30 Jun 2022 20:12:54 GMT





# $200 MILLION CLASS ACTION PRODUCT LIABILITY

## ATTORNEY ADVERTISING

McCune Wright Arevalo, LLP, is responsible for this solicitation. The information provided on this website is for general information purposes only. The information you obtain is not, nor is it intended to be, legal advice. Use of this website or submission of the online form does not create an attorney-client relationship.

Counsel Richard McCune is licensed to practice only in the state of California.  The law firm of McCune Wright Arevalo, LLP, has attorneys licensed to practice law in AZ, CA, IL, MO, NJ, NY and PA.  This information section is not intended to be a solicitation for services in states where it is forbidden for non-barred attorneys from advertising for services, and McCune Wright Arevalo, LLP, does not have attorneys barred in that state. McCune Wright Arevalo, LLP, is a national firm that brings lawsuits in a majority of the states. In states where one of its attorneys are not barred, it does so by filing the complaint along with local counsel barred in that state.

The results discussed do not guarantee, warrant, or predict the results in future cases

## Injustice: Welcome to Wells Fargo

McCune Wright Arevalo, LLP, (MWA) is fighting back against Wells Fargo's predatory overdraft practices that unjustly punish customers living paycheck-to-paycheck. Although Wells Fargo thought they'd get away with slimy, pocket-lining policies by implementing arbitration-only clauses in their account agreements that forbid consumers from bringing class actions, MWA won't let them hide from justice.

In June 2022, MWA – representing hundreds of clients who have been charged unfair overdraft fees in arbitrations against Wells Fargo – secured the return of **all overdraft fees charged within the past year plus a $1000.00 penalty** for every client. * The best part? All of that money went right into our clients' pockets with no charges for attorney's fees. And this is only the beginning.

*Results not guaranteed for all clients.

Document title: Wells Fargo New Arbitrations | McCune Wright Arevalo, LLP
Capture URL: https://mccunewright.com/wells-fargo-new-arbitrations/
Capture timestamp (UTC): Thu, 30 Jun 2022 20:12:54 GMT

... tions against Wells Fargo – secured the return of overdraft fees charged within the past year plus **a $1000.00 penalty** for every client. * The best part? All of that money went right into our clients' pockets with no charges for attorney's fees. And this is only the beginning.

*Results not guaranteed for all clients.

# MWA is Ready to Represent You.

We're committed to taking on 100,000 new clients in their overdraft arbitrations against Wells Fargo. You may qualify to join the movement towards justice if:

- You've been charged an overdraft fee on an ATM or debit card purchase in the past 12 months.
- You have an active Wells Fargo account.

That's it. That's all you need to take your money back from a corporation well-known for using underhanded tactics to boost their bottom line and increase bonuses for executives at the top.



**Are you a victim of unfair overdraft fees? Join MWA in the fight for justice by completing the form above.**

[insert fees section]

# A Moment of Clarity or Just Empty Words?

On January 6, 2022, Wells Fargo ATMs in Irvine, California, displayed the word "INJUSTICE" on their welcome screens. Though we at MWA would like to think Wells Fargo used this as a moment for self-reflection on how their practices abuse their customers, we know, based on their history of scandals, that this corporation will only listen to its wallet.

Here's how MWA is attaining justice out of Wells Fargo's injustice beyond securing overdraft fees for our clients. Arbitrations brought by the consumer costs only $50.00 paid by the attorney while Wells Fargo pays a whopping $4,000.00, not including their attorneys' fees! In short, bringing hundreds of thousands of arbitrations, each resulting in thousands paid by Wells Fargo, means consumers can finally hit one of the world's largest corporations where it hurts. Each of these thousands of arbitrations matters in holding Wells Fargo accountable.



...ping $4,000.00, not including their attorneys' fees. In short, bringing hundreds of thousands of arbitrations, each resulting in thousands paid by Wells Fargo, means consumers can finally hit one of the world's largest corporations where it hurts. Each of these thousands of arbitrations matters in holding Wells Fargo accountable.



**Join MWA as we say "game on" to Wells Fargo's attempts to skirt accountability. Complete the form above to see if you qualify for an arbitration.**



### Are you ready to bring arbitrations against Wells Fargo for unfair overdraft fees?

First Name | Last Name

Phone | Email

— Practice Area —

— Are you a new client? —

Message

— How did you hear about us? —

**Send Message >**



**HOME**          **CASES**                    **CONTACT US**                              **PRIVACY POLICY**

    

**Main Office:**
(602) 926-7797
3281 East Guasti Road
Suite 100
Ontario, CA 91761

**Orange County Office:**
(714) 909-2326
18565 Jamboree Road
Suite 550
Irvine, CA 92612

**Inland Empire – East Office:**
(909) 443-1643
164 W. Hospitality Lane
Suite 109
San Bernardino, CA 92408

**Coachella Valley Office:**
(760) 892-5099
73255 El Paseo Suite 10
Palm Desert, CA 92260

**Midwest Office:**
(618) 424-4402
231 North Main Street
Suite 20
Edwardsville, IL 62025

**East Coast Office:**
(973) 737-9981
One Gateway Center
Suite 1500
Newark, NJ 07102

© 2022 McCune Wright Arevalo, LLP

The information on this website is for general information purposes only. Nothing on this site should be taken as legal advice for any individual case or situation. This information is not intended to create, and receipt or viewing does not constitute, an attorney-client relationship.

# Exhibit M

# Wells Fargo Way2Save® Checking

August 7, 2019 ■ Page 1 of 4





## Questions?

*Available by phone 24 hours a day, 7 days a week:*
Telecommunications Relay Services calls accepted

**1-800-TO-WELLS**   (1-800-869-3557)

*TTY:* 1-800-877-4833
*En español:* 1-877-727-2932

華語 1-800-288-2288   *(6 am to 7 pm PT, M-F)*

*Online:* wellsfargo.com

*Write:* Wells Fargo Bank, N.A. (114)
P.O. Box 6995
Portland, OR  97228-6995

## You and Wells Fargo

Thank you for being a loyal Wells Fargo customer. We value your trust in our company and look forward to continuing to serve you with your financial needs.

## Account options

*A check mark in the box indicates you have these convenient services with your account(s).  Go to wellsfargo.com or call the number above if you have questions or if you would like to add new services.*

| | | | | |
|---|---|---|---|---|
| Online Banking | ✓ | Direct Deposit | ☐ |
| Online Bill Pay | ✓ | Auto Transfer/Payment | ☐ |
| Online Statements | ✓ | Overdraft Protection | ☐ |
| Mobile Banking | ☐ | Debit Card | ☐ |
| My Spending Report | ✓ | Overdraft Service | ✓ |

## Activity summary

| | |
|---|---|
| Beginning balance on 7/9 | $2.60 |
| Deposits/Additions | 1,342.00 |
| Withdrawals/Subtractions | - 1,362.52 |
| **Ending balance on 8/7** | **-$17.92** |



**Overdraft Protection**

This account is not currently covered by Overdraft Protection.  If you would like more information regarding Overdraft Protection and eligibility requirements please call the number listed on your statement or visit your Wells Fargo store.

August 7, 2019 ■ Page 2 of 4

**WELLS FARGO**

## Transaction history

| Date | Check Number | Description | Deposits/ Additions | Withdrawals/ Subtractions | Ending daily balance |
|------|--------------|-------------|---------------------|---------------------------|----------------------|
| 7/10 | | Purchase authorized on 07/10 Autozone 5667 6085 Balboa San Diego CA ____ Card ___ | | 9.45 | -6.85 |
| 7/11 | | Overdraft Fee for a Transaction Posted on 07/10 $9.45 Purchase Authori Zed on 07/10 Autozone 5667 6085 Balbo San Dieg | | 35.00 | -41.85 |
| 7/12 | | Edeposit IN Branch/Store 07/12/19 11:34:38 Am 3550 Murphy Canyon Rd San Diego CA 6505 | 42.00 | | 0.15 |
| 7/15 | | ATM Cash Deposit on 07/15 5522 Balboa Ave San Diego CA ____ ATM ID ____ Card ___ | 300.00 | | |
| 7/15 | | Purchase authorized on 07/15 Arco #42044 San Diego CA ____ Card ___ | | 18.42 | |
| 7/15 | | Save As You Go Transfer Debit to ___ | | 1.00 | 280.73 |
| 7/16 | | Purchase authorized on 07/16 Dollar Tr 3398 Murphy San Diego CA ____ Card ___ | | 9.18 | |
| 7/16 | | Save As You Go Transfer Debit to ___ | | 1.00 | 270.55 |
| 7/17 | | Purchase authorized on 07/17 Carnival Superm San Diego CA ____ Card ___ | | 24.25 | |
| 7/17 | | American-Amicabl Ins. Draft ___ | | 49.00 | |
| 7/17 | | Iaamerican Life Ins. Draft ___ | | 73.55 | |
| 7/17 | | Save As You Go Transfer Debit to ___ | | 1.00 | 122.75 |
| 7/19 | | Purchase authorized on 07/18 Yisapp.Com 888-4227865 AZ ____ Card ___ | | 55.92 | |
| 7/19 | | Purchase authorized on 07/18 Uber Trip Help.Uber.Com CA ____ Card ___ | | 7.28 | |
| 7/19 | | Purchase authorized on 07/19 Cvs/Pharmacy #08 08833--3 San Diego CA ____ Card ___ | | 10.12 | |
| 7/19 | | Capital One Phone Pymt ___ | | 100.00 | -50.57 |
| 7/22 | | Overdraft Fee for a Transaction Posted on 07/19 $100.00 Capital One Phone Pymt ___ | | 35.00 | |
| 7/22 | | Purchase authorized on 07/19 Carl's Jr 1100491 San Diego CA ____ Card ___ | | 18.30 | -103.87 |
| 7/23 | | Overdraft Fee for a Transaction Posted on 07/22 $18.30 Purchase Authori Zed on 07/19 Carl's Jr 1100491 San Diego | | 35.00 | |
| 7/23 | | American-Amicabl Ins. Draft ___ | | 72.04 | -210.91 |
| 7/24 | | Overdraft Fee for a Transaction Posted on 07/23 $72.04 American-Amicabl Ins. ___ | | 35.00 | |
| 7/24 | | ATM Cash Deposit on 07/24 3326 Sandrock San Diego CA ____ ATM ID ____ Card ___ | 180.00 | | -65.91 |
| 7/25 | | ATM Cash Deposit on 07/25 3326 Sandrock San Diego CA ____ ATM ID ____ Card ___ | 60.00 | | -5.91 |
| 7/29 | | Recurring Payment authorized on 07/24 Legalshield *Membr ____ Card ___ | | 29.90 | |
| 7/29 | | American-Amicabl Ins. Draft ___ | | 44.62 | -80.43 |
| 7/30 | | Overdraft Fee for a Transaction Posted on 07/29 $29.90 Recurring Payment Authori Zed on 07/24 Legalshield *Membr ___ | | 35.00 | |
| 7/30 | | Overdraft Fee for a Transaction Posted on 07/29 $44.62 American-Amicabl Ins. Draft ___ | | 35.00 | -150.43 |
| 8/1 | | ATM Cash Deposit on 08/01 3326 Sandrock San Diego CA ____ ATM ID ____ Card ___ | 150.00 | | |
| 8/1 | | ATM Cash Deposit on 08/01 3326 Sandrock San Diego CA ____ ATM ID ____ Card ___ | 100.00 | | |
| 8/1 | | Edeposit IN Branch/Store 08/01/19 11:15:58 Am 5522 Balboa Ave San Diego CA ___ | 150.00 | | |

August 7, 2019 ■ Page 3 of 4



## Transaction history *(continued)*

| Date | Check Number | Description | Deposits/ Additions | Withdrawals/ Subtractions | Ending daily balance |
|---|---|---|---|---|---|
| 8/1 | | American Gen Lif Ins Paymt | | 290.34 | -40.77 |
| 8/2 | | Overdraft Fee for a Transaction Posted on 08/01 $290.34 American Gen Lif Ins Paymt | | 35.00 | |
| 8/2 | | Purchase authorized on 08/02 Autozone 5667 6085 Balbo San Diego CA               Card | | 8.62 | |
| 8/2 | | Purchase authorized on 08/02 Autozone 5667 6085 Balbo San Diego CA               Card | | 10.76 | |
| 8/2 | | Purchase authorized on 08/02 Home Bar Liquor San Diego CA               Card | | 18.77 | -113.92 |
| 8/5 | | Overdraft Fee for a Transaction Posted on 08/02 $8.62 Purchase Authori Zed on 08/02 Autozone 5667 6085 Balbo San Dieg | | 35.00 | |
| 8/5 | | Overdraft Fee for a Transaction Posted on 08/02 $10.76 Purchase Authori Zed on 08/02 Autozone 5667 6085 Balbo San Dieg | | 35.00 | |
| 8/5 | | Overdraft Fee for a Transaction Posted on 08/02 $18.77 Purchase Authori Zed on 08/02 Home Bar Liquor San Dieg | | 35.00 | |
| 8/5 | | ATM Cash Deposit on 08/03 3326 Sandrock San Diego CA               ATM ID          Card | 200.00 | | |
| 8/5 | | ATM Withdrawal authorized on 08/03 3326 Sandrock San Diego CA          ATM ID          Card | | 40.00 | -58.92 |
| 8/6 | | Overdraft Fee for a Transaction Posted on 08/05 $40.00 ATM Withdrawal authorized on 08/03 3326 Sandrock San Diego CA | | 35.00 | |
| 8/6 | | Equitable Accept Loanpay | | 49.00 | -142.92 |
| 8/7 | | Overdraft Fee for a Transaction Posted on 08/06 $49.00 Equitable Accept Loanpay | | 35.00 | |
| 8/7 | | ATM Cash Deposit on 08/07 3326 Sandrock San Diego CA               ATM ID          Card | 120.00 | | |
| 8/7 | | ATM Cash Deposit on 08/07 3326 Sandrock San Diego CA               ATM ID          Card | 40.00 | | -17.92 |
| Ending balance on 8/7 | | | | | -17.92 |
| **Totals** | | | **$1,342.00** | **$1,362.52** | |

*The Ending Daily Balance does not reflect any pending withdrawals or holds on deposited funds that may have been outstanding on your account when your transactions posted.  If you had insufficient available funds when a transaction posted, fees may have been assessed.*

### Summary of Overdraft and Returned Item fee(s)

| | Total this statement period | Total year-to-date † |
|---|---|---|
| Total Overdraft Fees | $420.00 | $980.00 |
| Total Returned Item Fees | $0.00 | $0.00 |

† *Year-to-date total reflects fees assessed or reversed since first full statement period of current calendar year.*

### Monthly service fee summary

For a complete list of fees and detailed account information, see the Wells Fargo Account Fee and Information Schedule and Account Agreement applicable to your account (EasyPay Card Terms and Conditions for prepaid cards) or talk to a banker. Go to wellsfargo.com/feefaq for a link to these documents, and answers to common monthly service fee questions.

| Fee period 07/09/2019 - 08/07/2019 | Standard monthly service fee $12.00 | You paid $0.00 |
|---|---|---|
| **How to avoid the monthly service fee** | Minimum required | This fee period |
| Have any **ONE** of the following account requirements | | |
| · Minimum daily balance | $2,000.00 | -$210.91 ☐ |
| · Total amount of qualifying direct deposits | $750.00 | $0.00 ☐ |
| · Total number of posted debit card purchases or posted debit card payments of bills in any combination | 10 | 12 ☑ |

JC/JC

August 7, 2019 ■ Page 4 of 4

**WELLS FARGO**

## Worksheet to balance your account

Follow the steps below to reconcile your statement balance with your account register balance. Be sure that your register shows any interest paid into your account and any service charges, automatic payments or ATM transactions withdrawn from your account during this statement period.

**A**  Enter the ending balance on this statement.                  $ _____

**B**  List outstanding deposits and other credits to your account that do not appear on this statement. **Enter the total** in the column to the right.

| Description | Amount |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |
| Total | $ |

+ $ _____

**C**  Add **A** and **B** to calculate the subtotal.        = $ _____

**D**  List outstanding checks, withdrawals, and other debits to your account that do not appear on this statement. **Enter the total** in the column to the right.

| Number/Description | Amount |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
| Total | $ |

- $ _____

**E**  Subtract **D** from **C** to calculate the adjusted ending balance. This amount should be the same as the current balance shown in your register.

= $ _____

## General statement policies for Wells Fargo Bank

■ **To dispute or report inaccuracies in information we have furnished to a Consumer Reporting Agency about your accounts.** You have the right to dispute the accuracy of information that Wells Fargo Bank, N.A. has furnished to a consumer reporting agency by writing to us at Overdraft Collection and Recovery, P.O. Box 5058, Portland, OR 97208-5058. Please describe the specific information that is inaccurate or in dispute and the basis for the dispute along with supporting documentation. If you believe the information furnished is the result of identity theft, please provide us with an identity theft report.

■ **In case of errors or questions about your electronic transfers,** telephone us at the number printed on the front of this statement or write us at Wells Fargo Bank, P.O. Box 6995, Portland, OR 97228-6995 as soon as you can, if you think your statement or receipt is wrong or if you need more information about a transfer on the statement or receipt. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared.

1. Tell us your name and account number (if any).
2. Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe it is an error or why you need more information.
3. Tell us the dollar amount of the suspected error.

We will investigate your complaint and will correct any error promptly. If we take more than 10 business days to do this, we will credit your account for the amount you think is in error, so that you will have the use of the money during the time it takes us to complete our investigation.

©2010 Wells Fargo Bank, N.A. All rights reserved NMLSR ID 399801          Member FDIC.