# Exhibit R

**AMERICAN ARBITRATION ASSOCIATION**

| | |
|---|---|
| INDIVIDUAL CONSUMERS, | ) **CLAIMANTS' RESPONSE AND** |
| | ) **OBJECTION TO WELLS FARGO'S** |
| | ) **DEFACTO MOTION FOR MORE** |
| Claimants, | ) **DEFINITE STATEMENT** |
| | ) |
| | ) |
| v. | ) |
| | ) |
| | ) |
| WELLS FARGO BANK, N.A., | ) |
| | ) |
| | ) |
| Respondent. | ) |

_____

## <u>INTRODUCTION</u>

Respondent Wells Fargo Bank makes its arguments at the wrong time, in the wrong place, and directs them at the wrong target.  It was Wells Fargo who invited consumers to resolve their "disputes" in arbitration "as quickly and easily as possible." Wells Fargo defined such "disputes" as "***any*** unresolved disagreement between Wells Fargo and you." And once an arbitration is initiated, the only rules that apply by contract are the AAA's Consumer Arbitration Rules. AAA's rules compel Wells Fargo to pay the required fees. If Wells Fargo refuses to pay, all that is left for AAA is to dismiss the arbitration so Claimants can pursue their claims in court.

To be sure, Wells Fargo now appears to regret its unilateral decision to force consumer disputes into arbitration because it suddenly finds the exercise expensive and time-consuming. But Wells Fargo has only itself to blame. It could very well have availed itself of the type of protections it now seeks simply by doing nothing at all, and achieving those protections through standard rules of judicial civil procedure. In court, Claimants' pleadings would be governed by FRCP 12 or similar state rules, and Wells Fargo would be able to file all the motions to dismiss and dispositive motions it sees fit to draft. Thus, to the extent Wells Fargo approaches these consumer disputes with reluctance, that reluctance must be tempered by the fact that these claims are being arbitrated only as the consequence of Wells Fargo's own decision to force consumers to arbitrate their claims. The parties have disputes; Wells Fargo must pay for someone to decide them.

Faced with this logic, Wells Fargo changes the subject and resorts instead to a strawman attack on Petitioners' counsel, McCune Wright Arevalo, LLP ("MWA"). There is no question that history exists between MWA and Wells Fargo, far more so than Wells Fargo's selective recitation suggests. Wells Fargo's grudge goes back over a decade, when Judge Willam Alsup of the Northern District of California found Wells Fargo liable for over $200 million in damages stemming from violations of California law, and enjoining Wells Fargo from similar future practices. See Exhibit 1. Wells Fargo sees red but also, more importantly in this context, an opportunity to muddy otherwise clear waters. Its allegations regarding MWA are false—more a result of Wells Fargo's obsessions with MWA than any reflection of reality—but even so, they don't change the fundamental premise that Wells Fargo has unresolved disputes with its customers and, by contract, those disputes must be resolved pursuant to the AAA's rules.

Claimants have submitted their disputes to the AAA, and the AAA has accepted them. The contract, nor the AAA rules, nor any source of law requires anything else. To the extent that Wells

Fargo regrets how its contractual elections are playing out in practice, that is Wells Fargo own problem to resolve. There is nothing for the AAA to do but require Wells Fargo to pay its fees. If Wells Fargo does so, AAA should facilitate the necessary hearings. If not, AAA should close Claimants' files so they can pursue their claims in court.

## **ARGUMENT**

Wells Fargo's arguments run counter to every representation it makes regarding the efficiency and economy of the arbitration process. Wells Fargo inverts the plain meaning and purpose of the AAA Rules, all of which facilitate the ease of submitting disputes for resolution. Its concerns about the fees resulting from this process are concerns neither for AAA or for Claimants.  Claimants have paid their fees, and AAA is the contractual third-party Wells Fargo unilaterally selected to resolve disputes. It is baffling that Wells Fargo would demand to resolve disputes with its customers through AAA, then turn around and refuse to pay the required fees. It has long been suspected that large corporations like Wells Fargo use arbitration as a pretense for evading justice, rather than as an efficient means of providing it. Rarely is the evidence of that so obvious as it is from Wells Fargo's request here.

II.    **Consumer Rule 2 Governs Arbitration Demands**

    A.    <u>Consumer Rule 2 Is The Appropriate Standard For Determining The Sufficiency</u>

        <u>Of A Demand</u>

Consumer Rule 2's filing requirements are complete and exhaustive, and Claimants have met them. AAA does have discretion to make rules and resolve claims in an efficient and economic way, but AAA has already accounted for those goals in Rule 2, having determined that consumer arbitration should be a simple and efficient endeavor. To that end, Rule 2 sets forth the requirements for a valid claim:

> The party who starts the arbitration (referred to as the "claimant" throughout the arbitration) must contact, in writing, the party that the case is filed against (referred to as the "respondent" throughout the arbitration) that it wishes to arbitrate a dispute. This written contact is referred to as the Demand for Arbitration ("Demand"). The Demand must do the following:
>
> - Briefly explain the dispute
>
> - List the names and addresses of the consumer and the business, and, if known, the names of any representatives of the consumer and the business
>
> - Specify the amount of money in dispute, if applicable
>
> - Identify the requested location for the hearing if an in-person hearing is requested
>
> - State what the claimant wants

Claimants have not only met these requirements, as AAA has acknowledged that Claimants "met the filing requirements." See Exhibit 2. If Claimants had not met the filing requirements, Claimants presume AAA would have told them so at the time. And this only makes sense. A process arbitrator is appointed after a claim is accepted, not to decide whether a claim is acceptable.

Even the courts have recognized that the pleading requirements for arbitration demands fall below usual judicial pleading requirements. Recently, the California Court of Appeal held that a general pleading alone satisfies arbitral pleading requirements. *See Bussen v. Westpark Cap. Fin. Servs., LLC*, No. B304977, 2022 WL 2913830, at *6 (Cal. Ct. App. July 25, 2022) ("The pleading requirements that typically apply to the discovery rule are deemed inapplicable here, given the more general pleading requirements for matters filed with the American Arbitration Association. See Consumer Arbitration Rules, Rule 2.") Here, Claimants have pled with even more certainty than filing with a general demand.

And courts have similarly recognized that Rule 2 is the only source of authority for establishing arbitral filing requirements.[1] In *Medina v. Found. Rsrv. Ins. Co*., the court explained that "[a]rbitration is a special statutory proceeding which requires application of procedural rules that may conflict with more general rules of civil procedure in order to accomplish the purpose…." 1997-NMSC-027, ¶ 9, 123 N.M. 380, 382, 940 P.2d 1175, 1177. Thus, even the courts note the lower standards inherent in the arbitral forum and defer to the AAA's pleading standards.

Of course, a claimant may always plead more at his or her own election, but there is no requirement to do so. No one disputes that these rules are a far cry from the substantive pleading requirements provided for in judicial rules of civil procedure, but these are the rules Wells Fargo elected.[2] There is no mechanism permitting Wells Fargo to demand AAA arbitration, then change the rules to its advantage when it doesn't like how the process plays out.

---

[1] *See Mendez v. Sony Computer Ent. Am., LLC*, No. 1:20-CV-00588-DCN, 2021 WL 5702153, at *2 (D. Idaho Dec. 1, 2021), reconsideration denied, No. 1:20-CV-00588-DCN, 2022 WL 2179961 (D. Idaho June 15, 2022).

[2] Rule 2 is not complicated but it is not alone in that regard. For instance, California continues to permit the filing of a general denial in response to a complaint. In that sense, there is nothing particularly remarkable about Rule 2.  It is simply the rule to be followed in AAA proceedings.

B.    Vague And Imprecise Phrases Scattered Throughout the Record Are No
      Replacement For The Unambiguous Requirements Of Rule 2

Attempting to find something outside of Rule 2 to hang its argument on, Wells Fargo argues that the phrase "lawful demand," found in the arbitration agreement, imposes additional pleading requirements upon consumers.  But this argument fails as both a matter of law and common sense.  With regard to the law, contracts are always interpreted so as to give meaning to specific language over the general.  *See, e.g.*, *Starlight Ridge South Homeowners Assn. v. Hunter-Bloor*, 177 Cal.App.4th 440 (2009) ("Where two provisions appear to cover the same matter, and are inconsistent, the more specific provision controls over the general provision.").  The phrase "lawful demand" is undefined and found nowhere in the Consumer or Supplementary Rules, so the more specific Rule 2 would govern in any event. But as common sense dictates, the most likely place a consumer would look to determine what constitutes a "lawful" demand—absent any definition in the arbitration clause, like here—would be in the AAA Consumer Rules and, specifically, Rule 2. Wells Fargo's argument thus forms a perfect circle, back to Rule 2.

Further, Wells Fargo misplaces its reliance upon the Arbitration Agreement's use of the term "lawful demand" because it does not address Claimants' filing obligations at all.  Rather, it is used in an explanatory manner to describe what happens if one party refuses to submit to arbitration. But here, the parties are in arbitration, Claimants' demands have been accepted and processed (making them "lawful demands," by definition), and there has not even been a motion to compel arbitration.  At this point, the Process Arbitrator need simply take notice of AAA's previous acknowledgement that Claimants have met the filing requirements, and act accordingly.

Respondent reaches deep into the AAA's Consumer Rules for its next argument, suggesting that the AAA's arbitration pleading standard is not found in Rule 2, but on Page 44 of the Glossary of Terms.  There, AAA defines a Demand for Arbitration as "the written document created by the claimant that informs the respondent that it wishes to arbitrate a dispute." AAA explains that a demand provides "basic information about the dispute, the parties involved and what the claimant wants as a result of the arbitration." It is on this vague phrase, "basic information," that Wells Fargo hangs the weight of its argument.

But this is not a pleading standard—it isn't even a rule. It is a generalized description of what constitutes a demand, meant not for Wells Fargo's sophist attorneys to manipulate, but for consumers unfamiliar with the arbitration process to understand. Of course, it is axiomatic that the actual rule trumps commentary about the rule. *See Tesco Controls, Inc. v. Monterey Mech. Co*., 124 Cal. App. 4th 780, 792 (2004). Moreover, statutory interpretation requires terms and clauses in a uniform structure to be interpreted consistently. *Env't Def. v. Duke Energy Corp*., 549 U.S. 561, 562, 127 S. Ct. 1423, 1426, 167 L. Ed. 2d 295 (2007) The term "basic information" in the glossary merely summarizes Rule 2's requirement to "briefly explain the dispute." In short, the phrases "basic information" and "briefly explain the dispute" mean one and the same. If anything, Wells Fargo's parsing illustrates—with irony, to boot—precisely why AAA should stick to the plain language of Rule 2.

C.    There Is No Rule Expanding Pleading Requirements Beyond Those In Rule 2

Much of Wells Fargo's remaining argument is taken up with reasons that AAA should expand the pleading requirements in this particular case.  For example, Wells Fargo purports to require all Claimants to produce certain evidence before AAA ever agrees to receive a claim. But Rule 2 does not require claimants to submit substantive evidence of claims prior to filing. Courts don't even require that. Indeed, any other rule would prejudice Claimants in at least two ways. First, the nature of arbitration is informal—a Claimant submits a claim, and the parties select an arbitrator to arbitrate the claim, given the evidence that exists. In other words, Wells Fargo is asking AAA to install a gatekeeper to the process that simply does not exist anywhere in the rules.

Second, it would require Claimant to proffer its legal strategies before the arbitration. Wells Fargo has already engaged in no shortage of litigation merely over Rule 2, a rule which leaves very little room for interpretive error.  A requirement for Claimants to sneak preview their cases to Wells Fargo in advance

And third, Wells Fargo already has all the information it pretextually demands from consumers. Indeed, Claimants have already requested information that will assist in substantive resolution of their claims, but Wells Fargo has refused cooperation. Wells Fargo thus speaks with forked tongue. It claims that burdening consumers with additional pleading requirements will resolve these cases efficiently, even as it hoards the information necessary to actually decide these claims.

More fundamentally, Wells Fargo's position runs contrary to Consumer Due Process Protocol Principle 13, which provides that "[n]o party should ever be denied the right to a fundamentally-fair due process due to an inability to obtain information material to a dispute." If Process Arbitrator Shapiro is to make any decision coming out of this dispute at all, it would be to

require Wells Fargo to honor these information requests.

But no matter what whether Wells Fargo shares the information or not, it has all the necessary evidence it needs to resolve these claims. If Wells Fargo wants to avoid the administrative fees that are inherent in arbitration, it can show its hand just as easily as Claimants can. Plainly put, Wells Fargo wants the perceived benefits of arbitration without any of the burdens. That is not the way it works.

Nor is there any requirement, in Rule 2 or elsewhere, that consumers must describe in their demands all the laws Wells Fargo may have violated. Again, that may be a requirement in federal court, where FRCP 12 requires "plausible" allegations of a cause of action before the litigation can proceed. But that simply puts us back where we all started—Wells Fargo waived itself out of protections like those provided in FRCP 12 by electing to resolve "disputes" in arbitration. Commentators will continue to debate whether this is a good or bad thing for the legal system, for society at large, or for the cause of justice. None of that matters here. All that matters here is that Wells Fargo elected to be governed by AAA Rule 2, and now it wants to change the rules.

D.    <u>Wells Fargo Has Every Reason To Avoid Confronting Rule 2</u>

All of Wells Fargo's rhetorical distractions beg the question: Why hasn't Wells Fargo simply argued that the demand did not "briefly explain the dispute?" After all, that remains the rule. The reason is, of course, that Claimants' demands go far beyond briefly explaining the dispute. Had these demands merely stated that the "claimant suffered harm from Wells Fargo's overdraft policies," this alone would have satisfied Rule 2. But Claimants have gone above and beyond by describing how Wells Fargo's overdraft practices have harmed them and why they should recover.  Hence, Wells Fargo's efforts to find some other foundation for its arguments.

Certainly, AAA has adopted the Supplementary Rules to handle mass case filings. In doing so, AAA empowers a "process arbitrator" to decide disputed administrative matters. Of course, Claimants do not quibble with the premise that the Process Arbitrator can review AAA's Filing Requirements for the purpose of carrying out her duties, per Rule MC-6. But Wells Fargo is not really asking for that: It has not challenged the premise that Claimants' demands "briefly described" their disputes. That is the whole point of Wells Fargo's varied attempts to latch on alternative standards like "basic information" and "lawful demand." Wells Fargo's demand is that the Process Arbitrator change Rule 2 itself, and thus provide the alternative pleading standard Wells Fargo has failed to establish.

### III.    Wells Fargo's Attacks On MWA Are Misguided

Wells Fargo's allegations regarding MWA are untrue and only underscore its underlying grudge—if not outright obsession—with MWA. The "advertising" Wells Fargo describes was not made available to the public but resulted from a short-lived mistake on MWA's part.  At some point on June 30, 2022 , an MWA employee pushed through a website update that inadvertently included some unreviewed draft webpages. While these draft pages were viewable for several hours, there was no existing link on the MWA website, or anywhere else, directing the public to these pages. The webpages in question could not be found by entering "Wells Fargo" in the MWA website's search engine. Nor were the draft pages live for long enough to register on Google searches.  Thus, MWA is not aware of any way in which the public would have known about the draft pages, much less reviewed or act on them. See Exhibit 3.

MWA reviews its website every few days and saves various analytic reports, thus preserving this information. These reports indicate that the web page in question was viewed **27** times, and of those 27 views, **22** were unique. See Exhibits 4-7. All 27 views occurred on the same date time-stamped on the screen shot Wells Fargo submitted, suggesting that the webpage was discovered, then shared internally among Wells Fargo and its counsel.

While Wells Fargo is well aware of the circumstances in which it discovered these hidden pages, MWA's investigation suggests that Wells Fargo must have discovered the draft page through a process called "web-crawling."  Web-crawling is a colloquial term for engaging a specialist to access certain files that list the webpages published as part of the website. MWA monitors use of its website through a program called Inspectlet, precisely for purposes of website security, and maintains records of the sessions where these pages were viewed.  After reviewing these sessions, the web-crawler could not have accessed the page without knowing the direct link

and entering it into the browser. See Exhibit 8. Furthermore, Wells Fargo's own screen capture demonstrates that the user did not navigate to the /wells-fargo-new-arbitrations/ webpage. Instead, the user entered the URL into the browser directly, something that only could have been done if a crawler was employed for the purpose.

Unsurprisingly, several of the webpage's substantive hits came from Virginia, where Wells Fargo's counsel is located. It is impossible to definitively track each of these viewings as Wells Fargo-related, but many of these viewings were immediate bounces, meaning that the viewer took no time on the page at all. At the end of the day, there is nothing to see here but a simple mistake, uncovered by a billion-dollar bank with both the resources and the necessary obsession to uncover such foot-faults.

In any event, Wells Fargo alleges that the driving force behind these cases is to "harass" it into paying administration fees. Wells Fargo cites Rule 44(c) of the Consumer Rules barring meritless claims as a form of harassment, but its argument confuses the means with the ends. The Claimants seek to enforce Regulation E and stop Wells Fargo's predatory overdraft practices, and they cannot do so except by arbitration. In other words, Wells Fargo's argument presumes that consumers have a choice regarding how to handle their disputes. But Wells Fargo has already ensured that they don't. In essence, Wells Fargo argues that it shouldn't have to pay its fees until Claimants prove they have been wronged, which is not how dispute resolution works.

Make no mistake: Claimants are as concerned as Wells Fargo, if not more so, regarding their forced submission of claims to AAA. Claimants do not have the same rights in arbitration as they have in federal court to undertake efficient class litigations, to perform fact and expert discovery, or to obtain a full hearing on the merits governed by the rules of evidence. But the whole premise of arbitration agreements is that the benefits and ***burdens*** of arbitration are

12

***bilateral***. *See Aguirre v. Aetna Res.*, LLC, No. 120CV00414NONEEPG, 2021 WL 5771666, at *13 (E.D. Cal. Dec. 6, 2021), report and recommendation adopted, No. 1:20-CV-0414 JLT EPG, 2022 WL 718409 (E.D. Cal. Mar. 10, 2022). Wells Fargo ***adopted the burdens of arbitration*** in return for Claimants' agreement to waive their legal rights. That was the bargain struck, and that is the bargain Claimants have no choice but to enforce. Wells Fargo can play the victim all day long, but it is before AAA of its own accord. There is no reason for AAA to expect anything but Wells Fargo's cooperation in these matters, including the payment of fees owed because Wells Fargo elected AAA as its favored forum for resolving disputes.

## **CONCLUSION**

Claimants should not have their cases burdened by extra filing requirements. The extra filing requirements only serves to delay the process, a process which Claimants contend must take no longer than 180 days. Moreover, the rules only support review of the demands for the requirements set out in Consumer Arbitration Rule 2, which have been met as evidenced by AAA's earlier acceptance of those demands. If these extra requirements are imposed, Claimants reserve all rights to consider such requirements a breach of the arbitration agreement, and act in a manner consistent thereto.

Dated: September 21, 2022

**McCune ● Wright ● Arevalo, LLP**

/s/ *Kyle Lawheed*
Richard D. McCune, Esq.
Richard A. Nervig, Esq.
Kyle D. Lawheed, Esq.
McCune, Wright & Arevalo, LLP
3281 E. Guasti Rd., Suite 100
Ontario, CA  91761
Tel. (909) 206-0674
Email: kl@mccunewright.com

***Counsel for Claimant(s)***

# EXHIBIT 1

(For Claimants' Response and Objection To Wells
Fargo's Defacto Motion For More Definite Statement)

United States District Court

For the Northern District of California

1

2

3

4

5                              IN THE UNITED STATES DISTRICT COURT

6

7                           FOR THE NORTHERN DISTRICT OF CALIFORNIA

8

9

10   VERONICA GUTIERREZ, ERIN                        No. C 07-05923 WHA
     WALKER, and WILLIAM SMITH, as
11   individuals and on behalf of all others         **CLASS ACTION**
     similarly situated,

12              Plaintiffs,

13        v.                                         **FINDINGS OF FACT AND**
                                                     **CONCLUSIONS OF LAW**
14   WELLS FARGO BANK, N.A.,                         **AFTER BENCH TRIAL**

15              Defendant.
                                       /
16

17                                     **INTRODUCTION**

18        This certified consumer class action challenges hundreds of millions of dollars in

19   overdraft fees imposed on depositors of Wells Fargo Bank, N.A. through allegedly unfair and

20   fraudulent business practices.  This order is the decision of the Court following a two-week

21   bench trial.

22                                       **SUMMARY**

23        Overdraft fees are the second-largest source of revenue for Wells Fargo's consumer

24   deposits group, the division of the bank dedicated to providing customers with checking accounts,

25   savings accounts, and debit cards.  The revenue generated from these fees has been massive.  In

26   California alone, Wells Fargo assessed over $1.4 billion in overdraft penalties between 2005 and

27   2007.  Only spread income — money the bank generated using deposited funds — produced

28   more revenue.

EXHIBIT 19
Page 001

This action does not challenge the amount of a single overdraft fee (currently $35). That is accepted as a given. Rather, the essence of this case is that Wells Fargo has devised a bookkeeping device to turn what would ordinarily be *one* overdraft into as many as *ten* overdrafts, thereby dramatically multiplying the number of fees the bank can extract from a single mistake. The draconian impact of this bookkeeping device has then been exacerbated through closely allied practices specifically "engineered" — as the bank put it — to multiply the adverse impact of this bookkeeping device. These neat tricks generated colossal sums per year in additional overdraft fees, just as the internal bank memos had predicted. The bank went to considerable effort to hide these manipulations while constructing a facade of phony disclosure. This order holds that these manipulations were and continue to be unfair and deceptive in violation of Section 17200 of the California Business and Professions Code. For the certified class of California depositors, the bookkeeping device will be enjoined and restitution ordered.

**PROCEDURAL HISTORY**

Plaintiffs commenced this action in November 2007, alleging violations of the "unfair" and "fraudulent" restrictions of Section 17200. Two of Wells Fargo's business practices were initially targeted: (1) a high-to-low "resequencing" practice, challenged herein, and (2) an "including and deleting" practice, which plaintiffs no longer challenge.[1] Originally, the Court certified two classes corresponding to these separate practices: (1) a high-to-low "resequencing" class represented by plaintiff Veronica Gutierrez and (2) an "including and deleting" class represented by plaintiffs Erin Walker and William Smith (Dkt. No. 98). In early 2009, Wells Fargo moved for summary judgment against all of plaintiffs' claims, which — in addition to Section 17200 violations — included other state claims targeting the same business practices. The bank also moved for decertification of both classes (Dkt. Nos. 176, 199, 200). In a trio of orders, these motions were granted in part and denied in part (Dkt. Nos. 245–47). Most significantly, the "including and deleting" class was decertified (Dkt. No. 245). The last vestiges of plaintiffs' "including and deleting" claims were then abandoned at trial (Tr. 965–66).

---

[1] This "including and deleting" practice involved the inclusion and deletion of pending debit-card transactions in the calculation of a customer's available balance.

2

United States District Court

For the Northern District of California

EXHIBIT 19
Page 002

1    The "resequencing" class, however, survived for trial.  This class was defined as (Dkt. No.

2    98):

3    [A]ll Wells Fargo customers from November 15, 2004 to June 30,
     2008, who incurred overdraft fees on debit card transactions as a
4    result of the bank's practice of sequencing transactions from
     highest to lowest.
5

6    Plaintiffs were allowed to conduct a new restitution study covering Wells Fargo transaction data

7    for the entire "resequencing" class period.  Following the completion of this study, Wells Fargo

8    again moved for summary judgment and class decertification (Dkt. No. 292).  These motions

9    were denied.

10    The instant order follows a two-week bench trial that commenced on Monday, April 26,

11    2010, and concluded on Friday, May 7.  Following the close of evidence, both sides submitted

12    lengthy proposed findings of fact and conclusions of law, followed by responses (Dkt. Nos.

13    452–55).  The undersigned also denied without prejudice a motion for judgment on partial

14    findings submitted by Wells Fargo during trial and allowed the bank to reargue its points in its

15    proposed findings of fact (Dkt. Nos. 417, 446).  Closing arguments were heard on the morning of

16    July 9.

17    Rather than merely vet each and every finding and conclusion proposed by the parties, this

18    order has navigated its own course through the evidence and arguments, although many of the

19    proposals have found their way into this order.  Any proposal that has been expressly agreed to by

20    the opposing side, however, shall be deemed adopted (to the extent agreed upon) even if not

21    expressly adopted herein.  It is unnecessary for this order to cite the record for all of the findings

22    herein.  Citations will only be provided as to particulars that may assist the court of appeals.  In

23    the findings, the phrase "this order finds . . . " is occasionally used to emphasize a point.  The

24    absence of this phrase, however, does not mean (and should not be construed to mean) that a

25    statement is not a finding.  All declarative statements set forth in the findings of fact are factual

26    findings.

27

28

United States District Court
For the Northern District of California

3

EXHIBIT 19
Page 003

**FINDINGS OF FACT**

1.  The core of this controversy is a bookkeeping device adopted by the bank called "high-to-low resequencing" that transforms one overdraft into as many as ten overdrafts — ten being the voluntary limit the bank imposed on what could otherwise be an almost limitless prospect. The bank instituted this device for California accounts in April 2001 and then soon magnified its impact through closely allied practices. What now follows is an explanation of the bookkeeping device and how it changed overdrafting at Wells Fargo.

**LOW-TO-HIGH vs. HIGH-TO-LOW**

2.  "Posting" is the procedure followed by all banks to process debit items presented for payment against accounts. During the wee hours after midnight, the posting process takes all debit items presented for payment during the preceding business day and subtracts them from the account balance. These items will typically be debit-card transactions and checks (plus a few other occasional items described below). If the account balance is sufficient to cover all such debit items, there will be no overdrafts regardless of the bookkeeping method used. If, however, the account balance is insufficient to cover all such debit items, then the account will be overdrawn. When an account is overdrawn, the posting sequence can have a dramatic effect on the *number* of overdrafts incurred by the account (even though the total overdraw will be exactly the same). In turn, the *number* of overdrafts drives the *number* of overdraft fees.

3.  Prior to April 2001, Wells Fargo used a low-to-high posting order, as did most banks (then and now). Low-to-high posting meant that the bank posted settlement items from lowest-to-highest dollar amount. Low-to-high posting paid as many items as the account balance could possibly cover and thus *minimized* the number of overdrafts. This was because the smallest purchases were always deducted from the customer's checking account first and the balance was used up as slowly as possible.

4.  This changed in April 2001. Then, Wells Fargo did an about-face in California and began posting debit-card purchases in highest-to-lowest order. The reversal of the bank's previous low-to-high posting order had the immediate effect of *maximizing* the number of overdraft fees imposed on customers. This was exactly the reason that the bank made the switch.

4

EXHIBIT 19
Page 004

United States District Court

For the Northern District of California

United States District Court
For the Northern District of California

5.      To illustrate, assume that a customer has $100 in his account and uses his debit card to buy ten small items totaling $99 followed by one large item for $100, all of which are presented to the bank for payment on the same business day.  Using a low-to-high posting order, there would be only be one overdraft — the one triggered by the $100 purchase.  Using high-to-low resequencing, however, there would be *ten* overdrafts — because the largest $100 item would be posted first and thus would use up the balance as quickly as possible.  Scenarios very much like this happened to plaintiffs Veronica Gutierrez and Erin Walker, as will be shown momentarily.

### COMMINGLING

6.      The switch in April 2001 to high-to-low posting in California was followed by two closely allied practices, both intentionally "engineered" — to use the bank's own term at the time — to amplify the overdraft-multiplying effect of high-to-low ordering:  (1) a switch to commingling of debit-card purchases with checks and automated clearing house ("ACH") transactions in December 2001, and (2) the deployment of a secret "shadow line" in May 2002 to authorize debit-card purchases into overdrafts.[2]

7.      Regarding commingling, before December 2001, all debit-card purchases were posted prior to checks, and all checks were posted prior to ACH transactions.  While transactions for each transaction type were already being resequenced in high-to-low order (since April 2001), the different transaction types were posted separately.

8.      In December 2001, however, Wells Fargo began commingling debit-card purchases, checks, and ACH transactions together and posting the entire group from highest-to-lowest dollar amount.  This amplified the overdraft-multiplying effect of high-to-low posting.  Checks and ACH transactions — which tended to be the larger items — now consumed the account balance even faster than if all debit-card transactions had been deducted first (debit-card purchases typically being smaller).

---

[2] ACH transactions typically include mortgage payments, car payments, or other monthly payments (*e.g.*, recurring bills) that a Wells Fargo customer can authorize in advance.

5

EXHIBIT 19
Page 005

United States District Court
For the Northern District of California

9.      For the commingling change, the "before and after" looked like this (high-to-low posting having already been instituted in April 2001):



**Before**

| 1. Debit-card purchases posted in high-to-low order | → | 2. Checks posted in high-to-low order | → | 3. ACH transactions posted in high-to-low order |

**After**

| 1. Debit-card purchases, written checks, and ACH transactions commingled together | → | 2. All commingled transactions posted in high-to-low order |

### THE SHADOW LINE

10.     The last step in the three-step plan was executed in May 2002. Wells Fargo implemented a practice involving a secret bank program called "the shadow line." Before, the bank declined debit-card purchases when the account's available balance was insufficient to cover the purchase amount. After, the bank authorized transactions into overdrafts, but did so with no warning that an overdraft was in progress. Specifically, this was done without any notification to the customer standing at the checkout stand that the charge would be an overdraft and result in an overdraft fee. Thus, a customer purchasing a two-dollar coffee would unwittingly incur a $30-plus overdraft fee. (This very scenario happened to plaintiff Walker.) Internally, Wells Fargo called this its "shadow line," as in shadow "line of credit." The amount of the credit ceiling per customer was and still is kept secret. Again, customers were not even alerted when shadow-line extensions were made to them — until it was too late and many overdraft fees were racked up. In this program, the bank correctly expected that it would make more money in overdraft fees than it would ever lose due to "uncollectibles" (*i.e.*, overdrafts that were never paid back).

6

EXHIBIT 19
Page 006

United States District Court

For the Northern District of California

### CLASS REPRESENTATIVE VERONICA GUTIERREZ

11.    Ms. Gutierrez opened a checking account and a savings account at the Rancho Cucamonga branch of Wells Fargo in San Bernadino County on October 25, 2002.  She was eighteen at the time.

12.    Ms. Gutierrez had never held a bank account in her own name prior to opening these two accounts.  She had also never used a debit or ATM card.  This was her first real banking experience.

13.    A Wells Fargo customer service representative ("CSR") assisted Ms. Gutierrez in opening her checking and savings accounts.  The CSR provided Ms. Gutierrez with various Wells Fargo documents during this process.

14.    One such document given to Ms. Gutierrez was a Wells Fargo brochure entitled "Checking, Savings and More" (TX 89).  Certain portions of this brochure were shown to Ms. Gutierrez by the CSR, including sections highlighting the features of "Student Checking," "Wells Fargo Advantage Checking," and "Wells Fargo Cards" (Tr. 373–76).  The CSR highlighted these sections after asking Ms. Gutierrez what kind of account she was interested in opening and learning that Ms. Gutierrez was going to be a college student.

15.    With respect to the "Wells Fargo Cards" section of the brochure, Ms. Gutierrez reviewed the subsections entitled "overdraft protection," "ATM card," "ATM & Check Card," and "Visa Credit Cards" while at the branch (*id.* at 374–76).

16.    Wells Fargo refers to its debit cards as "check cards" in all of its marketing literature.  The difference between the two terms is purely branding.  In all relevant respects, a debit card is the same as a check card.

17.    The "ATM & Check Card" subsection of the brochure included the following statements regarding Wells Fargo debit cards (TX 89) (emphasis added):

> All the features of the ATM card, plus:
>
> •    Make purchases at over 19 million MasterCard merchants worldwide.
>
> •    Purchase amounts are *automatically deducted* from your primary checking account.

7

EXHIBIT 19

Page 007

18.    After reviewing the "Wells Fargo Cards" section of the brochure, Ms. Gutierrez asked the CSR for guidance about how to use an ATM and debit card (Tr. 381). The CSR told Ms. Gutierrez that a debit card could be used in any store where a MasterCard logo was shown (the bank has since switched to VISA-based debit cards). The CSR then assisted Ms. Gutierrez in setting up a PIN number to use for ATM transactions.

19.    The CSR also mentioned to Ms. Gutierrez that she would have overdraft protection through the savings account she was opening. Ms. Gutierrez was not informed by the CSR, however, as to what "having overdraft protection" meant (Tr. 376). She had no idea at the time.

20.    Ms. Gutierrez was also provided with a Wells Fargo "Welcome Jacket" while opening these accounts (*id.* at 377; TX 86). The front of the Welcome Jacket stated "Welcome to Wells Fargo" and "Thank You for Opening Your Account With Us." Inside the Welcome Jacket was a pocket to hold additional materials.

21.    The Welcome Jacket provided to Ms. Gutierrez contained a copy of Wells Fargo's then-current Consumer Account Agreement ("CAA"), effective April 1, 2002 (TX 13). The CAA was 69 pages in length and was densely packed with single-spaced text in ten-point font.

22.    The CSR did not go through any of the 69 pages of content in the CAA with Ms. Gutierrez when her accounts were opened at the branch (Tr. 380). The CSR also failed to inform Ms. Gutierrez about the bank's resequencing practices, including the order in which debit-card purchases would be posted against her checking account (*ibid.*).

23.    Also included in the Welcome Jacket given to Ms. Gutierrez was a copy of Wells Fargo's then-current Consumer Account Fee and Information Schedule (*id.* at 379; TX 14). This document, which included 37 pages of densely packed text in ten-point font, detailed the amount charged by Wells Fargo for various types of account-related fees, including overdraft and returned-item (*e.g.*, bounced check) fees.

24.    Ms. Gutierrez only briefly flipped through the hundred-plus pages of text in the CAA and Consumer Account Fee and Information Schedule while at the branch (Tr. 380).

25.    Finally, before leaving the branch, Ms. Gutierrez signed at least one Wells Fargo document and received a printout of the deposits she had made to open her accounts (*id.* at

8

EXHIBIT 19
Page 008

376–78).  By the end of the process, Ms. Gutierrez had acquired a Wells Fargo checking account, savings account, and an ATM and debit card (hereinafter simply referred to as a debit card).  She also applied for a Wells Fargo student VISA credit card.

26.     Ms. Gutierrez received her debit card in the mail sometime after opening her checking and savings accounts (*id.* at 381–82).  She also signed up for Wells Fargo's "online banking" service, which allows customers to view their available balance and account statements over the internet (*ibid.*).

27.     Using her Wells Fargo checking account, Ms. Gutierrez paid for school books, gas, bills, and recreation (*id.* at 383).  For the first few years, to keep track of her balance, she would use a check register.  Ms. Gutierrez would also keep copies of receipts from purchases and carbon copies of checks to compare them with Wells Fargo monthly account statements.  She did this to be "absolute[ly] sure that extra purchases were not being made on [her] account, without [her] knowing" (*id.* at 383–85).

28.     After a few years, however, Ms. Gutierrez stopped using a check register.  She also stopped verifying receipts against her account statements.  This was because of "inconsistencies" between what Wells Fargo was reporting to her regarding her account balance and what she was "keeping track of, personally" (*id.* at 385).  Instead, Ms. Gutierrez began relying on Wells Fargo's online banking information and toll-free customer service phone numbers to obtain her available balance and to check which transactions had been posted to her account (*ibid.*).

29.     On Thursday, October 5, 2006, Ms. Gutierrez walked into a Subway sandwich shop.  She spent $11.27 and used her Wells Fargo debit card to pay for the meal (TX 1).  That same day, she made three purchases at AutoZone, an auto-parts store where she was then employed (Tr. 395–96).  The three purchases were for $47.99, $17.23, and $3.23 (TX 1).

30.     For whatever reason, Ms. Gutierrez returned one of the three AutoZone purchases — specifically, the purchase in the amount of $17.23.  The return was made on the same day as the purchase (*ibid.*).

31.     The next day, Friday, October 6, Ms. Gutierrez went to an IHOP restaurant.  She used her Wells Fargo debit card to pay for her meal, totaling $26.51.  Ms. Gutierrez also went to a

9

EXHIBIT 19
Page 009

hamburger house that same day called Farmer Boys and purchased a meal with her debit card totaling $8.10. Finally, that evening, Ms. Gutierrez used her Wells Fargo debit card at a Bank of America ATM at the Hollywood Bowl to withdraw $22.00 from her Wells Fargo checking account (*ibid.*). Since a non-proprietary ATM was used, Ms. Gutierrez was charged a two-dollar transaction fee by Wells Fargo.[3]

32.     That weekend, Ms. Gutierrez went to an Albertsons supermarket and spent $74.39. She used her Wells Fargo debit card to complete the purchase (*ibid.*).

33.     Finally, on Tuesday, October 10, Ms. Gutierrez used Wells Fargo's online banking service to initiate and complete an "online transfer" of $80.00 from her Wells Fargo checking account to the checking account of a family member (*ibid.*; Tr. 400). That same day, a check written by Ms. Gutierrez in the amount of $65.00 was presented to the bank for payment (TX 449).

These transactions are shown as follows:

| Thurs. Oct. 5 | Fri. Oct. 6 | Weekend Oct. 7–8 | Tues. Oct. 10 |
|---|---|---|---|
| $11.27 Subway<br>$47.99 Autozone<br>$17.23 Autozone<br>$3.23 Autozone<br><br>($17.23) return of Autozone purchase | $26.51 IHOP<br>$8.10 Farmer Boys<br>$22.00 ATM cash withdrawal<br>$2.00 fee for non-Wells Fargo ATM | $74.39 Albertsons | $80.00 online transfer of funds to family member<br><br>$65.00 check presented to Wells Fargo for payment |

34.     None of the debit-card purchases was declined or otherwise rejected by Wells Fargo. In fact, all were allowed by the bank. There were no indications given to Ms. Gutierrez by Wells Fargo that any of her purchases, withdrawals, or transfers had been made against insufficient funds or would result in overdraft fees being assessed.

35.     The very next day, on Wednesday, October 11, Wells Fargo assessed $88 in overdraft fees against Ms. Gutierrez's checking account (TX 1, 2). These fees were triggered by

---

[3]  The two-dollar fee charged by Wells Fargo was in addition to a two-dollar fee charged by Bank of America, the bank that operated the ATM. This is why Ms. Gutierrez's withdrawal amount was $22.00 rather than $20.00 — Bank of America automatically added its two-dollar fee to the withdrawal amount.

10

EXHIBIT 19
Page 010

United States District Court

For the Northern District of California

1  four overdrafts caused by the two smallest AutoZone purchases made by Ms. Gutierrez on

2  October 5, her Subway purchase made on October 5, and her Farmer Boys purchase made on

3  October 6.  Each overdraft carried a penalty of $22.  (The overdraft fee today is $35.)

4          36.      The four debit-card purchases that triggered overdraft fees were among twelve

5  transactions that posted against Ms. Gutierrez's checking account after the close of business day

6  on Tuesday, October 10 (TX 1).  These transactions are listed below in the exact order that they

7  were posted against her checking account (*ibid.*).  Amounts that were debited from her account

8  are represented below in parentheses.  According to Ms. Gutierrez's account statement, her

9  checking account balance prior to the posting of these transactions was $316.90 (*ibid.*).

| | Transaction Description | Amount | Balance |
|---|---|---|---|
| 1. | Return of debit-card purchase made on 10/5/2006 at AutoZone | $17.23 | $334.13 |
| 2. | Online transfer of funds to another account | ($80.00) | $254.13 |
| 3. | ATM withdrawal on 10/6/2006 at a non-Wells Fargo ATM | ($22.00) | $232.13 |
| 4. | Non-Wells Fargo ATM fee | ($2.00) | $230.13 |
| 5. | Debit-card purchase made on 10/7/2006 at Albertsons supermarket | ($74.39) | $155.74 |
| 6. | Check #1103 | ($65.00) | $90.74 |
| 7. | Debit-card purchase made on 10/5/2006 at AutoZone | ($47.99) | $42.75 |
| 8. | Debit-card purchase made on 10/6/2006 at IHOP restaurant | ($26.51) | $16.24 |
| 9. | Debit-card purchase made on 10/5/2006 at AutoZone | ($17.23) | -$0.99 ** |
| 10. | Debit-card purchase made on 10/5/2006 at Subway restaurant | ($11.27) | -$12.26 ** |
| 11. | Debit-card purchase made on 10/6/2006 at Farmer Boys restaurant | ($8.10) | -$20.36 ** |
| 12. | Debit-card purchase made on 10/5/2006 at AutoZone | ($3.23) | -$23.59 ** |

** $22 overdraft fee assessed.

*United States District Court*
For the Northern District of California

11

EXHIBIT 19
Page 011

37.     The transactions were posted by Wells Fargo in the following order:  *First*, all credits were posted to Ms. Gutierrez's checking account.  This is why the returned AutoZone purchase was the first of the twelve items to post.  *Second*, transactions representing cash withdrawals (or their equivalent) were posted from highest-to-lowest dollar amount.  The online transfer of funds, ATM withdrawal, and associated two-dollar transaction fee were part of this "priority posting" group (as called by the bank).  *Third*, and most significantly, debit-card transactions, checks, and ACH transactions were commingled together and posted from highest-to-lowest dollar amount.  The parties agree that this is how Wells Fargo posted transactions during the class period (Dkt. No. 448).

38.     The adverse impact of Wells Fargo's high-to-low bookkeeping switch is clearly shown by these transactions.  If the last eight transactions had been posted by Wells Fargo from lowest-to-highest dollar amount, only *one* of the debit-card purchases — the $74.39 purchase at Albertsons supermarket — would have been an overdraft.  Thus, only *one* overdraft fee ($22), as opposed to *four* overdraft fees ($88), would have been assessed.

39.     The adverse impact of commingling is also well illustrated.  Assuming that debit-card transactions were posted in high-to-low order, if Wells Fargo had simply posted the $65 check *after* all of the debit-card transactions — as was its practice prior to commingling — only *one* overdraft fee ($22) as opposed to *four* overdraft fees ($88) would have been assessed.[4] This clearly illustrates the adverse impact that the commingling decision had on customers like Ms. Gutierrez, as well as the integral role that commingling had in enhancing the bank's high-to-low bookkeeping play.

40.     Finally, if Wells Fargo had posted Ms. Gutierrez's debit-card transactions in chronological order (or as close to chronological order as possible), the $74.39 purchase at Albertsons supermarket — which was made on October 7 — would have been posted last.  Under this scenario, only *one* overdraft fee ($22), as opposed to *four* overdraft fees ($88), would have been assessed.

---

[4]  Even if the check was returned unpaid, only one "returned item fee" would have been assessed.

12

United States District Court
For the Northern District of California

EXHIBIT 19
Page 012

United States District Court
For the Northern District of California

41.    At trial, Wells Fargo noted that it had instituted a one-dollar "overdraft courtesy threshold" during the class period (Tr. 356).  It is clear — when examining Ms. Gutierrez's account statement — that this minuscule threshold was not in place when she incurred these overdrafts (TX 1).

42.    With a one-dollar courtesy threshold, a checking-account holder is allowed to overdraw his or her account up to the one-dollar threshold amount before the account is considered "overdrafted" and a fee is assessed.  At an unknown date during the class period, this threshold increased from zero to one dollar (Tr. 356).  The fact that Ms. Gutierrez was assessed a $22 overdraft fee for overdrafting her account by $0.99 shows that the one-dollar courtesy threshold had not yet been instituted.  Despite being touted by the bank, it provided no benefit to her.

43.    Ms. Gutierrez first learned about these four overdraft fees via an insufficient-funds notice sent by Wells Fargo using regular "snail mail" (TX 2).  While it is unclear when Ms. Gutierrez actually received the notice, it is likely that she did not receive it until a few days after the fees had been assessed.  The notice informed Ms. Gutierrez that the last four debit-card purchases listed above had been presented to Wells Fargo for payment on October 10 and were paid into overdraft.  It also informed Ms. Gutierrez that $88 in fees had been imposed on her.

44.    The notice further instructed Ms. Gutierrez to deposit $111.59 into her checking account to cover the items paid into overdraft and their corresponding fees.  Thus, despite overdrafting her checking account by only $23.59, Ms. Gutierrez was required to pay $111.59 to Wells Fargo to return her account to a zero balance.

45.    The high-to-low bookkeeping devices employed by Wells Fargo caused Ms. Gutierrez to be assessed four overdraft fees ($88) rather than one overdraft fee ($22) *for exactly the same conduct*.  These manipulations mathematically ensured that the larger items would consume her balance faster, thereby allowing Wells Fargo to impose more overdraft fees.

46.    When she received the insufficient-funds notice, Ms. Gutierrez had no understanding of what the $88 fee meant, or how the amount had been calculated (Tr. 388).  Ms. Gutierrez also did not understand how overdraft fees could be assessed if a debit-card

13

EXHIBIT 19
Page 013

United States District Court

For the Northern District of California

1  purchase was "approved" by Wells Fargo while making purchases at a store or restaurant. She

2  had not been adequately apprised of the shadow-line extension.

3       47.    With respect to the posting of debit-card purchases against her checking account,

4  Ms. Gutierrez did not know "how the system worked" but simply assumed that when her Wells

5  Fargo debit card was swiped when making a purchase, it would be deducted "automatically" from

6  her account as Wells Fargo marketing literature had indicated (*id.* at 386).

7       48.    Over the next two days, October 12 and 13, two additional overdraft fees were

8  assessed on Ms. Gutierrez by Wells Fargo (TX 1). The fee imposed on October 12 was caused by

9  a debit-card purchase of $5.68 made by Ms. Gutierrez on October 9 at a Jack in the Box

10  restaurant. The fee on October 13 was caused by a debit-card purchase of $20.01 made by

11  Ms. Gutierrez on October 10 at an ExxonMobil gas station. Unlike the prior overdraft fees,

12  however, the October 13 overdraft fee was $33 (rather than $22) — a result of Wells Fargo's

13  two-tiered fee schedule that imposed harsher fees on account holders who had overdrafted their

14  accounts on multiple occasions within a twelve-month period.

15       49.    To sum up the damage, by October 13, Ms. Gutierrez had overdrafted her account

16  by only $49.28. Due to the multiplication of overdraft penalties, however, she was required to

17  deposit almost four times that amount — $192.28 — into her checking account to return it to a

18  zero balance (TX 4). Stated differently, three-fourths (in round terms) of her $192.28 checking-

19  account deficit consisted of Wells Fargo overdraft penalties.

20       50.    Had the bank not commingled Ms. Gutierrez's debit-card purchases with her

21  checks, she would have only had to pay $126.28 (rather than $192.28) to return her checking

22  account balance to zero. Similarly, if Ms. Gutierrez's transactions had been posted in low-to-high

23  order or chronologically, she would have only had to pay $126.28 to return her checking account

24  to a zero balance.

25       51.    Ms. Gutierrez received a payroll payment via direct deposit from her employer,

26  AutoZone, on October 13. The deposit, which went straight into her Wells Fargo checking

27  account that evening, was in the amount of $412.90. While this returned Ms. Gutierrez's

28

14

EXHIBIT 19
Page 014

United States District Court

For the Northern District of California

checking account to a positive balance, over a third of this payroll payment went directly into Wells Fargo's pockets to cover the overdraft penalties (TX 1).

52.    While the high-to-low bookkeeping device did not directly affect the overdraft fees incurred by Ms. Gutierrez on October 12 and 13 (since her account was already overdrafted on those days), it catapulted her into a higher overdraft bracket and upped her per-occurrence fee. Moreover, as stated, the high-to-low posting of Ms. Gutierrez's debit-card purchases dramatically increased the rate at which her balance was consumed, thereby multiplying the number of overdraft penalties she incurred on October 11.

53.    Given the costs of Ms. Gutierrez's college education and her limited income at the time, $143 in overdraft fees was a significant amount of money for her to have to pay in overdraft penalties (Tr. 405).  Ms. Gutierrez would *not* have made the four purchases that resulted in overdraft fees if she had been advised or warned that each purchase — some as small as $3.23 — would be covered by a secret shadow line of credit and assessed a $22 or $33 overdraft fee (*id.* at 403–05).

54.    Ms. Gutierrez did not benefit in any way, shape, or form from Wells Fargo's high-to-low bookkeeping device.

55.    After receiving these fees, Ms. Gutierrez decided not to depend on the available balance information Wells Fargo communicated to her online and over the phone (*id.* at 406). Instead, she had to "sort of trick [her] brain" to remind herself that she had less money in her checking account than the bank had been communicating to her.

56.    Even after receiving and reviewing her Wells Fargo account statement for the period covering the transactions discussed above, Ms. Gutierrez could *still* not decipher the process or order in which the various transactions were posted to her checking account and how her debit-card purchases could lead to multiple overdraft fees.  The Court has studied her account statements and finds that it was impossible for her or anyone else to reconstruct how the bank came up with its number of overdrafts.

57.    Even if Ms. Gutierrez had meticulously maintained a chronological check register of all of her transactions (as Wells Fargo insists that she and other customers should), it could not

15

EXHIBIT 19

Page 015

United States District Court

For the Northern District of California

1    have accurately reflected or predicted how the bank would have posted transactions.  Stated

2    differently, Ms. Gutierrez had no reason to know that Wells Fargo would resequence her

3    debit-card transactions in a way that would maximize the number of overdraft fees it could assess

4    on her.  She would *not* have known that she was at risk of incurring *four* overdraft fees on

5    October 10.  This is significant, for over and again at trial, bank counsel and bank witnesses

6    waxed eloquent about the virtues of keeping a check register.  In reality, the most exacting

7    register would not have told Ms. Gutierrez that she would be hit with four rather than one

8    overdraft fee.

9        58.    Despite being new to banking, Ms. Gutierrez understood the importance of

10    managing her checking account and not spending more than she had.  She acknowledged that she

11    made a mistake by overdrafting her account.  She did *not*, however, expect or believe it was fair

12    for Wells Fargo to capitalize upon her mistake by artificially resequencing her debit-card

13    transactions to maximize fee revenue for the bank.

14        59.    Ms. Gutierrez was harmed by this practice.  She was deceived by the bank's

15    obfuscation of its practice regarding high-to-low posting and the risk that one overdraft could be

16    transformed into as many as ten overdrafts.  She also relied upon the bank's misleading marketing

17    materials that reinforced her natural assumption that debit-card transactions would post

18    chronologically.

19        60.    Ms. Gutierrez's testimony in support of these findings was and remains

20    imminently credible.

21                    CLASS MEMBER ERIN WALKER

22        61.    Erin Walker, a member of the "resequencing class," suffered a similar piling-on

23    encounter.  Ms. Walker opened a checking account and a savings account in July 2006 at a Wells

24    Fargo branch in Culver City.  Like Ms. Gutierrez, she was around eighteen at the time she opened

25    these accounts and this was her first real banking experience.

26        62.    Ms. Walker chose Wells Fargo because she had seen its ATMs throughout the

27    campus of Arizona State University, where she was about to start school.

28

16

EXHIBIT 19
Page 016

United States District Court

For the Northern District of California

63.     The Wells Fargo CSR who assisted Ms. Walker in opening her accounts provided her with a Wells Fargo "Welcome Jacket" (Tr. 756–57; TX 18, 84).  Ms. Walker did not read the Welcome Jacket while at the branch, but read it at home (Tr. 757–58).  In particular, Ms. Walker read the same portion of the Welcome Jacket pertaining to debit cards that Ms. Gutierrez read, which stated that "[e]ach purchase is automatically deducted from your primary checking account" (TX 84).

64.     Ms. Walker did not recall receiving a Wells Fargo CAA at the time she opened her account.  She also did not recall if her Welcome Jacket contained a copy of a CAA (Tr. 758).  This order finds, however, that it was Wells Fargo's customary business practice to provide CAAs to its customers when they opened a new account, and that in all likelihood, Ms. Walker *did* receive a copy of the CAA (*id.* at 275).  In any event, she did not read through Wells Fargo's CAA and was unaware of its contents when she opened her accounts.  She had no knowledge or understanding of how transactions would be posted against her checking account (*id.* at 768).  No one at the bank had explained it to her.

65.     During the account-opening process, Ms. Walker signed up for overdraft protection and to receive a Wells Fargo debit card.  The debit card arrived in the mail sometime thereafter.  While she was at the Wells Fargo branch, the CSR did *not* instruct Ms. Walker about how to use her debit card (*id.* at 759).  Nevertheless, Ms. Walker ended up using her debit card more often than checks to make purchases (*id.* at 759–60).

66.     Like Ms. Gutierrez, Ms. Walker also signed up for Wells Fargo's online banking services after opening her accounts.  She used this service periodically to check her available balance online (*id.* at 760).

67.     On Tuesday, May 29, 2007, Ms. Walker made a $9.66 purchase at Jackson Market in Culver City using her Wells Fargo debit card (TX 21).  Two days later, on Thursday, May 31, she used the same debit card to purchase $10.92 of merchandise at a store called Essence of Nature in Los Angeles.

68.     The following day, Friday, June 1, Ms. Walker purchased $20.27 worth of gasoline from a Shell gas station using her Wells Fargo debit card (*ibid.*).  That same day, Ms. Walker

17

EXHIBIT 19
Page 017

purchased food items at a restaurant called Sandbags and at Jamba Juice, an establishment that serves smoothies. The purchase at Sandbags totaled $7.52 while the Jamba Juice purchase totaled $4.00. Both purchases were made using her Wells Fargo debit card.

69.     Finally, on Saturday, June 2, Ms. Walker went to an ARCO gas station and spent $20.61 using her Wells Fargo debit card. That same day, she also went to two coffee shops — Starbucks and The Coffee Bean & Tea Leaf — and spent $5.55 and $4.10, respectively, using her Wells Fargo debit card.

These transactions are shown as follows:

| $9.66 Jackson Market | $10.92 Essence of Nature | $20.27 Shell gas station<br>$7.52 Sandbags<br>$4.00 Jamba Juice | $20.61 ARCO gas station<br>$5.55 Starbucks<br>$4.10 The Coffee Bean |
|---|---|---|---|
| **Tues. May 29** | **Thurs. May 31** | **Fri. June 1** | **Sat. June 2** |

70.     Ms. Walker completed each of these debit-card purchases without any indication from the bank that she lacked sufficient available funds to cover them. At no time did Wells Fargo warn her that she was overdrawn or that any one of these purchases could trigger an avalanche of overdraft penalties from earlier purchases she had already made. Instead, Wells Fargo allowed each transaction to go through with nary a warning.

71.     On Tuesday, June 5, Wells Fargo assessed *eight* overdraft fees against Ms. Walker's checking account. The amount of each fee was $34. In total, Ms. Walker was assessed $272 in overdraft fees.

72.     The eight debit-card purchases were posted in high-to-low order against her account (TX 21). Commingled with these debit-card purchases was a check Ms. Walker had written in the amount of $8.47. This check was presented for payment on June 4.

73.     During the posting of these nine transactions, a transfer of funds from Ms. Walker's savings account to her checking account was made in the amount of $3.72 (*ibid.*). This automated transfer was triggered by Wells Fargo's overdraft-protection service when the

United States District Court

For the Northern District of California

18

EXHIBIT 19
Page 018

first of eight overdraft items was posted.[5]  The $3.72 transfer, however, was not large enough to cover the overdraft amount, resulting in an overdraft fee.  Since Ms. Walker only had $3.72 in her savings account at the time, that was the most that Wells Fargo could transfer into her checking account.

74.   The balance of Ms. Walker's checking account before any of these transactions were posted was $36.41.  Shown below is an illustration of how the eight debit-card purchases, the written check, and the overdraft-protection transfer posted against her checking account after the close of business day on June 4.  As before, items that were debited are represented in parentheses.

|  | Transaction Description | Amount | Balance |
|---|---|---|---|
| 1. | PIN-based debit-card purchase on 6/2/2007 at ARCO gas station | ($20.61) | $15.80 |
| 2. | Debit-card purchase on 6/1/2007 at Shell gas station | ($20.27) | -$4.47 ** |
| 3. | Overdraft protection transfer from Ms. Walker's savings account | $3.72 | -$0.75 |
| 4. | Debit-card purchase on 5/31/2007 at Essence of Nature | ($10.92) | -$11.67 ** |
| 5. | Debit-card purchase on 5/29/2007 at Jackson Market | ($9.66) | -$21.33 ** |
| 6. | Check #104 presented for payment on 6/4/2007 | ($8.79) | -$30.12 ** |
| 7. | Debit-card purchase on 6/1/2007 at Sandbags restaurant | ($7.52) | -$37.64 ** |
| 8. | Debit-card purchase on 6/2/2007 at Starbucks | ($5.55) | -$43.19 ** |
| 9. | Debit-card purchase on 6/2/2007 at The Coffee Bean & Tea Leaf | ($4.10) | -$47.29 ** |
| 10. | Debit-card purchase on 6/1/2007 at Jamba Juice | ($4.00) | -$51.29 ** |

** $34 overdraft fee assessed.

---

[5]  It is possible that the overdraft-protection transfer was made after all of the debit-card and check transactions had posted.  The record is unclear on *when* overdraft-protection transfers were processed during batch posting.  In any event, it does not affect this analysis.

19

United States District Court
For the Northern District of California

EXHIBIT 19
Page 019

United States District Court
For the Northern District of California

75.     As shown, by commingling the eight debit-card purchases with the written check and posting them in high-to-low order, Ms. Walker's available balance was depleted to a negative balance using the least number of transactions possible, allowing the maximum number of overdraft fees to be assessed.

76.     Taking into account the availability of $3.72 in overdraft protection funds, if Wells Fargo posted these same transactions in low-to-high order, only *three* overdraft fees ($101) rather than *eight* overdraft fees ($274) would have been assessed on Ms. Walker on June 5 — a difference of $173.  This again illustrates how a high-to-low ordering dramatically increases the number of overdraft items *for exactly the same conduct*.

77.     Similarly, if all debit-card transactions had been posted from low-to-high *before* the written check, as Wells Fargo used to do in California prior to April 2001, only *four* overdraft fees would have been assessed (or, alternatively, the check would have been returned, resulting in a $34 non-sufficient funds fee) (TX 353).

78.     Finally, if the transactions had been posted in chronological order (or as close to chronological order as possible), Ms. Walker would have been assessed between five and seven overdraft fees, depending upon where the check was posted relative to the debit-card purchases and the time-stamp information for the June 1 purchases.[6]  In either scenario, the fees would have been less than under a high-to-low ordering.

79.     Ms. Walker did not learn that she had been assessed hundreds of dollars in overdraft fees until a few days after the eight fees had been assessed.  She found out by using Wells Fargo's online banking services, although insufficient funds notices had been mailed to her mother's address — the address of record on her account — by the bank (Tr. 762–63, 801–02).

80.     By that time, a number of additional debit-card purchases had triggered more overdraft fees to be assessed.  For example, a $6.60 purchase at The Coffee Bean & Tea Leaf on

---

[6]  Wells Fargo stored the date and time data for approximately 84 percent of debit-card purchases for class members during the class period (nearly 84 percent) (Tr. 879–80).  It did not store timestamp information for the remaining 16 percent of debit-card transactions.  Based upon this timestamp information, the bank could chronologically order most debit-card purchases in the order transacted.  The record, however, does not contain time-stamp data for Ms. Walker's June 1 purchases.  The order in which these purchases were made affects the number of overdraft fees that could have been assessed under chronological sequencing.

20

EXHIBIT 19
Page 020

United States District Court
For the Northern District of California

1   June 3 was posted after the close of business day on June 5.  That transaction triggered an

2   additional $34 overdraft fee to be assessed against Ms. Walker's checking account on June 6.

3          81.    Three other transactions, including an ATM withdrawal of $20, a $20.78

4   debit-card purchase of gasoline made on June 5 at an ARCO gas station, and a $4.69 debit-card

5   purchase made on June 4 at Coldstone Creamery (an ice cream parlor) posted to Ms. Walker's

6   checking account after the close of business day on June 6.  This caused three more $34 overdraft

7   fees to be assessed on June 7.  Additionally, Ms. Walker was assessed five dollars for a so-called

8   "Continuous OD Level 2 Charge" by Wells Fargo on June 7.  This charge was imposed due to

9   Ms. Walker's failure to pay off her negative balance within a certain number of days.

10         82.    By the end of day on June 7, Ms. Walker's checking account had reached a

11  negative balance of -$516.36.  Of this deficit, $413 were Wells Fargo overdraft fees (including

12  continuous overdraft fees).  In other words, despite overdrafting her account by one hundred

13  dollars, thanks to high-to-low resequencing and the shadow-line program, Ms. Walker was

14  required to pay Wells Fargo nearly five times that amount to return her checking account to a

15  zero balance.

16         83.    That same day, Ms. Walker made a purchase at a Starbucks coffee shop in the

17  amount of $5.60.  She used her Wells Fargo debit card to complete the purchase.  Despite being

18  overdrafted by hundreds of dollars at this point, Wells Fargo nevertheless approved the purchase

19  at the point-of-sale under its shadow line.  Ms. Walker was assessed an additional $34 overdraft

20  fee for this purchase on June 11.

21         84.    Finally, for a $10.34 debit-card purchase made by Ms. Walker on June 5 at

22  Jackson Market, she was assessed an additional $34 overdraft fee on June 12, again due to the

23  shadow line of credit.

24         85.    By June 14, Ms. Walker had been assessed six five-dollar continuous overdraft

25  fees and fourteen $34 overdraft fees by Wells Fargo.  This amounted to $506 in penalties for

26  overdrafting her checking account by approximately $120.

27         86.    While only a portion of these penalties can be directly tied to the bank's high-to-

28  low posting (since posting order will not change the number of overdrafts assessed once the

EXHIBIT 19
Page 021

United States District Court
For the Northern District of California

account is already overdrafted), high-to-low bookkeeping made it much more difficult for Ms. Walker to return her account to a positive balance. Stated differently, by enabling Wells Fargo to assess the maximum number of overdraft fees on June 5, high-to-low ordering and the shadow line made it much more likely that Ms. Walker's account would remain overdrafted for a longer time period.[7]

87. Ms. Walker was able to convince Wells Fargo — after calling the bank, meeting in-person with a Wells Fargo representative, and complaining about these fees — to reverse four overdraft fees and four continuous overdraft fees. She was still liable for $350 in penalties (TX 22). After repaying these fees, she closed her Wells Fargo checking and savings accounts (Tr. 784).

88. Like Ms. Gutierrez, Ms. Walker understood the importance of not spending more than she had in her checking account (*id.* at 788–89). Nevertheless, she acknowledged that she made a mistake and forgot to check her balance prior to making the above purchases (*id.* at 779). She neither understood nor expected, however, that her purchases would be deducted from her account in a way that would maximize her exposure to overdraft fees. She had no idea that all of her smallest purchases made at a Starbucks or The Coffee Bean would be posted last so as to allow Wells Fargo to charge her a $34 overdraft fee for each cup of coffee purchased.

89. Ms. Walker also did not understand how she could be assessed over $500 in overdraft-related fees for purchases that were "approved" at the point-of-sale, the majority of which were less than ten dollars in value.

90. Ms. Walker was harmed by Wells Fargo's unfair and deceptive business practices. Like Ms. Gutierrez, she was deceived by the bank's non-disclosures regarding high-to-low posting and the risk that one overdraft could be transformed into as many as ten overdrafts. She also reasonably relied upon the bank's misleading marketing materials reinforcing a customer's natural assumption that debit-card transactions would post chronologically.

---

[7] These findings aside, the amount of restitution ordered herein will be strictly limited to overdraft penalties caused by high-to-low posting. Restitution will not be awarded for any overdraft fees that would have been assessed regardless of the bank's posting order.

22

EXHIBIT 19
Page 022

**United States District Court**
For the Northern District of California

91.     Ms. Walker's testimony in support of these findings was and remains imminently credible.

### THE BATCH POSTING PROCESS

92.     All banks post transactions after the close of every business day. This occurs in the wee hours after midnight. During this process, transactions that were presented for settlement during the day are posted against the customer's checking account (Tr. 593–94). In recent years, this has become a computerized process.

93.     Wells Fargo calls its automated system HOGAN. The HOGAN deposit system does not exercise individualized discretion based upon the nature of a customer's transactions. Unlike only a few years ago when individualized discretion was sometimes exercised in a manual sort, Wells Fargo does not prioritize payments, for example, to the Internal Revenue Service versus payments to a wine shop. Rather, HOGAN is designed to sequence and post transactions in a pre-programmed order selected by the bank.

94.     When a credit transaction is "posted" during batch posting, the amount of the credit is added to the ledger (*i.e.*, actual) balance of the customer's checking account. Examples of credit transactions include a deposited check, a return of a debit-card purchase, a transfer of funds into a checking account from another source (*e.g.*, a savings account), and the direct deposit of payroll. This increases the balance, although a temporary hold is sometimes placed on deposited checks.

95.     When a debit transaction is "posted," the amount of the debit is deducted from the ledger balance of the customer's checking account. If the customer has sufficient funds in his or her checking account to cover a debit, it is simply posted to the customer's checking account and paid. No overdraft fee is assessed.

96.     All possible types of debit transactions are posted during batch processing, including debit-card transactions, traditional written checks, ACH transactions, cash withdrawals or transfers, cashiers-check purchases, and cashed checks (Tr. 604). As stated, debit-card purchases, checks, and ACH transactions are commingled together and posted in high-to-low order by Wells Fargo. Most banks, by contrast, still use the opposite low-to-high sequencing.

23

EXHIBIT 19
Page 023

97.    Once the funds in an account are consumed, further debits will be overdrafts. When the HOGAN deposit system at Wells Fargo is presented with a debit transaction for posting, two steps are performed: *First*, the system determines whether the transaction is a "must pay" item.  A "must pay" item means exactly that — the bank is obligated to pay it and cannot reject it, even if the customer lacks sufficient funds to cover it.  This is because the bank has already authorized the purchase and the merchant has relied on the authorization by letting the customer leave the store with merchandise.  Significantly, the vast majority of debit-card purchases are "must pay" items.  This is significant because it undercuts the bank's rationale presented at trial for high-to-low posting, as will soon be seen.

98.    *Second*, if the transaction is not a "must pay" item, the HOGAN system determines whether to pay the item or return it unpaid.  To make this decision, the HOGAN system first looks at the customer's balance.  If there are insufficient funds to cover the transaction, the HOGAN system then looks for overdraft-protection sources — *e.g.*, savings or credit-card accounts that are linked to the customer's primary checking account.

99.    If the customer has sufficient funds available through overdraft protection, Wells Fargo automatically transfers funds from the customer's savings account (or charges the customer's credit card) to cover the overdraft amount (Tr. 612–14).  A fee, however, is charged every time an overdraft-protection transfer is made (*id.* at 1147; TX 6, 347, 353, 355).  These overdraft-protection fees — though lower than overdraft fees — are also a profit center for the bank (Tr. 1368).

100.    Finally, if there are still not enough funds to cover the transaction, the HOGAN system looks to a hidden source of funds that the bank internally calls the "shadow line."  The bank computer performs a secret "risk assessment" — akin to a credit analysis — to determine whether the customer would be likely to repay the overdraft amount and corresponding fee if the item is honored (*id.* at 1564–65).  As stated, this hidden amount that the bank is willing to "spot the customer" is the customer's "shadow line" — as in shadow "line of credit."  If the bank decides, based upon the shadow line, to pay the item into overdraft, an overdraft fee is then

24

EXHIBIT 19
Page 024

United States District Court
For the Northern District of California

1    assessed.  If, however, the bank elects to return the item unpaid, a non-sufficient funds ("NSF")

2    fee is assessed.  During the class period, NSF fees were lower than overdraft fees.

3        101.    Importantly, during the class period, the same shadow line was employed *before*

4    the posting process to authorize debit-card transactions in the first place.  Put differently, rather

5    than declining debit-card purchases when the customer lacked sufficient funds (as the bank did

6    prior to May 2002), the bank approved such transactions with the shadow line without any

7    warning to the customer at the checkout counter that an overdraft was in the making.  Then, when

8    the debit-card purchase came in for settlement soon thereafter, one or more overdraft fees were

9    assessed.

10        **WELLS FARGO'S ACTUAL MOTIVE AND PURPOSE:  PROFITEERING**

11        102.    The trial record is most telling about the true reasons Wells Fargo adopted

12    high-to-low bookkeeping and the two allied practices — commingling and the shadow line —

13    described herein.  Internal bank memos and emails leave no doubt that, overdraft revenue being a

14    big profit center, the bank's dominant, indeed sole, motive was to maximize the number of

15    overdrafts and squeeze as much as possible out of what it called its "ODRI customers"

16    (overdraft/returned item) and particularly out of the four percent of ODRI customers it recognized

17    supplied a whopping 40 percent of its total overdraft and returned-item revenue.  This internal

18    history — which is laid bare in the bank's internal memos — is so at odds with the bank's theme

19    of "open and honest" communication and that "overdrafts must be discouraged" that the details

20    will be spread herein.

21        103.    Internal bank memos were presented at trial pertaining to a bank-wide strategic

22    plan called "Balance Sheet Engineering" — or "BSE" for short (*see, e.g.,* TX 36, 61).  The

23    documents and testimony surrounding the BSE plan provided clear evidence that the challenged

24    practices were implemented for no other purpose than to increase overdrafts and overdraft fee

25    revenue (Tr. 134–35, 237).

26        104.    Both the commingling of debit-card transactions with checks and ACH

27    transactions and the extension of the shadow line to debit-card purchases were part of Wells

28    Fargo's BSE plan.  The commingling change was deemed "BSE Phase 1" while the extension of

25

EXHIBIT 19
Page 025

the shadow line to point-of-sale (POS) debit-card purchases was deemed "BSE Phase 2a" (*ibid.*; TX 36, 61).

105.    The internal BSE memos show that both the commingling change and the adoption of the shadow-line program were intended to capitalize on the overdraft-multiplying effect of high-to-low ordering, which had been recently implemented in California in April 2001, a few months before.

106.    A graphical timeline of Wells Fargo's BSE initiatives, taken straight out of a Wells Fargo internal memo from February 2002, is shown below (TX 36). As the internal timeline illustrates, both BSE Phase 1 and BSE Phase 2a were part of a larger suite of OD/NSF (overdraft/non-sufficient funds) initiatives being deployed by the bank. The internal timeline also shows that these initiatives were implemented by Wells Fargo specifically to increase revenue.

Here is the internal bank graphical timeline dated February 2002:



26

EXHIBIT 19
Page 026

United States District Court

For the Northern District of California

107.     Again, this internal timeline picked up just after high-to-low sequencing was deployed in California.  As shown in the timeline, Wells Fargo expected the commingling change in combination with the high-to-low change — labeled as BSE Phase 1 — to generate an additional $40 million annually in overdraft fees nationwide (TX 36; Tr. 73).  This was over and above the millions that the high-to-low change alone was already going to add.  These financial projections were echoed in a number of internal spreadsheets pertaining to these initiatives (*see, e.g.*, TX 61).

108.     The commingling change was implemented in December 2001.  Prior to this date, the bank posted all debit-card transactions from highest-to-lowest dollar amount, *then* all checks from highest-to-lowest dollar amount, and *then* all ACH transactions from highest-to-lowest dollar amount.  In other words, the different transaction types were posted separately.  In December 2001, however, the bank began commingling debit-card transactions with checks and ACH transactions and posting the entire group from highest-to-lowest dollar amount.  Since checks and ACH transactions tended to be the larger items, commingling assured that balances would be consumed more rapidly so as to increase the number of overdrafts under a high-to-low ordering.  This was the meaning of the $40 million revenue boost predicted by the memo.

109.     Consistent with the $40 million projection in the February 2002 document, Wells Fargo Executive Vice-President Ken Zimmerman, who personally took part in the decision-making process for the commingling change, admitted at trial that the bank was well aware that commingling was expected to produce a "significant increase in overdraft income" (Tr. 1422).  According to Mr. Zimmerman, the increase in overdraft income was "one of the significant factors in the decision-making" process for the commingling change.  Indeed, the trial record shows that it was the only significant factor.

110.     The undeniable connection between commingling and high-to-low resequencing was also clearly evidenced by internal bank memos.  In the February 2002 BSE memo, the bank explained that the December 2001 commingling change was designed "to more-closely mirror true High-to-Low sort order" (TX 36).  This is significant because Wells Fargo knew — and its own expert witness, Professor Christopher James, confirmed at trial — that high-to-low posting

27

EXHIBIT 19
Page 027

United States District Court

For the Northern District of California

would "mechanically . . . lead to more overdrafts" than other posting order (Tr. 613, 1863–64). It is a mathematical certainty. Indeed, Mr. Zimmerman, who was personally involved in the bank's decision, admitted that he recommended *against* a high-to-low posting order due to the adverse impact it would have on customers (*id.* at 113, 160–61, 340). His objection was overruled. Thus, the additional revenue expected from commingling was premised upon the adverse impact of high-to-low posting.

111.    In this connection, the February 2002 memo went on to cheer that "[t]he two most important OD/NSF [revenue] drivers [we]re up significantly" following the December 2001 commingling change (TX 36). These "two most important OD/NSF drivers" were: (1) the percentage of Wells Fargo checking accounts incurring overdraft fees and (2) the number of overdraft items per overdrafted account. This is also clearly shown in another bank slide from the February 2002 memo:



The two most important OD/NSF drivers are up significantly post-implementation, even after adjusting for seasonality 

**Percent Change in Frequency of Overdrafts**
(Consumer - Nov vs. Dec/Jan)

California: 7.8%   Western: 12.1%   North Central: 0.3%

**% of Accounts Incurring OD/NSF**
• California and Western have demonstrated significant increases in OD frequency post implementation, while North Central has lagged. This is likely the result of much higher debit card activity in former West regions.



**Percent Change in Items per Occurrence**
(Consumer - Nov vs. Dec/Jan)

California: 10.1%   Western: 8.0%   North Central: 5.5%

**Items per Occurrence**
• Another key driver, Items per Occurrence is up across the board post-implementation and compared to the same period a year ago.

* Consumer only

HIGHLY CONFIDENTIAL
WFB-G 0780A-A

28

EXHIBIT 19
Page 028

United States District Court

For the Northern District of California

112.    Based upon Wells Fargo's own analysis of its California customers, the percentage of checking accounts incurring overdraft fees *rose* 7.8 percent after the commingling change.  As telling, the number of overdraft items per overdrafted account *rose* 10.1 percent over that same time period (*ibid.*).  The commingling of transactions to more closely mirror a "true High-to-Low sort order" was working as planned.

113.    A separate internal bank memo dated April 2002 provided additional analysis and commentary on the effect of commingling (TX 37).  After crunching the numbers over the prior year, the April 2002 analysis stated that the number of overdraft items per occurrence was up strongly due to the fact that debit-card transactions were "now commingled with checks in the processing stream."  Yet again we see that Wells Fargo knew and expected that commingling would further amplify the overdraft-multiplying effect of high-to-low posting.

114.    In sum, this order finds that Wells Fargo intended to boost its overdraft revenue by $40 million via the December 2001 commingling change, relying upon the overdraft-multiplying effect of high-to-low resequencing to generate this additional revenue.

115.    Turning to the shadow line, the BSE timeline in the February 2002 memo also showed the May 2002 extension of the shadow line to debit-card purchases, labeled in the document as "BSE Phase 2a."  This was expected by Wells Fargo to generate yet another $40 million annually in overdraft fees nationwide (on top of the $40 million boost expected from commingling) (TX 36).

116.    As with the commingling change, extracting more overdraft penalties was the motivation behind the extension of the shadow line to the authorization of debit-card purchases in May 2002.  The additional $40 million in overdraft revenue that the bank expected from this change was predicated upon the overdraft-multiplying effect of high-to-low posting.

117.    At all relevant times, including now, the vast majority of debit-card purchases followed a two-step process during the class period:  authorization and settlement.  When a Wells Fargo debit-card holder used his or her card to complete a purchase at a store or restaurant, an authorization request was almost always submitted to the bank then and there.  Within a matter of seconds, the authorization request was approved or declined by the bank.  An occasional

29

EXHIBIT 19
Page 029

United States District Court
For the Northern District of California

1  exception to this rule occurred if the purchase was made from a merchant who lacked the

2  capability to submit an electronic authorization request at the time of purchase — a rare event.

3  For these merchants, there was no authorization step, only a settlement step.

4      118.   Whether the authorization request was approved or declined by Wells Fargo, the

5  merchant was notified within a matter of seconds at the point of sale.  As stated, approval of an

6  authorization request constituted a promise by Wells Fargo to pay the merchant the authorized

7  amount — *i.e.*, the debit-card purchase became a "must pay" item.

8      119.   If the debit-card transaction was approved, the merchant would obtain payment

9  from the bank via a separate process called "settlement."  Once the merchant submitted the

10  debit-card transaction to the bank for settlement, the transaction would be posted during the

11  bank's posting process in the wee hours after midnight, as described above.

12      120.   The time period between authorization and settlement was very short.  Wells

13  Fargo's own expert, Dr. Alan Cox, provided direct testimony at trial that for the vast majority of

14  debit-card purchases, the merchant presented the transaction for settlement within two business

15  days.  Indeed, according to Dr. Cox, around 90 percent of debit-card purchases were presented

16  within two business days of authorization, and over half actually cleared *on the same day* they

17  were authorized (Tr. 1782).  For PIN-based debit-card purchases (where the user provided her

18  PIN number at the point of sale rather than her signature), settlement was even faster — it almost

19  always occurred on the same day as the authorization (*id.* at 640–41, 1023–24).[8]

20      121.   As stated, prior to May 2002, an authorization request for a debit-card purchase

21  would be declined if the customer's checking account lacked sufficient available funds and the

22  customer did not have enough overdraft-protection funds to cover the purchase amount.  No fees

23  were charged for a declination.  Given the extremely short time frame between authorization and

24  settlement, this meant that any debit-card purchase that *was* approved by the bank prior to May

25  2002 was unlikely to be assessed an overdraft fee when posted.

26  
---

27      [8]  There were two ways to make a debit-card purchase during the class period:  (1) a signature-debit
    purchase or (2) a PIN-based purchase.  The former used a credit-card network to process the transaction — *e.g.*,
    VISA — while the latter used a PIN-based network — *e.g.*, Interlink.  The differences, however, are immaterial
28  to the findings herein.  Both signature-debit and PIN-based purchases were subject to the shadow line and high-
    to-low posting during the class period (TX 36).

EXHIBIT 19
Page 030

United States District Court
For the Northern District of California

122.    After deployment of the shadow line in May 2002, however, Wells Fargo began authorizing previously declined purchases as prospective overdrafts, assessing an overdraft fee for each overdraft.  This initiative was called "overdraft via POS" within the bank, meaning the bank had now found a way to rack up overdraft fees for point-of-sale purchases that previously were protected from overdrafts.

123.    From the customer's perspective — standing at the checkout counter — the shadow line was completely invisible.  The bank would approve the purchase without any warning that an overdraft was in the making.

124.    Given the extremely short time frame between authorization and settlement, by approving these debit-card purchases when the customer lacked sufficient funds, Wells Fargo expected a marked uptick in overdraft fees.  An increase in the number of overdrafted accounts — upon which the high-to-low resequencing could work its magic to the tune of $40 million in additional revenue — was the intended result.  Exactly this occurred.

125.    It is true, as Wells Fargo says, that when any specific shadow-line authorization is made, Wells Fargo does not know for sure that an overdraft will occur by the time the item is presented for settlement.  It is theoretically possible that an intervening deposit may be made to save the day in the short interval between authorization and settlement.  While this may occasionally occur, the bank specifically expected when it deployed the shadow line for debit-card purchases that it would generate $40 million annually in additional overdraft revenue.

126.    Yet another powerful item of evidence illustrating the bank's motive with respect to high-to-low posting, the commingling change, and the extension of the shadow line to debit-card purchases was an April/May 2002 email exchange between Mr. Zimmerman and his boss, Les Biller (TX 38, 57).[9]  The email exchange was also forwarded to Karen Moore, Senior Vice-President of Wells Fargo's Consumer Deposits group, and other executives at the bank. These emails (and the PowerPoint presentation appended to them) were written by Mr. Zimmerman in the midst of an unexpected shortfall in overdraft fee revenue in early 2002.

[9]  These emails were *completely redacted* when first produced by the bank.  Only after a Rule 37 motion was threatened did the bank relent and reveal their contents.

31

EXHIBIT 19
Page 031

The exchange concerned the reasons for the decline, including whether the manipulations in question were driving away customers.

127.    Highlights from the first of two emails in this exchange are reproduced below, with emphasis added to particularly relevant passages (TX 38):

> From:  Zimmerman, Ken A.
> Sent:   Monday, April 15, 2002 5:59 PM
> To:     Biller, Les S.
>
> *          *          *
>
> Les,
>
> As you are probably aware, we have been investigating a recent erosion in OD/NSF[10] revenue in the consumer deposits portfolio.
>
> *          *          *
>
> A driver-based look at the weakness in OD/NSF revenue indicates that *reduced overdraft frequency . . . is responsible for the shortfall. . . . This decline was not anticipated in the 2002 planning process.*  This shortfall is even more concern [sic] when you consider the 50% haircut we applied to [revenue projections for] the BSE initiatives in the 2002 Plan.  While an initial spike in revenue followed by a trough is not unusual . . . *the continued weakness . . . is cause for concern.*
>
> *          *          *
>
> If the current . . . trend continues, we would expect a significant shortfall relative to Plan . . . despite *the positive . . . effect of the installation of BSE 2A (overdraft via POS) in May.*  The anticipated lift of BSE2A totals $24MM in 2002[.]
>
> *          *          *
>
> We are currently analyzing the change in frequency of overdrafts and expect to have more information in 5–10 days.  Our suspicion is that the BSE-related changes of late November (changes in sort order) may have driven accelerated attrition among high-OD customer segments.  *Given our dependence on a small set of OD customers (4% generate 40% of total OD/NSF revenue), a small change in behavior within this group can cause a large change in revenue.*

---

[10]  As a reminder, "OD/NSF" means overdraft/non-sufficient funds.

32

EXHIBIT 19
Page 032

United States District Court
For the Northern District of California

128.    This internal email shows the following:  *First*, it is evident that Wells Fargo decision-makers closely monitored overdraft fee revenue — unexpected declines triggered an immediate investigation into the cause.

129.    *Second*, in sharp contrast to the bank's theme that overdrafts were to be discouraged, bank executives wished to increase them and viewed any decline in overdrafts as a "cause for concern."

130.    *Third*, Wells Fargo's true intentions regarding the shadow-line extension to debit-card purchases, referred to as "BSE 2A" in the email, were laid bare by Mr. Zimmerman. In his own words, it was intended to generate "overdraft via POS" — meaning overdraft via a point-of-sale debit-card purchase — resulting in $24 million in additional overdraft revenue for the remainder of 2002.  "Overdraft via POS" was deemed a "positive" for the bank, not a negative.  (Previously, "overdraft via POS" was not allowed due to declinations.)

131.    *Fourth*, Wells Fargo was "dependent upon a small set of OD customers" — namely, four percent of them — to generate 40 percent of its overdraft fee revenue.  Given this dependence, the bank did *not* want to lose its "high-OD" customers and, more to the point, did *not* want to lose the fee income they supplied.

132.    In the second email of this exchange, written two weeks after the first email, Mr. Zimmerman reported on his findings regarding the decline in overdraft revenue.  Excerpts from this May 2002 email are shown below, with notable portions emphasized (TX 38):

From:  Zimmerman, Ken A.
Sent:   Wednesday, May 01, 2002 9:08 AM
To:      Biller, Les S.

                              *            *            *

Les,

        In light of your calendar . . . I am forwarding a rather long email with our findings regarding the recent weakness in overdraft revenue.  *If there is good news to be had, it is probably in the fact that the weak ODRI revenue appears to be primarily linked to year-over-year increases in both the volume and size of tax refunds rather than any apparent reaction to pricing or BSE changes.*

        You'll recall that only one of our key ODRI [overdraft and returned item] metrics (OD frequency/% of accounts incurring)

33

EXHIBIT 19
Page 033

United States District Court
For the Northern District of California

was significantly below Plan in Q1 [of 2002.] . . . Since the problem was clearly related to the volume of accounts overdrafting, we . . . investigated potential explanations for the reduced frequencies. Candidates included:

• tax refunds (beyond normal seasonality expectations)
• price elasticity (tied to BSE 1A)
• increased attrition among heavy overdraft customers
• effect of increased sales of overdraft protection
• significant change in portfolio tenure (*because new accounts generate the bulk of OD revenue*)

As you will see in the attached presentation, substantial increases in the average size, volume, and Direct Deposit of tax refunds appears to explain . . . the shortfall in Q1 2002 OD revenue.

\*          \*          \*

In terms of future expectations, we have seen continued strong electronic refund activity in each week in April, and know that paper refunds are lagging electronic. *This would imply that some weakness will continue into May and persist until the excess balances are depleted. We are conducting additional analyses of these accounts to hopefully gain some insight into the timing of a resumption of normal OD behavior.*

133.    In short, Mr. Zimmerman discovered that the decline in overdraft fee revenue in early 2002 was attributable to the direct deposit of tax refunds into the checking accounts of high-OD customers. This was "good news" for the bank, because it meant that its high-OD customers would resume "normal OD behavior" once "the excess balances [created by the tax refunds] [we]re depleted." So, Wells Fargo was *relieved* that its high-to-low bookkeeping could continue without driving away its high-OD depositors — *i.e.*, there was no "cause for concern."

134.    Also evident from both emails is that the bank maintained detailed information regarding the overdraft behavior of its customers. In addition to knowing that its high-OD customer segment "generated 40% of total OD/NSF revenue," Wells Fargo also knew that "new accounts generate[d] the bulk of OD revenue" (TX 38). This latter fact was also echoed in the videotaped deposition of Les Biller that was played at trial.

135.    The PowerPoint presentation appended to the second email offered additional insights into the bank's views regarding overdrafts and overdraft revenue. The presentation noted that "attrition among ODRI accounts is *troubling*" and that "increased tax refunds" had produced

34

EXHIBIT 19
Page 034

United States District Court
For the Northern District of California

a *negative* ORDI revenue impact" and "*negative* ODRI effect" — namely a "decline in the frequency of overdrafts" (TX 57) (emphasis added). This shows that Wells Fargo did not want its customers to stop overdrafting (contrary to its litigation stance) and wanted to retain its ODRI customers and the ODRI revenue they generated.

136.    These internal documents along with the larger trial record demonstrate that Wells Fargo implemented high-to-low posting, the commingling change, and the extension of the shadow line to debit-card purchases to turn what would ordinarily be one overdraft — which Wells Fargo Senior Vice-President Karen Moore admitted at trial was already "expensive" (Tr. 1149) — into as many as ten, and did so to extract as much ODRI revenue as possible from its ODRI customer base.

137.    During the class period, overdraft revenue was the second-largest source of revenue for the Wells Fargo "Consumer Deposits" group (now called the "Consumer and Small Business Deposits" group) (*id.* at 623, 1515).[11] During the class period, Wells Fargo posted $1,772,193,757 — almost two billion dollars — in overdraft fees to the accounts of its California customers (TX 190).

138.    Although Mr. Zimmerman testified at trial that it was not a "core strategy" of Wells Fargo to grow this massive source of revenue, the bank's own internal memos and emails *he authored* directly contradicted this assertion. This testimony was not credible.

139.    After resistance by the bank, a court order allowed plaintiffs' expert Arthur Olsen to access Wells Fargo's computerized customer data and crunch the numbers. Expert Olsen's study shows that the high-to-low switch boosted overdraft fees by hundreds of millions of dollars for the California class during the class period. The high-to-low switch had a colossal impact on depositors.

140.    Weighing all of the evidence presented at trial, this order finds that gouging and profiteering were Wells Fargo's true motivations behind the high-to-low switch and the allied practices that soon followed. High-to-low posting was adopted exclusively to generate more

---

[11] The Consumer Deposits group is the unit within Wells Fargo that was and remains primarily responsible for managing consumer checking accounts. It is responsible for implementing the business practices challenged in this action (Tr. 59–60).

EXHIBIT 19
Page 035

overdraft fees and fee revenue at the expense of depositors. The two closely allied practices that followed were similarly motivated by a singular desire to boost overdraft fee revenue using the bank's high-to-low bookkeeping device. While these changes occurred prior to the class period, they set the stage for the profiteering that ran rampant during the class period and continues even now.

### WELLS FARGO'S POST-HOC RATIONALIZATIONS

141.    Two of the bank's key defenses in this action presuppose that its decision-makers based its practices on factors other than multiplying overdrafts and overdraft revenue. *First*, Wells Fargo argued at trial that customers *wanted* and *benefitted* from a high-to-low posting order. *Second*, to support its federal preemption defense, Wells Fargo argued at trial that its decision-makers anchored the decision in the four factors set forth in 12 U.S.C. 7.4002(b)(2). This order finds that these are post-hoc rationalizations merely invented for trial.

142.    Starting with the argument that Wells Fargo customers "wanted" and "benefitted from" the challenged practices, no credible evidence was presented at trial to support the bank's argument that high-to-low resequencing was deployed for this purpose or that customers wanted or benefitted from it.

143.    That the vast majority of debit-card purchases are "must pay" items constitutes a complete showstopper to this argument. The bank must pay them regardless, even as overdrafts. There are only two exceptions — rare in practice — where the bank can reject such an item: (1) if the merchant did not obtain authorization prior to presenting the transaction for settlement, or (2) the merchant fails to present the transaction for settlement within 30 days of authorization (*id.* at 592, 1021–22). Aside from these two rare exceptions, Wells Fargo is *required* to pay a customer's debit-card purchases whether or not the customer has sufficient available funds to cover them.

144.    Thus, posting debit-card transactions in high-to-low order confers no benefit upon Wells Fargo customers. Unlike checks or ACH transactions, which the bank *can* return unpaid, there is *no risk* that Wells Fargo will reject a large debit-card purchase if it posts last rather than

36

EXHIBIT 19
Page 036

United States District Court
For the Northern District of California

1    first.  It is a "must pay" item.  Again, this distinction is important because this lawsuit is

2    concerned only with debit-card purchases.

3        145.    Since there is no real benefit to Wells Fargo customers when debit-card

4    transactions are in high-to-low order, the only impact of the bank's posting practices was and

5    remains to multiply the number of overdraft fees assessed on its customers.  That is clearly not a

6    "benefit" to any consumer.  Indeed, this adverse impact is exactly why Mr. Zimmerman

7    recommended *against* switching to a high-to-low posting order (but he was overruled).

8        146.    Apart from the must-pay aspect, there is no correlation between the dollar amount

9    of an item and its priority of payment for a depositor.  From a depositor's viewpoint, a small item

10   may well be as or more important than a medium or large item.  A smaller item to a local

11   government, for example, may be of more importance than a larger item for magazine

12   subscriptions.  No study has ever been conducted, as far as the record shows, to establish any

13   correlation between dollar amount and customer priority of payment.  On the other hand, it is

14   mathematically certain that posting in high-to-low order will result in more overdrafts than any

15   other posting sequence.

16       147.    It is extremely implausible that depositors would prefer a system guaranteed to

17   turn what would ordinarily be one overdraft into as many as ten to merely improve the odds that a

18   large item would be honored at the expense of others.  Yes, it is possible to construct a

19   hypothetical where a large rent *check* would be paid under a high-to-low scheme but not

20   otherwise.  But it is also possible to construct a hypothetical where a smaller but more important

21   check (such as the payment of a traffic ticket) might go unpaid under a high-to-low regime.  The

22   supposed net benefit of high-to-low resequencing is utterly speculative.  Its bone-crushing

23   multiplication of additional overdraft penalties, however, is categorically assured.  Thus, wholly

24   apart from the fact that the rationalization has no applicability to debit-card transactions (due to

25   their "must pay" aspect), the net harm to depositors from the practice is so plain and so vast that

26   this order rejects completely that high-to-low resequencing is a net benefit to depositors or

27   preferred by them.  Customer complaints filed by Wells Fargo depositors, quoted elsewhere in

28   this order, underscore this disapproval.

EXHIBIT 19
Page 037

United States District Court

For the Northern District of California

148.    Turning to the actual considerations behind the bank's decision, it is true that Wells Fargo witnesses vaguely testified that the high-to-low posting order was adopted to benefit customers so that their largest obligations would be paid first (Tr. 89, 653, 1459, 1473, 1556–58). Almost always, however, this testimony was specific to checks or ACH transactions. According to the argument, a customer's largest expenditures "may be" the customer's "most important" transactions, possibly rent checks or ACH mortgage payments. Thus, by paying largest items first, there would be less of a chance that such items would be returned unpaid due to insufficient funds. This check and ACH rationale, to repeat, has no applicability to must-pay items.

149.    The bank produced no documentary evidence that this supposed "benefit" to customers was actually discussed or considered by Wells Fargo management when the bank made the decision to post debit-card transactions in California in high-to-low order.

150.    The bank also produced no study or documentary evidence that any Wells Fargo customers preferred a high-to-low posting order for debit-card transactions (or *any* transactions for that matter). On this point, two Wells Fargo witnesses — Mr. Zimmerman and Mr. Biller — referred to a consumer survey supposedly performed by Norwest Bank, which Wells Fargo merged with in 1998, that allegedly evidenced a customer preference for high-to-low posting (Tr. 104). This survey proved to be an utter phantom. Despite calls for its production, it was never produced at trial and neither Mr. Zimmerman nor Mr. Biller (nor any other bank witness) knew where a copy of it could be found.

151.    Given this lack of evidence and the compelling evidence of gouging in the bank's internal memos, the Court is convinced and so finds that this customer "benefit" and "preference" rationale was invented merely for public consumption and was not an actual motivating factor at the time any high-to-low decision was made, much less the high-to-low decision for must-pay items.

152.    It is true that the rationale later appeared in Wells Fargo argument pieces distributed after the fact as *scripts* to bank employees to help justify the high-to-low posting order to customers who complained (*see, e.g.*, TX 55, 56). These later scripts, however, were for public consumption and did not reflect the bank's true motives.

38

EXHIBIT 19
Page 038

United States District Court

For the Northern District of California

153.    In the totality of the pre-decision memos, the Court has found only one that arguably points to this rationale.  In January 2001, Wells Fargo Senior Vice-President Karen Moore sent an email stating that *check* posting would be changed from serial to high-to-low order (after the decision to make the change had already been made).  She stated "[t]his may assure that the customer's most important check (perhaps their rent or mortgage) is paid first" (TX 48).  The words "may" and "perhaps" exemplify the speculative nature of this rationalization.  "May" necessarily implies "may not."  "Perhaps" necessarily implies "perhaps not."  This comment, moreover, pertained only to a change regarding *checks,* not debit-card transactions — the subject of the present challenge.  Rent checks and mortgage payments, of course, were not and are not paid using debit cards.  There are no emails or memoranda giving any reason for using high-to-low posting for debit-card transactions other than revenue enhancement.  This isolated sentence cannot overcome the overwhelming evidence that high-to-low resequencing was applied to debit-card transactions in order to multiply the number of overdrafts.

154.    A 2008 FDIC report introduced at trial shows that only about a quarter of surveyed FDIC-supervised banks posted consumer deposit transactions in high-to-low order (TX 184).  If it were true that banking customers actually preferred a high-to-low posting order, one would expect that more banks would be doing it and indeed promoting it as a plus.  Despite pretending that high-to-low posting was preferred by customers, Wells Fargo has never promoted high-to-low posting as a customer plus.  Indeed, as will be touched upon soon, the bank took pains to obfuscate this practice.  This is surely because high-to-low posting is *not* a customer plus.  Rather, it was used and is still being used by Wells Fargo as a snare for the unwary.

155.    A 2009 comment in the Federal Register proffered by Wells Fargo during trial lends the bank only superficial support.  In deciding not to address high-to-low posting at that time, the Board of Governors of the Federal Reserve System, the Office of Thrift Supervision, and the National Credit Union Administration stated:

> The Agencies are not addressing transaction processing order at
> this time.  The Agencies believe that it would be difficult to set
> forth a bright-line rule that would clearly result in the best outcome
> for all or most consumers.  For example, requiring institutions to
> pay smaller dollar items first may cause an institution to return

39

EXHIBIT 19
Page 039

United States District Court

For the Northern District of California

1    unpaid a large dollar nondiscretionary item, such as a mortgage
2    payment, if there is an insufficient amount of overdraft coverage
     remaining to cover the large dollar item after the smaller items
3    have been paid.

4    74 Fed. Reg. 5498, 5548 (Jan. 29, 2009).

5        156.    As set forth in the Federal Register, the agencies began the administrative

6    proceeding in May 2008 by soliciting comment on whether institutions should be required to

7    process in low-to-high order to minimize overdraft fees.  Industry commentators made several

8    arguments.  *First*, they invoked Section 4-303 of the Uniform Commercial Code as conferring

9    discretion on institutions with respect to posting order.  (The legislative comment to Section

10   4303(b) of the California Commercial Code was not referenced.)  *Second*, some banks argued that

11   most customers prefer high-to-low posting because it results in their largest bills being paid first.

12   *Third*, some banks argued that there were various alternatives such as

13   in-sequence processing and that they should retain flexibility on a bank-by-bank basis.

14       Rather than decide anything, the agencies chose not to make any decisions on this

15   particular issue "at this time."  They said it would be difficult to set forth "a bright-line rule that

16   would clearly result in the best outcome for all or most customers."  They noted that causing

17   smaller items to be paid first "may cause" an institution to return unpaid a large dollar

18   nondiscretionary item, such as a mortgage payment.  This statement falls far short of validating

19   high-to-low posting.  At most, it merely said that low-to-high posting — the proposal on the

20   table — was not invariably the best sequence, a truism, and that the agencies were not yet ready

21   to decide one way or the other whether to impose it on all banks in all circumstances.

22       More to the point, this statement cannot overturn the extensive trial record herein.  Wells

23   Fargo, for example, has been given a full and fair opportunity to prove that depositors prefer

24   high-to-low posting, yet the bank has utterly failed to do so.  It has also been given a full and fair

25   opportunity to find and procure the illusory "Norwest Study" or any other study but it has utterly

26   failed to do so.  This is not an administrative proceeding where any blurb and argument piece can

27   be tossed into the bin.  We have had a trial with evidence and safeguards for getting at the truth.

28   It is now evident that the bank's supposed studies and rationales have withered and vanished

40

EXHIBIT 19
Page 040

United States District Court

For the Northern District of California

under effective cross-examination.  The trial record here demonstrates that depositors do not prefer high-to-low posting, that there is no net benefit, and that the bank's actual motive in imposing a high-to-low regime was to multiply the number of overdrafts and thereby increase its overdraft revenue.

157.    Turning to the December 2001 commingling change, Wells Fargo witnesses testified that "one of the key motivations" behind commingling was the supposed "migration" of consumer and merchant behavior from one transaction type to another, *e.g.*, away from checks and towards debit-card and ACH transactions (Tr. 1164–65, 1415–16).

158.    Due to these supposed trends, the bank allegedly decided to commingle checks, debit-card transactions, and ACH transactions because posting them separately had become "increasingly confusing" to customers and service personnel (*id.* at 1415–16).

159.    Mr. Zimmerman also testified that by commingling debit-card transactions with checks and ACH transactions, the bank could honor more of its customers' high-dollar items in the form of checks and ACH transactions by "truly sorting transactions in a high to low manner" (*id*. at 1460).  This testimony echoed a similar statement, referenced earlier, in the bank's internal BSE memos (TX 36).

160.    Weighing the evidence, this order rejects the testimony provided by bank witnesses.  *First*, no written evidence showed that Wells Fargo actually considered "migration trends" when it decided to commingle debit-card transactions with checks and ACH transactions.

161.    *Second*, no written evidence showed that *any* Wells Fargo customers or service personnel were "confused" by the separate posting of checks, debit-card transactions, and ACH transactions.  By contrast, the evidence presented at trial showed that most customers were not even aware of how transactions were posted by the bank.  The bank did not notify customers about the old system, the new system, or the change in systems.

162.    *Third*, the notion that customers preferred a high-to-low posting order has already been rejected by this order.  Rather, by "truly sorting transactions in a high to low manner" via commingling, Wells Fargo actually *exacerbated the harm* that customers would suffer in the form

41

EXHIBIT 19
Page 041

of overdraft fees by using up their balances at a faster rate, thereby maximizing the number of items paid into overdraft.

163.    This adverse impact is exactly why Mr. Zimmerman — who, as stated, had recommended against the high-to-low switch before being overruled — also recommended *against* the December 2001 commingling change when the decision was made. He knew that it would amplify the overdraft-multiplying effect of high-to-low posting on customers (Tr. 160, 1551).[12] As before, he was overruled.

164.    For these reasons, this order finds that customers did not prefer or benefit from the December 2001 commingling change, and that Wells Fargo did *not* consider any of the above factors when it decided to commingle debit-card transactions with checks and ACH transactions. Any testimony to the contrary was not believable.

165.    As for the shadow-line extension, according to Mr. Zimmerman, one of the "key motivations" behind this change was to increase the approval rate of debit-card purchases. This begs an important question. The increase in approval rate was achieved *only by authorizing debit-card purchases into overdrafts*. The whole point of the shadow line was, as Mr. Zimmerman put it, to promote "overdraft via POS" (TX 38). This was not previously allowed. Declinations protected against overdrafts. By authorizing what the bank had previously declined, "overdraft via POS" was suddenly operational.

166.    No written evidence showed that customers preferred or benefitted from this change. Rather, the documentary evidence presented at trial showed that the bank implemented this change for the main purpose of boosting overdraft revenue by $40 million (TX 36).

167.    When unwittingly using the secret shadow line of credit to approve transactions, customers standing at the checkout counter were not warned that an overdraft was in the making. It is very hard to believe that customers would have preferred such a system of "overdraft via POS." This is why the Federal Reserve has recently outlawed the practice absent a customer's affirmative opt-in consent, as will soon be discussed.

---

[12]  Mr. Zimmerman also recommended against the commingling of transactions because he was concerned that the change would result in litigation against the bank. This concern proved prescient (Tr. 161).

42

**United States District Court**
For the Northern District of California

EXHIBIT 19
Page 042

168.    Turning to the bank's preemption defense and its supposed considerations under 12 C.F.R. 7.4002, the regulation then stated (and continues to state) the following:

> A national bank establishes non-interest charges and fees in accordance with safe and sound banking principles if the bank employs a decision-making process through which it considers the following factors, among others:
>
> (i)  The cost incurred by the bank in providing the service;
>
> (ii)  The deterrence of misuse by customers of banking services;
>
> (iii)  The enhancement of the competitive position of the bank in accordance with the bank's business plan and marketing strategy; and
>
> (iv)  The maintenance of the safety and soundness of the institution.

169.    As set forth in detail below, Wells Fargo did *not* actually consider any of these factors when implementing the challenged posting practices.

170.    While Mr. Zimmerman testified that the April 2001 high-to-low posting order change in California was justified in part by cost considerations, his testimony was not credible (Tr. 1429–30).

171.    No documentary evidence supported his assertion that Wells Fargo considered operating costs when deciding to post debit-card transactions from highest-to-lowest dollar amount.  Moreover, much of Mr. Zimmerman's testimony on this matter was not anchored in any genuine recollection of what the bank actually considered when it made this decision (*see, e.g.*, *id*. at 1427–40).

172.    It is true that when Wells Fargo deployed high-to-low posting for debit-card transactions in California in April 2001, it had already done so for debit-card transactions outside of California (*id.* at 1412).  This is because Wells Fargo, following its merger with Norwest Bank in 1998, was at the tail end of an eighteen-month process of moving the two banks' accounting and deposit systems onto a single system (*id.* at 68, 1409–10).  California was the last Wells Fargo region to move onto the new system (*id.* at 280–81, 1411).

43

EXHIBIT 19
Page 043

United States District Court

For the Northern District of California

173.    Referencing this history, Mr. Zimmerman testified that the change in posting order in California in April 2001 "brought California into alignment with the rest of the bank, which was already processing debit cards from high to low," and that this change saved Wells Fargo costs by ensuring bank-wide uniformity (*id.* at 1429–30).

174.    This testimony is irrelevant, however, to whether the initial bank-wide decision by Wells Fargo to deploy high-to-low posting for debit-card transactions was motivated by cost considerations.  Indeed, as explained at trial, Wells Fargo's decision to post debit-card transactions in high-to-low order was made in early 1999, two years before it was actually deployed in California (*id.* at 1412).

175.    One impetus for the decision in 1999 was Wells Fargo's merger with Norwest Bank.  At the time of the merger in 1998, Wells Fargo and Norwest were posting debit-card transactions in different sequences — Wells Fargo was posting in low-to-high order while Norwest was posting in high-to-low order.  Thus, Wells Fargo had to decide, among other things, on a uniform posting order for the new merged entity.  In this connection, Wells Fargo considered three different posting orders:  (1) high-to-low, (2) low-to-high, and (3) sequential/chronological order.  After considering these three options, Wells Fargo executives — overruling the objections of Mr. Zimmerman noted earlier — made the bank-wide decision to post debit-card transactions in high-to-low order (*id.* at 75–76).

176.    The bank produced no documentary evidence, however, that Wells Fargo management considered the impact that these three sequencing orders would have had on the bank's operating costs.  Rather, the trial record shows that the bank only considered increased revenue.

177.    In sum, this order finds that Mr. Zimmerman's testimony that Wells Fargo considered operating costs when deciding to post debit-card transaction in high-to-low order was not credible.  The bank did *not* consider operating costs when it made this decision.

178.    Wells Fargo similarly produced no evidence at trial showing that the bank instituted high-to-low posting of debit-card transactions to deter customers from misusing banking services.  By contrast, the trial evidence showed that Wells Fargo deployed its

44

EXHIBIT 19
Page 044

high-to-low posting practices — including the commingling change and the extension of the shadow line to debit-card purchases — to significantly *increase* the number of overdrafts incurred by customers and further boost an already major source of fee revenue (TX 36, 38, 57, 61; Tr. 134–35, 237). In short, the bank's intentions behind high-to-low resequencing were to promote — not deter — customer overdrafts.

179. As showcased in the April/May 2002 emails between Mr. Zimmerman and Mr. Biller, Wells Fargo became "concerned" when overdraft frequency unexpectedly declined (TX 38). Part of this concern was that the deployment of high-to-low posting had caused increased attrition among the bank's coveted "high-OD customer segment" — the "4% [that] generate[d] 40% of total OD/NSF revenue" (TX 38). Attrition among these accounts was "troubling" to the bank (TX 57). Once the bank learned that tax refunds were to blame, however, the bank treated this as "good news" — it simply had to wait until the tax refunds were "depleted" before "normal OD behavior" would again resume (TX 38).

180. BSE documents similarly showed that Wells Fargo had no intention of deterring overdraft behavior — rather, the bank intended to promote overdrafts. The BSE initiatives were *dependent* upon an increase in customer overdrafts (*see, e.g.*, Tr. 134–35, 237; TX 36, 61). On this point, Wells Fargo's own documents stated that "two most important OD/NSF drivers" for increasing OD/NSF revenue were: (1) the percentage of accounts incurring overdrafts and (2) the number of overdraft items per overdrafted account (TX 36).

181. This order rejects as untrue the testimony provided by bank witnesses that high-to-low posting was implemented to deter overdraft behavior and prevent the bank from attracting customers who would misuse bank services via overdrafting.

182. With respect to considering the "competitive position" of the bank, as already stated, Mr. Zimmerman's testimony as to the posting orders of competing banks was unanchored in a specific recollection of what the bank *actually* considered when it decided to post debit-card transactions in high-to-low order (*see, e.g.*, Tr. 1427–40). Rather, Mr. Zimmerman opined at trial about what the bank "would have" considered when making such a decision, conveniently regurgitating language along the lines of 12 C.F.R. 7.4002.

45

EXHIBIT 19
Page 045

**United States District Court**
For the Northern District of California

183.    When finally asked directly, Mr. Zimmerman confirmed that he had no specific recollection of whether the posting practices of competitors were specifically considered when Wells Fargo decided to post debit-card transactions in high-to-low order (*id.* at 1448). Mr. Zimmerman further testified that he did not recall any specific discussion about the posting practices of Wells Fargo's competitors when the decision to commingle transactions in April 2001 was made (*id*. at 1449).

184.    No documentary evidence showed that Wells Fargo considered its competitive position or even knew how its competitors were posting debit-card transactions when it made the decision to post these transactions from high-to-low.

185.    This order finds that Wells Fargo did *not* consider the enhancement of its competitive position when it decided to post debit-card transactions in high-to-low order.

186.    Finally, no documentary evidence supported Wells Fargo's argument that it changed its posting practices to maintain the safety and soundness of the bank. Wells Fargo changed its posting order to generate millions of dollars in additional revenue at the expense of its customers. True, this would enhance the balance sheet and thus arguably enhance the bank's financial strength. But are safety and soundness served by the *promotion* of overdrafts? The Court doubts that the OCC would agree with this view. Certainly, no OCC authorities have been supplied so stating.

187.    The consistent lack of internal records evidencing the bank's supposed consideration of these factors is even more suspect given the nine- to twelve-month planning process required to deploy the challenged practices (*id.* at 1421, 1558). Given this lengthy time frame, there should have been *some* documents or emails showing that the bank considered these factors, especially if the bank was subject to federal oversight under 12 C.F.R. 7.4002 and other federal regulations. No such evidence was presented. While Wells Fargo asserted that it did not have document retention policies at the time for these types of documents, its retention policies were never offered at trial *despite an express invitation to present them at trial*.

188.    In sum, this order finds that the bank did not actually consider any of the factors set forth in 12 C.F.R. 7.4002 when it decided to switch to high-to-low posting for debit-card

46

EXHIBIT 19
Page 046

United States District Court

For the Northern District of California

1  transactions, commingle transactions, and extend a "shadow line" of credit to debit-card

2  purchases.

3       189.  If high-to-low resequencing, the commingling change, and the shadow-line

4  extension were subject to 12 C.F.R. 7.4002, the bank would have kept records to prove

5  compliance with the regulation and for national bank examiners to review (*id.* at 1529).

6       190.  The fact that no documents show that Wells Fargo was attempting to comply with

7  12 C.F.R. 7.4002 shows that the federal regulation governing bank charges and fees was a

8  non-factor in these decisions.[13]  The vague testimony provided by bank witnesses to the contrary

9  was not credible.

10       191.  The only motives behind the challenged practices were gouging and profiteering.

11       192.  The bank's argument that its one-dollar "courtesy threshold" implemented during

12  the tail end of the class period evidences its "good faith" towards its customers is rejected (*id.* at

13  355–56).  Similarly, the bank's argument that after-the-fact fee reversals or posting credits before

14  debits evidences the bank's "good faith" is also rejected.  These were non-factors when the bank

15  decided to deploy the practices challenged herein.

16       THE SETTLEMENT RELEASE IN *SMITH V. WELLS FARGO BANK, N.A.*

17       193.  In December 2002, a class action lawsuit — *Sean M. Smith v. Wells Fargo Bank,*

18  *N.A.* (Case No. GIC802664) — was brought against Wells Fargo in San Diego Superior Court

19  over an alleged failure by the bank to adequately disclose the extension of the shadow line to

20  debit-card purchases in a 2002 "Policy Change Notice."  Pillsbury Winthrop Shaw Pittman LLP

21  represented the bank, while Finkelstein & Krinsk LLP served as class counsel.

22       194.  A settlement agreement was reached in May 2007, and the class action settlement

23  was approved in November 2007 by Judge Ronald S. Prager.  Judgment was thereafter entered.

24  Under the settlement agreement, class members were allowed to submit a claim form to Wells

25  Fargo (postmarked by January 8, 2008) stating that they had incurred an overdraft fee during the

26

27       [13]  A "pricing change" under 12 C.F.R. 7.4002 is also subject to the disclosure requirements of
Regulation DD, 12 C.F.R. 230.3.  Wells Fargo did not even attempt to comply with Regulation DD in
28  connection with the challenged high-to-low practices (Tr. 1531–34).  This provides additional support for this
finding.

47

EXHIBIT 19
Page 047

United States District Court

For the Northern District of California

1    twelve-month period following May 24, 2002.  Wells Fargo would then refund up to $20 in

2    overdraft fees to that class member, subject to an aggregate cap on total claims of three million

3    dollars.

4        195.    What Judge Prager did not know — since it only came to light in *this*

5    proceeding — was that Wells Fargo paid merely $2080 to 166 claimants.  This is not a typo.

6    Barely two thousand dollars were paid to class members.

7        196.    By contrast, Wells Fargo agreed to pay Finkelstein and Krinsk $2.2 million in

8    attorney's fees and costs.

9        197.    On February 1, 2008, Judge Prager ruled on a motion concerning whether and how

10   *Smith* encompassed the instant case.  Judge Prager held that while our named plaintiff was a

11   member of the settlement class in *Smith*, the claims in our case were *not* released by the *Smith*

12   settlement.  While Judge Prager noted that the release language in the *Smith* settlement agreement

13   appeared quite broad, he found that the release was actually limited to the claims in the *Smith*

14   complaint.  (Judge Prager still, it should be noted, was not made aware of the minuscule amount

15   paid to dispose of *Smith*.)

16       198.    After examining the *Smith* complaint, Judge Prager concluded that the claims in

17   the instant action — targeting Wells Fargo's high-to-low posting practices — were *not* released

18   because the claim in *Smith* was limited to disclosures in a 2002 "Policy Change Notice" and

19   overdraft fees incurred during the twelve-month period between May 2002 and May 2003.  In

20   reaching this conclusion, Judge Prager noted that he did *not* agree with Wells Fargo's argument

21   that the *Smith* release barred the claims asserted herein.

22                   **MISLEADING MATERIALS AND INADEQUATE DISCLOSURES**

23       199.    Given the harsh impact of the bank's high-to-low practices, the bank was obligated

24   to plainly warn depositors beforehand.  Instead, the bank went to lengths to hide these practices

25   while promulgating a facade of phony disclosure.  The bank's own marketing materials were

26   deceptive in leading customers to expect purchases to be debited in the order made (rather than to

27   be resequenced in high-to-low order).  This order finds that these misleading materials and

28   inadequate disclosures were likely to deceive reasonable depositors, as now covered in detail.

EXHIBIT 19
Page 048

1       THE CONSUMER ACCOUNT AGREEMENT AND OTHER INADEQUATE DISCLOSURES

2           200.    The Wells Fargo Consumer Account Agreement ("CAA") was and remains a

3   lengthy document given to customers when opening a new account (Tr. 275).  The trial record

4   contains numerous versions of Wells Fargo's CAA, including version from November 1999

5   (TX 49), August 2000 (TX 75), April 2001 (TX 76); April 2002 (TX 13), October 2004 (TX 79),

6   October 2005 (TX 81), October 2006 (TX 19), and November 2007 (TX 339).  All of these CAAs

7   were distributed nationwide, and each is approximately 60 pages in length (Tr. 1134–35).

8           201.    While plaintiff Walker did not recall receiving a copy of the CAA when she

9   opened her Wells Fargo bank accounts in July 2006, this order nevertheless finds that the CAA

10  was customarily provided to all Wells Fargo customers when they opened a new account

11  (Tr. 796).  The CAA claims to "govern[] the relationship between the bank deposit account

12  holder[] and the bank" and "outlines the terms and conditions that apply to [Wells Fargo]

13  checking accounts, and outlines the contractual obligations both of the bank, as well as with

14  [Wells Fargo] consumers" (Tr. 586, 1134; *see also* TX 13 at 4).

15          202.    None of the CAAs introduced at trial adequately disclosed Wells Fargo's posting

16  practices.  For example, the April 2002 CAA contained a section entitled "Debiting Your

17  Account; Order of Posting" (TX 13 at 24–25).  This section stated, in relevant part:

19          We may pay Items presented against your account in any order we
            choose, unless a particular order is either legally required or
20          prohibited.  In particular, we may choose to pay Items in the order
            of highest dollar amount to lowest dollar amount (unless such a
21          practice is specifically prohibited by an applicable state or federal
            law, rule or regulation).  We may change the order of posting
22          Items to your account anytime without notice to you.

23          203.    While the April 2002 CAA used the phrase "[w]e *may choose* to pay Items in the

24  order of highest dollar amount to lowest dollar amount[,]" it is undisputed that Wells Fargo was

25  then *actually* posting cash withdrawals, debit-card, check, and ACH transactions from

26  highest-to-lowest dollar amount (*see* Dkt. No. 448; Tr. 2770–78).

27          204.    The phrasing "[w]e may choose" suggested to customers that the bank would

28  either exercise discretion or that it had not yet chosen to go to a high-to-low scheme.  In fact,

United States District Court

For the Northern District of California

49

EXHIBIT 19
Page 049

United States District Court

For the Northern District of California

1  the bank knew good and well that it was already imposing and would continue to impose

2  high-to-low bookkeeping — the worst possible system from the customer's perspective.

3       205.    This phrasing was almost identical, in fact, to the phrasing used before the switch.

4  No notice was ever given of the high-to-low change.

5       206.    In the October 2004 CAA, Wells Fargo altered the prior language and added new

6  language to the "Order of Posting" section of the CAA.  The new language is highlighted below

7  in italics (TX 79 at 23):

8

9          The Bank may post Items presented against the Account in any
        order the Bank chooses, unless the laws governing your Account

10          either requires or prohibits a particular order.  For example, the
        Bank may, if it chooses, post Items in the order of the highest

11          dollar amount to the lowest dollar amount.  The Bank may change
        the order of posting Items to the Account at any time without

12          notice.  *If more than one Item is presented to the Bank for payment
        on a day the Bank determines there are sufficient funds to pay one*

13          *or more but not all of the Items, the number of Items paid and the
        overdraft and returned Item fees assessed may be affected by the*

14          *order that the Bank chooses to pay those Items . . . .  For example,
        if the Bank pays Items in the order of highest-to-lowest dollar*

15          *amount, the total number of overdraft and returned Item fees you
        are charged may be larger than if the bank were to pay the Items*

16          *in the order of lowest-to-highest dollar amount.*

17       207.    A similar explanation was included in Wells Fargo CAAs dated October 2005,

18  October 2006, and November 2007 (TX 81, 19, 339).  (The parties did not put a CAA from 2003

19  into evidence.)

20       208.    This revised language compounded the deception.  It did not adequately disclose

21  that the bank had *already adopted* the high-to-low scheme.  Rather, a reasonable consumer would

22  have been deceived — just as with earlier CAAs — by the bank's representation that it "may, *if it*

23  *chooses*, post Items in the order of the highest dollar amount to the lowest dollar amount."  This

24  disclosure reinforced the misleading impression that Wells Fargo had not yet chosen to post in the

25  order of the highest dollar amount to the lowest dollar amount or that it would exercise discretion

26  on a case-by-case basis.

27       209.    Apart from its content, the "disclosure" on posting order was buried within a sea of

28  single-spaced text stretching over 60 pages in tiny ten-point font.  For example, in the 2002 CAA,

50

EXHIBIT 19
Page 050

United States District Court
For the Northern District of California

1    the posting-order "disclosure" was 24 pages into the document. This order finds that no

2    reasonable depositor could be expected to read the entire document or locate the "disclosure"

3    within the bank's CAA. Moreover, even if the customer read the CAA, no reasonable depositor

4    could be expected to understand the disclosure regarding posting order and overdraft fees,

5    especially given the deceptive use of "may" throughout the disclosure.

6        210.    Tellingly, Wells Fargo's *own* expert, Itamar Simonson, who spoke to the adequacy

7    of the bank's disclosures regarding posting order, testified that the length and complexity of the

8    CAA made it "completely unrealistic to assume that . . . many consumers would actually read

9    those lengthy documents" (Tr. 977–78). Additionally, Mr. Simonson confirmed that the length

10   and complexity of the CAA made it "so difficult for consumers to understand" (*id.* at 982). This

11   remarkably candid opinion was echoed throughout Expert Simonson's *direct* testimony (*id.* at

12   977, 979):

13           [E]ven if they were to read, word for word, in those — some of
             those lengthy documents, such as the account agreement, which is
14           — I think we all agree, very few actually do that . . . it would be
             impossible for [customers] to predict the exact balance [of their
15           checking accounts] at any particular point in time.

16                          *            *            *

17           [A]s I said, we all agree — and I noticed in Dr. Mandell's
             deposition that even he did — that very few people read, for
18           example, the account agreement, where this disputed statement
             appears. So very few people read that.
19

20       211.    This order also agrees with Expert Simonson on these points as well as his opinion

21   that those Wells Fargo customers who read the CAA "are probably not the same people who just

22   have $20 in their bank account, and playing it close to the edge" (*id.* at 980).

23       212.    The bank, however, knew — when it wanted — how to speak plainly. After the

24   fact, when a customer complained about getting hammered with overdraft fees, Wells Fargo

25   provided a clear explanation of its posting process. This explanation, however, would only be

26   provided once the customer submitted a written complaint expressing anger or confusion

27   regarding overdraft fees. Wells Fargo would send these customers a response letter containing

28

51

EXHIBIT 19
Page 051

United States District Court

For the Northern District of California

1    standard "form" language describing in very straightforward terms the *actual* posting order used

2    by the bank (Tr. 1319–20; TX 127).

3        213.    An example of this "form" language, found in a Wells Fargo letter dated

4    February 26, 2008, in response to a customer complaint, is reproduced below (TX 127, BATES

5    4387) (emphases in original):

> When checks or other items are presented against insufficient
> funds in your checking account, we pay or return them and assess
> handling fees the following *business* day.  The decision to pay or
> return items is based on the number of overdraft occurrences in the
> preceding 12 months.
>
> We pay items from highest-to-lowest dollar amount.  Transactions
> are processed in the following order:
>
> •    Credits
> •    Fees from overdraft/or returned items of the previous day
> •    Previous day's work — Items with an *as of* date[14]
> •    Cash withdrawals
> •    Checks, check card and POS purchases from highest-to-
>       lowest [sic] dollar amounts

15        214.    In addition to these form-letter responses, Wells Fargo provided a similarly clear

16    disclosure regarding posting order to customers if they went to the trouble of complaining about

17    excessive overdraft fees over the phone (Tr. 1313–14).

18        215.    The very existence of these clear *after-the-fact* explanations further highlights the

19    bank's before-the-fact obfuscation.  Before the fact, the bank piled ambiguity onto vagueness and

20    hit it all at page 27 of a 60-page document.  Once the customer was hammered by the bank's

21    resequencing practice *and* went to the trouble of complaining, then *and only then* did the bank roll

22    out the clear-cut script.

23        216.    In sum, the bank intentionally made its disclosure in a way that was calculated to

24    go unnoticed by class members and used language that, even if read, obfuscated the practices

25    challenged herein.

---

[14]  These would include transactions that were presented for settlement after the batch processing
cut-off time had expired on the prior business day.

52

EXHIBIT 19

Page 052

217.     Additionally, given that Wells Fargo's own expert admitted that most bank customers did not read the CAA and, even if they did, the length and complexity of the document made it "so difficult for consumers to understand," this order also finds that it was *not* within the reasonable expectations of class members that the bank had in fact already put in place a posting practice that could transform a single mistake into as many as ten overdrafts.

218.     No other Wells Fargo documents adequately disclosed the challenged resequencing practices to the bank's customers in California.  With respect to Wells Fargo's Consumer Account Fee and Information Schedule, which — like the CAA — was provided to Wells Fargo customers when they opened a new account, this document also failed to disclose how transactions were resequenced prior to batch posting or how a high-to-low posting order could impact the number of overdraft fees the bank could assess (Tr. 1159; *see, e.g.*, TX 343, 345, 346, 347, 348, 349, 350, 352, 353, 354).  In other words, while the Consumer Account Fee and Information Schedule was used "to disclose the amounts of [the bank's] fees to customers," it only disclosed the individual fee amounts (Tr. 1156).  It did not disclose how posting order could dramatically multiply the number overdraft penalties a customer could be assessed.[15]

219.     Nor did the bank's account statements alert depositors.  Throughout the class period, Wells Fargo separated credit transactions, debit-card transactions, and checks on its printed account statements.  The separation of these transactions made it nearly impossible for a customer to determine the actual posting order being employed by the bank.

220.     Further obfuscating the bank's high-to-low posting order was the fact that certain "priority debit" transactions — like cash withdrawals and balance transfers — were always posted *before* debit-card transactions, checks, and ACH transactions.  The account statement of Ms. Gutierrez discussed earlier in this order provided a clear example of this obfuscation, as her $22 ATM withdrawal posted *before* her $74.39 debit-card purchase at Albertsons supermarket (TX 1).  Thus, even if a reasonable consumer viewed the actual order that his transactions were posted by the bank, a high-to-low ordering would not be self-evident.

---

[15]  This failure also supports the prior finding that the challenged resequencing practice was not a "pricing decision" under 12 C.F.R. 7.4002.  If the challenged practice was truly a pricing decision, the bank would have disclosed it in the Consumer Account Fee and Information Schedule.

53

EXHIBIT 19
Page 053

United States District Court
For the Northern District of California

1    221.    Finally, none of Wells Fargo's marketing documents admitted into evidence

2    disclosed the bank's posting order or its potential impact on overdraft fees.

3    **MISLEADING MARKETING MATERIALS**

4    222.    The bank's murky disclosures regarding posting order were exacerbated by

5    misleading information disseminated by Wells Fargo reinforcing the perception that transactions

6    would be deducted from their accounts in chronological order.

7    223.    A Wells Fargo marketing theme was that debit-card purchases were "immediately"

8    or "automatically" deducted from an account.  This likely led the class to believe:  (1) that the

9    funds would be deducted from their checking accounts in the order transacted, and (2) that the

10    purchase would not be approved if they lacked sufficient available funds to cover the transaction.

11    This language was present on Wells Fargo's website (TX 129), on Wells Fargo's Checking,

12    Savings and More brochures from 2001 and 2005 (TX 88, 89), and Wells Fargo's New Account

13    Welcome Jacket from 2004 (TX 82).

14    224.    A few examples of these misleading statements were included in the findings for

15    Ms. Gutierrez and Ms. Walker (Nos. 17, 63).  Additional examples of these misleading

16    representations are shown below:

17

18    Debit cards can be used wherever Visa and MasterCard debit cards
are accepted. They differ from credit cards in that the money is

19    *immediately* withdrawn from your account (TX 129) (emphasis
added).

20    *        *        *

21    Don't spend money today counting on a deposit tomorrow.  Check
card and ATM transactions generally *reduce the balance in your*

22    *account immediately* (TX 116) (emphasis added).

23    *        *        *

24    With a debit card, you can use ATMs, but you can do even more.
Instead of carrying cash or writing a check, you can use a debit

25    card at stores and restaurants that accept Visa or MasterCard debit
cards.  Remember, *the money comes right out of your checking*

26    *account the minute you use your debit card* (TX 143) (emphasis
added).

27    *        *        *

28

54

EXHIBIT 19
Page 054

**United States District Court**
For the Northern District of California

1    Remember that whenever you use your debit card, *the money is
     immediately withdrawn from your checking account. If you don't*
2    *have enough money in your account to cover the withdrawal, your*
     *purchase won't be approved* (TX 131) (emphasis added).
3

4    225.    This order finds that these misrepresentations were placed in such a wide array of

5    marketing documents and these documents were distributed in such a widespread manner that

6    class members were likely to be misled by them.[16]

7    226.    Furthermore, when a customer used Wells Fargo's online banking service, the

8    bank would display "pending" debit-card purchases in chronological order, leading customers to

9    believe that the processing would take place in that order. In reality, debit-card purchases were

10   never posted in this order during the class period, as the bank well knew. Nothing on the bank's

11   online-banking website warned customers that the pending transactions, displayed

12   chronologically to them, would be resequenced behind the scenes and posted in high-to-low order

13   to maximize overdrafts.

14   227.    Finally, the trial record clearly shows that Wells Fargo encouraged its customers to

15   keep track of their account balances using a register (*see, e.g.*, TX 131 at 48; Tr. 547, 1216).

16   Indeed, this has been a theme of the bank in this litigation, and Wells Fargo account statements

17   included this very recommendation (*see, e.g.*, TX 1). Pam Erwin, who handled Wells Fargo's

18   financial literacy program to educate consumers about financial decision-making, explained at

19   trial when discussing debit-card purchases that "it's the account holder's responsibility to track

20   those transactions against their check register and/or savings register" (Tr. 547). A register,

21   however, is chronological. It fosters the view that items are deducted in chronological order.

22   228.    In this regard, a customer who faithfully uses a register to track items would know

23   the exact point — indeed, the exact transaction — at which her account goes into overdraft. That

24   faithful customer could not reasonably be expected to know that the bank would manipulate the

25   order of her transactions so as to deplete her account balance faster than shown in her register,

26

27   _____

28   [16] In particular, the Checking, Savings and More brochure and the Wells Fargo Welcome Jacket were
     customarily given to all banking customers when they opened their accounts. That said, the "immediately" and
     "automatically" language was used in so many marketing pieces that it can be reasonably assumed that class
     members were exposed to them (*see, e.g.*, TX 116, 129, 131, 143, 501, 559).

55

EXHIBIT 19
Page 055

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1  triggering not one but as many as ten overdraft penalties, all due to the bank's high-to-low

2  bookkeeping scheme. A precise register could never alert a customer who makes a mistake that

3  her one overdraft will be converted into as many as ten overdrafts.

4      229.    This order finds that Wells Fargo not only failed to adequately disclose its

5  high-to-low posting practices but promoted a false perception that debit-card purchases would be

6  deducted from their accounts in the order transacted.

7  **INADEQUATE DISCLOSURES OF THE SHADOW LINE**

8      230.    The shadow line itself has never been disclosed to customers — its specific

9  workings remain shrouded in secrecy. At trial, witnesses for Wells Fargo refused to explain the

10  details except to advise that it amounted to a computerized credit-risk assessment on an

11  account-by-account basis.

12      231.    The objective of the shadow line was to promote "overdraft via POS," as the

13  bank's internal memos explained, meaning to encourage more overdrafts — and thus more

14  overdraft fees — through point-of-sale debit-card purchases. Instead of declining transactions

15  when funds were too short, as it once did, the bank switched to approving them without warning

16  to the customer standing in line at a coffee shop or elsewhere that an overdraft — and a

17  $34 overdraft fee — was in progress.

18      232.    The available-balance information communicated online to customers was

19  supposed to represent the amount of funds the bank would make available for their next

20  transaction. Wells Fargo defined it as such. This, however, was not true. Wells Fargo allowed

21  customers to spend *more* than their available balance using their debit cards via undisclosed

22  shadow-line overdrafts.

23      233.    In 2002, prior to adopting the shadow line for debit-card purchases, Wells Fargo

24  put the following notice in its customers' monthly account statements and — for new customers

25  — by an addendum to their customer account agreements (TX 364) (emphasis in original):

26

27          Wells Fargo is changing our approval criteria for Point-of-Sale
        (POS) transactions (e.g. when you use your ATM Card, ATM &
28          Check Card or Gold ATM & Check Card to purchase goods and

56

EXHIBIT 19
Page 056

United States District Court
For the Northern District of California

1
2
services from affiliated merchants). If you perform a POS transaction *without* sufficient funds in your account to cover the transaction, we may:

3
4
•    Cover the item if you have overdraft protection;
•    Pay the item and create an overdraft to your account; or
•    Decline the transaction.

5
6
If we authorize the transaction, you may be charged a fee, which will vary depending upon the action taken.

7    234.    This was inadequate to fairly warn depositors.[17]  *First*, at all times — before and

8    after the shadow line — all banks had the option under commercial law to pay an item into

9    overdraft or to decline to do so.  *See* Cal. Com. Code § 4401; *see also Bank of America v.*

10   *Universal Finance Co.*, 131 Cal. App. 116, 125 (1933).  The insert made it appear as if the change

11   was adding a new option when in fact the pay-into-overdraft option was already in place.  The

12   *real* change was an operations switch from routinely declining transactions to routinely approving

13   them as overdrafts without point-of-sale notice.  This was to promote "overdraft via POS."  This

14   went undisclosed.

15       235.    *Second*, the insert stated:  "If we authorize the transaction, you may be charged a

16   fee, which will vary depending upon the action taken."  In truth, however, it might not be "a fee"

17   but as many as *ten* overdraft fees (at $35 each).  The same applied to the phrase "We may . . . pay

18   the item and create an overdraft to your account."  In truth, it might not be "an overdraft" but as

19   many as *ten* overdrafts.  The word "may" was misleading, for it was *in truth* a certainty — not a

20   maybe — that overdraft fees would be assessed barring an intervening deposit.  In short, the

21   insert vastly understated the risks of the bank's "overdraft via POS" practice.

22       236.    This order finds that these disclosures failed to warn or explain to reasonable

23   depositors that the shadow-line extension would amplify the impact of high-to-low posting on

24   overdraft fees (Tr. 1154; TX 90, 341, 408).  This omission was likely to deceive class members.

25
26
27   ───────────────
     [17]  While this 2002 notice was the subject of *Smith v. Wells Fargo Bank, N.A.*, that case involved the
28   question of whether the notice adequately disclosed the shadow line itself.  The claims herein are limited to the
     bank's high-to-low practice.  Thus, the 2002 notice is only being discussed to highlight the fact that it did not
     contain adequate disclosures regarding the impact that high-to-low posting would have on overdraft fees.

EXHIBIT 19
Page 057

**COMPLAINTS FROM WELLS FARGO CUSTOMERS**

237.    Hundreds of customer complaints regarding overdraft fees were admitted at trial. These included many complaints written by California Wells Fargo customers who found themselves on the receiving end of a cascade of overdraft charges caused by high-to-low resequencing. These complaints expressed indignation that transactions were "re-dated," "re-arranged," and "manipulated" from the order in which they had occurred (*see*, *e.g.*, TX 127, BATES 4583, 4663, 4931, 5241, 5269, 5957).[18] For example, one customer complained (*id.* at BATES 4726):

> They took the extra 100 that would have paid some of the other debits, and put through the largest amounts first. This caused me to be overdraft 10X's in one day for 5 and 10 charges. . . . This is over 340.00 in over draft.

238.    One handwritten complaint from a customer who had been "a loyal Wells Fargo customer for almost 8 years, starting at age 18," stated (*id.* at BATES 5148):

> I'm facing additional fees of over $500. I cannot afford that at this point in my life. This is a lot of money for me.
>
> There are a lot of ways to get trapped in overdraft that's unnecessary. The processing of larger debits much time before several smaller ones, which will accrue a significantly larger overdraft fee build up, which is exactly what happened to me.

239.    This order agrees that Wells Fargo constructed a trap — a trap that would escalate a single overdraft into as many as ten through the gimmick of processing in descending order. It then exploited that trap with a vengeance, racking up hundreds of millions off the backs of the working poor, students, and others without the luxury of ample account balances.

---

[18] The bank's hearsay objections to these particular complaints are overruled. The complaints are admissible to show that depositors were assessed large overdrafts and that customers — once informed of the bank's rationale — disagreed that high-to-low resequencing was for the depositor's benefit. For these purposes, the complaints are admissible and probative.

58

United States District Court
For the Northern District of California

EXHIBIT 19
Page 058

United States District Court

For the Northern District of California

### OTHER STATE LAWS TARGETING POSTING ORDER

240.    This order further finds that enforcement of plaintiffs' claims would have only an incidental effect on the bank's ability to engage in the business of banking.  It would also not "obstruct, impair, or condition" the bank's ability to exercise its deposit-taking powers.  For many years, the bank used low-to-high processing and other posting methods.  Doing so did not impair the bank's abilities.

241.    For years, moreover, Wells Fargo has complied with far more restrictive laws in Nevada barring high-to-low posting of checks (TX 59):

> 2.  A fee or charge for the presentation for payment, on a single business day, of multiple checks drawn by a customer on an account for which there is an insufficient balance to pay all of the checks, must be determined as if the checks drawn in a single series or class were presented:
>
> (a)  In the order the checks were written;
>
> (b)  From the lowest check number to the highest check number;
>
> (c)  In order of ascending amounts, the check for the smallest sum being presented first.

N.R.S. 657.120 (1999).[19]

242.    Wells Fargo has complied with this restrictive law by simply posting transactions differently in Nevada than in California (since 2001) (TX 59).  This has not disturbed the bank's ability to engage in the business of banking and exercise its deposit-taking powers.

243.    Additionally, Wells Fargo has also been posting transactions differently in New Mexico and Washington "for at least a couple of years" (Tr. 1502–08).  In these states, the bank has been operating a "pilot program" where all "prior day" credits and debits are posted before credits and debits presented on the "current day."  This provides further proof that posting order variances do *not* more than incidentally affect the bank's ability to engage in the business of banking.

---

[19]  The original 1989 version of the statute was even more restrictive.  It did not include a serial or chronological option and forced banks to post checks in low-to-high order.  *See* N.R.S. 657.120 (1989).

EXHIBIT 19
Page 059

**ANALYSIS AND CONCLUSIONS OF LAW**

The legal analysis will proceed in two steps:  *First*, this order will address plaintiffs' claim that Wells Fargo's high-to-low posting practice was "unfair" under Section 17200.  *Second*, this order will address whether that practice was "fraudulent" under Section 17200.  With respect to Wells Fargo's defenses on these claims, most will be addressed with the merits of each claim. This order, however, will separately address Wells Fargo's preemption defense and "no standing" defense.  Finally, this order will consider the impact of the release in *Smith v. Wells Fargo Bank, N.A.*

### 1.    "UNFAIR" BUSINESS PRACTICES UNDER SECTION 17200.

Section 17200 of the California Business and Professions Code prohibits business acts or practices that are "unlawful," "unfair," or "fraudulent."  Each of these three restrictions constitutes a separate and independent claim.  *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999) (citations omitted).  Only "unfair" and "fraudulent" business practices are at issue in this litigation.

For an "unfair" business practice under Section 17200, the undersigned judge previously held herein that plaintiffs had to (1) identify an unfair policy or practice *tethered to a legislatively declared policy* or (2) show an actual or threatened impact on competition (Dkt. No. 246).  *Id.* at 185–88.  The claim that Wells Fargo's "resequencing" practices are "unfair" under Section 17200 is properly "tethered" under *Cel-Tech* to the legislative comment expressed under California Commercial Code Section 4303(b), as now detailed.

### A.    The "Tethering" Requirement Under *Cel-Tech* is Satisfied by the Legislative Comment to California Commercial Code Section 4303(b).

Adopted in 1963, California Commercial Code Section 4303(b) is California's version of Section 4-303 of the Uniform Commercial Code.  It addresses the relationship between the bank and presenters of items for payment and states:

> Subject to subdivision (a) [of this section], items may be accepted, paid, certified, or charged to the indicated account of its customer in any order.

60

EXHIBIT 19
Page 060

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

Cal. Com. Code § 4303(b).  In other words, as between a bank and various merchants presenting items for payment, the bank has discretion to choose whom to pay when funds are insufficient to pay all of them.  This provision came into play in this litigation when Wells Fargo raised it to argue that state law authorized banks to post transactions, including debit-card transactions, in any order they wished.

The California legislature, however, expressly disavowed such unfettered discretion.  As part of the 1992 amendments to the California Commercial Code, a legislative comment was added to Section 4303 that stated:

> The only restraint on the discretion given to the payor bank under subsection (b) is that the bank act in good faith.  *For example, the bank could not properly follow an established practice of maximizing the number of returned checks for the sole purpose of increasing the amount of returned check fees charged to the customer.*

Cal. Com. Code § 4303(b), Calif. cmt. 7 (emphasis added).[20]  Thus, banks were *required* to act in good faith when exercising discretion vis-a-vis posting order and could not, for example, establish posting practices for the sole purpose of maximizing penalties imposed on customers.

The same legislative comment also made clear that "discretion" as used in Section 4303(b) meant *item-by-item* discretion:

> For example, three checks drawn on a customer's account are presented for payment to the payor bank as follows:  an $850 check to the Internal Revenue Service, a $300 check to a department store and a $200 check to John Doe.  The balance of available funds in the customer's account is $900.  Since the three checks overdraw the customer's account by $450 the payor bank has no duty to the customer to pay all three checks.

> Under subsection (b) if the bank chooses not to pay all of the checks, it may either pay the $850 check to the IRS and return the other two smaller checks or pay the two smaller checks and return the $850 check.

---

[20]  Another section of the California Commercial Code states that "[i]f a receiving bank has received more than one payment order of the sender or one or more payment orders and other items that are payable from the sender's account, the bank may charge the sender's account with respect to the various orders and items in any sequence."  Cal. Com. Code § 11504(a).  This section does not change the fact that California legislators clearly imposed a duty of good faith on the bank when exercising discretion with respect to posting order.

61

EXHIBIT 19
Page 061

United States District Court

For the Northern District of California

1
2
3
4

In this example, it may well be that the customer would prefer that the check to the IRS be paid because nonpayment may have more serious consequences than nonpayment of the other two checks, but that is not necessarily true. Payment of one of the smaller checks may be more vital or the customer may prefer to minimize the number of checks returned because the payor bank normally charges a fee with respect to each returned check.

5
6
7
8
9

The bank has no way of knowing the wishes of the customer, *but it may be able to identify a check that appears to be particularly important. It is necessary to give discretion to the payor bank because it is impossible to state a rule that will be fair to the customer in all cases*, having in mind the almost infinite number of combinations of large and small checks in relation to the available balance on hand in the drawer's account; the possible methods of receipt; and other variables.

10    Cal. Com. Code § 4303(b), Calif. cmt. 7 (emphasis added). In other words, the legislature

11    recognized that a bank may exercise individualized discretion to prioritize a payment that

12    "appears to be particularly important." A computer-driven high-to-low, one-size-fits-all

13    resequencing of transactions does *not* employ any such item-by-item discretion. This point is *not*

14    that banks must go back to manual sorting. Rather, the point is that, contrary to Wells Fargo's

15    argument, the posting discretion afforded by Section 4303 must be exercised in good faith

16    towards the customer and may not be exercised solely to drive up overdraft fees.

17         While on its face this comment only refers to checks, it plainly covers debit cards as well.

18    The comment was approved when depositors only used checks in lieu of a cash payment. Since

19    then, debit cards have arrived as another way to make such payments. The comment applies with

20    full force to both. Indeed, Wells Fargo itself argued that Section 4303(b) applied to both checks

21    and debit cards when it raised this section as a shield to liability — albeit without expecting

22    anyone to read the legislative comment. Wells Fargo does not argue to the contrary even now,

23    but this point should be made lest the question suggest itself on appeal. (That the bank once relied

24    so vigorously on the California Commercial Code, moreover, belies its supposed faith in federal

25    preemption.)

26         **B.    The Requirement That the Bank Act in "Good Faith" Also Flows from the Implied Covenant of Good Faith and Fair Dealing.**

27
28         Apart from this provision of the UCC, California's civil law governs the relationship

between a bank and a customer. In *Perdue v. Crocker Nat'l Bank*, 38 Cal. 3d 913, 923 (1985),

62

EXHIBIT 19
Page 062

United States District Court

For the Northern District of California

1  a decision specifically addressing overdraft fees, the California Supreme Court held that "where a

2  contract confers on one party a discretionary power affecting the rights of the other, a duty is

3  imposed to exercise the discretion in good faith and in accordance with fair dealing."

4  　　　Throughout trial, Wells Fargo stated that the CAA was its "contract with the customer"

5  that "govern[ed] the relationship" between the bank and deposit-account holders. The CAA itself

6  contained such language (*see, e.g.*, TX 3 at 4). Unlike the simple one-page agreements that were

7  used at the time of *Perdue*, the Wells Fargo CAA weighs in at over 60 pages, each page

8  containing single-spaced text in ten-point font. Buried deep within this document in substantially

9  the same form in all versions was the statement that Wells Fargo "may, if it chooses, post items in

10  the order of the highest dollar amount to the lowest dollar amount" (*see, e.g.*, TX 13 at 24–25,

11  TX 79 at 23). Passing over momentarily the fact that even the bank's own expert conceded that

12  few consumers would ever read or understand it, this phrasing called for the exercise of

13  discretion, as the bank's own internal memos recognized (TX 48). And, having delegated itself

14  discretion, *Perdue* imposed on the bank the duty to exercise that discretion in accordance with the

15  covenant of good faith and fair dealing. This precludes exercising that discretion to turn what

16  would ordinarily be one overdraft into as many as ten.

17  　　　Citing *Carma Developers v. Marathon Dev. Cal., Inc.*, 2 Cal. 4th 342, 373–74 (1992),

18  Wells Fargo argues that this language allowed the bank to exercise its discretion to adopt

19  high-to-low posting — even if in bad faith. In *Marathon*, the California Supreme Court held that

20  while the implied covenant of good faith and fair dealing was read into every contract, it could

21  not create obligations different from or inconsistent with the *express* terms of the contract. That

22  said, *Marathon* emphasized that express grants of discretion were still subject to "the reasonable

23  expectations of the parties." *Id.* at 374.

24  　　　Based on the trial record, this order finds that class members could not reasonably have

25  expected that the bank would transform what would ordinarily be one overdraft into as many as

26  ten. As stated, the bank's *own* expert on disclosures, Itamar Simonson, explained at trial that the

27  majority of consumer checking-account holders would not and could not be expected to read the

28  CAA. In his own words, it is "completely unrealistic to assume that . . . many consumers would

63

EXHIBIT 19
Page 063

1    actually read those lengthy documents" (Tr. 977–78). Moreover, even if they read the section on

2    posting order, Expert Simonson noted that most consumers would not be expected to understand

3    how posting order could impact overdraft fees (*id.* at 976–78, 982). Indeed, both plaintiffs who

4    testified at trial — Ms. Gutierrez and Ms. Walker — stated that they did not understand how

5    changes in posting order could impact the number of overdraft fees they could be assessed.

6        At least with the freely negotiated lease-termination provision in *Marathon*, both sides

7    reasonably expected and understood the impact of the discretion. Here, even Wells Fargo's own

8    expert, Itamar Simonson, admitted that it was "difficult for consumers to understand," based

9    upon the CAA disclosure, how the exercise of discretion by a bank to post transactions from

10   highest-to-lowest dollar amount would impact them (*id.* at 982).

11       An important factor in determining the reasonable expectation of the parties in the context

12   of adhesion contracts is "the extent to which the contract affects the public interest." *Allan v.*

13   *Snow Summit, Inc.*, 51 Cal. App. 4th 1358, 1375–76 (1996). The legislative comment to Section

14   4303(b) of the California Commercial Code evidences a policy of California to ensure that banks

15   act with good faith when re-ordering transactions during the posting process and *not* post in a way

16   to ramp up overdraft fees. Here, the contractual language regarding posting order was ambiguous

17   at best. The bank stated in every version of its CAA that it "may, *if it chooses*, post items in the

18   order of the highest dollar amount to the lowest dollar amount" (*see, e.g.*, TX 79 at 23) (emphasis

19   added). Even a sophisticated customer could reasonably have understood this to mean that the

20   bank had *not* yet chosen to implement such a change or would exercise discretion on an

21   item-by-item basis as expressly contemplated by the legislative comment to Section 4303.

22   Ambiguities should be resolved against the drafter, especially where contracts of adhesion are

23   involved. *See* Cal. Civ. Code § 1654; *see also Goddard v. South Bay Union High School Dist.*,

24   79 Cal. App. 3d 98, 105 (1978).

25       Finally, the same section of the CAA also noted that "[t]he Bank may post Items presented

26   against the Account in any order the Bank chooses, *unless the laws governing your Account*

27   *either requires or prohibits [sic] a particular order*" (*see, e.g.*, TX 79 at 23) (emphasis added).

28   The "good faith" limitation found in the legislative comment of Section 4303(b) imposed such a

United States District Court

For the Northern District of California

64

EXHIBIT 19

Page 064

restriction. That section (and the comments thereto) prohibited certain posting orders — namely, those implemented for the purpose of increasing the number of overdraft penalties inflicted on customers. Thus, by the bank's own terms, it subjected itself to the "good faith" limitations of Section 4303(b).

In sum, customers reasonably expect, of course, that if they overdraft their accounts, they will have to pay an overdraft fee. They do not, however, reasonably expect that they will have to pay up to ten overdraft fees when only one would ordinarily be incurred. This severe result is so pernicious that it should be allowed, if at all, only upon a showing that it was within the reasonable expectations of the parties. Here, the proof is the opposite. The bank went to great lengths to bury the words deep in a lengthy fine-print document and the words selected were too vague to warn depositors, as even the bank's own expert conceded. These circumstances preclude the *Marathon* exception to *Perdue*.

### C. Wells Fargo Acted in Bad Faith When it Posted Debit-Card Transactions in High-to-Low Order.

Based on the legal standards above, this order concludes that the revenue initiatives implemented by Wells Fargo in 2001 and 2002 — all of which ran rampant during the class period and indeed through at least the end of trial — violated the "unfair" restriction of Section 17200. The trial record and findings herein show that these initiatives had an immediate, intended, and material impact on increasing the number of overdraft fees that Wells Fargo could assess customers. All three initiatives were motivated by avarice at the depositor's expense. No credible evidence — indeed, no *written* evidence — points to any other rationale.

To recap these facts, the first initiative was the high-to-low switch. Before, Wells Fargo used low-to-high posting, which minimized overdrafts. The switch to high-to-low posting maximized overdrafts. This was mathematically guaranteed. No notice was given that the switch had occurred.

None of the bank's proffered justifications are credible. *First*, as found above, the bank did not act out of solicitude for customers and any supposed belief that customers would prefer high-to-low posting. That is a post-hoc rationalization. Among other reasons, the vast majority of debit-card purchases are "must pay" transactions. As such, posting order would make no

United States District Court

For the Northern District of California

65

EXHIBIT 19
Page 065

difference to the customer — the bank is required to honor a debit-card purchase whether it posts first, last, or somewhere in between. *Second*, as found above, the bank did not base its decision on the factors set forth in 12 C.F.R. 7.4002. Wells Fargo considered nothing other than increasing overdraft revenue when deciding to post debit-card transaction in high-to-low order.

The initiatives challenged herein required nine to twelve months of planning and implementation. Many emails and reports would have been generated over this extended time period. The trial record, however, is devoid of written documents showing that Wells Fargo implemented the high-to-low change for any purpose other than profiteering. While Wells Fargo asserted that it did not have document retention policies at the time for these types of documents, its retention policies were never offered at trial *despite an express invitation to present them*. And, if Wells Fargo had truly believed that its initiatives were subject to federal oversight under 12 C.F.R. 7.4002 and other federal regulations, it *would normally have* prepared and retained written records to show compliance. The absence of any such records speaks volumes.

In sum, Wells Fargo's decision to post debit-card transactions in high-to-low order was made for the sole purpose of maximizing the number of overdrafts assessed on its customers, exactly what Section 4303 and *Perdue* bar. Accordingly, the decision was not made in good faith.

### D. Wells Fargo Acted in Bad Faith When it Commingled Debit-Card Transactions With Checks and ACH Transactions.

The second initiative, implemented in December 2001, was the commingling of debit-card transactions with checks and ACH transactions in the posting process. Once commingled, these transactions were posted together in high-to-low order.

Before, all debit-card transactions were posted ahead of checks, and all checks were posted ahead of ACH transactions. There was a purpose behind this separation. Unlike debit-card transactions, checks and ACH transactions were *not* "must pay" transactions. In other words, the bank had discretion to return them unpaid. Because of this, Wells Fargo had a legitimate business reason to pay "must pay" items first (*e.g.*, process checks and ACH transactions *after* all debit-card transactions). On this point, the legislative comment to

66

EXHIBIT 19
Page 066

1   Section 4303(b) states that "[t]he bank has the right to pay items for which it is itself liable ahead

2   of those for which it is not."

3          This, however, was thrown aside in December 2001.  The commingling change had the

4   intended effect of multiplying the number of debit-card transactions for which the bank could

5   assess an overdraft fee.  Through commingling, the typically larger checks and ACH items used

6   up the accounts faster so that there would be more overdrafts when the typically smaller value

7   debit-card items were paid.  Wells Fargo's own words summed this effect up best:  the

8   commingling change was designed to "more-closely mirror true High-to-Low sort order"

9   (TX 36), *i.e.*, to eat the account up as soon as possible and thus yield more overdraft fees.

10          The internal Wells Fargo documents quoted in the findings show that overdraft revenue

11   was the sole motivating factor, predicting a "lift" in overdraft revenues by $40 million.  The

12   April/May 2002 email exchange between Mr. Zimmerman and Mr. Biller graphically confirmed

13   this profiteering motive.

14          Given the evidence, this order concludes that the decision to commingle debit-card

15   transactions with checks and ACH transactions was made solely to gouge the customer, exactly

16   what the legislative comment barred.

17          **E.     Bad Faith and the Shadow Line.**

18          The third initiative was "overdraft via POS" — the extension of the shadow line to

19   debit-card purchases in May 2002.  As a result of this change, Wells Fargo began authorizing

20   debit-card purchases even though the account was already overspent.  Before, if an account holder

21   had insufficient available funds to cover a debit-card purchase, the bank would decline the

22   transaction, thereby protecting the customer from further unintended overdrafts.  After, the bank

23   authorized the transaction without informing anyone that an overdraft was in progress.

24          Profiteering was the sole motive behind this revenue initiative.  On this point, BSE

25   documents clearly showed that the extension of the shadow line to debit-card purchases in

26   May 2002 was — like the commingling change — expected to increase fee revenues by

27   $40 million.  (In other words, this $40 million increase was above and beyond the separate

28

67

EXHIBIT 19
Page 067

1    $40 million in revenue expected from commingling.)  Mr. Zimmerman called this initiative

2    "overdraft via POS" — a telling label capturing the true motive.  No credible or written evidence

3    showed that this initiative was implemented for any other reasons.

4         In sum, Wells Fargo used bad faith to deploy high-to-low posting of debit-card

5    transactions, commingle debit-card transactions with checks and ACH transactions, and extend

6    the shadow line to debit-card purchases.  The commingling and shadow-line decisions were

7    closely allied with the bank's high-to-low bookkeeping scheme.  Together, they formed a

8    "one-two-three" punch to maximize the overdraft-multiplying effect of a high-to-low posting

9    order — all at the expense of customers.

10        For these reasons, the bank's high-to-low initiatives were "unfair" under Section 17200.

11   These practices were adopted solely to maximize the number of overdraft items assessed on

12   customers (over all other possible orderings) and for the sole purpose of increasing revenue.  This

13   not only violated the "good faith" requirement of California Commercial Code § 4303(b) and the

14   good faith requirement under *Perdue*.

15        Wells Fargo's counter-arguments are unpersuasive.  *First*, Wells Fargo argues that it did

16   not seek to "maximize" the number of overdraft items for the "sole purpose" of assessing

17   overdraft fees.  To support this argument, the bank points to its overdraft-protection services, its

18   limitation of *ten* overdraft items per day, and its one-dollar overdraft "courtesy threshold."  In the

19   same vein, Wells Fargo also argues that by posting a customer's credits first (rather than last), this

20   reduced the number of overdraft items it could have potentially assessed customers.

21        These arguments are rejected.  That Wells Fargo could have gouged even worse than it

22   has hardly alters the fact that it has gouged badly.  Plaintiffs do not need to prove that the bank

23   mistreated depositors in every way possible in order to show that they were mistreated.  The

24   presence of an extraordinarily high *ten*-item cap on daily overdraft fees, as well as a minuscule

25   one-dollar courtesy threshold, do not change the fact that Wells Fargo deployed the challenged

26   practices for the sole purpose of multiplying overdrafts to increase fee revenue.  Additionally, the

27   mere continued availability of overdraft-protection services — another profit center for the bank

28

68

EXHIBIT 19
Page 068

that benefits from increased overdraft activity — does not change the fact that high-to-low posting had the intended effect of squeezing more overdrafts out of its customers.

*Second*, this order rejects Wells Fargo's argument that because class members could have avoided overdraft fees if they simply had managed their accounts with precision, its practices cannot be deemed "unfair." Even the most precise register could not have predicted that what appeared to be a single overdraft would be converted to ten by the artifice of high-to-low resequencing. Of course it is true that we should all live within our means and avoid overdrafts. That is a given. And, of course it is true that when we overdraft, whether by accident or not, we must expect to pay a fee. That is also a given. This, however, cannot justify turning what would ordinarily be one overdraft into as many as ten. Such a severe result should only be tolerated after clear-cut warnings and consent.

*Third*, contrary to Wells Fargo's characterization of this litigation, plaintiffs are not challenging a simple "price" increase. Nor are plaintiffs arguing that "making money" is unlawful. Rather, plaintiffs' claims are properly tethered to a "good faith" limitation set forth by the California legislature in a comment to California Commercial Code § 4303(b) limiting a bank's ability to increase its revenues through resequencing schemes.

### 2.  "FRAUDULENT" BUSINESS PRACTICES UNDER SECTION 17200.

To establish liability under the "fraudulent" restriction of California Business and Professions Code Section 17200, "it is necessary only to show that members of the public are likely to be deceived." *In re Tobacco II Cases*, 46 Cal. 4th 298, 312 (2009) (internal quotations and citations omitted). Unlike common law fraud, which requires proof of falsity, scienter, and actual reliance, it is not necessary for a plaintiff to prove that a fraudulent deception under Section 17200 was actually false, known to be false by the perpetrator, or reasonably relied upon by a victim who incurs damages. *Ibid.*; *see also Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1025–26 (9th Cir. 2008) ("Unlike a common law fraud claim, a UCL fraud claim requires no proof that the plaintiff was actually deceived."). Rather, "[t]he determination as to whether a business practice is deceptive is based on the likely effect such [a] practice would have

*United States District Court*
For the Northern District of California

69

EXHIBIT 19
Page 069

on a reasonable consumer." *Morgan v. AT&T Wireless Services, Inc.*, 177 Cal. App. 4th 1235, 1256 (2009).

A claim that a business practice is (or was) "fraudulent" under Section 17200 can be based upon representations that deceive because they are untrue as well as representations that may be accurate on some level but nonetheless tend to mislead or deceive. As such, a perfectly true statement couched in such a manner that it is likely to mislead or deceive the consumer, such as by failure to disclose *other* relevant information, is actionable under Section 17200. *Id.* at 1255 (citation omitted). As now detailed, Wells Fargo's deceptive practices were and continue to be in violation of the "fraudulent" restriction of Section 17200.

> **A.    The Wells Fargo Consumer Account Fee and Information Schedule
> Did Not Disclose the Bank's Posting Practices.**

Fees associated with individual overdraft items were disclosed to Wells Fargo customers through a document called the Consumer Account Fee and Information Schedule. This document, which was provided to customers when they opened an account, not only explained the per-item fee that would be assessed per overdraft item, but set forth the ten-item daily cap on overdraft and NSF fees. Wells Fargo used this document to disclose all relevant information for account-related fees, and reasonable consumers would have understood this document to contain all relevant information pertaining to overdraft fees.

Significantly, the Consumer Account Fee and Information Schedule did *not* disclose the high-to-low posting order or its impact. It did not tell customers that frequent use of a debit card for small-valued purchases could result in an avalanche of overdraft fees for each of those purchases due to the high-to-low posting order. It also failed to cross-reference any information on posting order in the CAA.

> **B.    The Consumer Account Agreement Failed to Adequately Disclose
> the Challenged Resequencing Practices.**

In shaping the reasonable expectations of its customers, the bank should have prominently disclosed its high-to-low scheme and its ability to transform a single mistake into as many as ten overdrafts. The bank's "disclosures" on posting order, however, were buried 20-or-so pages into a 60-plus-page document of single-spaced, ten-point font text. As stated, Wells Fargo's own trial

70

EXHIBIT 19
Page 070

expert, Itamar Simonson, affirmatively testified on direct examination that customers would *not*
and could *not* be expected to read the lengthy document (Tr. 977–78). And, even if it was read,
the statements therein on posting order were "difficult for consumers to understand," as the
bank's own expert confirmed (*id.* at 982).

For example, the October 2004 CAA stated that "the Bank may, *if it chooses*, post
[transactions] in the order of the highest dollar amount to the lowest dollar amount" (*see, e.g.*,
TX 79 at 23) (emphasis added). This statement — if it was ever read — would have been
understood by an ordinary consumer to mean that Wells Fargo had *not yet chosen* to post
transactions in high-to-low order. This was misleading, for the bank well knew that it already had
chosen and indeed was already processing in high-to-low order. Versions of the CAA given to
customers after October 2004 did not resolve these deficiencies. While these copies of the CAA
stated that a high-to-low posting order, *if* used, *might* result in the imposition of more overdraft
and returned-item fees than a low-to-high posting order, the CAA continued the misleading
implication that the bank *had yet to choose* a high-to-low scheme or would exercise discretion on
a case-by-case basis.

### C. Wells Fargo Only Disclosed its Posting Practices to Customers After They Were Blind-Sided by Multiple Overdraft Fees.

The closest Wells Fargo got to an accurate and understandable disclosure of its posting
practices was after the fact and, even then, only to those who complained (*see, e.g.*, TX 127,
BATES 4387). Wells Fargo provided its tellers and phone-bank employees with a clear script to
respond to customers who protested after receiving multiple overdraft fees caused by high-to-low
resequencing. These explanations were in plain English. At least for those angry few lucky
enough to qualify for these responses, they provided a comprehensible disclosure of the bank's
actual posting practices — *after the fact*.

### D. The Dissemination of Misleading Information Enhanced the Likelihood That Wells Fargo Customers Would be Deceived.

Wells Fargo directed misleading propaganda at the class that likely led class members to
expect that the actual posting order of their debit-card purchases would mirror the order in which
they were transacted. For example, the "account activity" information provided to customers

71

EXHIBIT 19
Page 071

through online banking — a service made available to all Wells Fargo depositors — displayed "pending" debit-card transactions *in chronological order* (*i.e.*, the order in which the transactions were authorized by Wells Fargo). When it came time to post them during the settlement process, however, the same transactions were *not* posted in chronological order but were posted in high-to-low order.

Misleading marketing materials promoted the same theme of chronological subtraction. A number of Wells Fargo marketing materials, including the Wells Fargo Welcome Jacket that was customarily provided to all customers who opened a consumer checking account, contained misleading representations regarding how debit-card transactions were processed. Specifically, these various materials — covered in detail in the findings of fact — communicated that debit-card POS purchases were deducted "immediately" or "automatically" from the user's checking account (*see, e.g.*, TX 116, 129, 131, 143, 501, 559). Such representations would lead reasonable consumers to believe that the transactions would be deducted from their checking accounts in the sequence transacted.

This deception was then exploited by the shadow line. As Wells Fargo Senior Vice-President Karen Moore testified at trial, "[t]he available balance is created for the bank to understand the amount of money that we would make available to the customer for their next transaction" (Tr. 593). Wells Fargo's own website defined the term "available balance" to customers as "the most current picture of funds you have available for withdrawal" (*id.* at 1220–21). Once the shadow line was extended to debit-card purchases in May 2002, Wells Fargo began using it to approve into overdraft purchases that were previously declined. Customers who relied upon the online available balance would be deceived into thinking that a debit-card purchase would be *declined* if they did not have sufficient funds to cover the transaction.

Finally, Wells Fargo encouraged the use of registers in its marketing materials. This promoted the idea that transactions would be deducted chronologically.[21] Registers necessarily rely upon a chronological accounting of transactions and reinforce a natural expectation by a

---

[21] Indeed, plaintiff Gutierrez utilized such a register to keep track of her purchases until she began relying upon Wells Fargo's phone-bank services and online banking services to track her "available balance."

EXHIBIT 19
Page 072

United States District Court
For the Northern District of California

1   customer that transactions will subtract chronologically.  But, Wells Fargo did *not* subtract items

2   in chronological order; it subtracted them artificially in high-to-low order.  Even the most

3   exacting register could not anticipate that a single overdraft would be turned into ten through the

4   magic of high-to-low resequencing.  To be clear, there is nothing wrong with promoting the use

5   of check registers.  It is wrong, however, to lead customers to expect items will be deducted in

6   chronological order only to surprise them with a different sequence that generates an avalanche of

7   unexpected overdrafts.

8          In sum, Wells Fargo affirmatively reinforced the expectation that transactions were

9   covered in the sequence made while obfuscating its contrary practice of posting transactions in

10  high-to-low order to maximize the number of overdrafts assessed on customers.

11         **3.    REMAINING DECEPTION CLAIMS.**

12         Plaintiffs seek only injunctive relief for their claims of negligent misrepresentation and

13  fraud.  Given that such relief will be ordered under plaintiffs' Section 17200 claims, it is

14  unnecessary for this order to reach these claims.  As for plaintiffs' false advertising claim, since

15  liability under the "fraudulent" restriction of Section 17200 has been established, liability for

16  plaintiffs' false advertising claim under Section 17500 — which is based upon the same deceptive

17  conduct — has also been proven.  *See Tobacco II*, 46 Cal. 4th at 312 ("A violation of the UCL's

18  fraud prong is also a violation of the false advertising law.").

19         **4.    PREEMPTION.**

20         Wells Fargo argues that the National Bank Act and the implementing regulations of the

21  Office of the Comptroller of the Currency (OCC) preempts all of the foregoing (Dkt. Nos. 38,

22  323).  12 U.S.C. 24 (Seventh); 12 C.F.R. §§ 7.4002, 7.4007, 7.4009.  The undersigned rejected

23  this argument on two prior occasions (Dkt. Nos. 98, 337).  Based on a full trial record, this order

24  again rejects it.

25         The Act vests national banks such as Wells Fargo with authority to exercise "all such

26  incidental powers as shall be necessary to carry on the business of banking."  12 U.S.C. 24

27  (Seventh).  The Supreme Court has "repeatedly made clear that federal control shields national

28  banking from unduly burdensome and duplicative state regulation."  *Watters v. Wachovia*

73

EXHIBIT 19
Page 073

United States District Court

For the Northern District of California

1    *Bank, N.A.*, 550 U.S. 1, 11 (2007).  That said, "[s]tates are permitted to regulate the activities of

2    national banks where doing so does not prevent or significantly interfere with the national bank's

3    or the national bank regulator's exercise of its federal powers." *Id.* at 12.  However, "when state

4    prescriptions significantly impair the exercise of authority, enumerated or incidental under the

5    [NBA], the state's regulations must give way." *Ibid.*

6          The OCC has the primary responsibility for the surveillance of the "business of banking"

7    authorized by the Act.  *Nationsbank of N.C., N.A. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251,

8    256 (1995).  To carry out this responsibility, the OCC has the power to promulgate regulations

9    and to use its rulemaking authority to define the "incidental powers" of national banks beyond

10   those specifically enumerated in the statute.  *See* 12 U.S.C. 93a.  OCC regulations enjoy the same

11   preemptive effect as the Act itself.  *See Martinez v. Wells Fargo Home Mortg., Inc.*,

12   598 F.3d 549, 555 (9th Cir. 2010).

13         The Act and OCC regulations do *not* "preempt the field" of banking in its entirety.

14   "Federally chartered banks are subject to state laws of general application in their daily business

15   to the extent such laws do not conflict with the letter or the general purposes of the [Act]."

16   *Watters*, 550 U.S. at 11 (citations omitted).  The Ninth Circuit recently emphasized this limitation

17   on preemption, stating that "[s]tate laws of general application, which merely require all

18   businesses (including national banks) to refrain from fraudulent, unfair, or illegal behavior, do not

19   necessarily impair a bank's ability to exercise its [federally-authorized] powers." *Martinez*,

20   598 F.3d at 555.

21         As the *Martinez* decision explained, "the OCC has specifically cited [Section 17200] in an

22   advisory letter cautioning banks that they may be subject to such laws that prohibit unfair or

23   deceptive acts or practices."  *Ibid.* (citing OCC Advisory Letter, Guidance on Unfair or Deceptive

24   Acts or Practices, 2002 WL 521380, at *2, *7 n.2 (Mar. 22, 2002)).  The Ninth Circuit then listed

25   a number of decisions exemplifying this limitation on preemption, including *White v. Wachovia*

26   *Bank, N.A.*, 563 F. Supp. 2d 1358 (N.D. Ga. 2008), which held that a claim under the Georgia

27   Fair Business Practices Act that a bank engaged in unfair or deceptive business practices by

28

74

EXHIBIT 19
Page 074

**United States District Court**
For the Northern District of California

1    manipulating the posting of transactions to an account in order to impose overdraft fees was *not*

2    preempted by the Act or OCC regulations.

3        **A.**    **The Resequencing Practice Was Not a Pricing Decision Under 12 C.F.R. 7.4002.**

4            Wells Fargo's preemption defense focuses on three OCC regulations:  12 C.F.R 7.4002,

5    7.4007, and 7.4009.  This order will first address 12 C.F.R 7.4002, which targets "National bank

6    charges."  Section 7.4002 — formerly Section 7.8000 prior to 1996 — was most recently

7    amended in 2001.[22]  Since 2001, this regulation has stated in relevant part (emphasis added):

8

9            (a)  *Authority to impose charges and fees*. A national bank may charge its customers non-interest charges and fees, including deposit account service charges.

10           (b)  *Considerations*.

11              *        *        *

12

13           (2)  The establishment of non-interest charges and fees, their amounts, and the method of calculating them are business decisions to be made by each bank, in its discretion, according to sound banking judgment and safe and sound banking principles.  A national bank establishes non-interest charges and fees in accordance with safe and sound banking principles *if the bank employs a decision-making process through which it considers the following factors, among others*:

14

15

16

17               (i)  The cost incurred by the bank in providing the service;

18               (ii)  The deterrence of misuse by customers of banking services;

19

20               (iii)  The enhancement of the competitive position of the bank in accordance with the bank's business plan and marketing strategy; and

21

22               (iv)  The maintenance of the safety and soundness of the institution.

23              *        *        *

24           (d)  *State law*.  The OCC applies preemption principles derived from the United States Constitution, as interpreted through judicial precedent, when determining whether State laws apply that purport to limit or prohibit charges and fees described in this section.

25

26

27

28       [22]  The 2001 amendment was intended to clarify the preemption language used in the prior version.  It did not substantively change the regulation.  As such, the holdings herein are equally applicable to the version of Section 7.4002 in effect between 1996 and 2001.

75

**EXHIBIT 19**
**Page 075**

**United States District Court**
For the Northern District of California

1    Wells Fargo says that the resequencing practice challenged by plaintiffs is a component of

2    "pricing" (*i.e.*, is part of establishing "non-interest charges and fees" under this regulation) under

3    12 C.F.R. 7.4002.  This is rejected.

4    There is a material difference between the bank's authority to establish overdraft fees —

5    which includes the authority to set the amount of each fee and the method of calculating each

6    fee — versus bank practices aimed at multiplying the number of overdrafts during the posting

7    process.  The recent *Martinez* decision illustrates the former situation.  In *Martinez*, the plaintiffs

8    challenged the alleged "overcharging of underwriting fees and the marking up of tax service fees"

9    by Wells Fargo Home Mortgage.  The plaintiffs argued that the bank's underwriting fees were

10   excessive because they were not reasonably related to the bank's actual costs of performing the

11   underwriting.  The bank's tax service fees were argued as being "excessive" for analogous

12   reasons.  The Ninth Circuit held that both challenges were preempted by 12 C.F.R. 7.4002

13   because plaintiffs were "[i]n essence, . . . argu[ing] that these fees [were] too high, and [were]

14   ask[ing] the court to decide how much an appropriate fee would be."  *Martinez*, 598 F.3d at 556.

15   By contrast, plaintiffs in the instant case are neither challenging Wells Fargo's right to

16   establish overdraft fees nor claiming that the amount of each *individual* overdraft fee is somehow

17   excessive.  Rather, plaintiffs target a practice whereby debit-card transactions are manipulated

18   immediately prior to being posted so as to skyrocket the number of overdraft *items* posted against

19   a customer's account.  In other words, plaintiffs challenge bookkeeping practices that convert

20   what is really one overdraft to count as ten overdrafts.  This is a classic state law issue.  Indeed, it

21   was Wells Fargo that first raised California Commercial Code Section 4303 in its defense

22   herein — only to learn that the legislative comment thereto barred the very practice at issue.

23   Equally fatal to this defense is an utter failure of proof.  For preemption to possibly apply,

24   12 C.F.R. 7.4002 *requires* national banks to actually use a four-factor decision-making process

25   when establishing non-interest charges and fees.  Specifically, to invoke preemption under this

26   regulation, a national bank *must* consider:  (1) the cost incurred by the bank in providing the

27   service, (2) the deterrence of misuse by customers of banking services, (3) the enhancement of the

28

76

EXHIBIT 19
Page 076

competitive position of the bank in accordance with the bank's business plan and marketing strategy, and (4) the maintenance of the safety and soundness of the institution.

As stated, however, Wells Fargo did not consider *any* of these factors when it decided to resequence debit-card transactions from highest-to-lowest dollar amount, commingle debit-card transactions with checks and ACH transactions, and extend the shadow line to the authorization of debit-card purchases.  That no documentary evidence supported the bank's supposed consideration of these factors shows it was a feigned pretense contrived for the trial.  The bank also admittedly failed to disclose these various practices to its customers pursuant to Regulation DD, which would have applied to these decisions if they were truly "pricing changes" under 12 C.F.R. 7.4002.

**B.      The Regulation Recognizes That State Law May Nonetheless Apply.**

Even if the practices challenged herein were somehow "pricing changes" under 12 C.F.R. 7.4002, a number of OCC interpretive letters recognize that state law still regulates conduct like that at issue here.  For example, in OCC Interpretive Letter #916 (May 22, 2001), the OCC expressly stated that the certain acts of misrepresentation by a bank could warrant a finding that the "good faith" limitation set forth in the comment to Section 4303(b) of the California Commercial Code was violated:

> On this point, Federal law governing national bank fees, as embodied in section 7.4002(a), is consistent with the check-posting provision of the California Commercial Code cited by the Bank, which permits the Bank to post checks "in any order." The Commentary to the California provision glosses this provision with the application of a "good faith" standard.
>
> While this letter does not address the applicability to the Bank of the California Commercial Code check-posting provision or the standard articulated in the Commentary, we note that a relevant factor in evaluating good faith would be whether a bank's actions were inconsistent with the practices it had represented to its customers that it would follow.

Similarly, in OCC Interpretive Letter #997 (April 15, 2002), the OCC noted that "a relevant factor in evaluating good faith [under Texas Commercial Code § 4.303] may be whether

United States District Court

For the Northern District of California

77

EXHIBIT 19

Page 077

a bank's actions were inconsistent with the practices it had represented to its customers that it would follow."

Both of the above interpretive letters expressly noted that *state* laws based upon UCC 4-303, including California Commercial Code § 4303, were "consistent with" and therefore did *not* conflict with federal laws governing national bank fees. Additionally, a number of OCC advisory letters militate against preemption. In Advisory Letter AL 2002-3, the OCC warned federal banks of the ramifications of engaging in unfair or deceptive practices that were in part violations of state law:

> Generally, a deceptive act or practice involves a representation or omission that is likely to mislead a reasonable consumer in some material way. Whether particular conduct constitutes an unfair act or practice would depend on the particular facts and circumstances presented, but generally would involve acts or practices that are unscrupulous, unconscionable, or contrary to public policy, and that harm consumers.

The letter went on to explain that the consequences of engaging in practices that may be unfair or deceptive under federal *or state law* can include litigation, enforcement actions, monetary judgments, and harm to the institution's reputation. The letter also stated that "[a] number of state laws prohibit unfair or deceptive acts or practices, *and such laws may be applicable to insured depository institutions*." Thus, the OCC itself contemplated that such suits will occur from time to time. In sum, the state-law restrictions applied herein are not preempted by 12 C.F.R. 7.4002.

**C.    Plaintiffs' Claims are Not Preempted Under 12 C.F.R. 7.4007 or 7.4009.**

Similarly, Wells Fargo has not proven preemption under 12 C.F.R. 7.4007 or 7.4009. As 12 C.F.R. 7.4007 explains, "[a] national bank may receive deposits and engage in any activity incidental to receiving deposits, including issuing evidence of accounts[.]" The regulation further states that "[a] national bank may exercise its deposit-taking powers without regard to state law limitations concerning" checking accounts, disclosure requirements, and funds availability. That said, the regulation also carves out the following exceptions: "[s]tate laws on [contracts and torts] are not inconsistent with the deposit-taking powers of national banks and apply to national banks

78

EXHIBIT 19
Page 078

1   to the extent that they only incidentally affect the exercise of national banks' deposit-taking

2   powers[.]"

3          Furthermore, as held in a prior order (Dkt. No. 98), 12 C.F.R. 7.4007 only relates to a

4   bank's deposit-taking powers and *not* to a bank's ability to reorder transactions in order to

5   maximize overdraft fees during the posting process.  None of the evidence presented at trial

6   warrants a departure from this ruling.  Additionally, the trial record is devoid of any credible

7   evidence demonstrating that the state-law claims asserted in this action would impose more than

8   an incidental effect on the exercise of Wells Fargo's deposit-taking powers or — as covered by

9   12 C.F.R. 7.4009 — any other power authorized under the Act or OCC regulations.

10         **5.    STANDING UNDER SECTION 17200.**

11         Due to the passage of Proposition 64 in November 2004, a plaintiff must prove "actual

12  reliance" to have standing to bring fraud-based Section 17200 claims on behalf of absent class

13  members.  *See* Cal. Bus. & Prof. Code § 17204.  As explained by the California Supreme Court in

14  *Tobacco II*, a plaintiff must show that the defendant's deceptions were "an immediate cause of the

15  plaintiff's injury-producing conduct."  The deception, however, does not have to be "the sole or

16  even the predominant or decisive factor influencing [the plaintiff's] conduct."  Instead, "it is

17  enough that the representation . . . played a substantial part, and so had been a substantial factor,

18  in influencing [the plaintiff's] decision."  Additionally, where a plaintiff has been exposed to "an

19  extensive and long-term advertising campaign," proof of individualized reliance on specific

20  misrepresentations or false statements is not required.  *Tobacco II*, 46 Cal. 4th at 326–28

21  (citations and internal quotations omitted).

22         As explained in the *Tobacco II* decision, Proposition 64 was directed at "unscrupulous

23  lawyers who exploited the generous standing requirement of the UCL to file 'shakedown' suits to

24  extort money from small businesses."  *Id.* at 316 (citation omitted).  As such, the "intent of

25  California voters [in passing Proposition 64] was to limit such abuses by 'prohibiting private

26  attorneys from filing lawsuits for unfair competition *where they have no client who has been*

27  *injured in fact.*'" *Id.* at 316–17 (citation omitted) (emphasis added).  Proposition 64 amended

28  Section 17204 of the California Business and Professions Code to authorize suits by any person

United States District Court

For the Northern District of California

79

EXHIBIT 19
Page 079

1   "who has suffered injury in fact and has lost money and property as a result of such unfair

2   competition."  This changed the prior language, which granted standing to any plaintiff "acting

3   for the interests of itself, its members or the general public[.]"  In sum, the intent and effect of

4   Proposition 64 was to "prevent *uninjured* private persons from suing for restitution on behalf of

5   others."  *Id.* at 314 (citation omitted) (emphasis added).

6        In the instant case, it is clear that both Ms. Gutierrez — the class representative — and

7   Ms. Walker have alleged and proven that they were harmed as a result of misrepresentations and

8   omissions by Wells Fargo.  Moreover, they have shown that they, "in all reasonable probability[,]

9   would not have engaged in the injury-producing conduct" if Wells Fargo had disclosed its posting

10  practices (and their intended effect on manufacturing overdraft fees) in a non-deceptive fashion.

11  As such, this is not a situation where "uninjured private persons" have "su[ed] for restitution on

12  behalf of others[,]" or where a lawsuit has been filed where "no client has been injured in fact."

13  The abuses targeted by Proposition 64 are not present in the instant litigation.[23]

14       Additionally, Wells Fargo's argument that the class-wide misrepresentation claims (and

15  the exact documents they pertain to) must be surgically and precisely limited to those asserted by

16  the class representative is *not* supported by the *Tobacco II* decision.  The California Supreme

17  Court clearly stated that "[r]epresentative parties who have a direct and substantial interest have

18  standing; the question whether they may be allowed to present claims on behalf of others who

19  have *similar, but not identical, interests depends not on standing, but on an assessment of*

20  *typicality and adequacy of representation.*"  *Id.* at 319–20 (emphasis added).  Moreover, "there is

21  nothing in . . . Proposition 64 that purports to alter accepted principles of class action procedure

22  that treat the issue of standing only to the class representative and not the absent class

23  members[.]"  *Id.* at 321.

24

25

26       [23]  The undersigned judge recognizes that Section 17200 has been much abused and overused, as noted
by the proponents of Proposition 64 and the California Supreme Court in *Tobacco II*.  Indeed, the undersigned
27  judge has regularly dismissed meritless Section 17200 claims in other actions.  *See, e.g.*, *Lopez v. Wachovia
Mortgage*, 2010 WL 2836823, at *6 (N.D. Cal., 2010); *Halton Co. v. Streivor, Inc.*, 2010 WL 2077203, at *5
28  (N.D. Cal., 2010); *Apple, Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190, 1204 (N.D. Cal., 2008); *Parrish v.
National Football League Players Ass'n*, 534 F. Supp. 2d 1081, 1092–94 (N.D. Cal., 2007).  The instant case,
however, presents the type of pernicious practice that the legislature meant to prevent.

80

EXHIBIT 19
Page 080

United States District Court
For the Northern District of California

1      Here, both Ms. Gutierrez and Ms. Walker have standing to bring claims under Section

2   17200.  Both relied upon the bank's deceptive omissions and marketing materials — including

3   the Wells Fargo "Welcome Jacket" and CAA — that promoted the idea that transactions would be

4   deducted chronologically rather than in high-to-low order.  Both Ms. Gutierrez and Ms. Walker

5   suffered actual losses of money as a result of the unfair and deceptive business practices

6   discussed herein.  As such, having met the "injury in fact" requirement imposed by

7   Proposition 64, both Ms. Walker and Ms. Gutierrez have standing to bring their individual claims,

8   and Ms. Gutierrez may properly present claims on behalf of class members with "similar, but not

9   identical, interests."

10         **6.   THE *SMITH V. WELLS FARGO BANK, N.A.* SETTLEMENT.**

11      Throughout this litigation, Wells Fargo has argued that *any* claims related to the extension

12   of the shadow line to the authorization of debit-card purchases were foreclosed by the settlement

13   and release negotiated in *Smith v. Wells Fargo Bank, N.A.*  As noted in the findings, the

14   settlement was approved by Judge Ronald S. Prager of the San Diego County Superior Court in

15   November 2007 (Dkt. No. 431-1).  Following the close of trial, both sides were invited to submit

16   further briefing on this issue.

17      This order concludes that the *Smith* release does not bar any of the claims resolved herein.

18   In their respective briefs, both Wells Fargo and plaintiffs *agreed* that this case is and has always

19   been about the bank's high-to-low posting practices and their impact on customers.  Judge Prager

20   reached the same conclusion, ruling that the release in *Smith* did not encompass high-to-low

21   posting and was limited to the substantive claims in the *Smith* complaint.  As such, to the extent

22   that the claims and findings herein involve the shadow line and its related "disclosures," it is only

23   to highlight their role in exacerbating the bank's high-to-low scheme.  Liability, however, is tied

24   solely to the bank's high-to-low posting practices.  Relief will also be so limited.[24]

25

26

27      [24]  After closely scrutinizing the *Smith* settlement, this order suggests that the agreement reached in
*Smith* between class counsel and Wells Fargo Bank was almost certainly collusive.  The class received merely

28   $2,080 in settlement money while class counsel received over two million dollars in fees, a fact Judge Prager
was surely never told and which the undersigned judge had to ask Wells Fargo repeatedly to disclose.  This
point, however, is not determinative of any aspect of the present litigation.

81

EXHIBIT 19
Page 081

United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**7.    SUBJECT-MATTER JURISDICTION.**

Despite conceding that "the jurisdictional requirements of 28 U.S.C. § 1332(d)(2) are satisfied" in its answer (Dkt. No. 16), Wells Fargo recently filed a "notice" of a "potential jurisdictional defect" under the Class Action Fairness Act (CAFA), Pub. L. No. 109-2, 119 Stat. 4 (codified in scattered sections of 28 U.S.C.) (Dkt. No. 465).  In its notice, the bank cited and attached the recent Eleventh Circuit decision in *Cappuccitti v. DirecTV, Inc.*, --- F.3d ----, 2010 WL 2803093, at *3 (11th Cir. 2010), which held that "in a CAFA action originally filed in federal court, at least one of the plaintiffs must allege an amount in controversy that satisfies . . . 28 U.S.C. § 1332(a)."  Plaintiffs filed a response a few days later (Dkt. No. 471).

Although no motion has been filed challenging subject-matter jurisdiction in this action, and the bank has clarified that it is *not* challenging jurisdiction herein (Dkt. No. 475), this order nevertheless concludes that the requirements for jurisdiction under CAFA have been met.  The applicable code section clearly states:

> The district courts shall have original jurisdiction of any civil
> action in which the matter in controversy exceeds the sum or value
> of $5,000,000, exclusive of interest and costs, and is a class action
> in which—
>
> (A)  any member of a class of plaintiffs is a citizen of a State
> different from any defendant;
>
> (B)  any member of a class of plaintiffs is a foreign state or a
> citizen or subject of a foreign state and any defendant is a citizen
> of a State; or
>
> (C)  any member of a class of plaintiffs is a citizen of a State and
> any defendant is a foreign state or a citizen or subject of a foreign
> state.

28 U.S.C. 1332(d)(2).  Nowhere in Section 1332(d) are the jurisdictional requirements of Section 1332(a) cross-referenced, *except* for the removal of "mass actions" from state court.  *See* 28 U.S.C. 1332(d)(11)(B)(i) (defining a "mass action" as any civil action *except a class action filed in district court under FRCP 23* in which monetary relief claims of 100 or more persons are proposed to be tried jointly on the ground that the plaintiffs' claims involve common questions of

82

EXHIBIT 19
Page 082

law or fact).  The instant action was not removed from state court as a "mass action," but filed

originally in district court as a class action under FRCP 23.  Jurisdiction is therefore proper.

**RELIEF GRANTED**

**1.    "NEW" REGULATION E.**

While this action has always been about Wells Fargo's high-to-low resequencing

practices, the shadow line — as this order has shown — played a supporting role in exacerbating

the adverse impact of high-to-low posting on class members.  That said, plaintiffs' claims did *not*

target the legality of the shadow line but were limited strictly to high-to-low posting and its

impact on overdraft fees.  As such, the relief granted herein will be limited to the bank's high-to-

low resequencing practices.

The shadow line, however, has met its own fate.  The Federal Reserve — through recent

amendments to 12 C.F.R. 205 ("Regulation E") that have been effective since July 1, 2010 —

forced financial institutions like Wells Fargo to provide consumers with a choice regarding

whether they wanted debit-card purchases to be authorized into overdrafts.  This went far beyond

simply requiring banks to provide a clear disclosure of their fees and terms associated with

overdrafts.  Rather, new Regulation E bars all shadow lines on debit-card purchases unless the

customer *opts in and affirmatively consents* to having her debit-card purchases subject to shadow

lines of credit.[25]  And, customer consent can only be obtained after full and fair disclosure of the

downsides of the practice.  Importantly, a customer is free *not* to opt in.  *See* 12 C.F.R. 205.17.

The Board of Governors of the Federal Reserve System, who issued Regulation E

pursuant to the Electronic Fund Transfer Act (15 U.S.C. 1693 *et seq.*), explained the need for

these changes as follows:

> The Board believes that, on balance, an opt-in rule creates the
> optimal result for consumers with respect to ATM and one-time
> debit card transactions.  First, the cost to consumers of overdraft
> fees assessed in connection with ATM and debit card overdrafts is

---

[25]  The amended regulation further prohibits financial institutions from tying the
payment of overdrafts for checks and other transactions to the consumer opting into the
overdraft service for debit-card transactions.  New Regulation E ensures that consumers who
do not opt in are provided with the same account terms, conditions and features, including
price, as provided to consumers who do opt in.  *See* 12 C.F.R. 205.17.

83

EXHIBIT 19
Page 083

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    significant.  For one-time debit card transactions in particular, the
2    amount of the fee assessed may substantially exceed the amount
     overdrawn.  If the consumer incurs multiple debit card overdrafts in
3    one day, fees may accrue into the hundreds of dollars.  Many
     consumers may prefer such transactions not to be paid.

4    Second, an opt-in rule that is limited to ATM and one-time debit
5    card transactions may result in fewer adverse consequences for
     consumers than a rule applicable to a broader range of
6    transactions. While a check or ACH transaction that is returned for
     insufficient funds might cause the consumer to incur a merchant
7    fee for the returned item, in addition to an insufficient funds fee
     assessed by the consumer's financial institution, a declined ATM
8    or debit card transaction does not result in any fees to the
     consumer.

9    Third, available research indicates that the large majority of
10   overdraft fees are paid by a small portion of consumers who
     frequently overdraw their accounts.  These consumers may have
11   difficulty both repaying overdraft fees and bringing their account
     current, which may in turn cause them to incur additional overdraft
12   fees. An opt-in approach could therefore best prevent these
     consumers from entering into a harmful cycle of repeated
13   overdrafts.

14   Fourth, many consumers may not be aware that they are able to
     overdraft at an ATM or POS. Debit cards have been promoted as
15   budgeting tools, and a means for consumers to pay for goods and
     services without incurring additional debt. Additionally, the ability
16   to overdraft at an ATM or POS is a relatively recent development.
     Consequently, consumers may unintentionally overdraw their
17   account based on the erroneous belief that a transaction would be
     paid only if the consumer has sufficient funds in the account to
18   cover it.  With an opt-in approach, consumers who do not opt in
     will be less likely to incur unanticipated overdraft fees.

19   Official Staff Commentary to Regulation E, 74 Fed. Reg. 59033, 59038–39 (Nov. 17, 2009).

20       In sum, the Federal Reserve recognized nearly all of the abuses found herein and

21   concluded that if consumers *truly* wanted a service that subjected many customers to costly

22   overdraft fees, they should be given a clear disclosure *and the choice to affirmatively opt-in*.

23   While Regulation E did not address the high-to-low resequencing practices at issue in this class

24   action, it is instructive for the relief now ordered.

25       **2.    INJUNCTIVE RELIEF.**

26       Plaintiffs and the class seek a permanent injunction enjoining Wells Fargo from engaging

27   in the unfair and fraudulent business practice found herein.  This order finds that such relief is

28   appropriate and authorized under Section 17203 of the California Business and Professions Code,

84

EXHIBIT 19
Page 084

and necessary to prevent further harm to Wells Fargo's customers. The Effective Date shall be **NOVEMBER 30, 2010**. This date is fixed far enough out to give time to plan for an orderly implementation of injunctive relief and to allow the bank to seek a stay from the court of appeals (if it elects to appeal). The following class-wide relief is therefore ordered:

1.    By the Effective Date, defendant Wells Fargo is ordered to cease its practice of posting in high-to-low order for all debit-card transactions for all class members.

2.    On or before the Effective Date, defendant Wells Fargo must, for all class members, either reinstate a low-to-high posting method or use a chronological posting method (or some combination of the two methods) for the posting of debit-card transactions for class members.[26]

3.    Before implementing any posting system, defendant Wells Fargo must file a declaration explaining the specifics of how it will work in order to allow counsel and the Court to vet it. This filing must be made 49 calendar days before the Effective Date.

4.    All agreements, disclosures, websites, online banking statements, and promotional materials provided to class members must be conformed to the new posting system.

**3.    RESTITUTION.**

In addition to injunctive relief, this order finds that an award of restitution is warranted under Section 17203 to restore those overdraft fees paid by class members that were wrongfully extracted by Wells Fargo through its unfair practice as found herein.

---

[26] This order finds that the bank's deposit system is able to post transactions in different sequences on an account-by-account basis. For example, transactions for Wells Fargo depositors with accounts in New Mexico and Washington are posted in a different order that accounts in California (Tr. 1504–05). Similarly, transactions for Wells Fargo depositors with accounts in Nevada are posted in a different order than accounts in California (*id.* at 263–64). There are no technical restrictions preventing the bank from posting transactions differently for individual account holders.

85

EXHIBIT 19
Page 085

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1    Section 17203 states that "[t]he court may make such orders or judgments . . . as may be

2    necessary to restore to any person in interest any money or property, real or personal, which may

3    have been acquired by means of such unfair competition."  The California Supreme Court has

4    repeatedly construed this language, in light of the "concern that wrongdoers not retain the benefits

5    of their misconduct" to mean that "relief under the UCL is available without individualized proof

6    of deception, reliance and injury if necessary to prevent the use or employment of an unfair

7    practice."  *See, e.g.*, *Tobacco II*, 46 Cal. 4th at 320; *Bank of the West v. Superior Court*,

8    2 Cal. 4th 1254, 1267 (1992); *Committee on Children's Television, Inc. v. General Foods Corp.*,

9    35 Cal. 3d 197, 211 (1983); *Fletcher v. Security Pacific National Bank*, 23 Cal. 3d 442, 452

10   (1979).  In other words, absent class members on whose behalf a Section 17200 action is

11   prosecuted need *not* show on "an individualized basis that they have 'lost money or property as a

12   result of the unfair competition[.]'"  *Tobacco II*, 46 Cal. 4th at 320.

13   That said, an award of restitution must be limited to "return[ing] money obtained through

14   an unfair business practice to those persons in interest from whom the property was taken, that is,

15   to persons who had an ownership interest in the property or those claiming through that person."

16   *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1144–45 (2003) (citation omitted).

17   While a wide range of restitution scenarios were presented at trial by both sides, this order

18   concludes that the proper measure of restitution must be measured from a posting order that most

19   closely tracks a chronological posting order for debit-card transactions.  Rejected is plaintiffs'

20   argument that restitution should be based on the low-to-high ordering used by Wells Fargo prior

21   to the high-to-low switch in May 2001.  True, low-to-high posting is more favorable to depositors

22   and was the system used before the bank switched to high-to-low resequencing.  A main theme of

23   plaintiffs' case, however, is that the bank promoted the expectation that debit-card transactions

24   would post *chronologically*.  As such, restitution based on chronological posting of these

25   transactions will most closely track depositors' expectations.

26   This order finds that plaintiffs' expert Arthur Olsen has convincingly shown that it is

27   entirely practical to re-run the computerized data in storage for each class members' account and

28   determine how many overdrafts were added by the high-to-low practice for debit-card

86

EXHIBIT 19
Page 086

1   transactions during the class period.  Indeed, he has already done so, using various alternate

2   posting sequences.  This has been done by him on an account-by-account, day-by-day, and

3   transaction-by-transaction basis, using the bank's own real-world data.  Court orders were needed

4   to provide him access to this data, but — after much work and time — this order finds that Expert

5   Olsen has done a professional and careful job in laying out the impacts of various alternative

6   posting protocols.  This work has not only demonstrated the enormous impact of the high-to-low

7   scheme, but it has demonstrated that it is possible, in considering relief and restitution, to add

8   back to depositors' specific accounts the amounts that were wrongfully taken by Wells Fargo,

9   using posting protocols that this order finds would have tracked the ordinary and reasonable

10  expectations of depositors.

11      In the Court's judgment, restitution should be made based on the following sequence:

12
13      1.  Credits
        2.  Priority debit transactions[27]
        3.  Debit-card transactions with date/time information in
14          chronological order
        4.  Debit-card transactions without date/time information in
15          low-to-high order
16      5.  Checks and ACH transactions in high-to-low order

17  This corresponds exactly to Olsen Scenario No. 2A (TX 212-G; Tr. 911–12).

18      This order finds that Olsen Scenario No. 2A properly posted credits and priority debit

19  transactions in their usual and customary order — namely, first and second, before all debit-card

20  transactions, checks, and ACH transactions (*id.* at 74, 287, 885–86; Dkt. No. 448-1).  This order

21  also finds that Wells Fargo has *never* posted checks and ACH transactions ahead of credits, or

22  checks and ACH transactions ahead of all debit-card transactions within California (Dkt. No. 448-

23  1).  Rather, checks and ACH transactions were customarily posted *after* debit-card transactions

24  prior to commingling, as done in Olsen Scenario No. 2A (*ibid.*).  The only reason that Wells

25  Fargo now suggests radical rearrangements and manipulations of credits, checks, and ACH

26  transactions is to artificially *minimize* the restitution awarded to the class.

27

28      [27]  The "priority posting group" included cash withdrawals and equivalents, such as wire transfers,
        ATM withdrawals, and money orders (Tr. 336, 1256).

87

EXHIBIT 19
Page 087

United States District Court
For the Northern District of California

1    With respect to the fourth item above, it is worth noting that the bank did not maintain

2    date/time information for a small percentage of its customers' debit-card transactions.[28]  As such,

3    a "perfect" chronological ordering could not be reconstructed due to these gaps in the bank's data.

4    This order finds, however, that it makes very little difference in the aggregate whether these

5    transactions without date/time information are posted before or after the chronologically

6    sequenced debit-card transactions that *did* have date/time information.  The bank's own expert

7    confirmed this finding on direct examination at trial (Tr. 720).

8    In his analysis, Expert Olsen calculated the differential between the number of overdraft

9    fees that were *actually* assessed on customers during the class period and the number of overdraft

10   fees that *would have been* assessed on customers using the above sequence.  Overdraft fees that

11   would have been assessed on customers no matter what ordering was used by the bank were

12   excluded from the differential.  For example, overdraft fees solely attributable to purchases

13   authorized by the shadow line and *not* caused by high-to-low resequencing were excluded.

14   Additionally, Expert Olsen considered uncollectibles — meaning overdraft fees that the bank was

15   unable to collect from a particular account — in reducing restitution awards.  Class members who

16   had opted out were also excluded from his analysis (Tr. 894).  This order finds that these

17   adjustments were accurate and proper.

18   Expert Olsen also took into account overdraft fee reversals credited against each

19   individual account using two different methods:  (1) a last-in-first-out (LIFO) method, where any

20   fee reversal was credited against the last overdraft fee assessed prior to the reversal, and (2) a

21   30-day reversal period, where any fee reversal credited within a 30-day period following an

22   unfairly assessed overdraft fee was deducted from any restitution calculated for that particular

23   account.  These alternative methods were employed because the bank's transaction data did not

24   contain information tying specific fee reversals to particular overdraft fees.  In other words, it was

---

[28]  As stated, 84 percent of debit-card transactions had date/time information (Tr. 879–80).  Class members, of course, should not be penalized for data deficiencies in the very computer systems used to power the bank's unlawful practices.  It would not be equitable to allow the bank to extract hundreds of millions of dollars through unfair and fraudulent business practices and then use the supposed inadequacies of its own record-keeping system to shield itself from restitution.  *See, e.g., Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264 (1946) (setting forth the familiar proposition that where a defendant has done wrong, the defendant, as the wrongdoer, cannot object to a damage study that is the best possible with the data available).

88

EXHIBIT 19
Page 088

United States District Court
For the Northern District of California

1   often impossible for Expert Olsen to tell from the bank's data whether a fee reversal was directed

2   at the most recent overdraft fee or one that had been assessed weeks earlier. This is another

3   instance where the bank's data prevented a perfect calculation of restitution.

4       With respect to fee reversals, this order finds that a 30-day reversal period provides the

5   fairest and proper method of restitution. Of the two methods employed by Expert Olsen to

6   account for fee reversals, it is the most generous to the bank and, as the bank's own expert

7   testified on direct examination, is the "superior" approach to crediting fee reversals against an

8   award of restitution (*id.* at 1748).

9       Finally, this order finds that the shadow line *per se* has been properly ignored in Expert

10  Olsen's analysis. While Wells Fargo argued at trial that plaintiffs' restitution studies failed to

11  take into account the impact of the shadow line on returned-item fees, this is a red herring. *First*,

12  given the secrecy of the shadow line, plaintiffs and their expert were never provided with the

13  proper tools to apply the shadow line in their restitution studies. Instead, they were provided with

14  a bare algorithm — without any accompanying instructions — that would take years to decipher

15  and many guesses along the way. Even the bank's own restitution expert was not up to the task of

16  programming the shadow line from scratch. Instead, the bank's expert relied upon Wells Fargo's

17  internal risk management group and pre-programmed computer system to perform his forensic

18  shadow-line calculations — a luxury denied to plaintiffs' expert. *Second*, all of the bank's

19  analyses were based upon a mere ten days worth of customer data (as compared to the 43-months

20  of data analyzed by Expert Olsen). This strips the bank's arguments of all weight and credibility.

21      Restitution must be paid by the bank on a class-member-by-class-member basis, based

22  upon the difference between the foregoing posting sequence versus the result of the high-to-low

23  system used during the class period. The Olsen study demonstrates that this amount, in total, will

24  be close to $203 million.

25      The next question is how procedurally to refund the money. For accounts due restitution

26  and still open at Wells Fargo, the bank shall simply post a credit to the accounts. For accounts

27  that have been closed but whose owner still banks with Wells Fargo in any capacity, the bank

28  shall credit one of the owner's active accounts. For class members no longer doing business with

United States District Court
For the Northern District of California

89

EXHIBIT 19
Page 089

1  Wells Fargo and to whom restitution is owed, the bank shall provide class counsel with their last

2  known U.S. mail address, last known email address, and last known telephone number.

3      Counsel shall meet and confer and recommend a detailed plan of distribution and notice,

4  including a plan to track down class members for whom the available contact information is

5  inadequate, such plan to include use of the National Change of Address Registry and published

6  notice.  Counsel shall also meet and confer and produce a computerized listing of each class

7  member and the amount of restitution due to each using the foregoing posting protocol, reserving

8  all objections as to substance.  Counsel should consider whether restitution should be extended up

9  to the date of the injunction's Effective Date rather than merely up to the end of the class period.

10  A procedure to determine attorney's fees and non-cost expenses should also be recommended.

11  This joint recommendation shall be filed no later than 42 days before the Effective Date.  Please

12  recommend a form of judgment, reserving all substantive rights, that will capture the central

13  points of this order and poise the action for any appeal.

14      The Court will retain jurisdiction to enforce this order.

15

16      **IT IS SO ORDERED.**

17

18  Dated:  August 10, 2010.

_____

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

19

20

21

22

23

24

25

26

27

28

90

EXHIBIT 19
Page 090

# EXHIBIT 2

(For Claimants' Response and Objection To Wells Fargo's Defacto Motion For More Definite Statement)

AMERICAN ARBITRATION ASSOCIATION® | INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION®

Western Case Management Center
Neil Currie
Vice President
45 E River Park Place West
Suite 308
Fresno, CA
Telephone: (877) 528-0880
Fax: (855) 433-3046

September 16, 2022

Richard A. Nervig, Esq.
McCune Wright Arevalo, LLP
18565 Jamboree Road
Suite 550
Irvine, CA 92612
Via Email to: ran@mccunewright.com

Joshua D. Davey, Esq.
Troutman Pepper Hamilton Sanders LLP
301 South College Street
Suite 3400
Charlotte, NC 28202
Via Email to: joshua.davey@troutman.com

Individual Consumers
-vs-
Wells Fargo & Co., Wells Fargo Bank, N.A.

Dear Parties:

This acknowledges receipt of Demands for Arbitration for the matters in the enclosed case list and arbitration agreements providing for administration by the American Arbitration Association (AAA). These cases are now assigned to me for administration as the Consumers have met the filing requirements.

The **Consumer Arbitration Rules** and **Supplementary Rules for Multiple Case Filings** apply to these matters.

**<u>Answer</u>**

- This acknowledges receipt of Wells Fargo's Answer dated July 6, 2022. The Answer pertains to the cases outlined in the attached case list.
- Please reference the Rules if filing a counterclaim.

**<u>Initial List of People Form</u>**

- Please complete and return the enclosed Initial List of People Form by October 7, 2022. Instructions are provided on the Initial List form and on the enclosed reference sheet.

**Hearing Type and Locale of In-Person Hearing**

- We note the parties' arbitration agreement provides that:
  *"An arbitration will be held in the state whose laws govern your account."*
- If no disclosed claim or counterclaim exceeds $25,000, the matter shall be resolved by the Procedures for the Resolution of Disputes through Document Submission contained in the Consumer Arbitration Rules, unless a party asks for a hearing or the arbitrator decides that a hearing is necessary.

**CA CCP §1282.4**

- Your attention is directed to California Code of Civil Procedure Section 1282.4 regarding representation by an attorney not licensed to practice in the State of California. Please refer to the State Bar of California website if you need a certification form as described in the statute. Admissions requirements, Out of State Attorney Arbitration Counsel FAQ, and other information may be found at: The State Bar of California.

**The Costs of Arbitration effective November 1, 2020**

- Pursuant to section 1284.3 of the California Code of Civil Procedure, consumers with a gross monthly income of less than 300% of the federal poverty guidelines are entitled to a waiver of arbitration fees and costs, exclusive of arbitrator fees. This law applies to all consumer agreements subject to the California Arbitration Act, and to all consumer arbitrations conducted in California. If you believe that you meet these requirements, you must submit to the AAA a declaration under oath regarding your monthly income and the number of persons in your household. Please contact the undersigned if you have any questions regarding the waiver of administrative fees.
- The costs for this case are detailed in the Consumer Rules Costs of Arbitration effective November 1, 2020, available on our website at www.adr.org.

**Amounts Paid or Due**

- This confirms the Filing Fees have been paid.

**Cybersecurity and Privacy**

- Please review the enclosed *AAA-ICDR® Best Practices Guide for Maintaining Cybersecurity and Privacy,* and *AAA-ICDR® Cybersecurity Checklist*.

**Small Claims Court Option**

- We draw your attention to R-9 of the Consumer Arbitration Rules. If a party's claim is within the jurisdiction of a small claims court, either party may choose to exercise the small claims option. If either party would like this matter decided by a small claims court, please send your written request to the case administrator and copy all other parties. If the parties disagree over whether the claim is within the jurisdiction of a small claims court, the case will proceed in arbitration and the arbitrator may make a final determination on whether the claim may proceed to small claims court.

**Next Administrative Step**

- This will confirm the parties have a call scheduled with the Process Arbitrator, Hon. Anita Rae Shapiro, on October 18, 2022 at 10:00 AM Pacific Time. Please dial in to the conference call by using the following telephone number and code:

  Telephone No.: (855) 633-2040        Access Code: 2189638#

Please review the enclosed Consumer Arbitration Reference Sheet for more information or view our website at www.adr.org/consumer.

The AAA appreciates the opportunity to assist you with your dispute resolution needs.

Sincerely,
/s/
Donna Martinez
Director of ADR Operations
Consumer Group Team
Direct Dial: (559) 475-6265
Email: consumergroupteam@adr.org


Supervisor Information: *Sophia Parra, Assistant Vice President,(559)490-1907,* SophiaParra@adr.org

Enclosures

cc:     Ashley Hawthorne
        Alicia A. Baiardo, Esq.
        Michael Peretz, Esq.
        David C. Wright, Esq.
        Brandon Keshish
        Kyle Lawheed
        Kristina J. Catapang
        Joel S. Allen
        Emily J. Kirk, Esq.
        Jacob Franchek
        Richard D. McCune, Esq.
        Mary Katherine Grob, Esq.
        Chloe Lee
        Michelle Truong
        Bill Mayberry
        Jason Evans
        Amy Morrissey Turk
        Krystal Gollogly

## AMERICAN ARBITRATION ASSOCIATION

INDIVIDUAL CONSUMERS,

        Claimants,

    v.

WELLS FARGO BANK, N.A.,

        Respondent.

**AAA CASE NO. in re Individual Consumers**

**DECLARATION OF DEVIN TEXEIRA IN SUPPORT OF CLAIMANTS' RESPONSE AND OBJECTION TO WELLS FARGO'S MOTION FOR DEFACTO MORE DEFINITE STATEMENT**

I, Devin Texeira, declare as follows:

1.    I am over the age of 18 and am an Executive Director of DB Legal Services, Inc. The facts stated herein are based on my personal knowledge, and, if called as a witness, I could and would testify competently thereto.

2.    Attached as **Exhibit 3** to this declaration is a true and correct copy of an analytic report showing the activity of the website during the applicable time period.

3.    Attached as **Exhibits 4-7** to this declaration are true and correct copies of various analytics demonstrating how many individuals viewed the site and from what particular location viewing occurred.

4.    Attached as **Exhibit 8** to this declaration is a true and correct copy of a document demonstrating the website was not accessible from a google link.

5.    The website in question was not live long enough to be crawled by Google Bots, which means it could not be found via a Google search.  These are scheduled to crawl every few days on the McCune Wright Arevalo, LLP website and give analytic reporting on whether the site has a presence online.

6.      Google Analytics reports that on June 30, 2022, the website in question had a total of 27 views by 22 unique users. This is the same date timestamped on Respondent's screenshot, which suggests that the link was mostly, if only, shared internally amongst Wells Fargo for viewing, as users would specifically have to go looking for this.

7.      Inspectlet Sessions show users had no access to the webpage without having a direct link to it. In the given example, notice how there was no navigation to the /wells-fargo-new-arbitrations/, but the user probably had this link in advance, possibly derived from crawling McCune Wright Arevalo, LLP's website's sitemap. Even when a user would have searched the McCune Wright Arevalo, LLP website for "Wells Fargo," this webpage show up in a list of results from the search.


I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct to the best of my knowledge.  Executed this September 21, 2022 at Ontario, California.


**DEVIN TEXEIRA**

*/s/ Devin Texeira*
3281 E Guasti Rd Ste 100
Ontario, CA 91761
(909) 557-1250
dct@mccunewright.com

2

## PROOF OF SERVICE

I am employed in the County of San Bernardino, State of California. I am over the age of 18 and not a party to the within action. My business address is 3281 E Guasti Rd Ste 100, Ontario, CA 91761.

I served as dated below, the document(s) described as **CLAIMANTS' RESPONSE AND OBJECTION TO WELLS FARGO'S DEFACTO MOTION FOR MORE DEFINITE STATEMENT and DECLARATION OF DEVIN TEXEIRA IN SUPPORT OF CLAIMANTS' RESPONSE AND OBJECTION TO WELLS FARGO'S DEFACTO MOTION FOR MORE DEFINITE STATEMENT** on the interested parties in this action in the following manner:

**SEE ATTACHED SERVICE LIST**

    ( x )    **BY ELECTRONIC MAIL.**

    ( )    **BY U.S.MAIL**: I enclosed the documents in a sealed envelope or package addressed to the persons at the addresses as designated on the attached service list and depositing same with the United States Postal Service, with the postage fully prepaid.

    I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on September 21, 2022, at Ontario, California.

                                    By: */s/ Kristina Catapang*
                                          Kristina Catapang

3

# EXHIBIT 3

(For Claimants' Response and Objection To Wells
Fargo's Defacto Motion For More Definite Statement)

**Analytics** Unfiltered

## Pages

| | All Users | Jun 1, 2022 - Sep 11, 2022 |
| --- | --- | --- |
| ⭕ | 100.00% Pageviews | |

**Explorer**

● Pageviews



🔻 This data was filtered with the following filter expression: **/wells-fargo-new-arbitrations/**

| Page | | Pageviews | ↓ | Unique Pageviews | Avg. Time on Page | Entrances | Bounce Rate | % Exit | Page Value |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | **27**<br>% of Total:<br>0.03%<br>(80,139) | | **22**<br>% of Total:<br>0.04%<br>(60,369) | **00:10:33**<br>Avg for View:<br>00:00:59<br>(979.22%) | **20**<br>% of Total:<br>0.04%<br>(46,496) | **80.00%**<br>Avg for View:<br>75.47%<br>(6.01%) | **74.07%**<br>Avg for View:<br>58.02%<br>(27.67%) | **$0.00**<br>% of Total:<br>0.00%<br>($0.07) |
| 1. | /wells-fargo-new-arbitrations/ 📄 | **27**<br>(100.00%) | | **22**<br>(100.00%) | **00:10:33** | **20**<br>(100.00%) | **80.00%** | **74.07%** | **$0.00**<br>(0.00%) |

Rows 1 - 1 of 1

© 2022 Google

# EXHIBIT 4

(For Claimants' Response and Objection To Wells
Fargo's Defacto Motion For More Definite Statement)



# EXHIBIT 5

(For Claimants' Response and Objection To Wells Fargo's Defacto Motion For More Definite Statement)



## Location

ALL » COUNTRY: United States

Jun 1, 2022 - Jul 31, 2022

| All Users |
| 47.62% Users |

**Map Overlay**

Summary



| 1 | 3 |

🔽 This data was filtered using an **advanced filter**.

| Metro | Acquisition | | | Behavior | | | Conversions | Goal 1: Contact us ▾ | |
|---|---|---|---|---|---|---|---|---|---|
| | Users ↓ | New Users | Sessions | Bounce Rate | Pages / Session | Avg. Session Duration | Contact us (Goal 1 Conversion Rate) | Contact us (Goal 1 Completions) | Contact us (Goal 1 Value) |
| | **17**<br>% of Total:<br>0.04%<br>(40,352) | **11**<br>% of Total:<br>0.03%<br>(39,528) | **20**<br>% of Total:<br>0.04%<br>(46,435) | **80.00%**<br>Avg for View:<br>75.42%<br>(6.08%) | **1.35**<br>Avg for View:<br>1.72<br>(-21.68%) | **00:03:26**<br>Avg for View:<br>00:00:43<br>(383.79%) | **0.00%**<br>Avg for View:<br><0.01%<br>(-100.00%) | **0**<br>% of Total:<br>0.00%<br>(1) | **$0.00**<br>% of Total:<br>0.00%<br>($1,000.00) |
| 1. Washington DC (Hagerstown MD) | 3<br>(17.65%) | 3<br>(27.27%) | 3<br>(15.00%) | 100.00% | 1.00 | 00:00:00 | 0.00% | 0<br>(0.00%) | $0.00<br>(0.00%) |
| 2. Atlanta GA | 3<br>(17.65%) | 2<br>(18.18%) | 3<br>(15.00%) | 100.00% | 1.33 | 00:00:00 | 0.00% | 0<br>(0.00%) | $0.00<br>(0.00%) |
| 3. (not set) | 2<br>(11.76%) | 1<br>(9.09%) | 2<br>(10.00%) | 100.00% | 1.00 | 00:00:00 | 0.00% | 0<br>(0.00%) | $0.00<br>(0.00%) |
| 4. Richmond-Petersburg VA | 2<br>(11.76%) | 0<br>(0.00%) | 3<br>(15.00%) | 66.67% | 1.67 | 00:08:25 | 0.00% | 0<br>(0.00%) | $0.00<br>(0.00%) |
| 5. Los Angeles CA | 2<br>(11.76%) | 0<br>(0.00%) | 3<br>(15.00%) | 66.67% | 1.67 | 00:08:34 | 0.00% | 0<br>(0.00%) | $0.00<br>(0.00%) |
| 6. Raleigh-Durham (Fayetteville) NC | 1<br>(5.88%) | 1<br>(9.09%) | 2<br>(10.00%) | 100.00% | 1.00 | 00:00:00 | 0.00% | 0<br>(0.00%) | $0.00<br>(0.00%) |
| 7. Dallas-Ft. Worth TX | 1<br>(5.88%) | 1<br>(9.09%) | 1<br>(5.00%) | 0.00% | 1.00 | 00:01:09 | 0.00% | 0<br>(0.00%) | $0.00<br>(0.00%) |
| 8. Tulsa OK | 1<br>(5.88%) | 1<br>(9.09%) | 1<br>(5.00%) | 100.00% | 1.00 | 00:00:00 | 0.00% | 0<br>(0.00%) | $0.00<br>(0.00%) |
| 9. Denver CO | 1<br>(5.88%) | 1<br>(9.09%) | 1<br>(5.00%) | 100.00% | 1.00 | 00:00:00 | 0.00% | 0<br>(0.00%) | $0.00<br>(0.00%) |
| 10. Phoenix AZ | 1<br>(5.88%) | 1<br>(9.09%) | 1<br>(5.00%) | 0.00% | 3.00 | 00:16:29 | 0.00% | 0<br>(0.00%) | $0.00<br>(0.00%) |

Rows 1 - 10 of 10

© 2022 Google

# EXHIBIT 6

(For Claimants' Response and Objection To Wells Fargo's Defacto Motion For More Definite Statement)



## Location

ALL » COUNTRY: United States

Jun 1, 2022 - Jul 31, 2022

**All Users**
47.62% Users

**Map Overlay**

Summary



1 ————— 5

🔽 This data was filtered using an **advanced filter.**

| | | Acquisition | | | Behavior | | | Conversions | Goal 1: Contact us | |
|---|---|---|---|---|---|---|---|---|---|---|
| Region | Page | Users ↓ | New Users | Sessions | Bounce Rate | Pages / Session | Avg. Session Duration | Contact us (Goal 1 Conversion Rate) | Contact us (Goal 1 Completions) | Contact us (Goal 1 Value) |
| | | 17<br>% of Total: 0.04% (40,352) | 11<br>% of Total: 0.03% (39,528) | 20<br>% of Total: 0.04% (46,435) | 80.00%<br>Avg for View: 75.42% (6.08%) | 1.35<br>Avg for View: 1.72 (-21.68%) | 00:03:26<br>Avg for View: 00:00:43 (383.79%) | 0.00%<br>Avg for View: <0.01% (-100.00%) | 0<br>% of Total: 0.00% (1) | $0.00<br>% of Total: 0.00% ($1,000.00) |
| 1. Virginia | /wells-fargo-new-arbitrations/ | 5 (29.41%) | 3 (27.27%) | 6 (30.00%) | 83.33% | 1.33 | 00:04:13 | 0.00% | 0 (0.00%) | $0.00 (0.00%) |
| 2. Georgia | /wells-fargo-new-arbitrations/ | 3 (17.65%) | 2 (18.18%) | 3 (15.00%) | 100.00% | 1.33 | 00:00:00 | 0.00% | 0 (0.00%) | $0.00 (0.00%) |
| 3. California | /wells-fargo-new-arbitrations/ | 2 (11.76%) | 0 (0.00%) | 3 (15.00%) | 66.67% | 1.67 | 00:08:34 | 0.00% | 0 (0.00%) | $0.00 (0.00%) |
| 4. (not set) | /wells-fargo-new-arbitrations/ | 1 (5.88%) | 1 (9.09%) | 1 (5.00%) | 100.00% | 1.00 | 00:00:00 | 0.00% | 0 (0.00%) | $0.00 (0.00%) |
| 5. Arizona | /wells-fargo-new-arbitrations/ | 1 (5.88%) | 1 (9.09%) | 1 (5.00%) | 0.00% | 3.00 | 00:16:29 | 0.00% | 0 (0.00%) | $0.00 (0.00%) |
| 6. Colorado | /wells-fargo-new-arbitrations/ | 1 (5.88%) | 1 (9.09%) | 1 (5.00%) | 100.00% | 1.00 | 00:00:00 | 0.00% | 0 (0.00%) | $0.00 (0.00%) |
| 7. Florida | /wells-fargo-new-arbitrations/ | 1 (5.88%) | 0 (0.00%) | 1 (5.00%) | 100.00% | 1.00 | 00:00:00 | 0.00% | 0 (0.00%) | $0.00 (0.00%) |
| 8. Kansas | /wells-fargo-new-arbitrations/ | 1 (5.88%) | 1 (9.09%) | 1 (5.00%) | 100.00% | 1.00 | 00:00:00 | 0.00% | 0 (0.00%) | $0.00 (0.00%) |
| 9. North Carolina | /wells-fargo-new-arbitrations/ | 1 (5.88%) | 1 (9.09%) | 2 (10.00%) | 100.00% | 1.00 | 00:00:00 | 0.00% | 0 (0.00%) | $0.00 (0.00%) |
| 10. Texas | /wells-fargo-new-arbitrations/ | 1 (5.88%) | 1 (9.09%) | 1 (5.00%) | 0.00% | 1.00 | 00:01:09 | 0.00% | 0 (0.00%) | $0.00 (0.00%) |

Rows 1 - 10 of 10

© 2022 Google

# EXHIBIT 7

(For Claimants' Response and Objection To Wells
Fargo's Defacto Motion For More Definite Statement)



## Location

ALL » COUNTRY: United States

Jun 1, 2022 - Jul 31, 2022

All Users
47.62% Users

**Map Overlay**

Summary



1 ▬▬▬ 3

⚠ This data was filtered using an **advanced filter**.

| City | Acquisition | | | Behavior | | | Conversions | Goal 1: Contact us ▾ | |
|------|-------------|---|---|----------|---|---|-------------|----------------------|---|
| | Users ↓ | New Users | Sessions | Bounce Rate | Pages / Session | Avg. Session Duration | Contact us (Goal 1 Conversion Rate) | Contact us (Goal 1 Completions) | Contact us (Goal 1 Value) |
| | 17<br>% of Total:<br>0.04%<br>(40,352) | 11<br>% of Total:<br>0.03%<br>(39,528) | 20<br>% of Total:<br>0.04%<br>(46,435) | 80.00%<br>Avg for View:<br>75.42%<br>(6.08%) | 1.35<br>Avg for View:<br>1.72<br>(-21.68%) | 00:03:26<br>Avg for View:<br>00:00:43<br>(383.79%) | 0.00%<br>Avg for View:<br><0.01%<br>(-100.00%) | 0<br>% of Total:<br>0.00%<br>(1) | $0.00<br>% of Total:<br>0.00%<br>($1,000.00) |
| 1.  Atlanta | 3<br>(17.65%) | 2<br>(18.18%) | 3<br>(15.00%) | 100.00% | 1.33 | 00:00:00 | 0.00% | 0<br>(0.00%) | $0.00<br>(0.00%) |
| 2.  Ashburn | 3<br>(17.65%) | 3<br>(27.27%) | 3<br>(15.00%) | 100.00% | 1.00 | 00:00:00 | 0.00% | 0<br>(0.00%) | $0.00<br>(0.00%) |
| 3.  (not set) | 2<br>(11.76%) | 1<br>(9.09%) | 2<br>(10.00%) | 100.00% | 1.00 | 00:00:00 | 0.00% | 0<br>(0.00%) | $0.00<br>(0.00%) |
| 4.  Los Angeles | 2<br>(11.76%) | 0<br>(0.00%) | 3<br>(15.00%) | 66.67% | 1.67 | 00:08:34 | 0.00% | 0<br>(0.00%) | $0.00<br>(0.00%) |
| 5.  Richmond | 2<br>(11.76%) | 0<br>(0.00%) | 3<br>(15.00%) | 66.67% | 1.67 | 00:08:25 | 0.00% | 0<br>(0.00%) | $0.00<br>(0.00%) |
| 6.  Phoenix | 1<br>(5.88%) | 1<br>(9.09%) | 1<br>(5.00%) | 0.00% | 3.00 | 00:16:29 | 0.00% | 0<br>(0.00%) | $0.00<br>(0.00%) |
| 7.  Denver | 1<br>(5.88%) | 1<br>(9.09%) | 1<br>(5.00%) | 100.00% | 1.00 | 00:00:00 | 0.00% | 0<br>(0.00%) | $0.00<br>(0.00%) |
| 8.  Coffeyville | 1<br>(5.88%) | 1<br>(9.09%) | 1<br>(5.00%) | 100.00% | 1.00 | 00:00:00 | 0.00% | 0<br>(0.00%) | $0.00<br>(0.00%) |
| 9.  Raleigh | 1<br>(5.88%) | 1<br>(9.09%) | 2<br>(10.00%) | 100.00% | 1.00 | 00:00:00 | 0.00% | 0<br>(0.00%) | $0.00<br>(0.00%) |
| 10. Dallas | 1<br>(5.88%) | 1<br>(9.09%) | 1<br>(5.00%) | 0.00% | 1.00 | 00:01:09 | 0.00% | 0<br>(0.00%) | $0.00<br>(0.00%) |

Rows 1 - 10 of 10

# EXHIBIT 8

(For Claimants' Response and Objection To Wells Fargo's Defacto Motion For More Definite Statement)

